SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
------------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

        -against-

JOSEPH JACKSON,

                        Defendant.
------------------------------------------------------------------------x

AFFIRMATION IN SUPPORT OF MOTION TO VACATE JUDGMENT PURSUANT TO C.P.L. § 440.10(1)(h)

Indictment No. 91607

       SHERYL H. ANANIA, an attorney duly admitted to practice law before the courts of the State of New York, affirms the following under penalty of perjury:

       1.    I am the Executive Assistant District Attorney of counsel to the Honorable Madeline Singas, District Attorney of Nassau County, and Chief of the Conviction Integrity Unit of the Nassau County District Attorney's Office ("NCDA").

       2.    This affirmation is submitted in support of the motion of the Nassau County District Attorney's Office ("NCDA") to vacate defendant Joseph Jackson's judgment of conviction under Indictment 91607. This motion is made pursuant to C.P.L. § 440.10(1)(h) and is returnable on February 16, 2018.

       3.    The statements contained herein are made upon information and belief, the source of said information and the basis of said belief being my review of the records of the NCDA, review of the hearing and trial transcripts of this case, review of correspondence sent to the NCDA by defendant Joseph Jackson, and discussions with various individuals about this case, as noted herein.

4. The facts and circumstances underlying defendant's judgment of conviction are as follows. On March 20, 1994, at about 2:00 a.m., Steven Jason and his friend Skwanitra Witherspoon walked out of a party at the American Legion Hall on Sunrise Highway and Guy Lombardo Avenue in Freeport, New York. As the two walked towards a nearby Blimpie's restaurant parking lot, a man approached Mr. Jason and fatally shot him with a revolver.

5. The police were summoned and took statements from various individuals.

6. Ms. Witherspoon was one of the individuals who spoke with the police. She described the shooter as a light-skinned black man, in his early 20's, and wearing a baseball hat and a three-quarter length light-blue jacket. She did not estimate the shooter's height at that time, but at trial described him as between 5'7" to 5'8" tall.

7. Defendant Joseph Jackson is a 6' tall, light-skinned black man. In March 1994, he was twenty-four years old.

8. Maurice Larrea and Glenn Montes also spoke with the police on March 20, 1994, and each provided the police with a signed statement. A copy of Maurice Larrea's statement is attached hereto as Exhibit 1, and a copy of Glenn Montes's statement is attached hereto as Exhibit 2.

9. Maurice Larrea, an off-duty New York City police officer and his friend Glenn Montes drove by the American Legion Hall and witnessed the shooting. Glenn Montes observed two male blacks chasing another male black in the Blimpie's parking lot. As the male black who was being chased got close to the sidewalk, he "ducked" or "dove" to the ground. One of the male blacks who was chasing him stood directly behind him and pointed a gun at

him and fired two to three shots. According to Montes, the second male black was six to seven feet behind the shooter in the middle of the parking lot.

10. Glenn Montes drove past the scene to the next block and Officer Larrea jumped out of the car to call 911 from a phone booth. (The 911 call was not disclosed to the defense.) He then ran back towards the scene of the shooting while Glenn Montes drove back to the scene. Officer Larrea observed a black male running towards him wearing a black leather jacket with a dark colored hooded sweatshirt. He described him to be in his mid-20's. Officer Larrea took out his revolver and told the male to stop. The male stopped and then ran across Sunrise Highway into the OTB parking lot. Officer Larrea yelled to Montes, "That's him, that's the guy." Larrea chased him on foot, and Montes chased him in his car, but the male disappeared. Mr. Montes described the male as, *inter alia*, early 20's, 5'9"-5'10" tall, medium build with a dark brown face.

11. After losing sight of the male they believed to be the shooter, Officer Larrea and Mr. Montes returned to the scene of the shooting where they spoke to Freeport Police Officers. Later that evening they each gave a signed statement (32b) to a detective from the 1st Precinct. These statements were not disclosed to the defense.

12. Nine months later, on December 17, 1994, Nassau County Police Department narcotics detectives arrested Joseph Jackson for selling crack cocaine to a confidential informant on August 9, 1994. He was questioned by Nassau County Homicide Bureau detectives regarding the murder of Steven Jason. They had previously spoken to the defendant's cousin Peddie Jenkins who stated that he witnessed the defendant shoot and kill Steven Jason outside the American Legion Hall on March 20, 1994. After thirty-four hours in

police custody, the defendant signed a fifteen-page confession admitting to the murder of Steven Jason.

13. On March 7, 1997, Joseph Jackson was convicted, after a jury trial, of Murder in the Second Degree, Intimidating a Witness in the First Degree and Hindering Prosecution in the Second Degree. There were three key pieces of evidence introduced at trial against the defendant.

14. The first piece of evidence was the eyewitness testimony of the deceased's girlfriend Skwanitra Witherspoon. She testified that she left a party at the American Legion Hall with the deceased Steven Jason. As they walked to the Blimpie's parking lot next door, she observed a male who she had never seen before approach the deceased and pull out a black revolver which he pointed at the deceased. She did not see anyone else in the parking lot or on the street. She turned around, and while running back to the American Legion Hall, she heard five to six shots ring out. She identified the defendant in court as the man she observed in the early morning of March 20, 1994 pointing a gun at the deceased Steven Jason. She also testified that she identified the defendant in a line-up on April 11, 1995.

15. The second piece of evidence came from the defendant's cousin Peddie Jenkins, an accomplice, who provided the motive for the murder and claimed to be an eyewitness. Mr. Jenkins testified that the defendant shot and killed the deceased Steven Jason to prevent him from testifying against the defendant's close friend Tony Jackson. Mr. Jackson was in jail pending indictment for shooting Steven Jason. Mr. Jason was murdered two days before he had been scheduled to testify in the Grand Jury. Mr. Jenkins testified that he told the defendant when the deceased would be leaving the party at the American Legion and observed the

defendant shoot the deceased. Mr. Jenkins later pled guilty to Criminal Facilitation in the Second Degree and was sentenced to two to six years imprisonment.

16. The third piece of evidence was the defendant's confession to Nassau County Police Homicide Detective Robert Dempsey. On December 17, 1994, at about 12:30 p.m., defendant Joseph Jackson was arrested for selling crack. He was subsequently brought into the homicide bureau and questioned about Steven Jason's murder. The next day, December 18, 1994, still in police custody, defendant admitted that he had shot Steven Jason, and provided a fifteen-page signed confession. He said, *inter alia*, that he had shot Steven Jason out of love for his friend Tony Jackson, who had asked defendant, through an intermediary, to stop Steven Jason from testifying against him at a grand jury hearing. As described in the written statement, defendant said that immediately after he shot Mr. Jason he jumped into a car parked in the Blimpie's parking lot and was driven away. *See* confession signed by Joseph Jackson, attached hereto as Exhibit 3. Defendant also signed a police-issued card that set forth his *Miranda* rights.

17. Prior to trial, the defense was provided with a Freeport Police Department Incident Report that named Maurice Larrea and Glenn Montes as witnesses. Their phone numbers, along with Montes's address, were also provided. The Incident Report states that Larrea was an off duty New York City Police Officer who was in foot pursuit of a male black who was at the place of occurrence when the shooting occurred. It also states that Officer Larrea canvassed the area where he last observed "the subject" running. The Report also named Glenn Montes as being with Officer Larrea and that Montes saw "the subject" shooting the deceased while Montes was driving past the scene of the shooting. The report noted that

5

both witnesses had "responded to HQ to give 32 B's." Those 32b statements of Maurice Larrea and Glenn Montes were not provided to the defense.

18. Defendant was tried by a jury in Nassau County, and convicted of all the crimes with which he had been charged. He was sentenced in March 1997 to an indeterminate term of imprisonment of twenty-five years to life on the murder conviction, and to lesser sentences on the other convictions (Boklan, J., at trial and sentence).

19. In a letter dated June 29, 2017, Joseph Jackson wrote to the NCDA Conviction Integrity Unit and asked for review of his "wrongful conviction." Defendant contended that detectives had coerced and fabricated his confession. He stated also that after making a request pursuant to the Freedom of Information Law, he received a copy of the 32b statements of Maurice Larrea and Glenn Montes. Defendant stated that those statements constituted *Brady* material because they contained differing descriptions of the perpetrator, and those statements had not been provided to him by the NCDA.

20. After receiving defendant's letter, I spoke about the case with the Assistant District Attorney (A.D.A.) who had been the prosecutor at defendant's trial. He did not remember seeing the statements of Maurice Larrea and Glenn Montes, neither of whom had testified at trial.

21. I searched defendant's case file maintained by the NCDA and did not see those 32b statements therein.

22. Pursuant to my request, the A.D.A. contacted the Freeport Police Department about the 32b statements. The Freeport Police Department found those statements in its file, and provided them to the NCDA. In addition, the A.D.A. obtained the Nassau County Police

Department's homicide file pertaining to defendant's case, which also contained those 32b statements.

23. I spoke with Maurice Larrea over the telephone on October 2, 2017. He recalled the shooting, having seen the shooter, and chasing a man to the OTB parking lot. He assumed that he chased the shooter, but there was a time where he lost sight of the man. He was unable to identify the man he had been chasing. He said that after giving his 32b statement on the day of the murder, no one contacted him until five years ago when he heard from a defense attorney. Other than that one time, I was the only person to reach out to him about the case.

24. On October 19, 2017, I spoke with Glenn Montes over the telephone. In regard to the March 20, 1994 shooting, he recalled driving east on Sunrise Highway, and seeing people on the sidewalk near the American Legion Hall. He saw someone run out of the hall, a gun flash, and someone fall down. The shooter stood over that person, and then ran across Sunrise Highway. Mr. Montes chased after the shooter by car until the man climbed over a fence. Mr. Montes is "100% sure" that the man he chased was the shooter. Mr. Montes said that, after he gave a statement to the police about the shooting, no one contacted him about the matter until about five years ago when he heard from a defense attorney. He heard nothing after that until I contacted him.

25. On October 24, 2017, I spoke with Skwanitra Witherspoon over the telephone. She said that she could not remember much about the case because she had suffered a stroke in 2002. She recalled, however, that Steven Jason escorted her out of the American Legion Hall, and as they walked to a parking lot, a man approached Mr. Jason and pointed a gun at

him. Mr. Jason told her to run, and she fled back to the hall, hearing gunshots en route. She remembers describing the shooter, but does not recall the description she gave. She had never before seen the shooter. She did not recall viewing a photo array or a lineup, but remembered testifying and identifying a man in court. She is "positive" that the man she identified was the shooter.

26. On November 1, 2017, I interviewed Peddie Jenkins over the telephone. Mr. Jenkins stood by his trial testimony, in which he identified the defendant as the shooter of Steven Jason.

27. I spoke with the assigned detective, now retired, Gary Abbondandelo as well as retired detective Robert Dempsey about defendant's case. Neither one remembered the 32b statements of Messrs. Larrea and Montes.

28. On January 9, 2018, I spoke with defendant Joseph Jackson in prison. His attorney, Scott Brettschneider, was present for the conversation. Mr. Jackson said that he received the 32b statements after making a FOIL request to the Nassau County Police Department. He received the 32bs in 2007. He wrote to various defense attorneys and the Exoneration Initiative but no one responded to him. He wrote to the Nassau County Conviction Integrity Unit in June 2017 for the first time.

29. For reasons more fully set forth in the accompanying memorandum of law, defendant's judgment of conviction should be vacated pursuant to C.P.L. § 440.10(1)(h). The statements of Police Officer Larrea and Glenn Montes, although not contained in the files of the Nassau County District Attorney's Office, nonetheless constitute *Brady* material that should have been disclosed to the defense prior to trial.

30. Furthermore, after careful consideration of numerous factors including the age of the case, the limited recollection of witness Skwanitra Witherspoon, and the varying accounts (which were disclosed prior to trial) of Peddie Jenkins, the NCDA does not intend to retry Joseph Jackson.

WHEREFORE, the Court should issue an order vacating Joseph Jackson's March 7, 1997, judgment of conviction.

Dated: Mineola, New York
February 9, 2018

_____
SHERYL H. ANANIA