UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JOSEPH JACKSON,

Plaintiff,

-against-

NASSAU COUNTY; THE INCORPORATED VILLAGE OF FREEPORT; DETECTIVE ROBERT DEMPSEY; DETECTIVE GARY ABBONDANDELO; DETECTIVE JOHN M. HOLLAND; DETECTIVE MICHAEL HERTS; DETECTIVE MARTIN ALGER; DETECTIVE ANTHONY SORRENTINO; DETECTIVE DAVID L. ZIMMER; POLICE OFFICER MELENDEZ; LIEUTENANT BURDETTE; SERGEANT MCHALE; SERGEANT NOLL; DETECTIVE SHARKEY; POLICE OFFICER DOWDELL; POLICE OFFICER BARRY MCGOVERN; DETECTIVE TURNER; DETECTIVE EDWARD HAGGERTY; POLICE OFFICER HALL; DETECTIVE LAURETTE KEMP; DETECTIVE WILLIAM TWEEDY; DETECTIVE ANTHONY KOSIER; DETECTIVE SERGEANT DAN SEVERIN; DETECTIVE JERL MULLEN; THE ESTATE OF DETECTIVE JERL MULLEN; JOHN DOE, AS THE ADMINISTRATOR OF THE ESTATE OF JERL MULLEN; and JOHN and JANE DOE 1 through 20,

Defendants.

**FIRST AMENDED COMPLAINT**

Jury Trial Demanded

18 CV 3007 (JS) (GRB)

Plaintiff Joseph Jackson, by and through his attorneys, the law firm of Elefterakis, Elefterakis & Panek, alleges as follows:

## INTRODUCTION

1.      Plaintiff Joseph Jackson spent over 23 years incarcerated on murder and related charges in connection with the shooting death of Steven Jason in Freeport, New York on March 20, 1994.

2.      Mr. Jackson, however, had no involvement in the crime.

3.      This injustice resulted from a series of intentional acts by the individual defendants, outlined herein, with participation and knowing approval of supervisors up the chain of command, and as a direct consequence of unconstitutional policies, practices and customs maintained by defendants County of Nassau and Incorporated Village of Freeport.

## NATURE OF THE ACTION

4.      This is an action to recover money damages arising out of the violation of plaintiff's rights under the Constitution.

## JURISDICTION AND VENUE

5.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States and the laws of the State of New York.

-2-

6.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343 and 1367(a).

7.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## NOTICE OF CLAIM

8.     Within ninety days after the claim alleged in this complaint arose, written notices of claim were duly served upon defendants.

9.     At least thirty days have elapsed since the service of the notices of claim, and adjustment or payment of the claims has been neglected or refused.

10.     This action has been commenced within one year and ninety days after the happening of the events upon which the claims are based.

## JURY DEMAND

11.     Plaintiff demands a trial by jury in this action.

## PARTIES

12.     Plaintiff Joseph Jackson is a resident of Nassau County in the State of New York.

13.     Defendant County of Nassau is a county within the State of New York. It operates the Nassau County Police Department ("Nassau PD" or "NCPD"), a department or agency of defendant County responsible for the appointment, training, supervision, promotion and discipline of police officers and supervisory police officers, including several of the individually named defendants herein.

-3-

14.     Defendant Incorporated Village of Freeport ("Freeport") is a village in the town of Hempstead within the County of Nassau. Freeport operates the Village of Freeport Police Department ("Freeport PD"), a department or agency of defendant Freeport responsible for the appointment, training, supervision, promotion and discipline of police officers and supervisory police officers, including several of the individually named defendants herein.

15.     The individual defendants, at all times relevant herein, were officers, employees and agents of the NCPD and/or Freeport PD. The individual defendants are sued in their individual and official capacities.

16.     At all times relevant defendants John and Jane Doe 1 through 20 were police officers, detectives or supervisors employed by the NCPD and/or Freeport PD. Plaintiff does not know the real names of defendants John and Jane Doe 1 through 20.

17.     At all times relevant herein, defendants John and Jane Doe 1 through 20 were acting as agents, servants and employees of the County of Nassau and/or Freeport. Defendants John and Jane Doe 1 through 20 are sued in their individual and official capacities.

18.     At all times relevant herein, all individual defendants were acting under color of state law.

-4-

## STATEMENT OF FACTS

19.     On March 20, 1994, at approximately 2:00 a.m., Steven Jason walked out of the American Legion Hall on Sunrise Highway and Guy Lombardo Avenue in Freeport, New York.

20.     In the vicinity of a nearby Blimpie's restaurant, Mr. Jason was fatally shot.

21.     One alleged eyewitness, Skwanitra Witherspoon, described the shooter as 5'7" to 5'8" tall.

22.     Another eyewitness, Martha Campbell, described the shooter as 5'8".

23.     Plaintiff Joseph Jackson is a 6' tall African-American man with a very light complexion.

24.     Two men – Maurice Larrea, an off-duty NYPD officer, and his friend Glenn Montes – also witnessed the shooting and gave detailed written statements to police that morning.

25.     In their statements, Larrea and Montes explain that after witnessing the crime and pursuing a 5'9"-5'10" black male perpetrator with a "dark brown face," they called 911 from a payphone.

26.     Most of the individual defendants were at the crime scene and involved in taking witness statements, canvassing the area with Montes and Larrea and conducting

the preliminary manhunt investigation – these include defendants Abbondandelo, Holland, Herts, Zimmer, Melendez, Burdette, McHale, Noll, Dowdell, McGovern, Turner, Mullen, Hall, Tweedy and Severin.

27.     The Montes statement was taken by defendant Holland.

28.     The Larrea statement was taken by defendant Herts.

29.     Martha Campbell's statement was taken by defendant Zimmer.

30.     Skwanitra Witherspoon gave statements to defendants Tweedy, McGovern and Mullen.

31.     Defendants Melendez and Hall canvassed the area with Montes and Larrea.

32.     Despite the deeply exonerative character of the evidence, and their affirmative obligation to disclose it, defendants and their agents hid and withheld the existence of eyewitnesses Montes and Larrea and their detailed written statements from plaintiff, to whom they were never disclosed.

33.     Thereafter, defendants engaged in extensive efforts to frame Joseph Jackson for the Steven Jason murder.

34.     Defendants Dempsey, Abbondandelo and Alger, among others, corruptly persuaded Peddie Jenkins, plaintiff's cousin, and Roy and Tyrone Isaac to provide statements falsely implicating Mr. Jackson in the Jason murder.

35.     The defendants also attempted to persuade others, including a barber known as "Woody" to falsely implicate Mr. Jackson in the Jason murder.

36.     Nine months later, on December 17, 1994, defendants including Haggerty, Kemp and Sorrentino arrested Mr. Jackson for a purported drug sale offense so that he could be isolated and interrogated by defendants including Dempsey, Abbondandelo, Herts, Mullen, Severin and Sharkey.

37.     Even though defendants knew that plaintiff was represented by counsel, they acted to intentionally circumvent and deny plaintiff his right to counsel, so that a false confession could be extracted from him. Defendants, including Severin and Sharkey, provided false information to Mr. Jackson's relatives while he was in custody to prevent them from learning his whereabouts and obtaining counsel for him.

38.     While isolated over the course of approximately forty hours, plaintiff was beaten, threatened and coerced into signing a fifteen-page false confession prepared by police.

39.     During this time, defendant Kosier, in coordination with other defendants, purported to administer a polygraph examination of Mr. Jackson with the corrupt intention of using the test and its results to pressure Mr. Jackson into signing a statement falsely implicating himself in the murder.

40.     Defendants Mullen and Dempsey each physically assaulted plaintiff without provocation or justification during the interrogation.

41.     The inhumane treatment to which plaintiff was subjected included several hours spent in a frigid interrogation room while stripped to his underwear.

42.     The defendants, particularly Dempsey, are known to have procured false confessions through improper tactics on prior occasions, with devastating results. *See Restivo v. Hessemann*, 846 F.3d 547, 554 (2d Cir. 2017), *cert. denied,* 138 S. Ct. 644, 199 L. Ed. 2d 528 (2018) (Upholding $43 million award to innocent plaintiffs also assaulted and coerced into falsely confessing by NCPD detectives including Robert Dempsey, causing each man to sustain 18 years of wrongful incarceration).

43.     Defendants from NCPD and Freeport PD conspired with and assisted each other in framing plaintiff for the Steven Jason murder.

44.     For example, at a hearing on November 8, 1995, defendant Abbondandelo, who was undoubtedly aware of the existence of eyewitnesses Montes

and Larrea as the lead investigator at the scene following the Jason murder, provided false sworn testimony and concealed the critical eyewitnesses whose testimony exonerated plaintiff:

> **Q:** Detective, I'm going to direct your attention to the on-the-scene investigation that you discussed, which took place on March 20, 1994 regarding the death of Steven Jason?
>
> **A:** Yes, sir.
>
> **Q:** Can you tell me what detective from the homicide squad was assigned to the investigation?
>
> **A:** I was, sir.
>
> **Q:** You were the primary detective; is that right?
>
> **A:** Yes, sir.
>
> **Q:** During the course of your investigation at the scene, did you determine whether there were any eyewitnesses to this incident?
>
> **A:** Yes, sir.
>
> **Q:** Can you tell me how many eyewitness were identified as eyewitnesses to this incident?
>
> **A:** There was one, to my knowledge.
>
> **Q:** Was that Ms. Witherspoon?
>
> **A:** That's correct.

45. After being deprived of key *Brady* material, plaintiff, who is factually innocent of any involvement in the Steven Jason murder, was tried and convicted, on March 7, 1997, of Murder in the Second Degree, Intimidating a Witness in the First Degree and Hindering Prosecution in the Second Degree.

46.    The only evidence offered against plaintiff at trial was his coerced false confession and the incredible and inconsistent testimony of two purported witnesses, each of whom was corruptly influenced by the defendants and offered enticements in exchange for their testimony. Peddie Jenkins, who may well have been the true perpetrator, was given a lenient deal in exchange for his testimony.

47.    The second trial witness, Ms. Witherspoon, offered testimony that is incredible as a matter of law.

48.    The defendants knew that the trial witnesses offered false testimony, but nevertheless suborned it, violating plaintiff's right to due process and a fair trial.

49.    Defendants also, *inter alia*, deprived plaintiff of evidence needed to prove his alibi.

50.    In March 1997, Justice Boklan sentenced plaintiff to twenty-five years to life on the murder conviction, and to lesser sentences on the other convictions.

51.    Many years later, plaintiff obtained the Larrea and Montes witness statements (but not their 911 call) through a FOIL request and brought them to the attention of the Nassau County DA's Conviction Integrity Unit ("CIU").

52.    After an investigation, the CIU concluded that *Brady* violations had occurred, and that plaintiff had been wrongfully convicted.

53.     The CIU also confirmed that the withheld *Brady* material was contained in the files of both the Freeport PD and NCPD.

54.     On February 14, 2018, the CIU filed a motion to set aside plaintiff's conviction.

55.     The motion was granted, the indictment was dismissed, and plaintiff was released, on February 16, 2018.

56.     As indicated in the memorandum filed by prosecutors in support of their motion to vacate Mr. Jackson's criminal judgment, the Montes and Larrea statements constitute newly-discovered evidence within the meaning of N.Y.C.P.L. § 440.10 and the Nassau County DA's office has reason to believe Mr. Jackson is innocent.

57.     Such circumstances, taken together with the defendant officers' broad record of misconduct (discussed further below), is "indicative of innocence" and supports the conclusion that the criminal proceedings were favorably terminated.

58.     As a result of defendants' misconduct, plaintiff spent over 23 years incarcerated, including years spent in solitary confinement.

## THE SCIENCE OF FALSE CONFESSIONS

"Our distrust for reliance on confessions is due, in part, to their decisive impact upon the adversarial process. Triers of fact accord confessions such heavy weight in their determinations that the introduction of a confession makes the other aspects of a trial in court superfluous, and the real trial, for all practical purposes, occurs when the confession is obtained. No other class of evidence is so profoundly prejudicial. Thus the decision to confess before trial amounts in effect to a waiver of the right to require the state at trial to meet its heavy burden of proof."

*Colorado v. Connelly*, 479 U.S. 157, 182 (1986) (Brennan, J., dissenting) (citations and quotation marks omitted).

59. New York State has an above-average rate of false confessions.

60. In exonerations based on DNA evidence in New York State, of which there have been approximately thirty, false confessions appear in nearly 50% of cases.

61. The best scientific estimate of the nationwide false confession rate is in the range of 20-25%, with a much higher rate in murder cases.

62. The leading academic researcher is Professor Saul M. Kassin, of the John Jay College of Criminal Justice and Williams College, who, in 1985, with Lawrence S. Wrightsman, established a framework of three types of false confessions: voluntary, compliant and internalized, that has gained widespread acceptance.

63. According to Professor Kassin, a compliant false confession is where "the suspect acquiesces in order to escape from a stressful situation, avoid punishment, or gain a promised or implied reward." Such false confessions are common even in the absence of physical violence, which guarantees them.

-12-

64.     The quintessential compliant false confession case is that of the Central Park Five, youths who in 1989 were convinced by detectives that they would be brought straight home if they falsely admitted to peripheral involvement in a jogger's brutal rape. The teens were instead convicted and sentenced, only to be exonerated years later through DNA evidence.

65.     Even when conducted legally, American-style police interrogation is a psychologically oriented, guilt-presumptive process in which lying is permitted and suspects are intentionally isolated and confronted.

66.     The literature describes police interrogation as an inherently asymmetrical social interaction "led by an authority figure who holds a strong *a priori* belief about the target and who measures success by the ability to extract an admission from that target."

67.     Researchers have identified "situational risk factors," that increase the likelihood of false confession, including the presentation of false evidence, extended interrogations without rest, and the use of misinformation.

68.     In replicable peer-reviewed experiments, innocent individuals presented with false evidence are found nearly twice as likely to give a false written confession, doing so at a rate of 94%.

69.     A suspect's profile may also increase their "dispositional vulnerability," or the likelihood that they will succumb to even legal interrogation tactics.

70.     Another identified cause of false confessions is the inability of police interrogators to accurately recognize when someone is lying. Studies show that law enforcement officers have little to no increased ability to detect false statements.

71.     Kassin tells the story of Jeffrey Deskovic, who spent 15 years in prison after he falsely confessed to a murder before being exonerated by DNA evidence. In relenting to pressure and offering a false confession, Deskovic believed that "truth and justice would prevail" and that his innocence would be discovered: "I thought it was all going to be okay in the end."

## DEFENDANTS' MALICE AND DELIBERATE INDIFFERENCE

72.     As described above, defendants withheld exculpatory evidence, corruptly influenced witnesses, coerced a confession from plaintiff and concealed the misconduct that pervaded the investigation.

73.     Defendants knew or should have known that they did not have probable cause to arrest and prosecute plaintiff because they deliberately used constitutionally impermissible practices to manufacture evidence against him that they knew to be false, and that was contradicted by withheld exculpatory evidence. There was no physical, circumstantial or credible testimonial evidence linking plaintiff to the crime. Nevertheless, defendants caused plaintiff to be charged with and convicted for the death of Steven Jason.

74. Defendants procured an indictment against plaintiff in bad faith and conspired to charge him with murder and other crimes, also in bad faith.

75. Plaintiff is innocent and has maintained his innocence from the inception of the criminal prosecution against him.

76. Unfortunately, plaintiff's wrongful conviction was not an isolated incident. By the 1990s, the NCPD and Freeport PD were well aware that arrests and prosecutions tainted by police falsifications were a major problem—one that had been the subject of numerous lawsuits, civil settlements, and excoriating judicial opinions.

> Here, whether County policymakers constructively acquiesced in the alleged constitutional abuses of its homicide detectives is an issue for the jury. Plaintiffs' evidence demonstrates the following: the County had almost immediate notice that Restivo had been physically assaulted during his interrogation, yet no investigation was made into Restivo's allegations (R/H Stmt. of Disputed Facts ¶¶ 59–65); credible allegations that detectives planted hair evidence in Restivo's van surfaced at Restivo and Halstead's 1986 criminal trial, yet the County conducted no investigation (*id.* ¶¶ 67–70); in 1995, the County learned that Volpe elicited a false confession from a murder suspect (which eventually resulted in a civil settlement) but did not investigate or discipline him (*id.* ¶¶ 71–76); in 2004, a civil jury found that Dempsey was responsible for malicious prosecution of a suspect from whom Dempsey had elicited a false confession, but Dempsey was never investigated or disciplined (*id.* ¶¶ 77–87); the County settled a 2002 civil suit arising out of an alleged 2001 false confession of a suspect in a different murder

-15-

investigation (*id.* ¶¶ 88); *see also Martinez v. Cnty. of Nassau,* No. 02–CV–4985 (JS) (WDW)); and, prior to the Fusco investigation, a manslaughter conviction was reversed because of an illegal confession obtained by NCPD detectives, *see People v. Evans,* 70 A.D.2d 886, 888, 417 N.Y.S.2d 99, 101 (2d Dep't 1979).

This evidence—especially the failure to investigate or discipline detectives involved in false confessions— suggests that the County had a "custom whereby it acquiesced in unconstitutional conduct by its officers." *Okin,* 577 F.3d at 440. Defendants chiefly argue that evidence concerning the three false confession cases that followed the Fusco investigation cannot establish what the County's policy was years earlier in 1985. (Def. Reply 12–13.) In the Court's view, however, these later cases can be probative of policymakers' attitudes at the time of the Fusco case. *Jones,* 2012 WL 3104523, at *10 ("It is not unreasonable to infer that Town officials who were indifferent to such abuse in 2000 might have held similar attitudes three years earlier."); *see also Chepilko v. City of N.Y.,* No. 06–CV–5491, 2012 WL 398700, at *15 (E.D.N.Y. Feb. 6, 2012) ("Subsequent or contemporaneous conduct can be circumstantial evidence of the existence of preceding municipal policy or custom."). Obviously the gap between the initial Fusco investigation and the later false confession cases is greater than the three-year gap discussed in *Jones,* but at least two of the later cases involved detectives (Volpe and Dempsey, respectively) who had a hand in the Fusco case. And, in any event, the timing is a matter of weight for the jury.

*Kogut v. Cty. of Nassau*, 06 CV 6695 (JS) (WDW), 2012 WL 3704710, at *2-3 (E.D.N.Y. Aug. 27, 2012).

77. At his deposition on June 14, 2011, John Restivo testified about his own experience in the interrogation room with defendant Dempsey:

> After being assaulted by defendant Dempsey, I demanded to leave. They wouldn't let me leave. I demanded to make a phone call. They wouldn't let me make a phone call. I demanded to make a phone call to a lawyer. They told me I didn't need a lawyer. They told me "You don't have any rights here."

78. On June 17, 1997, high school student Shonnard Lee was arrested, taken to NCPD headquarters, and placed in the hands of Dempsey and another detective, who proceeded to interrogate him for seven hours without first advising him of his Miranda rights. The detectives interrogated him about the murder of Sammy Jones; when he denied any knowledge and told them he had been with his brother that night, the detectives called him a liar, screamed at him, and abused him until Lee broke down crying. They also denied his repeated requests to contact his mother and an attorney.

79. Lee's mother called the NCPD headquarters repeatedly during his interrogation and was told that they had no information about him. Finally, after midnight, a detective admitted to her that Lee was at the homicide bureau. Lee's mother told the detective she spoke to that Lee was represented by counsel and that she wished to speak to Lee immediately. She was not allowed to speak to Lee and the interrogation continued.

80.    Finally, Dempsey left the room, came back with some paperwork, and told Lee that he needed to sign the pages if he wanted to go home. Lee signed at 1:20 a.m., having been in custody for almost 7 hours. That paperwork contained a document handwritten by Dempsey purporting to be a statement by Lee confessing to having murdered Jones with a baseball bat.

81.    Lee never gave any such statement.

82.    Dempsey also interrogated one of Lee's friends, Tajuan Crum, without giving him his Miranda warnings, and even after confirming Crum's alibi, threatened Crum that he would be charged himself unless he signed a statement, written by Dempsey, implicating Lee. "Scared to death," Crum signed the statement.

83.    Additionally, Dempsey falsified a statement from Winona Hammonds, falsely reporting that she had told Dempsey that she overheard Crum and Lee bragging about killing Jones.

84.    Additionally, Dempsey suborned another witness, Jeffrey Bourne, into giving false testimony against Lee alleging that Lee had told Bourne he killed Sammy Jones.

85.    Dempsey did all this despite the fact that four months before Lee's arrest another witness, Ragan Martin, identified Sammy Jones's killer for Dempsey as Corey Jones, also known as "Sha" and "Corey." Martin subsequently showed Dempsey Corey

Jones's house, where one of the detectives took a photo of Jones's Camaro, and also identified Corey Jones from a photo lineup; that lineup included Lee, but Martin did not identify Lee as involved in the murder.

86.     Lee was charged, indicted, tried and acquitted. At Lee's criminal trial, Dempsey testified that Lee had admitted to the murder, but the jury acquitted Lee.

87.     Lee then brought a civil suit, and in the civil suit, a jury determined that Dempsey maliciously prosecuted Lee and awarded Lee $750,000 in compensatory and $1,250,000 in punitive damages.

88.     Despite this finding by a civil jury that Dempsey had committed serious misconduct, Nassau County never investigated or disciplined Dempsey.

## NASSAU COUNTY AND FREEPORT'S UNCONSTITUTIONAL POLICIES

89.     The unconstitutional and tortious acts of the defendant officers were not isolated incidents. Upon information and belief, there was a custom, policy, pattern and practice of Nassau County and Freeport beginning years before the unjust conviction of Mr. Jackson and continuing throughout his incarceration, of condoning, encouraging, ratifying and acquiescing in the practice of failing to conduct reasonable criminal investigations, conducting unconstitutional interrogations, fabricating evidence including confessions and evidence supporting probable cause, committing perjury, failing to investigate alibi evidence, coercing

-19-

confessions, failing to disclose exculpatory evidence and covering up this unconstitutional misconduct. Upon information and belief, Nassau County and Freeport policymakers were on notice of, but deliberately indifferent to these unconstitutional customs, policies and practices.

90.    Upon information and belief, Nassau County and Freeport, and their policymakers, as well as the individual supervisors in this case, failed to train or supervise investigators to ensure they complied with constitutional requirements in eliciting confessions, disclosing favorable evidence to prosecutors, and obtaining probable cause for arrest and for prosecution, and that they did not fabricate evidence or commit perjury.

91.    Upon information and belief, Nassau County and Freeport, through their final policymakers, failed to adequately screen, supervise, and/or discipline detectives, officers, and investigators.

92.    As a direct and proximate consequence of the aforementioned actions by the defendants, plaintiff suffered over twenty-three years of imprisonment. During his incarceration, he sustained a variety of physical and emotional injuries.

## PLAINTIFF'S INJURIES AND DAMAGES

93.    Mr. Jackson suffered severe emotional and mental anguish and pain as a result of being punished for crimes he did not commit. He was denied effective

treatment for his emotional injuries while incarcerated and continues to suffer mental anguish to this day. For example, plaintiff fears police contact and his everyday activities are limited and disrupted by the traumas he has suffered in this case. He was imprisoned when his grandmother—with whom he had an extremely close relationship before he was incarcerated—passed away.

94.     Plaintiff was also denied the opportunity to pursue normal relationships with, and to enjoy the companionship of, family members and friends. While he was incarcerated, he was denied the opportunity to spend quality time with his family and to develop relationships with his children.

95.     Plaintiff was denied decades of gainful employment and income. His earning power and ability to support himself have been permanently hampered by the years of productive work experience his wrongful imprisonment denied him.

96.     Plaintiff has been publicly shamed, disgraced, ridiculed, and humiliated, in the most extreme manner possible. He was a figure of regional outrage and disdain, for events in which he had no part. Nothing can undo the reputational damage he has sustained.

97.     Plaintiff and his family incurred substantial legal fees during the decades he spent seeking to defend himself and prove his innocence.

98.     Additionally, Mr. Jackson claims, *inter alia*, loss of liberty; loss of enjoyment of life; continuing pain and suffering, including post-incarceration psychological issues; post-incarceration mental health treatment costs; lost earnings while incarcerated; impaired earning capacity and limitations on future employment opportunities; emotional distress; humiliation; indignities; embarrassment; degradation; physical injuries and lack of access to health care while incarcerated; attorneys' fees, and other pecuniary losses; and past pain and suffering; loss of family relationships; and loss of reputation.

## FIRST CLAIM
### Federal Malicious Prosecution

99.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

100.    Defendants acting deliberately and with malice, initiated and took steps to continue the criminal prosecution of Mr. Jackson, without probable cause or other legal justification, by fabricating and coercing a confession they falsely attributed to Mr. Jackson and failing to disclose their misconduct as well as key exculpatory *Brady* material, in knowing disregard of Mr. Jackson's constitutional rights.

101.   There was not even arguable probable cause to arrest or prosecute Mr. Jackson, and no reasonable officer would have believed there was.

102.   Defendants were obligated to, but did not, disclose *Brady* material.

103.   Defendants corruptly influenced witnesses in support of the prosecution.

104.   The prosecution ultimately terminated in Mr. Jackson's favor when his conviction was vacated and the indictment against him was dismissed.

105.   As a direct and proximate result of individual defendants' misconduct, Mr. Jackson was wrongfully convicted and suffered the injuries and damages described above.

### SECOND CLAIM
### Fabrication of Evidence in Violation of 4th and 14th Amendments

106.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

107.   Defendants deliberately fabricated evidence by manufacturing a statement and forcing Mr. Jackson to adopt it in written form and then misrepresenting to prosecutors, in conjunction with their own perjurious testimony, that the statements had originated with Mr. Jackson.

-23-

108.   Defendants intentionally withheld exculpatory evidence from plaintiff and denied and concealed the existence of key witnesses in direct contravention of plaintiff's constitutional rights.

109.   Defendants also tampered with witness testimony in their effort to frame and falsely convict plaintiff.

110.   Such fabrication of evidence violated Mr. Jackson's clearly established Fourteenth Amendment rights to a fair trial and not to be deprived of liberty without due process of law.

111.   As a direct and proximate result of the individual defendants' fabrications, Mr. Jackson was wrongfully convicted and suffered the injuries and damages described above.

**THIRD CLAIM**
**§ 1983 Coercion**

112.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

113.   Defendants isolated Joseph Jackson – denying him the right to counsel, which had attached – and engaged in, *inter alia*, a deliberate course of lies, trickery and deceit, threatening and inflicting bodily harm on plaintiff, giving him false assurances of leniency and making false promises to him.

-24-

114.   Then, despite his protestations of innocence, in a custodial interrogation in which *Miranda* warnings and counsel were withheld, plaintiff's will was ultimately overborn, and defendants induced Mr. Jackson to sign the statement defendants had prepared, falsely incriminating himself in violation of his clearly established Fifth and Sixth Amendment rights to be free from compelled self-incrimination and to be afforded access to counsel.

115.   Defendants' coercive and conscience-shocking interrogation tactics generated false and unreliable evidence used against Mr. Jackson at trial, causing his wrongful conviction and all the injuries set forth above.

## FOURTH CLAIM
### § 1983 Supervisory Liability

116.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

117.   Supervisors, acting deliberately, recklessly and under color of law, were, at the relevant times, supervisory personnel with the NCPD or Freeport PD, with oversight responsibility for training, hiring, screening, instruction, supervision and discipline of the detectives and police officers who deprived Mr. Jackson of his clearly established constitutional rights.

118.   The supervisors were personally involved in both the deprivation of Mr. Jackson's constitutional rights and in creating or condoning the policy or custom of failing to take preventative and remedial measures to guard against such constitutional deprivations.

119.   The supervisors were reckless in their failure to supervise the subordinate defendants, and either knew or should have known that defendant officers were maliciously prosecuting civilians, deliberately failing to investigate evidence pointing to other leads or suspects, fabricating and coercing confessions, suppressing exculpatory evidence, perjuring themselves as witnesses, and depriving civilians of due process of law.

120.   These supervisory defendants knew or in the exercise of due diligence would have known that the conduct of the named and Doe defendants against Mr. Jackson was likely to occur.

121.   The failure of these supervisory defendants to train, supervise and discipline the named individual defendants and the Doe defendants amounted to gross negligence, deliberate indifference or intentional misconduct, which directly caused the injuries and damages set forth above.

## FIFTH CLAIM
### *Monell* Custom and Policy and Failure to Supervise or Train

122.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

123.   The County of Nassau and Freeport, by and through their final policymakers, had in force and effect during the Jason investigation and for years beforehand, a policy, practice or custom of conducting constitutionally inadequate investigations; fabricating inculpatory evidence; perjury; failing to obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; suppressing from prosecutors material information favorable to criminal defendants; failing to follow the duties imposed by *Brady v. Maryland;* and using unconstitutional interrogation tactics.

124.   The County of Nassau and Freeport systemically failed to train their police officers, detectives and investigators to conduct constitutionally adequate investigations; not to lie about their conduct; to accurately document the manner in which interrogations were conducted when confessions were elicited; to obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; to disclose to prosecutors material information favorable to criminal defendants; and to refrain from unconstitutional interrogation tactics and perjury.

125.   The County of Nassau and Freeport failed to adequately supervise their police officers, detectives and investigators in conducting constitutionally adequate investigations; accurately documenting the manner in which interrogations were conducted when confessions were elicited so that confessions were not fabricated; obtaining probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; disclosing to prosecutors material information favorable to criminal defendants; testifying truthfully; and refraining from using unconstitutional interrogation tactics. Officers knew that in this climate of lax supervision, they were free to deviate from constitutional requirements in these areas.

126.   The County of Nassau and Freeport, by and through their final policymakers, failed to adequately discipline their police officers for investigative wrongdoing, though it was foreseeable that constitutional violations of the type Mr. Jackson suffered would be a predictable result of such failures.

127.   As set forth above, final policymakers for the County of Nassau and Freeport had actual or constructive notice of such failures to train, supervise and discipline their employees, and failed to provide training or supervision despite an obvious need for such training and supervision, where defendants knew that it was

foreseeable that detectives, officers, and investigators would predictably confront these situations and as a result of the failure to train and supervise, constitutional violations would result.

128. Such failures to train, supervise and discipline, and such unconstitutional governmental customs, practices and/or policies, amounted to deliberate indifference to the constitutional rights of criminal defendants like Mr. Jackson, and were the moving force behind his false, coerced and fabricated confession and the failure to disclose *Brady* that caused his arrest, prosecution, and incarceration, as well as all the ongoing injuries and damages set forth above.

## SIXTH CLAIM
### State Law Malicious Prosecution

129. Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

130. Defendants, lacking probable cause, nonetheless intentionally, recklessly, and with malice, caused Mr. Jackson to be arrested, prosecuted, and convicted of murder and related charges.

131. Defendants initiated and commenced the prosecution, and took steps to ensure that it continued.

132. Furthermore, the defendant officers intentionally withheld from and misrepresented to prosecutors facts vitiating probable cause against Mr. Jackson, including, *inter alia*, the Larrea and Montes statements.

133. As Mr. Jackson has maintained from the outset, he is innocent of any wrongdoing and had no knowledge of or participation in the charged crimes.

134. The prosecution finally terminated in Mr. Jackson's favor when his conviction was vacated and the indictment against him dismissed.

135. As a direct and proximate result of defendants' actions, Mr. Jackson was wrongly prosecuted, convicted and imprisoned for over twenty-three years, and suffered other grievous and continuing damages and injuries set forth above.

## SEVENTH CLAIM
### State Law False Imprisonment

136. Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

137. Defendants intended to confine Mr. Jackson, and, lacking probable cause or any other privilege, curtailed his liberty by arresting him and taking steps to ensure he was imprisoned on the basis of false evidence and without legal justification.

138. Mr. Jackson was conscious of the confinement, and did not consent to it.

-30-

139.   As a direct and proximate result of defendants' actions, Mr. Jackson was wrongly arrested and falsely imprisoned from December 17, 1994, until he was finally released on February 16, 2018, and suffered the other grievous and continuing damages and injuries set forth above.

## EIGHTH CLAIM
### Intentional or Negligent Infliction of Emotional Distress

140.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

141.   The deliberate conduct of the defendants in coercing and fabricating a false confession for a murder they knew Mr. Jackson did not commit, their ensuing refusal to investigate the matter properly, and their cover-up of the truth, perpetuated in public statements over many years, constitutes the intentional infliction of emotional distress.

142.   In the alternative, defendants' conduct in coercing and fabricating a false confession and covering up the truth breached a duty of care owed to Mr. Jackson as a citizen and as a criminal suspect, which unreasonably endangered his physical safety and caused him to fear for his own safety, constituting the negligent infliction of emotional distress.

143.   Defendants' conduct, falsely implicating Mr. Jackson in the Jason

-31-

murder and subjecting him to public stigma to this day notwithstanding the dismissal of charges against him, caused Mr. Jackson to suffer ongoing, unimaginable emotional distress and traumatic psychological *sequelae*.

## NINTH CLAIM
### § 1983 Conspiracy

144.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

145.   The Nassau County and Freeport defendants agreed to violate provisions of the state and federal constitution and cause the wrongful conviction of Joseph Jackson.

146.   The individual defendants took several overt acts in furtherance of their agreement, including the suppression of exculpatory evidence and fabrication of inculpatory evidence, tampering with witnesses, offering false documents and testimony, arresting Mr. Jackson under false pretenses and impeding his access to counsel, assaulting him and coercing him into falsely confessing.

147.   These acts resulted in a violation of plaintiff's rights to due process and to be free from unlawful search and seizure. Mr. Jackson was wrongfully convicted and spent decades in prison as a consequence.

148.   Accordingly, defendants violated the Fourth, Fifth, Sixth and Fourteenth

Amendments because they conspired to deprive Mr. Jackson of his rights.

149. As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## TENTH CLAIM
### Failure to Intervene

150. Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

151. Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

152. As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff respectfully requests judgment against defendants as follows:

(a) Compensatory damages against all defendants, jointly and severally;

(b) Punitive damages against the individual defendants, jointly and severally;

(c) Reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1988; and

(d) Such other and further relief as this Court deems just and proper.

Dated:     March 8, 2019
           New York, New York

                              Elefterakis, Elefterakis & Panek

                              _____
                              Gabriel P. Harvis
                              Baree N. Fett
                              80 Pine Street, 38th Floor
                              New York, New York 10005
                              (212) 532-1116
                              gharvis@eeplaw.com

                              *Attorneys for plaintiff*