# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JOSEPH JACKSON,<br><br>         Plaintiff,<br><br>    -against-<br><br>NASSAU COUNTY; THE INCORPORATED VILLAGE OF FREEPORT; DETECTIVE ROBERT DEMPSEY; DETECTIVE GARY ABBONDANDELO; DETECTIVE JOHN M. HOLLAND; DETECTIVE MICHAEL HERTS; DETECTIVE MARTIN ALGER; POLICE OFFICER ROBERT MELENDEZ; DETECTIVE WALTER SWENSON; DETECTIVE ANTHONY KOSIER; DETECTIVE SERGEANT DAN SEVERIN; DORA MULLEN, AS ADMINISTRATOR OF THE ESTATE OF JERL MULLEN; JANE DOE, AS ADMINISTRATOR OF THE ESTATE OF ARTHUR ZIMMER; and JOHN and JANE DOE 1 through 20,<br><br>        Defendants. | **SECOND AMENDED COMPLAINT**<br><br>Jury Trial Demanded<br><br>18 CV 3007 (JS) (AKT) |

Plaintiff Joseph Jackson, by and through his attorneys, the law firm of Elefterakis, Elefterakis & Panek, alleges as follows:

## NATURE OF THE ACTION

1. This is an action to recover money damages arising out of the violation of plaintiff's rights under the Constitution.

## INTRODUCTION

2.      Plaintiff Joseph Jackson spent over 23 years incarcerated on murder and related charges in connection with the shooting death of Steven Jason in Freeport, New York on March 20, 1994.

3.      Mr. Jackson, however, had no involvement in the crime.

4.      As described below, the defendants caused Mr. Jackson to be wrongfully convicted of the crime, despite his innocence, by manufacturing eyewitness testimony and coercing plaintiff into falsely confessing while concealing material facts surrounding the murder that would have vindicated plaintiff and likely identified the true perpetrator.

## JURISDICTION AND VENUE

5.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States and the laws of the State of New York.

6.      The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343 and 1367(a).

7.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## NOTICES OF CLAIM

8.     Within ninety days after the claim alleged in this complaint arose, written notices of claim were duly served upon defendants.

9.     At least thirty days have elapsed since the service of the notices of claim, and adjustment or payment of the claims has been neglected or refused.

10.     This action has been commenced within one year and ninety days after the happening of the events upon which the claims are based.

## JURY DEMAND

11.     Plaintiff demands a trial by jury in this action.

## PARTIES

12.     Plaintiff Joseph Jackson was, at all times relevant hereto, a resident of Nassau County in the State of New York.

13.     Defendant County of Nassau is a county within the State of New York. It operates the Nassau County Police Department ("Nassau PD" or "NCPD"), a department or agency of defendant County responsible for the appointment, training, supervision, promotion and discipline of police officers and supervisory police officers, including several of the individually named defendants herein.

14.     Defendant Incorporated Village of Freeport ("Freeport") is a village in the town of Hempstead within the County of Nassau. Freeport operates the Village of Freeport Police Department ("Freeport PD"), a department or agency of defendant

Freeport responsible for the appointment, training, supervision, promotion and discipline of police officers and supervisory police officers, including several of the individually named defendants herein.

15.     Defendants Robert Melendez and Arthur Zimmer were, at all times relevant herein, officers, employees and agents of the Freeport PD. Defendants Melendez and Zimmer are sued in their individual capacities and Zimmer, who is deceased, is being sued through the administrator of his estate (who has not yet been identified).

16.     Defendants Robert Dempsey, Gary Abbondandelo, John M. Holland, Michael Herts, Martin Alger, Walter Swenson, Anthony Kosier, Dan Severin and Jerl Mullen were, at all times relevant herein, officers, employees and agents of the Nassau PD. Defendants Dempsey, Abbondandelo, Holland, Herts, Alger, Swenson, Kosier, Severin and Mullen are sued in their individual capacities and Mullen, who is deceased, is being sued through the administrator of his estate, Dora Mullen.

17.     At all times relevant defendants John and Jane Doe 1 through 20 were police officers, detectives or supervisors employed by the NCPD and/or Freeport PD. Plaintiff does not know the real names of defendants John and Jane Doe 1 through 20.

18.     At all times relevant herein, defendants John and Jane Doe 1 through 20 were acting as agents, servants and employees of the County of Nassau and/or Freeport.

Defendants John and Jane Doe 1 through 20 are sued in their individual and official capacities.

19.    At all times relevant herein, all individual defendants were acting under color of state law.

## EXHIBITS TO THE COMPLAINT

20.    Plaintiff incorporates the following exhibits in support of his complaint:[1]

| | |
|---|---|
| Exhibit 1 | Transcript of Feb. 16, 2018 Proceedings |
| Exhibit 2 | CIU Notice of Motion to Vacate Conviction |
| Exhibit 3 | Affirmation of Sheryl H. Anania |
| Exhibit 4 | CIU Memorandum of Law in Support of Motion to Vacate |
| Exhibit 5 | Nassau County Supreme Court Case Record |
| Exhibit 6 | Letter from Plaintiff to CIU dated June 29, 2017 |
| Exhibit 7 | Plaintiff's 440.10(1)(g) Motion Papers |
| Exhibit 8 | Transcripts of Plaintiff's Hearings and Trial Proceedings |
| Exhibit 9 | Peddie Jenkins Sentencing Minutes and DA Letter |
| Exhibit 10 | Arrest Report Concerning Plaintiff's Arrest on 12/17/1994 |
| Exhibit 11 | Statements Attributed to Skwanitra Witherspoon |
| Exhibit 12 | Statement Attributed to Plaintiff |
| Exhibit 13 | Order denying Plaintiff's Appeal |
| Exhibit 14 | Records of Plaintiff's Polygraph Examination[*] |
| Exhibit 15 | Rosario List |
| Exhibit 16 | Orders Vacating and Dismissing Plaintiff's Indictment |
| Exhibit 17 | Plaintiff's Federal Spoliation Motion Papers |
| Exhibit 18 | Affidavit of Richard "Woody" Miller |
| Exhibit 19 | Peddie Jenkins' First Statement |
| Exhibit 20 | Peddie Jenkins' Second Statement |

---

[1] The exhibits are accessible at ███████████.

[*] Starred exhibits have been designated "confidential" by the County of Nassau, thus prohibiting plaintiff from publicly filing them. If it should please the Court, plaintiff has challenged these designations and the parties are currently conferring on the dispute. If the parties cannot reach agreement, plaintiff intends to seek Court intervention.

Exhibit 21    Statement of Maurice Larrea
Exhibit 22    Statement of Glenn Montes
Exhibit 23    Nassau County Response to 30(b)(6) Deposition Notice
Exhibit 24    Morning Report[*]
Exhibit 25    Detective Swenson Memo Book[*]
Exhibit 26    Records of Takita Dorsey Polygraph Examination[*]
Exhibit 27    Nassau County DA Records of Michael Skillings[*]
Exhibit 28    Ballistic Report[*]
Exhibit 29    Report of Dr. Saul Kassin in *Kogut v. County of Nassau*
Exhibit 30    Nassau County DA Fusco Homicide Memorandum
Exhibit 31    Letter acknowledging Complaint against Robert Dempsey
Exhibit 32    Robert Moore Documents reflecting Mullen Allegations
Exhibit 33    Shonnard Lee Records reflecting Dempsey Allegations
Exhibit 34    [Intentionally Omitted]
Exhibit 35    Excerpts of deposition of Robert Dempsey, Feb. 13, 2009
Exhibit 36    Excerpts of deposition of John Restivo, June 13, 2011
Exhibit 37    Decision of Trial Court in *PSNY v. John Kogut*
Exhibit 38    Statement of Shonnard Lee
Exhibit 39    Excerpts of deposition of Shonnard Lee, Mar. 5, 2001
Exhibit 40    Affidavit of Robert Moore
Exhibit 41    Excerpts of deposition of Robert Moore, Nov. 25, 1997
Exhibit 42    Affidavit of Dorothy Lee
Exhibit 43    Affidavit of Jeffrey Bourne
Exhibit 44    Excerpts of deposition of Ragan Martin, Nov. 8, 2000
Exhibit 45    Disciplinary record of Robert Dempsey (excerpt)
Exhibit 46    March 20, 1994 Crime Scene Log
Exhibit 47    Freeport Incident Report and Melendez Addendum
Exhibit 48    Rough Deposition Transcript of Glenn Montes, Feb. 6, 2020
Exhibit 49    Rough Deposition Transcript of Maurice Larrea, Feb. 6, 2020
Exhibit 50    Notes showing Peddie Jenkins lead[*]
Exhibit 51    Plaintiff's FOIL Requests
Exhibit 52    FOIL Response from NCDA
Exhibit 53    Excerpts of Plaintiff's 50-h Testimony
Exhibit 54    News Articles
Exhibit 55    Indictment
Exhibit 56    Motion to Suppress Confession

## STATEMENT OF FACTS

21.     On March 20, 1994, at approximately 2:00 a.m., Glenn Montes observed two black men chasing Steven Jason in a parking lot adjacent to a Blimpie's restaurant on Sunrise Highway and Guy Lombardo Avenue in Freeport, New York. Exhibits 3-4, 22, 48-49.

22.     According to Montes, the men chased Mr. Jason to the curb of Sunrise Highway, at which point Jason dove to the ground and Montes observed one of the men shoot and kill him. *Id.*

23.     At the time of the shooting, Montes was driving his friend Maurice Larrea, then an off-duty NYPD officer, home from a bachelor party that both men had just attended. *Id.*

24.     Mr. Montes, who directly observed the crime and the shooter, is the only known eyewitness to the murder. *Id.*

[This Space Intentionally Left Blank]



Crime Scene Photo (annotated)

25.     After witnessing the crime, Montes drove to a nearby payphone and Larrea jumped out and called 911, as both men later described in written statements taken by police. *Id.*

26.     Larrea's recorded 911 call and associated records were never obtained or preserved by the government, despite an affirmative duty, and have since been destroyed. *Id.; see* Exhibit 23 (DE #207).

27.    After speaking with 911, Maurice Larrea, who was intoxicated, encountered the shooter running toward him on the sidewalk of Sunrise Highway. Exhibits 3-4, 21-22, 49.

28.    Larrea drew his firearm and stopped the perpetrator. *Id.*

29.    Montes heard Larrea call out "that's him, that's the guy." *Id.*; Exhibit 48.

30.    Montes is "100% sure" that the man Larrea stopped had shot and killed Steven Jason moments earlier. *Id.*

31.    There was only one shooter. Exhibit 28.

32.    Montes describes the shooter as having a "dark brown face" and standing approximately 5'9"-5'10" with "close cut dark short hair."[2] Exhibits 3-4, 21-22, 48-49.

33.    Moments later, the shooter ran across Sunrise Highway and North, in the direction of the Freeport train and fire stations, with Glenn Montes, still in his car, in pursuit. *Id.*

34.    Around the same time, Larrea encountered a Freeport Police Officer, defendant Melendez, whom Larrea knew from growing up in the Village of Freeport. *Id.*

35.    Together, defendant Melendez and Larrea canvassed the area where Larrea had last seen the shooter but did not locate him. *Id.*

---

[2] Plaintiff is a very light skinned African American man standing six feet tall who had dreadlocks in March 1994. *Id.*

36.     After returning to the crime scene, Montes and Larrea went to the Freeport Police Station, where they spent several hours, leaving after 5:00 a.m. *Id.*

37.     By virtue of his upbringing in Freeport, Larrea was acquainted with more than half a dozen of the Freeport officers who responded to the Steven Jason homicide. *Id.*

38.     Larrea revealed his intoxication to multiple officers that night, including Officer Melendez and high-ranking Nassau County police supervisor defendant Dan Severin, with whom he joked about how drunk he was. Exhibit 49, p. 35.

39.     Defendant Herts, of Nassau County, who took a detailed written statement from Larrea that night, also knew the off-duty officer was intoxicated, but did not include that information in the written statement he prepared. Exhibits 21, 49.

40.     From the stationhouse, Larrea called his NYPD supervisors to report the off-duty incident but affirmatively misrepresented himself as having been sober when he drew his weapon. Exhibit 49, p. 60.

41.     As defendants Severin, Melendez, Herts and other John Doe defendant investigators knew at the time, it would have been catastrophic for the budding law enforcement career of their friend, off-duty Officer Larrea, if the NYPD was to learn that Larrea had drawn his firearm while intoxicated and then lied about it to

commanding officers. *Id.* ("I'm not going to have him come and suspend me, you know, for being intoxicated and being involved...").

42.     Defendants, including Melendez, Severin, Herts and Holland – who took the statement from Glenn Montes – took steps to make sure that did not happen to Mr. Larrea by concealing evidence that might reveal Larrea's impairment that night. Exhibit 15.

43.     First, individual defendants, including Herts and Severin, altered the official narrative of the crime to omit any reference to Montes, Larrea or the 911 call. Exhibit 24.

44.     For example, the official "Morning Report" prepared by defendants Severin, Herts and unidentified others hours after Montes and Larrea had left the stationhouse makes no mention of these eyewitnesses or their account. *Id.*

45.     Second, defendants, including Abbondandelo, Dempsey and Mullen, corrupted the account of Skwanitra Witherspoon, a woman allegedly in the vicinity of the shooting but who had not observed it, to suggest that Witherspoon had been the sole eyewitness and had identified plaintiff as the perpetrator. Exhibit 11.

46.     As the Nassau County District Attorney Conviction Integrity Unit ("CIU") noted in its motion to dismiss the indictment decades later, the account

defendants ultimately attributed to Skwanitra Witherspoon is squarely contradicted by the first-hand account of Glenn Montes. Exhibit 4, p. 3.

47.     Defendants' concealment of evidence persisted through plaintiff's trial, and the existence of Montes and Larrea, and their 911 call, were never disclosed, as illustrated by the false sworn testimony of lead homicide detective defendant Gary Abbondandelo at a hearing on November 8, 1995:

> Q:    Detective, I'm going to direct your attention to the on-the-scene investigation that you discussed, which took place on March 20, 1994 regarding the death of Steven Jason?
>
> A:    Yes, sir.
>
> Q:    Can you tell me what detective from the homicide squad was assigned to the investigation?
>
> A:    I was, sir.
>
> Q:    You were the primary detective; is that right?
>
> A:    Yes, sir.
>
> Q:    During the course of your investigation at the scene, did you determine whether there were any eyewitnesses to this incident?
>
> A:    Yes, sir.
>
> Q:    Can you tell me how many eyewitnesses were identified as eyewitnesses to this incident?
>
> A:    There was one, to my knowledge.
>
> Q:    Was that Ms. Witherspoon?
>
> A:    That's correct.

Exhibits 8, 17, 21-23, 46; *see also* Exhibits 3-4.

48.     Third, defendants, including Nassau County detective defendant Walter Swenson, suppressed evidence that might have led back to Larrea (or Montes), including, for example, the account of Elisa Valdez, who reported to defendant Swenson on March 23, 1994 that she and her boyfriend had heard shots fired and seen an automobile in pursuit of a male suspect heading Northbound the night before, consistent with the accounts of Montes and Larrea. Exhibits 15, 25.

49.     The individual defendants, including Swenson, concealed the existence of Ms. Valdez, her companion and the information these witnesses possessed and never disclosed documents, including Swenson's memo book, that would have led to the discovery of these witnesses. Exhibits 15, 25.

50.     Other exonerative evidence was also suppressed and concealed from plaintiff, including a 36-minute recorded interview on June 6, 1994 between defendant Arthur Zimmer, then a detective in the Freeport Police Department, and Peddie Baldwin, a potential eyewitness to the homicide.[1]

51.     In the suppressed recorded conversation, Baldwin provides several leads that support plaintiff's innocence, and Baldwin notes being present for the crime (along with others) and observing the perpetrator as a 5'8" Puerto Rican.

---

[1] Accessible at https://bit.ly/2Ul4Hs9.

52.    All witnesses known to have been in the vicinity of the Steven Jason homicide describe seeing a man shorter than 5'10", with several of them describing the man as 5'7".

53.    As indicated above, Mr. Jackson is a six-foot-tall, light skinned African American man who had dreadlocks in March 1994. Exhibits 3-4.

54.    Defendants' suppression of the Zimmer-Baldwin Interview and statement of Elisa Valdez, alongside the suppressed Montes/Larrea/911 evidence, constitute *Brady* violations.

[This Space Intentionally Left Blank]

55.     The theory of the crime ultimately developed by police is at fundamental odds with the account of Montes, Larrea and Valdez and involves a perpetrator fleeing Southbound in a vehicle instead of Northbound on foot. *See* Exhibit 12.



56.     In or about October 1994, Peddie Jenkins, plaintiff's cousin who is approximately 5'8" with darker skin, was reported to police after he was overheard

bragging at his high school that he had been involved in the Steven Jason murder. Exhibit 50.

57.    Jenkins, who had open criminal cases and is a known liar, was arrested and allegedly provided a statement to defendants Dempsey, Mullen and Abbondandelo on November 15, 1994.

58.    Jenkins' alleged 11-page November 15th statement is an admitted fabrication in which Jenkins claims he did not observe the murder, but personally facilitated it. Exhibit 19.

59.    In the statement, Jenkins, likely the perpetrator, admits to fleeing Northbound toward E. Dean Street on foot after the crime was committed, consistent with the shooter's direction of flight according to Montes, Larrea and Valdez. *Id.*

60.    Without ever consulting with Montes or Larrea or investigating the crime as it took place – and as in other documented cases involving the same defendant officers – defendants Mullen, Abbondandelo, Dempsey, Alger and John Doe others corruptly coordinated the accounts of Peddie Jenkins and Skwanitra Witherspoon to manufacture the identification of Joseph Jackson as the alleged perpetrator, notwithstanding stark disparities in, *inter alia*, height, complexion, and hairstyle.

61.     Indeed, had Glenn Montes been appropriately consulted, Mr. Montes would have exonerated plaintiff and made plaintiff's conviction impossible; defendants did not consult Mr. Montes. Exhibits 48, 2-4.

62.     Three days later defendants, including Abbondandelo, Dempsey, Mullen and Alger, caused Peddie Jenkins to prepare a second 15-page statement with a wholly different account. Again, the second statement contains admissions of Jenkins' participation in the crime, but this later statement includes the allegation that Jenkins observed plaintiff commit the murder.[3] Exhibit 20.

63.     In exchange for the statement and testimony against plaintiff, Jenkins was only charged with criminal facilitation and, on the State's recommendation, received a very lenient sentence on that charge.[4] Exhibit 9.

64.     Consistent with prior allegations as outlined below, defendants, including Alger, Abbondandelo, Mullen, Herts, Dempsey and Swenson also attempted to

---

[3] In both statements (and in his trial testimony), Jenkins describes Steven Jason as being alone when leaving the American Legion Hall and at the time of his death, irreconcilably contradicting Skwanitra Witherspoon's narrative.

[4] The deal given to Peddie Jenkins in 1997 left him free to commit other crimes. See Lehman, Don, THE POST STAR, Feb. 16, 2002, Man gets seven years in prison for stabbing (accessible at: https://bit.ly/2wAB8Wd) ("Police said [Peddie Jenkins] went into the apartment and was waiting for [his girlfriend] that morning, sparking a dispute that ended with him chasing [his girlfriend] - carrying one of the couple's two young children - down a flight of stairs and into the street, stabbing her in the back at least twice with a kitchen knife.").

persuade others, including Richard "Woody" Miller, a barber, and two brothers, Tyrone and Roy Isaac, to falsely implicate plaintiff in the Steven Jason murder. Exhibit 18.

65.   Realizing that Woody's testimony exonerated Mr. Jackson, detectives suppressed it. *Id.*

66.   On December 17, 1994, Mr. Jackson was arrested and brought to the Nassau County Homicide squad for interrogation by defendants, including Robert Dempsey, Gary Abbondandelo, Anthony Kosier and Jerl Mullen. Exhibit 10.

67.   Even though these defendants knew that plaintiff was represented by counsel, they acted to intentionally circumvent and deny plaintiff his right to counsel, so that a false confession could be extracted from him. Exhibit 56.

68.   Defendants, including Severin and John Doe others, provided false information to Mr. Jackson's relatives while he was in custody to prevent them from learning his whereabouts and obtaining counsel for him. Exhibit 8 at, *e.g.*, P1062-64.

69.   While isolated over the course of thirty-nine hours, defendants Dempsey, Mullen and Abbondandelo beat and threatened plaintiff and, along with defendant Kosier and John Doe others, lied to and coerced plaintiff into signing a fifteen-page false confession written by defendant Dempsey. *Id.*

70.     These defendants subjected plaintiff to inhumane treatment including forcing him to spend several hours in a frigid interrogation room while stripped to his underwear. *Id.*

71.     The resulting false confession, attributed to Mr. Jackson, is provably false.

72.     First, it conflicts with the direct observations of Glenn Montes inasmuch as plaintiff bears no physical resemblance to the perpetrator.

73.     Second, it contradicts eyewitnesses Maurice Larrea, Glenn Montes and Elisa Valdez, as each reported a black male fleeing Northbound on foot, as opposed to Southbound by car.

74.     Third, it is broadly discredited by the polygraph results of Takita Dorsey who, according to the false confession, was a key player in the murder conspiracy. Exhibit 26.

75.     As in other tragic cases with which these defendants have been involved, Mr. Jackson did not author the statement attributed to him.

## PRIOR SIMILAR ALLEGATIONS OF MISCONDUCT

76.     Plaintiff's mistreatment was not an isolated incident. Similar misconduct by the defendants involved in plaintiff's interrogation have been the subject of numerous lawsuits, civil settlements, news reports and excoriating judicial opinions.

> [T]he County had almost immediate notice that Restivo had
> been physically assaulted during his interrogation, yet no

investigation was made into Restivo's allegations (R/H Stmt. of Disputed Facts ¶¶ 59–65); credible allegations that detectives planted hair evidence in Restivo's van surfaced at Restivo and Halstead's 1986 criminal trial, yet the County conducted no investigation (*id.* ¶¶ 67–70); in 1995, the County learned that Volpe elicited a false confession from a murder suspect (which eventually resulted in a civil settlement) but did not investigate or discipline him (*id.* ¶¶ 71–76); in 2004, a civil jury found that Dempsey was responsible for malicious prosecution of a suspect from whom Dempsey had elicited a false confession, but Dempsey was never investigated or disciplined (*id.* ¶¶ 77–87); the County settled a 2002 civil suit arising out of an alleged 2001 false confession of a suspect in a different murder investigation (*id.* ¶¶ 88); *see also Martinez v. Cnty. of Nassau,* No. 02–CV–4985 (JS) (WDW)); and, prior to the Fusco investigation, a manslaughter conviction was reversed because of an illegal confession obtained by NCPD detectives, *see People v. Evans,* 70 A.D.2d 886, 888, 417 N.Y.S.2d 99, 101 (2d Dep't 1979).

This evidence—especially the failure to investigate or discipline detectives involved in false confessions—suggests that the County had a "custom whereby it acquiesced in unconstitutional conduct by its officers." *Okin,* 577 F.3d at 440. Detectives chiefly argue that evidence concerning the three false confession cases that followed the Fusco investigation cannot establish what the County's policy was years earlier in 1985. (Def. Reply 12–13.) In the Court's view, however, these later cases can be probative of policymakers' attitudes at the time of the Fusco case. *Jones,* 2012 WL 3104523, at *10 ("It is not unreasonable to infer that Town officials who were indifferent to such abuse in 2000 might have held similar attitudes three years earlier."); *see also Chepilko v. City of N.Y.,* No. 06–CV–5491, 2012 WL 398700, at *15 (E.D.N.Y. Feb. 6, 2012) ("Subsequent or contemporaneous conduct can be circumstantial evidence of the existence of

preceding municipal policy or custom."). Obviously the gap between the initial Fusco investigation and the later false confession cases is greater than the three-year gap discussed in *Jones,* but at least two of the later cases involved detectives (Volpe and Dempsey, respectively) who had a hand in the Fusco case. And, in any event, the timing is a matter of weight for the jury.

*Kogut v. Cty. of Nassau,* 06 CV 6695 (JS) (WDW), 2012 WL 3704710, *2-3 (E.D.N.Y. Aug. 27, 2012); *see* Exhibits 29-33, 35-45, 54.

77.     At his deposition on June 14, 2011, John Restivo testified about his own experience in the interrogation room with defendant Dempsey:

> After being assaulted by defendant Dempsey, I demanded to leave. They wouldn't let me leave. I demanded to make a phone call. They wouldn't let me make a phone call. I demanded to make a phone call to a lawyer. They told me I didn't need a lawyer. They told me "You don't have any rights here."

78.     On June 17, 1997, high school student Shonnard Lee was arrested, taken to NCPD headquarters, and placed in the hands of Dempsey and another detective, who proceeded to interrogate him for seven hours without first advising him of his Miranda rights. The detectives interrogated him about the murder of Sammy Jones; when he denied any knowledge and told them he had been with his brother that night, the detectives called him a liar, screamed at him, and abused him until Lee broke down crying. They also denied his repeated requests to contact his mother and an attorney.

79.    Lee's mother called the NCPD headquarters repeatedly during his interrogation and was told that they had no information about him. Finally, after midnight, a detective admitted to her that Lee was at the homicide bureau. Lee's mother told the detective she spoke to that Lee was represented by counsel and that she wished to speak to Lee immediately. She was not allowed to speak to Lee and the interrogation continued.

80.    Finally, Dempsey left the room, came back with some paperwork, and told Lee that he needed to sign the pages if he wanted to go home. Lee signed at 1:20 a.m., having been in custody for almost 7 hours. That paperwork contained a document handwritten by Dempsey purporting to be a statement by Lee confessing to having murdered Jones with a baseball bat.

81.    Lee never gave any such statement.

82.    Dempsey also interrogated one of Lee's friends, Tajuan Crum, without giving him his Miranda warnings, and even after confirming Crum's alibi, threatened Crum that he would be charged himself unless he signed a statement, written by Dempsey, implicating Lee. "Scared to death," Crum signed the statement.

83.    Additionally, Dempsey falsified a statement from Winona Hammonds, falsely reporting that she had told Dempsey that she overheard Crum and Lee bragging about killing Jones.

84.    Additionally, Dempsey suborned another witness, Jeffrey Bourne, into giving false testimony against Lee alleging that Lee had told Bourne he killed Sammy Jones.

85.    Dempsey did all this despite the fact that four months before Lee's arrest another witness, Ragan Martin, identified Sammy Jones's killer for Dempsey as Corey Jones, also known as "Sha" and "Corey." Martin subsequently showed Dempsey Corey Jones's house, where one of the detectives took a photo of Jones's Camaro, and also identified Corey Jones from a photo lineup; that lineup included Lee, but Martin did not identify Lee as involved in the murder.

86.    Lee was charged, indicted, tried and acquitted. At Lee's criminal trial, Dempsey testified that Lee had admitted to the murder, but the jury acquitted Lee.

87.    Lee then brought a civil suit, and in the civil suit, a jury determined that Dempsey maliciously prosecuted Lee and awarded Lee $750,000 in compensatory and $1,250,000 in punitive damages.

88.    Despite this finding by a civil jury that Dempsey had committed serious misconduct, Nassau County never investigated or disciplined Dempsey.

## THE SCIENCE OF FALSE CONFESSIONS

"Our distrust for reliance on confessions is due, in part, to their decisive impact upon the adversarial process. Triers of fact accord confessions such heavy weight in their determinations that the introduction of a confession makes the other aspects of a trial in court superfluous, and the real trial, for all practical purposes, occurs when the confession is obtained. No other class of evidence is so profoundly prejudicial. Thus the decision to confess before trial amounts in effect to a waiver of the right to require the state at trial to meet its heavy burden of proof."

*Colorado v. Connelly*, 479 U.S. 157, 182 (1986) (Brennan, J., dissenting) (citations and quotation marks omitted).

89.     New York State has an above-average rate of false confessions.

90.     In exonerations based on DNA evidence in New York State, of which there have been approximately thirty, false confessions appear in nearly 50% of cases.

91.     The best scientific estimate of the nationwide false confession rate is in the range of 20-25%, with a much higher rate in murder cases.

92.     The leading academic researcher is Professor Saul M. Kassin, of the John Jay College of Criminal Justice and Williams College, who, in 1985, with Lawrence S. Wrightsman, established a framework of three types of false confessions: voluntary, compliant and internalized, that has gained widespread acceptance.

93.     According to Professor Kassin, a compliant false confession is where "the suspect acquiesces in order to escape from a stressful situation, avoid punishment, or gain a promised or implied reward." Such false confessions are common even in the absence of physical violence, which guarantees them.

94.     The quintessential compliant false confession case is that of the Central Park Five, youths who in 1989 were convinced by detectives that they would be brought straight home if they falsely admitted to peripheral involvement in a jogger's brutal rape. The teens were instead convicted and sentenced, only to be exonerated years later through DNA evidence.

95.     Even when conducted legally, American-style police interrogation is a psychologically oriented, guilt-presumptive process in which lying is permitted and suspects are intentionally isolated and confronted.

96.     The literature describes police interrogation as an inherently asymmetrical social interaction "led by an authority figure who holds a strong *a priori* belief about the target and who measures success by the ability to extract an admission from that target."

97.     Researchers have identified "situational risk factors," that increase the likelihood of false confession, including the presentation of false evidence, extended interrogations without rest, and the use of misinformation.

98.     In replicable peer-reviewed experiments, innocent individuals presented with false evidence are found nearly twice as likely to give a false written confession, doing so at a rate of 94%.

99.     A suspect's profile may also increase their "dispositional vulnerability," or the likelihood that they will succumb to even legal interrogation tactics.

100.   Another identified cause of false confessions is the inability of police interrogators to accurately recognize when someone is lying. Studies show that law enforcement officers have little to no increased ability to detect false statements.

101.   Kassin tells the story of Jeffrey Deskovic, who spent 15 years in prison after he falsely confessed to a murder before being exonerated by DNA evidence. In relenting to pressure and offering a false confession, Deskovic believed that "truth and justice would prevail" and that his innocence would be discovered: "I thought it was all going to be okay in the end."

## DEPRIVED OF A FAIR TRIAL, PLAINTIFF IS CONVICTED

102.   In their nefarious scheme to wrongfully convict plaintiff (and protect fellow officer Larrea), defendants never disclosed to prosecutors (or plaintiff) the evidence of what really happened on the night of the murder, including the Montes and Larrea statements, the 911 evidence, Elisa Valdez's statements, the Zimmer-Baldwin interview or their own misconduct in coercing plaintiff's "statement," causing his misidentification by Skwanitra Witherspoon and fabricating inculpatory evidence purportedly attributed to the Isaac brothers and Peddie Jenkins.

103.   Plaintiff was convicted on the basis of the coerced false confession and statements manufactured by defendants to fit a false narrative at odds with objective evidence.

104.   No forensic evidence of plaintiff's guilt was ever adduced or offered; indeed, none exists.

105.   Nevertheless, on December 9, 1996, following a jury trial in Nassau County, plaintiff Joseph Jackson was convicted of Murder in the Second Degree, Intimidating a Victim or Witness in the First Degree and Hindering Prosecution in the Second Degree. Exhibits 5, 8, 13.

106.   Mr. Jackson was sentenced on March 7, 1997 (Boklan, J.) to 25 years to life on the murder count and lesser sentences on the other charges. Exhibits 5, 8, 13.

## DECADES LATER, THE CIU INVESTIGATES AND MOVES TO DISMISS

107.   In 2017, at Mr. Jackson's request, the CIU investigated plaintiff's case and confirmed that the Montes and Larrea statements had been suppressed and had been maintained in the files of both the Freeport and Nassau County Police Departments. Exhibits 1, 3-4, 6.

108.   The CIU's investigation is detailed in a memorandum of law and affirmation of Executive Assistant Nassau County District Attorney Sheryl H. Anania dated February 14, 2018. Exhibits 3-4.

109.   On February 14, 2018, based on its investigation and after Mr. Jackson had served over two decades of his sentence, the CIU moved to vacate the conviction. *See* Exhibits 2-4.

110.   No evidentiary hearing was held on the motion, but Mr. Jackson was brought before a Nassau County Supreme Court Judge on February 16, 2018. *See* Exhibit 1.

111.   The court vacated the conviction, dismissed the indictment and freed Mr. Jackson. Exhibits 1, 16.

112.   Between his arrest on December 17, 1994 and his release on February 16, 2018, Mr. Jackson spent eight thousand four hundred and sixty-three days (twenty-three years and two months) in custody.

## DEFENDANTS' MALICE AND DELIBERATE INDIFFERENCE

113.    As described above, defendants withheld exculpatory evidence, corruptly influenced witnesses, coerced a confession from plaintiff and concealed the misconduct that pervaded the investigation.

114.   Defendants knew or should have known that they did not have probable cause to arrest and prosecute plaintiff because they deliberately used constitutionally impermissible practices to manufacture evidence against him that they knew to be false,

and that was contradicted by withheld exculpatory evidence. There was no physical, circumstantial or credible testimonial evidence linking plaintiff to the crime. Nevertheless, defendants caused plaintiff to be charged with and convicted for the death of Steven Jason.

115.   Defendants procured an indictment against plaintiff in bad faith and conspired to charge him with murder and other crimes, also in bad faith.

## NASSAU COUNTY AND FREEPORT'S UNCONSTITUTIONAL POLICIES

116.   The unconstitutional and tortious acts of the defendant officers were not isolated incidents. Upon information and belief, there was a custom, policy, pattern and practice of Nassau County and Freeport beginning years before the unjust conviction of Mr. Jackson and continuing throughout his incarceration, of condoning, encouraging, ratifying and acquiescing in the practice of failing to conduct reasonable criminal investigations, conducting unconstitutional interrogations, fabricating evidence including confessions and evidence supporting probable cause, committing perjury, failing to investigate alibi evidence, coercing confessions, failing to disclose exculpatory evidence and covering up this unconstitutional misconduct. Upon information and belief, Nassau County and

Freeport policymakers were on notice of, but deliberately indifferent to these unconstitutional customs, policies and practices.

117.   Upon information and belief, Nassau County and Freeport, and their policymakers, as well as the individual supervisors in this case, failed to train or supervise investigators to ensure they complied with constitutional requirements in eliciting confessions, disclosing favorable evidence to prosecutors, and obtaining probable cause for arrest and for prosecution, and that they did not fabricate evidence or commit perjury.

118.   Upon information and belief, Nassau County and Freeport, through their final policymakers, failed to adequately screen, supervise, and/or discipline detectives, officers, and investigators.

119.   As a direct and proximate consequence of the aforementioned actions by the defendants, plaintiff suffered over twenty-three years of imprisonment. During his incarceration, he sustained a variety of physical and emotional injuries.

## PLAINTIFF'S INJURIES AND DAMAGES

120.   Mr. Jackson suffered severe emotional and mental anguish and pain as a result of being punished for crimes he did not commit. He was denied effective treatment for his emotional injuries while incarcerated and continues to suffer mental anguish to this day. For example, plaintiff fears police contact and his everyday activities

are limited and disrupted by the traumas he has suffered in this case. He was imprisoned when his grandmother—with whom he had an extremely close relationship before he was incarcerated—passed away. He was likewise incarcerated when a young niece passed away from cancer.

121.   Plaintiff was also denied the opportunity to pursue normal relationships with, and to enjoy the companionship of, family members and friends. While he was incarcerated, he was denied the opportunity to spend quality time with his family and to develop relationships with his children.

122.   Plaintiff was denied decades of gainful employment and income. His earning power and ability to support himself have been permanently hampered by the years of productive work experience his wrongful imprisonment denied him.

123.   Plaintiff has been publicly shamed, disgraced, ridiculed, and humiliated, in the most extreme manner possible. He was a figure of regional outrage and disdain, for events in which he had no part. Nothing can undo the reputational damage he has sustained.

124.   Plaintiff and his family incurred substantial legal fees during the decades he spent seeking to defend himself and prove his innocence.

125.   Additionally, Mr. Jackson claims, *inter alia*, loss of liberty; loss of enjoyment of life; continuing pain and suffering, including post-incarceration

psychological issues; post-incarceration mental health treatment costs; lost earnings while incarcerated; impaired earning capacity and limitations on future employment opportunities; emotional distress; humiliation; indignities; embarrassment; degradation; physical injuries and lack of access to health care while incarcerated; attorneys' fees, and other pecuniary losses; and past pain and suffering; loss of family relationships; and loss of reputation.

**FIRST CLAIM**
**§ 1983 Malicious Prosecution**
**(against defendants Abbondandelo, Dempsey, Mullen and Severin)**

125.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

126.   Defendants acting deliberately and with malice, initiated and took steps to continue the criminal prosecution of Mr. Jackson, without probable cause or other legal justification, by fabricating and coercing a confession they falsely attributed to Mr. Jackson and failing to disclose their misconduct as well as key exculpatory *Brady* material, in knowing disregard of Mr. Jackson's constitutional rights.

127.   There was not even arguable probable cause to arrest or prosecute Mr. Jackson, and no reasonable officer would have believed there was.

128.   Defendants were obligated to, but did not, disclose *Brady* material.

129.   Defendants corruptly influenced witnesses in support of the prosecution.

130.   The prosecution ultimately terminated in Mr. Jackson's favor when his conviction was vacated and the indictment against him was dismissed.

131.   As a direct and proximate result of individual defendants' misconduct, Mr. Jackson was wrongfully convicted and suffered the injuries and damages described above.

**SECOND CLAIM**
**Fabrication of Evidence in Violation of 4th, 5th, 6th and 14th Amendments**
(against defendants Abbondandelo, Dempsey, Mullen, Alger, Kosier and Severin)

132.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

133.   Defendants deliberately fabricated evidence by manufacturing a statement and forcing Mr. Jackson to adopt it in written form and then misrepresenting to prosecutors, in conjunction with their own perjurious testimony, that the statements had originated with Mr. Jackson.

134.   Likewise, defendants manufactured the identification of plaintiff by Skwanitra Witherspoon and allegedly inculpatory statements from Peddie Jenkins,

the Isaac brothers and attempted to obtain such a statement from Richard "Woody" Miller.

135.   Defendants intentionally withheld exculpatory evidence from plaintiff and denied and concealed the existence of key witnesses in direct contravention of plaintiff's constitutional rights.

136.   Defendants also tampered with witness testimony in their effort to frame and falsely convict plaintiff.

137.   Such fabrication of evidence violated Mr. Jackson's clearly established Fifth, Sixth and Fourteenth Amendment rights to a fair trial and not to be deprived of liberty without due process of law.

138.   As a direct and proximate result of the individual defendants' fabrications, Mr. Jackson was wrongfully convicted and suffered the injuries and damages described above.

## THIRD CLAIM
### § 1983 Coercion
(against defendants Abbondandelo, Dempsey, Mullen, and Kosier)

139.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

140.   Defendants isolated Joseph Jackson – denying him the right to counsel, which had attached – and engaged in, *inter alia*, a deliberate course of lies, trickery and deceit, threatening and inflicting bodily harm on plaintiff, giving him false assurances of leniency and making false promises to him.

141.   Then, despite his protestations of innocence, in a custodial interrogation in which *Miranda* warnings and counsel were withheld, plaintiff's will was ultimately overborn, and defendants induced Mr. Jackson to sign the statement defendants had prepared, falsely incriminating himself in violation of his clearly established Fifth and Sixth Amendment rights to be free from compelled self-incrimination and to be afforded access to counsel.

142.   Defendants' coercive and conscience-shocking interrogation tactics generated false and unreliable evidence used against Mr. Jackson at trial, causing his wrongful conviction and all the injuries set forth above.

### FOURTH CLAIM
### § 1983 Supervisory Liability
(against defendants Severin and John Doe Supervisory defendants)

143.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

144.   Supervisors, acting deliberately, recklessly and under color of law, were, at the relevant times, supervisory personnel with the NCPD or Freeport PD, with

oversight responsibility for training, hiring, screening, instruction, supervision and discipline of the detectives and police officers who deprived Mr. Jackson of his clearly established constitutional rights.

145.   The supervisors were personally involved in both the deprivation of Mr. Jackson's constitutional rights and in creating or condoning the policy or custom of failing to take preventative and remedial measures to guard against such constitutional deprivations.

146.   The supervisors were reckless in their failure to supervise the subordinate defendants, and either knew or should have known that defendant officers were maliciously prosecuting civilians, deliberately failing to investigate evidence pointing to other leads or suspects, fabricating and coercing confessions, suppressing exculpatory evidence, perjuring themselves as witnesses, and depriving civilians of due process of law.

147.   These supervisory defendants knew or in the exercise of due diligence would have known that the conduct of the named and Doe defendants against Mr. Jackson was likely to occur.

148.   The failure of these supervisory defendants to train, supervise and discipline the named individual defendants and the Doe defendants amounted to

gross negligence, deliberate indifference or intentional misconduct, which directly caused the injuries and damages set forth above.

### FIFTH CLAIM
### *Monell* Custom and Policy and Failure to Supervise or Train
(against defendants Nassau County and Village of Freeport)

149.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

150.   The County of Nassau and Freeport, by and through their final policymakers, had in force and effect during the Jason investigation and for years beforehand, a policy, practice or custom of conducting constitutionally inadequate investigations; fabricating inculpatory evidence; perjury; failing to obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; suppressing from prosecutors material information favorable to criminal defendants; failing to follow the duties imposed by *Brady v. Maryland;* and using unconstitutional interrogation tactics.

151.   The County of Nassau and Freeport systemically failed to train their police officers, detectives and investigators to conduct constitutionally adequate investigations; not to lie about their conduct; to accurately document the manner in which interrogations were conducted when confessions were elicited; to obtain probable cause to ensure that suspects would not be falsely arrested and maliciously

prosecuted; to disclose to prosecutors material information favorable to criminal

defendants; and to refrain from unconstitutional interrogation tactics and perjury.

152.   The County of Nassau and Freeport failed to adequately supervise their

police officers, detectives and investigators in conducting constitutionally adequate

investigations; accurately documenting the manner in which interrogations were

conducted when confessions were elicited so that confessions were not fabricated;

obtaining probable cause to ensure that suspects would not be falsely arrested and

maliciously prosecuted; disclosing to prosecutors material information favorable to

criminal   defendants;   testifying   truthfully;   and   refraining   from   using

unconstitutional interrogation tactics. Officers knew that in this climate of lax

supervision, they were free to deviate from constitutional requirements in these

areas.

153.   The County of Nassau and Freeport, by and through their final

policymakers, failed to adequately discipline their police officers for investigative

wrongdoing, though it was foreseeable that constitutional violations of the type Mr.

Jackson suffered would be a predictable result of such failures.

154.   As set forth above, final policymakers for the County of Nassau and

Freeport had actual or constructive notice of such failures to train, supervise and

discipline their employees, and failed to provide training or supervision despite an obvious need for such training and supervision, where defendants knew that it was foreseeable that detectives, officers, and investigators would predictably confront these situations and as a result of the failure to train and supervise, constitutional violations would result.

155.   Such failures to train, supervise and discipline, and such unconstitutional governmental customs, practices and/or policies, amounted to deliberate indifference to the constitutional rights of criminal defendants like Mr. Jackson, and were the moving force behind his false, coerced and fabricated confession and the failure to disclose *Brady* that caused his arrest, prosecution, and incarceration, as well as all the ongoing injuries and damages set forth above.

## SIXTH CLAIM
### State Law Malicious Prosecution
(against Nassau County and Village of Freeport by *respondeat superior*)

156.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

157.   Defendants, lacking probable cause, nonetheless intentionally, recklessly, and with malice, caused Mr. Jackson to be arrested, prosecuted, and convicted of murder and related charges.

158.   Defendants initiated and commenced the prosecution, and took steps to ensure that it continued.

159.   Furthermore, the defendant officers intentionally withheld from and misrepresented to prosecutors facts vitiating probable cause against Mr. Jackson, including, *inter alia*, the Larrea and Montes statements.

160.   As Mr. Jackson has maintained from the outset, he is innocent of any wrongdoing and had no knowledge of or participation in the charged crimes.

161.   The prosecution finally terminated in Mr. Jackson's favor when his conviction was vacated and the indictment against him dismissed.

162.   As a direct and proximate result of defendants' actions, Mr. Jackson was wrongly prosecuted, convicted and imprisoned for over twenty-three years, and suffered other grievous and continuing damages and injuries set forth above.

## SEVENTH CLAIM
### State Law False Imprisonment
(against Nassau County and Village of Freeport by *respondeat superior*)

163.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

164.   Defendants intended to confine Mr. Jackson, and, lacking probable cause or any other privilege, curtailed his liberty by arresting him and taking steps

to ensure he was imprisoned on the basis of false evidence and without legal justification.

165.   Mr. Jackson was conscious of the confinement, and did not consent to it.

166.   As a direct and proximate result of defendants' actions, Mr. Jackson was wrongly arrested and falsely imprisoned from December 17, 1994, until he was finally released on February 16, 2018, and suffered the other grievous and continuing damages and injuries set forth above.

## EIGHTH CLAIM
### Intentional or Negligent Infliction of Emotional Distress
(against Nassau County and Village of Freeport by *respondeat superior*)

167.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

168.   The deliberate conduct of the defendants in coercing and fabricating a false confession for a murder they knew Mr. Jackson did not commit, their ensuing refusal to investigate the matter properly, and their cover-up of the truth, perpetuated in public statements over many years, constitutes the intentional infliction of emotional distress.

169.   In the alternative, defendants' conduct in coercing and fabricating a

false confession and covering up the truth breached a duty of care owed to Mr. Jackson as a citizen and as a criminal suspect, which unreasonably endangered his physical safety and caused him to fear for his own safety, constituting the negligent infliction of emotional distress.

170.   Defendants' conduct, falsely implicating Mr. Jackson in the Jason murder and subjecting him to public stigma to this day notwithstanding the dismissal of charges against him, caused Mr. Jackson to suffer ongoing, unimaginable emotional distress and traumatic psychological *sequelae*.

**NINTH CLAIM**
**§ 1983 Conspiracy**
(against all individual defendants)

171.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

172.   The Nassau County and Freeport individual defendants agreed to violate provisions of the state and federal constitution and cause the wrongful conviction of Joseph Jackson.

173.   The individual defendants took several overt acts in furtherance of their agreement, including the suppression of exculpatory evidence and fabrication of inculpatory evidence, tampering with witnesses, offering false documents and

testimony, arresting Mr. Jackson under false pretenses and impeding his access to counsel, assaulting him and coercing him into falsely confessing.

174.   The Zimmer-Baldwin Interview proves the existence of a conspiracy between Freeport and Nassau that extended from immediately after the homicide for many months and through plaintiff's conviction. *See* DE #242.

175.   There were multiple overt acts, including the undisclosed Zimmer-Baldwin Interview and the *Brady* violation of its suppression.

176.   Another example of the coordinated effort between the Nassau County and Freeport Police Departments is the willful suppression of the Montes/Larrea statements, which the CIU noted were in both defendant police departments' files but, for reasons described above, never revealed.

177.   These acts resulted in a violation of plaintiff's rights to due process and to be free from unlawful search and seizure. Mr. Jackson was wrongfully convicted and spent decades in prison as a consequence.

178.   Accordingly, defendants violated the Fourth, Fifth, Sixth and Fourteenth Amendments because they conspired to deprive Mr. Jackson of his rights.

179.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## TENTH CLAIM
### Evidence Suppression / *Brady Violations* / Spoliation &
### Denial of Access to Courts
### In Violation of the 5th, 6th and 14th Amendments
(against all individual defendants)

180.   Plaintiff repeats and realleges each and every allegation as if fully set forth

herein.

181.   Defendants deliberately suppressed and withheld evidence in violation

of *Brady*, including, as described above:

- The Montes and Larrea Statements
- The 911 Call and associated records
- Swenson's memo book and the Elisa Valdez information
- The Zimmer-Baldwin Interview

182.   Each act of suppression constitutes a violation of *Brady*.

183.   Further, the 911-related records were spoliated.

184.   The suppression and spoliation of evidence was calculated to secure

plaintiff's wrongful conviction and inhibit his ability to prove his innocence and

fairly present his post-conviction claims and the instant civil action, in violation of

the Constitution.

185.   As a direct and proximate result of this unlawful conduct, plaintiff

sustained the damages hereinbefore alleged.

## ELEVENTH CLAIM
### Unlawful Pre-Trial Detention
### In Violation of the 4th Amendment and
### *Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007)
(against all individual defendants)

186.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

187.   Defendants' failure to disclose exculpatory material, including the Montes and Larrea statements, the 911 evidence, the Zimmer-Baldwin Interview, and the information regarding Elisa Valdez and her companion, resulted in a pre-trial deprivation of plaintiff's liberty in violation of the Fourth Amendment.

188.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## TWELFTH CLAIM
### Failure to Intervene
(pled in the alternative against all individual defendants)

189.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

190.   Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

191.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

<u>PRAYER FOR RELIEF</u>

**WHEREFORE**, plaintiff respectfully requests judgment against defendants as follows:

(a) Compensatory damages against all defendants, jointly and severally;

(b) Punitive damages against the individual defendants, jointly and severally;

(c) Reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1988; and

(d) Such other and further relief as this Court deems just and proper.

Dated:      March 27, 2020
            New York, New York


            Elefterakis, Elefterakis & Panek

            _____
            Gabriel P. Harvis
            Baree N. Fett
            80 Pine Street, 38th Floor
            New York, New York 10005
            (212) 532-1116
            gharvis@eeplaw.com

            *Attorneys for plaintiff*