UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


```
                                .
Joseph Jackson,                 .    Docket #CV-18-3007 (JS)(GRB)
                                .
          Plaintiff,            .
                                .
            V.                  .    United States Courthouse
                                .    Central Islip, New York
Nassau County, et al.,          .    July 22, 2019
                                .    10:39 a.m.
          Defendants.           .
............................    .
```

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE GARY R. BROWN
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For The Plaintiff:              Gabriel P. Harvis, Esq.
                                Elefterakis Elefterakis
                                & Panek
                                80 Pine St.-38th Fl.
                                New York, NY 10005

                                Baree N. Fett, Esq.
                                Elefterakis Elefterakis
                                & Panek
                                80 Pine St.-38th Fl.
                                New York, NY 10005

For The Defendants:             Peter A. Meisels, Esq.
                                Wilson Elser Moskowitz Edelamn
                                & Dicker, LLP
                                3 Gannett Drive
                                White Plains, NY 10604

```
                              Janine A. Mastellone, Esq.
                              Wilson Elser Moskowitz Edelamn
                              & Dicker, LLP
                              1133 Westchester Ave.
                              West Harrison, NY 10604

                              Lalit K. Loomba, Esq.
                              Wilson Elser Moskowitz Edelamn
                              & Dicker, LLP
                              3 Lanneh Drive
                              White Plains, NY 10604

For the Incorporated          Stephanie L. Tanzi, Esq.
Village of Freeport:          Harris Beach, PLLC
                              The Omni
                              Ste. 901
                              333 Earle Ovington Blvd.
                              Uniondale, NY 11553

Audio Operator:

Transcribing Firm:            Writer's Cramp, Inc.
                              63 Dakota Drive
                              Hamilton, NJ 08619
                              609-588-8043
```

**Proceedings recorded by electronic sound recording, transcript produced by transcription service.**

1            THE CLERK:  Calling civil case 2018-3007, Jackson

2    vs. County of Nassau.  Counsel, please state your appearance

3    for the record.

4            MR. HARVIS:  Gabriel -- excuse me.  Gabriel P.

5    Harvis of Elefterakis Elefterakis & Panek for the Plaintiff,

6    Joseph Jackson.  Good morning, Your Honor.

7            THE COURT:  Good morning.

8            MS. FETT:  Good morning, Your Honor.

9            MR. MEISELS:  Peter --

10            MS. FETT:  I apologize.

11            MR. MEISELS:  I'm sorry.  I apologize.

12            MS. FETT:  Good morning, Your Honor.  Baree Fett for

13    Joseph Jackson from the firm Elefterakis Elefterakis & Panek.

14            THE COURT:  Okay.

15            MR. MEISELS:  Peter A. Meisels, Wilson Elser for

16    Nassau County Defendants.

17            MR. LOOMBA:  Good morning, Your Honor.  Lalit Loomba

18    from Wilson Elser for the County Defendants.

19            MS. MASTELLONE:  Good morning, Your Honor.  Janine

20    Mastellone from Wilson Elser for the County Defendants.

21            MS. TANZI:  Good morning, Your Honor.  Stephanie

22    Tanzi from Harris Beach for the Village Defendants.

23            THE COURT:  Okay.  Does that cover everybody?

24            MS. TANZI:  Yes.

25            THE COURT:  Good.  All right.  We're here for a

1   status conference.  I've reviewed the letters.  I know

2   everyone would like me to start talking about sanctions, but I

3   care about something much more as an initial matter.  Where

4   are we with respect to getting the Grand Jury minutes?

5        So the last time we were here, I directed the Defendants

6   to go to the State Court and ask for their release.  Has that

7   happened?

8            MR. MEISELS:  And we did that and we produced a

9   considerable number of the minutes.  Mr. Loomba actually

10  handled that.  We've actually produced today over 4,000 pieces

11  of various documents in response to the discovery demands,

12  including Grand Jury minutes.  I can't say that they are all

13  the Grand Jury minutes.  I'm not positive yet, but they

14  certainly have most of them.  And where we are in terms --

15  generally is that we've discovered that a lot of documents

16  that no longer exist in paper relating to what happened back

17  in the 1990s might be on microfiche.  And we also located an

18  offsite area where there may be some things in file boxes.

19       So we believe that we probably have more to produce --

20           THE COURT:  Okay.

21           MR. MEISELS:  -- than we have already.  Presently,

22  the appropriate people are going through microfiche records to

23  see what they can find, and that's in general where we are.

24  As to specifics, and given our response to the Plaintiff's

25  requests, there is actually one issue that came up with

1    Plaintiff's counsel that Mr. Loomba handled in reference to

2    pages that we had identified as being privileged, and put on a

3    privileged log, which --

4              THE COURT:  What kind of privilege?

5              MR. LOOMBA:  Your Honor, it was the work product

6    privilege.

7              THE COURT:  Okay.  We'll come back to that in a

8    moment.  I'm not up to your problems yet.  I'm still dealing

9    with my problems.

10         You said something interesting a few minutes ago, which

11   was you said, "We produced many or some Grand Jury minutes,

12   but not all."  That interests me from the following

13   perspective.  Where we left this, or at least where I thought

14   we left this was I said to you, "Go get the order that you

15   would be required to get to release the Grand Jury minutes, or

16   come back to me for such an order."  I didn't hear from you,

17   so I assumed you went and got some kind of order.  Now, when

18   you say you've --

19             MR. MEISELS:  We did.

20             THE COURT:  -- produced many Grand Jury minutes --

21   or some of the Grand Jury minutes, not all, I think -- I'm

22   going to guess that what you have produced is the Grand Jury

23   minutes that were produced in criminal discovery anyway, but

24   you haven't produced the things that weren't produced in

25   criminal discovery anyway.  Do I have that about right?

 1            MR. MEISELS:  Well, we turned over the Grand Jury

 2    minutes that were marked as Rosario material, and for every

 3    witness who testified at trial.  What I am not 100% sure of at

 4    this point, which I will know shortly, is whether anybody else

 5    other than those witnesses testified in the Grand Jury.

 6            THE COURT:  Okay.

 7            MR. MEISELS:  So that's why I'm not promising at

 8    this point that we've turned it all over.

 9            THE COURT:  Right, but it doesn't really --

10            MR. MEISELS:  I wanted to make sure --

11            THE COURT:  -- answer my question, which is if you

12    had -- if there were Grand Jury minutes that were not Rosario

13    material, that were not produced as Rosario material, you

14    would need a court order to release those.

15            MR. MEISELS:  We have that.

16            THE COURT:  You do?

17            MR. MEISELS:  Yeah.  We've got that.

18            THE COURT:  So you have the authorization, so I

19    don't have to do another motion on that?

20            MR. MEISELS:  No, no.  That's done.

21            THE COURT:  Okay.

22            MR. MEISELS:  We got that.  That's done.

23            THE COURT:  Got it.

24            MR. MEISELS:  And so that's the piece that I just

25    have to double check on.  I don't think there are more to

1    come, but there may be.

2              THE COURT:  Okay.

3              MR. MEISELS:  But the one thing that I do know, that

4    I can say that there is more come is this, most of the

5    Defendants retired many, many years ago.  The last employee

6    who is mentioned from Nassau County here just retired this

7    year.  But most of them retired, and when I say many years

8    ago, I'm talking about 24 years ago, 15 years ago.  And it's

9    not the policy of the Nassau County Police Department to

10   retain personnel records, particularly a long time after the

11   police officer becomes the responsibility of the State of New

12   York pension system.

13             THE COURT:  Okay.

14             MR. MEISELS:  But that doesn't mean that some of

15   them got microfiched, or something else happened.  So that's

16   what we're trying to sort out now.

17             THE COURT:  Okay.  Let me go back to counsel for the

18   Plaintiff.  So is it your position today, because I know you

19   would like to get into sanctions, and misstatements, and so

20   forth.

21             MR. HARVIS:  Okay.

22             THE COURT:  Do you have the Grand Jury minutes

23   you're looking for, or are you looking for more, or something

24   else?

25             MR. HARVIS:  Thank you, Your Honor.  Yeah, so no,

1    I'm not looking for Your Honor to get into that at all.  I

2    agree, we do have some of the Grand Jury minutes of Rosario's

3    stuff.  We -- it's important for us to see the rest of it

4    because we need to know who else testified.  For example,

5    these two fellows that were the witnesses that were never

6    disclosed.  It would be very important to know if they

7    testified, for example.

8        And I just wanted to say, you know, I'm not disputing

9    what counsel is saying that they've gotten an order, but we

10   were not participants in that process if it did happen.  I

11   don't know.  I've never seen the application for the order.

12   As far as I know, I've never seen the order itself.  So I

13   don't know when that happened or how it happened.  I know

14   there was an order to unseal the records from the prosecution,

15   like a 160-50 order.

16              THE COURT:  Right.  Right.  There's a different --

17              MR. HARVIS:  But my understanding is there's a

18   separate criminal procedure --

19              THE COURT:  Right.

20              MR. HARVIS:  -- rule for Grand Jury minutes.

21              THE COURT:  When did that happen, counsel?

22              MR. MEISELS:  Judge, we got that unsealed, I believe

23   about the week that we were here last.  Yeah.  It was either

24   just before we saw you or right after we saw you.

25              THE COURT:  Okay.

 1          MR. MEISELS:  We had a County Court judge sign the
 2     order.
 3          THE COURT:  Terrific.  Listen, I meant what I said
 4     last time about the concept of comity, right?  We allow the
 5     Court hold to look at it first.  And if there's -- very often,
 6     that Court will punt, right, and say, "We'll let the Federal
 7     Court decide if this is relevant."  And I could have done
 8     that, but we're done.  However, I do have a question.  Is that
 9     order itself privileged, or sealed, or are you going to give
10     them a copy of that order?
11          MR. MEISELS:  We produced a copy to counsel.  I
12     don't think that the order would be sealed.
13          THE COURT:  Okay.  I don't think so either, but I
14     don't know.  I asked the question.
15          MR. HARVIS:  Okay.  I mean, I thought the only order
16     I had seen was on the 160-50 on sealing of the actual records.
17          THE COURT:  Okay.
18          MR. HARVIS:  But we can work that out --
19          THE COURT:  Right.
20          MR. HARVIS:  -- I'm sure.
21          THE COURT:  Right. So, not surprisingly, what
22     counsel is most interested in is the portions of the Grand
23     Jury transcript that were not produced as Rosario material.
24     So if you have the authorization to release those, that's what
25     we should be focused on.  We find it difficult to believe when

1   you're talking about microfiche and whatnot, I would think

2   that there's a set of the Grand Jury minutes available through

3   the State Court, through the reporter, through some other

4   mechanisms.  Isn't that fair?

5           MR. MEISELS:  Well, Judge, I would expect -- well, I

6   shouldn't expect anything.  I should say I expect, but I can't

7   promise anything, that all the Grand Jury minutes have been

8   preserved.

9           THE COURT:  Yeah.

10          MR. MEISELS:  And that to the extent that I -- we

11  haven't produced everything, the rest of it should be

12  findable.

13          THE COURT:  Okay.  So when's that going to happen?

14  That's the question.

15          MR. MEISELS:  Well, Judge, that's the -- what we

16  have to complete.  That plus the other discovery that I

17  mentioned is going to be in the microfiche files.  This is

18  going to take us a while.  I think we can get this all done

19  between three and four weeks.

20      For example, one of the requests was for training

21  records, and we've agreed to turn over training policies, and

22  training records that go back to the time of this incident.

23  And -- but finding, and locating them, and copying them is not

24  that easy of a task, given that a lot of these things have

25  been sent offsite.  They're in different locations.  There's

1    one particular matter, but I think I may be digressing from

2    where you want to go with this, to answer your question, we

3    think we can have this all done in between three and four

4    weeks.

5              THE COURT:  Okay.  See, what I have to balance is

6    this consideration, which is Judge Seybert's proceeding the

7    motion to dismiss that you made, with the specific instruction

8    that we would continue discovery.  Right?  I mean, we resolved

9    that issue.  This is an unusual case in that certain factual

10   materials, like the Grand Jury minutes, might, and I emphasize

11   might, be relevant to dismiss.

12       I know that you all disagree violently on whether or not

13   the county has actually relied on the presumption of

14   regularity that attaches to an indictment or not.  What I'll

15   say is I looked at what you said, and yes, in the general

16   exposition of the law, you indicate the existence of probable

17   cause is a complete defense, and indictment by a Grand Jury

18   creates a presumption of probable cause that may only be

19   rebutted by evidence that the indictment was procured by

20   fraud, perjury, the suppression of evidence, or other police

21   conduct undertaken in bad faith.

22       Now, your point to me is, well, that was just a general

23   exposition of the law, because there's more.  But I don't see

24   anywhere in here is a note to Judge Seybert, or whoever else

25   might review this document that -- but we're not relying on

 1   that presumption.

 2            MR. MEISELS:  Judge --

 3            THE COURT:  It doesn't say that.

 4            MR. MEISELS:  -- if I may?  In reference to our

 5   motion that we made, which was filed, of course, and it

 6   happens to be page 540 of the document, what we say

 7   specifically is this --

 8            THE COURT:  Page 540?

 9            MR. MEISELS:  It's page ID-540.

10            THE COURT:  Okay.

11            MR. MEISELS:  But it's 17 of 33 of the document.

12            THE COURT:  Okay.

13            MR. MEISELS:  Okay?  If you take -- we make it very

14   clear that we're relying upon Ms. Witherspoon's statements,

15   okay, for probable cause, and not the presumption of innocense

16   -- presumption of probable cause in the Grand Jury, right?

17   Okay, then --

18            THE COURT:  Well, but here's the thing.  I see --

19            MR. MEISELS:  And then we do that again in the reply

20   memo.

21            THE COURT:  I know what you're saying, but what I'm

22   not certain of is given that you included that presumption

23   aspect in your motion papers, that someone reviewing this

24   motion by not say, "Well, look, the Plaintiff hasn't come

25   forward with enough evidence to rebut that presumption, so I'm

1   done."

2           MR. MEISELS:  Your Honor, Mr. Loomba, who actually

3   drafted this excellent motion could address that more

4   accurately than I can, but --

5           THE COURT:  But you don't -- you're not --

6           MR. MEISELS:  -- a decision was made --

7           THE COURT:  -- following my question, which is this.

8   If part of rebutting that presumption might be, for example,

9   seeing the balance of the presentation to the Grand Jury,

10  perhaps it would be better or more prudent to say, well, you

11  know what?  What we're going to do, we're going to deem this

12  withdrawn without prejudice for refiling until you complete

13  the discovery we're talking about, because it would be fair to

14  Plaintiff for it to be decided on that ground.  Isn't that

15  something I should be thinking about?

16          MR. MEISELS:  I don't think so, Your Honor.  Our

17  grounds are set forth very clearly in our papers, and then we

18  clarified it when we wrote to you what our grounds are, and

19  there was a very specific reason why we didn't do it the other

20  way.  That's just --

21          THE COURT:  I'm not sure -- let's put it this way.

22  I know that you and your adversary disagree on how clear it is

23  in the papers and so forth.  The motion isn't before me,

24  right?  And that's one of the problems.  I don't know.  So

25  when you say to me, "It's going to take me a month to produce

1   more material," I don't know that it's not material that they

2   need to effectively fight over this motion, which could be

3   decided before you get around to printing out all of the

4   microfiche pages.  I know how miserable that work is.  I know

5   how long it takes, but I don't want to put a Plaintiff in an

6   unfair position.

7               MR. LOOMBA:  Yes, Your Honor, can I just make two

8   short points?

9               THE COURT:  You can make seven long points, as long

10   as you give me the answers.  Go ahead.

11               MR. LOOMBA:  It'll be two short ones.  So --

12               THE COURT:  That's fine.

13               MR. LOOMBA:  -- in the reply brief, in Footnote #2,

14   we -- that would be page 2, Footnote #2, in the reply brief.

15   We make it extremely clear that the County Defendants are not

16   relying on the presumption rule, the indictment presumption

17   rule.

18       And so any judicial officer reviewing this motion in

19   whole would know when they read footnote 2 on page 2 of the

20   reply brief that the County Defendants were not so relying.

21       The second is this.  If we wanted to rely on the

22   indictment, we would have attached a copy of the indictment to

23   the motion, and said to Judge Seybert, "You're entitled to

24   review this indictment as a matter of public record, even

25   though it's a motion to dismiss."  We did not do that.  The

1    indictment is not attached as an exhibit to the motion.  So

2    we're not relying on that.  And so, therefore, discovery of

3    the Grand Jury minutes is not necessary for the Plaintiffs to

4    answer or rebut the motion because that's not a ground for

5    dismissal of the malicious prosecution claim that the County

6    Defendants has sought.

7              THE COURT:  Then I have a secondary question then.

8    If, indeed, and I will say that when you say, "Gee, you know,

9    Judge, in the reply brief on page X in footnote 2, we say

10   we're not really relying on that," but if I look at your main

11   brief, there are pages where you talk about this are of the

12   law, and the presumption, and so forth.  It does tend to

13   diminish how difficult it is for a busy Court to review things

14   and say, "Oh but wait, you didn't review footnote 2 of the" --

15   do you understand my point?  It's a little -- it's harder than

16   you think, right?

17             MR. LOOMBA:  I understand that, Judge.  I do.

18             THE COURT:  Because when we have a lot of these

19   cases and that defense is always raised.

20             MR. LOOMBA:  But in the main brief --

21             THE COURT:  Yes.

22             MR. LOOMBA:  -- even putting the reply brief to one

23   side --

24             THE COURT:  In front of me, yes.  Go ahead.

25             MR. LOOMBA:  We -- there's no sub-point C.  You

 1    know, based upon the indictment, the malicious prosecution

 2    claim should be dismissed.  We didn't raise --

 3          THE COURT:  Right, but when you say -- I'll quote it

 4    to you again, a different part.  "As this Court observed, the

 5    Plaintiff bears the burden of rebutting the presumption that

 6    arises from an indictment, and he must do so with more than

 7    mere conjecture and surmise that his indictment was procured

 8    as a result of conduct undertaken by Defendants in bad faith."

 9    If that's completely inapplicable to this motion, why is it in

10    here?  Do you see how confusing that is?  I'm not criticizing

11    you, other than to say you've got to sometimes walk in the

12    shoes of someone who reads these things to say this makes it a

13    little harder to resolve this.

14          MR. LOOMBA:  Well, Your Honor, if that was all we

15    wrote in the point, I would agree with you.  But the point

16    doesn't end with the exposition of the law.  It continues to

17    make the specific arguments that the County Defendants are

18    relying on.  And the indictment presumption rule is not

19    anywhere discussed in the specific arguments.

20          THE COURT:  I hear you, but I'm just letting you

21    know it's harder than you think.

22          MR. MEISELS:  Judge, and I -- and in response to the

23    notice and motion that we got for Rule 11 sanctions, which by

24    the way, I asked for -- the motion was served -- notice of

25    motion, theoretically relying upon an affidavit and memorandum

 1   of law, which I've asked for and I haven't gotten.  So I don't
 2   really know what's in this --
 3           THE COURT:  But you don't really want it.  You'd
 4   rather it go away.
 5           MR. MEISELS:  Well, I'm happy to have this resolved
 6   but --
 7           THE COURT:  Yeah.  So let's see if we can do that
 8   first.
 9           MR. MEISELS:  Okay.
10           THE COURT:  But let me ask you this question.  If we
11   are not resolving -- relying on a presumption here, and bear
12   in mind, I am not the person reviewing the motion and I
13   haven't sort of brushed up on this particular area of the law
14   for today, when we're talking about the statements and the
15   trial testimony Ms. Witherspoon established probable cause and
16   so forth, how in the world is that a motion to dismiss?  In
17   other words, isn't that one of those motions where you look at
18   it and say, look, there's obviously factual issues there.  In
19   which you allow discovery to proceed and then get to that
20   question.
21           MR. MEISELS:  I disagree, Your Honor.  I think that
22   based upon the statements of the eye witness, that is
23   sufficient probable cause and --
24           THE COURT:  But life doesn't exist in a vacuum --
25           MR. MEISELS:  -- to make a knowing --

1          THE COURT:  -- right?  It's not a vacuum.  I mean,
2     you've heard counsel say two minutes ago to me, "Judge, they
3     keep not talking about the other two witnesses who told them
4     it wasn't my guy."  What about that?  How do we deal with that
5     on a motion to dismissed, as compared to a summary judgment
6     motion?
7          MR. MEISELS:  We think that an eye witness statement
8     from particularly a lay person, it's not a police officer,
9     and the detail that she gave it was probable cause to make an
10    arrest, probable cause to prosecute.  And nothing -- and that
11    probable cause did not dissipate, because she then testified
12    consistently with what she had originally told the police.
13         THE COURT:  Right.  But we're still in the test tube
14    you want me to look into, as compared to the one that he's
15    shaking over there, saying, "But there's two witnesses and you
16    got the wrong guy, and you ignored that, or you didn't present
17    that to the Grand Jury, or you didn't present that to the
18    trial court."  What about that?
19         MR. MEISELS:  Well, in terms of the question about
20    whether or not there's any confusion about what our motion is
21    based upon, which I believe -- that's the -- the problem at
22    the moment, there's no reason why we can't write a letter to
23    the Judge and say, "By the way, to make sure there's no
24    confusion, the only grounds for our motion are" -- and file
25    the letter.

1          THE COURT:  I understand.

2          MR. MEISELS:  And that should solve the problem.

3          THE COURT:  But subpoint B is if that is the grounds

4   for your motion, shouldn't -- I mean, isn't there an obvious

5   sort of Rule 56(f), like I said it now looks like they changed

6   it on me, it used to be (d), approach where he's going to say,

7   "Look, I need to do full discovery on this witness, on the

8   other witnesses before I can even respond to this"?  Isn't

9   that going to be an issue?

10         MR. MEISELS:  I'm not --

11         MR. LOOMBA:  Your Honor, I disagree because --

12         THE COURT:  Tell me, please.

13         MR. LOOMBA:  Because the motion to dismiss, which is

14   in front of Judge Seybert, is really relying on the written

15   statements and trial testimony of one witness, Gwenitra

16   Witherspoon (phonetic).  There's a few cases in the Eastern

17   District that say -- and we've cited them in detail in the

18   memo of law, that when there's an independent basis probable

19   cause, that a malicious prosecution claim can be dismissed,

20   notwithstanding that there's an allegation that the indictment

21   and conviction was based upon fabricated evidence.

22         And the Courts say that the reason why an independent

23   basis can still be the basis to dismiss such a claim is

24   because otherwise, it would untether it from the Fourth

25   Amendment.  That's the actual language from the Eastern

1    District of New York.

2        So in order to respond to the motion and argument that we

3    made under Rule 12(b)(6), the Plaintiff is not going to need a

4    deposition of Mr. Lurea (phonetic), or a deposition of Mr.

5    Monthaste (phonetic), or anything else.  All he has to do is

6    rebut the argument that we made, that is developed and limited

7    upon the written statements and testimony of Ms. Gwenitra

8    Witherspoon, all of which we attached to the motion, all of

9    which the Court can consider as a matter of judicial notice on

10   -- or because they -- these documents have been referenced in

11   the Plaintiff's amended complaint.

12       There's no extra discovery that the Plaintiff would need

13   to answer that particular argument.  Now, it's interesting.

14   They filed a very lengthy and detailed opposition brief.  They

15   cited over 100 cases in that brief, but they didn't cite the

16   cases that we relied on in this very discreet argument.

17       But to answer Your Honor's question, they all need

18   discovery of Mr. Lurea and Mr. Monthaste to -- in order to

19   rebut it, you know, based upon the limited nature of the

20   argument that we made.

21           THE COURT:  What do you say to all of that?

22           MR. HARVIS:  What I say, Your Honor, is that I feel

23   like, you know, this is not the kind of issue that I would

24   have thought needed to make its way into the courtroom,

25   because in my experience in the past, when -- you know, in

1    good faith you explain to someone, and they may not have even

2    realized it, that they said something to the Court that was

3    either inaccurate, or arguable inaccurate, that they would

4    just do the right thing and just correct the record.  I mean,

5    that was really all I was looking for.

6         In terms of the substantive question of our ability to

7    meet the amendment -- excuse me, to meet the 12(b)(6) motion,

8    you know, I think that it's very difficult for the Court to

9    rule on the question of probable cause when it doesn't have a

10   baseline understanding of the facts that we know were

11   available to the investigators.  And so I don't agree that

12   it's sufficient to make a motion at this phase.

13        I think that the argument probably could have been made

14   that we needed more discovery.  We elected instead to just

15   meet the arguments on the merits and talk about the really

16   tremendously overwhelming body of case law, including from

17   Judge Seybert, herself, that says that when -- if the police

18   fabricate a confession, that that in and of itself may be

19   enough to rebut the presumption of probable cause, not to

20   mention the admitted Brady violations that we have.

21        So you know, I don't have a great amount of concern -- I

22   mean, don't get me wrong.  We would be in a very difficult

23   position if Judge Seybert, you know, accepted their

24   invitation, decided the issue on the presumption of probable

25   cause, and then our case was somehow dismissed.  I mean, I

1   can't -- that would be a tragedy.

2       I don't expect that that will happen, but certainly the

3   way it sits right now, it's at least a possibility and I think

4   it is unfair to us.  That's sort of how I would, you know,

5   respond to it.

6            THE COURT:  Okay.  So listen, I can resolve that

7   issue easily enough because I'm sure there will be no

8   objection to either side if I made it part of today's minute

9   order, the fact that it's -- you know, it is stipulated that

10  Defendants are not relying on the presumption on the

11  indictment.  I mean, I think we're done, right?  So that's

12  easy.

13           MR. MEISELS:  Yes.

14           THE COURT:  Right.  The more advanced question for

15  you is, are we done at that point?

16           MR. HARVIS:  Look, you know, I didn't -- I don't

17  stand to gain anything by pursuing some award of costs against

18  Mr. Meisels.  You know, if that's --

19           THE COURT:  Let's assume you're going to lose that

20  argument --

21           MR. HARVIS:  Okay.

22           THE COURT:  -- because I don't think sanctions at

23  this juncture are going to serve any reparative end.  I don't

24  think we're going to get anyplace with that.  So let's assume

25  that's out.

1             MR. HARVIS:  So -- yeah.

2             THE COURT:  My only question is do you need

3       practical relief?  In other words, you said to me, "Judge, I

4       need to see this before we can even fully respond to the

5       motion," then I have to think about it.  But if you think

6       we're okay, then we're okay.

7             MR. HARVIS:  Yeah.  You know, I --

8             THE COURT:  If they're not relying on the

9       presumption, they're relying on what they're relying on, which

10      is we had a witness.

11            MR. HARVIS:  Right.

12            THE COURT:  She said this.  And by the way, they may

13      not be wrong.  That might be enough.  I don't know.

14            MR. HARVIS:  Yeah, it's possible.  I mean, and yeah,

15      that we -- the Court is not being asked to decide the motion

16      on the question of the presumption of probable cause.  Yeah, I

17      mean, that would certainly, I think, remedy the issue from our

18      point of view.

19            THE COURT:  Okay.  So -- because I always have to --

20      I will make that part of today's minute order.  I'm going to

21      write out something that indicates that Defendants are not

22      relying in any way on the presumption of the indictment.  You

23      don't have a problem with that, right?

24            MR. MEISELS:  No.  At this juncture, Your Honor, not

25      for the purpose of this motion.

```
 1              THE COURT:  Today.  Today.  Later on, who knows,
 2    right?  And from the later on, who knows category, I still
 3    need to get discovery done.  So when you say you think, in a
 4    month you'll turn over the other things you need to turn over,
 5    you know, various microfiche and so forth, I don't want you to
 6    short yourself in that regard.  In other words, it's the
 7    summer.  It's hard to get people to do things.  I mean, can
 8    you tell me that in two months, 60 days from now, you'll have
 9    everything produced?  Can we do that?
10              MR. MEISELS:  Judge, that would be very helpful to
11    have that much time.
12              THE COURT:  Okay.  So we'll do 60 days, because we
13    don't need it today anyway, but I want to -- in the event that
14    you are shocked and you don't win your motion to dismiss, I
15    want you ready to move on.  So 60 days from now, all of it
16    turned over.  Okay?
17              MR. MEISELS:  Yes, Your Honor.
18              THE COURT:  Good.  I'm trying to be generous so
19    later on you don't say to me, "But, Judge, you didn't give me
20    enough time."  I'm trying to give you enough time.  So 60 days
21    is good, yes?
22              MR. MEISELS:  Yes, Your Honor.
23              THE COURT:  Good.  That works for you as well, yes?
24              MR. HARVIS:  Sure, Your Honor.  That's fine.
25              THE COURT:  Okay.  Good.  With those matters out of
```

1   the way, and to be clear, sanctions motion is denied.  We're

2   not going to argue about cost and we're not -- what else do we

3   need to do today, if anything?

4          MR. HARVIS:  Yes, please, Your Honor.  Thank you.

5   So Mr. Meisels was correct.  So they produced to us a little

6   over 4,000 pages.  It was what I would call like a classic

7   document dump.  We had -- a lot of the pages were upside down.

8   Nothing was labeled or organized.  There's no indication of

9   what the source of the documents was, who the author was.

10  It's just basically just 4,000 upside down random pages.

11         We don't think that that complies with Rule 34 and so --

12         THE COURT:  You can do this, right, with --

13         MR. HARVIS:  We did -- I had a -- I had someone in

14  my office do that, but -- and so that part is fixed.  But we

15  still have the problem of, you know, this is a case about what

16  was known by the district attorney, what was known by the

17  police department.  There's important information that we need

18  to sort of cordon off and figure out.  It's, I guess, you

19  know, provenance.

20         And so it's even more important, I would argue here, that

21  we get, you know, the basic Rule 34 information that tells us

22  where it came from and, you know, what it is basically,

23  especially with these handwritten notes that are just totally

24  not assigned to anyone.  And so that's one issue.

25         Then the other issue, which was sort of alluded to and I

1    think is, hopefully, subsumed within this 60 day order is

2    there were serious deficiencies in the actual material that

3    was produced, I mean, the categories of material that were

4    produced.  For example, there was a wholesale objection from

5    Nassau County to the production of disciplinary records and

6    personnel records.  I understand they are now saying they may

7    be hard to get, but when you read the responses, it's -- we're

8    not giving that to you.  "We consent" -- this is their words.

9    "We consent to in camera review of that material," which if

10   you read King v. Convy (phonetic) from 1989, if you read the

11   Frails (phonetic) case from Judge Reyes, that's not the way

12   the law works in this district anyway.

13       The way it should work is there's a very high bar to

14   withhold documents in a police misconduct case.  You have to

15   come forward, according to Judge Weinstein in the King case,

16   you have to come forward with affidavits from high ranking

17   officials.  I mean, I'm not requiring a lot of pomp and

18   circumstance.  I just want the standard process where if they

19   have a reason to withhold it, or there's some rationale for in

20   camera review, that's fine.  But in the ordinary course, that

21   objection is really in bad faith and it should really just be

22   withdrawn and we should get the material.  That's just one

23   example.

24       When you look at the Freeport responses, Freeport has

25   only given us 23 pages.  That's all we've ever gotten from

1   them.  As Mr. Corbitt was demanding last time that we withdraw

2   against them completely.  And, Your Honor, there was some

3   colloquy and you said, "Look.  Look at what the County is

4   about to produce.  They're going to produce all these records.

5   And tell Mr. Harvis who he should take out."  So I haven't

6   heard from anyone.  I don't know if they reviewed the records

7   or not, but I know that, you know, we have the same 23 pages

8   from them and they still, we believe -- really what I want to

9   say is the documents we've gotten have reinforced our view of

10  the case.  There's nothing that's come in that's cast any

11  doubts on our theory of these statements being withheld, or

12  shows any sort of good faith mistake or anything like that.

13  It's all just kind of the same stuff.

14       And so, you know, we just wanted to sort of point that

15  out just to say that hasn't gone anywhere.  There was a

16  specific instruction from the Court that they do that, and we

17  don't have any evidence that that's been done.  We also -- I

18  want to raise one specific issue with the Freeport responses,

19  which is that Rule 26(a)(1)(A)(4) requires disclosure of

20  insurance agreements.  This is an important issue here.  We

21  have potentially serious, you know, monetary damages at stake.

22       And in their initial disclosures, Freeport told us they

23  have a million dollar policy and an excess policy, that's the

24  wording.  So we've been trying to find out, well, what is that

25  excess policy?  And so that was one of our document requests.

1    And in response to that request, all we got was, "Well, we'll

2    tell you under separate cover."  That's how that was left.

3    And so, you know, again, Rule 34 -- I think a revision to Rule

4    34 says if you say that something is going to be produced in

5    the future, you have to give a specific date, and it has to be

6    reasonable.

7         And so -- this is for both of the Defendants.  You know,

8    it's a lot of things that they say they're going to produce

9    under separate cover.  There's no date provided.  And so

10   assuming that Your Honor's 60 day order sort of captures all

11   of that stuff, I think that moves the ball a great deal

12   because now we can at least know the things they've committed

13   to produce, there is a date certain for that.  And that --

14   Your Honor, I just want to be clear that it should encompass

15   what they've talked about there.

16        THE COURT:  Right.  Well, let me do something here.

17   Let me start with counsel for Freeport.  Do you have something

18   more that you're going to produce or anticipate producing,

19   other than the 23 pages you've turned over?

20        MS. TANZI:  At this stage, I don't believe there is

21   much more, Your Honor.  In terms of the insurance documents,

22   that is something that I'll have to speak with my client

23   about.  And if it's successful, of course, we'll turn it over.

24   I don't believe that we responded that we'd turn it over under

25   separate cover, but if that is the case, we're happy to --

1          THE COURT:  It almost doesn't matter what you

2    responded.  Do you have one?  If you have an excess insurance

3    agreement, he's right.  You've got to turn it over.

4          MS. TANZI:  Absolutely.  And --

5          THE COURT:  And it's going to be more than 23 pages.

6    Have you seen insurance policies?  They're quite long, right?

7    So that's going to be a lot.

8          MS. TANZI:  Sure.  In terms of what was responded

9    to, I -- my office, we do believe that the document disclosure

10   responded completely to the demand, of course, aside from the

11   insurance issue.  So I don't anticipate there will be much

12   more, but I certainly can converse with my client and see.  I

13   have gone and reviewed the records myself and there are not

14   rooms and rooms of records.  It's really not much.

15        And in response to counsel's other points, the last time

16   we were here, my colleague, Mr. Corbitt, was here and it was

17   the Court's directive to limit the claims and the number of

18   Defendants in this case.  After that, my office has reached

19   out to Plaintiff's counsel with a few letters: one asking for

20   the coercion claim to be dismissed against the Village

21   Defendants.  That was after a meet and confer phone conference

22   with counsel on May 30th, I believe, where it was our

23   perspective that counsel was agreeable to voluntarily

24   dismissing that claim.

25        After that, we got a response from counsel that they're

 1    not agreeable to dismiss that claim against the Village.

 2    After that, we sent a letter asking for specific Village

 3    Defendants to be dismissed from the case, based on the defense

 4    that -- and the stance that we've held from the beginning of

 5    non-involvement.  And with these -- with respect to the

 6    particular Defendants, they're not even named in the body of

 7    the complaint, aside from one paragraph where it's alleged

 8    that they've canvassed the area, waiting for the County

 9    Homicide Squad to arrive.

10         So we have not gotten a response on that particular

11    request yet, but -- from counsel, but I just wanted to

12    reiterate our point that we have made several attempts at both

13    limiting the claims in this case, and limiting at least some

14    of the obvious, from our perspective, individual Village

15    officers that certainly have no place in this case.

16              THE COURT:  Okay.  So, Counsel?

17              MR. HARVIS:  No, I was just going to say -- I mean,

18    we don't -- we're not trying to oppress a coercion claim

19    against people who did not coerce Mr. Jackson.  I mean, it's

20    just -- we're not trying to do that.  I think they sent us --

21    if I'm not mistaken, we discussed it, and then they sent us a

22    with prejudice stipulation, and I think that's where the

23    dispute arose.  I don't want to -- I'm not 100% sure, but I

24    think that was the intention there.

25              THE COURT:  Okay.

1          MR. HARVIS:  But certainly -- and we made it clear

2    in our motion opposition, as well, to Judge Seybert that we

3    were not going to try to -- we're not trying to like put --

4    teleport people into the room during the -- either they were

5    there or they weren't.  And so I think that's pretty

6    straightforward.

7          In terms of the second part of these -- you know, these

8    other officers who, you know, specifically show, et cetera.

9    It's the same 23 pages that we've had from the beginning.

10   They're just now accompanying it with a letter saying, "Look

11   at these 23 pages" --

12          THE COURT:  Okay.

13          MR. HARVIS:  -- "they show no one should be here."

14          THE COURT:  So here's the thing.  I gave everybody a

15   window.  We've got 60 days to wrap everything up.  I am a -- I

16   strictly adhere to the meet and confer rule.  It is the most

17   important rule in the book, because the truth is when you talk

18   to each other, you usually work things out.  And if you just

19   sort of fire allegations back and forth, it gets worse, not

20   better.

21          So use these 60 days, and if there's an issue, let's tee

22   it up properly, meaning we've had a meet and confer.  And if

23   there's a motion to compel, I will follow it.  Now, I will

24   note something, just by way of sort of preemptive strike.  So

25   I quickly ruled on the sanctions motion that was made today.

1    Rule 11 sanctions are a difficult thing.  They discourage

2    creative lawyering.  There's a lot of reasons why I want you

3    to be hesitant to pull the trigger on that.

4         I will note that in the world of discovery, if someone --

5    and this goes to everybody, not one side or the other -- if

6    you don't comply with the rules, and the discovery orders, and

7    so forth, there gets a point to be -- there gets to be a point

8    where sanctions are actually mandatory.  Most lawyers don't

9    realize that.  The rule says you shall impose the costs of

10   recovering things if one side is -- so let's not -- let's be

11   really careful around this.

12        You all seem reasonable.  You seem like you're getting

13   along, more or less.  I'd rather see more.  So use the 60

14   days, meet and confer, talk to each other, figure out what you

15   need.  If you don't, then come to me with a motion to compel,

16   but it will get uglier and more expensive if we have to do it

17   that way.  All right?

18             MS. TANZI:  Understood.

19             THE COURT:  What else should we cover today?

20             MR. HARVIS:  Well, I was just going to say, Your

21   Honor, just sort of looking ahead, once we have all the

22   documents, we -- the first depositions that were ever sort of

23   noticed or scheduled in this case were of the DA's, Michael

24   Walsh and Sheryl Andernia (phonetic).  He was the original

25   trial prosecutor.  She did the reinvestigation.

1          THE COURT:  Right.

2          MR. HARVIS:  So, you know, we're just -- just sort

3     of looking ahead at our next conference, I just wanted to put

4     on the Court's radar, you know, we're sort of chomping at the

5     bit to get their depositions done.  Once we know sort of which

6     documents were in the DA's file, et cetera.  And then we also

7     served a notice of 30(b)(6) deposition yesterday, which is

8     asking the County to basically assist us with the

9     identification process, who was on the scene, talking to

10    Monthaste and Lurea, what as the chain of custody for the

11    documents that they had, who tried to go get the 911 call, was

12    that preserved, stuff like that.

13         THE COURT:  Yes.

14         MR. HARVIS:  So, you know, just looking ahead,

15    that's sort of how we see the case developing so that the

16    factual record can be put together, and then we can sort of do

17    the fact witnesses.  And I just wanted to give the Court sort

18    of a heads up on that.

19         THE COURT:  Okay.

20         MR. HARVIS:  I'm just wondering if we can include in

21    today's minute entry some sort of order about the County

22    categorizing or identifying the documents that were previously

23    produced because --

24         THE COURT:  I'm going to ask you to meet and confer

25    on that first.

1               MR. HARVIS:  Okay, that's fine.

2               THE COURT:  Right?  In other words, I did mention to

3    you the upside down thing can be fixed by turning the screen

4    over or whatever.  See what you can work out first.

5               MR. HARVIS:  Sure, absolutely.

6               THE COURT:  If I have to get involved at that level

7    of detail, it's not going to go well, so --

8               MR. HARVIS:  That sounds reasonable.

9               THE COURT:  All right.  What else?

10              MR. MEISELS:  Your Honor, although we have not met

11   and conferred on this, but it's something that has been

12   discussed.  To the extent that we find personnel records, and

13   we're certainly going to find some of them, in Nassau, those

14   personnel records are broken down into three parts.  This is

15   for police officers.  There's an IAD file, a disciplinary

16   file, and then a personal file -- training file.

17       And we would like, one, to the extent that the material

18   is purely personal, they do not need to produce it at all.

19   And as to the disciplinary files and IAD files, that they be

20   produced to the Court for in camera inspection.

21       This is very personal information.  It shouldn't be

22   floating around unless there is something relevant in it.

23              THE COURT:  How much material are we talking about?

24              MR. MEISELS:  Since I haven't gotten my hands on the

25   files --

1           THE COURT:  Okay.

2           MR. MEISELS:  -- I really can't tell you.

3           THE COURT:  So this would fall into the advisory

4    opinion bucket, right?  The framers of the Constitution did me

5    a great favor by saying, "I can't tell you until you know."

6    So look at the files and to the extent that there's material

7    that needs to be reviewed by the Court, I'll do it, but that's

8    only after you do the due diligence of reducing it to the bare

9    minimum.

10       In other words, turn over what you can, because lots of

11    this stuff will not be that personal.

12           MR. MEISELS:  Correct.

13           THE COURT:  Some of it can be redacted, right?  And

14    counsel can always come back and say, "Well, his home address

15    shouldn't be redacted for X, Y, and Z reason."  We'll talk

16    about that.  But to the extent that there are things that you

17    feel are purely sort of personal matters and whatnot, you'll

18    give them the privilege log, and if he objects, then we'll

19    queue it up for an in camera review.  And I love doing that.

20    It's my favorite thing to do.

21           MR. MEISELS:  I'm sure.

22           THE COURT:  So --

23           MR. MEISELS:  And no doubt there will be information

24    that's just not relevant to this case, but personal to the

25    officer.

1          THE COURT:  Well, right, but relevance -- I mean,

2     relevance is not the strongest objection.  It's got to be

3     really personal and sensitive before we care about how

4     relevant it is, right?  The stuff that you're going to really

5     care about would be if there are disciplinary files, and how

6     things may have played out in other matters.  That's where

7     it's going to get messy, right?  That's the harder part.

8          He probably doesn't care about the officer's social

9     security number or whatever.  You can redact that out.  That's

10    easy.  So you'll figure it out.  And then you'll come to me

11    with what you need.  And I'm happy to do it.  That's why they

12    pay me the modest salary.

13          MR. MEISELS:  Thank you, Your Honor.

14          THE COURT:  Anything else?  Anything further for

15    Plaintiff?

16          MR. HARVIS:  Just a last thing, Your Honor.  I just

17    want the schedule to be such so that the production happens,

18    we have an opportunity to review it, and then we come to the

19    Court.  Just so that we don't end up here and not having had a

20    chance to review --

21          THE COURT:  I'm sorry.  Say that to me again.

22          MR. HARVIS:  I just want the schedule to account for

23    a production of the material and then some reasonable amount

24    of time for us to review it, and potentially even discuss it

25    with them.

```
 1              THE COURT:  Right.
 2              MR. HARVIS:  Before come back to Court.
 3              THE COURT:  Sure, sure, sure.
 4              MR. HARVIS:  Great.
 5              THE COURT:  So they're going to turn over everything
 6    in 60 days.  I presume some of it will come earlier.  So you
 7    can do that and, you know, I'm here.
 8              MR. HARVIS:  Okay.
 9              THE COURT:  I'm not limiting when you can come back.
10              MR. HARVIS:  Okay.
11              THE COURT:  All right?
12              MR. HARVIS:  So we're not setting a conference now
13    then?
14              THE COURT:  Say it again?
15              MR. HARVIS:  We're not --
16              THE COURT:  I wasn't going to unless you want me to.
17              MR. HARVIS:  I don't really -- I mean, I would
18    prefer it, but I don't think it's a huge deal.
19              THE COURT:  Here's the thing.  I would rather you
20    sort of tee up the issues first.  So just -- anybody can get a
21    conference by saying, "Judge, we'd like to come in."  And I'll
22    give you dates, or you give me dates, we can make it Thursday.
23    We can make it Monday.  And --
24              MR. HARVIS:  That sounds good.
25              THE COURT:  -- we have very quick service.  It's
```

```
 1   almost like a drive-thru, you just come.  All right?

 2             MR. HARVIS:  Yes.

 3             THE COURT:  Anything else?

 4             MR. HARVIS:  No.

 5             THE COURT:  Anything else for the Defendants?

 6             MR. MEISELS:  No, Your Honor.

 7             THE COURT:  All right.  Good seeing all of you.

 8             ALL:  Thank you, Your Honor.

 9             THE COURT:  We are adjourned.

10        (Court adjourned)

11

12                      CERTIFICATION
13   I certify that the foregoing is a correct transcript from the
14   electronic sound recording of the proceedings in the above-
15   entitled matter.
16

17

18   𝓛𝑒𝓌𝒾𝓈 𝒫𝒶𝓇𝒽𝒶𝓂                    8/1/19
19

20   _____        _____
21   Signature of Transcriber                Date
```