UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
JOSEPH JACKSON,

                        Plaintiff,

                                              MEMORANDUM & ORDER
            -against-                         18-CV-3007(JS)(AKT)

NASSAU COUNTY; THE INCORPORATED
VILLAGE OF FREEPORT; DETECTIVE
ROBERT DEMPSEY; DETECTIVE GARY
ABBONDANDELO; DETECTIVE JOHN M.
HOLLAND; DETECTIVE MICHAEL HERTS;
DETECTIVE MARTIN ALGER; POLICE
OFFICER ROBERT MELENDEZ; DETECTIVE
WALTER SWENSON; DETECTIVE ANTHONY
KOSIER; DETECTIVE SERGEANT DAN
SEVERIN; DORA MULLEN, AS
ADMINISTRATOR OF THE ESTATE OF JERL
MULLEN; JANE DOE, AS ADMINISTRATOR
OF THE ESTATE OF ARTHUR ZIMMER; and
JOHN and JANE DOE 1 through 20,

                        Defendants.
----------------------------------X
APPEARANCES
For Plaintiff:      Gabriel Paul Harvis, Esq.
                    Baree N. Fett, Esq.
                    Elefterakis Elefterakis & Panek
                    80 Pine Street, 38th floor
                    New York, New York 10005


For Nassau
County Defendants:  Peter A. Meisels, Esq.
                    Janine A. Mastellone, Esq.
                    John Martin Flannery, Esq.
                    Lalit Kumar Loomba, Esq.
                    Allison Michelle Holubis, Esq.
                    Wilson Elser Moskowitz Edelman & Dicker
                    1133 Westchester Avenue
                    White Plains, New York 10604


For Village         Keith Michael Corbett, Esq.
of Freeport         Stephanie L. Tanzi, Esq.
Defendants:         Harris Beach PLLC
                    100 Wall Street, 23rd Floor
                    New York, New York 10005

1

Plaintiff Joseph Jackson ("Plaintiff") seeks damages from the County of Nassau (the "County"), nine County detectives, the Incorporated Village of Freeport (the "Village"), one Village police officer, and one Village detective (collectively, "Defendants") for his alleged wrongful conviction and imprisonment for murder.  In 2018, after more than twenty years in prison, the Nassau County Conviction Integrity Unit ("CIU") filed a motion to vacate Plaintiff's sentence, which motion the Nassau County Supreme Court granted.  Plaintiff subsequently filed this action, alleging (1) nine federal causes of action, under 42 U.S.C. § 1983 ("Section 1983"), for malicious prosecution, denial of a fair trial, Brady violations, coercion, supervisory liability, Monell liability, conspiracy, failure to intervene, and prolonged pre-trial detention against various individual Defendants; and (2) three state law causes of action for malicious prosecution, false imprisonment, and intentional and/or negligent infliction of emotional distress against the County and Village.

Before this Court are the County Defendants' partial motion to dismiss (County Defs. Mot., ECF No. 288; County Defs. Br., ECF No. 290; County Defs. Reply, ECF No. 308), and the Village Defendants' motion to dismiss Plaintiff's Second Amended Complaint (Village Defs. Mot., ECF No. 291; Village Defs. Br., ECF No. 293; Village Defs. Reply, ECF No. 306).  Plaintiff filed an opposition to both motions.  (Pl. Opp. to Village Defs., ECF No. 300; Pl.

Opp. to County Defs., ECF No. 301.)  For the reasons that follow, the County Defendants' motion is GRANTED in part and DENIED in part; and the Villages Defendants' motion is GRANTED.

BACKGROUND

I.   <u>Factual History</u>[1]

    A.   <u>The Parties</u>

        At all relevant times, Plaintiff has been a resident of Nassau County, New York.  (Second Amended Complaint ("SAC"), ECF No. 278, ¶ 12.)  In addition to the County, Plaintiff names as defendants the following individuals who served as detectives at the County during the relevant period: Robert Dempsey ("Dempsey"); Gary Abbondandelo ("Abbondandelo"); John M. Holland ("Holland"); Michael Herts ("Herts"); Martin Alger ("Alger"); Walter Swenson ("Swenson"); Anthony Kosier ("Kosier"); Dan Severin ("Severin"), and Jerl Mullen ("Mullen").  (<u>Id.</u> ¶ 16.)  Defendants Dempsey, Abbondandelo, Holland, Herts, Alger, Swenson, Kosier, and Severin are sued in their individual capacity, while Mullen, who is deceased, is being sued through the administrator of his estate, Dora Mullen (the "Mullen Estate").  (<u>Id.</u>)  The Court collectively refers to these individuals as the "Individual County Defendants," and together with the County, the "County Defendants."

---

[1] For purposes of this Memorandum and Order, all facts are drawn from the Second Amended Complaint and assumed to be true.

In addition to the Village, Plaintiff names as defendants Robert Melendez ("Melendez"), a Village police officer during the relevant period, and Arthur Zimmer ("Zimmer"), a Village detective during the relevant period. (Id. ¶ 15.) Defendant Melendez is being sued in his individual capacity, while Zimmer, who is deceased, is being sued through the unidentified administrator of his estate (the "Zimmer Estate"). (Id.) The Court collectively refers to these individuals as the "Individual Village Defendants," and together with the Village, the "Village Defendants."[2]

B.   The Murder of Steven Jason

This case arises from the murder of Steven Jason on March 20, 1994. The following allegations are taken from Plaintiff's SAC:

In the early hours of March 20, 1994, Glenn Montes ("Montes") was driving his friend Maurice Larrea ("Larrea"), then an off-duty New York Police Department ("NYPD") officer, home from a bachelor party they had attended that evening. (SAC ¶¶ 21, 23.) At approximately 2:00 a.m., while heading east on Sunrise Highway, Montes observed two black men chasing Steven Jason in a parking lot adjacent to a Blimpie's restaurant on the corner of Sunrise Highway and Guy Lombardo Avenue in Freeport, New York. (Id. ¶ 21.) As Montes would later tell Individual County Defendant

_____

[2] Plaintiff also names John and Jane Doe Defendants.

4

Holland, Jason reached the curb of Sunrise Highway and dove to the ground, at which point Montes saw one of the men shoot him (the "Montes Statement").  (Id. ¶¶ 22, 42.)

Montes drove to a nearby payphone and Larrea stepped out to call 911.  (Id. ¶ 25.)  After the call, Larrea encountered an individual whom he believed to be the shooter running toward him on the sidewalk of Sunrise Highway.  (Id. ¶ 27.)  Larrea drew his firearm and ordered the suspected shooter to stop, calling out to Montes, "that's him, that's the guy."  (Id. ¶¶ 28-29.)  Montes later stated that he is "100% sure" that the man Larrea stopped was the shooter, whom he described as having a "dark brown face" with "close cut dark short hair" and standing approximately 5'9" to 5'10".  (Id. ¶¶ 30, 32.)

The shooter dashed across Sunrise Highway and headed north, with Larrea and Montes, still in his car, in pursuit.  (Id. ¶ 33.)  As they pursued the shooter, Larrea encountered Individual Village Defendant Melendez, whom Larrea knew from growing up in Freeport.  (Id. ¶ 34.)  The trio canvassed the area but could not locate the shooter.  (Id. ¶ 35.)  Montes and Larrea returned to the crime scene before proceeding to the Village Police Station, where they remained until after 5:00 a.m.  (Id. ¶ 36.)

At least four other individuals were in the vicinity of the shooting: Skwanitra Witherspoon ("Witherspoon"), Elisa Valdez ("Valdez") and her boyfriend, and Peddie Baldwin ("Baldwin").

First, Witherspoon was "in the vicinity of the shooting" and provided an account of the incident to Individual County Defendants Abbondandelo, Dempsey, and Mullen. (Id. ¶¶ 45-47.) She also identified Plaintiff as the shooter. (See id. ¶¶ 102, 134.) Plaintiff alleges that Abbondandelo, Dempsey, and Mullen "corrupted" the Witherspoon account "to suggest that Witherspoon had been the sole eyewitness" of the shooting. (Id. ¶¶ 45-47.) Second, Valdez reported to Individual County Defendant Swenson that "she and her boyfriend had heard shots fired and seen an automobile in pursuit of a male suspect heading Northbound" the night of the shooting (the "Valdez Statement"). (Id. ¶ 48.) Last, Baldwin provided a recorded statement to Village Defendant Zimmer (the "Zimmer-Baldwin Interview"). (Id. ¶ 50.) Plaintiff alleges Baldwin was a "potential eyewitness to the homicide" who provided "several leads that support [P]laintiff's innocence" and described the perpetrator as a 5'8" Puerto Rican. (Id. ¶ 51.)

    C.   <u>The Investigation</u>

       As noted, Larrea "was acquainted with more than a half dozen of the Village officers who responded to the Steven Jason homicide." (Id. ¶ 37.) While at the station, Larrea apparently informed "multiple officers," including Individual Village Defendant Melendez and Individual County Defendants Severin and Herts, who took Larrea's statement that night (the "Larrea Statement"), that he was intoxicated that evening; in a call to

6

his NYPD supervisors, however, Larrea stated that he was sober when he drew his weapon. (Id. ¶¶ 38, 40.) The effort to cover up Larrea's intoxication and subsequent misrepresentation to his NYPD supervisors is the driving force behind the SAC's allegations of wide-ranging police misconduct. Because "it would have been catastrophic for the budding law enforcement career of their friend, off-duty Officer Larrea, if the NYPD was [sic] to learn that Larrea had drawn his firearm while intoxicated and then lied about it to commanding officers" (id. ¶ 41), Plaintiff claims that Defendants (1) concealed evidence that might have revealed Larrea's intoxication and (2) corrupted the statements of Witherspoon and Peddie Jenkins ("Jenkins"), Plaintiff's cousin, to facilitate the development of a theory of the crime that was at odds with the accounts provided by Montes, Larrea and Valdez.

Plaintiff alleges four categories of concealed evidence. First, Plaintiff alleges Individual County Defendants Herts and Severin "altered the official narrative of the crime to omit any reference to Montes, Larrea or the 911 call." (Id. ¶ 43.) In support of this allegation, Plaintiff points to the official "Morning Report," prepared by Severin, Herts, and other unidentified individuals the morning of the shooting, which made no mention of the Montes and Larrea Statements. (Id. ¶ 44.) Second, Plaintiff alleges Individual County Defendants Abbondandelo, Dempsey, and Mullen corrupted the account of

Witherspoon "to suggest that Witherspoon had been the sole eyewitness and had identified plaintiff as the perpetrator." (Id. ¶ 45.) Third, Plaintiff alleges Individual County Defendant Swenson "concealed the existence of Ms. Valdez" and her boyfriend, whose account was consistent with the accounts provided by Montes and Larrea. (Id. ¶ 48-49.) Last, Plaintiff alleges the Zimmer-Baldwin Interview recording, dated June 6, 1994, was suppressed and concealed. (Id. ¶ 50.) According to Plaintiff, Baldwin described the perpetrator as a 5'8" Puerto Rican, but at the time of the shooting, Plaintiff was a six-foot tall, light-skinned African American with dreadlocks. (Id. ¶ 53.)

Relatedly, Plaintiff alleges that Alger, Abbondandelo, Mullen, Herts, Dempsey, and Swenson attempted to persuade Richard "Woody" Miller, "a barber," and brothers Tyrone and Roy Isaac to falsely implicate Plaintiff as the murderer but, realizing their testimony exonerated Plaintiff, suppressed it. (Id. ¶¶ 64-65.) The SAC does not provide any background on these individuals, such as their connection to the shooting, let alone describe their allegedly exculpatory statements.

Plaintiff further alleges Individual County Defendants Mullen, Abbondandelo, Dempsey, and Alger "corruptly coordinated the accounts of Peddie Jenkins and Skwanitra Witherspoon to manufacture the identification of [Plaintiff] as the alleged perpetrator." (Id. ¶ 60.) He claims that, in or about October

1994, Peddie Jenkins, who is approximately 5'8" with darker skin, was reported to police after he was overheard bragging that he had been involved in the murder of Steven Jason. (Id. ¶ 56.) Jenkins was arrested and provided a statement to Dempsey, Mullen, and Abbondandelo on November 15, 1994. (Id. ¶ 57.) In his first statement, Jenkins admitted that he "personally facilitated" the murder and fled northbound on foot after the shooting, consistent with the shooter's direction reported by Montes, Larrea, and Valdez. (Id. ¶¶ 58-59.) Rather than consult Montes and Larrea, however, Plaintiff alleges that on November 18, 1994, Dempsey, Mullen, Abbondandelo, and Alger "caused Peddie Jenkins to prepare a second" statement that provided a wholly different account. (Id. ¶¶ 60-62.) In his second statement, Jenkins included the allegation that he observed Plaintiff commit the murder; in exchange for including this allegation, Jenkins received a favorable sentence in a pending criminal case. (Id. ¶ 63.)

D.   Plaintiff's Interrogation and Conviction

On December 17, 1994, Plaintiff was arrested and brought to the Nassau County Homicide squad for interrogation by Dempsey, Abbondandelo, Kosier, and Mullen. (Id. ¶ 66.) Plaintiff alleges that "those defendants knew that [P]laintiff was represented by counsel," but nevertheless acted to deny Plaintiff his right to counsel. (Id. ¶ 67.) Moreover, Plaintiff claims Individual County Defendant Severin "provided false information to [Plaintiff's]

relatives while he was in custody to prevent them from learning his whereabouts and obtaining counsel for him." (Id. ¶ 68.)

During his interrogation, which Plaintiff avers lasted "thirty-nine hours," Plaintiff alleges Dempsey, Mullen, and Abbondandelo beat, threatened, and lied[3] to Plaintiff to coerce him to sign a false confession written by Dempsey. (Id. ¶ 69.) He was forced to spend "several hours in a frigid interrogation room while stripped to his underwear." (Id. ¶ 70.) According to Plaintiff, the allegedly false confession was contradicted by the information provided by Larrea, Montes, Valdez, and "the polygraph results of Takita Dorsey who, according to the false confession, was a key player in the murder conspiracy." (Id. ¶¶ 71-74.) Plaintiff provides no further information regarding Dorsey's involvement in the shooting or the polygraph results.

Following a jury trial in Nassau County, on December 9, 1996, Plaintiff was convicted of second-degree murder; intimidating a victim or witness in the first degree; and hindering prosecution in the second degree. (Id. ¶ 105.) Plaintiff was sentenced to twenty-five years to life on the murder count and to lesser sentences on the other charges. (Id. ¶ 106.) In connection with his trial, Plaintiff alleges that Defendants failed to disclose to him or prosecutors: the Montes and Larrea Statements;

---

[3] The SAC alleges Kosier lied to Plaintiff but does not allege he beat or threatened Plaintiff.

evidence of Larrea's 911 call; the Valdez Statement; the recorded Baldwin-Zimmer Interview; and that Defendants had coerced Plaintiff's statement, caused his misidentification by Witherspoon, and fabricated inculpatory evidence from Jenkins. (Id. ¶ 102.)

E.   Plaintiff is Exonerated

In 2017, at Plaintiff's request, the Nassau County CIU investigated Plaintiff's case and confirmed that the Montes and Larrea Statements had been suppressed but had been maintained in the files of both the Village and County police departments. (Id. ¶ 107.)   As a result, the CIU moved to vacate Plaintiff's conviction, and on February 16, 2018, the Nassau County Supreme Court vacated the conviction pursuant to New York Penal Code § 441.10(1)(h) and dismissed the indictment. (Id. ¶ 109-11; Mot. Vacate Hr'g, Loomba Decl., Ex. F, ECF No. 289-6.)   At the time of his release, Plaintiff had served twenty-three years and two months in custody. (SAC ¶ 112.)

F.   Broader Allegations of Defendants' Misconduct

The SAC includes allegations of prior similar misconduct by certain Individual County Defendants.   First, Plaintiff alleges the County failed to investigate or discipline Individual County Defendant Dempsey for past instances of coercive interrogation tactics and evidence fabrication.   (Id. ¶¶ 76-88.)   Plaintiff also claims the County and Village Defendants were aware of, but

ignored, unconstitutional customs, policies and practices, including "failing to conduct reasonable criminal investigations, conducting unconstitutional interrogations, fabricating evidence including confessions and evidence supporting probable cause, committing perjury, failing to investigate alibi evidence, coercing confessions, failing to disclose exculpatory evidence and covering up this unconstitutional misconduct." (Id. ¶ 116.) Plaintiff further alleges Defendants and the individual supervisors in this case failed to adequately screen, train, or supervise subordinates. (Id. ¶¶ 117-18.)

II.  Procedural History

Plaintiff initiated this action on May 22, 2018, against the County, Village, and forty-two individual defendants. (Compl., ECF No. 1.) At a January 16, 2019 pre-motion conference, this Court directed the parties to meet and confer regarding limiting the number of claims and defendants in the action. (See Min. Entry, ECF No. 159.) Consistent with the Court's instruction, Plaintiff filed an amended complaint on March 8, 2019 (see ECF No. 162), and the parties fully briefed Defendants' respective motions to dismiss.

On November 21, 2019, and again on February 25, 2020, Plaintiff filed a motion seeking leave to file a second amended complaint, which Defendants opposed. The Court granted Plaintiff's motion and directed the parties to discuss a briefing

schedule on any renewed motions to dismiss the SAC at a March 6, 2020 status conference before Magistrate Judge Tomlinson. (Feb. 26, 2020 Elec. Order.) Following the status conference, which stayed all party depositions pending resolution of Defendants' anticipated motions to dismiss, Plaintiff filed his SAC. (See SAC, ECF No. 278.)

The SAC alleges twelve causes of action: (1) malicious prosecution as against Abbondandelo, Dempsey, Mullen, and Severin (Claim 1); (2) fabrication of evidence / denial of a fair trial as against Abbondandelo, Dempsey, Mullen and Severin, Alger, and Kosier (Claim 2); (3) coercion as against Abbondandelo, Dempsey, Mullen, Kosier (Claim 3); (4) supervisory liability as against Severin and Doe Defendants #1-20 (Claim 4); (5) Monell liability as against the County and Village (Claim 5); (6) malicious prosecution in violation of New York law as against the County and Village (Claim 6); (7) false imprisonment in violation of New York law as against the County and Village (Claim 7); (8) intentional or negligent infliction of emotional distress as against the County and Village (Claim 8); (9) conspiracy as against the Individual County and Individual Village Defendants (Claim 9); (10) evidence suppression, Brady violations, spoliation and denial of access to courts as against the Individual County and Individual Village Defendants (Claim 10); (11) unlawful pre-trial detention as against the Individual County and Individual Village Defendants

13

(Claim 11); and (12) failure to intervene as against the Individual County and Individual Village Defendants (Claim 12).

The County Defendants filed a partial motion to dismiss the SAC, specifically moving to dismiss: (1) the malicious prosecution claims arising under Section 1983 and New York law; (2) the fabrication of evidence claim as against Severin and Alger; (3) the coercion claim as against Kosier; (4) the supervisory liability claim; (5) the Monell liability claim; (6) the false imprisonment claim; (7) the intentional or negligent infliction of emotional distress claims; (8) the evidence suppression claim; (9) the unlawful pre-trial detention claim; (10) the failure to intervene claim; and (11) all claims against the Mullen Estate. Plaintiff opposes that motion.  The Village Defendants filed a motion to dismiss all claims asserted against them, which Plaintiff opposes.

DISCUSSION

I.   Legal Standard

To withstand a motion to dismiss, a complaint must contain factual allegations that "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

Id. (citing Twombly, 550 U.S. at 556).  This plausibility standard
is not a "probability requirement" and requires "more than a sheer
possibility that a defendant has acted unlawfully."  Id. (internal
quotation marks and citation omitted).  "While a complaint attacked
by a Rule 12(b)(6) motion to dismiss does not need detailed factual
allegations, a plaintiff's obligation to provide the grounds of
his  entitlement  to  relief  requires  more  than  labels  and
conclusions, and a formulaic recitation of the elements of a cause
of action will not do."  Twombly, 550 U.S. at 555 (cleaned up).
Moreover,  the  Court  is  "not  required  to  credit  conclusory
allegations or legal conclusions couched as factual allegations."
Hernandez v. United States, 939 F.3d 191, 198 (2d Cir. 2019)
(quoting Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014)).  At
this stage, the Court's role is "not to weigh the evidence that
might be presented at trial but merely to determine whether the
complaint itself is legally sufficient."  Bertuglia v. City of New
York, 839 F. Supp. 2d 703, 713 (S.D.N.Y. 2012) (quoting Goldman v.
Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)).

II.  Analysis

A.  Consideration of Plaintiff's and County Defendant's
Exhibits

The  County  Defendants  ask  the  Court  to  dismiss
Plaintiff's SAC under Rule 8(a) or, in the alternative and pursuant
to Rule 10(c) and/or Rule 12(f), strike certain exhibits Plaintiff
appended to his SAC.  The ground for the County Defendant's request

15

is paragraph 20 of the SAC, which lists fifty-six exhibits
Plaintiff appended to his SAC.  According to Plaintiff, these
exhibits were filed in connection with his pending claim for unjust
conviction in the New York State Court of Claims.  (Pl. Opp. to
County Defs. at 8.)  Included in the exhibits are dozens of sworn
statements and records made in connection with the underlying
investigation into the death of Steven Jason, depositions of Montes
and Larrea from February 2020, as well as "news articles" and
filings in unrelated actions, among other documents.

        Relatedly, in an apparent effort to counter Plaintiff's
factual allegations, the County Defendants filed a declaration in
support of their motion that attaches eighteen exhibits, i.e.,
(1) a certificate of conviction of Plaintiff's narcotics charge
related to his sale of cocaine on or about August 9, 1993 ("Ex.
A"); (2) the Village Incident Report ("Ex. B"); (3) Plaintiff's
FOIL request to the Nassau County District Attorney's Office, dated
June 25 2007 ("Ex. C"); (4) a notice of motion and affirmation
filed by Plaintiff's attorney in support of his motion to vacate
his conviction ("Ex. D"); (5) a notice of motion filed by the
Nassau County District Attorney's Office to vacate Plaintiff's
conviction ("Ex. E"); (6) the transcript of proceedings before the
Nassau County Supreme Court on February 16, 2018 ("Ex. F");
(7) Plaintiff's SAC ("Ex. G"); (8) the Montes Statement ("Ex. H");
(9) the four statements Witherspoon provided investigators ("Ex.

16

I"); (10) the March 20, 1994, statement of Martha Campbell provided to investigators, which was referenced in Plaintiff's amended complaint but omitted from the SAC ("Ex. J"); (11) the "relevant" pages from Larrea's February 6, 2020 deposition ("Ex. K"); (12) the Larrea Statement ("Ex. L"); (13) the "relevant" pages from Montes' February 6, 2020 deposition ("Ex. M"); (14) a note reflecting a conversation between Swenson and Valdez ("Ex. N"); (15) the "relevant" pages from Witherspoon's testimony provided in Plaintiff's underlying criminal trial ("Ex. O"); (16) the final account of the Mullen Estate received from the Estates Division of the Wake County Superior Court in North Carolina ("Ex. P."); (17) the Affidavit of Publisher and Notice to Creditors for the Mullen Estate, published in <u>The Wake Weekly</u> ("Ex. Q"); and (18) the "relevant" pages from the testimony Abbondandelo provided at the suppression hearing held in Plaintiff's underlying criminal case ("Ex. R").  (<u>See generally</u>, Loomba Decl., ECF No. 289.[4])   The County Defendants ask the Court to take judicial notice of these documents or, for certain documents, contend that they are referenced in and integral to the Amended Complaint or SAC.

Accordingly, the Court first addresses the scope of materials it is permitted to consider in connection with Defendants' motions to dismiss.

---

[4] The attached exhibits are found at ECF Nos. 289-1 through 289-24, respectively.  Hereafter, the Court will simply cite to the relevant exhibits by their identified letters.

1.  *Applicable Law*

The Court begins with the Federal Rules of Civil Procedure (the "Rules").  Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 10(c) elaborates that any "written instrument" attached as an exhibit to a complaint is also part of the complaint.  Last, Rule 12(f) empowers the Court to strike from a complaint "any redundant, immaterial, impertinent, or scandalous matter."

The Second Circuit has provided district courts with guidance as to the universe of documents they should consider when resolving a motion to dismiss.  At this stage, a court's task "is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side."  Lynch v. City of New York, 952 F.3d 67, 75 (2d Cir. 2020).  "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits.  The Rule thus assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it."  Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis in original).  As Global Network explained, a motion for summary judgment, rather than a motion to dismiss, "is the proper procedural device to consider

18

matters outside the pleadings, such as facts unearthed in discovery, depositions, affidavits, statements, and any other relevant form of evidence." Id.  To the extent matters outside the pleadings are considered by the court, the proper course is to convert the motion to one for summary judgment under Rule 12(d). FED. R. CIV. P. 12(d).

Thus, on a motion to dismiss, the court limits its inquiry to the legal feasibility of the pleadings.  "[A] pleading is deemed to include any 'written instrument' that is attached to it as 'an exhibit,' or is incorporated in it by reference." Lynch, 952 F.3d at 79 (internal citations omitted).  As the Second Circuit explained in Lynch, "The term 'written instrument' generally refers to a 'legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate.'" Id. (citing Smith v. Hogan, 794 F.3d 249, 254 (2d Cir. 2015) (quoting BLACK'S LAW DICTIONARY (10th ed. 2014))).  Nevertheless, even when a plaintiff chooses not to attach a written instrument as an exhibit or incorporate it by reference, "if it is one 'upon which' the plaintiff 'solely relies and which is integral to the complaint,' the court may take the document into consideration in deciding the defendant's motion to dismiss." Doe v. New York Univ., No. 20-CV-01343, 2021 WL 1226384, at *11 (S.D.N.Y. Mar. 31, 2021) (quoting Lynch, 952 F.3d at 79); see also Global Network, 458 F.3d at 156; DiFolco v. MSNBC

Cable LLC, 622 F.3d 104, 111 (2d Cir. 2010).  Moreover, "[a] court
may take judicial notice of a document filed in another court not
for the truth of the matters asserted in the other litigation, but
rather to establish the fact of such litigation and related
filings."  Global Network, 458 F.3d at 157 (quoting Int'l Star
Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d
66, 70 (2d Cir. 1998)).

          Typically, this type of dispute arises when a defendant
asks the court to consider exhibits attached to its motion to
dismiss.  See, e.g., Doe, 2021 WL 1226384, at *9-15.  But the
dispute can also arise when a plaintiff attaches materials to his
complaint.  For example, in Smith v. Hogan, the Second Circuit
affirmed a district court's decision to not consider an affidavit
contained in 170 pages of exhibits attached to the plaintiff's
complaint, finding the affidavit was not a written instrument
within the meaning of Rule 10(c), "or otherwise properly considered
to be part of the complaint," and reasoning that deeming the
affidavit part of the complaint "would do considerable damage to
Rule 8(a)'s notice requirement" and render the ability of
defendants and the courts to determine what the complaint plausibly
alleges "a needlessly complicated adventure."  794 F.3d at 254-
55.

          It is true that the Smith panel acknowledged that it
"has permitted the consideration of other documents, apart from

written instruments under Rule 10(c), at the motion to dismiss stage," and appeared particularly troubled that the plaintiff "never even mentioned" the affidavit in his complaint.  Id. at 254-55.  However, more recently, another panel of the Second Circuit held that a document cannot be considered "integral" to the complaint unless it is a written instrument.  See Lynch, 952 F.3d at 78.  In Lynch, the Second Circuit had to decide whether a memo book maintained by one of the defendants could be considered "integral" to the complaint in that case.  Id.  There, the plaintiff argued that one of the allegations in the plaintiff's amended complaint was based on an entry in the memo book.  Id.  The Lynch Court acknowledged that the plaintiff had relied on the memo book entry in drafting his amended complaint, but nevertheless concluded that it was not "integral" to the pleading because it was not a "written instrument."  Id. at 79; see also Madej v. Yale Univ., No. 20-CV-0133, 2021 WL 148888, at *5 (D. Conn. Jan. 15, 2021) (recognizing Lynch further constrained the universe of documents district courts may consider on a motion to dismiss); Doe, 2021 WL 1226384, at *10-12 (discussing Lynch).[5]

---

[5] While it is true that the Lynch panel did not explicitly disavow other Circuit Court panel decisions using broader language to describe the universe of documents that can be considered integral to a complaint, as District Judge Woods noted in his opinion recognizing Lynch's impact, neither has the Second Circuit published an opinion in which it "embraced as 'integral' a document that cannot reasonably be characterized as a written instrument." Doe, 2021 WL 1226384, at 11, n.6 (collecting cases).

In sum, and as _Lynch_ instructs, at the pleading stage the Court considers the SAC and any written instrument attached to it as an exhibit, incorporated to it by reference, or integral to Plaintiff's allegations. Doing so will enable the Court to assess the feasibility of the SAC without weighing the evidence that may support or undermine it.

2.   _Application to SAC_

Turning to the fifty-six exhibits Plaintiff has attached to his SAC, the Court finds that they are not written instruments properly attached or incorporated to the pleading, as they do not define rights, duties, entitlements, or liabilities. Rather, as summarized _supra_, the exhibits consist of materials related to the investigation into the death of Steven Jason and Plaintiff's underlying conviction, as well as news articles and documents filed in separate court proceedings. Plaintiff agrees, stating that he will "gladly remove[] the exhibit list and references" from the SAC. (Pl. Opp. to County Defs. at 8 (further contending that the exhibit materials are "uniformly relevant" at the summary judgment stage).) While Plaintiff is entitled to rely on these materials in drafting his pleading, permitting Plaintiff to attach them as exhibits would render Rule 10(c)'s "written instrument" requirement meaningless and raise the concerns identified by the Second Circuit in _Smith_.

3.  *Application to the County Defendants' Exhibits*

As to the eighteen exhibits attached to the County Defendants' motion to dismiss, the Court finds that the majority of them are not written instruments and, therefore, cannot be considered at this stage, even acknowledging that Plaintiff has relied on many of the documents in drafting his SAC.  See <u>Madej</u>, 2021 WL 148888, at *5 ("[T]he incorporation-by-reference exception is not a mechanism for responding to all situations where a plaintiff withholds damaging information from a complaint. Rather, the exception prevents plaintiffs from generating complaints invulnerable to Rule 12(b)(6) only in certain situations, <u>e.g.</u>, when plaintiffs have selectively quoted from certain types of written instruments.  In many circumstances, the proper recourse for a complaint that withholds other types of information is to move for summary judgment, following discovery.")  The County Defendants' purpose in presenting this volume of evidence in this context is clear: they ask the Court to consider the evidence that was before the County when investigating Steven Jason's murder, to weigh that evidence, and to conclude that the evidence contradicts Plaintiff's allegations that, for example, the County lacked probable cause to prosecute him.  <u>Cf.</u> <u>Doe</u>, 2021 WL 1226384, at *12.  This is an invitation to error. See <u>Global Network</u>, 458 F.3d at 156; <u>cf.</u> <u>Shakespeare v. Compu-Link Corp.</u>, 848 F. App'x 474, 475-76 (2d Cir. 2021) (vacating district

court dismissal order for erroneously relying on materials outside the pleadings "to draw inferences against [plaintiff] and resolve factual disputes"); Lively v. WAFRA Investment Advisory Group, Inc., 2021 WL 3118943, at *6-7 (2d Cir. July 23, 2021) (disapproving of the district court's consideration of materials outside the pleadings).

Even if the Court were to consider any "document" -- rather than "written instrument" -- integral to the SAC under caselaw predating Lynch, many of the County Defendants' attached exhibits still fail to meet that standard. For example, the County Defendants reference Larrea's deposition testimony that he did not recall whether he called 911 or some other number after witnessing the shooting (Ex. L) to cast doubt on Plaintiff's allegation that the County Defendants concealed the evidence of any such call. (See County Defs. Br. at 7, 29; SAC ¶ 47.) But "the argument that a court can rely on previous testimony on a motion to dismiss for the purpose of contradicting facts asserted in the complaint was explicitly rejected by the Second Circuit in [Global Network]." Johnson v. Levy, 812 F. Supp. 2d 167, 176 (E.D.N.Y. 2011). In Global Network, the district court dismissed the plaintiff's complaint, relying, in part, on the testimony of the plaintiff's sole shareholder and president in an unrelated criminal matter. Global Network, 458 F.3d at 153-54. The Second Circuit reversed, because "not only did the district court consider external material

in its ruling, it relied on those materials to make a finding of fact that <u>controverted</u> the plaintiff's own factual assertions set out in its complaint." <u>Id.</u> at 156 (emphasis in original). Similarly, here, the County Defendants ask this Court to rely on Larrea's deposition testimony, which is by no means unambiguous, to controvert Plaintiff's allegation that Larrea called 911 the night of the shooting.  In the same vein, the County Defendants rely on Witherspoon's statements and testimony at Plaintiff's underlying criminal trial to bolster their claim that they had probable cause to prosecute Plaintiff.  (<u>See</u> County Defs. Br. at 19-20; Loomba Decl., Exs. I, O.)  At this stage, however, the Court declines to consider these external materials to controvert the factual assertions set forth in Plaintiff's SAC.  The external materials are not written instruments, <u>see</u> <u>Lynch</u>, 952 F.3d at 78-79; they are not integral to the SAC under pre-<u>Lynch</u> case law, <u>see</u> <u>Joyner v. County of Cayuga</u>, No. 20-CV-0060, 2020 WL 1904088, at *3 (N.D.N.Y. Apr. 17, 2020) (declining to consider police reports at motion to dismiss stage and adopting the "better view . . . adopted by a majority of courts in our Circuit, . . . that these kinds of police records are not 'integral' to a false arrest complaint," because "[t]o accept the truth of the documents offered by Defendants at this stage would amount to a premature determination that the arresting officers and the alleged victim are more credible than Plaintiff"); and, to the extent argued, the Court

cannot take judicial notice of their content for the truth of the matters asserted therein, see Global Network, 458 F.3d at 157. Indeed, in moving to strike the exhibits attached to Plaintiff's SAC, the County Defendants undermine their request for the Court to consider external materials.  Therefore, the Court declines to consider the exhibits contained in the Loomba Declaration unless otherwise noted.

        4.   *Consideration of Rule 12(d)*

        Last, the Court declines to convert Defendants' motions to dismiss into summary judgment motions.  See Madej, 2021 WL 148888, at *6 (declining, in its discretion, to convert Rule 12(b)(6) motion into one seeking summary judgment).  Under Rule 12(d), converting Defendants' motions requires giving "[a]ll parties . . . a reasonable opportunity to present all material that is pertinent to the motion." Fed. R. Civ. P. 12(d).  However, discovery in this case has been contentious (see, e.g., ECF Nos. 324, 325, 333 (most recent orders regarding various discovery disputes)); thus, converting the motions would invite arguments that Plaintiff has not yet obtained "all the material that is pertinent to the motion," thereby risking further delay.  Madej, 2021 WL 148888, at *6 ("conclude[ing] that the better course of action is to give the parties the benefit of" ruling on the dismissal motion "without consideration of materials beyond the Second Amended Complaint, instead of risking delay").  Indeed,

this is the second time the parties have briefed their motions to dismiss.  Therefore, the Court declines to convert Defendants' motions.

      B.   <u>Claims against the Mullen Estate</u>

      Next, the Court considers another preliminary issue: Whether Plaintiff can maintain his claims against the Mullen Estate.

      Jerl Mullen, a former County homicide detective, passed away on January 4, 2015, more than three years before Plaintiff initiated this action.  Therefore, Plaintiff alleges his claims against the Mullen Estate, purportedly by way of substitution under Rule 25.  (<u>See</u> Sept. 23, 2019 Elec. Order (the "Substitution Order") (granting Plaintiff's motion to substitute the Mullen Estate as a defendant).)  Rule 25 states that "[i]f a <u>party</u> dies and the claim is not extinguished, the court may order substitution of the proper party," <u>i.e.</u>, the decedent's "successor or representative."  Fᴇᴅ. R. Cɪᴠ. P. 25(a) (emphasis added).  However, the plain meaning of Rule 25 "presupposes that substitution is for someone who was a party to a pending action"; thus, "[s]ubstitution is not possible if one who was named as a party in fact died before the commencement of the action."  7C Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1951 (3d ed., Apr. 2021 update).  This interpretation of Rule 25(a) is well established, including in this Circuit.  <u>See</u> <u>Automated Info.</u>

Processing, Inc. v. Genesys Sols. Grp., Inc., 164 F.R.D. 1, 3 (E.D.N.Y. 1995); Mizukami v. Buras, 419 F.2d 1319, 1320 (5th Cir. 1969); Flick v. Vadlamudi, No. 09-CV-0647, 2010 WL 3061096, at *1 (W.D. Mich. July 16, 2010), report and recommendation adopted, No. 09-CV-0647, 2010 WL 3061021 (W.D. Mich. Aug. 3, 2010).

Accordingly, the Substitution Order is VACATED, see Bruccoleri v. Gangemi, No. 17-CV-7443, 2019 WL 499769, at *6 (E.D.N.Y. Feb. 8, 2019) (ruling that where substitution order was improperly entered it would be vacated), and the County Defendants' motion to dismiss all claims against the Mullen Estate is GRANTED.

C.   Section 1983 Claims

Section 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of any rights, privileges, or immunities secured by the Constitution or the laws of the United States. See 42 U.S.C. § 1983; Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161 (1992). Further, it is well settled that to establish liability under Section 1983, a plaintiff must "plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution,'" that is,

personally participated in the alleged constitutional deprivation. Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)) (rejecting "special rule for supervisory liability" and holding constitutional violations "must be established against the supervisory official directly").

The Court turns to examining each of Plaintiff's Section 1983 Claims.

1. *Malicious Prosecution (Claim 1)*[6]

The County Defendants and Plaintiff devote the lion's share of their briefs to arguing Plaintiff's malicious prosecution claim. (County Defs. Br. at 19-21; Pl. Opp. to County Defs. at 12-23; County Defs. Reply at 2-6.) The County Defendants argue that the evidence provided by Witherspoon "establish[ed] an independent basis of probable cause to initiate and continue the criminal prosecution against Plaintiff," and because probable cause is a defense to a claim for malicious prosecution, Plaintiff's claim fails. Relatedly, they assert that each of the Individual County Defendants is entitled to qualified immunity from the malicious prosecution claim, because a reasonable officer could have concluded there was probable cause to prosecute

---

[6] Plaintiff does not bring his Section 1983 malicious prosecution claim against the Individual Village Defendants, but he does bring a state law claim for malicious prosecution against the Village, as discussed infra.

Plaintiff based on Witherspoon's evidence.  In response, Plaintiff assails the reliability of the evidence Witherspoon provided and asks the Court to view it "holistically and in light of [P]laintiff's uncontested coercion, conspiracy and evidence fabrication claims."  (Pl. Opp. to County Defs. at 13; see also id. at 12-13, 15-19.)  Because the parties dispute the extent to which probable cause can serve as a defense to a malicious prosecution claim under caselaw in this Circuit, the Court first clarifies the standard before turning to merits of the parties' arguments.

i.  *Applicable Law*

"In order to prevail on a Section 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment . . . and must establish the elements of a malicious prosecution claim under state law."  Manganiello v. City of New York, 612 F.3d 149, 160–61 (2d Cir. 2010) (internal citations omitted).  Under New York law, a claim for malicious prosecution requires: "(1) the initiation or continuation of a criminal proceeding against the plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions."  Id. at 161 (quoting Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997)); see also Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003).

30

In addition, under Section 1983, the plaintiff must further demonstrate "a post-arraignment deprivation of liberty that rises to the level of a constitutional violation."  Bailey v. City of New York, 79 F. Supp. 3d 424, 448 (E.D.N.Y. 2015) (citing Boley v. Durets, No. 12-CV-4090, 2013 WL 6562445, at *5 (E.D.N.Y. Dec. 10, 2013)).

"[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York."  Savino, 331 F.3d at 72; see also McClellan v. Smith, 439 F.3d 137, 145 (2d Cir. 2006) ("The absence of probable cause is an essential element to a claim for malicious prosecution.")  This is the case because "a malicious prosecution claim is rooted in the Fourth Amendment right to be free from a baseless criminal prosecution."  Hoyos v. City of New York, 999 F. Supp. 2d 375, 390 (E.D.N.Y. 2013) (citing Morse v. Spitzer, No. 07-CV-4793, 2012 WL 3202963, at *2 (E.D.N.Y. Aug. 3, 2012) (interpreting Albright v. Oliver, 510 U.S. 266, 271 (1994), and Singer v. Fulton County Sheriff, 63 F.3d 110, 116 (2d Cir. 1995))).  But importantly, the relevant probable cause determination depends on the stage of the criminal proceeding.

At the arrest stage, the Second Circuit has described probable cause to arrest as "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed . . . a crime."  Stansbury v.

31

Wertman, 721 F.3d 84, 89 (2d Cir. 2013) (quoting Jaegly v. Couch, 439 F.3d 149, 152 (2d Cir. 2006)); Ashley v. City of New York, 992 F.3d 128, 136 (2d Cir. 2021).  At the prosecution stage, however, the probable cause standard is "slightly higher." Stansbury, 721 F.3d at 95; Hoyos v. City of New York, 650 F. App'x 801, 802 (2d Cir. 2016) (summary order).  "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." Stansbury, 721 F.3d at 95 (quoting Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003)); Hoyos, 999 F. Supp. 2d at 390 ("[T]he relevant probable cause determination is whether there was probable cause to believe the criminal proceeding could succeed and, hence, should be commenced.").  As a result, timing is key, with probable cause in the context of malicious prosecution being measured "as of the time the judicial proceeding is commenced (e.g., the time of the arraignment)," not the time of the arrest.  Hoyos, 999 F. Supp. 2d at 390 (quoting Davis v. City of New York, 373 F. Supp. 2d 322, 333 (S.D.N.Y. 2005)); id. ("Information obtained 'after the arrest, but before the commencement of proceedings, is relevant to the determination of probable cause' for a malicious prosecution claim." (quoting Jackson v. City of New York, 939 F. Supp. 2d 235, 251 (E.D.N.Y. 2013)); Stone v. Port Authority, No. 11-CV-3932, 2014 WL 3110002, at *9 (E.D.N.Y. July 8, 2014) ("[E]ven when probable cause is

present at the time of arrest, evidence could later surface which would eliminate that probable cause."); Jean v. County of Nassau, No. 14-CV-1322, 2020 WL 1244786, at *9 (E.D.N.Y. Mar. 16, 2020) (citing McDermott v. City of New York, No. 94-CV-2145, 1995 WL 347041, at *5 (E.D.N.Y. May 30, 1995) ("In the absence of some indication that the authorities became aware of exculpatory evidence between the time of the arrest and the subsequent prosecution that would undermine the probable cause which supported the arrest, no claim for malicious prosecution may lie.")). And even where the arrest and prosecution are supported by probable cause, thus defeating any claim for false arrest or malicious prosecution, "a plaintiff can still prevail on a fair trial claim if fabricated evidence causes some 'further deprivation'" of the plaintiff's liberty. Ross v. City of New York, No. 17-CV-3505, 2019 WL 4805147, at *9 (E.D.N.Y. Sept. 30, 2019) (quoting Rowell v. City of New York, No. 16-CV-6598, 2019 WL 280469, at *2 (S.D.N.Y. Jan. 22, 2019) (citing Ganek v. Leibowitz, 874 F.3d 73, 91 (2d Cir. 2017)); see also Frost v. New York City Police Dep't, 980 F.3d 231, 244 (2d Cir. 2020); Garnett v. Undercover Officer C0039, 838 F.3d 265, 278 (2d Cir. 2016); Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997). Put simply, the existence of probable cause to arrest and prosecute a plaintiff is not a defense to his claim for deprivation of a

fair trial.  Morse, 2012 WL 3202963, at *5 (reconciling Ricciuti and Zahrey v. Coffey, 221 F.3d 342 (2d Cir. 2000)).

>    ii.  *Application*

The Court first addresses the County Defendants' claim to qualified immunity.  Pearson v. Callahan, 555 U.S. 223 (2009); Francis v. Fiacco, 942 F.3d 126, 139-40 (2d Cir. 2019).  Qualified immunity shields government officials from civil liability resulting from the performance of their discretionary functions only where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Wallace v. Suffolk County Police Dep't, 396 F. Supp. 2d 251, 265 (E.D.N.Y. 2005) (Seybert, J.) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  To determine whether qualified immunity applies, courts consider "whether the facts shown make out a violation of a constitutional right and whether the right at issue was clearly established at the time of the defendant's alleged misconduct."  Tankleff v. County of Suffolk, No. 09-CV-1207, 2017 WL 2729084, at *17 (E.D.N.Y. June 23, 2017) (quoting Estate of Devine v. Fusaro, 676 F. App'x 61, 62 (2d Cir. 2017) (cleaned up)).  Whether a right was clearly established should be analyzed from the perspective of a reasonable law enforcement officer, and the relevant inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id.  Although "a qualified immunity

defense may be advanced on a 12(b)(6) motion, it faces a 'formidable hurdle' when advanced at such an early stage in the proceedings." Wallace, 396 F. Supp. 2d at 265 (quoting Cathedral Church of the Intercessor v. Incorporated Village of Malverne, 353 F. Supp. 2d 375, 391 (E.D.N.Y. 2005)).

In support of their argument that qualified immunity should apply, the County Defendants argue that, "based on Ms. Witherspoon's evidence, a reasonable officer could conclude that there was at least arguable probable cause to prosecute plaintiff." (County Defs. Br. at 20.) But "[a]rguable probable cause should not be misunderstood to mean almost probable cause." Walsh v. City of New York, 742 F. App'x 557, 562 (2d Cir. 2018) (summary order) (quoting Dancy v. McGinley, 843 F.3d 93, 107 (2d Cir. 2016)). Moreover, qualified immunity does not apply "when alleged fabrication of evidence is key to the case," as it is here. Bailey, 79 F. Supp. 3d at 458. In light of Plaintiff's allegations that the Witherspoon evidence was itself corrupted by certain Individual County Defendants, and the "formidable hurdle" the County Defendants face at this stage, the Court concludes that qualified immunity is inappropriate at this juncture.

Turning to the parties' arguments, the County Defendants dispute only the lack of probable cause requirement. However, at this stage in the proceedings, the Court cannot find the County Defendants had independent probable cause to believe the criminal

proceeding against Plaintiff could succeed, as required to defeat a malicious prosecution claim. Instead, where, as here, facts are contested and the court is without a record fully developed through discovery, it cannot make a probable cause finding without discrediting the SAC's well-pleaded allegations of fabricated and concealed evidence, which it is precluded from doing at the dismissal stage. Shabazz v. Kailer, 201 F. Supp. 3d 386, 397 (S.D.N.Y. 2016) (in context of evidence fabrication claim, distinguishing Hoyos "because it was decided on a motion for summary judgment" and declining to conclude on motion to dismiss "that the allegedly fabricated evidence did not cause the prosecutor to initiate the prosecution against the plaintiffs when she otherwise would not have proceeded with the prosecution").

Indeed, Plaintiff alleges facts that undermine the County Defendants' probable cause determination. Specifically, Plaintiff alleges certain Individual County Defendants, namely, Abbondandelo, Dempsey, Mullen, and Severin, became aware of key statements from Larrea and Montes, which were omitted from the Morning Report, that were at odds with the information provided by Witherspoon, on whose statements and testimony the County Defendants attempt to base their entire probable cause determination. Moreover, Plaintiff alleges that Individual County Defendant Swenson received information from two other witnesses who were in the vicinity of the shooting, Valdez and her unnamed

boyfriend, that further contradicted Witherspoon's information and the story later developed by investigators and prosecutors.  Then, when confronted with information from Jenkins that corroborated Montes and Larrea's account, Plaintiff alleges Dempsey, Mullen, Abbondandelo, and Alger caused Jenkins to change his story and implicate Plaintiff.   Thus, unlike the defendants in Jean, according to the allegations, here, the County Defendants discovered "intervening fact[s]" that dissipated any probable cause determination supported by evidence furnished by Witherspoon.  2020 WL 1244786, at *9.

The Court declines the County Defendants' invitation to turn a blind eye to these allegations and rely entirely on Witherspoon to find probable cause existed to prosecute.  As Plaintiff aptly points out, each of the cases cited by the County Defendants was decided at the summary judgment stage.  (See Pl. Opp. to County Defs. at 20-22.)  The County Defendants fail to identify a single case decided on motion to dismiss where the district court, confronted with well-pleaded allegations of evidence fabrication, dismissed a malicious prosecution claim based on a finding that the defendants had probable cause to prosecute independent of that allegedly fabricated evidence.  See, e.g., Hoyos, 999 F. Supp. 2d at 390 (dismissing malicious prosecution claim based on independent probable cause on summary judgment); Morse, 2012 WL 3202963 (same); Torres v. City of New

York, No. 16-CV-6719, 2017 WL 4325822, at *5 (Sept. 27, 2017) (same).

Last, the County Defendants rely on Morse and its progeny for the proposition that "even where plaintiff alleges, as here, that the malicious prosecution is based on fabricated evidence, 'the existence of probable cause independent of the fabricated evidence is a defense to that claim.'" Hoyos, 999 F. Supp. 2d at 390 (quoting Morse, 2012 WL 3202963, at *5); (County Defs. Br. at 20-21; County Defs. Reply at 2-4). The Court agrees with the legal proposition, which "tethers" the malicious prosecution claim to its Fourth Amendments roots and ensures it remains legally distinct from the fair trial claim, but declines to apply it here on a motion to dismiss, because according to the SAC's allegations, the evidence the County Defendants claim supported their probable cause judgment was not "independent" of the alleged fabrication. "[I]nherent to the exception of independent probable cause is that the probable cause must be independent from the alleged fabrication." Ross, 2019 WL 4805147, at *8. While the County Defendants point to the evidence provided by Witherspoon as independent probable cause supporting Plaintiff's prosecution (County Defs. Br. at 19-20), Plaintiff alleges that certain Individual County Defendants corrupted the account of Witherspoon to pin the murder on him (SAC ¶ 60). As a result, at this stage,

the evidence Witherspoon provided cannot be considered separate or independent from the allegedly fabricated or concealed evidence.

2. *Fabrication of Evidence / Deprivation of Fair Trial (Claim 2)*

Plaintiff asserts his claim for fabrication of evidence against Individual County Defendants Abbondandelo, Dempsey, Mullen and Severin, Alger, and Kosier. The County Defendants move to dismiss this claim as against Severin and Alger, arguing the SAC fails to adequately allege they personally participated in the alleged fabrication of evidence. (County Defs. Br. at 21-22.)

"The Due Process Clause guarantees a criminal defendant's 'right to a fair trial.'" Frost, 980 F.3d at 244 (quoting Ramchair v. Conway, 601 F.3d 66, 73 (2d Cir. 2010)). A defendant's violation of this right is "redressable in action for damages under 42 U.S.C. § 1983." Id. (quoting Ricciuti, 124 F.3d at 130). The elements of a denial of the right to a fair trial claim are: "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." Garnett, 838 F.3d at 279.

First, as to Severin, whom Plaintiff describes as a "high-ranking" supervisor (SAC ¶ 38), the Court finds the SAC adequately pleads his direct participation in the alleged fabrication of evidence, because Plaintiff alleges that Severin

39

"altered the official narrative of the crime" by excluding from the Morning Report any reference to the Montes and Larrea Statements and mischaracterizing Witherspoon's statements to police. The Second Circuit has clarified that fraudulent omissions, like the one alleged here, can serve as fabricated evidence for the purposes of a claim for denial of a fair trial. Morse v. Fusto, 804 F.3d 538, 550 (2d Cir. 2015); see also Hutchins v. Solomon, No. 16-CV-10029, 2018 WL 4757970, at *17 (S.D.N.Y. Sept. 29, 2018) ("[I]n the context of a fabrication of evidence claim, the Second Circuit equates 'the fraudulent omission of factual information . . . with the affirmative perpetration of a falsehood,' and expressly disclaims any 'plausible legal distinction between misstatements and omissions'" (quoting Fusto, 804 F.3d at 550)). In short, Plaintiff has "identif[ied] the actual fabrication" Severin is alleged to have perpetrated, i.e., omitting key statements from the Morning Report. Hutchins, 2018 WL 4757970, at *16. At this juncture, that is enough to plausibly plead direct participation.

Second, as to Alger, the Court similarly finds that the SAC adequately pleads his direct participation in the alleged fabrication of evidence. Plaintiff alleges Alger and other Individual County Defendants "corruptly coordinated the accounts of Peddie Jenkins and Skwanitra Witherspoon to manufacture the identification of [Plaintiff] as the alleged perpetrator,"

notwithstanding evidence to the contrary. (SAC ¶¶ 60-63.)[7] Thus, unlike those cases in which courts have dismissed denial of fair trial claims for lack of personal participation, Plaintiff has "state[d] with requisite specificity the evidence that was purportedly fabricated" and Alger's direct involvement in the fabrication. See Longo v. Ortiz, No. 15-CV-7716, 2016 WL 5376212, at *6 (S.D.N.Y. Sept. 26, 2016) (dismissing denial of fair trial claim where plaintiff's allegations that "the defendants fabricated evidence, gave false testimony, and made false extrajudicial statements to the Manhattan District Attorney's Office to be used against Mr. Longo at trial as well as to a Supreme Court judge in an effort to secure a search warrant, indictment and conviction against [the plaintiff]" lacked specificity); Lewis v. City of New York, 591 F. App'x 21, 22 (2d Cir. 2015) (summary order) ("[A]gree[ing] with the district court that because Lewis has provided no detail regarding the evidence purportedly fabricated by the defendant officers, he has not stated a plausible claim for denial of the right to a fair trial.").

---

[7] Plaintiff further alleges that Alger and other County Defendants attempted to persuade Richard "Woody" Miller, "a barber," and brothers Tyrone and Roy Isaac to falsely implicate Plaintiff as the murderer but, realizing their testimony exonerated Plaintiff, suppressed it. (SAC ¶¶ 64-65.) These conclusory allegations "are not entitled to the assumption of truth," Hayden v. Patterson, 594 F.3d 150, 161 (2d Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)), since Plaintiff does not provide any background on these individuals' involvement in the shooting, let alone describe their allegedly exculpatory statements. For that reason, the Court declines to consider them.

Accordingly, the County Defendants' motion to dismiss Plaintiff's fabrication of evidence claim as against Severin and Alger is DENIED.

3.   *Brady Violations (Claim 10)*

Plaintiff asserts that the Individual County and Village Defendants violated Brady by suppressing the following pieces of evidence: (1) the Montes and Larrea Statements; (2) the 911 call recording; (3) the notes from Swenson's interview with Valdez; and (4) the Zimmer-Baldwin Interview.   The County Defendants argue that Plaintiff did receive the Montes and Larrea Statements at his suppression hearing in the underlying criminal case; that the 911 call may not have occurred; and that the Valdez interview notes and the Zimmer-Baldwin Interview are not Brady materials.   (County Defs. Br. at 28-29.)   The Village Defendants argue that they did not prosecute Plaintiff in his underlying criminal case, and that Plaintiff does not allege they failed to turn over any evidence. (Village Defs. Br. at 17.)

"A Brady violation has three components: '(1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued.'"   Paulin v. City of Beacon, No. 17-CV-5105, 2019 WL 4274211, at *5 (S.D.N.Y.

Sept. 10, 2019) (quoting <u>United States v. Jackson</u>, 345 F.3d 59, 71 (2d Cir. 2003)).

First, as alleged, Plaintiff can proceed with his <u>Brady</u> claims against the Individual County Defendants, based upon their involvement in the investigation and prosecution of Plaintiff. <u>Rosario v. City of New York</u>, No. 18-CV-4023, 2019 WL 4450685, at *5 (S.D.N.Y. Sept. 16, 2019) ("Although the Complaint does not specify which Defendants interviewed Ms. Torres, it pleads that all individual Defendants, except Defendant Monks, questioned witnesses or documented their interviews.")  While the County Defendants argue that Plaintiff did receive the Larrea and Montes Statements in one of the state court pre-trial submissions (<u>see</u> Ex. B) and that the 911 call may not have occurred as alleged, "no materials that may be properly considered on this [dismissal] motion undermine the allegations that Defendants failed to disclose [the Larrea and Montes S]tatements or [their] identity as the source of the statements in a timely manner." <u>Id.</u>  The County Defendants' remaining arguments are without merit.[8]

As for Individual Village Defendants, Plaintiff admits he received the audio file of the Zimmer-Baldwin Interview from the County Defendants.  (ECF No. 242 at 2.).  Tellingly, in his

---

[8] Because the Court finds it unnecessary to address Plaintiff's estoppel argument, the Court declines to consider the arguments relating to this issue raised in supplemental briefing submitted by the parties (<u>see</u> ECF Nos. 317, 318).

SAC, Plaintiff does not explicitly attribute the suppression to the Village. (E.g., SAC ¶ 54 ("Defendants' suppression of the Zimmer-Baldwin Interview . . . ." (emphasis added")).) In light of Plaintiff's concession and his general allegation regarding the suppression of the Zimmer-Baldwin Interview, Plaintiff has not plausibly alleged a Brady claim against the Individual Village Defendants.

Accordingly, the Individual County Defendants' motion to dismiss the Brady violation claim is DENIED, and the Individual Village County Defendants' motion to dismiss the Brady violation claim is GRANTED.

4. *Coercion (Claim 3)*

Plaintiff asserts his coercion claim against Individual County Defendants Abbondandelo, Dempsey, Mullen, and Kosier, alleging that, while in custody, they extracted a false confession from him by lying to his family in order to "circumvent" his right to representation, and beating, threatening and lying to him during the course of a thirty-nine hour interrogation that was partly conducted in a "frigid interrogation room." (SAC ¶¶ 67-71.) The County Defendants move to dismiss this claim as against Kosier, arguing the SAC fails to adequately allege he personally participated in the alleged coercion. (County Defs. Br. at 21-22.)

A Section 1983 coercion claim may arise "if coercion was applied to obtain a waiver of the plaintiff's rights against self-incrimination and/or to obtain inculpatory statements, and the statements thereby obtained were used against the plaintiff in a criminal proceeding." Hincapie v. City of New York, 434 F. Supp. 3d 61, 76 (2020) (quoting Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 346 (2d Cir. 1998)); see also Sedunova v. City of New York, 652 F. App'x 29, 31 (2d Cir. 2016) (summary order), as corrected (June 29, 2016).

The Court finds Plaintiff adequately pleads Kosier's direct involvement in the alleged coercion that extracted Plaintiff's false confession. It is true, as the County Defendants point out, that the SAC does not allege that Kosier, unlike Abbondandelo, Dempsey, and Mullen, threatened and beat Plaintiff during his interrogation. Rather, Plaintiff limits his allegation against Kosier, alleging only that he lied during Plaintiff's interrogation. However, the County Defendants fail to explain why that distinction warrants dismissing these claims against Kosier, especially where the SAC explicitly alleges Kosier was part of the team of Individual County Defendants that coerced Plaintiff through "inhumane treatment" into signing a false confession that was used at trial to secure his conviction. See Hincapie, 434 F. Supp. 3d at 71 (finding complaint adequately alleged personal involvement in conduct giving rise to the plaintiff's Section 1983

claim for coercion). Moreover, to the extent the County Defendants' attempt to controvert the timeline of events as alleged by relying on external materials, as discussed <u>supra</u>, that reliance is improper at this stage of the proceedings.[9]

Accordingly, the County Defendants' motion to dismiss Plaintiff's coercion claim as against Kosier is DENIED.

5.  *Supervisory Liability (Claim 4)*

Plaintiff asserts a claim for supervisory liability under Section 1983 as against Individual County Defendant Severin and John Doe supervisory defendants. However, as the Second Circuit recently made clear, "there is no special rule for supervisory liability" and, in order "[t]o hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." Tangreti, 983 F.3d at 620. As a result, Plaintiff cannot proceed against Severin under Section 1983 based purely on his supervisory role at the County. Nevertheless, because

---

[9] In connection with his coercion claim, Plaintiff references the polygraph results of Takita Dorsey who, according to the allegedly false confession, was a key player in the murder conspiracy. (SAC ¶ 74.) Plaintiff claims, without alleging any facts regarding Dorsey's involvement in the shooting or the results of Dorsey's polygraph test, that the polygraph test result contradicted Plaintiff's allegedly false confession. These conclusory allegations "are not entitled to the assumption of truth," and the Court declines to consider them. Hayden v. Patterson, 594 F.3d 150, 161 (2d Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).

Plaintiff has adequately pleaded Severin's direct participation in certain constitutional violations, see supra, Plaintiff's claims may proceed under that theory.

Accordingly, the County Defendants' motion to dismiss Plaintiff's Section 1983 supervisory claim as against Severin and John Doe supervisory defendants is GRANTED.

### 6.    *Monell* (Claim 5)

Next, Plaintiff brings a Section 1983 claim against the County and Village under Monell.  Plaintiff asserts three distinct theories of Monell liability: (1) a de facto policy or custom through a widespread practice; (2) failure to train; and (3) failure to supervise and discipline.  (See SAC ¶¶ 76-88, 113-18, 150-55.)  In connection with his Monell claim, Plaintiff first alleges that the County and Village maintained unofficial policies of conducting constitutionally inadequate investigations, fabricating inculpatory evidence, committing perjury, failing to obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted, suppressing from prosecutors material information favorable to criminal defendants, failing to comply with Brady obligations, and employing unconstitutional interrogation tactics.  (See id. ¶ 150.)  Plaintiff next alleges that the County and Village demonstrated deliberate indifference in failing to train, supervise, and discipline employees with respect to these alleged unconstitutional practices.  (See id. ¶¶

151-53.)   In support of these allegations, Plaintiff relies on allegations of misconduct, including fabrication of evidence and coercive interrogation tactics, by County investigators, including Dempsey, cited in this Court's August 27, 2012 decision in Kogut v. County of Nassau, No. 06-CV-6695, 2012 WL 3704710, a case that ended without imposing Monell liability.   (Id. ¶¶ 76-88.)

It is well established that a municipality such as the County and the Village cannot be held liable under Section 1983 on a respondeat superior theory.   See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978); Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008).   "Rather, municipalities may be liable only where 'execution of a government's policy or custom' causes constitutional violations."   Buari v. City of New York, No. 18-CV-12299, 2021 WL 1198371, at *21 (S.D.N.Y. Mar. 30, 2021) (quoting Monell, 436 U.S. at 694).

"To prevail against a municipality in a Section 1983 action, a plaintiff must plead and prove three elements: (1) an official policy or custom that (2) caused the plaintiff to be subjected to (3) a denial of a constitutional right."   Kogut v. County of Nassau, No. 06-CV-6695, 2009 WL 5033937 (E.D.N.Y. Dec. 11, 2009) (citing Hartline v. Gallo, 546 F.3d 95, 103 (2d Cir. 2008)).   "For a Monell claim to survive a motion to dismiss, a plaintiff must allege 'sufficient factual detail' and not mere 'boilerplate allegations' that the violation of the plaintiff's

constitutional rights resulted from the municipality's custom or
official policy." Ying Li v. City of New York, 246 F. Supp. 3d
578, 636 (E.D.N.Y. 2017) (quoting Plair v. City of New York, 789
F. Supp. 2d 459, 469 (S.D.N.Y. 2011) (collecting cases)); see also
Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993) ("The
mere assertion . . . that a municipality has such a custom or
policy is insufficient in the absence of allegations of fact
tending to support, at least circumstantially, such an
inference."), overruled on other grounds by Leatherman v. Tarrant
County Narcotics Intelligence & Coordination Unit, 507 U.S. 163
(1993). The plaintiff can satisfy the municipal policy requirement
by alleging:

> (1) a formal policy officially endorsed by the
> municipality; (2) actions or decisions made by
> municipal officials with decision-making
> authority; (3) a practice so persistent and
> widespread that it constitutes a custom
> through which constructive notice is imposed
> upon policymakers; or (4) a failure by
> policymakers to properly train or supervise
> their subordinates, such that the policymakers
> exercised 'deliberate indifference' to the
> rights of the plaintiff.

Ying Li, 246 F. Supp. 3d at 636 (citing Second Circuit decisions).

"To demonstrate a de facto policy or custom through a
widespread practice, a plaintiff must 'show that the policymaker
was aware of a subordinate's unconstitutional actions, and
consciously chose to ignore them, effectively ratifying the
actions.'" Buari, 2021 WL 1198371, at *22 (quoting Amnesty America

v. Town of West Hartford, 361 F.3d 113, 126 (2d Cir. 2004)).  To
do so, the plaintiff can "cit[e] to complaints in other cases that
contain similar allegations," provided those complaints "involve
factually  similar  misconduct,  [are]  contemporaneous  to  the
misconduct at issue in the plaintiff's case, and result in an
adjudication of liability."  Id. (first quoting Gaston v. Ruiz,
No. 17-CV-1252, 2018 WL 3336448, at *6 (E.D.N.Y. July 6, 2018);
then quoting Isaac v. City of New York, No. 16-CV-4729, 2018 WL
5020173, at *17 (E.D.N.Y. Aug. 6, 2018), and Calderon v. City of
New York, 138 F. Supp. 3d 593, 613 (S.D.N.Y. 2015)).

        The plaintiff can also base his Monell claim on a showing
of "deliberate indifference" to a risk that a recurring situation
will likely result in a constitutional violation.  Davis v. City
of New York, 75 F. App'x 827, 829 (2d Cir. 2003).  To support a
claim that a municipality's failure to train amounts to deliberate
indifference, the plaintiff must show:

>               (1) that a policymaker of the municipality
>               knows to a moral certainty that its employees
>               will confront a given situation; (2) that the
>               situation either presents the employee with a
>               difficult choice of the sort that training or
>               supervision will make less difficult or that
>               there is a history of employees mishandling
>               the situation; and (3) that the wrong choice
>               by the employee will frequently cause the
>               deprivation of a citizen's constitutional
>               rights.

Young v. County of Fulton, 160 F.3d 899, 903-04 (2d Cir. 1998)
(citing Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir.

1992) (internal quotations and alterations omitted)). Liability for deliberate indifference can be based on two distinct theories: failure to train or failure to supervise/discipline. Amnesty America, 361 F.3d at 127.

Under the failure-to-train theory, the plaintiff must "allege facts that support an inference that the municipality failed to train its police officers, that it did so with deliberate indifference, and that the failure to train caused his constitutional injuries." Tieman v. City of Newburgh, No. 13-CV-4178, 2015 WL 1379652, at *20 (S.D.N.Y. Mar. 26, 2015). While "[r]ecurring civil rights complaints can put a municipality on notice of deficiencies in its training program . . . [t]here is no bright-line rule for how many civil rights complaints there must be, or how recent the complaints must be, to put a municipality on notice." Buari, 2021 WL 1198371, at *23 (first citing Breton v. City of New York, 404 F. Supp. 3d 799, 818 (S.D.N.Y. 2019); then citing Tieman, 2015 WL 1379652, at *20).

Under the failure-to-supervise theory, a plaintiff must plead "(1) there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) the municipality consistently failed to investigate those allegations." Treadwell v. County of Putnam, No. 14-CV-10137, 2016 WL 1268279, at *4 (S.D.N.Y. Mar. 30, 2016) (citing Tieman, 2015 WL 1379652, at *21-22). While an obvious need for greater

supervision to protect against unconstitutional conduct "may be demonstrated through proof of repeated complaints of civil rights violations" that are not followed by a "meaningful attempt . . . to investigate or to forestall further incidents," Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995), "there is no requirement that complaints result in a formal finding of misconduct for such complaints to support findings of failure to supervise." Felix v. City of New York, 344 F. Supp. 3d 644, 662 (S.D.N.Y. 2018).

i.   *The County Defendants*

(a)   Widespread Practice Theory

First, Plaintiff fails to plausibly allege that there is a County practice of conducting constitutionally inadequate investigations, fabricating inculpatory evidence, committing perjury, failing to obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted, suppressing from prosecutors material information favorable to criminal defendants, failing to comply with Brady obligations, and employing unconstitutional interrogation tactics "so widespread as to have the force of law." Board of County Comm'rs v. Brown, 520 U.S. 397, 404 (1997); see also City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) ("[T]he Court has long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express

municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167–168 (1970)). As noted, in support of these allegations, Plaintiff relies upon this Court's August 27, 2012 decision in Kogut, discussing allegations of misconduct by County investigators, including Dempsey, for fabrication of evidence and coercive interrogation tactics. (SAC ¶ 76 (block quoting Kogut, 2012 WL 3704710, at *2-3).) He further alleges other similar claims of Dempsey's misconduct which, upon further review, are allegations copied and pasted from certain plaintiffs' Local Rule 56.1 Statements in Kogut. (Compare SAC ¶¶ 78-88), with Kogut v. County of Nassau, No. 06-CV-6695, Pls. 56.1 Stmt., ECF No. 243, ¶¶ 77-87. However, the lawsuits cited in Kogut and the other complaints alleged are insufficient to plausibly support an inference of a widespread custom in this instance. See Tieman, 2015 WL 1379652, at *17 (concluding allegations of nine lawsuits in five years, plus "public forum comments" and a third-party report on the defendant-city's misconduct, were insufficient to plausibly allege a Monell claim for widespread custom).

To begin, even if the lawsuits and complaints involved similar conduct to that alleged here, only two ended in adjudication of liability -- one for malicious prosecution and the other for malicious prosecution and fabrication of evidence -- and none resulted in adjudication of Monell liability. As a result,

these lawsuits cannot support Plaintiff's allegation of a widespread de facto custom of conducting constitutionally inadequate investigations, committing perjury, suppressing from prosecutors material information favorable to criminal defendants, failing to comply with Brady obligations, and employing unconstitutional interrogation tactics, because they do not involve factually similar misconduct. Nor can they support an inference of a widespread custom of fabricating inculpatory evidence or failing to obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted. The fact that on two occasions two of the County's investigators, only one of whom is an Individual Defendant here, were found liable for unconstitutional conduct over a ten year period "during which hundreds, if not thousands, of arrests were made" does not plausibly demonstrate that fabricating evidence and maliciously prosecuting individuals "was so frequent and pervasive to constitute a custom." Id. (citing Walker v. City of New York, No. 12-CV-5902, 2014 WL 1259618, at *3 (S.D.N.Y. Mar. 18, 2014)). "Even drawing reasonable inferences in [Plaintiff's] favor, such a relatively small number of cases over the course of [one] decade[] in such a large municipality does not plausibly suggest that the alleged practice is 'so widespread as to have the force of law' . . . or 'so manifest as to imply the constructive acquiescence of senior policy-making officials.'" Buari, 2021 WL

1198371, at *26 (first quoting <u>Brown</u>, 520 U.S. at 404; then quoting <u>Sorlucco v. N.Y.C. Police Dep't</u>, 971 F.2d 864, 871 (2d Cir. 1992)).

(b)  <u>Failure-to-Train and Failure-to-Supervise Theories</u>

However, Plaintiff can proceed with his <u>Monell</u> claim under the failure-to-train and failure-to-supervise theories.  In this context, the lawsuits pleaded by Plaintiff and discussed <u>supra</u> were sufficient to put the County on notice of the need for more supervision and deficiencies in its training program.  <u>See</u> <u>Tieman</u>, 2015 WL 1379652, at *20; <u>see also</u> <u>McCants v. City of Newburgh</u>, No. 14-CV-556, 2014 WL 6645987, at *4 (S.D.N.Y. Nov. 21, 2014), <u>clarified on denial of reconsideration</u>, 2014 WL 7398910 (S.D.N.Y. Dec. 9, 2014) (denying motion to dismiss <u>Monell</u> claim on deliberate indifference grounds where the plaintiff's pleadings referred to seventeen other excessive force claims in the seven-year period preceding the at-issue conduct, thus placing the municipality "on notice to the possible use of excessive force by its police officers"); <u>Farrow v. City of Syracuse</u>, No. 12-CV-1401, 2014 WL 1311903, at *8, n.7 (N.D.N.Y. Mar. 31, 2014) (observing, <u>obiter dictum</u>, that plaintiff's <u>Monell</u> claim would have survived motion to dismiss based on fifteen excessive force claims filed against the municipality in the five-year period preceding the at-issue conduct).  As the Second Circuit stated in <u>Amnesty America</u>, to state a claim for a municipality's failure to train its employees, the plaintiff "need only plead that the city's failure to train

55

caused the constitutional violation," because "[i]t is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage." 361 F.3d at 130, n.10.[10] Moreover, Plaintiff has alleged, and this Court concluded in Kogut based on uncontroverted statements of fact filed in connection with summary judgment motions, that the County failed to investigate and discipline officers for their conduct. Kogut, 2012 WL 3704710, at *2-3. Stated differently, Plaintiff has plausibly pleaded deliberate indifference by alleging enough facts to support an inference that the County persistently failed to investigate complaints or discipline officers whose conducted prompted the complaints.

### ii. *The Village*

Conversely, Plaintiff has not alleged enough facts to establish Monell liability as to the Village. Unlike the multiple constitutional violations alleged against the County, the

---

[10] The Court recognizes that other district courts in this Circuit interpret Twombly and Iqbal, which post-date Amnesty America, as requiring plaintiffs to "provide more than a simple recitation of their theory of liability, even if that theory is based on a failure to train." Simms v. City of New York, No. 10-CV-3420, 2011 WL 4543051, at *2 n.3 (collecting cases), aff'd Simms v. City of New York, 480 F. App'x 627 (2d Cir. 2012). But as this Court has explained, the Twombly/Iqbal standard is "context specific," and a plaintiff has "no realistic way to learn about a municipality's training programs without discovery." Michael v. County of Nassau, No. 09-CV-5200, 2010 WL 3237143, at *4 (E.D.N.Y. Aug. 11, 2010) (Seybert, J.); see also Ferrari v. County of Suffolk, 790 F. Supp. 2d 34, 46 (E.D.N.Y. 2011) (Seybert, J.) (same).

allegations against the Village are boilerplate.  In one representative example, Plaintiff alleges, without specificity, that the Village "failed to train or supervise investigators to ensure they complied with constitutional requirements in eliciting confessions . . . ."  (SAC ¶ 117.)  But by the SAC's own allegations, the Individual Village Defendants were not involved in Plaintiff's interrogation.  Moreover, Plaintiff offers no evidence of similar lawsuits, grievances or complaints against the Village; "[t]he absence of such detail dooms Plaintiff's [cause of action]."  Rivera v. Westchester County, No. 18-CV-8354, 2019 WL 3958425, at *5 (S.D.N.Y. Aug. 22, 2019).  "Although Plaintiff alleges that policymakers 'tolerated' a policy or custom of Brady violations, he provides no examples beyond what occurred in his own case, which is insufficient." Paulin, 2019 WL 4274211, at *7 (collecting cases where plaintiffs made boilerplate Monell allegations); Tieman, 2015 WL 1379652, at *13 (S.D.N.Y. Mar. 26, 2015) ("[M]ere allegations of a municipal custom, a practice of tolerating official misconduct, or inadequate training and/or supervision are insufficient to demonstrate the existence of such a custom unless supported by factual details.").

Accordingly, the County's motion to dismiss Plaintiff's claim for Monell liability is GRANTED IN PART as to Plaintiff's widespread practice theory, and DENIED IN PART as to Plaintiff's failure-to-train and failure-to-supervise theories; and the

57

Village's motion to dismiss Plaintiff's claim for <u>Monell</u> liability is GRANTED.

   7. *Conspiracy (Claim 9)*[11]

  Plaintiff alleges that the Individual County and Village Defendants conspired to violate Plaintiff's constitutional rights and cause his wrongful conviction. (SAC ¶ 172.) In support of that claim Plaintiff highlights: (1) the suppression of the Zimmer-Baldwin Interview, recorded by Individual Village Defendant Zimmer, and (2) Individual Village Defendant Melendez's interactions with Montes and Larrea the night of the incident. (SAC ¶¶ 41-42, 174). Because the conspiracy allegations against the Individual Village Defendants are conclusory, Plaintiff's conspiracy claim asserted against them cannot survive the Village Defendants' motion to dismiss.

  To establish a conspiracy claim under Section 1983, Plaintiff must allege "(1) an agreement between two or more state actors, or between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." <u>Tankleff v. County of Suffolk</u>, No. 09-CV-1207, 2010 WL 5341929, at *11 (E.D.N.Y. Dec. 21, 2010) (quoting <u>Pangburn v. Culbertson</u>, 200 F.3d 65, 72 (2d. Cir. 1999)); <u>see also</u> <u>Ciambrello v. County of Nassau</u>,

---

[11] The Individual County Defendants do not move to dismiss the conspiracy claims.

292 F.3d 307, 324-25 (2d Cir. 2002).  Additionally, to survive a motion to dismiss, the complaint must allege facts that plausibly suggest a "meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." Romer v. Morgenthau, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000) (quoting Warren v. Fischl, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999)); see also Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003). While "conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence," Pangburn, 200 F.3d at 72, the plaintiff must still allege facts beyond "conclusory, vague, or general allegations" to assert the existence of an agreement to inflict constitutional injury, Ciambriello, 292 F.3d at 324-25.  Thus, dismissal is proper if the complaint "contain[s] only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights." Ciambriello, 292 F.3d at 325 (citation omitted).

The SAC fails to allege an agreement among the Individual County and Village Defendants to act in concert to violate Plaintiff's rights.  Indeed, taking a step back, more than three years into this litigation, and after amending his complaint twice, Plaintiff's allegations against the Village remain sparse.  As to Melendez, Plaintiff alleges that Melendez was aware that Larrea, an acquaintance, lied to his NYPD supervisors about the fact he

was intoxicated the night of the incident, thus providing Melendez a motive to cover up Larrea's intoxication and blame Plaintiff for the murder. But speculation that Melendez was motivated to conspire is not enough. See Rosario, 2019 WL 4450685, at *7 (finding allegations that an eyewitness was motivated to conspire with law enforcement to incriminate plaintiff in shooting insufficient to make out conspiracy claim at pleading stage). Rather, Plaintiff must "allege with at least some degree of particularity overt acts which [Defendant Melendez] engaged in which were reasonably related to the promotion of the alleged conspiracy." Myers v. County of Nassau, 825 F. Supp. 2d 359, 368 (E.D.N.Y. 2011). Plaintiff does not allege Melendez took any acts to further the supposed conspiracy, and his additional conspiracy-related allegations, with the exception of the Zimmer-Baldwin interview, all relate to investigative actions undertaken by Individual County Defendants.

Nor can the alleged suppression of the Zimmer-Baldwin Interview establish a conspiracy. Plaintiff alleges "[t]he Zimmer-Baldwin Interview proves the existence of a conspiracy between Freeport and Nassau that extended from immediately after the homicide for many months through [P]laintiff's conviction." (SAC ¶ 174.) This is the type of vague and conclusory assertion that cannot survive a motion to dismiss. See Sharp v. Town of Greece, No. 09-CV-6452, 2010 WL 1816639, at *7 (W.D.N.Y. May 3,

2010) (finding allegation that defendant "took action pursuant to an agreement" insufficient to make out a conspiracy claim). Plaintiff does not allege any facts to tie Zimmer to the alleged conspiracy to deprive Plaintiff of a fair trial, such as contact or coordination between Zimmer and other Individual County Defendants subject to the conspiracy claim. See Buari, 2021 WL 1198371, at 19 ("The Court cannot infer that these individuals, without having spoken to one another, all acted in concert with the goal of depriving [the plaintiff] of his constitutional rights.")  There are no facts in the SAC supporting Plaintiff's allegation that there was a meeting of the minds, rendering his conspiracy claim against the Individual Village Defendants untenable.   Even when confronted with plausibly alleged constitutional violations, courts routinely dismiss conspiracy claims where the plaintiff fails to allege facts from which a meeting of the minds can be inferred. See, e.g., Hickey-McAllister v. Brit. Airways, 978 F. Supp. 133, 139 (E.D.N.Y. 1997) ("Because plaintiff has alleged no facts at all from which a meeting of the minds between Anton and Smith on a course of action intended to deprive plaintiff of her constitutional rights can be inferred, her allegations are insufficient to survive a motion for dismissal."); Warren, 33 F. Supp. 2d at 177 (finding insufficient allegation of conspiracy despite plaintiff's specific claims of conspiracy to alter tapes and create illegal search warrants, where

there was no basis for the assertion that defendants actually conspired together to bring about these actions); Romer, 119 F. Supp. 2d at 364.

Accordingly, the Village's motion to dismiss Plaintiff's conspiracy claim is GRANTED.

8.   *Failure to Intervene (Claim 12)*

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994). To plead a failure to intervene claim, a plaintiff must allege "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." Guerrero v. City of New York, No. 16-CV-0516, 2017 WL 2271467, at *3 (S.D.N.Y. May 23, 2017) (quoting Jean-Laurent v. Wilkinson, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008), aff'd sub nom. Jean-Laurent v. Wilkerson, 61 F. App'x 18 (2d Cir. 2012)). Further, the Court recognizes that "a failure to intervene theory of liability is inapplicable where a defendant is a direct participant in the alleged primary violation," but aligns itself with other courts that have permitted plaintiffs to plead failure to intervene claims in the alternative,

as Plaintiff does here.  Guerrero, 2017 WL 2271467, *4 (collecting cases).

The Court finds Plaintiff has plausibly alleged that the Individual County Defendants had a reasonable opportunity to intervene to prevent various constitutional harms, including, for example, undue coercion in connection with Plaintiff's interrogation, but failed to take reasonable steps to intervene. However, because Plaintiff fails to allege any facts showing either of the Individual Village Defendants, given their limited involvement in the investigation according to the SAC, had a "realistic opportunity to intervene and prevent" the alleged constitutional harm, Plaintiff's claim against the Village is dismissed.

Accordingly, the County's motion to dismiss Plaintiff's failure to intervene claim is DENIED, and the Village's motion to dismiss Plaintiff's failure to intervene claim is GRANTED.

9.   *Unlawful Pre-Trial Detention under Russo (Claim 11)*

Although false arrest and unlawful detention claims generally may be considered together, see, e.g., Little v. City of New York, 487 F. Supp. 2d 426, 437 (S.D.N.Y. 2007) ("False arrest is simply an unlawful detention or confinement brought about by means of an arrest rather than in some other way and is in all other respects synonymous with false imprisonment,"), the two claims have grown to be distinct in the Second Circuit, under certain circumstances.  See Russo v. City of Bridgeport, 479 F.3d 196 (2d Cir. 2007).

Jackson v. City of New York, 29 F. Supp. 3d 161, 178 (E.D.N.Y. 2014).  To prevail on an unlawful pre-trial detention claim, a plaintiff must show "(1) that he has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) that the actions of the officers violated that right, and (3) that the officers' conduct shocks the conscience." Delamota v. City of New York, 683 F. App'x 65, 67 (2d Cir. 2017) (summary order) (quoting Russo, 479 F.3d at 205 (internal quotation marks omitted)).

In Russo, the police arrested the plaintiff for first-degree robbery based on a cashier's identification of the plaintiff in a photo line-up. Russo, 479 F.3d at 199.  The crime was also recorded on videotape by a security camera, in which the robber's left arm and parts of his forearms, all free of tattoos, were depicted. Id.  However, the plaintiff had prominent tattoos on his forearms, hands, neck, and legs. Id. at 199-200. Nevertheless, during the subsequent seven months that the plaintiff was incarcerated, the officers did not provide the plaintiff with a copy of the videotape, despite numerous requests, and misrepresented that the videotape showed the perpetrator had body tattoos in an effort to secure the plaintiff's confession. Id. at 200.  When an attorney for the city finally went to retrieve the videotape, he found it locked in one of the officer's desk drawers. Id. at 201.  After viewing it, the city dropped the

charges.  Id. at 202.  Based on these facts, the Second Circuit held the defendants violated the plaintiff's Fourth Amendment right to be free from "sustained detention stemming directly from the law enforcement officials' refusal to investigate available evidence."  Id. at 208.

This case does not fit within the Russo framework, as there was no "definitive evidence" in the Village's or County's possession that could have proven that Plaintiff was not the shooter.  Husbands ex rel. Forde v. City of New York, 335 F. App'x 124, 129 (2d Cir. 2009); see also Harewood v. Braithwaite, 64 F. Supp. 3d 384, 403 (E.D.N.Y. 2014) ("A failure to investigate evidence that is only arguably exculpatory does not shock the conscience.").  Rather, "most of the evidence was testimonial, and while the evidence was conflicting, some of it specifically identified [Plaintiff]" as the shooter.  Wilson v. City of New York, 480 F. App'x 592, 595 (2d Cir. 2012).  Because "Russo has been narrowly construed to involve situations where a law enforcement official has mishandled or suppressed readily available exculpatory evidence," like the videotape that definitively exonerated the plaintiff in Russo, the Court finds Plaintiff has not plausibly alleged a claim for unlawful pre-trial detention.  Jackson, 29 F. Supp. 3d at 179 (emphasis added).

Accordingly, Defendants' motion to dismiss Plaintiff's claim for unlawful pre-trial detention is GRANTED.

65

D.   New York State Law Claims

1.   *Malicious Prosecution (Claim 6)*

In arguing for dismissal of the New York state law malicious prosecution claim, the County reiterates the same arguments it made in connection with Plaintiff's Section 1983 malicious prosecution claim. Because those arguments failed, and because the County does not explain why the outcome should be different under New York state law, the County's motion to dismiss this claim is DENIED.

The Village Defendants move for dismissal of Plaintiff's malicious prosecution claim on different grounds, arguing that the County, not the Village initiated the prosecution against Plaintiff. (Village Defs. Br. at 23-24.) Plaintiff argues in response that dismissal "would be premature." (Pl. Opp. to Village Defs. at 19.) However, the Court finds that it is well established under New York law that a village is not liable for malicious prosecution where it does not prosecute the plaintiff. See Roche v. Village of Tarrytown, 309 A.D.2d 842, 843, 766 N.Y.S.2d 46, 47 (N.Y. App. Div. 2d Dep't 2003) ("[S]ince the Village did not prosecute Roche, the Village cannot be charged with malicious prosecution."); O'Dell v. County of Livingston, 174 A.D.3d 1307, 1308, 103 N.Y.S.3d 730, 732 (N.Y. App. Div. 4th Dep't 2019) ("Inasmuch as the Village did not prosecute plaintiff, the Village

cannot be sued for malicious prosecution."). Accordingly, the Village's motion to dismiss this claim is GRANTED.

2. *False Imprisonment (Claim 7)*

Arguing for dismissal of Plaintiff's common law false imprisonment claim,[12] the County reiterates the arguments that it made in connection with Plaintiff's claim for malicious prosecution, i.e., the County had probable cause to arrest Plaintiff based on the Witherspoon statements. Having found that Plaintiff has plausibly alleged the County did not have probable cause to defeat Plaintiff's malicious prosecution claim, the Court concludes the same outcome is warranted as to Plaintiff's common law false imprisonment claim, even though the probable cause showing necessary to defeat a false arrest claim is less than that necessary to defeat a malicious prosecution claim. Accordingly, the County's motion to dismiss the false imprisonment claim is DENIED.

Because the Village did not arrest or detain Plaintiff, however, the Village's motion to dismiss Plaintiff's false imprisonment claim is GRANTED.

---

[12] The Court clarifies that Plaintiff's false imprisonment claim relates to the time he spent incarcerated for the murder of Steven Jason, not for any prior drug offenses.

3.   *Intentional and/or Negligent Infliction of Emotion Distress (Claim 8)*

Plaintiff asserts a claim for intentional and/or negligent infliction of emotional distress against the County and Village.   Under New York state law, the tort of intentional infliction of emotional distress has four elements: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." Grice v. McMurdy, 498 F. Supp. 3d 400, 414 (W.D.N.Y. 2020) (quoting A.M. ex rel. J.M. v. N.Y.C. Dep't of Educ., 840 F. Supp. 2d 660, 690 (E.D.N.Y. 2012)). As this Court has recognized in earlier wrongful conviction suits, it is well settled under New York law that the "circumstances under which recovery may be had for purely emotional harm are extremely limited . . . ." Tankleff v. County of Suffolk, No. 09-CV-1207, 2010 WL 5341929, at *14 (E.D.N.Y. Dec. 21, 2010) (quoting Jason v. Krey, 60 A.D.3d 735, 875 N.Y.S.2d 194, (N.Y. App. Div. 2d Dep't 2009)); see also Kogut v. County of Nassau, Nos. 06-CV-6695, 06-CV-6720, 2009 WL 5033937, at *12-13 (E.D.N.Y. Dec. 11, 2009) (Seybert, J.).   Moreover, the New York Court of Appeals has "questioned whether the doctrine of liability for intentional infliction of extreme emotional distress should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability," such as claims for false arrest or malicious prosecution, a proposition that has been consistently

applied by lower state courts and federal courts applying New York
law. Yang Feng Zhao v. City of New York, 656 F. Supp. 2d 375, 404
(S.D.N.Y. 2009) (quoting Fischer v. Maloney, 43 N.Y.2d 553, 557,
402 N.Y.S.2d 991, 992-93, 373 N.E.2d 1215 (N.Y. 1978)); see also
Moore v. City of New York, 219 F. Supp. 2d 335, 339 (E.D.N.Y.
2002).

     Here, Plaintiff alleges conduct that fits well within
traditional tort theories of false arrest and malicious
prosecution. Thus, his claim for intentional infliction of emotion
distress "will not fly." Yang Feng Zhao, 656 F. Supp. 2d at 405;
Moore, 219 F. Supp. 2d at 340 (dismissing intentional infliction
of emotional distress claims where they "overlap[ped]" with
traditional tort claims for false arrest and malicious
prosecution). The Court finds unpersuasive the cases cited by
Plaintiff because they fail to address the New York Court of
Appeals' concern that intentional infliction of emotional distress
claims are not the appropriate vehicle when a plaintiff's
allegations fit within the mold of traditional tort theories. (Pl.
Opp. to County Defs. at 29-30.)[13]

     Plaintiff's claim for negligent infliction of emotional
distress is an even greater stretch. In general, New York courts
have exhibited a "longstanding reluctance to recognize causes of

---

[13] See Newton v. City of New York, 566 F. Supp. 2d 256, 281 (S.D.N.Y.
2008); Hincapie, 2020 WL 362705 at *10; see also Grega v.
Pettengill, 123 F. Supp. 3d 517, 550-51 (D. Vt. 2015).

                              69

action for negligent infliction of emotional distress, especially in cases where the plaintiff suffered no independent physical or economic injury . . . . [because] tort liability is not a panacea capable of redressing every substantial wrong." Broadnax v. Gonzalez, 2 N.Y.3d 148, 153, 809 N.E.2d 645, 648, 777 N.Y.S.2d 416, 419 (N.Y. 2004) (carving out an exception to the general rule, and allowing expectant mothers to recover damages for emotional distress in cases involving medical malpractice resulting in miscarriage or stillbirth); see also Mobley v. King, 4 N.Y.3d 627, 637, 830 N.E.2d 301, 304, 797 N.Y.S.2d 403, 406 (N.Y. 2005) (recognizing the holding in Broadnax as "a narrow one, intended to permit a cause of action where otherwise none would be available to redress the wrongdoing that resulted in a miscarriage or stillbirth"). Here, Plaintiff alleges intentional, not negligent, police misconduct. (See SAC ¶ 168 (alleging "deliberate conduct of defendants" caused Plaintiff emotional distress).) As such, the conduct alleged here does not fit within the narrow band of negligent emotional distress cases recognized under New York law.

Accordingly, Defendants' motions to dismiss Plaintiff's intentional and/or negligent infliction of emotional distress claims are GRANTED.

\* \* \*

The Court has considered the parties' remaining arguments and finds them to be without merit or mooted by this Memorandum and Order.

CONCLUSION

Thus, for the foregoing reasons, IT IS ORDERED that the Court:

(1) GRANTS the Village Defendants' motion to dismiss in its entirety; and

(2) GRANTS IN PART and DENIES IN PART the County Defendants' motion to dismiss, with the motion:

(a) GRANTED with respect to all claims asserted against the Mullen Estate;

(b) GRANTED with respect to Claims 4, 8, and 11;

(c) GRANTED IN PART with respect to Claim 6, such that the Plaintiff's claim based on the widespread practice theory is dismissed, but that Plaintiff's claim based on the failure-to-train and failure-to-supervise theories remains; and

(d) DENIED with respect to Claims 1, 2, 3, 5, 6, 7, 10, and 12.

IT IS FURTHER ORDERED that **WITHIN FIFTEEN (15) DAYS FROM THE DATE OF THIS ORDER**, Plaintiff is directed to file a third amended complaint that omits the stricken exhibits and any reference to them in the body of the complaint, along with a

71

redline version (filed as an attachment) reflecting the changes. Plaintiff is not permitted to amend his pleadings to remedy the deficiencies identified herein; rather, the third amended complaint is to reflect the Court's rulings, consistent with this Memorandum and Order.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     July   28  , 2021
           Central Islip, New York