# EXHIBIT G

COUNTY COURT  :  NASSAU COUNTY

PART I

- - - - - - - - - - - - - - - - - - x

PEOPLE OF THE STATE OF NEW YORK

      -against-

JOSEPH JACKSON,

                           Defendant

- - - - - - - - - - - - - - - - - - x

Ind. #
91,134
91,607

Charge:
Murder
2nd

                  Mineola, New York
                  January 24, 1996

BEFORE:  HON. ABBEY L. BOKLAN
          COUNTY COURT JUDGE

                  *    *    *    *

               MINUTES OF HEARING

                  *    *    *    *

APPEARANCES

    MICHAEL WALSH, ESQ.
    Assistant District Attorney
    For the People

    EUGENE CORDERO, ESQ.
    For the Defendant

    JAMES F. GILL, C.S.R.
    Official Court Reporter

COUNTY CLERK OF NASSAU COUNTY
FILED
AUG 20 1996

2

THE CLERK:  People versus Joseph Jackson, Indictment No. 91,134 and 91,607.  People ready?

MR. WALSH:  People ready.

THE CLERK:  Defendant ready?

MR. CORDERO:  Yes.

THE COURT:  Well I'm delighted to be continuing this hearing finally with everyone well again.  So let's call the witness to the stand.  I don't know if anyone has anything to say before.

MR. WALSH:  I don't think so.

MR. CORDERO:  No, Judge.

MR. WALSH:  Detective Dempsey.

ROBERT DEMPSEY, Detective, Shield Number 53, Homicide Squad, Nassau County Police Department, having been previously sworn, was examined and testified as follows:

MR. CORDERO:  Are you ready, Judge?

THE COURT:  I am.

MR. CORDERO:  First of all, let me apologize to all the participants.  I'm in the right neighborhood thanks to Mr. Walsh's assistance with the notes that he took of my

Dempsey-People-cross                                          3

    cross.

(Continuing) CROSS EXAMINATION

BY MR. CORDERO:

  Q Good afternoon, Detective Dempsey.

  A Good afternoon.

  Q Detective, when we left off, I believe that I was discussing with you Mr. Jackson's speaking with you about his knowledge or lack of knowledge of Steven Jason?

  A Yes sir.

  Q The deceased in this case.

  A Yes.

    THE COURT:  Can we just get a time frame again?

    MR. CORDERO:  Yes.  That's where I'm a little lost myself.

    THE COURT:  Okay.

    MR. CORDERO:  We're in the first couple of hours of questioning, I believe.

  Q Do you recall, Detective, when the subject of Mr. Jackson's acquaintance or lack thereof with Jason came up initially between the two of you?

  A I believe the initial conversation took place when Mr. Jackson was speaking directly to Detective Abbondandelo at the beginning of the interview that day.

Dempsey-People-cross                                              4

Q    And that was prior to your entry into the interview room?

A    No, I was in the room.  But Detective Abbondandelo was conducting the interview at the time.

Q    And he indicated to you, you told us that he gathered some knowledge about Steven Jason's death from Tony Jackson?

A    Yes.

Q    And he learned of it from Tony Jackson directly?

A    That's correct.

Q    Now you said that Mr. Jackson, Joseph Jackson, had some dealings with an individual named G-Man about checking about a report that he had been at the party which preceded Steven Jason's death?

A    Yes.

Q    Did this issue come up around the same conversation between Detective Abbondandelo and Mr. Jackson?

A    Yes.

Q    Did you ever determine identity from Mr. Jackson for this individual by the name of Woody?

A    I know that Detective Abbondandelo knows his full name but I don't.

Dempsey-People-cross                                                    5

        Q    And Mr. Jackson didn't give you a name other

than a street name?

        A    As far as Woody is concerned, that's all he

mentioned was Woody.

        Q    Did Mr. Jackson tell you whether or not he was

at this particular party for Steven Jason?

        A    Your client?

        Q    Yes, that's right.  When I say Mr. Jackson, I

know we've talked about Tony Jackson.  I'm referring to

the defendant.

        A    No, he said he was not there.

        Q    And I think you said that either yourself or

Detective Abbondandelo asked if he knew of his

whereabouts at that time.  And he indicated to you that

he was home with one of his wives, Teresa Covington?

        A    He said that he was home in Hempstead in his

apartment.  And Teresa Covington was in the building, I

believe.

        Q    So you said he was home in his apartment by

himself?

        A    Yes.

        Q    Now you also stated this issue about whether or

not he was in the vicinity or at the party came up.  That

Mr. Jackson told you after he heard that Woody said that

Dempsey-People-cross                                          6

he, Jackson, was at the party for Steven Jason that Mr.

Jackson, the defendant, took some steps to speak to

Woody.  And he enlisted the aid of another individual?

    A    Yes.

    Q    Who was that?

    A    G-Man.

    Q    Did he give you a name for this G-Man?

    A    Yes.

    Q    What was that?

    A    Gregory Pickins.

    Q    And did you ever question Gregory Pickins in

connection with this investigation?

    A    No sir.

    Q    You or any other member of the Homicide Squad?

    A    No sir.

    Q    Did Mr. Jackson tell you anything more in

connection with G-Man's visiting this individual Woody at

the barber shop?

    A    Yes.

    Q    What was that?

    A    He said that G-Man got back to him and said

that he said that Woody said that he was at the party

with a guy by the name of Blue but that he did not see

anything.

Dempsey-People-cross                                                    7

Q    So that he, Woody, did not see anything?

A    Correct.

Q    Other than the name Blue, did any other name
come up regarding that individual described as Blue?

A    Not in my presence, sir.

Q    You stated that during this discussion with
Detective Abbondandelo some discussion came up regarding
the 45 caliber pistol?

A    Yes.

Q    Can you tell me how that subject was raised and
who raised it, how the discussion came about?

A    Well Detective Abbondandelo asked Mr. Jackson
if he had any guns.  And at that time Mr. Jackson said
yes, he did have a gun.  He had a 45 caliber automatic
pistol.

But that he had gotten into a beef with another
tenant in the same apartment house where he was living
and the head of the security, Mr. Jackson's boss Mike
Charles, took the gun away from him.

Q    Did Mr. Jackson tell you whether he ever
retrieved that gun from Mike Charles?

A    No.

Q    Did you ask him where the gun was at the time
that he was being questioned?

Dempsey-People-cross                                          8

A    No sir.

Q    Was there anything significant to the mentioning of a 45 caliber gun with respect to this particular investigation from your perspective?

A    Forty five caliber was not on my mind at that time. I was aware of the caliber of bullets that shots or were used on Mr. Jason.

Q    Which were?

A    Thirty eight special.

Q    Now did either you or Detective Abbondandelo ask whether or not Mr. Jackson ever owned or possessed a 38 caliber weapon?

A    Later on during the interview I had with Mr. Jackson I asked him if he owned any other guns. He told me that he used to have the 357 magnum.

Q    That was later on in the evening, is that right?

A    Eventually his admissions were that he did have a 38.

Q    During this initial discussion between Detective Abbondandelo and Mr. Jackson, you testified that Mr. Jackson was confronted by I believe it was Detective Abbondandelo with information received from a man named Moosey, also known as Roy Isaac?

Dempsey-People-cross                                          9

A    Yes.

Q    Did you raise the name Moosey or did Detective Abbondandelo?

A    Well we both raised it later on in the interview.  But Detective Abbondandelo may have raised it first.

Q    Did Mr. Jackson use the name Moosey prior to either of you mentioning it?

A    I don't recall that, sir, no.

Q    Do you remember the subject coming up about Moosey's discussion with the defendant to the effect that Moosey told the defendant that people were telling the police that the defendant was at the party or in the vicinity of the party?

A    Mr. Cordero, I'm just thinking, going back to your last question.  I have to correct that and say that he did use the name of Moosey when he told us that Moosey, his friend Moosey, told him that the police were looking to pin that murder, the Jason murder on him about a month prior.  I have to say that.

Q    So the name Moosey was first used by Mr. Jackson?

A    Yes.

Q    And he was explaining to you that that was why

Dempsey-People-cross                                    10

he was investigating his whereabouts at the time of the

Jason homicide?

    A    That he was checking his own.

    Q    That Jackson was checking his own whereabouts

at that time?

    A    Yes.

    Q    Because he had to go about nine or ten months

or whatever it was?

    A    Yes.

    Q    Now he told you that he checked for news

articles in the library about this particular homicide,

is that right?

    A    Yes.

    Q    And he told you he checked with his company to

see whether or not there was any record whether he had

been working, is that right?

    A    Yes.

    Q    And he did volunteer this information to you,

correct?

    A    Yes.

    Q    You stated that during this first conversation

with Mr. Jackson, the name of Tony Jackson or Ton came up

in connection with Steven Jason?

    A    Yes.

Dempsey-People-cross                                          11

Q     Did you raise that name?  Did he raise that
name?  Did Detective Abbondandelo?  How did that
discussion happen?

A     I believe he, Detective Abbondandelo, asked him
well how did you find out about Jason's death.  And he
responded with the answer that Tony Jackson told him
about it.

Q     And you asked him, that came up earlier and
there was some discussion about my client's relationship
with Tony Jackson, is that right?

A     Later on, yes.

Q     This is later on about the one hour long
conversation?

A     Well it was a little after that.  When I was
directing the interview so to speak and I was having
direct conversation with Mr. Jackson.

                 THE COURT:  Can we just get a time frame?
                 Is this the 2:45-3 p.m. time?  Is it a
                 different time?

                 THE WITNESS:  It was after 2:45, Your
                 Honor.

Q     But the discussions that we've referred to
other than this issue about Tony Jackson, the discussions
we've referred to were during this initial conversation

Dempsey-People-cross                                          12

with Mr. Jackson, correct?

     A    Yes.

     Q    Primarily the questioning by Detective
Abbondandelo?

     A    Correct.

          MR. CORDERO:  Your Honor, does that assist

          you as far as fixing a time frame?

          THE COURT:  Yes.  Because my own notes

          from November appears that we're getting

          involved with Tony Jackson about 2:45, three

          p.m.  Is that correct, Detective?

          THE WITNESS:  Yes.

          MR. CORDERO:  That's what I have also.

     Q    I think you stated that around the time that
Tony Jackson's name came up or Tony Jackson came up in
discussion that there was a break in the questioning?

     A    Yes.

     Q    What occurred at that time?

     A    There was a break in the questioning because I
believe he wanted to go to the men's room.

     Q    Mr. Jackson?

     A    Yes.

     Q    And what happened then?

     A    And then when we came back into the room I

Dempsey-People-cross                                    13

asked Detective Abbondandelo if I could ask him some

questions and Detective Abbondandelo agreed.

Now I sat behind the desk.  Mr. Jackson was still

sitting in the same seat that he had originally been in.

And Detective Abbondandelo now sat in front of the

desk and across from Mr. Jackson.

Q    During that visit to the bathroom with Mr.

Jackson, was he accompanied by members of the police

department?

A    Yes.

Q    And then the members accompanied him back to

the interview room?

A    Yes.

Q    Now when you switched seats and you began

questioning Mr. Jackson, you had first spoke with him not

about the death of Steven Jason but rather the death

about three months later approximately of Tony Jackson,

correct?

A    Yes.

Q    Now what the purpose for you discussing Tony

Jackson's death with Mr. Jackson?

A    Because I was looking to speak to your client

Mr. Jackson regarding my case.  Because I was the

investigating detective regarding the death of Anthony

Dempsey-People-cross                                          14

Olige Jackson.

And during the course of my investigation, Mr.
Jackson's name had come up and I had reached out to the
other Jackson, Tony Jackson's mother.

And she was going to contact Mr. Jackson and she did
according to her.  But your client kept avoiding meeting
with him.

MR. CORDERO:  I move to strike avoiding

meeting.

THE COURT:  Sustained as to form.

Q    As a result of your efforts, Detective, despite
those efforts, Mr. Jackson never met up with you?

A    That's correct.

Q    When you started to speak to Mr. Jackson about
Tony Jackson, what did Mr. Jackson tell you about his
relationship with Tony Jackson?

A    He told me that they were real close and that
he considered Anthony Olige Jackson a cousin to him.
That he was blood to him.

And I had a conversation about that.  I said, well I
spoke to Mrs. Jones, Anthony Olige's mother, about that.

And she said that you are not blood related and that
you are not a cousin.  And he said, he told me, "Well I
know.  But we always consider each other to be."

Dempsey-People-cross                                                    15

And then we had a conversation about the fact that he didn't go to the wake or the funeral.  And he said that he did not like funerals and wakes.

And then I said to him, "Well you didn't show up at Mrs. Jones' house to express your condolences.  You only live down the street." He said, "No, but I spoke to her on the telephone".

Q    Now during the course of your investigation of Tony Jackson's homicide, was there any connection there with Steven Jason of any kind that you developed?

A    Connection with Steven Jason?

Q    Yes.  Any connection between Tony Jackson and Steven Jason.

A    Well I was receiving information that Tony Jackson may have been involved in the death of Steven Jason.  That he may have orchestrated a hit on Steven Jason.  And I was investigating that aspect.

Q    And this information was received from confidential sources, anonymous sources?

A    There was friends of Mr. Jackson's, Anthony Olige Jackson, who were telling me that this was a payback from Jason's family.

That they believed that Mr. Jason's family orchestrated a hit on Tony Olige Jackson and that a

Dempsey-People-cross                                            16

gentleman by the name of Deuge, also known as Antoine

Poindexter, may have actually killed Anthony Olige

Jackson in June of 1994.

 Q And the motivation being that the Jason family

blamed Tony Jackson for the death of Steven Jason?

 A Yes.

 Q Mr. Jackson told you that he and Tony had known

each other since they were small children, correct?

 A Yes.

 Q Did he express to you any feelings that he had

regarding the death of Tony Jackson?

 A Did he express what, sir?

 Q His feelings or reaction to the death of Tony

Jackson at the time that you first questioned him about

it.

 A He was very sincere and very sad about it.

 Q Did you ask him what he had heard about this

involvement with Antoine Poindexter, also known as Deuge?

 A Yes.  He said that he had heard from someone

that Deuge may have been involved and may have killed

Anthony Olige Jackson.

 I asked him who would that be.  He said that this

fellow Ali, also known as Beboe Beaver, told him that.

 Q What was the first name, Ali?

Dempsey-People-cross                                                17

A      Sometimes he's called Ali.  And he's also
called Beboe Beaver.

Q      Did Mr. Jackson ever tell you that he had an
opinion as to the person responsible for the death of
Tony Jackson?

A      No, he never said he had an opinion.

Q      Did he ever indicate to you during questioning
of him at this time, I shouldn't say ever, at this time
that there was any relationship in his mind between the
Jason shooting and the shooting of Tony Jackson?

A      Well other than what I just told you, he told
me that Beboe Beaver told him that there was a strong
possibility that Deuge killed Tony Jackson.  But other
than that, no sir.

Q      Was Deuge also from the Freeport area?

A      Yes.

Q      As were the rest of these individuals whose
names we've been using?

A      That's correct.  Deuge is the first cousin of
Steven Jason.

Q      The first cousin?

A      Yes.

Q      Now I think you also asked him whether or not
Tony Jackson commonly carried a weapon?

Dempsey-People-cross                                              18

A    Yes.

Q    And he indicated to you that in fact he did?

A    He said the last time he saw him Tony Jackson had a tech nine, yes.

Q    Now you said that was about three days before he was killed?

A    That's correct.

Q    Well you stated that you raised the issue at some point during this discussion about a confrontation between my client and Antoine Poindexter?

A    Yes.

Q    And you determined from other investigations that such a confrontation had taken place?

A    Well that was the main reason why I originally wanted to talk to your client.  Because family members of Mr. Olige Jackson in June were telling me that they heard through some of the friends, associates of Anthony Olige Jackson, that your client Joseph Jackson had been threatened by Antoine Poindexter and that your client may have originally been identified as Anthony Olige Jackson by Deuge.

That was one of the reason why I kept going to his father's house on East Dean Street.  I was trying to talk to your client about that possibility that he was

Dempsey-People-cross                                          19

mistaken for my homicide victim.  And your client and I

had a conversation about that.

    Q    Did you discuss any similarities and physical

makeup between Tony Jackson and the defendant?

    A    He told me, your client told me that there was

an incident took place in May of '94 when he was standing

outside in front of his father's house on Dean Street.

And he was standing also in front of a fellow by the name

of Dave Nelson's house.  That's a friend of your client.

    And that there was a red Cherokee parked on East

Dean Street.  And he recognized the passenger in that red

Cherokee as Antoine Poindexter.  And that Poindexter was

giving him a hard stare looking at him, a hard stare for

a long period of time.

    Then the Cherokee drove away.  He told me that there

came a time when he actually met up with Poindexter in

the barber shop and that he had a conversation about that

with Poindexter, at which time Poindexter said that he

was not actually looking at him but he was looking at

your client's friend Dave Nelson.

    But that your client told me that he thought that

Deuge was looking at him because he thought that he was

Anthony Olige Jackson.

    Q    So this hard stare event, for want of a better

Dempsey-People-cross                                                    20

description, occurred prior to the death of Tony Jackson?

    A    Yes.

    Q    Again was there any discussion about any

similarity in appearance between the two of them?

    A    Other than your client said he thought that

Deuge may have thought he was Olige Jackson.

    Q    There was no discussion at that time between

Mr. Jackson and you about what was it about his

appearance which would lead somebody to believe he was

Tony Jackson?

    A    No sir.

    Q    Is there a physical similarity between Mr.

Jackson and the deceased Tony Jackson?

    A    Yes.

              MR. WALSH:  Objection.

              THE COURT:  Was that an objection?

              MR. WALSH:  Yes.

              THE COURT:  Sustained.

    Q    Now was there any further discussion about the

Tony Jackson murder between yourself and Mr. Jackson

during this afternoon session other than what you've told

us about?

    A    Any further discussion about that?

    Q    I think you told us that this conversation

Dempsey-People-cross                                                    21

began about 2:45 p.m. and that the conversation ended at

about 5:15 p.m.  And you've related the subject matters

that were discussed.  Was there any other discussion

other than those particular subject matters over that two

and a half hour period?

    A    In regard to what?

    Q    Any of the discussion between yourself,

Detective Abbondandelo and Mr. Jackson while he was in

the interview room.

    A    Oh yes.

    Q    What other subjects were discussed other than

the information concerning the Steven Jason and the Tony

Jackson homicide, your attempts to find Joseph Jackson

and so forth?

    A    I asked Joseph Jackson, your client, if he was

present at an incident that took place at the Northeast

Park in Freeport on Memorial Day weekend of that year.

    And your client told me that he was not present but

that he heard about it.  And I went on to tell your

client a little bit about that incident that took place.

    And your client agreed with me to certain things

that I was told that Mr. Jackson was chased out of the

park by the Jason family and that he later came back

armed.

Dempsey-People-cross                                          22

Q    When you say Mr. Jackson, do you mean Joseph

Jackson?

A    Anthony Olige Jackson was present at a park, a

public park, a Village park in Freeport on the Memorial

Day weekend in May of 1994.

At that park that particular day the family of

Steven Jason was having a benefit basketball game.  And

the Jason family saw Anthony Olige Jackson and allegedly

told Mr. Jackson that he had some nerve showing up at

that park being that he was involved in the death of

Steven Jason and that he should leave.

My investigation revealed that Anthony Olige Jackson

rode away on a bicycle but returned a short time later,

at which time he was armed with a concealed firearm.

I asked your client if he heard about that and he

said he did.  And that he told me, your client told me

that he believed that Anthony Olige Jackson probably was

armed at that time.

Q    All right, so then you say you confirmed

certain facts.  He didn't say he was present at that

park?

A    No, he said he was not present.

Q    But he had said that his opinion was that the

odds were that Tony Jackson would have been armed?

Dempsey-People-cross                                        23

    A    Yes.

    Q    What other facts did he confirm to you?

    A    He also, we had a conversation at that time about his children. Again he talked about he has three daughters. They're all two years of age. There are different mothers involved.

    We went back to talking about another incident that took place between Anthony Olige Jackson and Steven Jackson. And there was words of exchange between these two gentlemen at a basketball game at the Darr Junior High School.

    I told your client that I had received information that there were some bad words exchanged between Jasons and Anthony Olige Jackson at that time. If he heard about it.

    He told me that he was not present but he heard that Anthony Olige Jackson was dissed at that game.

    Q    Did you get a time frame on this? When was this alleged to have occurred?

    A    This took place prior to the incident that I spoke about at the Northeast Park. It was prior to the death of Steven Jason. And it was some time back in 1993, possibly in the fall.

    Q    And did you raise the subject of this

Dempsey-People-cross                                              24

confrontation between Tony Jackson and Steven Jason?

    A    Yes.

    Q    And you were asking, correct me if I'm wrong,

the purpose was to ask Mr. Jackson, Joseph Jackson

regarding his knowledge if that occurred, did that occur,

that kind of thing?

    A    I was looking to confirm some kind of things

with your client that he may have known to be fact.

    Q    And what in fact did he tell you about his

knowledge of that?

    A    Well he told me that he was not at that

basketball game but that he had heard that Anthony Olige

Jackson in his words was dissed at that basketball game.

    Q    Did he say by whom?

    A    He didn't say by whom.  But I already told him

that I heard and I was told that it was an exchange of

words that took place between Anthony Olige Jackson and

Steven Jason.

    Q    Did he tell you anything about that Darr Junior

High School incident?

    A    No sir.

    Q    Other than the two incidents that you've just

discussed with us, the two other subjects that were

discussed, was there any further discussion on other

Dempsey-People-cross                                            25

subjects?

        A    Yes.

        Q    What was that?

        A    He also told me that Anthony Olige Jackson had
told him that he, Olige Jackson, heard that people from
Jason's family were looking to blame him for the murder
of Steven Jason and that he, Anthony Olige Jackson,
wanted to meet up with Deuge and have a conversation with
Deuge about that problem because he, Olige Jackson, did
not want to let anything happen near his mother's house,
meaning Olige Jackson's mother's house.

        Q    Did he give you a time frame, Mr. Jackson, my
client, as far as this conversation with Tony Jackson
concerning the subject?

        A    I don't understand your question.

        Q    You said that this is Tony Jackson advising my
client and my client in turn is now relating this
conversation to you during his questioning.  He's telling
you that Tony Jackson told him that the Jason family and
Deuge in particular was looking for him.  They wanted to
arrange some sort of a meeting with Deuge or some sort of
a summit if you will with this Deuge person?

        A    Yes.

        Q    Did he give you a time frame as far as when

Dempsey-People-cross                                         26

this discussion with Tony Jackson occurred?

     A    A time frame, it took place around the time
that he last saw him.  Your client told me that the last
time he saw Anthony Olige Jackson was about two or three
days prior to his death in June when Dave Nelson, your
client's friend who lived across the street from him on
East Dean Street, drove Anthony Olige Jackson over to
your client's uncle's house in Roosevelt.

     Your client's uncle's name is Lianda Deese and he
lived at 109 Henry Street.  And that at that time he
discussed, he saw, your client saw that Anthony Olige
Jackson was armed with a tech nine.

     He said that Anthony Olige Jackson said that Beboe
Beaver loaned him that gun and that Anthony Olige Jackson
went on to say that he heard that there were people from
Jason's family looking to talk to him about the death of
Jason and in particular Deuge, Antoine Poindexter, and
that he wanted to meet up with Deuge and discuss that
because he didn't want anything to happen near his
mother's house.

     Q    When he used that phrase didn't want anything
to happen, did you question him about what he meant by
that or what Tony Jackson had meant by that?

     A    I didn't but I knew what he was telling me.

Dempsey-People-cross                                              27

Q    And you assumed that had to do with some
possibility of violence?

A    Yes sir.

Q    Now did Mr. Jackson during this whole
discussion with you ever tell you what Tony Jackson had
told him if anything about who was responsible for the
death of Steven Jason?

A    No, but there was a question that was asked of
him earlier if Tony Jackson had ever asked him, your
client, to take care of Jason.  And he said no.

Q    But there was no other discussion about Tony
Jackson attributing anyone's responsibility for Steven
Jason's death?

A    No sir.

Q    Was there any other discussion that took place
during this two and a half hour period?

A    Yes.

Q    What was that?

A    Your client told me that he knew that on the
night that Anthony Olige Jackson was killed that Olige
Jackson was looking for him, meaning your client.

I said:  "Well how did you know that?"  He said,
"Well it's my Aunt Kim Prunty told me that he came to my
father's house at 57 East Dean Street the night of his

Dempsey-People-cross                                                    28

death looking for me.  But I wasn't there because I was

staying in Hempstead alone at my apartment."

    Q    Was there any further questioning or discussion

about that event other than relating that to you in the

manner that you've just testified?

    A    At his house?

    Q    Right.  About the events at his house with Tony

Jackson.

    A    No sir.

    Q    Any other discussions about any other subjects

during the two and a half hour period?

    A    I had a conversation with him again about

Gregory Pickins, also known as G-Man.  And I asked him

where he thought he lived and he said he lives on Rutland

Street in Freeport.

    Q    Anything further about G-Man?

    A    Yes.  I told him that I went to a location for

a fellow by the name of Beboe Beaver.  And I knocked at

Beboe Beaver's front door and there was no answer.

    As I was getting back into the police car with

another detective, a male came to the front picture

window and made an obscene gesture at me and the other

detective.  That I tried to go back and knock on the door

but this gentleman would not come to the door.

Dempsey-People-cross                                             29

Q    Did you tell him who you thought that male was?

A    Yes.  I told him it was Beboe Beaver.  I believe it was Beboe Beaver.

Q    Did you ask Mr. Jackson anything more about this Beboe Beaver?

A    No.  Other than your client Mr. Jackson told me that he's a sneaky individual.  He doesn't believe what he says.

Q    Were you questioning Mr. Jackson at that time regarding Beboe Beaver's identity or his whereabouts? What was the purpose of discussing that with Mr. Jackson?

A    Because I had learned through my investigation of the death of Anthony Olige Jackson that only Beboe Beaver was a friend and confidant of Mr. Jackson, the other Jackson.

Q    Tony Jackson?

A    Yes.

Q    And I assume that you at that point when you were speaking to Joseph Jackson had not had an opportunity to ever question Beboe Beaver?

A    No sir.

Q    Any other discussions between you and Mr. Jackson or Detective Abbondandelo and Mr. Jackson for this two and a half hour period?

Dempsey-People-cross                                          30

A    Well there came a point where Detective
Abbondandelo asked your client if he was willing to take
a polygraph test, at which time your client indicated
that he would take one.

Q    I realize the subject of the polygraph came up.
And you told us that that was at around 5:15 or 5:30 in
the evening.

You told us that over the course of about 2:45 down
to that time, 5:15, 5:30, that the primary subject of the
discussion was the death of Tony Jackson, correct?

A    Yes.  Most of that conversation was about the
case that I was investigating.

Q    Was there discussion in addition during that
period of time regarding any involvement alleged by
Joseph Jackson on the death of Steven Jason?

A    Yes.

Q    What was that conversation?

A    He was asked directly if Tony Jackson ever
asked him to take care or kill Steven Jason.  And he said
that Tony Jackson never told him that.

Q    You related that to us.  And he was asked that
directly on more than one occasion by yourself?

A    And Detective Abbondandelo.

Q    And he told you categorically that did not

Dempsey-People-cross                                                          31

happen?

    A    That's correct.

    Q    Was he asked at that time whether he had any further knowledge about who may have killed Steven Jason?

    A    No.

    Q    Did you make notes regarding what Mr. Jackson related to you during this period of time?

    A    Yes.

    Q    Did you prepare any lead sheets in connection with the Olige Jackson death based upon what Mr. Jackson told you during this interview?

    A    No sir.

    Q    Now at about 5:15 or 5:20 then, Mr. Jackson had denied really any knowledge concerning the Jason homicide other than what he had been told by other people?

    A    That's correct.

    Q    And who was it who raised the subject of a polygraph? Was it Detective Abbondandelo?

    A    Yes.

    Q    Was there any discussion between either of you or your superiors prior to offering a polygraph to Mr. Jackson?

    A    Not to my knowledge.

    Q    Was there any discussion about Moosey taking a

FORM 740 PENGAD/INDY 1-800-631-6989

Dempsey-People-cross                                              32

polygraph with Mr. Jackson around that time?

    A    No sir.

    Q    Moosey has a given name, correct?

    A    Yes.

    Q    What is his name?

    A    His name is Roy Isaac.

    Q    Mr. Isaac was questioned by the Homicide Squad
prior to the questioning of Joseph Jackson also
concerning the death of Steven Jason, correct?

    A    Yes.

    Q    And did you tell Mr. Jackson that Moosey had
taken the polygraph test and that he was let go and the
same thing would happen with him if he took a polygraph
test and passed it?

    A    I did not, no sir.

    Q    Did anyone say that to Mr. Jackson to your
knowledge in the Homicide Squad?

    A    Not to my knowledge.

    Q    Did Moosey in fact take a polygraph test at one
point?

                MR. WALSH:  Objection.

                THE COURT:  Sustained.

    Q    Was Mr. Jackson told at the time that the
polygraph was offered that he, Joseph Jackson, was not

FORM 740 PENGAD/INDY 1-800-631-6989

Dempsey-People-cross                                                    33

under arrest?

A    Could you repeat that, sir?

Q    Yes.  Was Mr. Jackson told when he was offered
the polygraph exam that he was not under arrest?

A    When he was offered the polygraph?

Q    That's right.

A    No sir.

Q    When Detective Abbondandelo asked Mr. Jackson
to take this polygraph test, did he agree to do so?

A    Yes.

Q    Was he told what the polygraph would be about
at that time?

A    He was told I believe that he would be asked
relevant questions to the death of Steven Jason.  But he
also had the right to refuse to take the test.

Q    And he agreed to take the test voluntarily?

A    Yes.

Q    Now you stated at that point that you and
Detective Abbondandelo left Mr. Jackson alone in the
interview room and the two of you went to speak with his
supervisor?

A    The supervisor plus Detective Abbondandelo had
to make arrangements to call the polyigimist in to give
him the blood test.

Dempsey-People-cross                                                34

Q    What was the purpose of giving Mr. Jackson the
polygraph exam at that time?

A    Probably to see or show your client that there
was evidence indicating that he was involved in it.  But
that he had a right to take that test if he wanted to do
so.

Q    So the intention was to utilize the polygraph
to demonstrate to Mr. Jackson that he had not been
forthright in certain answers to your questions, is that
correct, as opposed to prove his innocence?

A    I believe that Mr. Jackson was involved in the
death of Steven Jason and so did Detective Abbondandelo.
I did not believe, even though he took it, I did not
believe that he would pass it.

Q    What facts did you develop during your
investigation that led you to that conclusion at that
point and time?

A    There was an interview of, an extensive
interview of Mr. Jackson's cousin known to me as P.D.
Jenkins.

P.D. Jenkins indicated to Detective Abbondandelo and
myself that he actually saw his cousin Joseph Jackson
shoot Mr. Jason to death on the night of March 19th into
March 20, 1994, in front of the Blimpies Restaurant on

Dempsey-People-cross                                                      35

Sunrise Highway in Freeport.

    Q    And what facts as alleged by Mr. Jenkins in that statement led you to believe Mr. Jenkins?

           MR. WALSH:  Objection.

           THE COURT:  Sustained.

    Q    Other than P.D. Jenkins' statement regarding Mr. Jackson's alleged involvement in the shooting of Steven Jason, was there any other evidence independent of the Jenkins statement that you had which at that time prior to the polygraph linked Mr. Jackson to that shooting?

    A    Yes.

    Q    What was that?

    A    It was a statement made by Roy Isaac, also known as Moosey, in which Issac stated that he had a conversation with Joseph Jackson and Joseph Jackson told Moosey that he took care of that beef with Steven Jason.

    Q    Did you take a statement from Roy Isaac to that effect?

    A    No, I took preliminary notes from Mr. Isaac when I first met him.

           MR. CORDERO:  Just give me a moment, Judge.  I'm sorry.

           THE COURT:  Whatever you need.

FORM 740 PENGAD/INDY 1-800-631-6989

Dempsey-People-cross                                          36

Q    Was it 32B or other type of statement taken by someone in the Homicide Squad from Roy Isaac?

A    Yes.

Q    And who might that be?

A    Detective Abbondandelo I believe took it.

Q    Do you recall when that statement was taken?

A    I believe that was taken on November 17 or 18, 1994.

MR. CORDERO:  I would call at this time, Judge, for the production of any such notes. I don't believe that I've been provided with that as Rosario material.

Detective Abbondandelo previously testified at this hearing.  Detective Dempsey has advised us that this was a fact independent of the Jenkins statement which provided, if you will, probable cause for Mr. Jackson's arrest and continued questioning and so forth.

THE COURT:  Mr. Walsh.

MR. WALSH:  I believe, Your Honor, Detective Abbondandelo also testified that there was information gained from the Issac brothers that led them to believe that the

Dempsey-People-cross                                          37

defendant was the perpetrator as well.

I believe Mr. Cordero has already called for production of the statements from Isaac and the Court denied it.  I don't see where any of these statements would constitute Rosario material.

THE COURT:  I don't recall whether the issue arose in November.  But it would be consistent with my ruling now to have made that ruling then.  I don't see how that's Rosario material.

MR. CORDERO:  Judge, it's a statement taken by the witness in the investigation which they were relying on for Mr. Jackson's arrest. They're telling you, Judge, if they intend to rely whatsoever on -- let me backtrack.

I realize Detective Dempsey is on the stand.  But for these purposes, I don't have a problem with him being here.

Detective Dempsey has indicated that the reason for the continued questioning of Mr. Jackson, among others, was certain facts that were previously determined to be or which were previously disclosed during the lengthy

Dempsey-People-cross                                          38

investigation of this homicide.

Just to set it clear, we're talking about a March '94 homicide with an arrest that ultimately takes place in March '95 or February '95.

The questioning takes place in December '94. I'm sure that given the length of this questioning, the People are going to be relying upon certain aspects because they're going to legitimize the fact that Mr. Jackson was held for such an extended period of time and continued to be questioned.

Among the issues now that I'm developing, we have the testimony of Detective Dempsey that the statement given by Roy Isaac was something that was substantively different from the information being imparted by Mr. Jackson.

It was a purpose for the entire period of time that it took to set up a polygraph or administer a polygraph.

Thereafter, I would submit it was also, the People would argue, a basis for the continued questioning of Mr. Jackson over an extended period of time.

Dempsey-People-cross                                              39

If that is the case, I think that it is

relevant and material to my examination of this

witness as well as to rely upon that

information in that statement which was taken

from and written by another witness in this

hearing who was the carrying detective on this

case.

And I frankly don't understand why it

hasn't been turned over as Rosario material.

It is my job as defense counsel to determine

what use if any to make of this material.

It's very clear from the Court of Appeals

standards. And it's clearly material that was

generated by the prosecution witness in his

own handwriting in connection with his

investigation of this homicide for which my

client has been indicted.

So I think I'm entitled to it, Judge. I

renew my application on the basis of the record

that has been developed for the production of

that statement.

THE COURT: Mr. Walsh.

MR. WALSH: I think if you carry that

logic to its extreme, that means that I have

Dempsey-People-cross                                    40

to turn over my entire file or the entire

police file to Mr. Cordero to determine what

is not Rosario material.

I don't think that is in any way the law.

You could use that same logic to say whether

any witness in a police file is Rosario

material.  It's simply not.  There's been no

showing whatsoever.

I believe that this constitutes Rosario

material.  This witness is not testifying at

this hearing.  And interestingly enough, it

was not on our direct case or not during my

questioning that we even brought up the issue

of either Roy Isaac or Tyrone Isaac.

It was through Mr. Cordero's cross

examination of first Detective Abbondandelo and

now Detective Dempsey that this even came

about.

It was through his questioning, I

believe, of Detective Abbondandelo that I

believe Tyrone Isaac had provided information

that would be attributable probable cause in

this case to Detective Dempsey that there was

information from Roy Isaac that would

Dempsey-People-cross                                                41

contribute to probable cause.

I do not believe the fact that Mr.
Cordero brings this out on cross examination
that that makes anything the Isaacs have to
say Rosario material.

MR. CORDERO:  Judge, again my submission
is what makes it Rosario material is not the
statement of a non-witness but the fact that
it's a document that was prepared and was
generated by a witness that's already been
called, a police witness that's already been
called.  It's a part of the file.

Since it was generated by Abbondandelo,
it should be produced as part of the Rosario
material to be given to me in connection with
that particular witness who was called by the
People.

THE COURT:  That is not my understanding
of what Rosario material is.  Your application
for me to direct the People to supply that
witness' statement is denied.

MR. CORDERO:  I respectfully except,
Judge.  We also don't know frankly what we're
talking about.  We don't know if the statement

Dempsey-People-cross                                         42

specifically or if these are not including
marginal notes or independent notes other than
the specific statements made by the witness
which may have been made by Detective
Abbondandelo.

So in a sense, Judge, I really don't want
to belabor it but you are ruling in a vacuum
without seeing these objects. I respectfully
except from the Court's ruling.

THE COURT: Your exception is automatic.

Q    After the break was taken in the questioning of
Mr. Jackson at about 5:15 to 5:30 in the afternoon, how
long was Mr. Jackson alone in the interview room?

A    At what time, sir?

Q    I'm fixing you on about 5:15 or 5:30 p.m.
There was the initial discussion about a polygraph. A
break was taken to speak with his supervisor.

The two of you left the room, you and Abbondandelo.
Arrangements had to be made to bring in the polyigimist.
I'm asking you, a, was Mr. Jackson left alone in the room
which I think your lawyer said he was, is that correct?

A    Yes.

Q    And also how long was he left alone?

A    He was left alone for over an hour, at which

Dempsey-People-cross                                                    43

time I had come back into the room because I offered him

something to eat.   There was no discussion prior to that

polygraph test.

There was no further discussions that we had with

him relative to his whereabouts or anything else about

the case.

We more or less left him alone with his own thoughts

until I came back in which was probably an hour or so

later when I asked him if he wanted something to eat.   At

which time he said no.

He had some water and he didn't want anything to

eat.   And then there came a time again near 7:30 when I

asked him and again he said no.

And then on his way to the polygraph room he did

stop at the men's room and relieved himself.

Q    So there was no questioning of Mr. Jackson at

all during that period of time?

A    Other than to ask him if he wanted something to

eat or if he wanted water or coffee, whatever.

Q    Did you in any way assist in the composition of

any of the questions being prepared by the polygraph to

be used, by the polyigimist to be used in the test?

A    No.

Q    Did you meet with the polyigimist prior to the

Dempsey-People-cross                                      44

2    administration of the exam?

3        A    Yes.  As we walked into the polygraph room with

4    Mr. Jackson.

5        Q    At about what time did you arrive there?

6        A    It was somewhere between 7:45 and 7:50 p.m.

7        Q    Were there any other police officers with you

8    at that time?

9        A    Yes.

10       Q    Who was that?

11       A    Detective Abbondandelo at first and then

12   Detective Mullen came in the door behind us.

13       Q    Had Detective Mullen had any interaction with

14   Mr. Jackson to your knowledge up to that point?

15       A    Up to that point, no sir.

16       Q    From the point where you first began to

17   question Mr. Jackson until that time, did Mr. Jackson

18   have anything to drink?

19       A    Yes, he had water.

20       Q    Did he have anything to eat?

21       A    He was offered something to eat several times

22   and he refused.

23       Q    Now you stated that you sat through a portion

24   of the polygraph exam?

25       A    Yes.

FORM 740 PENGAD/INDY 1-800-631-6989

Dempsey-People-cross                                        45

Q    And can you tell me where you were sitting?

A    I was in an observation room which was located
outside the actual testing room.

Q    Does that have a two way mirror which allows
you to see in and the subject not to see out?

A    One way I would say.

Q    One way rather?

A    Yes.

Q    And were you observing my client during the
period of time that he was being polygraphed?

A    Yes.

Q    Can you tell me how he was clothed?

A    Well he had dark pants on.  He had a green,
like a sweatshirt with a white stripe on it.

Q    Do you remember at any time the sweatshirt
coming off him?

A    I'm not sure of that, sir.  I think he had that
on during the test.

Q    Do you know whether the window was open in that
room?

A    Open?

Q    Yes.  In the polygraph suite where he was being
questioned.

A    I don't believe it was.

Dempsey-People-cross                                          46

Q    At any time do you recall Mr. Jackson

complaining about being cold?

A    No sir.

Q    During the administration of the test.

A    No sir.

Q    Were you able to hear what was being said in

the adjacent room?

A    Yes.

Q    Was there any record made of the polyigimist

notes of the polygraph interview itself?

A    Not to my knowledge.

Q    Did you make any notes during that time?

A    No sir.

Q    What do you recall being asked of Mr. Jackson

at that time and what do you recall him saying?

A    Well prior to taking the test, he was asked

many questions by the polyigimist with reference to his

background, where he was, what kind of work he does.

And then during the test he was asked direct

questions.  Was he at the American Legion Hall that night

of the party.  Was he at the Blimpies Restaurant.  Did he

actually shoot Mr. Jackson.  Questions similar to that.

Q    And with respect to those questions, Mr.

Jackson continued to deny being there and having any

Dempsey-People-cross                                                          47

involvement?

        A     That's correct.

        Q     And you've told us that the polygraph started
at about eight p.m.  I'm showing that you arrived at the
polygraph suite about eight p.m.

        A     Well just prior to eight.  It started around
eight.

        Q     It started at eight?

        A     Yes.

        Q     And how long did this polygraph test last?

        A     Well it went for about three hours.  Less than
three hours maybe.

        Q     When did it end?

        A     It was sometime near 11:30.

        Q     And was Detective Kosior the polyigimist?

              THE COURT:  Didn't we say Kosior the last
        time?

              MR. WALSH:  I think we said Kosior.

              THE COURT:  Do we have any place that we
        can look it up?

              MR. WALSH:  I think I have a report.

              THE WITNESS:  It is K-o-s.

              MR. WALSH:  It looks like K-o-s-i-o-r.

              THE COURT:  Thank you.

Dempsey-People-cross                                                48

Q    Now during that period of time when the
polygraph was being administered, Detective Kosior was in
the room where Mr. Jackson was?

A    Yes.

Q    There was no one else in there?

A    No sir.

Q    Did anyone else observe any portion of the exam
with you?

A    Yes.

Q    Who was that?

A    I recall Detective Mullen coming into the
observation room with me.

Q    Now when did you learn, or how should I say,
did you learn that the polygraph exam was over?

A    That it was over?

Q    Yes.

A    After the third test was completed, I left the
observation room and I went into the inner office of the
polygraph room, at which time Detective Kosior came out
and he met with Detective Abbondandelo and myself.

Q    Where was Mr. Jackson at that time?

A    Mr. Jackson was still seated in the testing
room.

Q    Did you have a discussion with Detective

Dempsey-People-cross                                           49

Kosior?

    A    I believe Detective Abbondandelo had a
discussion with him.

    Q    In your presence?

    A    Yes.

    Q    After that discussion Detective Kosior gave you
an opinion, correct?

    A    Not at that time.  He told Detective
Abbondandelo that he had to look over the chart.

    Q    So what was done at that time with Mr. Jackson?

    A    Mr. Jackson was then walked back to the
Homicide Squad by myself and Detective Abbondandelo.

    Q    And what was done with him?

    A    He was seated in the same rear interview room
as we had been before, as he had been seated before.

    Q    Now was he given anything to drink or eat at
that time?

    A    A short time later he was, yes.

    Q    About what time was that?

    A    It was about 11:30 when I offered him some
pizza and a Coca Cola.  And he accepted two slices of
pizza and a Coke Classic.

    Q    Now was it before or after Mr. Jackson was
given his food that there was further discussion with Mr.

FORM 740 PENGAD/INDY 1-800-631-6989

Dempsey-People-cross                                                    50

Jackson between Detective Abbondandelo, yourself and Mr.

Jackson?

A    It was before and it was about an hour

discussion with Mr. Jackson after we had learned that Mr.

Jackson in the polyigimist's opinion had failed the

polygraph test.

Q    Now I want to understand this.  Mr. Jackson is

brought out of the polygraph suite.  He's brought back to

the Homicide Squad.  He's placed in an interview room.

There is no discussion with him at that time or there is?

A    Very shortly afterwards, yes.

Q    Was he left alone for a period of time?

A    I believe I was outside the office.  Detective

Abbondandelo had to go back to the polygraph office to

talk to Detective Kosior.

Q    Did you return to the polygraph suite with

Abbondandelo?

A    No.  I believe I stayed in the Homicide Squad.

Q    Did you continue to speak to Mr. Jackson

without Detective Abbondandelo present?

A    No sir.

Q    Did anyone else speak to him?

A    Not to my knowledge.

Q    Did there come a time when Detective

Dempsey-People-cross                                                    51

Abbondandelo returned from the polygraph suite?

        A    Yes.

        Q    And can you tell me how long he was gone?

        A    He was only gone for about five minutes or so.

        Q    And did he discuss anything with you prior to

any further questioning of Mr. Jackson?

        A    Yes.

        Q    What was that?

        A    He told me that Mr. Jackson had failed the

test, all questions, relative questions.

        Q    Anything further?

        A    No sir.

        Q    Now at that point you and Detective

Abbondandelo re-entered the interview room, is that

right?

        A    Yes.

        Q    And can you tell me whether at that time Mr.

Jackson was given his Miranda warnings?

        A    No.  He had been given those rights much

earlier.

        Q    Can you tell me if I'm correct, it's about

11:30 or so, when this questioning again begins, is that

right?

        A    No.  I would have to correct that and bring

Dempsey-People-cross                                              52

that back to around 10:30 or near eleven o'clock.

    Q    So it's about 10:30 or eleven o'clock?

    A    And he actually ate around 11:30.

    Q    And you stated that you had broken off any
questioning of Mr. Jackson about 5:15 or 5:30 the
previous afternoon, right?

    A    That same day, yes.

    Q    And there was a break off.  There was the
polygraph and then he was brought back to the Homicide
Squad to the interview room.

    So there was absolutely no readministration of
Miranda warnings at that time when you resumed
questioning, is that correct?

    A    That's correct.

    Q    And what if anything commenced the questioning?
Who started the discussion?

    A    I believe we both did.  And we continued to
have a conversation with him for approximately an hour.

    Q    Did you and Detective Abbondandelo tell Mr.
Jackson anything about the polygraph test at that time?

    A    Yes.

    Q    What was that?

    A    That he failed the test, all three tests.

    Q    There were three polygraph tests given?

FORM 740 PENGAD/INDY 1-800-631-6989

Dempsey-People-cross                                                53

A    Yes.

Q    And you told him what else?

A    We told him that we believed that he was
involved in the death of Steven Jason.  And Mr. Jackson
denied it.

We told him that he failed the test.  He failed
every relevant question, direct question regarding his
involvement.

And he said that he couldn't believe that he failed
it because he didn't do it.  And we continued to talk to
him.

We told him then that even his own cousin P.D.
Jenkins saw him that night with a gun in his hand and saw
him shoot Mr. Jason.

We went on to tell him also that even his good
friend Moosey told us that he told Moosey that he took
care of that beef with Mr. Jason.

Q    You were referring to the interview and the
information provided by Roy Isaac and Detective
Abbondandelo?

A    What was that?

Q    That's the information that Roy Isaac provided
to Detective Abbondandelo?

A    Yes.

Dempsey-People-cross                                              54

Q    And this was replied upon in further
interrogation of my client, is that right, that
information?

A    Yes.

          MR. CORDERO:  I renew my application for
          the production of the document, Judge.

          THE COURT:  Detective, did you take out
          the statement?  Did you show it all to the
          defendant?

          THE WITNESS:  No.

          THE COURT:  Mr. Walsh, do you wish to be
          heard?

          MR. WALSH:  On the same grounds.

          THE COURT:  I continue with my previous
          ruling.  Denied.

Q    Did you tell Mr. Jackson that he faced 25 years
to life on this charge?

A    I told him that if he was convicted of murder
he could possibly get 25 years to life, yes.

Q    And what was Mr. Jackson's response to you?

A    He shook his head.  He said he was not involved
and he did not kill Steven Jason.

Q    Did he tell you anything about P.D. Jenkins?

A    Yes.

Dempsey-People-cross                                                    55

Q     What was that?

A     He told me he's a fuckin liar.

Q     Was there any discrepancy between the statement given by P.D. Jenkins about what he allegedly saw and the statement given by Moosey with respect to his knowledge concerning the homicide?

A     You lost me on that.

Q     Were there any discrepancies between what Isaac had told Detective Abbondandelo with what information you had been given by P.D. Jenkins?

          MR. WALSH:   I object to that question.

          THE COURT:   Sustained.

Q     Did you ask or Detective Abbondandelo ask anything about Mr. Jackson's relationship with P.D. Jenkins or Moosey at that time?

A     Did I ask him about his relationship with him?

Q     Right.   I mean, you were the one that said he said his cousin P.D. Jenkins put a gun in his hand and confronted him.   You spoke in a rather loud tone when you said those words.   Was there any discussion or why would your cousin do that, words to that effect?

A     He acknowledged that P.D. Jenkins was his cousin.   And he acknowledged and told me that he was a liar.   And he said that P.D. Jenkins was not telling the

Dempsey-People-cross                                                    56

truth.

Q    When was the name Moosey first raised?

A    During that same conversation we brought up

P.D. Jenkins.   That was within that first hour after the

polygraph test when we resumed our interview of Mr.

Jackson.

Q    And that was the words to the effect that

Moosey had told you that my client had told him that he

had taken care of the beef with Steven Jason?

A    I didn't say that Moosey told me.

Q    No, that my client had told Moosey that.

A    Yes.

Q    Did you tell him when that discussion took

place and where?

A    I told him we spoke to Moosey.

Q    Do you remember telling Mr. Jackson that this

discussion with Moosey by him was supposed to have taken

place a certain time after the homicide of Steven Jason?

A    I don't understand your question.

Q    Did you put a time frame on this alleged

conversation between my client and Moosey that you

confronted him with?

A    I don't recall a time frame, no.

Q    Did Mr. Jackson deny again having anything to

Dempsey-People-cross                                     57

do with the Jason homicide at that time?

A    Yes.

Q    Did he tell you anything new or different other
than what he had told you before?

A    I don't recall any.

Q    Now this questioning went on for about an hour
you said or a half hour until some pizza was available?

A    About an hour then. Around 11:30 we stopped
and there was some pizza that had been sent in for us. I
went and made sure it was there. Then I came back and
offered him something to eat.

Q    But during this period of time your primary
discussion with Mr. Jackson focused on his failure of the
polygraph, the statement given by P.D. Jenkins and the
statement given by Moosey?

A    And the fact that we believed that he was
directly involved in the death of Steven Jason and that
he shot Steven Jason.

Q    And Mr. Jackson continued to tell you that he
wasn't involved?

A    That's correct.

Q    So Mr. Jackson wasn't conversing with you at
that time? He was denying accusations, was he not?

A    He was denying accusations and he was also

Dempsey-People-cross                                              58

conversing with us.

     Q    Well what conversation did he have other than
telling you he wasn't involved and what the people were
telling you wasn't true?

     A    Again he told us that he had never been to the
Blimpies Restaurant.  He never went there.  He was home.

        In fact, he said that he was home for three nights
including March 19th, the 20th and the 21st that he was
home in the apartment in Hempstead.

     Q    Which he had told you earlier in the afternoon?

     A    Yes.

     Q    Now you stated that he had other conversation
with you during that period of time?  Did he have other
conversation with you during that time other than the few
things you told us he told you?

     A    I told him that he was being charged with
murder.  If he was convicted of that he could get up to
25 years to life.

     Q    And did he have anything to say about that?

     A    He just nodded his head in the affirmative.

     Q    So there was nothing further that was said to
you by Mr. Jackson during that one hour period?

     A    Nothing that he did not say before.

     Q    So I again ask you, was this primarily a period

FORM 740 PENGAD/INDY 1-800-631-6989

Dempsey-People-cross                                    59

of time when you and Detective Abbondandelo in various

ways expressed your opinion of his guilt in which he

basically spent the entire time denying it?

        A    Yes.

        Q    Now did Mr. Jackson ask for this pizza?

        A    No.  I offered him something to eat and I told

him we had pizza in the office if he wanted and some

soda.  He said that he would take the couple of slices

and a coke.

        Q    And who gave him the food?

        A    I did.

        Q    Did you tell me where he had that food?

        A    In that same interview room where we were

speaking to him.

        Q    And can you tell me what happened at that time

after he was given the food?

        A    Detective Abbondandelo and I left the interview

room, left him alone with his food.

        Q    Did you ask Mr. Jackson at that time if he

wanted to call anybody?

        A    No sir.

        Q    Did he express to you his concern that his

family had no idea where he was?

        A    No sir.

Dempsey-People-cross                                                    60

Q     That he wanted to contact his family.  He never
did that?

A     No sir.

Q     Never asked to speak to an attorney during this
period of time?

A     No.

Q     Never asked you what you guys were going to do
with him?  Whether he was going to go home or be brought
to court?  He never asked that?

A     No sir.

Q     About how long was Mr. Jackson left alone in
the interview room?

A     Four about 40 to 45 minutes.

Q     And the pizza was given to him at about 11:30
p.m., is that right?

A     Yes.

Q     And did Mr. Jackson doze off?

A     I wasn't in the room with him, sir.

Q     Did there come a time when you re-entered the
room?

A     Yes.

Q     Did anyone go in there before you?

A     I don't believe so.

Q     Was Mr. Jackson dozing off at that time when

Dempsey-People-cross                                              61

you re-entered the room?

    A    No sir.

    Q    He was alert and awake?

    A    Yes.

    Q    Did he ask you whether he could make a phone
call at that time to his family or anything?

    A    No sir.

    Q    Did he ask you when he was going to get out of
there?

    A    No sir.

    Q    Did he ask anything at all?

    A    No sir.

    Q    So after this lull of about 45 minutes to an
hour you re-entered the interview room with someone else,
is that right?

    A    Yes.

    Q    Who was that?

    A    Detective Abbondandelo.

    Q    At that time did you administer any Miranda
warnings to Mr. Jackson or did the other detective in
your presence?

    A    No sir.

    Q    Who was the first person to say anything at
that point?

Dempsey-People-cross                                              62

A    I may have been.

Q    You may have been?

A    Yes.

Q    What did you say?

A    I again repeated the same thing I had told him an hour before.  That I believe that he was directly involved in the death of Steven Jason and that he was lying.

We had eyewitnesses, his own cousin.  He was an eyewitness to the murder, Steven Jason's murder.  He saw him with a gun in his hand and he saw him shoot him.

Q    Did Mr. Jackson tell you that he was responsible for the murder?  Or did he continue to deny his involvement?

A    He continued to deny his involvement.

Q    Did you or Detective Abbondandelo confront him with anything else, any other evidence that may have been gathered during the investigation?

A    No sir.

Q    About how long were you there together with Detective Abbondandelo talking to Mr. Jackson?

A    Until about 2:30 in the morning.

Q    Did Detective Abbondandelo leave at any time?

A    I believe he was in there most of the time with

Dempsey-People-cross                                                    63

me.  He may have left to go to the bathroom.  But he was

in there just about all the time we were there until

2:30.

Q    From that time about 12:30 to about 2:30, what

was the topic of discussion?

A    The death of Steven Jason and the fact that we

believed that your client Mr. Jackson was directly

involved in it.  That he shot Jason to death.

Q    And you questioned him again or confronted him

again with your beliefs for this two hour period,

correct?

A    Yes.

Q    Can you tell me what else Mr. Jackson told you

that are different from what he told you before?

A    He didn't say anything different at that time.

He stuck to his original story which was that he was

never at the Blimpies Restaurant.  That Tony Jackson

never asked him to take care of Steven Jason and that he

did not shoot Steven Jason.  He didn't know who shot

Steven Jason.

Q    Now did you and Detective Abbondandelo commence

any procedures necessary to bind Mr. Jackson over for

arraignment the following morning on this murder charge?

A    Not at that time.

Dempsey-People-cross                                                          64

Q    Did you prepare any paperwork in connection
with the arrest?

A    Not at that time.

Q    Was any progress being made in connection with
the questioning of Mr. Jackson over that two hour period
of time?

MR. WALSH:  Objection.

THE COURT:  Sustained.

Q    Did Mr. Jackson ask during this two hour period
to be left alone?  Did he tell you that he was tired of
being questioned and he had nothing else to say to you?

A    Not until 2:30 when he indicated to us that he
wanted to go to sleep.

Q    He said, "I'm tired of talking to you, I want
to go to sleep"?

A    No, he didn't say he was tired of talking to
us.

Q    He didn't say that?

A    No sir.

Q    Did Mr. Jackson go to sleep?

A    To the best of my knowledge he did, yes.

Q    And what assistance did you give him to do
that?

A    I gave him, there were two chairs.  I told him

Dempsey-People-cross                                                    65

to get both the chairs up and use his jacket as a pillow,

roll the jacket up if he wanted to and stretch out.

    I told him that I would also turn the light off, the

overhead light in that room, so that he would have some

darkness to sleep in.

    Q    About what time was it that that occurred?

    A    About 2:30.

    Q    Now at that point to your knowledge, Detective,

Mr. Jackson had been in police custody for about 14

hours, is that right?

    A    Approximately.

    Q    And he had been interrogated on and off, mostly

on, for most of that 14 hours, is that right?

    A    I would say interviewed.

    Q    Interviewed or interrogated.  The fact of the

matter is he was being questioned for most of that 14

hour period, right?

    A    Yes.

    Q    And other than the two pieces of pizza and the

coke he had nothing further to eat, right?

    A    Not until later on that same morning.

    Q    And he told you he was tired?

    A    Yes.

    Q    I think you told us that you then met with some

Dempsey-People-cross                                          66

of your other brother officers after Mr. Jackson was left

in the room alone with lights off.

    A    Yes.

    Q    And there were discussions held.

    A    Yes.

    Q    Did you commence paperwork to place Mr. Jackson

under arrest for the death of Steven Jason?

    A    Not at that time.

    Q    Was there any impediment to doing so?

           MR. WALSH:  Objection.

           THE COURT:  Sustained as to form.

    Q    Were all the necessary forms available to you

in the Homicide Squad that were needed to be filled out

or just the arrest report, the felony complaint and the

other touches?

    A    Yes.

    Q    And none of those forms were filled out?

    A    Not at that time.

    Q    Were there any discussions held with any

superior officers after that time when Mr. Jackson went

to sleep during that one and a half hour period?

    A    Yes.

    Q    And who was that officer?

    A    I believe it was Detective Sergeant Cox or

Dempsey-People-cross                                                    67

Severin.

        Q    Any discussions with the Nassau District

Attorney's office?

        A    Not at that time.

        Q    Let me ask you this.  Prior to that time were

there any discussions with anyone from the Nassau

District Attorney's office about Mr. Jackson's

questioning?

        A    Not to my knowledge.

        Q    You told us that after your discussions you

then returned home, took a shower and changed your

clothes?

        A    Yes.

        Q    And then returned to the Homicide Squad?

        A    Yes.

        Q    Had you discussed your intention to return to

the Homicide Squad with any superior officer?

        A    Yes.

        Q    Did you receive authorization to return?

        A    Yes.

        Q    Was there any paperwork that was required to be

filled out in connection with that?

        A    No sir.

        Q    And you returned about three hours later and

Dempsey-People-cross                                             68

you got back about 5:30 in the morning?

    A    Between 5:30 and six.

    Q    When you returned, did you check in on Mr.
Jackson at that time?

    A    Yes.

    Q    Can you tell us what you observed?

    A    I saw him lying in between two wooden chairs.
And his head was resting on his jacket that he had rolled
up in a ball.  He appeared to be sleeping.

    Q    Did there come a time when anyone entered that
room to your knowledge?

    A    Yes.

    Q    When for the first time did someone enter the
room where Mr. Jackson was sleeping to your knowledge?

    A    When he was sleeping?

    Q    Yes.

    A    I don't recall anyone going in there when he
was sleeping.

    Q    Do you remember Detective Mullen going into
that room?

    A    Yes.

    Q    Was that at about 6:45 a.m.?

    A    No.  I saw Detective Mullen in the room with
Mr. Jackson at around 7:30.

Dempsey-People-cross                                                69

Q    You don't recall whether Mullen entered the room between 6:45 and seven a.m. in the morning?

A    I didn't see him go in, no.

Q    When you entered the room next, what time was it?

A    It was around 7:30.

Q    Was Mr. Jackson asleep or awake?

A    No, he was awake and he was involved in talking to Detective Mullen.

Q    So Detective Mullen was in there prior to you?

A    Yes.

Q    Did you overhear any of their discussion at that time?

A    No sir.

Q    And did you take part in any questioning of Mr. Jackson at that time?

A    No sir.

Q    What did you do at that time?

A    I asked him if he wanted something to eat or drink. I told him we had some fresh bagels in the office if he wanted one.

And he told me he would have a buttered bagel and a cup of water. He also indicated to me that he wanted to go to the men's room.

Dempsey-People-cross                                        70

Detective Mullen and I walked him back down the hall
to the men's room.  He relieved himself in the men's
room.  He washed his face.

He then accompanied Detective Mullen and I back to
the Homicide Squad.  He entered the rear interview room.

I went to another room where there were bagels and a
quarter pound of butter.  I buttered the bagel for Mr.
Jackson.

I obtained another cup of Poland spring water for
Mr. Jackson and I returned to the rear interview room
where he was still seated with Detective Mullen, at which
time I gave him his buttered bagel, his ice water and I
left that room.

Q    And was this about 9:30 in the morning?

A    No, this is around 7:30.

Q    Are you sure of that?

A    Yes.

Q    Did you participate in any discussions with Mr.
Jackson from that period of time when you arrived back at
the Homicide Squad throughout that morning other than the
discussion about the offer of the bagel and making
arrangements?

A    No.  Detective Mullen was in that room alone
with Mr. Jackson until sometime around 11:30.

Dempsey-People-cross                                                71

Q    And what were you doing during that period of time during that four to five hour period?

A    I was looking over my notes.  I was also looking into my case with Anthony Olige Jackson.

And going through my notebook, I checked to see if I had covered all the names that I wanted to cover with Tony Jackson, with Anthony Olige Jackson.  Joseph Jackson, I should say.

Q    Do you keep a notebook, Detective?

A    I had a notebook with me, yes.

Q    We've been provided with certain notes which were attributed to you regarding the interview of Joseph Jackson.  They appear to be on 11 by 14 paper.  Were the notes kept in some sort of notebook also?

A    Not pertaining to your client.

Q    Did you make any entries in that notebook during that five hour or so period concerning what Mr. Jackson had told you during your previous questioning?

A    No sir.

MR. CORDERO:  Excuse me for a moment.

THE COURT:  Yes.

(Discussion off the record.)

Q    After Detective Mullen stopped speaking with Mr. Jackson, was Mr. Jackson left alone in the interview

Dempsey-People-cross                                                72

room?

    A    For awhile he was, yes.

    Q    Did you speak with Detective Mullen about any

of his discussion with Mr. Jackson which took place over

the course of that morning?

    A    Yes.

    Q    Did Mr. Jackson tell you -- I'm sorry, withdraw

that. Did Detective Mullen tell you anything that was in

any way different that he had been told by my client with

respect to this case that you had not previously heard?

              MR. WALSH:  Objection.

              THE COURT:  Sustained.

    Q    Let me rephrase that. Did Detective Mullen

tell you any fact that Mr. Jackson may have told him that

Mr. Jackson did not tell you?

    A    I don't recall that.

    Q    Can you tell me did there come a time when you

re-entered the interview room and spoke with Mr. Jackson

again?

    A    Yes.

    Q    When was that?

    A    It was just before 12:30.

    Q    And he was alone in there?

    A    Yes.

FORM 740 PENGAD/INDY 1-800-631-6989

Dempsey-People-cross                                          73

Q    Can you tell me what initially occurred as you walked in?

A    I offered him something to eat for lunch.  And he didn't want anything to eat.  I believe he ordered another cup of water.

Q    Did he ask you how much longer he was going to be held there?

A    No sir.

Q    At that point you were aware that Mr. Jackson was in custody for 24 hours, did you not?

A    Yes.

Q    And after Mr. Jackson took some water, was anything else done for Mr. Jackson?

A    He may have gone to the men's room or requested to go to the men's room.  And then we had a further, I had a further conversation with him.

Q    Now at that time were you aware of any other steps being taken with respect to processing Mr. Jackson for the court?

A    No sir.

Q    Did you personally take any steps to secure Mr. Jackson for arraignment on the charges for which he had been placed under arrest and arranged for his transport to court?

Dempsey-People-cross                                                74

A    No sir.

Q    Did Mr. Jackson ask to make a telephone call to anyone?

A    Later on he did.

Q    What about at that time, 12:30?

A    No sir.

Q    Did he ask you how much longer he was going to be there?

A    No sir.

Q    Did he ask you what you were going to do with him?

A    No sir.

Q    Did he ask any questions at all?

A    No sir.

Q    Can you tell me what his demeanor was at that time that you re-entered the room at 12:30?

A    He was lucid.  He was awake.  He talked in a normal tone of voice that he had talked to me 24 hours earlier.  He talked in a very low soft voice.

Q    Now after you entered the interview room, did you begin to speak with Mr. Jackson again?

A    Yes.

Q    And what if anything did you say?

A    At what time, sir?

Dempsey-People-cross                                                75

Q    This is at 12:30.  This is the following day,
12:30, the day after he was arrested.

A    I again accused him of being directly involved
in the death of Steven Jason.  And I told him that he had
lied and that he had failed the polygraph test because he
lied to direct questions involving that test, direct
questions regarding his involvement.  And that I believe
that he killed Steven Jason.  And he did it because of
the fact that Steven Jason had his good friend Tony
Jackson arrested.

Q    Did you tell him that, was there any discussion
with him at that time about any potential punishment for
homicide?

A    I again reminded him that if he was convicted
of murder in Nassau County that he was facing 25 years to
life imprisonment.

Q    Did you discuss with him the possibility of any
lower sentence?

A    No sir.

Q    Did you ever tell him that if he cooperated
with you that you would arrange to get a lower sentence
for him?

A    No sir.

Q    Did you tell him that if he told you the truth

Dempsey-People-cross                                          76

that you would report his truthfulness to anyone in a

position of authority?

    A    No sir.

    Q    Did you ever tell him that if he told you the

truth you would tell the District Attorney that he

cooperated with you?

    A    I told him at a later time that I would report

to the District Attorney if the weapon that he claimed he

threw into a storm drain after the murder in Roosevelt

were recovered.  That I would inform the District

Attorney that he cooperated and led us to where the

murder weapon was.

    Q    Now at this time at around 12:30 when you began

to re-interview Mr. Jackson, did you have any

discussions, you or other members of the Homicide Squad,

with members of the District Attorney's office?

    A    No, I did not.

    Q    Do you know if anyone else did?

    A    Not to my knowledge.

    Q    Were you aware whether there was any specific

Assistant District Attorney assigned to his particular

case?

    A    If there was a District Attorney assigned to

this case?

Dempsey-People-cross                                           77

Q    Yes.

A    I knew that Mr. Walsh had been assigned to the case.

Q    How long did you discuss the potential punishment for murder with Mr. Jackson?

A    About a minute or so.

Q    What did Mr. Jackson tell you if anything?

A    He didn't say anything.  Just nodded his head again in the affirmative.

Q    Did you say anything else to Mr. Jackson?

A    I again told him that I believe that he was involved.  That his cousin was not lying.  That his cousin had told us the truth.  That his own cousin saw him shoot Mr. Jason.

And that he was there that night and that again I told him that I believe he shot Mr. Jason because of his friend Tony Jackson being arrested by Mr. Jason.

Again your client Joseph Jackson denied having any involvement.  And he continued to deny his involvement. He had no knowledge who killed Mr. Jason.

Q    Did you confront him again with the statement of Mr. Isaac?

A    Yes.

Q    Did you refer to Mr. Isaac's statement during

Dempsey-People-cross                                          78

this period of time, during this period of questioning?

     A    Refer to statement?

     Q    Yes.

     A    No.  Show him a statement, no.

     Q    Did you refer to it yourself?

     A    No.

     Q    Had you reviewed it during any time prior to re-entering the interview room?

     A    No sir.

     Q    Other than confronting Mr. Jackson again with your belief and your willingness to accept P.D. Jenkins' version of what occurred as true and Mr. Jackson continuing to deny his involvement with Mr. Jason, did Mr. Jackson tell you anything else substantively different from what he previously told you?

     A    Later on he did.

     Q    When you say later on, are you talking about during the period from 12:30 to 3:40 p.m. or thereafter?

     A    After 3:40 p.m.

     Q    Now between the period from 12:30 to 3:40 p.m. you were alone with Mr. Jackson in the interview room, correct?

     A    Yes.  I recall being alone with him most of the time.

FORM 740 PENGAD/INDY 1-800-631-6989

Dempsey-People-cross                                          79

Q    Was anyone else in the room with you during
that period of time?

A    Detective Abbondandelo may have come in and
then stepped out.  But I was there with Mr. Jackson most
of the time.

Q    And what else did you talk to Mr. Jackson about
other than confronting him with this statement, the
information that you had received from Jenkins in this
alleged admission that he allegedly made to Isaac?

A    Mr. Jackson told me that I should go talk to
P.D.'s parents, the rest of the Jackson family.  That
he's always been a liar.

Q    Did you do that?

A    I didn't.

Q    Did anyone do that at your request?

A    I had met with Detective Abbondandelo and I had
met with P.D. Jenkins' mother and father back in November
approximately a month prior to the interview of your
client.

Q    Did you discuss that with Mr. Jackson at the
time?

A    That I spoke to his parents?

Q    That he invited you to speak with the Jenkins
family.

Dempsey-People-cross                                            80

A     No, I did not.

Q     Did you talk to Mr. Jackson about anything else
for this three hour and ten minute period of time?

A     No.   Other than the things that we had
previously discussed.

Q     And did Mr. Jackson tell you anything
substantively during that period of time other than what
he told you before?

A     Not at that time, no.

Q     During this period of time did you strike Mr.
Jackson at any time?

A     No.

Q     Did you tell him that he was in danger?

A     In danger?

Q     Not at the hands of the police but at the hands
of the other civilians.   That he might be in danger if he
was to go back on the street.

A     I didn't say that.

Q     Did you ever tell him that he was safer where
he was than he would be on the street if the Deuge caught
up with him?  Did you ever tell him that?

A     No sir.

Q     Did you talk to him about his relationship with
the family of Tony Jackson again?

Dempsey-People-cross                                                    81

A    Yes.

Q    And what did you talk to him about?

A    I went back and told him that he had been avoiding me.  Why did you avoid me?  Why every time I spoke to Mrs. Jones she would speak to you and then she would call me and say oh he's going to be home, go over there and speak to him.  How come every time I come to your house you weren't there?

Q    Did he ever respond to that?

A    Yes.

Q    What did he tell you?

A    He said, "I thought you were going to arrest me on a warrant".

Q    And in fact you learned that he had a warrant that was open for him, more than one, right?

A    Yes.

Q    Did you talk to him about anything else?

A    Nothing except going over again the things that we talked about before.  That I knew that he was close with Tony Jackson.  And that I knew that he killed Steven Jason because of the fact that Steven Jason had Tony Jackson arrested for shooting him back in December of 1993.

Q    Did you tell him anything else about what you

Dempsey-People-cross                                                    82

knew about the motivation that you claimed he had for

shooting Jason?

    A    No, but I told him that his own cousin again

was a witness to that shooting and saw him with the gun

in his hand.

    Q    Did you talk to him at all about Jason's

testimony in the grand jury?

    A    Jason's testimony, no sir.

    Q    Did you talk to him at all about Jason

testifying or being a witness against Tony Jackson?

    A    No, but he told me that at a later time.

    Q    You never raised that issue with him?

    A    At that time, no sir.

    Q    That was information that you had developed

during the course of your investigation, correct?

    A    What was that?

    Q    I mean, you knew that the case against Tony

Jackson was to proceed to the grand jury and that Steven

Jason was an eyewitness and the complainant in that case,

did you not?

    A    Yes.

    Q    And that in fact Jason's shooting took place

days before he was scheduled to testify against Tony

Jackson in the grand jury?

Dempsey-People-cross                                          83

A    Yes.

Q    This was information that you had developed
yourself?

A    No.

Q    Previously?

A    I was told that by Detective Abbondandelo.

Q    This is information that was already in the
Homicide Squad files?

A    Correct.

Q    So it's not something that you heard for the
first time from Mr. Jackson, right?

A    What was that?

Q    It's not something that you heard for the first
time from Joseph Jackson, correct?

A    I don't understand your question.

Q    I withdraw the question.  During the time that
you were speaking with Mr. Jackson again over this three
hour and ten minute period, did Mr. Jackson ask to call
his family?

A    No sir.

Q    Or when he was going to leave or whatever he
was going to be brought to court?

A    No.

Q    He didn't at any time ask you what was going to

Dempsey-People-cross                                          84

happen with him?

    A    No sir, he did not.

    Q    Did he ever complain about being held and questioned so long?

    A    No sir.

    Q    Did he tell you he was tired?

    A    Yes, he told me that he wanted to take a nap.

    Q    Did he tell you that he was tired of being questioned?

    A    No sir.

    Q    Did he tell you that he wanted to speak to an attorney?

    A    No.

    Q    How many times did he tell you that he was tired and he wanted to take a nap?

    A    He told us that at 2:30 in the morning.  And then it was near four o'clock in the afternoon the following day when he told me that he was tired and he wanted to take a nap.

    Q    Did he ask you how much longer he was going to be held in the Homicide Squad?

    A    No sir.

    Q    Did he in fact fall asleep at some time?

    A    Yes.  After he requested to take a nap.

FORM 740 PENGAD/INDY 1-800-631-6989

Dempsey-People-cross                                                  85

Q    When was that?

A    It was near four o'clock in the afternoon on the 18th.

Q    So he again fell asleep after this three hour and some minute period of questioning, right?

A    Yes.

Q    Now at this time let's say at four o'clock in the afternoon of I believe it's the 18th, Mr. Jackson had been in police custody since 12:30 on the 17th, correct?

A    Yes.

Q    And can you tell me, other than Mr. Jackson's questioning, what other investigative steps were being taken with respect to the death of Steven Jason?

MR. WALSH:  Objection.

THE COURT:  Sustained.

Q    Was there any investigative step that was being taken during this 16 hour period of time, I'm sorry, this 28 hour period of time regarding the death of Steven Jason that prevented Mr. Jackson from being brought to court?

MR. WALSH:  Objection.

THE COURT:  Overruled.

A    Could you repeat that question?

Q    Were there any other investigative steps that

Dempsey-People-cross                                                  86

were being taken during this 28 hour period of time which

prevented Mr. Jackson from being taken into court?

        A     Not to my knowledge.

        Q     Now according to your testimony it was close to

four o'clock when Mr. Jackson fell asleep, correct,

Detective?

        A     He appeared to be sleeping, yes.

        Q     He was sleeping in the same manner as

previously?  He was curled up on two chairs pushed

together with his jacket rolled up as a pillow?

        A     Yes.

        Q     And did there come a time when his questioning

or when questioning resumed?

        A     Yes.

        Q     And when was that?

        A     It was shortly after five p.m.

        Q     At five o'clock?

        A     Yes.

        Q     How did that begin?

        A     I looked in on Mr. Jackson and I saw that he

was now seated in an upright position.  His eyes were

awake and he was just staring at his hands.

        And I stepped into the room and I stepped around him

and sat behind the desk.  And now I continued to have a

Dempsey-People-cross                                                87

conversation with him.

Q    Did Mr. Jackson tell you that he was, he found
it difficult sleeping under the conditions that he had
been left in?

A    No sir.

Q    Did he complain about any pains or aches or
inability to sleep?

A    No sir.

Q    Now this interview room is located immediately
adjacent to the main room in the Homicide Squad, a large
room, correct?

A    Yes.

Q    Can you tell me how many police officers were
at the Homicide Squad at about four, between four and
five in the afternoon and other staff that day?

A    I would say several but I could not estimate
how many.

Q    And were people using telephones?

A    Probably, yes.

Q    Telephones were ringing?

A    Yes.

Q    People were speaking in normal tones of voice?

A    Yes.

Q    So these weren't hotel conditions, correct?

Dempsey-People-cross                                              88

MR. WALSH:  Objection.

THE COURT:  Sustained as to form.

MR. CORDERO:  I'll withdrawn the question.

Q    Was any extra effort being made telling everybody to speak in hushed tones because Mr. Jackson was sleeping?

A    No.

Q    So we don't know -- I'm sorry.  You can't tell me, can you, whether in fact Mr. Jackson slept a short amount of time or was unable to sleep between four and five in the afternoon, correct?

A    I can only tell you that he appeared to be napping, sleeping.

Q    How many times did you check him?

A    I walked over and looked into the glass window on two occasions.

Q    And he was curled up on the two chairs pushed together?

A    Yes.

Q    Now you stated that you re-entered the interview room at about five p.m.  Was anyone with you?

A    No, I was by myself.

Q    And what occurred at that time?

A    I sat down at the chair behind the desk.  Mr.

Dempsey-People-cross                                          89

Jackson was seated to my right.  And I now continued to

have a conversation with him.

         Q      And what conversation did Mr. Jackson have with

you?

         A      I started the conversation with him talking

about his children.  He had three two year old daughters

fathered by him with different mothers.

         And I then got into a conversation with him about

the statistics and how I thought it was a shame that it

appeared that he was just going to be another statistic

of a young black man being charged with murder and that

if he got convicted of this murder he was going away to

prison for several years and that his children would not

even know him unless they had to come to prison to see

him.

         I also told him that I thought it was also a tragedy

that Steven Jason who had a little three year old girl

would never be able to see his little daughter again.

         And also over the fact that Anthony Olige Jackson

had a little three year old girl who was never going to

see her father again.

                        THE COURT:  Counsel, pick a good time in

                the next five minutes to stop.

         Q      Did you ever during that conversation talk to

FORM 740 PENGAD/INDY 1-800-631-6989

Dempsey-People-cross                                          90

Mr. Jackson about possibly becoming a statistic in
another matter that he was facing the possibility of
being shot or killed on the street by those interested in
avenging the death of Steven Jason such as Antoine
Poindexter?  Did you ever talk to him about that at that
time?

    A    I may have indicated to him that the Jason
family would be highly annoyed at him if they found out
that he was the shooter of Mr. Jason.

    Q    Did you tell Mr. Jackson that you were doing
him a favor by keeping him in custody?  That if you let
him go he would probably turn up dead because word would
get out that he was a suspect being questioned in
connection with the death of Steven Jason?

    A    No.

    Q    Never indicated that to him?  Are you sure?

    A    No sir.

    Q    Despite this discussion by you, isn't it a fact
that Mr. Jackson continued to tell you that he didn't
kill Steven Jason?

    A    No.  He responded to the conversation that I
had about statistics.  And he said two things to me that
were rather interesting to me.  He said to me, "I'm not
sorry that Steven Jason is dead.  I didn't even know

Dempsey-People-cross                                      91

Jason."

    And then he went on to say to me in the same
conversation, "I'm not going to tell you that I killed
the guy and I'm not going to tell you that I didn't kill
him."

    Q   And in what tone of voice did he make that
statement?

    A   He was very profound.  He did not raise his
voice but a little louder and more sure of himself when
he said that to me.  Most definitely.

    Q   So he continued to deny his involvement,
correct?

    A   Yes.

        MR. CORDERO:  This is a good time to take
        a break, Judge.

        THE COURT:  Thank you.  Unfortunately my
        law secretary told me because of capital
        punishment school we're backed up for three
        days.  So we'll put it back on at two o'clock
        again tomorrow.

        MR. CORDERO:  Judge, Mr. Jackson was
        brought in at nine o'clock this morning.

        THE COURT:  We'll bring him at nine
        o'clock.  If you would prefer and you'd like

FORM 740 PENGAD/INDY 1-800-631-6989

Dempsey-People-cross                                    92

to come around late morning and see how our

status is.

If the People don't object and Detective

Dempsey is available, you could check in about

11:30.  I would be happy to start as soon as

I'm finished.

MR. CORDERO:  Judge, I have to be in

District Court on two matters.  But after that

I'll be available if you want to start earlier.

The reason I ask is because Mr. Jackson,

it's very unpleasant as you know sitting there

with so many prisoners just being locked in.

THE COURT:  If I could accommodate him I

would.  But experience has taught me that two

o'clock deliveries don't always arrive.

MR. CORDERO:  We'll make it two o'clock?

THE COURT:  Yes.

(Whereupon the hearing was adjourned to

Thursday, January 25th, at two o'clock p.m.)

```
COUNTY COURT  :  NASSAU COUNTY                          93

            PART I

- - - - - - - - - - - - - - - - - - - x

PEOPLE OF THE STATE OF NEW YORK

            -against-                          Ind. #
                                               91,134
JOSEPH JACKSON,                                91,607

                                               Charge:
                          Defendant            Murder
                                               2nd .
- - - - - - - - - - - - - - - - - - - x

                          Mineola, New York
                          January 25, 1996



BEFORE:  HON. ABBEY L. BOKLAN
         COUNTY COURT JUDGE


                    *    *    *    *

                MINUTES OF HEARING

                    *    *    *    *


APPEARANCES

     MICHAEL WALSH, ESQ.
     Assistant District Attorney
     For the People

     EUGENE CORDERO, ESQ.
     For the Defendant




JAMES F. GILL, C.S.R.
Official Court Reporter
```

FORM 740 PENGAD/INDY 1-800-631-6989

Dempsey-People-cross                                            94

THE CLERK:  People versus Joseph Jackson.

Hearing continued.  People ready?

MR. WALSH:  People ready.

THE CLERK:  Defendant ready?

MR. CORDERO:  Ready.

THE COURT:  Let's get the witness back.

MR. CORDERO:  Judge, I'd like to

apologize.  I was before Judge Orenstein this

morning.  We worked until one o'clock because

of the sentence that was on the front page of

Newsday.

THE COURT:  My court officers informed me

that you were before Judge Orenstein.

(Detective Dempsey recalled.)

THE COURT:  Good afternoon, Detective.

You're still under oath.

THE WITNESS:  Thank you.

THE COURT:  All right, Mr. Cordero,

whenever you're ready.

MR. CORDERO:  Thank you.

(Continuing) CROSS EXAMINATION

BY MR. CORDERO:

Q    Detective, I think yesterday we broke around

the point when I was questioning you about conversations

Dempsey-People-cross                                            95

that you were having with my client at about 5:30 in the

afternoon of Sunday the 18th, I believe it was.

    A     Yes.

    Q     Now you told us that Mr. Jackson had made a

comment about not caring about Steven Jason and words to

the effect of I'm not going to tell you I killed him or I

didn't kill him.

    I think that's where we broke the questioning.  I

believe and I'm not sure whether you testified as to what

you did at that time.  So I'm asking you what did you do

when you reached that point when that statement was made.

    A     I got up and I left the interview room leaving

Mr. Jackson alone.

    Q     Did you ask Mr. Jackson what he meant by that?

    A     No, I did not.

    Q     You stated that on direct that you went and

spoke to Detective Abbondandelo at that time?

    A     Yes.  And Sergeant Severin.

    Q     And how long were you in conference with them?

    A     Just a few minutes.

    Q     Did you have any discussions about Mr.

Jackson's statements to you, most recent statements to

you at that time?

    A     Yes.

Dempsey-People-cross                                          96

Q     What were those discussions?

A     I told Sergeant Severin that I thought I hit a sensitive nerve with Mr. Jackson.  And I was intrigued by the answer that he gave that I'm not going to tell you that I killed him and I'm not going to tell you that I didn't kill him.  I thought I hit a sensitive nerve with him.

Q     How long was Mr. Jackson left alone?

A     He was left there alone for about 10 or 15 minutes.  And then I went back inside and I asked him if he wanted anything to eat or drink.

I told him that we had Chinese food that was being brought in.  It should be there shortly.  And he indicated to me that he would eat some Chinese food.

He asked me what it was.  I said, "We're going to have some fried rice and there will be some egg rolls if you would like some".

And he ordered a plate of fried rice and egg rolls and a cup of ice water.  I then left the interview room and I returned about five to ten minutes later and I brought his dinner in to him.

Q     And was this dinner actually brought in specifically for him?

A     It was brought in for everyone.

Dempsey-People-cross                                                97

Q    Well my question is, you said that he said he wanted fried rice and an egg roll.  And my question to you is, did you order that specifically for him from the take-out restaurant?

A    No.  He asked me what the Chinese food was going to be.  And I knew that that was part of an order. I asked him if he wanted it.  And he said that he would take that.

Q    When you re-entered the room with the food, can you tell me what time that was?

A    It was around six o'clock.

Q    And what did you give Mr. Jackson at that time?

A    I gave him a plate that contained fried rice and it contained an egg roll.  There is some duck sauce, two little containers of duck sauce.  And I also brought him a large cup of water.

Q    Are you sure you didn't give him a Coca-Cola?

A    No, he had Coca-Cola with the pizza pie.

Q    Was Mr. Jackson accompanied while he ate this food?

A    No sir.  I left him alone with his food.

Q    And how long was he alone in the room?

A    Approximately 40, 45 minutes.

Q    And what did you do during that period of time?

Dempsey-People-cross                                              98

A     I was in another room eating the same food.

Q     How long was it that Mr. Jackson was left alone?

A     For about 40 to 45 minutes.

Q     And did any other officers enter that room to your knowledge during that period of time?

A     Not to my knowledge.

Q     What happened after that 45 minutes?

A     I asked Detective Hertz.  Detective Hertz had come into the office.  And I filled him in to what Mr. Jackson had last said to me.  And I asked him to accompany me back into the interview room.

Detective Hertz came in with me.  Mr. Jackson finished his meal.  And I sat behind the desk and Detective Hertz sat in the chair opposite Mr. Jackson.

                MR. CORDERO:  Excuse me.

                (Discussion off the record.)

Q     You re-entered the room with Detective Hertz, you said?

A     Yes.

Q     Now what was Detective Hertz's role in this investigation?

A     He was the original investigating detective from the First Squad, the First Precinct.

Dempsey-People-cross                                              99

Q    Was he involved at all with Mr. Jackson up until that time?

A    Not to my knowledge, sir, no.

Q    And when did he arrive at the Homicide Squad if you know?

A    I don't know when he arrived at the Homicide Squad.  But he walked into the rear room, another room where I had eaten my dinner.  And he hung up his coat.  And I asked him if he would accompany me back into the interview room.

Q    Now when you re-entered the interview room with Detective Hertz, can you tell me what discussions took place if any?

A    I introduced Detective Hertz to Mr. Jackson.  And after we were seated, I turned to Mr. Jackson and I said:  "How can I help you?"

And at that point Mr. Jackson said to me, "I'd like to be able to get out of prison some day and to see my children.  I want to tell you what happened that night."

Q    And this is in response to your comment, "How can I help you"?

A    Yes.

Q    What response did you make to that statement?

A    To that statement?

Dempsey-People-cross                                          100

Q    Yes.

A    I said to your client:  "Mr. Jackson, before
you say anything, I'm going to remind you of those
constitutional rights that you received from Detective
Abbondandelo earlier.

In fact, I want you to listen to me because I'm
going to repeat those rights to you."  And I went through
each and every warning.

After each warning was given, I asked him if he
understood that warning.  And he told me that he did.

And after I advised him of the four warnings, I then
asked him if he was still willing to talk to me without
talking to an attorney first.  And he told me that he
was.

I then said to him:  "Before you say anything else
now, just tell me the truth".  And now he went on to tell
me that he shot Steven Jason.  And that was about ten
minutes to seven in the p.m.

And he went on to tell me that he shot Steven Jason
because he did it out of love and caring for his friend
Anthony Olige Jackson.

Q    Now Detective Hertz was present during this
entire time?

A    Yes.

Q    And did you see whether Detective Hertz took any note?

A    I didn't see him writing anything there.

Q    Did Detective Hertz talk to Mr. Jackson at all?

A    I don't recall.  He just sat and listened.

Q    What did Mr. Jackson tell you at that time?

A    Mr. Jackson went on to tell me that sometime around the end of February, the beginning of March of 1994, he was riding his bicycle on Nassau Road near Debravois Avenue and Nassau Road when he saw a brown skinned girl that he knew by the name of Takita.

And I asked him what her last name was and he said he didn't know.  But he knew that this girl Takita was a girlfriend of Anthony Jackson and that Anthony Jackson was fucking this girl.

He went on to tell me that this girl stopped him and he had a conversation with her about a pending case between Anthony Jackson and Jason and that she told him that she had been over to see Anthony Jackson at the Nassau County Jail.

That Anthony Jackson wanted him to do a favor for him.  And he wanted him to prevent Steven Jason from testifying against him at a grand jury hearing that was going to take place either in March or the beginning of

Dempsey-People-cross                                    102

April.

And he told me that he told this girl Takita to tell Anthony Jackson that he would take care of it and that Mr. Jackson would not testify.

Q    Have you ever heard the name Takita previously in your investigation?

A    Yes.

Q    Do you know who this Takita is?

A    I know a female by the name of Takita, yes.

Q    Had you spoken to Takita prior to this statement being given by Mr. Jackson that you're testifying about now?

A    Yes.

Q    Was there any information that you received from Takita which was in any way corroborated by this statement?

A    By Mr. Jackson's statement?

Q    That's right.

A    No sir.

Q    Please go on.  Tell us what else Mr. Jackson told you at that time.

A    Mr. Jackson went on to say that about a week later some time about 5:20 p.m. he was home in his apartment at Number 420, 415 Fulton Avenue in Hempstead.

Dempsey-People-cross                                              103

And he said at that time Takita came and knocked at

his apartment door and that she came into the apartment

and she told him that she went over to see Tony Jackson

again at the jail and Tony Jackson wanted to make sure

that he could eliminate, meaning your client Mr. Jackson,

that he could eliminate Steven Jason from testifying

against him at a grand jury presentation.

At that time Mr. Jackson again told me that he

assured Takita that he would care of it and that she was

to tell Tony that it would be taken care of.

He said that she went on to tell him that Mr. Jason

was going to be at a party at the American Legion Hall in

Freeport on the night of March 19th and that if he wanted

to get to Steven Jason that would be a good time to do

so.

She also went on to tell him that there would be

another man, Tony's man, from Brooklyn would be coming

out on the train to the Freeport station that night and

that if he was going to get at Jason that night he should

meet Tony's man at the Freeport railroad station.

She said that he would know what he, Mr. Jackson,

looks like and that he should meet him at the station.

He said that he did go to the Freeport railroad

station on March 19, 1994, and sometime between 10:30 and

Dempsey-People-cross                                           104

eleven o'clock he was standing by the lower platform

street level side of the Freeport railroad station when

he saw a male black come off the platform and then go

down to street level.

And he said that this male looked at him at first

and then said to him:  "Are you Star?"  And Mr. Jackson

said yes, he was.

Mr. Jackson said:  "I asked this man what is your

name?"  And this man said, "Don't worry about that".  He

said this man said to him:  "Do you know La?"  Mr.

Jackson said, "Yes, I know La".

He said that this man then said:  "Do you know what

I'm here for?"  And Mr. Jackson said yes.

He said that he and this other man who was dressed

in a long Philadelphia Eagles type coat with a big

Philadelphia Eagles emblem across the back then left the

Freeport railroad station and then walked over to Sunrise

Highway.

I asked Mr. Jackson what he was wearing at that

time.  And he told me that he was wearing a blue

camouflage three quarter jacket with a hood.

That under that hood he had a black hooded

sweatshirt and that he also had a red sweatshirt under

that and that he was wearing dark blue Boss jeans and

Dempsey-People-cross                                            105

black Timberland boots.

He told me that he had one pants leg to his jeans
bloused inside the boot and the other pants leg outside
the boot.

I asked him if he had his gun.  He said he had a 38
caliber nickel plated revolver.

I asked him what the make was.  He said, "I don't
remember the make.  But I paid $200 for it from a guy on
Graphing Place."

He later told me that it was a crackhead that he
bought the gun from.  He told me it was fully loaded and
it had black rubber grips.

I asked him whether the guy with the Philadelphia
Eagles coat had a gun and he said the guy did.

I asked him to give me a physical description of
this male and he gave that to me also.

I asked him to tell me what the guy looks like and
he said he was brown skinned, he was black and that he
had very short low cut reddish brown hair with long
sideburns.

He told me that he was a big guy, well built, and he
weighed somewhere around 185 to 190 pounds and that he
appeared to be somewhere between 22 to 23 years of age.

I asked him how could you see a gun on him.  He said

Dempsey-People-cross                                              106

because he had his coat open and that he saw that this

guy had a gun tucked in his waistband and that it looked

like a revolver with black rubber grips on it.

I asked him what happened. He said, "As we left the

railroad station, we shared a Fillest Blunt together."

Later he told me that the Fillest Blunt is a Fillest

cigar that has weeds stuffed inside it.

I asked him where they went. He said they walked

along the northerly side of Sunrise Highway until they

got down opposite the Blimpies Restaurant.

I asked him what they did then. He said they then

stepped across Sunrise Highway to the south side and they

stood around near the Blimpies Restaurant.

I asked him what happened then. He told me that the

guy in the Philadelphia Eagles coat then had his hood

over his head and that he, Mr. Jackson, had his hood over

his head and that the guy in the Philadelphia Eagles coat

then started walking down toward the American Legion Hall

which was east of this location and that this guy in the

Philadelphia Eagles coat was hanging out and mingling

with the crowd that was hanging out front of the Legion

Hall and going inside to the party.

I asked him what he did. He told me that he stayed

in the parking lot of the Blimpies Restaurant and that he

Dempsey-People-cross                                    107

was looking through the front glass window down towards

the American Legion Hall in an eastbound direction.

Q    I just ask you, Detective, did Mr. Jackson

indicate at any time that he directed this individual

where to go?  Or is it as you are testifying the

individual simply went in the direction of the American

Legion Hall or that direction from Mr. Jackson?

A    Yes.  Mr. Jackson never indicated to me that he

directed the guy in the Philadelphia Eagles coat to go

anywhere.

He said that he continued to stand there and shortly

after they arrived at the Blimpies Restaurant his cousin

Peter Jenkins came out of the American Legion Hall and

saw him and came down to talk to him.  And he had a

conversation with his cousin.

I asked him what that was about and he said, Pete,

he was surprised to see me there.  And he asked me what I

was doing.  And I told him I was there to settle a beef

with Steven Jason.  I asked him what happened next and he

said that Petey wanted to shoot him himself.

He asked me to give him his gun and he told me that

"I'll kill Steven Jason and I'll do it for nothing".

He said, "I told him no.  All I want you to do is to

let me know, come down and tell me when Steven Jason is

Dempsey-People-cross                                                108

going to leave the party."

He said that Steven then, that Petey then left him
and then went back to the Legion Hall.  I asked him what
he did and he told me he continued to stand down by the
parking lot corner in the corner of the Blimpies
Restaurant and continue looking down towards the Legion
Hall.

He said that sometime around 12:30 a.m. he saw a car
that was parked on Sunrise Highway in an eastbound
direction that was parked just east of the American
Legion Hall.

He said he recognized that car as belonging to his
friend Moosey, also known as Roy Isaac.

He told me that that car is like a silver blue.
It's a Honda Accord and it's got dark tinted windows.

He said that he saw Moosey get out of the car and
stand out in front of the American Legion Hall hanging
out with other guests that were coming and going from the
party.

He said that sometime around one o'clock in the
morning he saw Moosey get back into that car and now shut
his alarm off but he had his lights flashing on and off.

He told me that he then walked down to Moosey's car
and he had a conversation with Moosey.  I asked him what

that conversation was about and he told me that he was
there.

He told Moosey that he was there to settle a beef
with Steven Jason.  That Moosey offered to help him and
that he told Moosey that after he settled the beef he
would need Moosey to give him a ride out of town fast.

I asked him what happened then.  He told me that he
also saw that Moosey was carrying his gun.

And I asked him what kind of gun it was.  He said
that Moosey had a 32 caliber automatic pistol.

I asked him to describe it.  He told me it was all
dark in color and that he kept it in a leather glove, a
black leather glove under the driver's seat of his car.

I asked him why Moosey carried a gun.  He told me
that he carries that gun because he uses it for
protection and he wants to blend in with me as one of the
guys.

I asked him what happened next.  He told me that he
walked away from Moosey and then he walked back to the
Blimpies Restaurant.  And he stood waiting there.

And he said it was like sometime around 1:45 a.m.
that same morning when his cousin Petey Jenkins ran out
of the front door of the American Legion Hall and ran
down to his location by the Blimpies Restaurant and that

Dempsey--People--cross                                                    110

Petey told him that Steven Jason was getting ready to

leave the party and that he was leaving with a girl.

I asked him what happened next.  And he told me that

a few minutes later he saw Steven Jason leave the party

and start walking towards his direction.

He told me that his plan was to stay hidden behind

the corner of the building at the Blimpies Restaurant and

that what he was going to do was that he was going to let

Steven Jason get to the end of the building and that he,

Mr. Jackson, was going to jump out in front of him.

He said that as Steven Jason and this girl kept

walking towards him he saw that guy in the Philadelphia

Eagles coat again, Tony's man as he referred to him, and

he said he saw Tony's man walking behind Steven and the

girl.

He said that he took his 38 caliber revolver and he

put it in his right hand and he held it beside his right

front coat pocket.

He said as Steven Jason and this girl got to the end

of the building he jumped out in front of Steven Jason

and that Steven Jason said something like "Oh shit".

He then said, Mr. Jackson said he said to Steven

Jason:  "Why didn't you drop the charges against La?"  He

said that Steven Jason looked at him and said:  "Who the

Dempsey-People-cross                                        111

fuck are you?  I don't even know you."

        Mr. Jackson said that he then pulled his hood back

so that Mr. Jason would get a better look at his face.

And he said to Mr. Jason:  "Don't I look like somebody

you did some shit to?"

        When he said that, Steven Jason again said:  "Who

the fuck are you?  I don't even know who you are."

        And he said by that time that Steven Jason said that

the guy in the Philadelphia Eagles coat had moved around

from behind Jason and the girl around to the back of him

and then stood at his right side.

        I asked him what happened next.  He said that Steven

Jason stepped back a little bit and used like a jerking

motion like he was trying to grab something.

        And that he said, "I pulled my gun out and I pointed

my gun at Jason's upper body.  And I fired my gun."

        I asked him how many shots he fired.  He told me two

to three times.  I asked him how far away he was from Mr.

Jason and he told me that he was about four or five feet

away.

        Later when I took a written statement from Mr.

Jackson, Mr. Jackson indicated to me that he knew he hit

Mr. Jason with his bullets because when he fired he saw

Mr. Jason flinch.

Dempsey-People-cross                                    112

I asked him what happened next.  He told me that he

then ran towards Moosey's car and that he saw Moosey had

his 38 caliber pistol in his hand.

I asked him what happened.  He said, "We jumped into

Moosey's car and that Moosey took off on Sunrise Highway

east and across to Brooklyn Avenue".

I asked him what happened then.  He said, "We sped

down Brooklyn Avenue.  We then made a right on Ocean

Avenue and we went north on Ocean Avenue."

I asked him where he went then.  He said he took

Ocean Avenue all the way down to Lena Avenue.  "We made a

left on Lena Avenue.  Then we went up to Pennsylvania

Avenue."

I asked him where he went then.  He said, "We took

Pennsylvania Avenue north until we got to Roosevelt.  We

made a stop at the corner of Henry Street and

Pennsylvania Avenue."

I asked him what happened there.  He said, "I got

out of the car and I threw my gun into the storm drain".

I asked him what happened then.  He said, "We drove

to my Uncle Lee and Aunt Deese's house at 109 Henry

Street".

I said to him:  "Did you go inside?"  He said, "No,

we went around to the back.  And Moosey and I smoked some

Dempsey-People-cross                                                        113

weed to cool down and chill out."

I asked him how long he was there.  He said about 15 minutes.  I asked him what happened then.  He said, "We got back into Moosey's car and we then drove to my apartment at 451 Fulton Avenue in Hempstead where I changed my clothes."

I asked him what happened then.  He said that "We drove into Brooklyn.  We bought some more weed.  After we bought the weed, we came back to Hempstead.  Moosey dropped me off at my apartment and then Moosey left and drove back to Freeport."

Q    About how long did it take for Mr. Jackson to give you this statement?

A    This was an oral statement.  It started about ten minutes to seven and it went to 8:15, 8:20.

Q    Were you stopping at any point to ask him for details about things he was telling you?

A    Yes.

Q    As he gave you this statement?

A    Yes.

Q    And as he gave you this statement, did you make notes regarding this statement?

A    Yes.

Q    Was Detective Hertz present during the entire

Dempsey-People-cross                                    114

time?

    A    Yes.

    Q    Were there any other detectives in the room?

    A    No sir.

    Q    Did Mr. Jackson tell you anything else about things he might have taken after the events during the oral statement?

    A    Yes.

    Q    What was that?

    A    He told me that he knew the cops were after him trying to pin the murder on him. He heard that from Moosey about a month prior. And that he was trying to establish an alibi.

He also wanted to talk to that girl that was walking with Steven Jason and that he went to his friend G-Man and asked G-Man to find out who that girl was because he wanted to talk to her and reach out to her.

And that G-Man, he said that G-Man went to Johnny Juice. Johnny Juice is also known as Johnny White.

And that Johnny Juice got back to him and told him that the girl's name was Takita and that she came from Washington, D.C. He said "I wanted to get that girl and talk to her but I didn't get a chance".

    Q    After Mr. Jackson made these statements to you,

FORM 740 PENGAD/INDY 1-800-631-6989

Dempsey-People-cross                                    115

what if anything did you do?

A    I asked Mr. Jackson if he was willing to give
me a written statement as to what he just told me.  And
he told me that he was.

I asked him if he had to go to the bathroom.  He
told me that he did.  And at that time Detective Hertz
and I walked him down to the men's room.

Q    Can you tell me what occurred after that?

A    Yes.  We went back to the same interview room.
Mr. Jackson sat in the same chair he had been sitting in
all along.

I sat behind the desk.  Detective Hertz sat at the
front of the desk and I started to prepare a written
statement in my handwriting.  Again having a conversation
with Mr. Jackson.

Q    And you went over the same aspects, the same
basic statement that he gave you orally, is that correct?

A    Yes.  But this time it was more in detail.

Q    Now who was present when you were preparing the
written statement, the 13 page statement that was
admitted into evidence previously?

A    Detective Hertz was in the interview room most
of the time.  Detective Hertz left.  Detective
Abbondandelo was in and out.

FORM 740 PENGAD/INDY 1-800-631-6989

Dempsey-People-cross                                    116

Then when the statement was completed and was

reading the statement just before I started to read the

statement to Mr. Jackson, Detective Abbondandelo came in

and Detective Hertz went out.

Q    Were there any times during the taking of the

written statement, Detective, that you were alone with

Mr. Jackson?

A    I may have been if Detective Hertz stepped out

or Detective Abbondandelo came in.  But I was continuing

to write and talk to Mr. Jackson.

Q    So I take it from your answer there were no

periods of more than a couple of minutes when you were

alone with Mr. Jackson during that time.

A    Correct.  No more than probably a minute or so.

Q    When Detective Abbondandelo came in for the

reading of the statement you referred to, did you read

the statement to Mr. Jackson at first or did you have him

read it first?

A    I read the statement to him at first.

Q    About what time was it that the statement was

completed and signed by Mr. Jackson?

A    I completed the statement around near 11:30 at

night.  And then a few minutes later Mr. Jackson signed

the statement.

Dempsey-People-cross                                    117

Q     Now during this time did Mr. Jackson have
anything to drink?

A     He had something to drink after the statement
had been completed.

Q     And after the signing?

A     Yes.

Q     Did Mr. Jackson during this period of time, did
he make any phone calls?

A     Not at that time.  But a short time later.

Q     Did there come a time when any of what you say
Mr. Jackson said to you verbally was audio taped by you?

A     No sir.

Q     Was there any video tape made at the scene?

A     No.  I asked Mr. Jackson if he was willing to
give a video statement and he told me that he was not.

Q     Was there audio tape available to you for your
use if you wanted to tape the statement that Mr. Jackson
was giving you?

A     I had a personal tape recorder that I could
have used.

Q     But you elected not to.

A     I've never used one yet.

Q     During any of the period of time when the
statement was being taken, was there any contact between

FORM 740 PENGAD/INDY 1-800-631-6989

Dempsey-People-cross                                          118

1

2      the Homicide Squad to your knowledge and the Nassau

3      District Attorney's office?

4          A     There may have been but I'm not aware of any.

5          Q     Now you told us that you made a promise to Mr.

6      Jackson about the location of the weapon?

7          A     Well after he told me where he threw the murder

8      weapon, we told him that we were going to send detectives

9      there to look for that weapon.

10         I promised him that if we found that weapon I would

11     let the District Attorney know that you cooperated in

12     helping us locate the murder weapon.

13         Q     Was that ever done?

14         A     Yes.  No weapon was found though.

15         Q     Can you tell me what was done with Mr. Jackson

16     after the statement was taken at 11:45 p.m. and signed?

17         A     After Mr. Jackson signed the statement, I

18     signed the statement.  Detective Abbondandelo signed the

19     statement.

20         As I read that statement to Mr. Jackson prior to him

21     signing it, there were also some corrections made.  I

22     made the spelling mistakes.  There was a correction made

23     on one of the pages indicating how many times he fired

24     his weapon.

25         Mr. Jackson, I asked him to place his initial there.

Dempsey-People-cross                                          119

Prior to Mr. Jackson signing the statement, I asked Mr.
Jackson if that was the truth.  He told me that it was.

I asked Mr. Jackson to read the statement.  Mr.
Jackson then took the statement from my hands and he
looked at the statement and started to read the first few
lines of the paragraph.

And I told him he could read by himself.  I saw Mr.
Jackson pause, turn each page over until he had completed
looking at all 15 pages.  He then put the statement back
on the desk.

Again I asked him if that was the truth.  He told me
that it was.  I then asked him if he would sign the
statement.  And then he said he would.

I gave him a pen and he placed his signature on each
page in the lower right hand corner.  The last page he
placed his signature and his address.

After I and Detective Abbondandelo had signed the
statement, witnessed the statement, I left the Homicide
Squad interview room and I went to the supervisor's
office and I notified Sergeant Severin that I had just
finished completing a written statement taken from Mr.
Jackson.

Q    Now did you remain at the Homicide Squad after
that time?

Dempsey-People-cross                                        120

A     Yes sir.

Q     And did you prepare any paperwork at all in
connection with Mr. Jackson's arrest for this charge of
murder?

A     I recall preparing some of the forms but not
all of them.

Q     Was it your understanding that Mr. Jackson was
to be arraigned on this charge since he had given you a
statement to this effect?

            MR. WALSH:  Objection.

            THE COURT:  Read that one back to me
        please.

            MR. CORDERO:  I'll withdraw the question.
        Let me rephrase it.

Q     Was Mr. Jackson fingerprinted, photographed and
booked for this charge, the murder of Steven Jason?

A     Not at that time.

Q     And was there any reason that you knew of why
that was not done?

A     Yes sir.

Q     What was that?

A     It was a decision made by the head of the Major
Offense Bureau Mr. Klein, the Nassau County District
Attorney's office, that we should continue the homicide

Dempsey-People-cross                                          121

investigation and not charge Mr. Jackson with the

homicide at that time.

But that he was in custody and still charged with,

there is some sale of drugs, a drug warrant and the sale

of narcotics.

Q    Did you have any conversations with A.D.A.

Klein yourself concerning this decision?

A    No sir.

Q    Who was it who related this to you if you

recall?

A    Detective Sergeant Severin.

Q    And during the time that you took the oral

statement from Mr. Jackson and then the written statement

from Mr. Jackson, did you yourself have any knowledge of

any narcotics charge that was pending against Mr.

Jackson?

A    Yes.

Q    And were you aware of that throughout the time

that you were questioning Mr. Jackson?

A    No.

Q    When did you become aware of the narcotics case

for the first time?

A    Well I should say --

Q    You yourself.

Dempsey-People-cross                                          122

A    I should say, Counsel, that when Mr. Jackson
first arrived at the Homicide Squad on the 17th of
December I knew that there was a warrant involving
selling of marijuana or possession of marijuana.  It was
a misdemeanor warrant, I believe.

On the next day on the 18th of December I was made
aware of the fact that there was an additional ongoing
narcotics investigation where there was a charge of sale
of drugs.  I believe it was cocaine that Mr. Jackson was
going to be charged with.

Q    Did you ever -- withdrawn.  When did you become
aware of that?  I know you were there for the early
morning hours.  You went home, showered, changed and
returned.  Was it before you left or after you came back?

A    It was later on in the morning after I returned
to the Homicide Squad on the 18th.

Q    Did at any time that morning you meet a
Detective Sorrentino from the Narcotics Squad at the
Homicide Squad?

A    Yes, I saw him there.

Q    Did you speak with him at all?

A    Nothing more than to say hello to him.

Q    Were you advised by other members of the
Homicide Squad that Detective Sorrentino was there to

Dempsey-People-cross                                      123

process Mr. Jackson's arrest for a narcotics charge?

    A    Yes.

    Q    And that grew out of a Freeport sweep type
operation that was ongoing from the Narcotics Bureau,
Nassau County Police Department?

    A    I didn't know where it was, sir. But I know
Detective Sorrentino is from narcotics. I didn't know
where the investigation was.

    Q    Then you were aware that was for an alleged
sale of cocaine?

    A    I believe it was cocaine sale.

    Q    Now after the written statement was completed,
you stated that you started to do some paperwork. Did
you do anything further yourself personally with Mr.
Jackson at that time?

    A    Yes.

    Q    And can you tell us what that is please?

    A    Shortly after midnight he wanted to go to the
men's room again. And I walked him down to the men's
room. He went to the men's room. He washed his hands
and face.

    I brought him back to the Homicide Squad. He had
some water. And then he wanted to know if he could go to
sleep and I said that he could.

Dempsey-People-cross                                        124

And I did the same procedure that I had done earlier
with him.  I put the two chairs together.  He used his
jacket as a pillow and he laid in between the two wooden
chairs and put his head on the jacket.

I stepped out of the interview room and I turned the
lights off in that room, the overhead lights, to give him
some type of a privacy that he would sleep.

And he slept for a couple of hours until sometime
about 2:30 when he was up and he tapped on the window and
he wanted to talk to me.

I then turned the light on and I stepped inside the
room.  And I asked him what he wanted and he told me that
he wanted to know if he could make a phone call to his,
one of his wives Teresa Covington.

I asked him what the number was.  He gave me a phone
number.  And I dialed that number of the phone and I made
a connection, handed the phone to Mr. Jackson and Mr.
Jackson had a conversation with someone on the telephone.

Q    Did you make a record of the number you dialed?

A    Yes.

Q    Was that entered on the form, the arrest report
Form 81?

A    If it was going to be listed, it would be on a
PDCN Form 85A possibly.

Dempsey-People-cross                                          125

Q      85A?

A      But I recorded that in my notes.  I don't know if it was on the form.

Q      But you did make a record in your notes of the date, time and the number call?

A      The number call and the time, yes.

Q      Did Mr. Jackson make any other telephone calls during this time at the Homicide Squad?

A      No sir.

Q      And how long did he remain at the Homicide Squad offices?

A      He remained there until it was after three going near four o'clock in the morning when we then, Detective Abbondandelo and I then took Mr. Jackson downstairs to the Records Bureau where he was fingerprinted and photographed.

Q      Now over the course of the weekend of the 18th, 19th and into the 20th, that Sunday of March 1994, was the Records Bureau of the Nassau County Police Department in 24 hour operation?

A      Yes.

Q      And it was located in the same building as the Homicide Squad, was it not?

A      Yes.

Dempsey-People-cross                                                     126

Q     Now for what purpose was Mr. Jackson taken by
you and Detective Abbondandelo to the Records Bureau at
that time?

A     He was now formally charged with murder.

Q     And he was arrested and charged on that murder
case at that time?

A     In March, yes.

Q     I'm sorry.  Perhaps you misunderstood my
question.  You told me at about three or four a.m. on
what would now be Monday morning, I believe the 21st, you
lodged Mr. Jackson with the Records Bureau?

A     Are you talking about December, sir?

Q     Yes.

A     December of 1994 he was lodged at the Records
Bureau in the detention cell.

Q     Right.

A     And that was in the early morning hours of the
19th.  At that time he was not being charged with murder.
He was held on a narcotics charge.

Q     What day of the week was that?

A     That was early Monday morning, I believe.

Q     Early Monday morning?

A     Yes.

Q     Excuse me for the mixup regarding the dates.

Dempsey-People-cross                                      127

So from the point of 12:30 p.m. on the Friday the 17th

Mr. Jackson was continuously in the Homicide Squad until

he was taken to the Records Bureau about three or four

a.m. on the 19th, is that right?

     A     No.  The 17th was a Saturday.  Sunday was the

18th.

     Q     Now you and Detective Abbondandelo were both

from the Homicide Squad?

     A     Yes.

     Q     You were the people who took him to be

arraigned, I'm sorry, to commence the procedure for his

being brought to court on a narcotics case, is that

right?

     A     We brought him down to the detention desk, yes.

     Q     Now tell me how many times, how long have you

been a homicide detective?

     A     I'm in my 18th year.

     Q     In your 18 years as a homicide detective, how

many times have you processed a prisoner for arrest on a

narcotics charge?

                MR. WALSH:  Objection.

                THE COURT:  Sustained.

     Q     Was this the first time that you had arrested

an individual on a narcotics charge during that period of

Dempsey-People-cross                                              128

time?

           MR. WALSH:  Objection.

           THE COURT:  Sustained.

Q    Was there anyone there from the Narcotics Squad when you transported Mr. Jackson into the Records Bureau?

A    No sir.  It was myself and Detective Abbondandelo.

Q    Now did you need any paperwork with respect to the narcotics charge in order to deliver Mr. Jackson to the Records Bureau and arrange for him to be processed there?

A    Yes.

Q    And can you tell me where that paperwork was when you went to do so at three or four in the morning?

A    We brought the paperwork with us.

Q    And where was it prior thereto?

A    The paperwork was prepared in the Homicide Squad.

Q    Did you prepare that paperwork?

A    I believe I prepared some of the paperwork but not all of it.

Q    When did you prepare that paperwork?

A    After Mr. Jackson had given a statement.  After Mr. Jackson was sleeping.

FORM 740 PENGAD/INDY 1-800-631-6989

Dempsey-People-cross                                    129

Q    After he had given the written statement?

A    Yes.

Q    Now can you tell me what paperwork you
prepared?

A    I may have prepared a PDCN Form 79 or 305.  I'm
not sure.

Q    Form 79 is a physical condition questionnaire?

A    The 79 is a physical condition, yes.

Q    And the Form 305 was what?

A    It's a Record Bureau form and it has to do with
height and weight and tattoos, scars, things like that.

Q    When was the last time that you saw Detective
Sorrentino at the Homicide Squad that Sunday?

A    I saw him in the morning.  I saw him for
approximately an hour or so, an hour and a half.

Q    Do you know if Detective Abbondandelo prepared
any forms in connection with the narcotics arrest to your
knowledge?

A    I'm not sure.

Q    And was Mr. Jackson taken to the Records Bureau
with the paperwork required and left there to be
transported for arraignment in court the next morning?

A    Yes.

Q    And that was on a narcotics charge, Detective?

Dempsey-People-redirect                                    130

A    Yes.

        MR. CORDERO:  I have nothing further of

    the witness.

        THE COURT:  Any redirect?

        MR. WALSH:  Yes.

REDIRECT EXAMINATION

BY MR. WALSH:

    Q    Detective Dempsey, you had indicated that you

may have prepared what is known as a Form 79, is that

correct?

    A    Just the heading part of it.

    Q    Would you describe then, when you say just the

heading part, first of all, what is a Form 79?

    A    A Form 79 is a police department form that's

required that it actually asks a prisoner or a person who

is in custody by the police certain questions as to their

physical condition, whether they want a doctor, whether

they've been drinking or taking drugs.  And those

questions are asked of a person by a superior officer.

    Q    In this particular case did you ask any of

those questions with respect to the Form 79 of the

defendant?

    A    No sir.

    Q    And the heading part that you indicated you may

Dempsey-People-redirect                                    131

have filled out, what would your response be with respect

to that?

  A  It's just a pedigree.  Maybe the date and the

charge that a person may be charged with.

  Q  I believe you had indicated that after or that

you had indicated to the defendant that if you recovered

the murder weapon that you would bring that to the

attention of the District Attorney's office?

  A  Correct.

  Q  I believe Mr. Cordero asked you whether or not

efforts were made to recover the weapon?

  A  Yes.

  Q  What if anything was done?

  A  There was the Department of Public Works of the

County of Nassau contacted.  Detective Hertz made contact

with the Department of Public Works supervisor.

  Detective Hertz went to that location at

Pennsylvania Avenue and Henry Street in Roosevelt.  And

at that time Detective Hertz had the Department of Public

Works drain and rake several catch basins that were

located in that vicinity including one at the

intersection of Pennsylvania Avenue and Henry Street.

  Q  And was any weapon recovered during the course

of that search?

Dempsey-People-redirect                                    132

A     No sir.

Q     You also indicated that the defendant told you
about riding his bicycle and coming across an individual
by the name of Takita?

A     Yes.

Q     Did you ask the defendant whether he knew
Takita's last name?

A     Yes.

Q     What did he indicate to you?

A     He said he didn't know.

Q     I believe that Mr. Cordero asked you on cross
examination whether or not you were familiar with a
person by the name of Takita?

A     Yes.

Q     How did you become familiar with Takita?

A     I met a black female now known to me as Takita
after the death of Anthony Jackson.  And that was after
June 16, 1994.

Q     Did you actually speak to Takita?

A     Yes.

Q     When you originally spoke with Takita, which
case was that?  Which death was that in connection with,
the Anthony Jackson death or the Steven Jason death?

A     It was the case of Anthony Olige Jackson.

Dempsey-People-redirect                              133

Q    Did you at any time discuss the death of Steven
Jason?

A    No, I did not.

Q    After Joseph Jackson indicated to you that he
had met Takita, did you after taking the statement from
Joseph Jackson speak with Takita once again?

A    Yes.

Q    What conversation did you have with Takita
subsequent to that?

A    Takita came to the Homicide Squad.  And I asked
her if she had ever spoken to Joseph Jackson and that if
she had ever relayed a message from Anthony Olige Jackson
to Joseph Jackson that Anthony Jackson wanted Steven
Jason killed or taken care of to prevent him from
testifying against Anthony Jackson at a grand jury
presentation.

She told me that she never did that.  I asked her if
she knew Joseph Jackson, also known as Star King.

And she said that she did know him and that she did
meet him one time when she was in the company of Anthony
Jackson.

And that she met him on East Dean Street in Freeport
outside Mr. Jackson's house.  But that she never relayed
those messages to Mr. Joseph Jackson.

Dempsey-People-redirect                                            134

I asked her if she would take a polygraph test and
she told me that she would.  She took the polygraph test.

Q     This conversation or these conversations you
had with Takita, did those take place before or after you
had taken a written statement from Joseph Jackson?

A     After.

Q     Detective, you I believe indicated on cross
examination that you never questioned a person by the
name of Gregory Pickens in connection with this case, is
that correct?

A     That's correct.

Q     Did you or other members of the Homicide Squad
make efforts to question Gregory Pickens?

A     Yes sir, we did.

Q     What efforts did you make?

A     We notified the Freeport Police Department
detectives, the Freeport Police Department.  We notified
the Bureau of Special Operations of the Nassau County
Police Department to attempt to locate Mr. Pickens so
that we could speak to him.

Mr. Pickens was not known as Mr. Pickens in the
Freeport-Roosevelt area.  But there was a person who
lived in either Freeport or Roosevelt by the name of G-
Man but no one seemed to be able to find him.

Dempsey-People-recross                                    135

Q    And when were those efforts made to contact Mr.
Pickens?

A    It was shortly after the statement was taken
from Mr. Jackson.

          MR. WALSH:  One moment, Your Honor.

          THE COURT:  Certainly.

          MR. WALSH:  I have nothing further.

          THE COURT:  Mr. Cordero.

RECROSS EXAMINATION

BY MR. CORDERO:

Q    Detective, did you ever determine Takita's
given name?

A    Yes.

Q    What is that?

A    Her name known to me as Takita Dorsey.

Q    Now you stated that in response to Mr. Walsh's
questions that you met with her at the Homicide Squad and
it was the first time you spoke to her after the Joseph
Jackson statement?

A    Yes.

Q    Did you take any notes or take a statement from
her concerning your conversations with her?

A    No sir.

Q    You stated that you arranged for a polygraph

Dempsey-People-recross                                            136

examination of Takita Dorsey?

     A    Yes.

     Q    And what were the results of that examination?

     A    She was found to be truthful.

     Q    Did you help pose any of the questions

propounded to Ms. Dorsey together with the polyigimist?

     A    Compose questions, no sir.

     Q    Did you help him compose the questions?

     A    No sir.

     Q    Would you tell me when it was that you spoke to

her at the Homicide Squad after the statement?

     A    It was approximately a week or two after Mr.

Jackson's arrest.

     Q    After his arrest for the narcotics charge?

     A    Yes.

               MR. CORDERO:  I have nothing further.

               THE COURT:  Mr. Walsh.

               MR. WALSH:  Nothing else.

               THE COURT:  Thank you, Detective.  You're

          finished.  The next witness, People.

               MR. WALSH:  Detective Jerl Mullen.

               (Discussion off the record.)

               JERL MULLEN, Detective, Shield 225,

Nassau County Police Department, Homicide Squad, having

Mullen-People-direct                                              137

been first duly sworn, called as a witness on behalf of

the People, was examined and testified as follows:

               THE COURT:  You may inquire.

               MR. WALSH:  Thank you.

DIRECT EXAMINATION

BY MR. WALSH:

    Q    Detective Mullen, how long have you been with

the Nassau County Police Department?

    A    Twenty three years.

    Q    You are currently associated with the Homicide

Squad?

    A    Yes.

    Q    How long have you been with the Homicide Squad?

    A    About eight years.

    Q    I'd like to direct your attention to the date

of December 18, 1995.  Were you working a tour of duty

with the Homicide Squad on that date?

    A    Yes.

    Q    And prior to that date, had you been involved

at least to some extent with an investigation into the

death of an individual known to you as Steven Jason?

    A    Yes.

    Q    Do you recall on the 18th of December 1994 what

your tour of duty was?

FORM 740 PENGAD/INDY 1-800-631-6989

Mullen-People-direct                                              138

1

2        A    I think it was a continuation.  It was probably

3   eight to four.

4        Q    Did there come a time on the 18th of December

5   1994 that you had an opportunity to come into contact

6   with a person now known to you as Joseph Jackson?

7        A    Yes.

8        Q    Where did that take place?

9        A    At the Homicide Squad, Nassau County Police

10  Department headquarters.

11       Q    And on the 18th, when did you first come into

12  contact on the 18th?

13       A    On the morning of the 18th, sir, sometime

14  around seven or 7:30.

15       Q    Could you describe for the Court the

16  circumstances under which you came into contact with him?

17       A    I went in to interview Mr. Joseph Jackson on

18  the morning of the 18th of December 1995.  Excuse me, '94

19  I think it was.

20       Q    Do you see Mr. Jackson in the courtroom today?

21       A    Yes.

22       Q    Please point to him and describe what he's

23  wearing today.

24       A    He's sitting at a table with the plaid shirt,

25  light skin, male black.

Mullen-People-direct                                            139

            MR. WALSH:  Let the record indicate that

        the witness has identified the defendant.

            THE COURT:  So reflect.

    Q    Detective Mullen, you indicated that you went

in to interview Joseph Jackson.  Where was Mr. Jackson

when you went to interview him?

    A    He was in the rearview room of the Homicide

Squad.

    Q    Would you describe that room for us please.

    A    The room is about a 9 by 12 or 10 by 12 foot

door and a window in it.

    Q    Was anyone else in the room with the defendant

when you went in?

    A    No sir.

    Q    Could you tell us what the defendant was doing

when you went in the room?

    A    He was sitting in the chair next to the wall,

sir.

    Q    Was anyone with you when you went in the room?

    A    No sir.

    Q    At the time that you entered the room, was the

defendant handcuffed?

    A    No sir.

    Q    Describe the defendant's appearance at that

Mullen-People-direct                                                        140

point and time, his physical appearance when you first

saw him at approximately seven o'clock.

    A    He had appeared to be awake, relaxed, sitting

up there.  He didn't seem to have no problem or physical

problems or anything.

    Q    Could you tell us what you said to the

defendant?  What was the first thing you said to him when

you went into the interview room?

    A    I introduced myself to him.  Detective Mullen.

I told him I was with the Homicide Squad.  I was going to

investigate the Steven Jason homicide.

    Q    Continue.  What conversation did you have with

the defendant at that point and time?

    A    And I asked him:  "What would you like for me

to call you, Joseph, Joe Jackson or Star King?"  And he

said:  "Which one?"  I said:  "Most people call you Star

King.  Would that be all right?"  He said, "No problem".

    Q    Did you thereafter have a conversation with the

defendant?

    A    Yes.

    Q    Where were you and where was the defendant when

you had this conversation?

    A    Well after entering the room and I walked past

him, I went to sit behind the desk and everything, he

continued to sit against the wall which is to my right at a right angle to me.  He sat there and I sat and talked with him for a couple of hours or so.

Q    During your conversation with him, was anyone else present?  Were any members of the Homicide Squad present?

A    Not during my conversation, no sir.

Q    Could you tell us what conversation you had with Joseph Jackson?  What did you say to him and what did he say to you?

A    After the introduction I asked him where he was living at.  He told me he was living at 451 Fulton Street in the Old Country Estates Apartments.

I asked him what was the apartment number and I believe he said it was 430.  But what happened was there was a problem between him and his girlfriend Teresa Covington which I asked him who was his girlfriend.

And so Teresa had found a picture of another girl in his wallet.  So he had to move out of 430.

And I think he was now living in Apartment Number 421.  I asked him about Teresa.  And he said Teresa was his live-in girlfriend and she had a child Bill, a two year old child.  And she worked at the Chemical Bank on Duffy Avenue.

FORM 740 PENGAD/INDY 1-800-631-6989

Mullen-People-direct                                            142

Q    Detective, did he indicate to you whether or

not he was living with Teresa Covington at that time?

A    On that particular date that I was asking him

the question he said no sir.  What happened was when

Teresa found the picture in his wallet, they had a little

altercation and everything.

So he moved into another apartment because he worked

for the security firm MCS or MCI, one of the security

firms.  And they had 600 Fulton, 390 and Country Estates.

And so what happened is he got a deal on the

apartment that he was now living in.  Even though he was

supposed to have been in another apartment.  He was still

in Country Estates which is 451.

Q    Continue with the conversation you had.

A    After talking a little bit about his

girlfriend, I asked him did he ever own any guns before.

And he said yes, he owned a 45, a 357 magnum and a 32

Derringer.

I asked him what happened to the guns.  He said the

45 he had to give it up.  He gave it back to the security

guy because there was a problem.

Somebody said something about that gun.  So he gave

it back to the security chief.  It never had no clip in

there.  That's one thing.  He said it never had a clip

Mullen-People-direct                                                    143

from a 45.

On the 357, he sold it on the street to somebody by
the name of Keith Lincoln or Kenneth Lincoln.  I think
something like that he said.

Q    After speaking with Mr. Jackson about any prior
ownership of the gun, what was the next thing that you
discussed with him?

A    I asked him did he know about Steven Jason.
Did he know who he was.  He said no, he didn't know who
Steven Jason was.

I asked him did he attend a party in Freeport for
Steven Jason.  He said no, he didn't attend a party.

I asked him about Tony Jackson and he said Tony
Jackson was his friend.  So I said: "When did you find
out about Steven Jason being killed?"  And he said well
he found out about it by going to the Freeport Library
and reading the current events.

And I asked him when did he go.  He couldn't
remember when he went to the Freeport Library to read the
current events but he said it was this girl named
Jacqueline that also went with him.

I asked him where did Jacqueline stay.  He said she
stayed in a white apartment building on Merrick Road
which is closer to the Freeport Library.  And whenever

Mullen-People-direct                                              144

she would go to the library he would stay in the

apartment building.

So I asked him about another time that he went to

the library.  And he said that one of the times other

than Jackson, Nicole went with him also.

I said:  "Don't you know that the woman saw you that

lives in that apartment complex on the night of the

incident?"  And he said that nobody saw him.

I got to talking to him about why did he got to the

Freeport Library and he didn't have a library card for

Freeport.  He couldn't give me one or say he had one.  He

said he just wanted to find out about Steven Jason's

murder.

And then when he found out what date it was, he went

back to the security office, the place where he was

working at Country Estates.

He asked them there about March 20th, the date that

was in question.  And the diary page was missing from the

book.

And so I said:  "Well if you knew all of that, what

was your next step after you did that?"  He said, "Well

there was also a word on the street that there was this

guy named Doug Blue.  Doug Blue drives this red BMW.

Doug Blue was at the party on the night of the incident."

Mullen-People-direct                                        145

And he went to see Doug Blue and asked who was in the car

with Doug Blue.  He said this guy named Woody.

    Q    I'm sorry.  He went to speak to Doug Blue?

    A    Yes.

    Q    Continue from there please.

    A    And he talked with Doug Blue about who was in

the car with him on the night that he went to Steven

Jason's party.  So Doug Blue told him it was this guy

named Woody.  Woody cuts hair in Roosevelt.

    Mr. Jackson then goes to the barber shop in

Roosevelt and gets a haircut from the guy named Woody.

He said he knew who the guy was because he had known him

in his past some kind of way.

    And this guy Woody was cutting hair next to the

Muslim.  The Muslim is actually the one that owns the

barber shop.  But Woody cuts hair.

    So Mr. Jackson gets in the chair, gets a haircut.

And then he asks Woody:  "Do you know who I am?"  So

Woody said, "No, I don't know who you are and

everything".

    So while he was getting a haircut he said Mr. Jason,

meaning Steven Jason's father, was in the barber shop

also and talking to him about being shown and him talking

about the police.  That means Mr. Jason was talking to

Mullen-People-direct                                      146

Woody who was cutting Mr. Jackson's hair.

So after he got a haircut and everything, he said it

was this here other guy by the name of Deuge.  Deuge is

actually Steven Jason's first cousin.

So after he got the haircut and he asked Woody about

how do you recognize him, he went out with this other guy

named G-Man.

When he goes outside, Mr. Jackson goes up to Deuge

and asks Deuge:  "Hey let's try to stop all of this

killing.  Let's put an end to it."

So Deuge says, "It's over when I say it's over".

The next time that he has any kind of contact with this

guy Woody, it's one night he and G-Man wait for the

barber shop to close.  It's dark outside.

They confront Woody about the same thing he had

asked him about.  They didn't know who he was.  And he

said no.

Moving from there, Mr. Jackson next went to what he

said was, he went to try and find out who was the girl

that was with Steven Jason on the night that he was

killed.

He went and saw this guy named Johnny Juice.  Johnny

Juice tells him that the girl who was with Steven Jason

on the night that he was killed is here in town.  It was

Mullen-People-direct                                    147

for the Thanksgiving holidays.

So Mr. Jackson then goes to try and find the girl
that's with Steven Jason. He couldn't find her because
she had went back to where she came from.

So I asked Mr. Jackson, I said, "Well you know, you
seem to know too much about this here one particular
case, Mr. Jason's death.

There's only three people that knows as much as you
know, anybody know about this case. One of them being
Detective Abbondandelo, the second one being myself and
the third one being the person that actually did the
shooting."

Because no one knew about the person that actually
was in the building on Merrick Road in the apartment
building and no one knew about the girl.

Q    When you say the girl, which girl are you
referring to?

A    The girl that was with Steven Jason on the
night of the incident. Knew where she was and where she
came from. And this here was over a period of time.

This here wasn't like maybe I would say a span of
time of two and a half hours we talked back and forth.
But I know in writing now some of my notes I was writing
some and then I was talking to Mr. Jason.

Because we even went to the bathroom one time.  He
wanted to take a break.  And at another time they brought
him breakfast.  They brought him a bagel.

He wouldn't drink coffee.  I think he drank water.
But he did go to the bathroom during this period of time
that I was speaking with him.

After I told him all these things about hey you
know, I know and the person that did the shooting know
and everything, I said it's just impossible that you
don't know what happened.

And then we just went on or over a talkative thing.
We started talking about personal lives, all of the
girlfriends he has.  He has three kids.

Q    Before you get into that, let me interrupt you,
Detective.  Can you tell us how it was that you first got
onto the subject of his going to the Freeport Library?

A    Because I asked him:  "How did you know who
told you that Steven Jason was dead?"  And he said that
he heard that the police were looking for him and
questioned him about Steven Jason's death.  So that's why
he went to the Freeport Library to get some information
about it.

Q    Did he indicate to you how he heard that, that
the police were looking for him with respect to Steven

Mullen-People-direct                                    149

Jason's death?

    A    No sir.  He didn't ever tell me about it, no.

    Q    Now after you had indicated to him that there were only three people who know this much information, you indicated that you then went on to start talking about his personal life?

    A    Yes sir.

    Q    Again were you the only one in the room with him at that time?

    A    Yes.

    Q    Could you tell us what conversation you had at that point and time?

    A    He told me that he had a tough life in being brought up.  He was an abused child.  He was moved around quite a bit.

    He never felt like he belonged in a place other than when he was with Tony Jackson.  And Tony Jackson and him, even though people took them for brothers or for blood, there was no relations to them.

    A lot of times people used to get them confused saying he was Tony Jackson.  That made him feel much better about himself.

    I asked him about his job.  He said he was working for the security agency.  I said, "You know that's a good

Mullen-People-direct                                        150

deal.  Because usually people your age is out on the

streets selling a lot of drugs and everything.  You don't

seem to be that way."

     He said no, he's trying to make it.  He wants to get

married.  He just wants to settle down.

     But he lost his best friend.  He didn't know how he

was going to make out.  We talked about things like that

for quite awhile.

     Q    Approximately how long did you talk about

things of a personal nature?

     A    About an hour.

     Q    In all, how long did your conversation with Mr.

Jackson last?

     A    About three and a half hours.

     Q    Which meant that your conversation with him

ended at about what time?

     A    About 10:30, eleven o'clock.

     Q    How did your conversation with Mr. Jackson end?

     A    I told Mr. Jackson, I said, "You know, you got

to take things now and look at them the way they are.

You have three kids.  They're all the same age.

     And one way or another, you're going to have to

settle down with one of these females.  If you want to

try and help yourself, tell us what happened.

Mullen-People-direct                                          151

I'm going to leave the room shortly.  And I won't be
back in here more than likely.

But you stand a chance of not ever seeing your
children again.  Otherwise somebody else is going to be
calling your kids Daddy."

That's how I left it.  I walked out of the room.

Q    During your entire conversation with the
defendant, were any other detectives from the Homicide
Squad present or any other detectives at all present?

A    No sir.

Q    Were any breaks taken during the course of your
conversation with Mr. Jackson?

A    Yes sir.

Q    What for?

A    Well he was eating his bagel and drinking
water, I believe.  And another time he wanted to go to
the men's room.

Q    When he had the bagel and water, do you recall
approximately what time that was?

A    I would say maybe between 7:30 and eight
o'clock.

Q    And you indicated that there was another break
taken for the defendant to go to the men's room.

A    About 9:30.

Mullen-People-direct                                                     152

Q    And who took him to the men's room?

A    I asked Detective Dempsey to go with me.

Q    And after you went to the men's room, you
returned to the interview room again?

A    Yes.

Q    Did Detective Dempsey remain with you in the
interview room or were you alone?

A    I was alone.

Q    How would you describe the defendant's demeanor
during the course of your conversation?

A    Relaxed and very talkative.

Q    At any time that you spoke with the defendant,
did you ever threaten him?

A    No.

Q    Did you ever make any promises to him during
your conversation?

A    No sir.

Q    Did you ever strike him in any way?

A    No sir.

Q    At any time during the period of time that you
spoke with the defendant, did he ever indicate to you
that he was unwilling to speak with you?

A    No sir.

Q    Did he ever ask to speak with a lawyer?

Mullen-People-direct                                    153

A    No sir.

Q    I'd like to direct your attention now,
Detective, to December 20, 1994.  Did there come a time
on that date that you had an opportunity to come into
contact or meet with a person by the name of Skwanitar
Witherspoon?

A    Yes.

Q    That's the correct spelling, Detective?

A    Yes.

Q    You had an opportunity to meet with her on the
20th of December?

A    Yes sir.

Q    And what was your purpose in meeting with Ms.
Witherspoon?

A    To continue the investigation further into the
death of Steven Jason.

Q    First of all, what was your purpose in actually
meeting with her?

A    My purpose in meeting with her?

Q    Yes.

A    We were to show her a photo array containing
pictures, six pictures, one of them being Joseph Jackson.

Q    Who made the arrangements to meet with Ms.
Witherspoon?

Mullen-People-direct                                          154

A    I did.

Q    Do you recall when it was that you first contacted Ms. Witherspoon?

A    I believe on the 19th I contacted the Witherspoon family.  And then I got permission to speak to Skwanitar.

Q    That would be on the 19th of December 1994?

A    Yes.

Q    And did you actually thereafter speak with Skwanitar Witherspoon?

A    Yes.

Q    Do you recall when that was?

A    That was on the 20th of December.

Q    Could you tell us what conversation you had with Ms. Witherspoon when you first spoke to her?

A    I was in Pittsburgh, Pennsylvania.  And I had flown out there that morning.  I met with her at the airline travel school that she was attending.

I saw her about 5:15 that afternoon.  It's called the City Line Towers, I believe.  I met with her.

There are security people there.  They gave me a conference room.  And I went in.  I sat down.  At this time Detective Abbondandelo was with me also.

Q    Prior to actually meeting with her, I take it

Mullen-People-direct                                                    155

you contacted her by telephone?

    A    Yes.

    Q    Can you tell us what conversation you had with
her over the phone when you first contacted her about
going to the meeting?

    A    I told her that I had talked with her mother
and I got permission to come out to Pittsburgh to talk
with her and continue to investigate into the death of
Steven Jason.  Would it be all right if we could meet and
talk one afternoon.  She said yes, there would be no
problem.

    Q    Did you indicate to her the reason that you
were coming out to speak with her?

    A    No sir.

    Q    Did she ask you any questions or make any
comments when you telephoned her?

    A    No.

    Q    On the 20th you did go to Pittsburgh for the
meet with Ms. Witherspoon?

    A    Yes.

    Q    And you met with her at approximately what
time?

    A    About 5:15.

    Q    Other than yourself and Detective Abbondandelo,

FORM 740 PENGAD/INDY 1-800-631-6989

156

Mullen-People-direct

were any other detectives or police officers with you at

the time that you met her?

    A   At the time that I met her?

    Q   On the 20th.

    A   That I met Ms. Witherspoon?

    Q   Right.

    A   No sir.

    Q   When you actually met Ms. Witherspoon on that

date, can you tell me what conversations you and

Detective Abbondandelo had with her at that time?

    A   I introduced myself and told her I'm glad to

see her. I also introduced Detective Abbondandelo. She

met him before.

    But I just wanted to assure her who he was. And

then like I said, we met with security and security

directed us to another room where we could have some

privacy.

    Q   And once you got into that, I believe you said

it was a conference room?

    A   Yes.

    Q   What did you tell her about what was going to

happen then?

    A   I asked her to sit down and then I sat down. I

said, "I'm going to show you an array of photographs.

FORM 740 PENGAD/INDY 1-800-631-6989

Mullen-People-direct                                    157

And I want you to see if you recognize the person that

shot Steven Jason."

     Q     Did she say anything to you at that point and

time or ask you any questions prior to looking at the

photos?

     A     No sir.

     Q     Did you ever tell her that the individual who

shot Steven Jason would be in that photo?

     A     No sir.  But going back now also, I told her

included when I first put the photographs down before I

put them down, I said, "I'm going to show you 12

photographs.  One is black and white and one is color.

     But the six pictures are the same.  So just take a

look at both sets and let me know if you recognize anyone

in the photographs."

     Q     You had arranged two separate photo packs,

correct?

     A     Yes.

     Q     First of all, who arranged the photo packs, do

you know?

     A     Detective Abbondandelo caused the photo array

to be arranged.

     Q     What were the photo packs that were arranged

please or that you used to show this Ms. Witherspoon?

Mullen-People-direct                                    158

A    Six black and white photos with caps on their
heads.  Six color photographs without caps.

Q    And was a photograph of the defendant included
in each of those photo arrays?

A    Yes.

Q    What position was the defendant in in each of
those photo arrays?

A    Number one.

Q    Did each of those photo arrays contain six
photographs of male blacks?

A    Yes.

Q    In the black and white photo array, were the
individuals depicted in that photograph array the same
people who were depicted in the photo array?

A    Yes.

Q    And were the various individuals including the
defendant in both the same position including both the
black and white and the color array?

A    Yes.

Q    Did there come a time that you actually
displayed these photographs to Ms. Witherspoon?

A    Yes.

Q    Where was she and where was Detective
Abbondandelo when that was done?

Mullen-People-direct                                159

        A    Detective Abbondandelo was sitting to my left
over at another table over against the wall.

        Ms. Witherspoon was sitting I would say south of me.
I was sitting north.  She was sitting directly across the
table from me.

        Q    Can you tell us exactly what you did, how you
went about showing those photo arrays.

        A    I laid the photo arrays on the table.  I told
her, "I want you to look at all the photos before you say
anything.  Then let me know if you recognize anyone.  Do
you recognize the person in these arrays who shot Steven
Jason if it is?"

                    THE COURT:  Excuse me.  Was that one array
              or 12 photos?

                    THE WITNESS:  There's 12 photos but it's
              actually two separate arrays.

                    THE COURT:  You had both of them out?

                    THE WITNESS:  Yes.  I put the color next
              to her and the black and white on top.

        Q    So the color is?

        A    Right underneath it.

        Q    And the black and white was?

        A    Right up.

        Q    What happened when you made those comments and

Mullen-People-direct                                              160

placed the photo arrays?

    A    She appeared to scan the photos and then she
said "number one".

    Q    Between the time that you put the photo arrays
down and the time that she said number one, do you recall
approximately how long that was?

    A    Less than a minute.

    Q    And during that period of time that she
appeared to be looking at the photo arrays other than to
say number one, did she make any other statements or
comments or ask any other questions?

    A    No sir.

    Q    Was her selection of photograph number one
recorded?

    A    Yes.

    Q    How so?

    A    I had her sign the photo array that was shown
to her and also I took a deposition from her.

    Q    Were each of the photo arrays that were placed
in front of her signed?

    A    Yes.

    Q    Where were they signed?

    A    On the rear of the photo.

        MR. WALSH:  May I have these marked for

Mullen-People-direct                                    161

identification, Your Honor?

            THE COURT:  Yes.  We're up to 67.

            MR. WALSH:  Perhaps A and B.

            THE COURT:  Yes.

            (Item referred to received and marked

People's Exhibits 67A and 67B for

identification.)

            MR. WALSH:  May I have them shown to the

detective?

            THE COURT:  Yes, show them to the

detective.

     Q     Detective, first showing you what's been marked
as People's Exhibit 67A for identification.  Do you
recognize what that is?

     A     Yes.

     Q     What do you recognize that to be?

     A     The photo array that I showed to Skwanitar
Witherspoon on December 20, 1994.

     Q     And how do you recognize that?

     A     Her signature appears on the rear of each photo
array, the date 12-20-64 and the time 5:20 p.m.

     Q     Now 67A, the one that I was asking you about,
is that the black and white photo array or the color
photo array?

Mullen-People-direct                                    162

A    67A is the black and white photo array.

Q    And if you take a look at People's Exhibit 67B.
Would you tell us what that is please?

A    That's the color array.  67B is the color
array.

Q    And how do you recognize that particular array?

A    On this particular one here Skwanitar
Witherspoon like I said before, it was placed underneath.
So I asked her to sign the front of this photo array.

And what happened, the person that we were using it
wouldn't write on the front.  So I asked her to sign on
the back of the photograph 67B.

Q    Did she begin to sign her name on the front?

A    Yes.

Q    And does that appear on the front of the photo
array right now?

A    Yes.

Q    Are the photo arrays that you have, 67A and 67B
for identification, in the same condition now as when you
showed them to this witness?

A    Yes.

Q    And in each of those photo packs, can you tell
us what position the defendant is in?

A    Number one.

Mullen-People-direct                                   163

MR. WALSH:  I offer each of those in

evidence, Your Honor.

THE COURT:  Show them to Mr. Cordero

please.

MR. CORDERO:  No objection for the purpose

of the hearing.

THE COURT:  Mark them.

(People's Exhibits 67A and 67B now marked

into evidence.)

THE COURT:  May I see them please?  Thank

you.

Q    Detective Mullen, again 67A is the black and

white.  67B is the color.  Can you tell us why one was in

black and white and the other was in color?

A    Because when you're doing the photo array you

want to alter it.  The computer will only alter it in

black and white instead of the color.  We felt like we

shouldn't put caps on their heads.

Q    Why was that?

A    Because at the time of the incident the person

described that did the shooting had his head covered.

Q    Detective, let me direct your attention to

April 11, 1995.  Were you working a tour of duty on that

day as well?

Mullen-People-direct                                      164

A    Yes.

Q    Did there come a time on the 11th that you had an opportunity to be involved in the conducting of a lineup regarding this case at the Homicide Squad of the Nassau County Police Department on that date?

A    Yes.

Q    Approximately what time did this lineup take place?

A    About 3:20 in the afternoon.

Q    What if any witnesses were asked to do this lineup?

A    Skwanitar Witherspoon was asked to view the lineup.

Q    Who first contacted Skwanitar Witherspoon with respect to viewing the lineup?

A    I did.

Q    Was that by telephone?

A    Yes.

Q    Can you tell us what conversation you had with her over the telephone when you first contacted her?

A    I asked her would she be able to come to New York on the 20th and possibly stay over for a couple of days.  Excuse me, it's the 20th I believe it was.  To come in that day and stay over a couple of days with

Mullen-People-direct                                    165

permission of her mother.  She said she would.

And I told her that I would be meeting her at the
airport and I'll pick her up and I'd like to bring her to
the Homicide Squad.  I don't know if I told her it was
for a lineup.  I'm not sure.

Because most of the time that I was talking, I told
the mother I wanted her to come to New York for two days
at least.

Q     Did she ask any questions or make any comment
to you about why she was coming to New York when you
spoke with her?

A     No sir.

Q     And what arrangements were made for her to come
to New York?

A     I made arrangements I think.  Excuse me.  What
happened when I say I made arrangements, being that she
flies free, I think she said she would catch a flight out
and I could pick her up and I would probably give her
some money myself while she's here.

Q     Did there come a time on the day of the lineup
that you did actually pick her up at the airport?

A     Yes.

Q     Was anyone else present when you picked her up
at the airport?

Mullen-People-direct                                          166

A     No.

Q     Can you tell us what conversation you had with Ms. Witherspoon about what was to take place that day from the time that you picked her up at the airport?

A     I told her I would be taking her to headquarters for a lineup.

Q     Did she ask you any questions or make any comments at that point and time?

A     Pertaining to the lineup?

Q     Yes.

A     No sir.

Q     Did you during the period of time that you drove from the airport to headquarters give her any instruction to make any comments about the lineup itself?

A     No sir.

Q     Now I believe you indicated that Ms. Witherspoon was brought to headquarters.

A     Yes.

Q     And where specifically within headquarters was she brought?

A     She was taken to the second deputy chief of detective's office.  And she remained in there until the lineup began.

Q     Was anyone with her in that office where she

Mullen-People-direct                                    167

remained until the lineup began?

    A    I was with her at all times just about.

    Q    Was she permitted access to anyone else prior

to the time that the lineup was conducted?

    A    No sir.

    Q    Where was the lineup --

    A    Correction. I believe you came into the office

where I was.

    Q    Myself?

    A    Yes.

    Q    Other than myself, did anyone else that you

recall have contact with her at headquarters prior to the

time that she viewed the lineup?

    A    I believe I was the only one other than you.

    Q    And where did the lineup itself actually take

place?

    A    It took place in the Homicide Squad office.

    Q    The office where Ms. Witherspoon was kept,

where was that in relation to the lineup in the Homicide

Squad office?

    A    It's down the hall maybe 16, 20 feet away from

the door of the homicide office.

    Q    And from the office in which you and Ms.

Witherspoon waited, can you actually view the Homicide

Mullen-People-direct                                    168

Squad?

    A   No sir.  You can't see it.

    Q   Were fillers obtained at some point and time
for the lineup to be conducted?

    A   Yes.

    Q   Did you have any involvement in the gathering
of fillers for the lineup?

    A   No sir.

    Q   Do you know where the fillers were kept prior
to the time the lineup was conducted?

    A   No sir.

    Q   At any time prior to the lineup actually
occurring, did you see any of the fillers?

    A   No sir.

    Q   There came a time that the defendant Mr.
Jackson was brought over for the lineup as well.

    A   I don't know.

    Q   You had no involvement in getting Mr. Jackson
to the Homicide Squad or the lineup?

    A   Correct.

    Q   Do you know where he was kept while awaiting
the lineup?

    A   No sir.

    Q   Did you ever see him while you waited with Ms.

FORM 740 PENGAD/INDY 1-800-631-6989

Mullen-People-direct                                        169

Witherspoon in the office?

    A    No sir.

    Q    Could you describe the facilities at the
Homicide Squad that were used in conducting his lineup?

    A    I guess the room is about a 12 by 20.  And it's
off the main office part of the Homicide Squad.

    It has two doors in it but one door has a one way
mirror.  It's an open room.  We keep all our file
cabinets.  That's where we have our lineups in that
office.

    Q    When you say one way mirror, what is a one way
mirror?

    A    You can see in but you can't see out.

    Q    While you were down the hall from the Homicide
Squad in the office that you described and prior to
viewing the lineup, what discussion did you have with Ms.
Witherspoon about the lineup itself?

    A    The only thing I told her was to be calm and
it's just going to be a one way mirror.  Just take your
time and that will be it.

    Q    Did you ever indicate to her that the defendant
Mr. Jackson would be in that lineup?

    A    No sir.

    Q    Did she ask you any questions or make any

Mullen-People-direct                                              170

comments while you were waiting for the lineup to be held

in that office?

    A    No sir.

    Q    Did there come a time that Ms. Witherspoon was

actually asked to view a lineup?

    A    Yes.

    Q    How did you become aware that the lineup was

ready to be viewed?

    A    Detective Abbondandelo came to the chief's

office and told me they were ready.

    Q    At that time, what did you say to Ms.

Witherspoon if anything?

    A    I told her let's stop.

    Q    Did she say anything to you?

    A    No sir.

    Q    Did you actually enter the Homicide Squad with

Ms. Witherspoon at that point and time?

    A    Yes.

    Q    Do you recall who else was in the Homicide

Squad when you brought Ms. Witherspoon in to view the

lineup?

    A    The only one I can recall right now is

yourself, Assistant District Attorney and Mr. Cordero.

That's all I can remember.

Mullen-People-direct                                        171

1

2      Q    Were there any other detectives or police

3  officers?

4      A    Oh yes, they were there.  I didn't focus on

5  them.  I just noted that you two was there.

6      Q    Did you have any role in actually arranging the

7  lineup itself?  In other words, putting the lineup

8  together and selecting the individuals in the lineup?

9      A    No.

10     Q    What happened when you entered the Homicide

11  Squad with Ms. Witherspoon?

12     A    We walked up to the viewing door.  I told Ms.

13  Witherspoon, "Look inside.  Do you recognize anyone in

14  the room?"  She said yes.  I said:  "What number?"  She

15  said, "Four".  I said:  "Well would you say it louder

16  please?"  She said, "Four".  I said, "Thank you".  I took

17  her back.

18     Q    From the time that you asked her to look, first

19  of all, what did you see her do when you asked her to

20  look in?

21     A    She looked in the room.  I gave her a few

22  seconds.  I asked her:  "Do you recognize anyone?"  She

23  said yes.  And that's when she said four.  But she didn't

24  say it loud.  Then I asked her to repeat it loud.

25     Q    Approximately how long did it take Ms.

Mullen-People-direct                                    172

Witherspoon to select number four from the time that she

first began looking until the time that she made the

selection?

        A    Less than 30 seconds.

        Q    Did you or anybody else say anything to Ms.

Witherspoon as she was looking at the lineup?

        A    No sir.

        Q    Did she make any other comments or ask any

questions as she viewed the lineup?

        A    No sir.

        Q    Did you ever have an opportunity to actually

view the lineup from where you were?

        A    Yes.

        Q    Describe what you saw.

        A    I saw six male blacks in a room with caps on

them.   Each one pulled up a number, holding up a number

and a white garment, holding up the lower portion of the

body.

        Q    Was the defendant in that lineup?

        A    Yes.

        Q    Do you recall what position the defendant

occupied?

        A    Yes.

        Q    What position was that?

Mullen-People-direct                                          173

A    Number four.

Q    What was done after Ms. Witherspoon selected or
indicated to you that she recognized him?

A    I took her back to the office that we had been
in prior to viewing the lineup.  I took her deposition
from her.

          MR. WALSH:  Can I have this marked for

          identification?

          THE COURT:  Yes.

          (Item referred to received and marked

          People's Exhibit 68 for identification.)

          MR. WALSH:  May I have that shown to the

          detective a moment please?

          THE COURT:  Certainly.

Q    Detective, I'm showing you what has been marked
as People's Exhibit 68 for identification.  Do you
recognize what it is?

A    Yes.

Q    What do you recognize it to be?

A    The lineup that we viewed in April.

Q    And with respect to that lineup, could you tell
us what position Joseph Jackson is in seated in that
particular photograph?

A    Number four.

Mullen-People-cross                                         174

        Q    Is that a fair and accurate picture of the
lineup that you observed or that you asked Ms.
Witherspoon to look at on April 11, 1995?

        A    Yes.

                MR. WALSH:  Offer it in evidence, Your
        Honor.

                THE COURT:  Show it to Mr. Cordero please.

                MR. CORDERO:  No objection.

                THE COURT:  Mark it.

                (People's Exhibit 68 now marked into
        evidence.)

                THE COURT:  May I see it please?

                MR. WALSH:  I have no further questions.

                THE COURT:  Mr. Cordero, would you like to
        start for about five minutes or would you
        rather wait and start in the morning?

                MR. CORDERO:  Might as well start.

                THE COURT:  Within the next five minutes
        or so.

                MR. CORDERO:  Very good.

CROSS EXAMINATION

BY MR. CORDERO:

        Q    Good afternoon, Detective.

        A    Good afternoon, Mr. Cordero.

Mullen-People-cross                                          175

Q    Detective, you stated that on December 18,
1994, when Mr. Jackson was present at the Homicide Squad
that you were working and eight to four tour.  I think
you said it was a continuation tour that you had been
working the night before?

A    I had been in the office, yes.

Q    Were you previously involved in any way with
the interrogation of Joseph Jackson?

A    Was I previously involved in asking him
anything?

Q    Yes.  Asking him anything or suggesting
questions to be answered, that type of thing.

A    No sir.

Q    You stated that you were previously involved in
the investigation of Steven Jason's death, is that right?

A    Yes.

Q    Was the case initially assigned to you?

A    No sir.

Q    It was Detective Abbondandelo's case, is that
right?

A    Yes.

Q    Can you tell me how it came to be that you
entered the room to speak with Mr. Jackson?

A    Well no one was in the room at the time.  So I

Mullen—People—cross                                          176

just decided that I would be in and speak with him that

morning.  That was the only reason I went in at that

time.

          Q     There was no discussion with anybody at the

Homicide Squad prior to your entry into the room?  That

you would take a period of time to speak with Mr.

Jackson?

          A     I could have told Detective Abbondandelo that I

was going into the room.  I don't know.  It could have

been in passing.  Just that I was going into the room and

speaking with him.

          Q     Did you speak with Detective Abbondandelo and

Detective Dempsey or Detective Dempsey I should say prior

to entering the room where Mr. Jackson went?

          A     When you say prior to --

          Q     Prior to going into the room.

          A     If you could ask it another way.  You're asking

me just prior to going into the room.  I had been

involved in some of the conferencing or some of the

talking about Mr. Jackson.  I was aware that he was there

and there was interviews going on at the time.

          Q     That's really what I'm asking you.

          A     You're right.

          Q     Were you involved in conferences with other

Mullen-People-cross                                                    177

detectives about Mr. Jackson having been questioned for a

period of time?

    A    Yes.

    Q    Prior to the time that you sat with him?

    A    Yes.

    Q    And were you apprised by anyone as to what he

may have said up to that moment and time when you first

spoke with him?

    A    It was a lot of talking.  But I can't recall

how much of that I even retained.  I know Detective

Dempsey and Detective Abbondandelo both talked back and

forth.  We were all at the conference table several

times.  It could have been during that time.

    Q    How did you learn the name Star King?

    A    Going back I believe I was on vacation back in

November of '94.  Detective Abbondandelo, I had been

working with him from March, from the date of the

incident of Steven Jason and been involved with Detective

Dempsey and Tony Jackson.

    So going back, looking back into March of that year

from Detective Abbondandelo to Detective Dempsey and up

until November sometime thereafter, I know I went away or

something.

    When I came back I think Detective Abbondandelo

Mullen-People-cross                                      178

informed me that they had a suspect on the Steven Jason

case or someone they wanted to talk to by the name of

Star King.

Q     And did you have an actual name other than the

street name Star King?

A     By the time Detective Abbondandelo if I recall,

he probably gave me the name Joseph Jackson and Star

King.

MR. CORDERO:  Judge, we can break now if

you like.

THE COURT:  Fine.  I spoke to my law

secretary.  My clerk went in and spoke to her

to see what time for tomorrow.  Eleven thirty

tomorrow.

MR. CORDERO:  All right.

THE COURT:  Please let us know if there is

a problem.

(Whereupon the hearing was adjourned to

Friday, January 26th, at 11:30 a.m.)

COUNTY COURT : NASSAU COUNTY                          179

       PART I

- - - - - - - - - - - - - - - - - - - x

PEOPLE OF THE STATE OF NEW YORK

      -against-                          Ind. #
                                                     91,134
JOSEPH JACKSON,                                      91,607

                                                     Charge:
                  Defendant          Murder
                                                     2nd
- - - - - - - - - - - - - - - - - - - x

               Mineola, New York
               January 26, 1996


BEFORE:   HON. ABBEY L. BOKLAN
          COUNTY COURT JUDGE

                    *    *    *    *

               MINUTES OF HEARING

                    *    *    *    *


APPEARANCES

     MICHAEL WALSH, ESQ.
     Assistant District Attorney
     For the People

     EUGENE CORDERO, ESQ.
     For the Defendant




JAMES F. GILL, C.S.R.
Official Court Reporter

FORM 740 PENGAD/INDY 1-800-631-6989

Mullen-People-cross                                    180

THE CLERK:  People versus Joseph Jackson.

Hearing continued.  People ready?

MR. WALSH:  People ready.

THE CLERK:  Defendant ready?

MR. CORDERO:  Defendant ready.

(Detective Mullen recalled.)

THE COURT:  You're still under oath.

THE WITNESS:  Yes.

THE COURT:  Mr. Cordero, whenever you're

ready.

MR. CORDERO:  Thank you.

(Continuing) CROSS EXAMINATION

BY MR. CORDERO:

Q    Good afternoon, Detective Mullen.

A    Good afternoon.

Q    You told us that when you first met Mr. Jackson

he was alone in the interview room.

A    Yes.

Q    During the period of time that you spoke with

him, was there any or were there ever any other

detectives in the room with you?

A    While I was doing the interview talking with

Mr. Jackson?

Q    Yes.

Mullen-People-cross                                           181

A    No sir.

Q    Now about how long all together were you with
Mr. Jackson in that interview room?

A    About three and a half, maybe four hours.

Q    And during that period of time you made notes
regarding certain subjects that you discussed with Mr.
Jackson, is that correct?

A    Yes.

Q    You said that among the things you discussed
with Mr. Jackson was a woman in an apartment.  I'm trying
to understand what you were referring to when you
discussed that with Mr. Jackson.  I think you said
something about a white apartment building on Merrick
Road?

A    Yes.

Q    Can you tell me what discussion you had at
first with Mr. Jackson about this woman?

A    I never talked too much about that woman.  I
was mostly talking to Mr. Jackson about when he went to
the library just by coincidence when Jackie went to the
library.

     He returned back to the white apartment building.
Then at other times Jackie went to the library alone and
he waited at Jackie's apartment which was the white

Mullen-People-cross                                        182

building which is also inclusive of one of our witnesses

that we had in this case.  That's what I was referring to

when I said the white apartment building.

    Q    And what witness were you referring to?

                MR. WALSH:  Objection.

                THE COURT:  Sustained.

    Q    You told us that you told my client didn't you

know the woman who you knew from the apartment saw you

that night?

    A    Yes.

    Q    You confronted him with that?

    A    Yes.

    Q    And when you said that night, what night were

you referring to?

    A    I was referring to the night of the incident,

the night that Steven Jackson was killed.

    Q    And what did Mr. Jackson tell you in response?

    A    He didn't have no answer for that.  He just

said that Jacqueline stayed in that apartment complex.  I

asked him what apartment complex did Jackie stay.  He

couldn't give me the number.  I asked for the description

of Jackie.  He said Jackie was just a big fat female

black.

    Q    Then you told Mr. Jackson that this woman who

Mullen-People-cross                                          183

knew him from that apartment house had seen him at the

site of the Jason homicide?

          A     Yes.

          Q     Had you interviewed that individual?

          A     Which one?

          Q     This woman.

          A     Yes sir.

          Q     Did you ask Mr. Jackson if he knew who this

woman was?

          A     No sir.

          Q     Did you ask Mr. Jackson about his relationship

with Doug Blue?

          A     I could have, sir.

          Q     You told Mr. Jackson that Doug Blue was at the

party on the night of the incident?

          A     No, I didn't tell him he was there on the night

of the incident.  Mr. Jackson told me that he went to see

Doug Blue.

          Q     Right.  Because he heard that Mr. Blue was at a

party the night of the incident?

          A     Yes.

          Q     And was it Mr. Jackson advised you that he

drove a red BMW?

          A     Yes.

Mullen-People-cross                                          184

Q    And he said that Woody was with him at the time

that he saw Doug Blue?

A    I believe he said Woody.  I don't know if Mr.

Jackson said Woody at the time.  But he said a male black

that was in the car was in Doug Blue's red BMW.  And he

knew him and he would have to call his name because he

knew him before as a barber.

Q    Now did Mr. Jackson explain to you why he was

making these efforts?

A    Because he said that he had got word that the

police was looking for him.

Q    In connection with what?

A    With the Steven Jason homicide.

Q    You said that you spoke with Mr. Jackson about

efforts which he made to locate a female who was with

Steven Jason at the time of his shooting?

A    Yes.

Q    And did you raise that issue or did Mr. Jackson

raise that issue?  How did that discussion come about?

A    I think in our conversation he was telling me

the efforts that he was doing in trying to find the

people around him that knew about this Steven Jason

murder.

And he brought it to my attention that he went out

Mullen-People-cross                                    185

and spoke to Johnny Juice.  And Johnny Juice is the one

that actually gave him the information about the female.

       Q    So he was telling you what efforts he was

making to establish that he wasn't responsible for it?

       A    Yes.

       Q    And he volunteered this information to you,

this name Johnny Juice, the other name Doug Blue and

other names like that?

       A    Yes.

       Q    It came up during the conversation?

       A    Yes.

       Q    Did you talk to Mr. Jackson about what he

should do while he was being questioned?  Did you ever

talk to him about what would be in his best interests?

       A    What would be in his best interests?

       Q    Yes.

       A    I couldn't say how he took it.  I was just in

our conversation of talking, explaining things to him.

       And when we got personal, he was telling me about

his three kids.  I told him if he wanted to see his

children again or something like that, I told him it

would be best that you cooperate with us and see what we

can establish in your behalf.  Because I said, "You've

got three two year old by three different females".  That

Mullen-People-cross                                    186

was it.

        Q    Did you tell him that if he was involved he
should admit his involvement because it would be best for
him to do so?

        A    No sir.  I didn't say anything like that.

        Q    Did you tell him that if he was involved he
should tell the truth?

        A    I said, "Just tell it like it happened".

        Q    Did you tell him that if he cooperated that he
would, you would see to it that he would have a chance to
see his children again?

        A    No sir.

        Q    When you told Mr. Jackson, when you had this
discussion with Mr. Jackson about his relationship with
Teresa Covington and the other young woman who you say he
has children with, was that the beginning of your
discussions with Mr. Jackson?

        A    The question was too long I think to answer.  I
started out asking him who did he live with.

        I think in the beginning he told me he said he
resided with Teresa Covington up until the time she found
a picture in the wallet.

        Then he moved to another apartment and then another
apartment.  I didn't get into this part about how many

Mullen-People-cross                                      187

children he had until much later.

    Q    Until much later?

    A    Until much later, yes.

    Q    So was the discussion that you had with him
about his efforts to clear his name and his efforts to
investigate truth from an alibi, those discussions were
held before you got into this situation with his
children?

    A    Yes.

    Q    Now I think you said that there came a time
fairly early in your questioning of Mr. Jackson when you
told him that because of the fact that he was trying to
find a girl who was with Steven Jason that that meant it
was impossible for him not to prove personal knowledge of
the shooting.  Do you remember telling us about that on
direct examination?

    A    I remember telling you about the girl on direct
examination, yes.

    Q    Now how did that come up?

    A    That was brought up through Mr. Jackson.  Mr.
Jackson brought it all up.

    Q    In what context did he bring it up?

    A    That was about almost to the end.  I think your
prior question was early into the interview.  It was

Mullen-People-cross                                    188

actually later on that he actually said that he had went

out and contacted Johnny Juice about finding this girl

and Steven Jason.  That was towards the end.

    Q    And did you say Mr. Jackson, that it would be

impossible for him to know that Steven Jason was with a

girlfriend when he was shot?

    A    No sir.

    Q    Well you said that you told Mr. Jackson that

something was impossible?

    A    Yes.

    Q    What was it that you told him was impossible

based on what he had told you?

    A    Based on what he had told me and when I said it

was impossible to Mr. Jackson that, number one, the

apartment building where he was at when he was going to

the library.

    Number two, when he went back to the security

agency.  Number three, when he went to see Mr. Woody the

barber.  And number four which was the girl.

    I said only three people know that to my knowledge

that can say actually those things and know what they are

talking about.  And that's Detective Abbondandelo, me,

Detective Mullen, and the person that did the shooting.

    Now they are the only ones that I've said.  That's

Mullen-People-cross                                      189

when I told him it's impossible for you to know all of
these things if you didn't do the shooting.

    Q    Now had other individuals been interviewed in
connection with this investigation prior to your speaking
with Mr. Jackson by yourself and Detective Abbondandelo
concerning the party at the VFW Hall, the American Legion
Hall?

    A    When you say that, I don't follow the question,
sir.

    Q    There were other people that were spoken to
about Steven Jason's whereabouts immediately before his
death.  Correct?  As part of this investigation?

    A    There was other people spoken to prior to
Steven Jason's death as to his whereabouts?

    Q    Prior to, as part of your investigation of Mr.
Jason's shooting.

    A    Yes.

    Q    Isn't it a fact that there were a number of
individuals interviewed who were at a party at the
American Legion Hall?

    A    Oh yes.  There was a lot of people.

    Q    And isn't it a fact that as a result of those
interviews you were able to determine that other people
had seen this girl with Steven Jason, isn't that right?

Mullen-People-cross                                    190

A     Yes.

Q     So when you told this one fact about him

knowing about the girl, Jackson knowing about the girl,

that it would be impossible for him to know about that

unless he was a shooter, that wasn't accurate, was it?

A     In my way of thinking it was accurate.  Because

for him to tell me that he went to see Johnny Juice to

find out who this girl was, to me that was pretty

accurate.  That was different.

Because Johnny Juice, I have interviewed Johnny

Juice.  For him to say Johnny Juice, it just struck

something in turn to me.

Q     I'm going to ask you -- first of all, let me

mark this for identification since I'll be referring to

it.

          THE COURT:  This is not something that has

          been previously marked?

          MR. CORDERO:  I'm sorry.  It's Rosario.

          Item number 11.

          THE COURT:  We can use the marked copy.

          That way you can hold onto yours.

          MR. CORDERO:  That would be great.  Thank

          you.  Show that to the witness please.

Q     Detective, I've given you notes.  In order for

Mullen-People-cross                                          191

me to continue questioning you about a number of these

items, I ask for you to read certain entries for me.

A    Yes.

MR. CORDERO:  Let the record reflect that

I'm referring to People's Exhibit 11 for

identification which is 14 pages, photocopy of

handwritten notes which I am told or hand-

written notes taken by Detective Mullen during

the three to four hours that he spent with Mr.

Jackson.

Q    Are these the true copy of notes that you kept?

A    Yes.

Q    Detective, if I may refer you to the third page

of those notes.  At the very top there's an arrow

pointing to the word "did".  Then a paragraph of writing.

A    Yes sir.

Q    Could you just read that to me?

A    "Did you know the female that lives in the

apartment saw you?"

Q    And the rest of the paragraph?

A    "I was there visiting girlfriend Jacqueline

Nicole.  Went there a few times but don't remember dates

or times."

Q    Let me ask you this.  In that section of your

notes it's your question about did you know the female and so forth.

And his response was that he was there a few times visiting his girlfriend Jacqueline Nicole and he went there a few times but he doesn't know the number of dates or times?  That was Jackson's response?

A     It wasn't all taken together.

Q     Right.

A     I was asking him about the woman.  And then he said he went there with Jacqueline and Jacqueline had went to the library.  And still he stayed in the apartment with Nicole.

It wasn't all at one time.  Sometimes I would stop and write something.  If I thought I could remember, I wouldn't write it down.

Q     But basically those last four or five lines?

A     Right.  Because just like I asked him what was the date.  He said he don't remember the dates and the times that he went to the library.

Q     Now over to the last page, that first entry on the top of the last page appears to be about five lines.  Would you just read that for us?

A     About pictures being shown and said he didn't know anyone.  Deuge was present and they talked about pit

Mullen-People-cross                                                          193

bulls and told him there had been enough killing.  Let it

be.

        Q     And that refers to his discussion with Deuge

that he told you about that you testified about at the

barber shop or outside the barber shop?

        A     Right.  They were in the parking lot in the

rear.  I think he said they went around to the parking

lot.  They was talking about pit bulls.  That's when he

had this conversation about Deuge.

        Q     And the last three lines of this particular

page end with the word "impossible".

        A     Yes.

        Q     Would you just read that for us also?

        A     This was when all of the people was at the

party in the beginning from withdrawal or something.  I

can't even remember what I wrote here.  Then I just wrote

"impossible".

        Q     Thank you, Detective.  Now you said that during

the time that you spoke with Mr. Jackson and you went

through this information, at about 11 o'clock in the

morning after talking to Mr. Jackson for an hour or so

about personal matters that at about that time you said

to Mr. Jackson he stood a chance of never seeing his kids

again, that someone else is going to be calling your kids

Mullen-People-cross                                          194

Daddy.  Do you remember making that statement to Mr.

Jackson?

    A    Yes.

    Q    And was that based upon the fact that Mr.

Jackson was being arrested for a murder of Steven Jason?

    A    Possibly.

    Q    Did you tell Mr. Jackson he was being arrested

for Steven Jason's murder?

    A    No sir.

    Q    What was Mr. Jackson's reaction to your telling

him that?  Did he say anything?

    A    No sir.

    Q    Now during the time that you spoke with Mr.

Jackson, did you ever threaten Mr. Jackson at all?

    A    No sir.

    Q    Did you strike him?

    A    No sir.

    Q    Did you ever tell him that he could trust you

more than any other homicide detective because you were a

brother?

    A    No sir.

    Q    I think you told us that you questioned Mr.

Jackson for approximately four hours and that there were

two breaks during that questioning.  One was when he had

Mullen-People-cross                                          195

a bagel and some water and that was at about 7:30 or

eight in the morning, is that right?

        A    Yes.

        Q    And about how long was that period of time?

        A    I think prior to him even having a bagel and

water, I think he could have went to the bathroom and

then he came back and he had the bagel and the water.

        And then he was eating.  I was continually asking

him questions while he was eating like that.  And

sometimes we just broke and talked.

        And then again later on in the morning he asked to

go back to the men's room.  So it was twice I think he

went to the men's room while me and him was together.

        Q    Each time he went to the men's room he was

escorted there by the police officer?

        A    Yes.

        Q    When did you cease questioning Mr. Jackson that

morning?

        A    I don't think I talked with Mr. Jackson any

more after I guess 10:30, 11 o'clock.  I don't believe I

talked with him again.

        Q    During that entire period of time did Mr.

Jackson continue to assert that he had nothing to do with

the death of Steven Jason, correct?

Mullen-People-cross                                          196

A     Yes.

Q     Now you told us that prior to initiating your
conversation with Mr. Jackson that you had meetings with
other members of the Homicide Squad including Detective
Dempsey and Abbondandelo, correct?

A     Yes.  I mean, there was some discussion, yes.

Q     And were you apprised or briefed on what they
had discussed with Mr. Jackson and what Mr. Jackson had
been telling them throughout that questioning?

A     There was talk.  I don't think I was there the
whole length of time.  I could have been in and out.  I
could have been doing something else.  It wasn't like you
know they come right out.

Whenever they're finished interviewing, they come
and give me a whole rundown from A to Z.  I wasn't in on
something like that.

Q     But prior to your questioning Mr. Jackson, were
you given a summary of what he had said up to that point?
Because at that point he had been questioned for a
substantial period of time.

A     Prior to me going in and talking with Mr.
Jackson without giving a summary, no.

THE COURT:  Counsel, we're going to stop
in the next couple of minutes.

FORM 740 PENGAD/INDY 1-800-631-6989

Mullen-People-cross                                          197

Q    Now when you stopped speaking with Mr. Jackson
and you left that interview room, who did you speak to at
that point from the Homicide Squad?

A    Usually it would probably be Detective
Abbondandelo.

Q    I'm not asking for usually or probably.  I'm
asking you if you recall now to the best of your
recollection who it was that you spoke to if anyone?

A    I don't recall.

Q    Do you recall Detective Abbondandelo being
present in the Homicide Squad as well as Detective
Dempsey when you exited the interview room?

A    I believe so.

Q    Do you recall sharing your discussions with Mr.
Jackson with other members of the Homicide Squad after
leaving the interview room?

A    Yes.

Q    Is there anyone in particular that you remember
speaking with?

A    No sir.

Q    Did you ever speak to Assistant District
Attorney Fred Klein concerning this matter during any
time when Mr. Jackson was being questioned?

A    No sir.

Mullen-People-cross                                    198

MR. CORDERO:  Judge, this is a good place to break.

THE COURT:  We'll continue again at two o'clock.

(Luncheon recess)

AFTERNOON SESSION

THE CLERK:  People versus Joseph Jackson. Hearing continued.  People ready?

MR. WALSH:  People ready.

THE CLERK:  Defendant ready?

MR. CORDERO:  Ready.

THE COURT:  Let's get the detective back on the stand.

(Detective Mullen recalled.)

THE COURT:  Good afternoon, Detective. You're still under oath.  Would you like some water?

THE WITNESS:  Yes.

THE COURT:  Whenever you're ready, Mr. Cordero.

MR. CORDERO:  Thank you.

(Continuing) CROSS EXAMINATION

BY MR. CORDERO:

Q    Good afternoon, Detective.

Mullen-People-cross                                              199

A    Good afternoon.

Q    Detective, when you broke off your conversation
with Mr. Jackson, can you tell me how that conversation
ended?  What was said by you and what was said by him at
the end of that conversation?  At the end of the three
and a half, four hour period?

A    I don't recall the last statement I made to
him.  But I just said I'll see you and I got up and
walked out of the room.

Q    Prior to that, was the last subject you
discussed with him your belief that he had a very
substantial amount of knowledge about the homicide,
someone involved?

A    Was that the last thing that I discussed with
him?

Q    Yes.

A    No sir.

Q    Do you remember what the last item you
discussed in substance with him was?

A    I think it was just mostly conversation between
me and him and talking about his personal life back and
forth.  I think that's how we ended it.

Q    Was there discussion about the children?

A    About the children, about his girlfriends,

Mullen-People-cross                                           200

about his job, his work, about his life and him moving

around.  I think that was the last part actually.  And

then I left the room.

    Q    Now after you left that room, did you have any

further involvement in any questioning of Mr. Jackson?

    A    Any further involvement in the questioning of

him?

    Q    Yes.

    A    No sir.  I did do one other thing after I did

leave Mr. Jackson.  I think and I didn't recall it either

in my notes.

    When I left the room, sometime that afternoon Mr.

Jackson had told me that he knew where this guy the

barber stayed at, Woody.

    And I think I had the 11 car of the Nassau County

Police Department go and check out this address.  I think

that was the last thing I did that particular day.

    Q    That was at Roosevelt?

    A    Yes.  That was a Roosevelt address, right.

    Q    Now you testified about certain steps that you

took with respect to Ms. Witherspoon, the witness.  Now

prior to December 20, 1994, you met with her in

Pittsburgh.  Had she seen any of the photographs to your

knowledge in connection with this case?

Mullen-People-cross                                              201

1

2        A    Not to my knowledge, sir.

3        Q    Prior to going to Pittsburgh, Pennsylvania, did

4   you speak with Ms. Witherspoon?

5        A    I don't follow the question.

6        Q    You went out to Pittsburgh because you said she

7   was in school that day?

8        A    Yes.

9        Q    And you obviously went there for the purpose of

10  conducting a photo identification?

11       A    Yes.

12       Q    So my question to you is, prior to doing so,

13  did you personally speak with her be telephone or

14  otherwise?

15       A    Yes.

16       Q    Do you recall when prior to the date you met

17  with her you spoke to her by telephone?

18       A    If that's the 20th, then I would have spoken to

19  her on the 19th.

20       Q    Were you the primary contact between the

21  Homicide Squad and Ms. Witherspoon?

22       A    Yes sir.  So far that I know.

23       Q    I'm sorry?

24       A    So far that I am aware of, I'm the one that

25  contacted her.

Mullen-People-cross                                                            202

Q    So what did you discuss with Ms. Witherspoon at
that time on the 19th of December?

A    That I would like to come out and speak with
her on the following date in a continuance of my
investigation.

Q    Did you advise her that anyone had been
arrested for the homicide?

A    No sir.

Q    Did you advise her that your purpose in going
to meet with her was to have her look at photographs?

A    No sir.

Q    Was there anything more that you discussed with
her other than what you've just told us?

A    Yes.

Q    What was that?

A    I asked her how she was doing in school.  How
did she like Pittsburgh.  How was the family doing.  Just
general conversation.  The only thing pertaining to this
case was that I would like to come out there in a
continuance of the investigation.

Q    And I assume you made arrangements with her
regarding a time to meet with her and a place and so
forth?

A    I asked her about what time would she be free

Mullen-People-cross                                      203

on that afternoon. Because I knew she had classes. She

had told me she had classes during the day.

    Q    When you arrived in Pennsylvania, when was the

next time that you contacted Ms. Witherspoon?

    A    The next time I contacted her, I believe when I

went to the place of her residence.

    Q    So prior to that, after arriving in Pittsburgh,

you didn't talk to her by telephone again?

    A    No sir.

    Q    You went to her residence and you brought these

two items marked as People's Exhibits 67A and 67B in

evidence, these two photograph sheets with you?

    A    Yes.

    Q    Did you bring any other photographs with you?

    A    No sir.

    Q    You were accompanied by Detective Abbondandelo

at the time that you met with Ms. Witherspoon?

    A    Yes.

    Q    When you met her, you said it was 5:15 p.m.

Would you tell me what you said to her at that time when

you first met her?

    A    I asked her how was she doing. We were out in

the lobby area outside of security enclosure. The

security is on the other side of the glass and

Mullen-People-cross                                        204

everything.

They were standing out in the foyer like.  And I was
carrying on a conversation how was she doing, how does
she like it and how was the room.  Just general
conversation.

Part of the security people was looking for us for a
place so we could cover some privacy.  Because the first
time they actually moved us they wanted us to be in this
big wide room.

And there was a lot of kids going back and forth.
Could they get something more private.  And that's when
they took us around into this conference room.

Q    Now may I ask you, did you compose the photo
array, when I say photo array I'm referring to 6A and 6B,
to be shown to this witness?

A    Did I compose it?

Q    Yes.  Did you prepare it?

A    No sir.

Q    Do you know who prepared it?

A    I couldn't say.

Q    Was this done at the Homicide Squad or
somewhere else in the police department?

A    Somewhere else in the police department.

Q    The Identification Bureau?

Mullen-People-cross                                        205

1

2      A    I don't know.  Detective Abbondandelo caused it

3   to be composed as it is now.  I didn't have nothing to do

4   with it.

5      Q    You told us that when you met with Ms.

6   Witherspoon you ultimately went into a more private area

7   with the assistance of security at the school?

8      A    Yes.

9      Q    And it was at that time that you began the

10  process of doing the photo identification?

11     A    Yes sir.

12     Q    Can you tell me again what was it that you said

13  to Ms. Witherspoon when you first raised the subject of

14  photographs?

15     A    After we were seated and everything she was

16  directly across the conference table from me.  I showed

17  her a photo array of 12 pictures, six pictures of the

18  same persons, one black and white and one color.

19     And I laid it on the table and I asked her does she

20  recognize or does she know anyone.  Let me get it right.

21  Does she recognize anyone in here that was involved in

22  the shooting of Steven Jason.

23     Q    Now you told us that when you showed her these

24  photographs you didn't show one at a time?  You showed

25  both?

Mullen-People-cross                                          206

A    Yes.  I laid them right out on the table.  The color next to her and black and white further away from her.

Q    So they were laid out on the table one on top of the other so to speak, not physically on top of each other?

A    You're right.

Q    One above the other?

A    Right.

Q    And the black and white was above the color?

A    Yes.

Q    The color was closest to her?

A    Yes.

Q    Can you tell me did she, you told us she made a selection of the individual in the number one position?

A    Yes.

Q    Prior to doing that and after you gave her these directions, did she say anything at all?

A    No sir.

Q    Can you tell us which or whether she pointed to a photograph when she indicated what identification she was making?

A    I believe she just said number one, sir.

Q    So she didn't point to either the black and

Mullen-People-cross                                                    207

white sheet or the color sheet physically?

    A    No sir.

    Q    Approximately how much time elapsed between the time you first put the photographs down for her to observe them until she made an identification?

    A    In less than a minute, sir.

    Q    Can you recall exactly what her words were when she made the identification?

    A    She said number one.

    Q    That's all?

    A    Yes.

    Q    Did you ask her anything when she said number one?

    A    No sir.  Not at the time.

    Q    Now was Ms. Witherspoon asked by you at that time whether or not the individual that she identified was the individual who had a gun on the night of Steven Jason's murder?

    A    No sir.

    Q    Did that subject every come up during your conversation with her that day?

    A    I think in the deposition, I think I wrote number one is the person who shot Steven Jason.

    Q    Now you stated that on the black and white

Mullen-People-cross                                                      208

photograph that there was an addition made apparently by

computer of what looked like felt hats or some sort of

full head coverings on the head of all of the people

depicted in that picture, right?

    A    Yes sir.

    Q    Was that Detective Abbondandelo who arranged

for that and not you?

    A    Yes.

    Q    Did you have any other discussions with Ms.

Witherspoon immediately after her identification of an

individual in position number one in the photo array?

    A    Did I have any other discussions?

    Q    Yes.  I know you took a 32B.  Did you discuss

with her anything else at that time about that

individual?

    A    No sir.

    Q    About the case?

    A    No sir.

    Q    Did you indicate to her that anyone was in

custody?

    A    No sir.

    Q    That she had picked the right person or that

the person she picked was in custody?

    A    No sir.

Mullen-People-cross                                                    209

Q    Did you ask her if she had ever seen this person before who she had picked out other than on the night of the incident?

A    No sir.

Q    Did Detective Abbondandelo ask any of those types of questions that I've asked you about, the last several questions in your presence?

A    No sir.  Not to my knowledge he didn't.

Q    Now after you prepared the 32B, did you have any other interaction with Ms. Witherspoon at that time?

A    Did I have any other direction?

Q    Interaction or discussion with her at that time.

A    I talked with her but not about the case.

Q    And when was the next time that you spoke to Ms. Witherspoon after the 20th of December 1994?

A    I couldn't recall.

Q    Well did you talk to her at all between the date that she made the photo identification and the date that the lineup was conducted involving Mr. Jackson?

A    I could have.  I'm not going to say yes or no. I could have.

Q    You're not sure?

A    I'm not sure, no.

Mullen-People-cross                                    210

Q      Did you physically come into contact with her
between that period of time?  Or was the next time that
you were in her presence when she came to the lineup
identification?

A      That's right.  The next time I was in her
presence, yes.

Q      Now did you have any discussions with her by
telephone prior to her coming to New York by plan to
attend the lineup?

A      Discussions on what, sir?

Q      Regarding her attending the lineup, securing
her attendance, things of that nature.

A      Only prior to making the arrangements for her
to come here.  That's the only time I remember I carried
on any kind of discussions with her.

Q      Did you tell her when she arrived at the
airport, you said you're the one who picked her up?

A      Yes.

Q      No one else was with you?

A      No sir.

Q      What airport did she come in?

A      JFK.

Q      Now did you take her directly from the airport
to the Homicide Squad for the purpose of the viewing of

Mullen-People-cross                                                   211

this lineup?

    A    I took her from the airport directly to police

headquarters.

    Q    Do you remember about what time it was that you

met her?

    A    I don't recall.  The first flight that I was

supposed to pick up on arrangements that were made, for

some reason she got bumped off that flight and she

couldn't get on it.

    Then she had to be rolled over to the next flight.

And what time that next flight came in I don't recall

because they had loaded up from the other flight because

there was too many people.

    Q    Let's go in the opposite direction.  Do you

remember what time the lineup was conducted?

    A    Yes.

    Q    What time?

    A    About three o'clock in the afternoon, 3:20.

    Q    Prior to Ms. Witherspoon actually seeing that

lineup, how much time had she been in New York roughly in

terms of hours?

    A    Only about an hour, an hour and a half at the

most.  From the time the plane landed and me picking her

up and getting her to headquarters.

Mullen-People-cross                                           212

Q    That's what I wanted to ask you.

A    I'm sorry.

Q    That's okay.  Now you picked her up and you
were with her alone in a police vehicle, is that right?

A    Yes.

Q    Now at that time when you first met her, did
she know to your knowledge that she was expected to view
a lineup that day?

A    I can't recall whether or not I told her mother
the reason or purpose she was actually coming to New
York.  I could have said that we were having a lineup.
And that would have been about the extent of the
conversation.

Q    When you were with her in the car driving back
from the airport to the Homicide Squad while you were
with her, did you tell her that there was going to be a
lineup conducted?

A    I believe so.  I could have told her about we
were going to have a lineup.

Q    Did you tell her that there was someone who was
in custody who would be in a lineup?

A    No sir.  I never told her anything like that.

Q    Did you ever mention the name Joseph Jackson to
her?

Mullen-People-cross                                    213

A    No sir.

Q    Did she ask you anything about what will happen
at the lineup?

A    No sir.

Q    Did you have any further discussion with her
about the lineup while you were bringing her back from
the airport?

A    I think the only thing I may have said to her
is that she don't have to worry.  No one will be able to
see you when you view the lineup.  That will be it.

I didn't say anything more about it.  I think the
conversation on the lineup, if this lasted two minutes it
was more than what I would say.  There was not that much
discussion on the lineup.

Q    Now when prior to the lineup in terms of time
-- withdrawn.  Measuring it back from the point where she
actually saw the lineup, about how long was she in police
headquarters prior to seeing the lineup?

A    That's tough.  I can't even fix a time.  It
wasn't that long.  We came right from the airport, went
upstairs, went to another room.  I guess I was in the
room maybe 30 to 45 minutes.

Q    Now the lineup itself was held in the Homicide
Squad?

Mullen-People-cross                                    214

A    Yes.

Q    And can you tell me where was the witness put when she was brought into police headquarters?

A    She didn't even come by the Homicide Squad.  We came up another way.  We came up on the side entrance I believe I brought her up.  And I put her right into the chief's office, the second deputy chief of detectives office.

Q    And can you tell me where that is in relation to the Homicide Squad office?

A    It's about 25 feet from the homicide office door on the opposite side of the hallway.

Q    And was the door to the office where she was open or closed?

A    It was closed at all times.  The only time that I can recall that door ever being open was when Mr. Walsh came in.  I think that was the only time I can recall the door being opened.

Q    Is there a window to that room?

A    That's the second deputy chief.  I think you got a window and air conditioning, everything is in that room.

Q    What I mean would be a window facing either --

A    Okay.  No, facing the parking lot out into the

Mullen-People-cross                                                    215

rear.  The part on the hallway is just the door and the

walls.  You can't see out of that room.

    Q    Now when Ms. Witherspoon was put in that room,

was she left alone or was she with anyone else?

    A    I was with her the whole time.

    Q    You stayed in the room?

    A    Yes sir.

    Q    Did you have any discussions with her about the

lineup or what might have been taken?

    A    Excuse me.  Let me just say one thing.  I

believe one time I did go to the men's room.  But I kept

the door closed.  I think one time I did go to the men's

room.  I told her don't worry about it.  I'll be right

back.

    Q    Were there any detectives from homicide who

came in or out of that office while she was in there?

    A    Not to my knowledge.  Like I said, it was just

me.  I'm the only one that really had contact with her.

    Q    Now did you convey to the other members of the

squad that you were in the building with the witness who

was going to view the lineup?

    A    Detective Abbondandelo knew when I arrived with

her to go into that room.

    Q    Did you radio ahead for him or did you walk

Mullen-People-cross                                                    216

1

2      into the Homicide Squad?

3          A    No sir.  I think I used the phone either

4      downstairs on the outside of the building or another

5      phone.  Because I was told what office to use.

6          Q    Now how were you and the witness summoned to

7      actually go to the viewing room to view the lineup?

8          A    Detective Abbondandelo.

9          Q    How did he go about doing it?

10         A    Knocked on the door and said the lineup was

11     ready.

12         Q    The lineup was ready?

13         A    He didn't say that.  He said it's ready.

14         Q    It's ready?

15         A    Yes.

16         Q    Again up to that point and time did Ms.

17     Witherspoon ask any further questions about what to

18     expect or what it would be like, anything like that?

19         A    No sir.

20         Q    Did you indicate to Ms. Witherspoon that there

21     would be other people in the viewing room with her when

22     she viewed the lineup through the one way mirror?

23         A    No sir.

24         Q    Did you tell her there would be an attorney

25     there for her?

FORM 740 PENGAD/INDY 1-800-631-6989

A    No sir.

Q    Once Detective Abbondandelo notified you that the lineup was ready, was there any conversation between you and Ms. Witherspoon at that time?

A    I told Ms. Witherspoon, "Come on, go with me".

Q    And what route did you take to get to the viewing room?

A    I walked out of the chief's door and made a right turn, went down the hall and made a left turn into homicide.

Q    When you arrived at the Homicide Squad, do you recall whether the lights were on or off?

A    I believe the office was dark.  Whether all of them was off I don't know.  But it was dark in there. Because I know, I remember seeing a lot of faces.  We walked right up to the window.

Q    Now the window that you looked through was a window inside of a door frame, correct?

A    Yes.

Q    Similar to the windows that we have at the rear of this room?

A    Yes.

Q    These doors?

A    Yes.

Mullen-People-cross                                    218

Q    Did you or any other detective in your presence
give her any instructions insofar as how to conduct
herself while viewing the lineup and what if anything to
say?

A    I was the only one that talked.

Q    What instructions did you give her in terms of
saying anything at the time that she viewed the lineup?

A    At the time she viewed the lineup?

Q    Yes.

A    I asked her if she recognized anyone in the
room.  And she said yes.  Then I said:  "What number?"
And she said, "Number four".

It was in such a low tone of voice.  I said, "Say it
louder please".  She said, "Number four".  I said thank
you.  Then we walked out of the room.

Q    Now where did you take her after that?

A    We returned to the same room which we had left
from before.

Q    Did she ask you if she picked out the right
person or anything along those lines?

A    No sir.

Q    She didn't ask you anything about the person
that she identified?

A    No sir.

Mullen-People-cross                                           219

Q    And was there anything at all, any discussion at all between you and she regarding the person that she identified?

A    Yes.

Q    What was that discussion?

A    I said, "I'm going to take a deposition as to the person you identified."

Q    And did you prepare the deposition yourself?

A    Yes.

Q    You helped her review it and sign it?

A    Yes.

Q    Did she ever indicate to you that she was less than a hundred percent sure of the person that she identified?

A    No sir.

Q    Other than preparing the deposition and going through that with her, was there any other discussion with her about the person she identified?

A    No.

Q    Were there any questions from her about that person?

A    No sir.

Q    Now what was done with the witness thereafter?

A    After what?

Q    After the 32B was completed regarding the

lineup.

A    I believe I took her to her aunt's house.

Q    And she would have been with you alone during

the trip to her aunt's house?

A    I don't know if I had Detective Abbondandelo go

with me at this time or not.  I'm not sure.  But I know I

took her away from headquarters.

Q    Any other discussion at that time with the

witness about the photo I.D. or the lineup I.D. or the

subject that she picked out or anything like that?

A    I just told her that I would be in touch with

her.  Enjoy your stay while you're here.  Do you have a

ride back to the airport in the morning?  And if you need

anything just let me know.

   MR. CORDERO:  I have nothing further,

   Judge.  Thank you.

   THE COURT:  Any redirect?

   MR. WALSH:  I don't believe so.  I just

   need the photograph.  No I don't, Your Honor.

   Thank you.

   THE COURT:  Thank you, Detective.

   THE WITNESS:  Thank you.

   THE COURT:  Next witness.

Alger-People-direct                                              221

          MR. WALSH:  Detective Alger.

          MARTIN ALGER, Detective, Shield 92,

Nassau County Homicide Squad, having been first duly

sworn, called as a witness on behalf of the People, was

examined and testified as follows:

          THE COURT:  You may inquire whenever

          you're ready.

          MR. WALSH:  Thank you.

DIRECT EXAMINATION

BY MR. WALSH:

     Q    Good afternoon, Detective.

     A    Good afternoon.

     Q    Detective, how long have you been with the

Nassau County Police Department?

     A    Twenty seven years.

     Q    Are you currently assigned to the Homicide

Squad?

     A    Correct.

     Q    Can you tell us how long you've been with the

Homicide Squad?

     A    Homicide 14 years in April.

     Q    I'd like to direct your attention to April 11,

1995.

     A    Yes sir.

Alger-People-direct                                              222

Q    Do you recall whether or not you were working

with the Homicide Squad on that date?

A    Yes.

Q    Do you recall what your tour of duty was that

day?

A    Yes.  I was working an eight to four, eight

a.m. to four p.m.

Q    On that date did you have an opportunity to

participate in conducting a lineup at the Homicide Squad?

A    Yes.

Q    Do you recall approximately what time it was

that that lineup took place?

A    At about 3:20 in the afternoon, 3:20 p.m.

Q    And would you tell us what your role was in

participating in or conducting that particular lineup?

A    I was assigned in the morning by Sergeant

Severin, Detective Sergeant Severin, to assist Detective

Abbondandelo in the lineup, at which time I went to

Hempstead to get fillers for the lineup, male blacks of

similar descriptions to the defendant.

Myself and Detective Donnelly later returned to

homicide with some fillers.  And at that point I began

organizing the room, putting the room together, setting

up the chairs, picking up the numbers and eventually

Alger-People-direct                                      223

placing the subjects into position.

Q     Where exactly was the lineup held?

A     In the Homicide Squad in a rear room of the
Homicide Squad.

Q     Would you describe the facilities that are used
or that were used on that date to conduct the lineup
please?

A     Again it's a rear room that we use for squad
meetings and the like which has a two way glass type of
mirror on a door.

There is some overhead lighting and there's also a
spotlight lighting on the wall which illuminates subjects
as they sit on the north wall of that room.

There is another exit door which would be on the
south side of the room.  There's chairs and a large
table.

Q     I believe, Detective, you said that you were in
part responsible for procuring fillers?

A     Correct.

Q     In the lineup?

A     Correct.

Q     First of all, how did you go about getting
fillers?

A     Again with a photograph of the defendant so I

Alger-People-direct                                    224

have a clear and accurate likeness of his description, I

then went to Hempstead, at which time I spoke to two male

blacks of similar description and asked them if they

wished to participate in this particular lineup.

Q    How many fillers were you able to get for the

lineup?

A    I believe we originally brought in six.  We

used five as actual fillers in the lineup.

Q    And who was it that transported the fillers to

the Homicide Squad?

A    Myself and Detective Donnelly of the Homicide

Squad.

Q    Do you recall approximately what time it was

that you arrived at the Homicide Squad with the fillers

that you went out and got?

A    It was approximately three o'clock.  About

1500.

Q    And could you tell us where the fillers were

kept prior to any witness actually viewing that lineup?

A    Within the room that I described that the

lineup was conducted.

Q    Now did there come a time that the defendant

was brought into the Homicide Squad?

A    Yes.

Alger-People-direct                                                    225

Q    Do you recall who it was who brought him to the Homicide Squad?

A    Yes.  I believe it was Abbondandelo and Detective Dempsey.

Q    Prior to the lineup actually being conducted, could you tell us or do you know where the defendant was kept?

A    Yes.  He would have been in an interview room which is off the main squad room of the Homicide Squad.

Q    Did you know or do you know how many witnesses were present at the time to actually view the lineup?

A    I knew they had a witness.

Q    Did you know where that witness was kept?

A    Down the hall in an office.  Down the hall from Homicide Squad.  Specifically I don't know which particular office.  It was down the hall.  I know they had the witness down there.

Q    Were any of the fillers or the defendant permitted access to view that particular witness prior to the time that the lineup was conducted?

A    No.

Q    Did you at any time see that witness prior to the time?

A    No, I did not.

Alger-People-direct                                          226

Q    At any time on the 11th of April 1995, did you

see the witness who actually viewed the lineup?

A    No, I did not.

Q    You indicated then once the fillers were

procured and the defendant arrived at the Homicide Squad

that you actually put the lineup together?

A    Correct.

Q    Describe exactly what you did in putting that

lineup together please.

A    Again I asked the individuals or the fillers

to, I randomly selected them to sit within positions on

the lineup.  I had the chairs set up, the six chairs set

up, at which time there was a conversation with Mr.

Cordero as to what position he wishes to have his client

seated in.

I believe there was some brief discussion at which

time it was suggested somewhere near the middle.  At

which time the defendant was placed in position number

four, at which time shortly thereafter we photographed

the lineup in that position.

Q    Who decided to put the defendant in position

number four?

A    Again after discussion with Mr. Cordero, it was

somewhere near the middle.  I believe it was my

Alger-People-direct

227

recollection of what he said to me.  That was the closest

position to the middle.

    Q    And as far as placing the fillers around the

defendant in the lineup, who chose the spot for the

remaining?

    A    I did.  And it was clearly randomly done.

    Q    With respect to the individuals in the lineup,

could you tell us how those individuals were clothed?

    A    Well again they had all different types of

clothing on.  But during the time that the lineup was

conducted, we had a white sheet which covered all the

individuals including the defendant from the neck down

including their footwear so their footwear would not be

exposed.  And each participant in the lineup was also

given a black baseball cap to wear.

    Q    And were those hats worn when the lineup was

conducted?  In other words, when the witness was asked to

view the lineup?

    A    Yes.

    Q    Now once the lineup was in place, what if any

instructions were given to the defendant and any of the

fillers in the lineup about what was to take place?

    A    Again I just instructed the participants in the

lineup and the defendant that upon my direction that they

FORM 740 PENGAD/INDY 1-800-631-6989

Alger-People-direct                                              228

should continue to face forward and look in my direction.

I was on an opposite wall in front of them. And eventually there came a time that there was a knock on the door. I told them to face forward, not to speak.

And shortly thereafter there was another knock at the door which indicated that the witness was now gone and shortly thereafter I had the detective from the photo unit take another photograph after the identification was made.

Q    At the time that you were in the lineup after you heard the first knock, were you able to hear any conversation that was occurring outside of the lineup room where the witness was actually asked to view the lineup?

A    No.  Again I could not hear anything and that's why we used the knocking signal.

Q    In between the first knock and the second knock, do you know approximately how much time had elapsed?

A    It was fairly quickly.  I would say probably a minute.

Q    Where were you positioned, Detective, at the time that the lineup was actually being conducted?  In other words, once you heard the first knock, where were

Alger-People-direct                                                    229

you in relation to that?  I think you described it as a
two way window.

     A     I would have been standing next to that window.
I would have been to the left of the door standing to the
left the door.

     Q     And by the way, when we talk about the
defendant, do you see that individual in the courtroom?

     A     Yes.

     Q     Please point to him and describe what he is
wearing today.

     A     The male black seated at defense counsel table,
light skinned male black wearing a blue and gray plaid
shirt.

               MR. WALSH:  I ask that the record reflect
          an in court identification.

               THE COURT:  So reflect.

               MR. WALSH:  May I have People's Exhibit
          68 in evidence shown to Detective Alger?

               THE COURT:  Certainly.

     Q     Detective, if you would look at People's
Exhibit 68 in evidence.  Do you recognize what that is?

     A     Yes.  This is a photograph of the lineup that
I've been describing which took place on the 11th of
April.

Alger-People-cross                                                230

Q    And Detective, does that photograph fairly and
accurately depict the lineup as it appeared to you on
April 11, 1995, at the time that the actual lineup
procedure was conducted?

A    Yes.

        MR. WALSH:   Thank you, Detective.   I have
        nothing further.

        THE COURT:   Cross examination.

        MR. CORDERO:   Thank you.

CROSS EXAMINATION

BY MR. CORDERO:

Q    Good afternoon, Detective.

A    Good afternoon, Mr. Cordero.

Q    Detective, can you tell me when this particular
photograph was taken?   Was this before the witness viewed
the lineup or after the witness viewed the lineup?

A    Again I can't tell you if that one was before
or after.   I know one was taken at about 18 minutes after
three and I think we took another one at about 23 minutes
after.

Q    Now with respect to the fillers that are in the
lineup itself, did you keep a record of their
identification?

A    Yes.

Alger-People-cross                                          231

Q    Names and addresses?

A    We took their names and dates of birth.

Q    You took their names and dates of birth?

A    Yes.

Q    What about their weight, height?

A    No.

Q    The participants in that lineup were all seated, is that right?

A    Correct.

Q    When standing, was there a disparity between these individuals in terms of height?

A    My recollection is not a great disparity. There may have been inches involved but not a great disparity.

Q    Whose decision was it to use a seating portion for the lineup?

A    Mine.

Q    And was there a particular reason that you did that?

A    I believe because of the height situation so there wouldn't be any problem with heights.

Q    Now with respect to the five fillers that were used in this lineup, did any of them have what might be called braids, cornrows or dredlocks in their hair?

Alger-People-cross                                                    232

         A    My recollection is that maybe one of them may

have had some type of braiding.  But again that was the

purpose of the baseball hats.

         Q    That's what I was about to ask.

         A    To again cover the heads of all the individuals

so there would be no disparity in the hairdos.

         Q    Now when you first observed Mr. Jackson in

person on the date of the lineup, he had been brought

there from the Nassau County Jail by two other

detectives, correct?

         A    Yes.

         Q    And you saw at that time that similar to today

he had his hair in braids or cornrows or dredlocks,

whatever you want to refer to them as?

         A    Yes.

         Q    And they were relatively long, correct, beyond

his collar certainly?

         A    Again my recollection is I don't remember them

being much longer than they are today.

         Q    Do you remember making an effort while I was

present in the room when the lineup was being set up to

have Mr. Jackson put all of his hair underneath the

baseball hat so that the braids would not be showing?

         A    I don't specifically recall that.  I may have

FORM 740 PENGAD/INDY 1-800-631-6989

Alger-People-cross                                              233

asked him to make sure his hair was under that.  I don't

recall if I had that conversation.

        Q     Do you recall Mr. Jackson trying to move his

braids up underneath that baseball hat, seeing him do

that prior to sitting in the lineup?

        A     Again I don't remember.  I don't clearly

remember there being much discussion or time spent with

his hair other than the fact that he was given a baseball

hat to wear.

        Q     Now I believe you've been shown this photograph

already, People's Exhibit 68 in evidence.  I'll ask you

to look at it one more time.

        Could you tell me whether or not that photograph

with respect to the skin tones of the individuals in the

lineup fairly and accurately reflects the skin tones of

those people as they appeared to your recollection that

day?

        A     Yes, it does somewhat indicate their appearance

that day, yes.

        Q     Well my question is specifically, it's a very

specific question.  As to skin tones as depicted in that

photograph, the skin tones as depicted in that

photograph, do they appear the same as they appeared to

be to your naked eye at the time that the lineup was set

Alger-People-cross                                          234

1  up?

2       A    They appear to be, yes.

3       Q    And with respect to the condition of the hats

4  and the hair of all the participants including Mr.

5  Jackson, again does that accurately depict the scene as

6  the lineup was conducted?

7       A    Yes.

8       Q    Do you have in your possession the photograph

9  that you were given to utilize in selecting the fillers?

10      A    Do I have that particular Polaroid photo?

11      Q    Yes.

12      A    No.  I don't have it with me.  It was given

13  back to Abbondandelo.

14      Q    When was the last time you saw it, the day of

15  the lineup?

16      A    Yes.

17      Q    So as far as you know, if it exists it would be

18  in Detective Abbondandelo's possession?

19      A    Yes.  It was a Polaroid photograph.

20           MR. CORDERO:  May I have a moment with Mr.

21      Walsh, Judge?

22           THE COURT:  Certainly.

23           (Discussion off the record.)

24           MR. CORDERO:  Thank you.

25

FORM 740 PENGAD/INDY 1-800-631-6989

Alger-People-cross                                           235

          THE COURT:  Do you need a short recess to
find something?

          MR. CORDERO:  No, Judge.  I wanted to
know if I had been given something.  The answer
is yes.  No problem.  I have nothing further
of this witness.

          THE COURT:  Any redirect?

          MR. WALSH:  No.

          THE COURT:  Thank you, Detective.  You're
finished.

          THE WITNESS:  Thank you.

          THE COURT:  Mr. Walsh, do you want to
start with Detective Kemp or do you want to
save that for the other portion?  Do you want
to start it?  It's up to you.

          MR. WALSH:  I have no preference.  She's
going to have to come back one way or another
so whatever the Court's preference is.

          THE COURT:  It doesn't matter.  Do you
want to discuss it with Mr. Cordero?

          MR. CORDERO:  Sure.

          THE COURT:  Whatever the two of you prefer
is fine with me.

          MR. WALSH:  Thank you.

(Discussion off the record.)

MR. WALSH:  Judge, I would say let's do
it now.  But Mr. Cordero brought to my
attention that there would probably be
additional Rosario with Detective Kemp that
I would need to give him before we actually
put her on.

THE COURT:  All right, let's pick our
adjourned date then.  We can go off the
record for that.

(Discussion off the record.)

THE COURT:  Let's go back on the record.
We have chosen February 13th after I conclude
the trial that I'll be starting on Monday.
Hopefully we'll be able to go on that day.

(Discussion off the record.)

THE COURT:  Just one other matter.  Mr.
Walsh, you indicated that there was one matter
that you preferred to finish today and that's
the preliminary Chipp rulings.

MR. WALSH:  Yes, Your Honor.  I asked the
Court sometime prior to today for a ruling
relative to People versus Chipp on the
suggestiveness of the identification

procedures.

I know the Court has at least
preliminarily indicated its concern over the
display of photographs made by the Detective
Sorrentino to not only Detective Kemp but the
confidential informant.

THE COURT:  I don't know if we ever did
that on the record or just informally with both
counsel present.

MR. CORDERO:  Judge, it was at the bench.

MR. WALSH:  My understanding, Judge, with
respect to identification procedures of the law
and whether it be lineup procedures or
photographic displays is that there is no
requirement that all of the individuals who
surround the defendant, whether it's in a
lineup or a photo display, have to be merely
identical to the defendant in appearance.

THE COURT:  I agree.

MR. WALSH:  Yes.  And generally I think
the language is such that it's sufficient that
the fillers are similar in appearance to the
defendant to the extent that there doesn't
exist any characteristic or visual that would

238

not only orient the viewer toward the

defendant but orient the witness toward the

defendant as a participant in the crime.

In the photographic array that was shown

to these two witnesses, I know that the

hairstyle of Mr. Jackson was different from

the hairstyle of the other individuals.

He had basically the same type of hair

that he has today in the courtroom, whatever

you want to call it, as opposed to the other

19 photographs.

THE COURT:  Excuse me, Counsel.  Before

you proceed because I don't want to interrupt

you in the course of the rest of your

argument.  If you could perhaps give me the

photo pack because I haven't seen it since

November so that I can view it while I'm

following the arguments of both counsel.

MR. WALSH:  Actually I put the photograph

of the defendant on top.

THE COURT:  You can proceed.

MR. WALSH:  Judge, while the defendant's

hairstyle in these photographs may be and it

certainly is different from the others depicted

in the remaining photographs, I think that the question really boils down to whether or not the fact that his hairstyle is different would give that witness any reason to believe that that difference is significant or any reason to believe that this defendant committed this particular crime.

I have reviewed some of the cases in this area and I would like to cite a few of them.

One is People versus Maddix. It's a Second Department case. It's at 13 App. Div. 2d page 89. In that case the defense argued that a lineup was suggestive due to the fact that the defendant wore an open neck shirt while the five other participants wore turtle neck shirts in that lineup.

The Courts held that the lineup was not unduly suggestive. And what the Court said was that there was no evidence that the complainant had any particular reason to perceive that that open collar shirt was significant.

It said particularly in the absence of any mention of shirt style in the victim's description as the perpetrator.

240

I have found other cases which basically contain that same language and use that same logic in determining whether or not a particular identification procedure is or is not suggestive.

People versus McClaren, I don't have the exact Appellate Division cite. It appeared in the New York Law Journal on January 29, 1990, page 28, column 6. In that case the defendant was the only person in the lineup wearing cut off jeans, an item which was described by one of the eyewitnesses to the crime. And the Court held that under all the circumstances that this lineup was not suggestive.

People versus Williams, 118 App. Div. 2d at 610. It was held that a lineup, that lineup was not suggestive, although the defendant was the only one in the lineup with a swollen left eye.

People versus Harkins at 126 App. Div. 2d 747 involved a photo array in which the defendant was the only one wearing an earring. In that case the Court held that that was not unduly suggestive.

People versus Walcales, 143 App. Div. 2d 207 held that that was not suggestive, although the defendant was the only one with a goatee.

And finally People versus Tedesco at 143 App. Div. 2d 155 involved the photographic array that the Court held not unduly suggestive, although the defendant in that case was the only one wearing a suit.

Those cases I think you can contrast with other cases. For instance, People versus Sapp, 98 App. Div. 2d 784 in which the Court held that the lineup in that case was suggestive, where the defendant was the only one wearing a plaid jacket, and that plaid jacket was a prominent feature in the witness' description.

And I think one other case, People versus Johnson, 79 App. Div. 2d 617, the Court held that the lineup was suggestive where the defendant was the only one in a plaid jacket which was also an important item in the witness' description.

So I think what's critical is whether or not the difference that we're talking about, in this case the hair, is anything that a

242

witness who tends to find particularly

significant or tends to make that witness

believe that this defendant is the one who

committed the crime.  In this case, Your Honor,

there was testimony by Detective Hagerty and

I've been provided with a transcript.

THE COURT:  This is what I was just going

to ask you to get to.  Because I have no

problem with or your premises of law.

And as I look once again at the photo pack

now, there are various pictures that stand out

for different reasons.  For example, we have

one person who looks like he'd been beaten up.

MR. WALSH:  Yes.

THE COURT:  With half a closed eye and

bushy hair.  We have only one individual who

was there with his eyes closed.  And of course

we have the defendant who was the only one with

the dredlocks.

MR. WALSH:  Yes.  And I certainly agree.

THE COURT:  So if you could turn your

attention to the arguments as to the clarity

of the descriptions of the individuals who

were involved.

MR. WALSH:  Judge, what I wanted to bring to the Court's attention was the testimony of Detective Hagerty.  I believe Mr. Cordero has the transcript as well.  It was page 94 and it was during Mr. Cordero's cross examination. Beginning at line or actually beginning at line 9.

Mr. Cordero asked Detective Hagerty: "Was that person wearing any clothing in the video tape?"  Detective Hagerty said "yes".

Mr. Cordero asked:  "What kind of clothing?"  And Detective Hagerty indicated that the individual who he saw on that tape was wearing a short sleeved shirt.  I believe he was wearing a baseball cap.  He was on a bicycle.  That being the case, Your Honor --

THE COURT:  That is my recollection as well.  But can you point out to me any evidence since you have the transcript and I don't whether his hair was shown outside of the cap or not?

MR. WALSH:  I can't say that there is any evidence in the record that the witness described his hair as being out or not.

244

THE COURT:  So basically by the state of
the record as it is now, I have no knowledge
of whether hair was showing on the cap.

MR. WALSH:  No.  Although my argument of
course would be that with the cap over his head
it would be difficult.  It would make it less
likely let's say that a witness who tends to
view the defendant's braids in that photograph
or that photo pack is significant given the
fact that we know he was wearing a hat.

THE COURT:  Isn't the burden on you to
show the non-suggestiveness of it?

MR. WALSH:  Absolutely.

THE COURT:  So Mr. Cordero, I will hear
you if you want.  But I'm basically at this
point going to rule and if you disagree with
it I will hear you that based on the record
the way it is, this photo pack, and this is
what I think I said, may very well be
suggestive.

And if I had to rule now without more
information as to the appearance of the
defendant and his hair coming out or not coming
out from the cap, I would have to rule it was

245

suggestive.

So if you want a ruling now, that would be
the ruling.  Mr. Cordero, did you wish to be
heard?

MR. CORDERO:  No, Judge.  Other than to
point out that Hagerty doesn't recall whether
he was wearing a baseball cap.  He said I
believe he was.  He himself doesn't describe
it in any further detail.  So the record is
pretty devoid.

THE COURT:  So Mr. Walsh, the way the
state of the record is now, if you want a
ruling now without evidence from anyone else
who was present, I would have to say it was
suggestive.

MR. WALSH:  I would have to say that the
only, I would ask for a ruling now.

THE COURT:  All right.  Would you also
like rulings on the other photo packs on the
lineup as well?

MR. WALSH:  Yes.

THE COURT:  did you wish to argue on any
of those?

MR. WALSH:  Judge, briefly just reviewing

246

the photo packs, two photo packs shown by

Detective Mullen to Ms. Witherspoon as well as

the lineup or photographs using the standards

that we've just discussed and the state of the

case law, I do not see anything in either the

photo packs or the lineup that is in any way

suggestive or in any way points to Joseph

Jackson in either of these two identification

procedures as one who is more likely to be

the perpetrator of the crime than anyone else.

I think both the photo packs and the

lineups were fair. And I think that neither

of the two were unduly suggestive. And I would

ask that the Court rule accordingly.

THE COURT: Mr. Cordero.

MR. CORDERO: Thank you. With respect to

the identifications of the photograph and the

lineup by Ms. Witherspoon, the only eyewitness,

the record is devoid of any detail at all

concerning what description if any Ms.

Witherspoon gave the police with respect to

the perpetrator in this case.

The record being silent with respect to

that, and turning to the photographs, first the

photograph of the lineup, I was present at the
lineup myself.

You can see from the photograph that's
been put into evidence of the lineup itself,
Mr. Jackson is the only person in that lineup
where there is any cornrows or braids showing
underneath a cap.

The individual who committed the crime,
the shooting, as I understand it was alleged to
have worn some sort of knit cap.

And that was the reason for the enhance-
ment or alteration of the black and white
photograph array, People's Exhibit 62A, the
addition of the computer generated images of
the hats on top of all the subjects in that
particular photograph.

He is also the person with the lightest
complexion, markedly the lightest complexion.
There is only one person similar to him in
complexion.  That's the person seated
immediately next to him I recall being Spanish
or black.

But in any event, that is the two items
that draw attention to the appearance of the

defendant in that lineup. Specifically of those two aspects, both of which involve his own personal physical appearance as compared to the fillers.

Although all of the fillers have to a greater or lesser degree some facial hair, most of them, I would say four out of the six if you count my client as one of the six, are of substantially darker complexion than Mr. Jackson.

And Detective Alger indicated that to his naked eye the photograph which you have in evidence accurately depicts the skin tone of the fillers.

So there are those two physical characteristics that distinguish Mr. Jackson. Most particularly the hair.

We have to view that with a backdrop of the witness having viewed the photo pack in which at least three, possibly four of the six individuals in that photo pack have hair which was to a greater or lesser degree also spiky.

But there were two in particular, I think

it's number six, Judge, and number one, number one being Mr. Jackson, who have marked braids in their hair as opposed to shorter hair was somewhat spiky due to the manner in which it's combed or styled.

Again I would submit that in the photo pack that was shown to the witness, there is only one other person with a complexion as light as Mr. Jackson, that being number five. And that individual has a slightly lighter complexion. But he does not have that characteristic of hair.

So again in the absence of any evidence whatsoever as to the detail if any given by Ms. Witherspoon of her identification of the perpetrator at the time that she was interviewed initially or subsequently during the investigation, I would submit that there is a prima facie showing not by the conduct of the police or by their comments to the witness but rather than by the photographs that have been introduced in evidence.

Certainly the lineup was a suggestive lineup. And also that there is suggestiveness

250

contained in the photo array.

Although I argue that the lineup itself
is more suggestive than the photo array because
there is a distinct difference between Mr.
Jackson's appearance in that lineup,
specifically the braids, and his complexion
than any other participant in the lineup which
drew attention to him.

Again in the absence of testimony with
respect to the description given by the
witness, we cannot say at this time whether
the witness observed braids on the persons'
head of the person who shot Steven Jason or
gave that description to the police.

So I can't tell you in the absence of
anything in the record what characteristics
there may be which might have been buttressed
by the suggestive nature of the lineup itself
and also the photo array which relate back to
the witness' observance of the perpetrator at
the time of the crime in March 1994.

And at that point I would suggest that
the appropriate path to take would be to direct
the People to produce the eyewitness for

251

examination at this Wade hearing.  Thank you.

THE COURT:  All right, the following are
my rulings.  I'll call it the Witherspoon photo
packs and the Witherspoon lineup.

The Court finds that none of them are
unduly suggestive and the People would not be
required to bring in the individual who viewed
either the photo pack or the lineup.

However, as far as the photo pack viewed
by Detective Kemp and the confidential
informant, the Court finds that based on the
record as it stands now, it is unduly
suggestive.  And the People will be required
to bring in those.

MR. WALSH:  Thank you.

MR. CORDERO:  Thank you.  Of course I
except to that portion of the Court's ruling
which denied my application.

THE COURT:  That is automatic.  And,
People, you have your exception as well to
the other portion.

MR. CORDERO:  Thank you.

(Whereupon the hearing was adjourned to
Tuesday, February 13th, at eleven o'clock a.m.)

252

CERTIFIED TO BE AN ACCURATE TRANSCRIPT

_James F. Gill, CSR_

JAMES F. GILL, C.S.R.

Dempsey-People-cross-page 3

Dempsey-People-redirect-page 130

Dempsey-People-recross-page 135

Mullen-People-direct-page 137

Mullen-People-cross-page 174

Alger-People-direct-page 221

Alger-People-cross-page 230


People's Exhibits 67A and 67B-page 163

People's Exhibit 68-page 174