## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JOSEPH JACKSON,<br><br>      Plaintiff,<br><br>  -against-<br><br>NASSAU COUNTY, et al.,<br><br>      Defendants. | **PLAINTIFF'S LOCAL CIVIL RULE 56.1(b) COUNTERSTATEMENT**<br><br>18 CV 3007 (JS) (AYS) |

Pursuant to Rule 56.1(b) of the Local Civil Rules and Rule III.G. of the Individual Practices of this Honorable Court, plaintiff respectfully submits the following counterstatement to defendants' Loc. Civ. R. 56.1(a) statement dated January 17, 2023:

1. Plaintiff Joseph Jackson ("plaintiff" or "Jackson") is a resident of Nassau County, New York. *See* Third Amended Complaint ("TAC") (**Exhibit A**), at ¶12.

 **Response: Undisputed for purposes of summary judgment.** However, plaintiff respectfully submits that this fact is immaterial. Plaintiff also objects on the grounds that unverified pleadings are inadmissible at summary judgment.

2. Defendant Nassau County ("County") is a municipal corporation organized under the laws of the state of New York. *See https://www.nassaucountyny.gov/.*

 **Response: Undisputed.**

3. At all relevant times from the date of Steven Jason ("Jason") was murdered (sic) (March 20, 1994), until the date of plaintiff's criminal conviction (December 9, 1996), Defendant retired Detective Robert Dempsey ("Det. Dempsey") was a member of the Nassau County Police Department ("NCPD") with the rank of Detective. *See* County Answer (**Exhibit D**), at ¶14.

 **Response: Undisputed.**

4. At all relevant times from March 20, 1994 to December 9, 1996, Defendant retired Detective Gary Abbondandelo ("Det. Abbondandelo") was a member of the NCPD with the rank of Detective. *See* **Exhibit D**, at ¶14.

> **Response: Undisputed.**

5. At all relevant times from March 20, 1994 to December 9, 1996, Defendant retired Detective John M. Holland ("Det. Holland") was a member of the NCPD with the rank of Detective. *See* **Exhibit D**, at ¶14.

> **Response: Undisputed.**

6. At all relevant times from March 20, 1994 to December 9, 1996, Defendant retired Detective Michael Herts ("Det. Herts") was a member of the NCPD with the rank of Detective. *See* **Exhibit D**, at ¶14.

> **Response: Undisputed.**

7. At all relevant times from March 20, 1994 to December 9, 1996, Defendant retired Detective Martin Alger ("Det. Alger") was a member of the NCPD with the rank of Detective. *See* **Exhibit D**, at ¶14.

> **Response: Undisputed.**

8. At all relevant times from March 20, 1994 to December 9, 1996, Defendant retired Detective Walter Swenson ("Det. Swenson") was a member of the NCPD with the rank of Detective. *See* **Exhibit D**, at ¶14.

> **Response: Undisputed.**

9. At all relevant times from March 20, 1994 to December 9, 1996, Defendant retired Detective Anthony Kosior ("Det. Kosior") was a member of the NCPD with the rank of Detective. *See* **Exhibit D**, at ¶14.

> **Response: Undisputed.**

10. At all relevant times from March 20, 1994 to December 9, 1996, Defendant retired Detective Sergeant Dan Severin ("Det. Sgt. Severin") was a member of the NCPD with the rank of Detective Sergeant. *See* **Exhibit D**, at ¶14.

> **Response: Undisputed.**

11. Lionel Olige was also known as Tony Jackson (Tony Jackson's real name was "Lionel Olige"). *See* Criminal Trial Transcript (**Exhibit E**), p. 542, ln. 6-12; *see also* Peddie Jenkins EBT Transcript (**Exhibit K**) p. 12, ln. 3-6.

> **Response: Undisputed.**

12. Plaintiff was childhood friends with Tony Jackson. *See* Plaintiff EBT Transcript October 29, 2021 (**Exhibit B**), p. 63, ln. 19-24. While they were childhood friends, plaintiff and Tony Jackson both lived in Freeport. *See* **Exhibit B**, p. 64, ln. 2-8. Plaintiff and Tony Jackson were close friends and their friendship continued after they were children. *See* **Exhibit B**, p. 65, ln. 17-20; *see also* Homicide Grand Jury Transcript (**Exhibit I**), p. 44, ln. 23 – p. 45, ln. 3; *see also* Plaintiff's 50-H Examination Transcript (Village) May 3, 2018 (**Exhibit FFFF**), p. 55, ln. 25 – p. 56, ln. 7.

> **Response: Undisputed that plaintiff was friends with Tony Jackson.** However, plaintiff respectfully objects on the grounds that this assertion violates this Honorable Court's Individual Practice Rule III.G.1., which states: "Each numbered paragraph in the Rule 56.1 Statement must contain only one factual assertion."

13. Peddie Jenkins ("Jenkins") and plaintiff are cousins. *See* **Exhibit I**, p. 22, ln. 8-12; *see also* **Exhibit B**, p. 206, ln. 7-17; *see also* **Exhibit K**, p. 11, ln. 4-9; *see also* **Exhibit E**, p. 721, ln. 3-8. Plaintiff went by the nickname of "Starking" and Jenkins called plaintiff "Star." *See* **Exhibit I**, p. 22, ln. 13-17.

> **Response: Undisputed.**

14. Jenkins knew Steven Jason ("Jason") and went to Freeport High School with him. *See* **Exhibit I**, p. 21, ln. 7-21; *see also* **Exhibit E**, p. 717, ln. 24 – p. 718, ln. 10.

> **Response: Undisputed that Jenkins testified as such.**

15. Jenkins knew that plaintiff knew Jason and that plaintiff had attended parties with Jason in the past. *See* **Exhibit E**, p. 722, ln. 17 – p. 723, ln. 4.

> **Response: Disputed.** Plaintiff did not know Steven Jason and had not attended parties with him. Deposition Transcript of Joseph Jackson, October 29, 2021, annexed to the Declaration of Gabriel P. Harvis dated February 16, 2023 ("Harvis Decl.") as Exhibit (Ex.") 1, ("Jackson Dep.") 61:9-11. Defendants lack a good faith basis to present this assertion as

undisputed.

16. On December 7, 1993, Tony Jackson allegedly shot and injured Steven Jason and was later arrested and charged with assault in the first degree and criminal use of a firearm in the second degree for this shooting. *See* **Exhibit E**, p. 542, ln. 13 – p. 543, ln. 5; *see* Pre-Trial Hearing Transcript Volume 1 (**Exhibit F**), p. 110, ln. 20 – p. 111, ln. 2; *see also* District Court Informations charging Tony Jackson with the December 7, 1993 shooting of Jason (**Exhibit II**); *see also* Jason's Supporting Depositions (**Exhibit SSSS**).

> **Response: Undisputed.**

17. On January 3, 1994, Jason testified at a Felony Exam that Tony Jackson shot him on December 7, 1993. *See* Felony Hearing Transcript from January 3, 1994 under Index No. 27929/93 (**Exhibit JJ**).

> **Response: Undisputed.**

18. In January of 1994, plaintiff told his cousin Jenkins that Tony Jackson shot Jason. *See* **Exhibit I**, p. 22, ln. 18 – p. 23, ln. 16. Plaintiff told Jenkins that as a result of shooting Jason, Tony Jackson was arrested and was in jail; plaintiff knew Jason was "snitching" on Tony Jackson and that Jason was going to testify in the Grand Jury against Tony Jackson. *See* **Exhibit E**, p. 726, ln. 6 – 728, ln. 24; *see* **Exhibit I**, p. 23, ln. 20-25.

> **Response: Disputed.** No such conversation occurred, the cited testimony is not credible as Jenkins is an admitted liar and compromised witness, and defendants lack a good faith basis to present this assertion as undisputed. *See* Trial Testimony of Peddie Jenkins, annexed to the Harvis Decl. as Ex. 113 ("Trial Tr."), 797:13-23 (lied in both statements about where he lived); 799:2-800:7 (admitted to lying about his name to police); 804:24-805:3, 819:20-820:23; 829:11-830:22, 839:12-14, 842:8-844:9; 912:3-914:25, 919:3-25(admitted to lying to the police in his November 15, 1994 statement); 815:11-816:3 (admitted generally to giving false names when arrested in the past); 849:9-852:4; 863:16-869:14, 947:14-949:9, 979:13 -980:7, 984:25-987:23, 996:8-996:3 (admits to false statements and omissions in his November 18, 1994 statement); 956:3-957:25, 959:8-960:17 (admits to differences between his November 18th statement and his grand jury testimony), 1026:9-24 (claims he was truthful in his November 18th statement) *but see* Anania Memo and Notes, annexed to the Harvis Decl. as Ex. 2, County2843-2853, County2849

(Jenkins reverts back to his November 15th version when recounting the events of the night to Ms. Anania on November 1, 2017); *see also* Anania Memo and Notes, Harvis Decl., Ex. 2, County2845-2846, 2849-2851 (discussing Jenkins' credibility issues); Deposition Transcript of Peddie Jenkins, May 24, 2022, annexed to the Harvis Decl. as Ex. 4, ("Jenkins Dep.") 32:22-35:4, 84:10-16; Deposition Transcript of Michael Walsh, May 6, 2022, annexed to the Harvis Decl. as Ex. 3, ("Walsh Dep."), 126:9-129:5; Deposition of Fred Klein, May 2, 2022, annexed to the Harvis Decl. as Ex. 5, ("Klein Dep.") 80:20-82:9-12.

19. Plaintiff told Jenkins that plaintiff had spoken with Tony Jackson and that Tony Jackson knew that Jason was going to testify against him. *See* **Exhibit I**, p. 24, ln. 10-23.

> **Response: Disputed.** No such conversation occurred, the cited testimony is not credible, and defendants lack a good faith basis to present this assertion as undisputed. *Id.*

20. Jenkins knew that Jason was going to testify against Tony Jackson and knew that plaintiff was close with Tony Jackson. *See* **Exhibit K**, p. 87, ln. 5-9.

> **Response: Undisputed that Jenkins testified as such.** However, this is not a material fact.

21. As explained by Jenkins, plaintiff did not want Jason to testify against Tony Jackson because Tony Jackson would have been convicted. *See* **Exhibit K**, p. 87, ln. 23 – p. 88, ln. 9.

> **Response: Undisputed that Jenkins testified as such.** However, this is not a material fact.

22. Plaintiff told his cousin Jenkins that he wanted to kill Jason because he "was a bitch ass nigger for snitching on [Tony Jackson] because he had supposedly pulled a gun out on Tony Jackson, took it from him, and shot him." *See* **Exhibit I**, p. 44, ln. 17-22.

> **Response: Disputed.** No such conversation occurred, the cited testimony is not credible, and defendants lack a good faith basis to present this assertion as undisputed. *See* Response to #18 *supra*.

23. Jenkins offered to kill Jason, but plaintiff said no. *See* **Exhibit E**, p. 725, ln. 17-21.

> **Response: Disputed.** No such conversation occurred, the cited testimony is not credible, and defendants lack a good faith basis to present this assertion as undisputed. *See* Response to #18 *supra*.

24. Jason died on March 20, 1994. *See* **Exhibit I**, p. 4, ln. 20 – p. 6, ln. 14; *see also* **Exhibit E**, p. 567, ln. 18-19; *see also* Jason's Death Certificate and Autopsy Report of the Nassau County Medical Examiner's Office (**Exhibit LL**).  Jason was shot on the sidewalk of Sunrise Highway in Freeport, New York in the vicinity of the Blimpies restaurant and the American Legion Hall. *See* **Exhibit I**, p. 3, ln. 13 – p. 4, ln. 14; *see also* **Exhibit E**, p. 1141, ln. 20 – p. 1142, ln. 10.

> **Response: Undisputed.**

25. On March 20, 1994, an autopsy was done on Jason's body which revealed Jason was shot four times, and that Jason died as a result of multiple gunshot wounds to his chest and abdomen. *See* **Exhibit E**, p. 629, ln. 21 – p. 630, ln. 9, p. 641, ln. 16-23; *see also* **Exhibit LL**.

> **Response: Undisputed.**

26. In 1994, Det. Abbondandelo was assigned to the NCPD Homicide Squad and had been assigned to the Homicide Squad for approximately 19 years. *See* **Exhibit I**, p. 3, ln. 8-12; *see also* **Exhibit E**, p. 1140, ln. 18-25.  In the early morning of March 20, 1994, Det. Abbondandelo was assigned to investigate Jason's death. *See* **Exhibit I**, p. 3, ln. 13-19; *see also* **Exhibit E**, p. 1141, ln. 9-19.

> **Response: Undisputed**. However, plaintiff respectfully objects on the grounds that this assertion violates this Honorable Court's Individual Practice Rule III.G.1., which states: "Each numbered paragraph in the Rule 56.1 Statement must contain only one factual assertion."

27. Det. Abbondandelo received a call, was informed that there had been a shooting in the vicinity of the Blimpies restaurant on Sunrise Highway in Freeport, New York, and responded to the scene on March 20, 1994 at approximately 4:15 a.m. *See* **Exhibit I**, p. 3, ln. 20 – p. 4, ln. 14; *see also* **Exhibit E**, p. 1141, ln. 20 – p. 1142, ln. 10; *see* Freeport Police Department ("FPD") Crime Scene Log (**Exhibit MM**), p. 2.

> **Response: Undisputed.**

28. On March 20, 1994, Det. Herts was an NCPD First Squad detective and was assigned to assist in investigating Jason's shooting. *See* Det. Herts EBT Transcript

(**Exhibit Y**), p. 27, ln. 6-7, p. 28, ln. 4-6, p. 29, ln. 6-9. Det. Holland, also assigned to the NCPD First Squad, and Det. Herts arrived at the crime scene together on March 20, 1994 at approximately 4:42 a.m. *See* **Exhibit Y**, p. 25, ln. 25 – p. 26, ln. 7; *see also* Det. Holland EBT Transcript (**Exhibit Z**), p. 20, ln. 24 – p. 21, ln. 6; *see also* **Exhibit MM**, p. 2.

> **Response: Undisputed**. However, plaintiff respectfully objects on the grounds that this assertion violates this Honorable Court's Individual Practice Rule III.G.1., which states: "Each numbered paragraph in the Rule 56.1 Statement must contain only one factual assertion."

29. Det. Swenson was assigned to the NCPD Homicide Squad in 1993. *See* Det. Swenson EBT Transcript (**Exhibit AA**), p. 16, ln. 7-10. Det. Swenson was assigned to assist Det. Abbondandelo in investigating Jason's murder. *See* **Exhibit AA**, p. 29, ln. 15 – p. 30, ln. 21.

> **Response: Undisputed.**

30. On March 20, 1994, Det. Sgt. Severin was the on-call supervisor for the NCPD Homicide Squad. *See* Det. Sgt. Severin EBT Transcript (**Exhibit KK**), p. 299, ln. 25 – p. 300, ln. 2. Det. Sgt. Severin responded to the scene well after the shooting occurred on March 20, 1994 at approximately 4:10 a.m. *See* **Exhibit KK**, p. 73, ln. 19-20.

> **Response: Undisputed.**

31. Peddie Jenkins knew Jason and went to Freeport High School with him. *See* **Exhibit I**, p. 21, ln. 7-21.

> **Response. Undisputed.**

32. On March 19, 1994 into March 20, 1994, there was a birthday party being held for Jason and his sister. *See* **Exhibit I**, p. 8, ln. 16-23; *see also* **Exhibit E**, p. 735, ln. 10-25; *see also* Jason Birthday Flyer (**Exhibit OOOO**).

> **Response. Undisputed.**

33. At this time, plaintiff was 23 years old and Jenkins was 17 years old. *See* **Exhibit I**, p. 43, ln. 21 – p. 44, ln. 3.

> **Response. Undisputed.**

34. The birthday party for Jason was being held at the American Legion Hall in Freeport, New York. *See* **Exhibit I**, p. 30, ln. 8-21; *see* **Exhibit E**, p. 730, ln. 24 – p. 731, ln. 7; p. 738, ln. 19-23; *see also* **Exhibit OOOO**.

> **Response. Undisputed.**

35. Jenkins told plaintiff that Jason was throwing a party. *See* **Exhibit E**, p. 725, ln. 4-9.

> **Response: Disputed.** No such conversation occurred, the cited testimony is not credible, and defendants lack a good faith basis to present this assertion as undisputed. *See* Response to #18 *supra*.

36. Jason dropped Jenkins and a few others off at the American Legion at approximately 9:00 p.m. and told them that he was going to come back later. *See* **Exhibit E**, p. 739, ln. 8-15.

> **Response: Undisputed that Jenkins testified as such.** However, this is not a material fact.

37. Jenkins acted as the doorman/security for this party. *See* **Exhibit I**, p. 30, ln. 8 – p. 31, ln. 19; *see also* **Exhibit E**, p. 738, ln. 2-18.

> **Response: Disputed.** Ralph Bruce was the bouncer. *See* 32B Statement of Ralph Bruce, annexed to the Harvis Decl. as Ex. 7 ("Bruce Statement") at County26; *see also* Abbondandelo Notes, annexed to the Harvis Decl. as Ex. 8 at County715; Deposition Transcript of Gary Abbondandelo, December 2, 2021, annexed to the Harvis Decl. as Ex. 6 ("Abbondandelo Dep.") 156:15-22.

38. People started arriving at the party at 10:00 p.m., and the party started at approximately 11:00 p.m. on March 19, 1994. *See* **Exhibit I**, p. 31, ln. 4-8; *see also* **Exhibit E**, p. 739, ln. 19-21.

> **Response: Undisputed that Jenkins testified as such.** However, this is not a material fact.

39. Jason was not at the party when it started, but he arrived on March 20, 1994 sometime between 12:00 a.m. and 12:30 a.m. *See* **Exhibit I**, p. 31, ln. 9-16; *see also* **Exhibit E**, p. 741, ln. 6-13.

**Response: Undisputed that Jenkins testified as such.** However, this is not a material fact.

40. Blimpies is on the same block, the same side of the street (Sunrise Highway) and in close proximity to the American Legion Hall where Jason's party was taking place. *See* **Exhibit I**, p. 32, 12-16; *see also* **Exhibit E**, p. 744, ln. 4-17.

**Response. Undisputed.**

41. During the party, Jenkins stepped outside of the American Legion Hall, walked towards Blimpies, and saw plaintiff. *See* **Exhibit I**, p. 32, ln. 6-19; *see also* **Exhibit E**, p. 745, ln. 10-24.

**Response. Disputed.** Jenkins did not see plaintiff because plaintiff was not present at that location on March 20, 1994 and had never been there. Jackson Dep., Harvis Decl., Ex. 1, 100:23-101:6, 107:8-14, 206:25–207:17.  Defendants lack a good faith basis to present this assertion as undisputed.

42. Plaintiff asked Jenkins to let him know when Jason was coming outside. *See* **Exhibit I**, p. 33, ln. 20-25; *see also* **Exhibit E**, p. 746, ln. 15-20.

**Response. Disputed.** Plaintiff was not present and made no such request. Jackson Dep., Harvis Decl., Ex. 1, 100:23-101:6, 107:8-14, 209:15-210:3. Defendants lack a good faith basis to present this assertion as undisputed.

43. Jenkins told plaintiff that he would let him know when Jason was coming outside. *See* **Exhibit I**, p. 33, ln. 20 – p. 34, ln. 2; *see also* **Exhibit E**, p. 746, ln. 15-22.

**Response. Disputed.** Plaintiff was not present and made no such request. Jackson Dep., Harvis Decl., Ex. 1, 100:23-101:6, 107:8-14, 209:15-210:3. Defendants lack a good faith basis to present this assertion as undisputed.

44. Jenkins also saw Jason's car in the Blimpies parking lot and told plaintiff that he was standing by Jason's car, a 1988 Acura Integra with New York registration A377VZ. *See* **Exhibit E**, p. 747, ln. 13 – p. 748, ln. 5; *see also* **Exhibit I**, p. 34, ln. 3-14; *see also* Det. Abbondandelo's Notes (**Exhibit HHHH**), p. 6; *see also* Det. Abbondandelo EBT

December 2, 2021 (**Exhibit L**), p. 156, ln. 7-14. Jason's vehicle was facing south bound. *See* **Exhibit L**, p. 156, ln. 7-14; *see also* **Exhibit HHHH**, p. 6.

> **Response. Disputed in part.** Plaintiff was not present, and no such conversation took place or could have taken place. Jackson Dep., Harvis Decl., Ex 1, 100:23-101:6, 107:8-14; 212:4-16; *see also* Response to # 18 *supra*. Plaintiff does not dispute that Steven Jason's vehicle was facing southbound, but this is not a material fact. Plaintiff also respectfully objects on the grounds that this assertion violates this Honorable Court's Individual Practice Rule III.G.1., which states: "Each numbered paragraph in the Rule 56.1 Statement must contain only one factual assertion." Defendants also lack a good faith basis to present this assertion as undisputed.

45. After speaking with plaintiff, Jenkins went back to the American Legion Hall. *See* **Exhibit I**, p. 34, ln. 15-18; *see also* **Exhibit E**, p. 750, ln. 19-22.

> **Response. Disputed in part.** Plaintiff was not present, and he never spoke to Jenkins, nor could he have spoken to Jenkins. Jackson Dep., Harvis Decl., Ex. 1, 100:23-101:6, 107:8-14, 212:4-16. Defendants lack a good faith basis to present this assertion as undisputed.

46. When Jenkins went back inside the American Legion Hall, he saw Tyrone Isaac and asked Tyrone Isaac to let him know when Jason was coming outside. *See* **Exhibit I**, p. 34, ln. 19 – p. 35, ln. 14; *see also* **Exhibit E**, p. 751, ln. 5-21.

> **Response: Undisputed that Jenkins testified as such.**

47. Later, Tyrone Isaac told Jenkins that Jason was coming outside. *See* **Exhibit I**, p. 35, ln. 16-22; *see also* **Exhibit E**, p. 753, ln. 2 – p. 754, ln. 4.

> **Response: Undisputed that Jenkins testified as such.**

48. Jenkins then went outside, ran down to Blimpies and told plaintiff that Jason was coming outside. *See* **Exhibit I**, p. 36, ln. 5-11; *see also* **Exhibit E**, p. 754, ln. 9-16.

> **Response: Disputed.** Plaintiff was not present at that location (he was at work in Hempstead) and Jenkins could not have seen or spoken to plaintiff. Jackson Dep., Harvis Decl., Ex. 1, 107:8-14, 217:11-21, 101:19-21; *see also* Response to #18 *supra*. Defendants lack a good faith basis to

present this assertion as undisputed.

49. Jenkins went back to the American Legion Hall, saw Jason, and Jason said that he had to go somewhere and that he would be right back. *See* **Exhibit E**, p. 755, ln. 16 – p. 756, ln. 11; *see* **Exhibit I**, p. 36, ln. 20 – p. 37, ln. 2.

> **Response: Undisputed that Jenkins testified as such.**

50. Jason walked outside and started walking towards Blimpies. *See* **Exhibit I**, p. 37, ln. 4-15; *see* **Exhibit E**, p. 756, ln. 12-16.

> **Response: Undisputed that Jenkins testified as such.**

51. Jenkins followed Jason outside and hid behind a car. *See* **Exhibit E**, p. 757, ln. 2- 7; *see also* **Exhibit I**, p. 37, ln. 6-7.

> **Response: Undisputed that Jenkins testified as such.**

52. As Jason approached Blimpies, Jenkins saw plaintiff pull out a black gun, point it at Jason and then heard several gun shots. *See* **Exhibit I**, p. 37, ln. 20 – p. 38, ln. 18; *see* **Exhibit E**, p. 760, ln. 17 – p. 761, ln. 25, p. 762, ln. 19-22.

> **Response: Disputed**. Jenkins could not have seen this because plaintiff was not involved in the crime. Jackson Dep., Harvis Decl., Ex. 1, 107:8-14, 217:11-21, 101:19-21; Anania Memo and Notes, Harvis Decl., Ex. 2, County2852-2853; *see also* Response to #18 *supra*. Defendants lack a good faith basis to present this assertion as undisputed.

53. Plaintiff was approximately three to five feet away from Jason when he pointed the gun at him. *See* **Exhibit I**, p. 38, ln. 23 – p. 39, ln. 2; *see also* **Exhibit E**, p. 762, ln. 2-5.

> **Response: Disputed**. Plaintiff was not involved in the crime and the credible evidence suggests Jenkins shot Steven Jason. Jackson Dep., Harvis Decl., Ex. 1, 100:23-101:6, 107:8-14, 217:11-21, 101:19-21; Anania Memo and Notes, Harvis Decl., Ex. 2, County2852-2853; *see* Response to #18 *supra*; Richard "Woody" Miller Affidavit, annexed to the Harvis Decl. as Ex. 9, ("Miller Aff.") at ¶¶3-24. Defendants lack a good faith basis to present this assertion as undisputed.

54. Jenkins saw plaintiff run away from the shooting towards Jason's car and the

-11-

Blimpies parking lot. *See* **Exhibit I**, p. 39, ln. 19 – p. 40, ln. 2, p. 34, ln. 3-14. *see also* **Exhibit E**, p. 766, ln. 3-19, p. 747, ln. 13 – p. 748, ln. 5.

> **Response: Disputed**. Jenkins could not have seen plaintiff run from the shooting because plaintiff was not present or involved in the crime. Jackson Dep., Harvis Decl., Ex. 1, 100:23-101:6, 107:8-14, 217:11-21, 101:19-21; Anania Memo and Notes, Harvis Decl., Ex. 2, County2852-2853; Miller Aff., Harvis Decl., Ex. 9 at ¶¶3-24; *see also* Response to #18 *supra*. Defendants lack a good faith basis to present this assertion as undisputed.

55. Jenkins then got up, ran over to Jason and saw Jason holding his chest. *See* **Exhibit I**, p. 39, ln. 3-6; *see also* **Exhibit E**, p. 767, ln. 8-10.

> **Response: Undisputed that Jenkins testified as such.**

56. Jason was in shock and kept saying "Star." *See* **Exhibit I**, p. 39, ln. 8-13; *see also* **Exhibit E**, p. 767, ln. 15 – p. 768, ln. 8.

> **Response: Disputed as improbable**. According to the findings of the County's own official reinvestigation, it is "highly doubtful that Steven Jason was standing upright saying 'Star' repeatedly after he had been shot." Anania Memo and Notes, Harvis Decl., Ex. 2 at County2849; *see also* Bruce Statement, Harvis Decl., Ex. 7, at County26; Abbondandelo, Harvis Decl., Ex. 6, 159:11-19; 32B Statement of Martha Campbell, annexed to the Harvis Decl. as Ex. 10 ("Campbell Statement") at County3392; *see also* Response to #18 *supra*.

57. After plaintiff ran from the scene, Jenkins did not see him for the rest of the day. *See* **Exhibit I**, p. 40, ln. 3-5; *see also* **Exhibit E**, p. 772, ln. 24 – p. 773, ln. 3.

> **Response: Disputed**. Plaintiff never ran from the scene and was not involved in the crime. Jackson Dep., Harvis Decl., Ex. 1, 100:23-101:6, 107:8-14, 217:11-21, 101:19-21; Anania Memo and Notes, Harvis Decl., Ex. 2, County2852-2853; Miller Aff., Harvis Decl., Ex. 9 at ¶¶3-31; *see also* Response to #18 *supra*. Defendants lack a good faith basis to present this assertion as undisputed.

58. Jenkins then ran back inside the American Legion Hall and announced that Jason was shot. *See* **Exhibit I**, p. 40, ln. 6-9; *see also* **Exhibit E**, p. 768, ln. 12-21.

**Response: Undisputed that Jenkins testified as such.**

59. Everybody at the party then ran outside the American Legion Hall. *See* **Exhibit I**, p. 40, ln. 9-10; *see also* **Exhibit E**, p. 769, ln. 10-15.

**Response: Undisputed that Jenkins testified as such.**

60. A few minutes later, Jenkins left the American Legion Hall through the front door, and went to the Freeport cab station. *See* **Exhibit E**, p. 769, ln. 24 – p. 770, ln. 13.

> **Response: Disputed**. Jenkins ran northbound from the scene with Steven Jason's blood on his clothing and carrying the murder weapon. Jenkins managed to run to the home of his aunt, Kim Prunty, who helped Jenkins dispose of the bloody clothing. Jenkins then "got rid of" the gun. Jenkins Dep., Harvis Decl., Ex. 4, 57:2-63:2.

61. When Jenkins walked outside, there was a crowd that had become unruly and the police officers were trying to hold everyone back. *See* **Exhibit E**, p. 770, ln. 14-23.

**Response: Undisputed that Jenkins testified as such.**

62. The next morning, Jenkins saw plaintiff at plaintiff's apartment in Hempstead, New York. *See* **Exhibit I**, p. 40, ln. 11-16; *see also* **Exhibit E**, p. 772, ln. 24 – p. 773, ln. 20.

> **Response: Disputed**. Plaintiff and Jenkins never saw each other on March 20, 1994. *see also* Response to #18 *supra*. Defendants do not have a good faith basis to present this fact as undisputed.

63. Jenkins spoke with plaintiff about the party and plaintiff told Jenkins to "shut [his] mouth and go back to the group home." *See* **Exhibit I**, p. 41, ln. 4-5; *see also* **Exhibit E**, p. 774, ln. 5-7.

> **Response: Disputed**. Plaintiff and Jenkins never saw each other on March 20, 1994. *see also* Response to #18 *supra*. Defendants do not have a good faith basis to present this fact as undisputed.

64. On October 18, 1994, Det. Sgt. Severin spoke with an anonymous caller named "Darren" who said that Jenkins was involved in setting up the murder of Jason. *See* **Exhibit F**, p. 107, ln. 4-16; *see also* **Exhibit KK**, p. 331, ln. 5-24; *see also* Det. Sgt.

Severin's Notes from October 18, 1994 (**Exhibit PPPP**).

> **Response: Disputed in part**. Plaintiff agrees that police received a call regarding Peddie Jenkins. It is not clear whether defendant Severin spoke to the caller (two officers noted the call), but the caller was not anonymous – police had his full name, Darren Brennan, as well as his address and date of birth. Mr. Brennan, age 16, told the police that Jenkins, 17, had been "bragging" about his involvement in murdering Steven Jason. Mr. Brennan made no mention of plaintiff. Deposition Transcript of Dan Severin, November 2, 2021, annexed to the Harvis Decl. as Ex. 11 ("Severin Dep.") 332:17-333:16; *see also* Handwritten note regarding Dan Brennan, annexed to the Harvis Decl. as Ex. 12 ("Brennan Note"), County4754-55.

65. On November 15, 1994, at approximately 3:25 p.m., Jenkins was brought to NCPD police headquarters in Mineola, New York by FPD police officers. *See* **Exhibit E**, p. 798, ln. 7- 11; *see also* **Exhibit E**, p. 1214, ln. 22 – p. 1215, ln. 4; *see also* NCPD Homicide Squad Blotters (**Exhibit TTTT**), p. 1.

> **Response: Undisputed.**

66. Initially, Det. Abbondandelo was skeptical when speaking with Jenkins. *See* **Exhibit L**, p. 299, ln. 5-9.

> **Response: Undisputed that Abbondandelo testified as such.**

67. At first, Jenkins told NCPD Detectives that he was not at Jason's party at the American Legion Hall. *See* **Exhibit E**, p. 801, ln. 24 – p. 802, ln. 2.

> **Response: Disputed**. For the first approximately four hours he was in NCPD custody on November 15, 1994, Jenkins denied his identity and insisted he was his own younger brother Shawn Jenkins. Abbondandelo Dep., Harvis Decl., Ex. 6, 296:2-298:11; see also Response to #18 *supra*.

68. Jenkins then told the NCPD Detectives that he was at Jason's party, that he saw plaintiff pointing a gun at Jason, that he knew Jason had just been shot, and signed a written statement to that effect. *See* Jenkins November 15, 1994 Written Statement (**Exhibit N**); *see also* **Exhibit L**, p. 303, ln. 1-6; *see also* **Exhibit E**, p. 792, ln. 21 – p. 793, ln. 2, p. 797, ln. 24 – p. 798, ln. 6. Det. Dempsey and Det. Abbondandelo witnessed Jenkins November 15, 1994 signed statement. *See* **Exhibit N**, p. 21.

**Response: Disputed.** Over the course of twelve hours on November 15, 1994, defendants Dempsey and Abbondandelo interrogated Jenkins, threatening him with a 25-to-life sentence if he refused to implicate plaintiff in the murder of Steven Jason and resulting in an 11-page statement written by Abbondandelo and signed by Jenkins that is universally understood to be a fabrication. *See* Jenkins Dep., Harvis Decl., Ex. 4, 45:24-46:11, 49:17-24, 69:12-16, 70:9-71:13; Anania Memo and Notes, Harvis Decl., Ex. 2, County2845-2849; NCPD Homicide Blotter, annexed to Harvis Decl. as Ex. 13 ("Blotter"), County2487-2489 (reflecting time in custody). Indeed, when Jenkins was subjected to a polygraph examination while in custody that day, the examiner noted Jenkins' story "really sounds like B.S.!" *See* NCPD Supplemental Polygraph Worksheet for Peddie Jenkins, annexed to the Harvis Decl. as Ex. 14, County 8288. Jenkins has a specific memory of seeing a picture of plaintiff on the wall when he entered the precinct and testified that it was the officers who first mentioned plaintiff during the interrogation. Jenkins Dep., Harvis Decl., Ex. 4, 70:9-12, 47:11-22.

69. When Jenkins spoke with NCPD Detectives on November 15, 1994, he did not tell them everything that happened. *See* **Exhibit L**, p. 301, ln. 4-8, p. 307, ln. 4-9, p. 318, ln. 12-19; *see also* **Exhibit E**, p. 1229, ln. 17 – p. 1230, ln. 4; *see also* **Exhibit F**, p. 187, ln. 13-24, p. 115, ln. 12 – p. 117, ln. 24.

**Response: Undisputed**.

70. On November 16, 1994, at approximately 3:00 a.m., Jenkins was transported from the NCPD Homicide Squad to NCPD Detention by Det. Abbondandelo and Det. Dempsey to be processed on open warrants. *See* **Exhibit L**, p. 321, ln. 11-19; *see* **Exhibit E**, p. 1218, ln. 22 – p. 1219, ln. 5; *see also* **Exhibit TTTT**, p. 3.

**Response: Undisputed**. However, this is not a material fact.

71. NCPD Detectives then located and spoke with Roy Isaacs and Tyrone Isaacs, and both provided written statements about their knowledge of the events and circumstances surrounding Jason's death. *See* Tyrone Isaacs' November 18, 1994 Written Statement (**Exhibit O**), p. 3-7; *see also* Roy Isaacs' November 18, 1994 Written Statement (**Exhibit P**), p. 10-11; *see also* **Exhibit L**, p. 344, ln. 12-16; *see also* **Exhibit E**, p. 1144, ln. 2-9; *see also* **Exhibit F**, p. 186, ln. 21-22; *see also* Det. Dempsey's Notes of Interview of Roy Isaacs (**Exhibit YYYY**); *see also* Det. Alger's Notes of Interview with

Tyrone Isaacs (**Exhibit ZZZZ**); *see also* Det. Donnelly's Notes of Interview with Tyrone Isaacs (**Exhibit AAAAA**).

> **Response: Disputed in part**. Plaintiff agrees that the Isaacs brothers were taken into custody on November 18, 1994. Roy Isaacs told prosecutors during the 2017 reinvestigation that "the police wrote out a statement" that he "read and signed." Anania Memo and Notes, Harvis Decl., Ex. 2, County2851. In the opinion of NCPD Polygraphist Edward Goutink III, both Roy and Tyrone Isaacs were deceptive and untruthful in their statements. *See* Polygraphs Examination Cards for Roy and Tyrone Isaacs annexed to the Harvis Decl. as Ex. 15, County2269-2272.

72. Tyrone Isaac's signed written statement included the facts that Jenkins asked Tyrone Isaac to let him know when Jason was coming out of the party, that Jenkins walked outside, that Jason walked out of the party with Skwanitra Witherspoon ("Witherspoon") and that he heard gun shots. *See* **Exhibit O**.

> Response: **Undisputed that Jenkins paid Tyrone Isaacs.**

73. Roy Isaac's signed written statement included that in December of 1993, plaintiff told Roy Isaac that he wanted to "get" Jason for putting Tony Jackson in jail, and that in April of 1994, plaintiff told Roy Isaac that he had "handled that beef" with Jason. *See* **Exhibit P**. Based on these statements, Roy Isaac believed that plaintiff had shot Jason outside of the American Legion hall. *See* **Exhibit P**.

> **Response: Disputed in part.** The hearsay statements attributed to Roy "Moosey" Isaacs were authored by the police and are untruthful and inadmissible. These witnesses signed statements written by the police to avoid charges and obtain favors. *See* Polygraph Examination Cards for Isaacs brothers, annexed to the Harvis Decl. as Ex. 15, County2269-2272; *see also* Anania Memo and Notes, Harvis Decl., Ex. 2, County2851 at discussion of Roy Isaacs; Anania Memo and Notes, Harvis Decl., Ex. 2, County3197 (noting Moosey's polygraph results as "qualified lying"); Deposition of Robert Dempsey, March 10, 2022, annexed to the Harvis Decl. as Ex. 17, (Dempsey Dep.), 229:17-25.

74. Det. Alger spoke with Tyrone Isaacs and witnessed Tyrone sign his written statement. *See* **Exhibit O**, p. 7; *see also* **Exhibit AAA**, p. 119, ln. 5-22; *see also* **Exhibit ZZZZ**.

**Response: Undisputed**. This is not a material fact.

75. Det. Abbondandelo spoke with Roy Isaacs and witnessed Roy Isaacs sign his written statement. *See* **Exhibit P**, p. 11; *see also* **Exhibit L**, p. 337, ln. 2-6.

> **Response: Disputed in part.** According to Isaacs, Abbondandelo wrote the statement. Anania Memo and Notes, Harvis Decl., Ex. 2, County2851 (at discussion of Roy Isaacs).

76. Ultimately, after NCPD Detectives spoke with Roy Isaacs and Tyrone Isaacs, it was decided to bring Jenkins back in for further questioning. *See* **Exhibit L**, p. 346, ln. 23 – p. 347, ln. 4; *see also* **Exhibit F**, p. 186, ln. 18-22; p. 187, ln. 8-12.

> **Response: Undisputed.**

77. On November 18, 1994, Jenkins had a court appearance at Nassau County District Court, and after he was released, NCPD Detectives brought Jenkins back to the NCPD Homicide Squad to speak with Jenkins again. *See* **Exhibit L**, p. 327, ln. 14-20; *see also* **Exhibit F**, p. 185, ln. 24 – p. 187, ln. 16; *see also* **Exhibit E**, p. 1220, ln. 2-23.

> **Response: Undisputed.**

78. The NCPD Detectives told Jenkins that they did not believe what Jenkins had told them on November 15, 1994. *See* **Exhibit E,** p. 862, ln. 7-11; p. 1229, ln. 4-7; *see also* **Exhibit L**, p. 348, ln. 13-23.

> **Response: Disputed**. According to Jenkins, the detectives told him that they had enough evidence to charge him with a homicide, but that that if Jenkins would say plaintiff shot Steven Jason, they would only charge him with criminal facilitation, a lesser charge. Jenkins Dep., Harvis Decl., Ex. 4, 48:18-49:24.

79. Jenkins then revealed a more detailed account of the events than was contained in his first statement made on November 15, 1994. *See* **Exhibit F**, p. 115, ln. 12 – p. 117, ln. 24; *see also* **Exhibit N**; *see also* Jenkins November 18, 1994 Written Statement (**Exhibit Q**); *see also* **Exhibit E**, p. 1026, ln. 9-24.

> **Response: Disputed**. It was not a more detailed account, it was a different account that was also a fabrication. *See* Anania Memo and Notes, Harvis Decl., Ex. 2, County2849 (discussing at "Trial Issue 1." that Peddie

admitted to lying in his first statement); *see also* Abbondandelo Dep., Harvis Decl., Ex. 6, 307:4-12, 312:25-314:1, 347:19-348:8, 348:13-23, 350:1-21 (Abbondandelo "let [Peddie] have it with the lies" and Jenkins "came up with version Number 2 of the story."; *see also* Response to #18 *supra*.

80. Jenkins then told the NCPD Detectives that he saw plaintiff shoot Jason, and signed a written statement to that effect. *See* **Exhibit Q**; *see also* **Exhibit E**, p. 792, ln. 21 – p. 793, ln. 2.

> **Response: Disputed.** The statement Jenkins signed on November 18, 1994 is not credible and its account is at odds with the record – the defendant officers apparently used their leverage over Jenkins by virtue of their ability to charge him with the Steven Jason homicide to induce Jenkins into falsely inculpating plaintiff. It was not a more detailed account, it was a different account that was also a fabrication. *See* Anania Memo and Notes, Harvis Decl., Ex. 2, County2849 (discussing at "Trial Issue 1." that Peddie admitted to lying in his first statement); *see also* Abbondandelo Dep., Harvis Decl., Ex. 6, 307:4-12, 312:25-314:1, 347:19-348:8, 348:13-23, 350:1-21 (Abbondandelo "let [Peddie] have it with the lies" and Jenkins "came up with version Number 2 of the story."; *see also* Response to #18 *supra*.

81. While Det. Dempsey and Det. Alger witnessed Jenkins sign the November 18, 1994 statement, Det. Alger was not present when Jenkins was questioned on November 18, 1994. *See* **Exhibit Q**, p. 15; *see also* **Exhibit AAA**, p. 34, ln. 25 – p. 35, ln. 15.

> **Response: Disputed.** Defendant Dempsey's notes suggest that Alger, who witnessed every page of Jenkins' statement, was also present for its preparation. *See* Dempsey notes (November 1994), annexed to the Harvis Decl. as Ex. 18 ("Dempsey November Notes") at County 2177-99.

82. Det. Abbondandelo believed that Jenkins' account of the events on November 18, 1994, which now included admissions against his own penal interests, was more consistent with the facts and truthful. *See* **Exhibit L**, p. 356, ln. 25 – p. 357, ln. 7, p. 358, ln. 7-9.

> **Response: Disputed.** Jenkins' account was untruthful, and defendant Abbondandelo knew that it was false. *See* Anania Memo and Notes, Harvis Decl., Ex. 2, pp. County2843-2853 *generally*; *see also*

Abbondandelo Dep., Harvis Decl., Ex. 6, 360:12-25, 362:11-23 (Abbondandelo took no steps to verify Jenkins' November 18, 1994 statement before taking plaintiff into custody on December 17, 1994); *see also* Response to #18 *supra*.

83. On November 18, 1994, Jenkins was arrested for criminal facilitation in the second degree as a result of his involvement with Jason's murder that occurred on March 20, 1994. *See* **Exhibit I**, p. 19, ln. 10-23; *see also* **Exhibit E**, p. 1145, ln. 4-11, p. 1231, ln. 14 – p. 1232, ln. 2.

**Response: Undisputed.**

84. After Jenkins gave his second statement, plaintiff was the prime suspect in Jason's murder. *See* **Exhibit L**, p. 359, ln. 10-14; *see also* **Exhibit F**, p. 118, ln. 17-21.

**Response: Undisputed that plaintiff was being targeted by the officers.**

85. On November 18, 1994, at approximately 10:20 p.m., Jenkins was transported to the Nassau County District Attorney's Office ("NCDA") by Det. Dempsey and was interviewed by retired Nassau County Assistant District Attorney Fred Klein ("ADA Klein"). *See* **Exhibit L**, p. 354, ln. 21-25; *see also* **Exhibit E**, p. 1233, ln. 3-21; *see also* **Exhibit TTTT**, p. 10-11.

**Response: Disputed in part.** ADA Fred Klein questioned Jenkins, but Klein was never told about Montes and Larrea or Peddie Jenkins' first statement. Klein Dep., Harvis Decl., Ex. 5, 84:15-85:10. After Klein interviewed Jenkins, he recalls that he "had some problems with whether that was enough to make an arrest and communicating that to the Police Department." *Id.* at 81:15-82:12.

86. This interview was recorded on video. *See* **Exhibit E**, p. 793, ln. 6-8, p. 1233, ln. 3-21. During this video recorded interview with ADA Klein, Jenkins again said that plaintiff murdered Jason. *See* Video of Jenkins November 18, 1994 Interview (**Exhibit R**).

**Response: Undisputed.**

87. Witherspoon grew up with Jason and Jason's sister. *See* **Exhibit I**, p. 48, ln. 21-23. Witherspoon was best friends with Jason's sister. *See* **Exhibit E**, p. 1050, ln. 17-19.

**Response: Undisputed that Witherspoon was friends with Jason's sister.**

88. In March of 1994, Witherspoon was living outside of the state of New York. *See* **Exhibit E**, p. 1051, ln. 7-9. She came back to Freeport to attend a birthday party for Jason and his sister on March 19, 1994. *See* **Exhibit E**, p. 1051, ln. 10 – p. 1052, ln. 8.

> **Response: Undisputed.** However, plaintiff respectfully objects on the grounds that this assertion violates this Honorable Court's Individual Practice Rule III.G.1., which states: "Each numbered paragraph in the Rule 56.1 Statement must contain only one factual assertion."

89. At this time, Witherspoon was dating Jason and they were in a long distance relationship. *See* **Exhibit E**, p. 1085, ln. 22 – p. 1086, ln. 5.

> **Response: Undisputed that Witherspoon testified as such.**

90. The party for Jason and his sister was held at the American Legion Hall on Sunrise Highway in Freeport, New York. *See* **Exhibit I**, p. 49, ln. 9-18; *see also* **Exhibit E**, p. 1052, ln. 9- 15.

> **Response: Undisputed.** However, plaintiff respectfully objects on the grounds that this is repetitive of defendants' Fact #34, *supra.*

91. On March 20, 1994, Witherspoon was with Jason at his birthday party. *See* **Exhibit I**, p. 48, ln. 24 – p. 49, ln. 8.

> **Response: Undisputed that they were both at the party.**

92. Witherspoon arrived at the party between 10:30 p.m. and 11:00 p.m. *See* **Exhibit I**, p. 49, ln. 19-21; *see also* **Exhibit E**, p. 1052, ln. 16-21. Jason was not in the building when Witherspoon arrived. *See* **Exhibit I**, p. 49, ln. 22-24.

> **Response: Undisputed.** However, this is not a material fact and plaintiff respectfully objects on the grounds that this assertion violates this Honorable Court's Individual Practice Rule III.G.1., which states: "Each numbered paragraph in the Rule 56.1 Statement must contain only one factual assertion."

93. Witherspoon stayed at the party for a few hours and left a short time after 1:30 a.m. *See* **Exhibit I**, p. 50, ln. 3-10; *see also* **Exhibit E**, p. 1054, ln. 18-19, p. 1055, ln. 23-25. Witherspoon left the party with Jason, and Jason was going to drive her home. *See* **Exhibit I**, p. 50, ln. 11-18; *See also* **Exhibit E**, p. 1055, ln. 10-19, p. 1056, ln. 5-7.

**Response: Disputed**. According to witnesses, Skwanitra Witherspoon was not with Steven Jason at the time he was killed. Glenn Montes describes a man alone chased by two others. *See* Anania Memo and Notes, Harvis Decl., Ex. 2, County2845 (Montes described seeing two black males chasing another black male before he was shot); County2849 (Larrea describes hearing shots and saw a man standing over the body shooting); County2846 (Jenkins describes Jason leaving the party alone before being shot); County2844 (Martha Campbell saw a black male run and get into a car after the shooting); *see also* Deposition of Glenn Montes, February 6 2020, annexed to the Harvis Decl. as Ex. 20 ("Montes Dep."), 25:8-28:14; 32B Statement of Glenn Montes, annexed to the Harvis Decl. as Ex. 19 ("Montes Statement"); Abbondandelo Dep., Harvis Decl., Ex. 6, 158:2-159:3.

94. When they left the party, Jason and Witherspoon walked towards the parking lot next to Blimpies to get into Jason's car. *See* **Exhibit I**, p. 50, ln. 21-22; *see also* **Exhibit E**, p. 1056, ln. 24 – p. 1057, ln. 2, p. 1058, ln. 11-20. They were walking westbound on Sunrise Highway. *See* **Exhibit E**, p. 1090, ln. 24 – p. 1091, ln. 7.

**Response: Disputed**. Several witnesses described seeing Steven Jason leave the party alone. Glenn Montes and Maurice Larrea describe a man alone chased by two others. *See* Anania Memo and Notes, Harvis Decl., Ex. 2, County2845 (Montes, a witness to the shooting described seeing two black males chasing another black male before he was shot); County2849 (Larrea describes hearing shots and saw a man standing over the body shooting); County2846 (Jenkins describes Jason leaving the party alone before being shot); County2844 (Martha Campbell saw a black male run and get into a car after the shooting); *see also* Montes Dep., Harvis Decl., Ex. 20, 25:8-28:14; Montes Statement, Harvis Decl., Ex. 19; Abbondandelo Dep., Harvis Decl., Ex. 6, 158:2-159:3.

95. Jason was a few steps ahead of Witherspoon and turned the corner towards the parking lot next to Blimpies before Witherspoon did. *See* **Exhibit I**, p. 50, ln. 21-24; *see also* **Exhibit E**, p. 1058, ln. 11-24.

**Response: Undisputed that Witherspoon testified as such.**

96. After Witherspoon turned the corner, she saw a man standing on the side of Blimpies. *See* **Exhibit I**, p. 50, ln. 24-25; *see also* **Exhibit E**, p. 1058, ln. 24 – p. 1059,

ln. 2.

> **Response: Undisputed that Witherspoon testified as such.**

97. When Witherspoon saw this man standing by himself, she was scared. *See* **Exhibit I**, p. 50, ln. 24 – p. 51, ln. 3; *see also* **Exhibit E**, p. 1058, ln. 24 – p. 1059, ln. 3.

> **Response: Undisputed that Witherspoon testified as such.**

98. This man pulled out a black gun from his pocket and pointed the gun at Jason's head. *See* **Exhibit E**, p. 1059, ln. 5-9, p. 1062, ln. 24 – p. 1063, ln. 4, ln. 24-25; *see also* **Exhibit I**, p. 51, ln. 3-9.

> **Response: Undisputed that Witherspoon testified as such.**

99. The man with the black gun was arm's length from Jason. *See* **Exhibit I**, p. 51, ln. 9-11; *see also* **Exhibit E**, p. 1064, ln. 16-18. This man with the black gun was directly in front of Witherspoon and was approximately "two steps away" from her. *See* **Exhibit I**, p. 51, ln. 12-15; *see also* **Exhibit E**, p. 1062, ln. 6-10.

> **Response: Undisputed that Witherspoon testified as such.** However, Witherspoon only saw the lips of the person holding the gun (she believes he had a hood over his head) and described the shooter as 5'6" (Peddie Jenkins' height) while plaintiff is 6,' *see* Anania Memo and Notes, Harvis Decl., Ex. 2, County2850; Plaintiff's Arrest Report, annexed to the Harvis Decl. as Ex. 22, *see also* Eyewitness Identification Expert Report of Dr. Jennifer Dysart, annexed to the Harvis Decl. as Ex. 21 ("Dysart Report") at pp. 11-12 (discussing effects of stress/arousal on eyewitness identification).

100. When she saw the man with the gun, Witherspoon did not do anything. *See* **Exhibit I**, p. 51, ln. 16-18. The man with the gun said something to Jason, but Witherspoon was not sure what he said. *See* **Exhibit E**, p. 1063, ln. 16-21.

> **Response: Disputed**. This is not the how the events took place according to other eyewitnesses. Glenn Montes describes seeing two Black men chasing Steven Jason in the parking lot of Blimpie's. Neither Montes nor Larrea mention seeing Witherspoon.

As Steven Jason reached the sidewalk, Glenn Montes saw him dive to the ground as one of his pursuers fired two to three shots. Glenn Montes then saw the shooter stand over Jason before running across Sunrise Highway with Montes in pursuit. Montes and Larrea describe the shooter as being several inches shorter than plaintiff with a distinctly different complexion and hairstyle and traveling northbound toward the Freeport Fire Station. *See* Anania Memo and Notes, Harvis Decl., Ex. 2, County2845 (Glen Montes, a witness to the shooting described seeing two black males chasing another black male before he was shot); County2849 (Larrea describes hearing shots and saw a man standing over the body shooting); County2846 (Jenkins describes Jason leaving the party alone before being shot); County2844 (Martha Campbell saw a black male run and get into a car after the shooting); *see also* Montes Dep., Harvis Decl., Ex. 20, 25:8-28:14; Montes Statement, Harvis Decl., Ex. 19; Abbondandelo Dep., Harvis Decl., Ex. 6, 158:2-159:3; Deposition of Maurice Larrea, February 6, 2020, annexed to the Harvis Decl. as Ex. 23 ("Larrea Dep."), 40:13-42:13, 47:7-48:6.



*Figure 1 Crime Scene Photo (annotated)*



*Figure 2 Google Map of Freeport, New York (annotated)*

101.     Jason and the man with the gun were standing on the side of Blimpies in the parking lot near where the first window closet to the street is located. *See* **Exhibit E**, p. 1073, ln. 20 – p. 1075, ln. 14.  Witherspoon was standing on the sidewalk on the front corner of Blimpies. *See* **Exhibit E**, p. 1073, ln. 20 – p. 1075, ln. 14.

**Response: Disputed**. This is inconsistent with the account of Glenn Montes and Maurice Larrea. *See* Response #100 above.

102.     Jason then started to run. *See* **Exhibit I**, p. 51, ln. 19-22. After Jason started to run, Witherspoon turned around and ran back to the party. *See* **Exhibit I**, p. 51, ln. 23-25. When they ran, they both turned left back towards the party. *See* **Exhibit E**, p. 1060, ln. 10-20.

> **Response: Disputed**. This is inconsistent with the account of Glenn Montes and Maurice Larrea. *See* Response #100 above.

103.     While Witherspoon was running back towards to the party, she heard gun shots. *See* **Exhibit I**, p. 52, ln. 2-4; *see also* **Exhibit E**, p. 1060, ln. 23-24.

> **Response: Undisputed**.

104.     Witherspoon ran back inside the American Legion Hall. *See* **Exhibit I**, p. 52, ln. 11-16; *see also* **Exhibit E**, p. 1065, ln. 5-6.

> **Response: Undisputed**.

105.     After the shooting, the police arrived at the American Legion Hall. *See* **Exhibit E**, p. 1065, ln. 19-24. While inside the American Legion Hall, the police "were asking anyone did they see anything, you know, did [anyone] hear anything. No one knew nothing." *See* **Exhibit E**, p. 1066, ln. 2-4.

> **Response: Undisputed that Witherspoon testified as such.**

106.     Witherspoon got up and told the police that she was the only person with Jason. *See* **Exhibit E**, p. 1066, ln. 6-7.

> **Response: Undisputed that Witherspoon testified as such.** However, while Ms. Witherspoon was standing up and talking to the officers, Freeport and Nassau County officers were searching house to house with Montes and Larrea "canvassing" for the shooter. *See* Freeport PD Incident Report, annexed to the Harvis Decl. as Ex. 24, County976-980; Anania Memo and Notes, Harvis Decl., Ex. 2, County2844-2845, 2849-2850.

107.     Witherspoon did not go back outside the party until the police showed up. *See* **Exhibit I**, p. 52, ln. 21-24. When Witherspoon walked back outside, she saw Jason lying in the street in close proximity to Blimpies. *See* **Exhibit I**, p. 52, ln. 25 – p. 53, ln. 10.

> **Response: Undisputed**. However, this is not a material fact.

108.     Witherspoon spoke with multiple police officers early that morning. *See* **Exhibit E**, p. 1097.  On March 20, 1994, Witherspoon spoke with FPD Officer Barry McGovern ("P.O. McGovern") and signed a written statement about Jason's shooting. *See* Witherspoon Written Statement to P.O. McGovern (**Exhibit S**); *see also* P.O. McGovern EBT Transcript (**Exhibit UUUU**), p. 30, ln. 4 – p. 32, ln. 16.  Later that morning, Witherspoon spoke with NCPD First Squad Detective William Tweedie ("Det. Tweedie") and signed a written statement about Jason's shooting. *See* Witherspoon Written Statement to Det. Tweedie (**Exhibit T**).

> **Response: Disputed in part**. Witherspoon, who was traumatized, observed a perpetrator who was 5'6", the same height as Peddie Jenkins, and wearing a hood over his head pointing a gun at her with her only able to observe the lips of the person. *See* Anania Memo and Notes, Harvis Decl., Ex. 2, County2844, 2849-2850; Trial Tr., Harvis Decl., Ex. 113, 1116:16-1118:3; Dysart Report, Harvis Decl., Ex. 21, pp. 11-12.

109.     On December 20, 1994, NCPD Detectives met with Witherspoon to continue the investigation into the shooting of Jason. *See* Pre-Trial Hearing Transcript Volume 2 (**Exhibit G**), p. 153, ln. 3-17.

> **Response: Disputed**. Abbondandelo and Mullen flew to Pennsylvania to obtain an identification from Witherspoon because they were told by the Nassau County District Attorney's office that plaintiff's arrest would not be authorized. Abbondandelo Dep., Harvis Decl., Ex. 6; 416:19-417:6; Abbondandelo II, Harvis Dep., Ex. 65, 14:16-24.

110.     NCPD Detective Jerl Mullen ("Det. Mullen") and Det. Abbondandelo flew to Pittsburgh, Pennsylvania to meet with Witherspoon. *See* **Exhibit G**, p. 154, ln. 13-24; *see also* **Exhibit L**, p. 417, ln. 8-18.

Response: Undisputed.

111.     The purpose of meeting with Witherspoon was to show her a photo array containing six (6) pictures of people, one of them being plaintiff. *See* **Exhibit G**, p. 153, ln. 18-23.

Response: Undisputed.

112.     Det. Abbondandelo had arranged for two separate photo arrays to be prepared that were to be shown to Witherspoon – the first photo array was six black

and white photographs of individuals with caps on their heads, and the second photo array was six color photographs of individuals without caps on their heads. *See* **Exhibit G**, p. 157, ln. 20 – p. 158, ln. 3, p. 204, ln. 14 – p. 205, ln. 4.

> **Response: Disputed in part**. The photo arrays were biased and conducted nonblind, and the officers were not operating in good faith – defendants had coerced plaintiff's false confession and suppressed the existence of the Montes and Larrea statements, the 911 call and Elisa Valdez and her boyfriend. *See* Dysart Report, Harvis Decl., Ex. 21, p. 14; Anania Memo and Notes, Harvis Decl., Ex. 2, County2850 (Witherspoon described the man with the gun as wearing a hood over his head and seeing only the lower part of his face and lips).

113.     A photograph of the plaintiff was included in each of these two photo arrays in position number "1." *See* **Exhibit G**, p. 158, ln. 4-9.

> **Response: Disputed in part.** The photo arrays were biased and conducted in a nonblind fashion, and the officers were not operating in good faith. *See* Dysart Report, Harvis Decl., Ex. 21, p. 14; *see also* Photo Array annexed to the Harvis Decl. as Ex. 25; Lineup Photos annexed to the Harvis Decl. as Ex. 16.

114.     These two photo arrays consisted of photographs of six (6) black males. *See* **Exhibit G**, p. 158, ln. 10-12.

> **Response: Disputed in part.** The photo array was biased and the officers were not operating in good faith. *See* Response ##112-113 *supra*.

115.     The photographs of the six (6) individuals in the black and white photo array were the same six (6) individuals included in the color photo array, and each individual was in the same position in both photo arrays. *See* **Exhibit G**, p. 158, ln. 13-20.

> **Response: Disputed in part.** The photo array was biased and the officers were not operating in good faith. *See* Response ##112-113 *supra*.

116.     Det. Mullen and Det. Abbondandelo met with Witherspoon at approximately 5:15 p.m. on December 20, 1994. *See* **Exhibit G**, p. 155, ln. 22-24. There were no other police officers present during this meeting with Witherspoon. *See* **Exhibit G**, p. 155, ln. 25 – p. 156, ln. 8.

> **Response: Disputed in part.** The photo array was biased and the officers were not operating in good faith. *See* Response ##112-113 *supra*.

117.     Det. Mullen placed the photo arrays on the table and told Witherspoon "I'm going to show you 12 photographs. One is black and white and one is color. But the six (6) pictures are the same. So just take a look at both sets and let me know if you recognize anyone in the photographs…. I want you to see if you recognize the person that shot Jason." *See* **Exhibit G**, p. 156, ln. 22 – p. 157, ln. 16, p. 159, ln. 7-13; *see also* **Exhibit L**, p. 418, ln. 7-15; *see also* Det. Abbondandelo EBT Transcript from February 14, 2022 (**Exhibit M**), p. 27, ln. 25 – p. 28, ln. 7.

> **Response: Disputed in part.** The photo array was biased and the officers were not operating in good faith. *See* Response ##112-113 *supra*.

118.     Neither Det. Mullen nor Det. Abbondandelo told Witherspoon that the individual who shot Jason would be in the photo array. *See* **Exhibit G**, p. 157, ln. 8-10; *see also* **Exhibit M**, p. 28, ln. 8-12.

> **Response: Disputed.** In creating a biased array, defendants effectively told Witherspoon who to select. They also withheld from Witherspoon that the suspect whose lips she was viewing was at least five inches taller than the man she saw. *See* Response ##112-113 *supra*.

119.     Witherspoon reviewed these photo arrays and identified plaintiff's photograph in position #1 as the man who pointed the gun at Jason. *See* **Exhibit G**, p. 159, ln. 25 – p. 160, ln. 4; *see also* **Exhibit L**, p. 418, ln. 16-21.

> **Response: Disputed.** The photo array was biased against plaintiff and was not administered correctly or in good faith. *See* Dysart Report, Harvis Decl., Ex. 21, pp. 14, 16-20; *see also* Anania Memo and Notes, Harvis Decl., Ex. 2, County2850 (noting that Witherspoon believed the man with the gun had a hood over his head, and that she saw the lower part of his face and his lips).

120.     Witherspoon did not have any doubt when she selected plaintiff's photograph from the photo arrays. *See* **Exhibit M**, p. 30, ln. 25 – p. 31, ln. 7.

> **Response: Disputed.** The officers did not record Witherspoon's level of confidence. The photo array was biased and the officers were not operating in good faith. *See* Dysart Report, Harvis Decl., Ex. 21, pp. 17-22.

121.     Witherspoon signed the back side of each of the photo arrays, and also signed a written statement regarding these photo arrays. *See* **Exhibit G**, p. 160, ln. 14 – p. 163, ln. 8; *see also* Black and White Photo Array presented to Witherspoon on December 20, 1994 (**Exhibit U**); *see also* Color Photo Array presented to Witherspoon on December 20, 1994 (**Exhibit V**); *see also* Witherspoon's December 20, 1994 Written Statement regarding photo arrays (**Exhibit W**); *see also* **Exhibit L**, p. 419, ln. 1-10.

> **Response: Disputed in part.** The photo array was biased and the officers were not operating in good faith. *See* Dysart Report, Harvis Decl., Ex. 21, pp. 17-22.

122.    On March 20, 1994, at approximately 1:45 a.m., Martha Campbell ("Campbell") was walking to the party at the American Legion Hall on Sunrise Highway in Freeport. *See* Campbell Supporting Deposition and Det. Swenson's Notes of Conversation with Campbell (**Exhibit X**).

> **Response: Undisputed.**

123.    When Campbell arrived to the Guy Lombardo Avenue entrance of the Blimpies parking lot, she saw a "lite colored" car back up to the wall of Blimpies which was closed. *See* **Exhibit X**, p. 2-3.

> **Response: Undisputed.**

124.    While Campbell was walking, she heard several gun shots, then saw a male black run from the street, get into the passenger side of this "lite-colored" car, and then saw this car drive southbound on Guy Lombardo Avenue with the lights off. *See* **Exhibit X**, p. 2-3.

> **Response: Disputed in part**. However, at the same time as this was happening the shooter was being chased in the opposite direction by Montes and Larrea, as witnessed by Elisa Valdez and her boyfriend. *See* Anania Memo and Notes, Harvis Decl., Ex. 2, County2844, 2845, 2850-2851; *see also* Defendant Swenson's note regarding Elisa Valdez, annexed to Harvis Decl. as Ex. 26 ("Valdez note"), County6353.

125.     Campbell then saw Jason laying in the street and shaking. *See* **Exhibit X**, p. 2.

> **Response: Undisputed.**

126.     After the police arrived, Campbell spoke with FPD Detective Arthur Zimmer and signed a written statement about what she witnessed. *See* **Exhibit X**, p. 2.

**Response: Undisputed.**

127.     Campbell told Det. Abbondandelo that "she was walking towards the American Legion when she heard several shots. She looked up and immediately saw two fellas running to a car that was in the Blimpies parking lot and exit the parking lot and head southbound on Guy Lombardo [Avenue]." *See* **Exhibit L**, p. 59, ln. 18 – p. 60, ln. 10.

**Response: Undisputed.**

128.     Det. Swenson and Det. Herts spoke with Campbell and went with her to trace her route from her house to Blimpies. *See* **Exhibit Y**, p. 69, ln. 20 – p. 70, ln. 2; *see also* **Exhibit AA**, p. 37, ln. 10-19.

**Response: Undisputed.**

129.     Campbell told Det. Swenson she thought she heard what sounded like fireworks. *See* **Exhibit AA**, p. 39, ln. 7-16; *see also* **Exhibit X**, p. 3. Campbell also told Det. Swenson when she looked up, she saw a male black in his twenties get into the passenger side of this "lite-colored" vehicle, and then saw this vehicle drive southbound down Guy Lombardo Avenue with the lights off. *See* **Exhibit AA**, p. 38, ln. 9 – p. 39, ln. 1, p. 40, ln. 1-13; *see also* **Exhibit X**, p. 3.

**Response: Disputed as incomplete**. Campbell reported that the person she saw was 5'8". *See* Campbell Statement, Harvis Decl., Ex. 10.

130.     Det. Swenson created a sketch after speaking with Campbell. *See* **Exhibit AA**, p. 35, ln. 15 – p. 36, ln. 20; *see also* **Exhibit X**, p. 3.

**Response: Undisputed.**

131.     Since Campbell "[heard] shots, [saw a] male black run to a car in lot and go south on Guy Lombardo [Avenue] [and] then [saw] deceased in street [and saw] number '5' on license plate", Det. Herts believed Campbell needed to be reinterviewed. *See* **Exhibit Y**, p. 107, ln. 22 –p. 108, ln. 5, p. 109, ln. 18 – p. 110, ln. 6; *see also* Det. Herts' notes relating to Campbell (**Exhibit BB**), p. 1.

**Response: Undisputed.** This is not a material fact.

132.     On March 20, 1994, in the early morning, Maurice Larrea ("Larrea") was in the passenger seat of a moving car being driven by Glenn Montes ("Montes") heading eastbound on Sunrise Highway in Freeport when he heard gun shots. *See* Larrea EBT Transcript (**Exhibit CC**), p. 20, ln. 16-24, p. 21, ln. 2-19, p. 23, ln. 14-25, p. 25, ln. 18-21, p. 26, ln. 5-7; *see also* Larrea's Written Statement (**Exhibit DD**); *see also* Montes' Written Statement (**Exhibit EE**); *see also* Google Map of Relevant Locations (**Exhibit QQQQ**) (Marking "2").

> **Response: Disputed in part**. Plaintiff agrees that Montes and Larrea were traveling eastbound on Sunrise Highway when they witnessed the Steven Jason homicide. However, the record suggests that Montes and Larrea initially observed the incident when their vehicle (a gray Volkswagen discussed below) was stopped at the intersection of Sunrise Highway and Guy Lombardo Avenue, and it is undisputed that Montes and Larrea drove directly past the crime scene. *See* Response #100, *supra*; *see also* Abbondandelo Dep. Harvis Decl., Ex. 6, 28:11-13 ("…[Montes and Larrea] were stopped in a vehicle, they were sitting in a vehicle [when they made the observations]"); 42:22-23 ("…[Montes and Larrea] were on Sunrise Highway stopped in a vehicle…"; 47:2-4 ("…[Montes and Larrea] were parked…they were stopped at the traffic light in the car."); 69:17-21. Both Montes and Larrea describe seeing the shooting and the shooter. *See* Anania Memo and Notes, Harvis Decl., Ex. 2, County2844-2845, 2849-2850; Abbondandelo Dep. Harvis Decl., Ex. 6, 32:6-11.

133.     The moving car that Larrea was in was a gray Volkswagen. *See* **Exhibit CC**, p. 128, ln. 10-18; *see also* **Exhibit DD**. When Larrea first heard gun shots, the car he was in was traveling at approximately 30 miles per hour. *See* **Exhibit CC**, p. 114, ln. 12-18.

> **Response: Disputed in part**. Initially, plaintiff objects on the grounds that this compound statement violates the Court's Individual Practice Rule III.G.1. Second, plaintiff does not dispute that Montes and Larrea were in Montes's Volkswagen, however this is not a material fact. Third, Larrea's recollection of the speed and sequence thirty years later (when he had been, at the time, a passenger under the influence of alcohol) is immaterial and contradicted by better evidence suggesting that Montes and Larrea viewed the crime scene carefully as one might expect from a law enforcement officer witnessing a shooting. Montes and Larrea have both described witnessing the shooting and observing the shooter. *See* Anania

Memo and Notes, Harvis Decl., Ex. 2, County2844-2845 (Glen Montes, a witness to the shooting described seeing two black males chasing another black male before he was shot), 2849-2850 (Larrea describes hearing shots and saw a man standing over the body shooting); *see also* Montes Dep., Harvis Decl., Ex. 20, 25:8-28:14; Montes Statement, Harvis Decl., Ex. 19; Larrea Dep., Harvis Decl. Ex. 23, 40:13- 42:13, 47:7-48:6; Anania Memo and Notes, Harvis Decl., Ex. 2, County3161-3162, 3394.

134.    After Larrea heard the gunshots, he looked in the direction of where the shots came from, which was to his right. *See* **Exhibit CC**, p. 27, ln. 4-7, p. 30, ln. 2-9. Montes did not stop the moving vehicle after Larrea heard the gunshots. *See* **Exhibit CC**, p. 140, ln. 19-21.

> **Response: Disputed in part**. Years before providing the deposition testimony cited here, Larrea told prosecutors during the 2017 reinvestigation that "he heard shots and saw a male standing over the body shooting." Anania Memo and Notes, Harvis Decl., Ex. 2, County2849; County3394. This is consistent with Larrea's 1994 written statement, which the parties agree was (like the 911 call) never turned over to prosecutors or plaintiff and which contains exculpatory information from a credible source regarding the manner in which the crime was committed, the description of the shooter and, *inter alia*, the shooter's method and direction of flight. *See* Anania Statement. Larrea statement. Defendants lack a good faith basis to present this assertion as undisputed. *See* Anania Memo and Notes, Harvis Decl., Ex. 2, County3394; *see also* 32B Statement of Maurice Larrea annexed to Harvis Decl. as Ex. 27 ("Larrea Statement"); Deposition of Sheryl Anania, April 12, 2022, annexed to Harvis Decl. as Ex. 28 ("Anania Dep."), 26:17-30:7.

135.    Larrea did not see the shooting and did not see the shooter. *See* **Exhibit CC**, p. 27, ln. 10-13, p. 30, ln. 9-19, p. 116, ln. 5-10, p. 137, ln. 4-5.

> **Response: Disputed**. Larrea "heard shots and saw a male standing over the body shooting;" that male, who Larrea later stopped at gunpoint face-to-face, had a "dark brown face" and had other exonerating characteristics. *See* Anania Memo and Notes, Harvis Decl., Ex. 2, County3394; Larrea Statement, Harvis Decl., Ex. 27; Larrea Dep., Harvis Decl., Ex. 23, 40:13-41:16, 42:4-14, 48:23-50:15, 54:8-13. testimony about them being face to face. Defendants lack a good faith basis to present this assertion as

undisputed.

136.      All Larrea saw was a number of people on the sidewalk in the area where he heard the gun shots, but did not know why people were standing outside. *See* **Exhibit CC**, p. 116, ln. 5- 14, p. 139, ln. 2-11, p. 30, ln. 9-19.

> **Response: Disputed**. Larrea "heard shots and saw a male standing over the body shooting." *See* Anania Memo and Notes, Harvis Decl., Ex. 2, County3394; *see also* Response to #134 *supra*.

137.      Larrea told Montes to pull over to the next payphone, located on Church Street, which was one block away from where the car was when he heard the gun shots. *See* **Exhibit CC**, p. 26, ln. 14, p. 27, ln. 14-17, p. 35, ln. 8-22, p. 140, ln. 22-24; *see also* **Exhibit QQQQ**, (Marking "3").

> **Response: Disputed.** Plaintiff agrees that the payphone Larrea used was approximately one block from the shooting, but disputes that Larrea merely heard gunshots – Larrea told prosecutors during the reinvestigation in 2017 that he saw the shooter standing over Steven Jason shooting. *See* Anania Memo and Notes, Harvis Decl., Ex. 2, County3394.

138.      While at the payphone, Larrea "called I don't know if I called Freeport numbers 378-0700 or I might have just called 911. I don't remember exactly. I just remember saying that there was shooting." *See* **Exhibit CC**, p. 26, ln. 14-24, p. 36, ln. 8-12, p. 117, ln. 18-23.

> **Response: Disputed.** In both his suppressed 1994 written statement and his 2017 statements to prosecutors during the reinvestigation, Larrea described "dialing 911." *See* Larrea Statement, Harvis Decl., Ex. 27, County2874; *see also* Anania Memo and Notes, Harvis Decl., Ex. 2, County3394. In any event, it is immaterial for the purposes of summary judgment which number Larrea dialed, because it is undisputed that defendants suppressed the existence of the call.

139.      Larrea was on the phone reporting this shooting for approximately 30 seconds. *See* **Exhibit CC**, p. 38, ln. 2-4. While on this phone call, no person walked by Larrea. *See* **Exhibit CC**, p. 38, ln. 5-8.

> **Response: Disputed in part.** At his deposition, Larrea testified: "I was still on the phone hanging up going back to the car and then saw someone coming at me." Larrea Dep., Harvis Decl., Ex. 23, 41:11-16.

140.    Larrea believed the person that he was speaking to was with the FPD and not the NCPD. *See* **Exhibit CC**, p. 118, ln. 15-19, p. 119, ln. 8-12, p. 142, ln. 23-25.

> **Response: Undisputed that Larrea testified as such.** However, this is immaterial, and it is undisputed that defendants suppressed the existence of this call. *See* Larrea Statement, Harvis Decl., Ex. 27, County2874; *see also* Anania Memo and Notes, Harvis Decl., Ex. 2, County3394; Larrea Dep., Harvis Decl., Ex. 23, 26:8-24, 115:17-24, 117:18-p. 118:5.

141.    After Larrea hung up the phone and while he was walking back to the car, a black male ran past him on the sidewalk. *See* **Exhibit CC**, p. 41, ln. 3-16, p. 45, ln. 2 – p. 46, ln. 2; p. 119, ln. 13-17; *see also* **Exhibit QQQQ**, (Marking "4").

> **Response: Disputed.** The suppressed 1994 Montes and Larrea statements and their statements to prosecutors in 2017 strongly support the conclusion that both men, who had just witnessed the shooting, believed they were chasing the shooter. *See* Anania Memo and Notes, Harvis Decl., Ex. 2, County2844-2845, 2849-2850, County3161-3162. Indeed, Nassau County argued this position before the state court in 2018 and prevailed. *See* Anania §440.10 Motion, annexed to the Harvis Decl. as Ex. 29 ("440 Motion"), P013-P017; *see also* Order granting §440.10 Motion, dated February 16, 2018, annexed to the Harvis Decl. as Ex. 30 ("Order").

142.    Larrea was unable to see the face of this male and would be unable to identify him. *See* **Exhibit CC**, p. 53, ln. 2-11, p. 164, ln. 11-16.

> **Response: Disputed.** Larrea stopped the shooter at gunpoint and was face-to-face with him – as a law enforcement officer, Larrea thus had ample opportunity to ascertain the shooter's description, including his bearing, build and height, regardless of the extent to which he saw his face. It is also undisputed that Montes saw and described the shooter, including his face, and that various discrepancies exonerate plaintiff. *See* Anania Memo and Notes, Harvis Decl., Ex. 2, County3161-3162, 3394; *see also* Larrea Statement, Harvis Decl., Ex. 27; Larrea Dep., Harvis Decl., Ex. 23, 40:13-41:16, 42:4-14, 48:23-50:15, 54:8-13; Anania Memo and Notes, Harvis Decl., Ex. 2, County2844-2845, 2849-2850.

143.    Other than the fact that this black male was running in a direction that was away from the scene, Larrea had no other reason to think this male was involved in the shooting. *See* **Exhibit CC**, p. 120, ln. 5-8.

> **Response: Disputed.** Maurice Larrea knew the person running was the shooter, which is why he yelled to Glenn Montes "that's him, that's the guy!" See Anania Memo and Notes, Harvis Decl., Ex. 2, County2845.

144.    Larrea then chased this male across Sunrise Highway into the OTB parking lot, but ultimately lost sight of him. *See* **Exhibit CC**, p. 57, ln. 10-15, p. 51, ln. 4-21; *see also* **Exhibit QQQQ**, (Marking "5").

> **Response: Disputed.** Larrea, off duty and intoxicated, pointed his service weapon at the person he thought was the shooter and told him to stop, which the man briefly did. The shooter then ran northbound across Sunrise Highway and escaped. *See* Anania Memo and Notes, Harvis Decl., Ex. 2, County3394; *see also* Larrea Statement, Harvis Decl., Ex. 27.

145.    Larrea pointed out this male that ran across Sunrise Highway into the OTB parking lot, under the train tracks across Brooklyn Avenue and into the rear of the firehouse. *See* **Exhibit EE**; *see also* **Exhibit DD**. Montes drove around to the other side of the firehouse, but ultimately was unable to locate the male that Larrea had chased. *See* **Exhibit EE**.

> **Response: Disputed.** Maurice Larrea yelled to Glenn Montes "that's him, that's the guy!" *See* Anania Memo and Notes, Harvis Decl., Ex. 2, County2845.

146.    Montes was only able to describe the male that he followed that ran into the OTB parking lot, not the shooter, and would most likely have been unable to identify this man. *See* **Exhibit EE**; *see also* Montes EBT Transcript (**Exhibit FF**), p. 67, ln. 4-21.

> **Response: Disputed**. In 2017, Glenn Montes told prosecutors in the Nassau County District Attorney's office conducting an official reinvestigation that he "saw someone run out [of the American Legion], saw the flash of a gun and saw somebody fall. The shooter was standing over the person. The shooter ran across Sunrise Highway and he chased him in his car. The shooter ran behind the firehouse and climbed a fence. Maurice [Larrea] got out and ran after him…**[Glenn Montes] is 100%**

<u>sure that the shooter ran across the highway and climbed over the fence.</u>"
Anania Memo and Notes, Harvis Decl., Ex. 2, County3162 (emphasis added); *see also* Montes Statement, Harvis Decl., Ex. 19.

147.     Larrea and Montes then went back to the location where Larrea heard the gun shots and police were there. *See* **Exhibit CC**, p. 60, ln. 7-12, p. 61, ln. 6-12; *see also* **Exhibit EE**.

   **Response: Disputed in part.** Plaintiff agrees that Montes and Larrea went back to where they had seen the shooting. *See* Anania Memo and Notes, Harvis Decl., Ex. 2.

148.     In 1994, Larrea knew FPD police officer Robert Melendez ("P.O. Melendez"), but was not close with him. *See* **Exhibit CC**, p. 16, ln. 10-16.

   **Response: Undisputed.**

149.     In 1994, P.O. Melendez was not friends with Larrea. *See* P.O. Melendez EBT Transcript (**Exhibit GG**), p. 46, ln. 21 – p. 47, ln. 9.

   **Response: Undisputed.**

150.     P.O. Melendez was the first police officer that Larrea spoke with after the shooting; Larrea first encountered P.O. Melendez in the vicinity of the crime scene and told him what he observed. *See* **Exhibit CC**, p. 14, ln. 25 – p. 15, ln. 4, p. 59, ln. 20 – p. 60, ln. 6, p. 61, ln. 6-22.

   **Response: Undisputed.**

151.     Larrea and P.O. Melendez got into a police car, canvassed the area and returned to the crime scene when they finished canvassing the area. *See* **Exhibit CC**, p. 64, ln. 6 – p. 66, ln. 17, p. 71, ln. 20-23.

   **Response: Undisputed.**

152.     Larrea and Montes then went to the FPD Police Station. *See* **Exhibit CC**, p. 76, ln. 21 – p. 77, ln. 8; *see also* **Exhibit FF**, p. 46, ln. 3-13.

   **Response: Undisputed.**

153.     While at the FPD Police Station, Larrea spoke with Det. Herts and signed a written statement about his recollection of what transpired on the early morning of

March 20, 1994. *See* **Exhibit DD**, *see also* **Exhibit Y**, p. 34, ln. 10-22.

> **Response: Undisputed that Larrea provided a written statement.**

154.    After Larrea signed the written statement, Det. Herts gave Larrea's statement to one of the NCPD Homicide Squad Detectives, and [it was] ultimately given to Det. Abbondandelo. *See* **Exhibit Y**, p. 47, ln. 7-13; p. 172, ln. 11 – p. 173, ln. 2.

> **Response: Plaintiff objects on the grounds that this assertion is unintelligible as phrased.** However, plaintiff does not dispute that Larrea's written statement was given to Abbondandelo.

155.    While at the FPD Police Station, Montes spoke with Det. Holland and signed a written statement about his recollection of what transpired on the early morning of March 20, 1994. *See* **Exhibit EE**; *see also* **Exhibit Z**, p. 25, ln. 5-16.

> **Response: Undisputed that Montes signed a statement.**

156.    When Det. Holland took a witness statement in connection with a homicide, his normal practice was to turn it over to the NCPD Homicide Squad detective in charge of the case; based on this practice, Det. Holland gave Montes' statement to Det. Abbondandelo. *See* **Exhibit Z**, p. 25, ln. 25 – p. 26, ln. 20; *see also* **Exhibit L**, p. 41, ln. 11-20.

> **Response: Undisputed that Holland testified this was his practice and that Abbondandelo took possession of the statement.**

157.    Prior to March 20, 1994, Det. Holland never heard of or met either Montes or Larrea. *See* **Exhibit Z**, p. 51, ln. 14-17.

> **Response: Disputed in part.** When asked if he had ever heard of or met Montes or Larrea, Holland testified: "[d]on't believe I have." However, this is not a material fact.

158.    Prior to March 20, 1994, Det. Herts never heard of or met either Montes or Larrea. *See* **Exhibit Y**, p. 46, ln. 21 – p. 47, ln. 6.

> **Response: Undisputed that Herts testified as such.** However, this is not a material fact.

159.    P.O. McGovern does not know either Montes or Larrea, and did not

go to high school with Larrea. *See* **Exhibit UUUU**, p. 51, ln. 24 – p. 52, ln. 14.

    **Response: Undisputed that McGovern testified as such.** However, this is not a material fact.

160.    Of all of the named defendants, P.O. McGovern only knows Det. Holland, and was not friends with him. *See* **Exhibit UUUU**, p. 64, ln. 5-22.

    **Response: Undisputed that McGovern testified as such.** However, this is not a material fact.

161.    P.O. Melendez wrote the initial FPD Incident Report with respect to Jason's shooting, which was marked as Exhibit 42 at plaintiff's pre-trial suppression hearing and plaintiff's criminal trial (hereinafter "Exhibit 42"). *See* FPD Incident Report written by P.O. Melendez (**Exhibit HH**); *see also* **Exhibit GG**, p. 21, ln. 16-25.

    **Response: Undisputed.**

162.    In Exhibit 42, P.O. Melendez listed Jason as "fatally shot", and included information for Witherspoon, Campbell, Larrea (Party #4) and Montes (Party #5). *See* **Exhibit HH**, p. 1 and 5.

    **Response: Disputed in part.** Plaintiff agrees that Melendez recorded information regarding Montes and Larrea (with names misspelled and information missing) but if the report was produced to plaintiff (an open question) it was in redacted form that obscured the Montes and Larrea information. *See* Deposition of Scott Brettschneider, April 20, 2022, annexed to the Harvis Decl. as Ex. 31 ("Brettschneider Dep."), 61:8-18, 74:12-78; *see also* Walsh Dep., Harvis Decl., Ex. 3, 236:12-14. Critically, none of the facts revealing the exonerating nature of Montes and Larrea's observations was contained in the incident report, nor did it reveal the 911 call. *See* Anania Memo and Notes, Harvis Decl., Ex. 2.



163.        In Exhibit 42, P.O. Melendez wrote down Larrea's name, phone number and that he worked for the New York City Police Department, and wrote down Montes' name, address, and phone number. *See* **Exhibit HH**, p. 5.

**Response: Undisputed**.

164.        In Exhibit 42, P.O. Melendez also wrote a narrative of his involvement, as well as that of Larrea and Montes. *See* **Exhibit HH**, p. 3 and 7.

**Response: Disputed in part.** The Freeport incident report (to the extent it was received by plaintiff's late arriving defense counsel, itself a factual question) did not provide plaintiff with any of the material/exculpatory facts contained in the suppressed Montes and Larrea written statements. Indeed, this was the basis for Nassau County's successful motion in state court to overturn the conviction and dismiss the indictment in 2018. *See* §440 Motion, Harvis Decl., Ex. 29; Anania Dep., Harvis Decl., Ex. 28; *see also* Order, Harvis Decl., Ex. 30; Exoneration Hearing Transcript, February 16, 2018, annexed to the Harvis Decl. as Ex. 66 ("Exoneration

Hearing"); *see also* Brettschneider Dep., Harvis Decl., Ex. 31, 36:13-27:7, 39:21-40:17, 61:8-18, 76:20-24, 77:13-78:3, 74:12-75:5.

165.    In Exhibit 42, P.O. Melendez wrote down that Larrea and Montes gave written statements ("32bs") to detectives. *See* **Exhibit HH**, p. 3.

**Response: Undisputed.**



166.     On March 23, 1994, Det. Swenson had a phone conversation with Elisa Valdez ("Valdez") and wrote notes of this conversation. *See* **Exhibit AA**, p. 65, ln. 8-20; *see also* Det. Swenson's Notes (**Exhibit HHH**), p. 4.

**Response: Undisputed.**

167.     Valdez told Det. Swenson that she was a journalism major, was with her boyfriend on March 20, 1994, was working for Newsday and covering a fire on West Sunrise Highway, left at about 1:50 a.m. to go to the Long Island Rail Road Station, heard gun shots, saw a male, who she could not identify, and saw this male run on foot under the train platform towards the fire department with a gray or white car in pursuit. *See* **Exhibit AA**, p. 65, ln. 16 – p. 66, ln. 13; *see also* **Exhibit HHH**, p. 4; *see also* **Exhibit L**, p. 268, ln. 17-21.

**Response: Undisputed that Valdez reported information along these lines.**

168.     Det. Swenson believed that Valdez and Campbell observed two different people on the early morning of March 20, 1994. *See* **Exhibit AA**, p. 68, ln. 17 – p. 69, ln. 5.

**Response: Undisputed that Swenson testified so testified.** However, this is not material.

169.     Det. Swenson told Det. Abbondandelo about his conversation with Valdez, gave Det. Abbondandelo the notes from his conversation with Valdez, and these notes became part of Det. Abbondandelo's case file. *See* **Exhibit AA**, p. 70, ln. 20 – p. 71, ln. 14, p. 139, ln. 11-16.

**Response: Disputed in part.** According to Abbondandelo, he was never told about Valdez, her boyfriend, the conversation or Swenson's note. Plaintiff agrees that Swenson's note – which was never produced – is a part of Det. Abbondandelo's case file. *See* Abbondandelo Dep., Harvis Decl., 6, 258:11-19; *see* P100. It also undisputed that Swenson's knowledge and notes about Valdez were never disclosed to plaintiff. Rosario List, annexed to the Harvis Decl., as Ex. 63.

170.     On March 23, 1994, Det. Abbondandelo received information that Petey Baldwin ("Baldwin"), Tony Jackson's cousin, may have killed Jason. *See* **Exhibit HHHH**, p. 17.

-41-

**Response: Undisputed.**

171.     On June 6, 1994, FPD Det. Zimmer interviewed Baldwin and audio recorded this interview. *See* Det. Zimmer and Baldwin Audio Recorded Interview (**Exhibit IIII**).

**Response: Undisputed.**

172.     Prior to December 17, 1994, Det. Mullen spoke with Baldwin and wrote notes of his conversation with him. *See* Det. Mullen Notes regarding Baldwin (**Exhibit JJJJ**); *see also* **Exhibit E**, p. 1412, ln. 14-20.

> **Response: Disputed in part**. Plaintiff agrees that Mullen took notes, but there are no notes in the record of Zimmer's call, which was never disclosed. *See* Rosario List, Harvis Del., Ex. 63.

173.     NCDA was scheduled to present Tony Jackson's shooting of Jason to a Nassau County Grand Jury on March 23, 1994. *See* **Exhibit E**, p. 543, ln. 6-10, p. 544, ln. 16-21.

**Response: Undisputed.**

174.     Jason was subpoenaed to testify as a witness in the Grand Jury against Tony Jackson on March 23, 1994. *See* **Exhibit E**, p. 545, ln. 11-15.

**Response: Undisputed.**

175.     Jason never testified against Tony Jackson because he was killed before the scheduled Grand Jury date. *See* **Exhibit E**, p. 545, ln. 16-21.

**Response: Undisputed.**

176.     Throughout the investigation, it was believed that Jason may have been killed in order to prevent him from testifying against Tony Jackson for the December 17, 1993 shooting. *See* **Exhibit L**, p. 134, ln. 14 – p. 136, ln. 3, p. 138, ln. 14-24; *see also* **Exhibit JJ**; *see also* **Exhibit E**, p. 508 – p. 550.

**Response: Undisputed that police adopted a theory along these lines.**

177.     On June 16, 1994, Tony Jackson was shot and killed. *See* **Exhibit F**, p. 177, ln. 15 – p. 178, ln. 4.

**Response: Undisputed**.

178.     In 1994, NCPD Detective Anthony Sorrentino ("Det. Sorrentino") was assigned to the NCPD Narcotics Squad and had been assigned to the Narcotics Bureau for several years. *See* **Exhibit F**, p. 8, ln. 24 – p. 9, ln. 6. *See* Dempsey Dep., Harvis Decl., Ex. 17, 169:2-16, 374:25-375:16; Abbondandelo Dep., Harvis Decl., Ex. 6, 365:4-17.

> **Response: Undisputed that defendant Sorrentino testified as such.** However, this is not material.

179.     In 1994, NCPD Detective Laurette Kemp ("Det. Kemp") was assigned to the NCPD Narcotics Squad and had been assigned to the Narcotics Bureau for several years. *See* Pre-Trial Hearing Transcript Volume 3 (**Exhibit H**), p. 24, ln. 13-19; *see also* Controlled Substance Grand Jury Transcript (**Exhibit J**), p. 10, ln. 24 – p. 11, ln. 7.

> **Response: Undisputed that defendant Kemp testified as such.** However, this is not a material fact.

180.     On August 9, 1994, Det. Sorrentino and Det. Kemp were working. *See* **Exhibit F**, p. 9, ln. 7-9; *see also* **Exhibit H**, p. 24, ln. 20-22.

> **Response: Undisputed that the defendants testified as such.** However, this is not a material fact.

181.     Det. Sorrentino was with Det. Kemp, as well as a confidential informant ("CI"), and were preparing to conduct undercover drug buys throughout Nassau County. *See* **Exhibit F**, p. 9, ln. 19 – p. 10, ln. 6; *see also* **Exhibit J**, p. 11, ln. 8-12. The CI was equipped with a video recording device. *See* **Exhibit F**, p. 10, ln. 18-20.

> **Response: Undisputed that there was testimony to this effect.** However, this is not a material fact. *See* Dempsey Dep, Harvis Decl., Ex. 17, 169:2-16, 374:25-375:16; Abbondandelo  Dep., Harvis Decl., Ex. 6, 365:4-17, 374:25-375:16.

182.     The CI would go out with NCPD detectives and attempt to purchase controlled substances. *See* **Exhibit J**, p. 3, ln. 25 – p. 4, ln. 7.

> **Response: Undisputed that there was testimony to this effect.** However, this is not a material fact. *See* Dempsey Dep., Harvis Decl., Ex.  169:2-

16,17, 374:25-375:16; Abbondandelo Dep., Harvis Decl., Ex. 6, 365:4-17, 374:25-375:16.

183.     On August 9, 1994, at approximately 8:15 p.m., Det. Sorrentino, Det. Kemp and the CI were in the Village of Freeport. *See* **Exhibit F**, p. 11, ln. 2-9; *see also* **Exhibit H**, p. 25, ln. 4-9.

> **Response: Undisputed that there was testimony to this effect.** However, this is not a material fact. *See* Dempsey Dep., Harvis Decl., Ex. 17, 169:2-16, 374:25-375:16; Abbondandelo Dep., Harvis Decl., Ex. 6, 365:4-17, 374:25-375:16.

184.     Det. Kemp, acting undercover, went with the CI to conduct a drug buy. *See* **Exhibit F**, p. 11, ln. 2-7; *see also* **Exhibit H**, p. 26, ln. 2-21. Det. Kemp was with the CI in an unmarked police vehicle. *See* **Exhibit H**, p. 25, ln. 8-12; *see also* **Exhibit J**, p. 12, ln. 13-15.  The CI exited Det. Kemp's vehicle and went around the corner in front of a deli. *See* **Exhibit J**, p. 12, ln. 13-20.

> **Response: Plaintiff objects on the grounds that this is a compound statement in violation of this Honorable Court's Individual Practices.** Plaintiff does not dispute that there was testimony that a "controlled buy" took place in August 1994. However, that fact is immaterial to any issue at summary judgment. *See* Dempsey Dep., Harvis Decl., Ex. 17, 169:2-16, 374:25-375:16; Abbondandelo Dep., Harvis Decl., Ex. 6, 365:4-17, 374:25-375:16.

185.     After the CI went to the deli, the CI came back around the corner with a male black. *See* **Exhibit H**, p. 26, ln. 7-14; *see* **Exhibit J**, p. 12, ln. 18-22.  Det. Kemp saw that this male black was on a bicycle, took out a plastic bag from his sock, reached inside the plastic bag and handed the CI what Det. Kemp believed was illegal drugs. *See* **Exhibit H**, p. 26, ln. 15-18; *see also* **Exhibit J**, p. 12, ln. 22 – p. 13, ln. 9.

> **Response: This is a compound statement containing immaterial facts.** Plaintiff does not dispute that there was testimony that an unrelated drug transaction took place. *See* Dempsey Dep., Harvis Decl., Ex. 17, 169:2-16, 374:25-375:16; Abbondandelo Dep., Harvis Decl., Ex. 6, 365:4-17, 374:25-375:16.

186.     The CI handed this black male twenty dollars ($20) and had a short conversation with this male before meeting back up with Det. Kemp and getting back

into Det. Kemp's vehicle. *See* **Exhibit H**, p. 26, ln. 15-21; *see also* **Exhibit J**, p. 8, ln. 8-14.   The CI then gave Det. Kemp two yellow bags containing a white rock-like substance that Det. Kemp believed to be crack- cocaine. *See* **Exhibit J**, p. 8, ln. 11-14.

> **Response: Undisputed that there was testimony to this effect.** However, this is not a material fact. *See* Dempsey Dep., Harvis Decl., Ex. 17, 169:2-16, 374:25-375:16; Abbondandelo Dep., Harvis Decl., Ex. 6, 365:4-17, 374:25-375:16.

187.      On August 9, 1994, at approximately 8:35 p.m., Det. Sorrentino met with Det. Kemp, and Det. Kemp handed Det. Sorrentino two yellow zip-lock bags each containing a rock- type substance which Det. Sorrentino believed to be crack. *See* **Exhibit F**, p. 12, ln. 8-16.

> **Response: Undisputed that there was testimony to this effect.** However, this is not a material fact. *See* Dempsey Dep., Harvis Decl., Ex. 17, 169:2-16, 374:25-375:16; Abbondandelo Dep., Harvis Decl., Ex. 6 365:4-17, 374:25-375:16.

188.      The substance contained in the two Ziploc bags that the CI received were subsequently tested, with results coming back that the substance was positive for cocaine. *See* **Exhibit J**, p. 13, ln. 10 – p. 14, ln. 6.

> **Response: Undisputed that there was testimony to this effect.** However, this is not a material fact. *See* Dempsey Dep., Harvis Decl., Ex. 17, 169:2-16, 374:25-375:16; Abbondandelo Dep., Harvis Decl., Ex. 6, 365:4-17, 374:25-375:16.

189.      Det. Sorrentino then took the video tape out of the recording device that the CI was equipped with and reviewed the video tape. *See* **Exhibit F**, p. 12, ln. 19-24.

> **Response: Undisputed that there was testimony to this effect.** However, this is not a material fact. *See* Id.

190.      This video depicted a man on a bicycle reach into his right sock, grab a large bag, provide smaller bags to the CI, and then take off on his bicycle. *See* **Exhibit F**, p. 13, ln. 23 – p. 14, ln. 4.

> **Response: Disputed in part**. Plaintiff agrees that the video, which has never been produced in discovery and is not part of the record, suggested a drug transaction had occurred, but disputes that the video was of

sufficient quality to have evidentiary value. *See* Dempsey Dep., Harvis Decl., Ex. 17, 169:2-16, 374:25-375:16; Abbondandelo Dep., Harvis Decl., Ex. 6, 374:25-375:16; *see also* Pre-Trial Hearing Testimony (1995), annexed to Harvis Decl., as Ex. 32 ("Pre-Tr. Hr. 1995"), 35:24-36:12.

191.     In late August of 1994, FPD Detective Edward Haggerty ("Det. Haggerty") met with Det. Sorrentino and viewed a video that captured this drug transaction. *See* **Exhibit F**, p. 78, ln. 2 – p. 79, ln. 7. Det. Haggerty believed that the plaintiff was depicted on the video during this drug transaction. *See* **Exhibit F**, p. 79, ln. 3-7.

> **Response: Disputed in part**. This is misleading as it suggests there was more than one video of the unrelated drug transaction. There was only one, extremely low-quality video that is not contained in the record. Plaintiff also objects that this is a compound statement. Plaintiff does not dispute that Haggerty viewed the video or that he testified that he believed it depicted plaintiff. However, this is not a material fact. *See* Dempsey Dep., Harvis Decl., Ex. 17, 169:2-16, 374:25-375:16; Abbondandelo Dep., Harvis Decl., Ex. 6, 365:4-17, 374:25-375:16; *see also* Pre-Tr. Hr. 1995, Harvis Decl., Ex. 32, 148:3-7 (Abbondandelo was told by Detective Sorrentino that the quality of the video "wasn't the best.")

192.     Prior to viewing this video in late August of 1994, Det. Haggerty knew plaintiff, had previously spoken with plaintiff and had come into contact with plaintiff about a dozen times. *See* **Exhibit F**, p. 79, ln. 8-16.

> **Response: Undisputed that Haggerty testified as such.** However, this is not a material fact. *See* Dempsey Dep., Harvis Decl., Ex. 17, 169:2-16, 374:25-375:16; Abbondandelo Dep., Harvis Decl., 6, 365:4-17, 374:25-375:16.

193.     Det. Haggerty informed Det. Sorrentino that plaintiff was depicted on this video. *See* **Exhibit F**, p. 80, ln. 2-5, p. 15, ln. 12-15.

> **Response: Disputed.** The officers testified that Haggerty believed it to be plaintiff, consistent with the graininess and low quality of the video. This is also not a material fact. *See* Dempsey Dep., Harvis Decl., Ex. 17, 169:2-16, 374:25-375:16; Abbondandelo Dep., Harvis Decl., 6, 365:4-17, 374:25-375:16.

194.     On August 26, 1994, a bench warrant was issued for plaintiff to appear under Nassau County First District Court Docket No. 08864/1992, where plaintiff was originally charged with New York State Penal Law sections 120.00 (Assault in the Third Degree) and 240.25 (Harassment in the First Degree), and was ultimately convicted of New York State ("NYS") Penal Law section 240.26 (Harassment in the Second Degree). *See* Plaintiff's Bench Warrant (**Exhibit NN**).

> Response: **Disputed in part.** This warrant commanded defendants to "bring" plaintiff "before [the issuing court] without unnecessary delay" and defendants, acting extrajudicially, failed to comply with that command. *See* Dempsey Dep., Harvis Decl., Ex. 17, 169:2-16, 374:25-375:16; Abbondandelo Dep., Harvis Decl., Ex. 6, 365:4-17.

195.     On October 29, 1994, an arrest warrant was issued for plaintiff to appear under Nassau County First District Court Docket No. 31032/1994, where the plaintiff was to appear for an arraignment on criminal charges for NYS Penal Law sections 221.05 (Unlawful Possession of Marijuana in the Second Degree) and 100.00 (Criminal Solicitation in the Fifth Degree). *See* Plaintiff's Arrest Warrant (**Exhibit OO**).

**Response: Plaintiff does not dispute that there was a warrant.**

196.     Prior to December 17, 1994, between the ages of 17 and 24, plaintiff had been arrested ten (10) times in Nassau County alone and pled guilty to numerous crimes. *See* Plaintiff's NCPD Local Criminal Record (**Exhibit CCCCC**); *see also* **Exhibit H**, p. 93, ln. 5 – p. 105, ln. 11.

> **Response: Disputed.** Neither of the cited exhibits support this assertion. The arrest record at defendants' Exhibit CCCCC, which does not indicate convictions and is not certified, appears to list multiple arrests for the same acts and juvenile arrests from decades ago, none of which are material or admissible. Plaintiff's cited testimony at the hearings was also unfairly elicited on cross-examination in what the prosecution admitted was impermissible impeachment. *See* Pre-Trial Hearing Testimony (1996) annexed to the Harvis Decl., as Ex. 33 ("Pre-Tr. Hr. 1996"), 214:23-216:23.

197.     In November of 1994, after plaintiff became a suspect in Jason's murder, Det. Abbondandelo became aware that plaintiff had several outstanding warrants. *See* **Exhibit F**, p. 167, ln. 9 – p. 168, ln. 4.

**Response: Disputed.** Plaintiff was already a suspect by the time Peddie Jenkins was taken into custody on November 15, 1994 – indeed, plaintiff's picture was hanging in the stationhouse. *See* Jenkins Dep., Harvis Decl., Ex. 4, 45:24-46:11, 47:11-22, 48:18-49:16, 51:15-20, 70:9-21, Abbondandelo Dep., Harvis Decl., Ex. 6, 345:9-20. Additionally, the defendants viewed the warrants as mere pretext to take plaintiff into custody at the homicide squad. Dempsey Dep., Harvis Dec., Ex. 17, 169:2-16, 374:25-375:16.

198.     On December 17, 1994, an anonymous phone call was received indicating that the plaintiff was standing on a corner in the Village of Freeport. *See* **Exhibit F**, p. 82, ln. 6-11.

**Response: Undisputed that Haggerty testified as such.** However, this is not a material fact.

199.     Det. Haggerty was informed that plaintiff was standing on a corner in the Village of Freeport on December 17, 1994 at approximately 12:00 p.m. *See* **Exhibit F**, p. 82, ln. 17-19.

**Response: Undisputed that Haggerty testified as such.** However, this is not a material fact.

200.     Det. Haggerty and other FPD officers went to Graffing Place and East Dean Street in the Village of Freeport. *See* **Exhibit F**, p. 83, ln. 2-14. Det. Haggerty saw plaintiff standing on the corner with two other males. *See* **Exhibit F**, p. 83, ln. 13-16. Plaintiff started to run and Det. Haggerty ran after plaintiff. *See* **Exhibit F**, p. 83, ln. 17-19. Det. Haggerty ordered plaintiff to stop, told him to get on the ground and ultimately placed handcuffs on plaintiff. *See* **Exhibit F**, p. 83, ln. 17-24.

**Response: Undisputed that Haggerty testified as such.** However, this is not a material fact. Plaintiff also respectfully objects on the grounds that this is a compound statement that violates this Court's Individual Practices.

201.     Plaintiff was placed in custody on outstanding warrants related to the criminal charges of Assault in the Third Degree, Criminal Solicitation in the Fifth Degree, and Unlawful Possession of Marijuana, arrested for Criminal Sale of a Controlled Substance in violation of NYS Penal Law section 220.39(1), and brought to the NCPD Homicide Squad for questioning. *See* **Exhibit KK**, p. 134, ln. 22 – p. 135,

ln. 14; *see also* **Exhibit NN**; *see also* **Exhibit OO**; *see also* **Exhibit L**, p. 369, ln. 7-9, p. 377, ln. 12; *see also* **Exhibit F**, p. 167, ln. 9-14, p. 169, ln. 7-10, p. 88, ln. 16 – p. 89, ln. 4, p. 91, ln. 2-6; *see also* Plaintiff's 50-H Examination Transcript (County) May 21, 2018 (**Exhibit EEEE**), p. 9, ln. 14-21.

> **Response: Disputed.** Plaintiff was placed in custody so he could be interrogated by the homicide squad about the Steven Jason and Tony Jackson homicides. *See* Dempsey Dep., Harvis Decl., Ex. 17 169:2-16, 374:25-375:16; Abbondandelo Dep., Harvis Decl., Ex. 6, 365:4-17.

202.      On December 17, 1994, plaintiff was transported by FPD police officers and arrived at the NCPD Homicide Squad at approximately 1:30 p.m. *See* NCPD Homicide Squad Blotters from December 17, 1994 through December 20, 1994 (**Exhibit PP**), p. 1.

> **Response: Undisputed.**

203.      With respect to the August 9, 1994 drug sale, the case was presented to the Nassau County Grand Jury and plaintiff was indicted for the following crimes related to the drug sale: 1) NYS Penal Law section 220.39(1) – Criminal Sale of a Controlled Substance in the Third Degree; and 2) NYS Penal Law section 220.16(1) – Criminal Possession of a Controlled Substance in the Third Degree. *See* Nassau County Indictment No. 91134/1995 (**Exhibit QQ**); *see also* **Exhibit J**.

> **Response: Disputed in part.** Plaintiff agrees that he was indicted on a drug sale charge approximately four months after his arrest on December 17, 1994, but notes that, on August 12, 1996, Judge Boklan ruled that the photo pack shown to the CI while plaintiff was in custody was unduly suggestive, noting that plaintiff was the only individual in a group of twenty with "curls or dreadlocks." *See* Decision by the Honorable Abbey Boklan dated August 12, 1996, annexed to the Harvis Decl. as Ex. 34 ("Order Denying Suppression"), County262; *see also* Pre-Tr. Hr. 1995, Harvis Decl., Ex. 32, 278:14-25.

204.      With respect to the August 9, 1994 drug sale, on January 22, 1997 Plaintiff pled guilty under Nassau County Indictment No. 91134/1995 to Criminal Sale of a Controlled Substance in the Fifth Degree pursuant to NYS Penal Law section 220.31, and on February 27, 1997, was sentenced as a Persistent Felony Offender to an indeterminate term of imprisonment of two (2) to four (4) years. *See* **Exhibit B**, p. 53, ln. 7-22; *see also* Plaintiff's Certificate of Conviction under Indictment No. 91134/1995

(**Exhibit BBBB**).

> **Response: Undisputed.** However, this is immaterial to the homicide charges defendants brought against plaintiff for murdering Steven Jason.

205.     Plaintiff's first interaction with both Det. Dempsey and Det. Abbondandelo was on December 17, 1994. *See* Det. Dempsey EBT Transcript (**Exhibit VV**), p. 163, ln. 20-22; *see also* **Exhibit F**, p. 200, ln. 23 – p. 201, ln. 2.

> **Response: Undisputed.**

206.     Between December 17, 1994 and December 19, 1994, Det. Dempsey transcribed notes of his interaction with plaintiff. *See* **Exhibit VV**, p. 174, ln. 17 – p. 175, ln. 14; *see* Det. Dempsey's Notes from December 17, 1994 through December 19, 1994 (**Exhibit WW**).

> **Response: Disputed.** Dempsey's notes of plaintiff's interrogation contain an approximately thirty-hour gap before plaintiff is alleged to have "confessed" and signed the statement written by Dempsey. Dempsey Dep., Harvis Decl., Ex. 17, 199:12-25, 241:11-15; *see* Dempsey notes , December 1994, annexed to the Harvis Decl. as Ex. 35 ("Dempsey December Notes"), County4836-4858; *see also* Jackson Dep., Harvis Decl., Ex. 1, 122:10-123:15 (describing what plaintiff's says occurred during the interrogation period).

207.     On December 17, 1994, shortly after Plaintiff's 1:30 p.m. arrival at the NCPD Homicide Squad, Plaintiff was advised of his *Miranda* rights and signed a *Miranda* rights card. *See Miranda* Rights Card signed by Plaintiff (**Exhibit CCCC**); *see also* **Exhibit H**, p. 51, ln. 2-6, p. 123, ln. 15-18; *see* **Exhibit F**, p. 119, ln. 13-23, p. 131, ln. 2 – p. 124, ln. 22; *see also* **Exhibit B**, p. 116, ln. 6-14.

> **Response: Disputed.** Plaintiff was questioned without Miranda warnings. Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 50:19-25, 51:20-52:12; *see* Jackson Dep., Harvis Decl., Ex. 1, 122:10-123:15 ("…Officer Dempsey slapped me around, beat on me, screamed in my face, starved me, antagonized me, and had other officers come through there and join in the fun. I was sleep deprived. I didn't get nothing to eat. I couldn't use the bathroom. I was already injured from previously being shot in the stomach. He was punching me in my stomach. Beating on my legs. Slapping me in my face, like I was a child. Making me say things that I

did not have nothing to do with whatsoever, and he knew it…"); *see also* Nassau County §50-h hearing transcript, annexed to the Harvis Decl. as Ex. 100, p. 17, ln. 11-18 ("I believe after the confession was signed, that I had to sign a fingerprint card or something. I am not sure."); *see also* Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 70:2-10 ("…I asked Detective Dempsey on several occasions…could I speak to a lawyer…But he told me he didn't give a fuck. He was running the show; if I did what he said to do, or I was going to get fucked, either way."); Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 61:19-62:3 ("Every few minutes…I would ask the same questions…Can I talk to my lawyer. What am I being held for. I didn't do nothing…"); Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 51:2-12 (describing circumstances of signing *Miranda* card). Plaintiff agrees that his signature appears on the Miranda card.

208.    Per Plaintiff, when Plaintiff signed the *Miranda* rights card, other police officers were present but he does not recall exactly which officers were present. *See* **Exhibit B**, p. 117, ln. 3-8.

**Response: Undisputed.** This is not a material fact.

209.    Plaintiff previously signed a *Miranda* rights card on April 4, 1990 with respect to an unrelated Assault. *See* April 4, 1990 *Miranda* Rights Card signed by Plaintiff (**Exhibit BBBBB**); *see also* **Exhibit B**, p. 94, ln. 14 – p. 96, ln. 17; *see also* **Exhibit H**, p. 131, ln. 6 – p. 133, ln. 23.

**Response: Undisputed.** However, this is not a material fact.

210.    On December 17, 1994, Det. Kosior was assigned to the NCPD Scientific Investigation Bureau, specifically the Polygraph Section, as a polygraphist. *See* **Exhibit H**, p. 227, ln. 24 – p. 228, ln. 11.

**Response: Undisputed.**

211.    On December 17, 1994, Det. Kosior was called to administer a polygraph examination and arrived to the Polygraph Section of the NCPD at approximately 5:45 p.m. *See* **Exhibit H**, p. 228, ln. 12-23.

**Response: Undisputed.**

212.    On December 17, 1994, at approximately 7:39 p.m., Det. Kosior completed drafting his test questions and was ready to have plaintiff come to the NCPD

Polygraph Section to administer the test. *See* **Exhibit H**, p. 233, ln. 3-12; *see also* Det. Kosier's Notes of Plaintiff's Polygraph Examination (**Exhibit XXXX**).

> **Response: Disputed in part.** Kosier's process that evening was irregular, because none of the detectives provided the Polygraph Section with an official Polygraph Examination Worksheet for the Steven Jason homicide and therefore Kosior had to learn the case facts from the detectives. *See* Deposition of Anthony Kosior, November 16, 2021, annexed to the Harvis Decl. as Ex. 36 ("Kosior Dep."), 35:16-25, 59:6-62:8, 62:20-63:4, 122:13-123:21, 163:19-25; *see also* NCPD Polygraph Examination Procedures, annexed to the Harvis Decl. as Ex. 37 ("Polygraph Procedures"), County7834-7836.

213.     On December 17, 1994, Det. Dempsey, Det. Abbondandelo and Det. Mullen brought plaintiff to the NCPD Polygraph Section. *See* **Exhibit F**, p. 136, ln. 7-9. After plaintiff was brought to the NCPD Polygraph Section, he was left with Det. Kosior, signed a polygraph consent form and consented to take a polygraph test; plaintiff's polygraph examination began at 7:58 p.m. *See* Plaintiff's Consent to Polygraph Examination (**Exhibit KKKK**); *see also* **Exhibit B**, p. 110, ln. 21 – p. 111, ln. 15; *see also* Det. Kosior EBT Transcript (**Exhibit PPP**), p. 127, ln. 14 – p. 129, ln. 2; *see also* **Exhibit H**, p. 233, ln. 9 – p. 234, ln. 6; *see also* **Exhibit F**, p. 136, ln. 18 – p. 137, ln. 16.

> **Response: Disputed.** Detectives told plaintiff that the only way to prove he wasn't lying was to take a lie detector test. "If I was to take the test and pass, they would let me go home. Moosey had already alerted me he took the test and they let him go. I figured if I did the same thing, there wouldn't be any problem. If I could prove my innocence by taking the lie detector test, and I didn't do anything wrong, they would let me go." Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 55:20-56:8. The consent form plaintiff signed stated: "…the results of this polygraph exam will not be used as evidence in court." Executed Polygraph Consent Form annexed to the Harvis Decl. as Ex. 38 ("Polygraph Consent Form"), County1072; *see* Kosior Dep., Harvis Decl., Ex. 36, 211:15-23; Dempsey Dep., Harvis Decl., Ex. 17, 212:3-9. Yet, during the hearings in plaintiff's criminal case the results of plaintiff's examination were entered as evidence in court repeatedly. Plaintiff's Polygraph Examination Card, annexed to the Harvis Decl., as Ex. 39 ("Plaintiff's Polygraph Exam Card"), County799 (reflecting that plaintiff's polygraph results were admitted as Hearing

Exhibit 17); Pre-Tr. Hr. 1995, Harvis Decl., 32, 138:22-140:4; Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 235:18-25; *see also* Order Denying Suppression, Harvis Decl., Ex. 34, p. 5.

Plaintiff also respectfully objects on the grounds that this is a compound statement in violation of the Court's Individual Practices.

214.     On December 17, 1994, Det. Kosior interviewed plaintiff which started at 8:12 p.m. and ended at 8:23 p.m. *See* **Exhibit PPP**, p. 113, ln. 16 – p. 114, ln. 4.

**Response: Disputed in part.** Before commencing the examination, defendant Kosior learned – and ignored – that plaintiff had not eaten or slept for an extended period and was recovering from gunshot wound injuries, which would prohibit examination under governing protocols or at least result in a qualified opinion. Kosior Dep., Harvis Decl., Ex. 36, 37:9-39:8; 56:13-57:9, 92:16-97:6, 104:14-108:18; 166:18-167:11, 284:5-285:21. Prior to the polygraph examination, plaintiff was strip searched and then only permitted to wear his shorts, t-shirt and socks for the hours-long procedure in a freezing late December office next to an air conditioner. *See* Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 58:3-60:25. Plaintiff agrees that an examination took place.

215.     On December 17, 1994, at approximately 10:38 p.m., plaintiff's polygraph examination was completed. *See* **Exhibit H**, p. 234, ln. 13-21.

**Response: Disputed in part.** Kosior intentionally elicited false information from plaintiff during the polygraph examination that was recorded in official documentation and later used by ADA Mike Walsh to impeach plaintiff's credibility during the hearings under false pretenses. Kosior Dep., Harvis Decl., Ex. 36, 114:17-117:15, 154:5-155:8, 217:15-24, 177:16-178:9; 181:15-182:4, 187:12-20; *see* NCPD Polygraph Examination Question Sheet, annexed to the Harvis Decl., as Ex. 40 ("Polygraph Question Sheet"), Polygraph Question Sheet, Harvis Decl., Ex. 40, County1070; Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 91:13-109:4, 214:3-219:20; Walsh Dep., Harvis Decl., Ex. 3, 45:8-21. Plaintiff agrees that the polygraph examination ended in the evening.

216.     The results from plaintiff's polygraph test were that he was not being truthful in denying responsibility for Jason's death. *See* Plaintiff's Polygraph Test Results (**Exhibit QQQ**).

**Response: Disputed.** Plaintiff disputes the validity of the polygraph procedure and maintains that he was truthful with the examiner. *See* Kosior Dep., Harvis Decl., Ex. 36, 114:17-117:15; 154:5-155:8; 217:15-24, 177:16-178:9; 181:15-182:4, 187:12-20, 182:5-186:23, Walsh Dep., Harvis Decl., Ex. 3, 45:8-21-46:12; Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 58:3-60:23; False Confession Expert Report by Dr. Hayley Cleary, annexed to the Harvis Decl., as Ex. 41 ("Cleary Expert Report"), p. 11.

217.     On December 17, 1994, between 7:58 p.m. and 10:38 p.m., no other NCPD Detective was in the polygraph examination room with Det. Kosior and the plaintiff. *See* **Exhibit H**, p. 234, ln. 5-25; *see also* **Exhibit F**, p. 136, ln. 18 – p. 138, ln. 2.

**Response: Disputed.** Mullen and Abbondandelo were in an adjacent room watching plaintiff. Kosior Dep., Harvis Decl., Ex. 36, 102:6-12; 150:9-151:12; Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 58:3-60:23.

218.     On December 17, 1994, at approximately 10:45 p.m., after the polygraph examination was completed, Det. Dempsey and Det. Abbondandelo escorted plaintiff from the NCPD Polygraph Section back to the NCPD Homicide Squad. *See* **Exhibit WW**, p. 8; *see also* **Exhibit F**, p. 138, ln. 3-6.

**Response: Plaintiff agrees that he was taken back to the homicide squad.**

219.     On the morning of December 18, 1994, at approximately 7:30 a.m., Det. Mullen was at the NCPD Homicide Squad, walked into the room where plaintiff was in, and spoke with plaintiff. *See* **Exhibit E**, p. 1346, ln. 20 – p. 1353, ln. 23.  Plaintiff told Det. Mullen that he worked for MCS Security. *See* **Exhibit E**, p. 1349, ln. 19-23; *see also* **Exhibit B**, p. 29, ln. 22 – p. 30, ln. 5.

**Response: Disputed.** Plaintiff told the detectives within five minutes of his arrival at the homicide squad that he worked at MCS security. Handwritten MCS notes, annexed to the Harvis Decl., as Ex. 42, County5320. Defendants also already knew plaintiff was employed by MCS as of at least June 7, 1994 through their investigation. *See* Lease Application, annexed to the Harvis Decl., as 43, County5326.

220.     On the morning of December 18, 1994 (a Sunday), Det. Abbondandelo called the Nassau County District Court police liaison office, and learned that plaintiff was unable to be arraigned on the outstanding warrants on December 18, 1994. *See*

**Exhibit F**, p. 169, ln. 14 – p. 170, ln. 10.

> **Response: Disputed.** The warrants were a pretext. Dempsey Dep., Harvis Decl., Ex. 17, 169:2-16, 374:25-375:16.

221.     On December 18, 1994, at approximately 6:45 p.m., plaintiff was read his *Miranda* rights again, and at approximately 6:50 p.m., plaintiff admitted that he shot Jason. *See* **Exhibit WW**, p. 12; *see also* **Exhibit F**, p. 327, ln. 5 – p. 328, ln. 20.

> **Response: Disputed**.

> > There was a time when…a stack of papers [was] placed in front of me. They told me they was doing me a favor. To do what they said, or my career was ended. I would never see my children again. Detective Dempsey asked me to sign some papers. I told him I wasn't going to sign anything unless I saw my lawyer. He struck me again…In the face…Abbandandelo was in the room…At that time, I started signing the papers. He flipped—he handed the first one, like, sign here. I signed. Then he flipped it. He said, sign here. I signed. He kept flipping pages, kept telling me to sign. I just signed…It was already signed, with [Dempsey's] signature and Abbondandelo's signature. They left a space in the middle for me to sign.

> Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 72:8-75:17; *id.* at 54:22-55:13, 66:4-19, 67:3-68:4 ("There was a time when I told Dempsey I didn't want to talk. I just was fed up with talking. I said if you are going to arrest me, arrest me. If not, I would like to talk to my family or my lawyer. He said you're not talking to nobody. He slapped me. He was sitting in front of me, beating on my knees, talking loud and aggressive; spitting in my face. If I didn't do what was right, I was surely getting twenty-five to life."), 61:14-63:25 ("Mullen came back in the room and told me I was a son-of-a-bitch. I was a liar. He knew I was lying the whole time. If I told another lie, he would slap my head through the file cabinet."), 64:10-65:5 ("Mullen left out and Dempsey came back in…Dempsey told me I was a piece of shit…He said if you tell me another lie, I'll fuck you up. He slapped me in my face…"); *see* Cleary Expert Report, Harvis Decl., 41, pp. 10-23; *see* Dempsey Dep., Harvis Decl., Ex. 17, 41:14-42:21, 47:17-

25, 43:13-44:17, 52:16-55:13, 66:20-23, 67:3-69:4, 72:17-24, 77:4-11, 77:12-82:20, 82:21-25, 85:9-87:3, 87:4-9 (discussing examples of allegations of coercive interrogation tactics made against Dempsey over decades, none of which were investigated by Nassau County); Shonnard Lee Verdict Sheet, 00 CV 881 (Court Exhibit 9), DE #250 in 06 CV 6695, annexed to the Harvis Decl., as Ex. 44 ("Lee Verdict Sheet"), p. 5 (reflecting civil jury finding that Dempsey "affirmatively misled" Shonnard Lee into signing a false confession); *see* Fed. R. Evid. 608(b)(1). Defendants lack a good faith basis to present this assertion as undisputed.

222.     Subsequently, on December 18, 1994, Det. Dempsey wrote out a written statement while speaking with plaintiff. *See* Plaintiff's December 18, 1994 Signed Written Statement (**Exhibit SS**); *see also* **Exhibit B**, p. 226, ln. 12-14; *see also* **Exhibit VV**, p. 237, ln. 14 – p. 238, ln. 10.

> **Response: Disputed**. Plaintiff did not even read the statement, let alone write it. The officers were the source of the content of the statement plaintiff signed. Jackson Dep., Harvis Decl., Ex. 1, 122:10-123:15; Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 72:8-75:17, 54:22-55:13, 66:4-19, 67:3-68:4, 61:14-63:25, 64:10-65:5; *see* Cleary Expert Report, Harvis Decl., Ex. 41, pp. 10-23; *see* Dempsey Dep., Harvis Decl., Ex. 17, 41:14-42:21, 47:17-25, 43:13-44:17, 52:16-55:13, 66:20-23, 67:3-69:4, 72:17-24, 77:4-11, 77:12-82:20, 82:21-25, 85:9-87:3, 87:4-9; Lee Verdict Sheet, Harvis Decl., Ex. 44, p. 5; Fed. R. Evid. 608(b)(1). Defendants lack a good faith basis to present this assertion as undisputed.

223.     Plaintiff signed every page of the fifteen (15) page written statement. *See* **Exhibit SS**; *see also* **Exhibit B**, p. 158, ln. 6 – p. 226, ln. 9; *see also* **Exhibit VV**, p. 242, ln. 6-8.

> **Response: Undisputed that plaintiff's signature appears on the form.**

224.     After plaintiff signed the written statement, he was given the opportunity to be recorded on video, but plaintiff refused. *See* **Exhibit L**, p. 407, ln. 4-8; *see also* **Exhibit WW**, p. 23; *see also* **Exhibit F**, p. 160, ln. 24 – p. 161, ln. 4.

> **Response: Disputed.** While he was in the custody of the homicide squad for 39 hours, plaintiff was not afforded opportunities. Jackson Dep., Harvis Decl., Ex. 1, 122:10-123:15; Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 62:18-63:26, 69:23-70:10, 71:13-73:20; *see* Cleary Expert Report,

Harvis Decl., Ex. 41, pp. 10-23.

225.     Several photographs, including several Polaroid photographs, were taken of plaintiff after he signed the statement in the NCPD Homicide Squad. *See* Photographs taken of Plaintiff (**Exhibit TT**); *see also* **Exhibit B**, p. 226, ln. 15 – p. 229, ln. 20; *see also* **Exhibit F**, p. 270, ln. 22 – p. 273, ln. 4.

>    **Response: Disputed.** The photograph bearing Bates Stamp County1046 (appearing at pp. 5-6 of defendants' Ex. TT) is a mugshot without a timestamp taken long before December 1994, as evidenced by plaintiff's face, hair and clothing (as compared to County1078). As for the Polaroids at County2900, plaintiff testified at the hearings that they were taken immediately after the polygraph exam on the evening of December 17, 1994 and some thirty hours or more before the photograph as indicated on County1078. *See* Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 60:21-61:18. The photograph at County1078 reflects injuries to plaintiff's face consistent with his testimony, including his cheek, lip, eye and forehead. Much of plaintiff's body is not visible in this photograph. *See, e.g.,* Jackson Dep., Harvis Decl., Ex. 1, 122:10-123:15; Pre-Tr. Hr. 1996, Harvis Decl., 33, 67:3-68:18; Dempsey Dep., Harvis Decl., Ex. 17, 41:14-42:21, 47:17-25, 43:13-44:17, 52:16-55:13, 66:20-23 (discussing allegations dating back decades that Dempsey used methods of pain infliction designed to avoid detection during interrogations).

226.     Per these photographs, plaintiff did not have any visible physical injuries. *See* **Exhibit KK**, p. 126, ln. 19 – p. 127, ln. 4.

>    **Response: Disputed as misleading.** County1078 reflects injuries to plaintiff's face consistent with his testimony, including his cheek, lip, eye and forehead. Defendants lack a good faith basis to present this assertion as undisputed or to rely on defendant Severin as the source of undisputed facts regarding plaintiff's injuries. *See* Jackson Dep., Harvis Decl., Ex. 1, 122:10-123:15; Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 72:8-75:17, 54:22-55:13, 66:4-19, 67:3-68:4, 61:14-63:25, 64:10-65:5; *see* Cleary Expert Report, Harvis Decl., Ex. 41, pp. 10-23; *see* Dempsey Dep., Harvis Decl., Ex. 17, 41:14-42:21, 47:17-25, 43:13-44:17, 52:16-55:13, 66:20-23, 67:3-69:4, 72:17-24, 77:4-11, 77:12-82:20, 82:21-25, 85:9-87:3, 87:4-9; Lee Verdict Sheet, Harvis Decl., Ex. 44, p. 5; Fed. R. Evid. 608(b)(1).

227.     Plaintiff did not ask for medical attention for the injuries he claims to have suffered during the interrogation and did not have to see a doctor. *See* **Exhibit B**, p. 142, ln. 21-25; p. 143, ln. 19-22; *see also* Plaintiff EBT Transcript December 22, 2021 (**Exhibit C**), p. 61, ln. 17-22; *see also* **Exhibit FFFF**, p. 29, ln.24-25.

> **Response: Disputed as misleading**. Plaintiff was threatened with harm if he disclosed the abuse. Jackson Dep., Harvis Decl., Ex. 1, 122:10-123:15 ("If you say anything about what happened upstairs, we're going to take you back up  there."); *see* Cleary Expert Report, Harvis Decl., Ex. 41, p. 7.

228.     Plaintiff does not know who Det. Holland is. *See* **Exhibit B**, p. 128, ln. 23 – p. 129, ln. 22.

> **Response: Disputed.** Plaintiff's deposition testimony and subjective knowledge are immaterial – Holland investaged the Steven Jason homicide and took the statement from homicide eyewitness Glenn Montes that was never disclosed to plaintiff. *See* Handwritten notes reflecting defendant Hollands's participation in the Jason murder investigation, annexed to the Harvis Decl., Ex. 45, County3488; Statement of Shatem McKoy, annexed to the Harvis Decl. as Ex. 46 ("McKoy Statement"), County84-91; Montes Statement, Harvis Decl., Ex. 19; Walsh Dep., Harvis Decl., Ex. 3, 107:10-108:25, 118:19-120:9; Anania Dep., Harvis Decl., Ex. 28, 129:8-12.

229.     Plaintiff does not recall who Det. Herts is or what he did. *See* **Exhibit B**, p. 129, ln. 23 – p. 130, ln. 11.

> **Response: Disputed.** Plaintiff's deposition testimony and subjective knowledge are immaterial - Herts was a member of the Steven Jason Homicide Task Force, interrogated plaintiff and interviewed Maurice Larrea, the off-duty NYPD officer whose statement was suppressed. *See* Swenson/Herts handwritten note, annexed to the Harvis Decl. as Ex. 47 ("Swenson/Herts note"), County 6462; Deposition of Martin Alger, November 8, 2021, annexed to the Harvis Decl., as Ex. 48 ("Alger Dep."), 51:4-18, 59:7-17; Dempsey Dep., Harvis Decl., Ex.17, 198:22-25, 218:15-21, 219:7-20, 221:18-222:8, 230:19-21; Walsh Dep., Harvis Decl., Ex. 3, 106:17-107:2; Deposition of Michael Herts, November 9, 2021, annexed to the Harvis Decl., as Ex. 49 ("Herts Dep."), 44:17-45:2,

44:9-16, 34:14-22, 32:7-25, 26:22-30:18; *see* Larrea Statement, Harvis Decl., Ex. 27; see Skillings investigative material, annexed to the Harvis Decl. as Ex. 62; *see* Handwritten note on Skillings, annexed to the Harvis Decl., as Ex. 50 ("Skillings note"), County2636 (noting that "Mike Skills might be dark skin short haircut 5'9" skinny kid running thru bushes").

230.      Plaintiff does not recall who Det. Alger is or what he did. *See* **Exhibit B**, p. 130, ln. 12 – p. 131, ln. 9.

> **Response: Disputed.** Plaintiff's deposition testimony and subjective knowledge are immaterial - Alger 1) interrogated Tyrone Isaacs without *Miranda* warnings, 2) conducted the Witherspoon lineup, including by obtaining fillers that Alger acknowledges were significantly darker complected than plaintiff; and 3) determined that the subjects in the Witherspoon lineup would be seated, even though it meant Witherspoon, who described a shooter five inches shorter than plaintiff, would be unable to discern plaintiff's stature. Alger Dep., Harvis Decl., Ex. 48, 121:19-122:10, 146:16-148:7, 133:25-134:16, 154:2-20, 174:2-18, 128:15-129:3, 181:10-182:25, 176:3-19, 177:7-25, 185:25-187:13, 186:23-187:7, 188:16-192:10, 196:13-16.

231.      Plaintiff does not recall who Det. Swenson is or what he did. *See* **Exhibit B**, p. 131, ln. 10 – p. 132, ln. 2.

> **Response: Disputed.** Plaintiff's deposition testimony and subjective knowledge are immaterial – Swenson, a member of the Steven Jason homicide task force (*see* Swenson/Herts note, Harvis Decl., Ex. 47 County 6462) spoke to Elisa Valdez on March 23, 1994, three days after the homicide, and documented her statement that she and her boyfriend saw individuals, likely Montes and Larrea, chasing a suspect, likely Peddie Jenkins, "twenty seconds" after hearing shots. Valdez Note, Harvis Decl., Ex. 26, County6353. The following day, Swenson learned from a subject known as "Peanut" that Racman Grayson was the shooter. Swenson handwritten note, Grayson, annexed to the Harvis Decl., as Ex. 58, County6354. On July 28, 1994, Swenson interviewed Freeport resident Christian Encarnacion. Swenson handwritten note, Encarnacion, annexed to the Harvis Decl., as Ex. 59, County5045. Swenson also interviewed Sharif Graham. Swenson handwritten note, Graham, annexed to the Harvis Decl., as Ex. 60, County5135. Swenson also participated in the

28-hour interrogation of Tyrone Isaacs. Polygraph Examination Card, Tyrone Isaacs, annexed to the Harvis Decl., as Ex. 61, County5277. Swenson also worked with Freeport Detective Arthur Zimmer to investigate Michael Skillings, initially reported as the shooter. *See* Skillings Investigation Material, Harvis Decl., as Ex. 62, County6192, County6172. Swenson's notes, and much of the foregoing information, including the Valdez information, was never disclosed or produced to plaintiff. *See* Anania Dep., Harvis Decl., Ex. 28, 117:6-19; Abbondandelo Dep., Harvis Decl., Ex. 6, 258:11-19; Rosario List, annexed to the Harvis Decl., as Ex. 63.

232.     Plaintiff does not know who Det. Kosior is or what he did wrong. *See* **Exhibit B**, p. 132, ln. 3-12.

**Response: Disputed.** Plaintiff's deposition testimony and subjective knowledge are immaterial – Kosior, who had been responsible for the polygraph examinations in the *Restivo* case, polygraphed plaintiff even though plaintiff's physical condition and the lack of a Polygraph Examination Worksheet should have led Kosior to stop the exam; conducted the exam in an unreasonable and predetermined manner with plaintiff insufficiently attired; skewed the results to falsely suggest plaintiff had lied using an opinion that should have been at least qualified; and disclosed the results of plaintiff's exam on the record during plaintiff's hearings. *See* Kosior Dep., Harvis Decl., Ex. 36, 72:2-74:3, 122:13-123:21, 59:6-62:8, 62:20-63:4, 163:19-25; Polygraph Procedure, Harvis Decl., Ex. 37, County7834-7836; Kosior Dep., Harvis Decl., Ex. 36, 35:16-25, 37:9-39:8; 56:13-57:9, 92:16-97:6, 104:14-108:18; 166:18-167:11, Polygraph Consent Form, Harvis Decl., Ex. 38, County1072; *see* Kosior Dep., Harvis Decl., Ex. 36, 211:15-23; Dempsey Dep., Harvis Decl., Ex. 17, 212:3-9; Kosior 114:17-117:15; 154:5-155:8; 217:15-24, 177:16-178:9; 181:15-182:4; Polygraph Question Sheet, Harvis Decl., Ex. 40, County1070; Kosior Dep., Harvis Decl., Ex. 36, 187:12-20, 182:5-186:23; Polygraph Scoring, annexed to the Harvis Decl., as Ex. 64, County1090; Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 91:13-109:4, 214:3-219:20; Walsh Dep., Harvis Decl., Ex. 3, 45:8-21; Plaintiff's Polygraph Exam Card, Harvis Decl., Ex. 39, County799; Pre-Tr. Hr. 1995, Harvis Decl., Ex. 32, 138:22-140:4; Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 235:18-25; *see also* Order Denying Suppression, Harvis

Decl., Ex. 34, p. 5; Walsh Dep., Harvis Decl., Ex. 3, 45:22-46:12,152:4-13, 165:19-166:9.

233.     Plaintiff does not know who Det. Sgt. Severin is or what he did wrong. *See* **Exhibit B**, p. 132, ln. 13 – p. 133, ln. 5.

> **Response: Undisputed.** This is immaterial. Defendant Severin supervised the Steven Jason Homicide Investigation and its Task Force, laughed and joked with an inebriated Maurice Larrea and then oversaw the suppression of his and Montes' statements and the Valdez material. Dempsey Dep., Harvis Decl., Ex. 17, 149:22-151:4; *see* Alger Dep., Harvis Decl. Ex. 48, 59:7-17; Abbondandelo Dep., Harvis Dep., Ex. 6, 381:15-382:1; Severin Dep., Harvis Decl., Ex. 11, 103:7-104:3, 133:21-134:21; Dempsey Dep., Harvis Decl., Ex. 17, 169:8-16; Larrea Dep., Harvis Decl., 13, 79:6-80:7.

234.     Between December 17, 1994 and December 19, 1994, Det. Herts was in and out of the NCPD Homicide Squad. *See* **Exhibit Y**, p. 160, ln. 11-25.  Det. Herts has no recollection of being involved in plaintiff's interrogation and did not see plaintiff's constitutional rights being violated. *See* **Exhibit Y**, p. 161, ln. 8 – p. 164, ln. 17.

> **Response: This compound statement is immaterial and duplicative of defendants' Fact 229,** *supra*. Defendant Herts was a member of the Steven Jason Homicide Investigation Task Force who was involved in plaintiff's interrogation and interviewed Maurice Larrea. *See* Alger Dep., Harvis Decl., Ex. 48, 51:4-18, 59:7-17; Dempsey Dep., Harvis Decl., Ex. 17, 198:22-25, 218:15-21, 219:7-20, 221:18-222:8, 230:19-21; Herts Dep., Harvis Decl., Ex. 49, 44:17-45:2, 44:9-16, 34:14-22, 32:7-25, 26:22-30:18; *see* Larrea Statement, Harvis Decl., Ex. 27.

235.     Other than taking a witness statement from Montes, Det. Holland had no other involvement in investigating Jason's homicide. *See* **Exhibit Z**, p. 49, ln. 24 – p. 50, ln. 11.  Det. Holland has never seen or met the plaintiff. *See* **Exhibit Z**, p. 50, ln. 12-16.  Between December 17, 1994 and December 19, 1994, Det. Holland was not present at the NCPD Homicide Squad while plaintiff was in custody. *See* **Exhibit Z**, p. 50, ln. 17-21.

> **Response: Disputed.** Holland had significant involvement beyond interviewing Glenn Montes and writing his statement, which was never produced. On December 17, 1993, Holland arrested Tony Jackson for

shooting Steven Jason. *See* Tony Jackson Arrest Report, annexed to the Harvis Decl., as Ex. 51, County2257-58. The next day, December 18, 1993, Holland signed the District Court Information for Tony Jackson. District Court Information, annexed to the Harvis Decl., as Ex. 52, County2245-46. On March 20, 1993, Holland responded to the scene of the Steven Jason homicide and then interviewed Glenn Montes and wrote out his statement. *See* Montes Statement, Harvis Decl., Ex. 19. On June 22, 1994, Holland and Dempsey interview Shatem McCoy in connection with the Steven Jason homicide. McKoy Statement, Harvis Decl., Ex. 46, County84-91. On July 20, 1994, Holland was among a group of detectives who interviewed Dannie Freeman. County5083-5091 annexed to the Harvis Decl., as Ex. 53. On July 26, 1994, Holland travelled to Brooklyn with Jerl Mullen. County4631-4634, annexed to the Harvis Decl., Ex. 54. On July 24, 1994, Swenson and Holland went to Freeport to interview K. Lopez. County3489, annexed to the Harvis Decl., as Ex. 55. On August 17, 1994, Holland interviewed Jermaine "Buggy" Hayes, an apparent suspect in the Steven Jason homicide. County5164-5177, annexed to the Harvis Decl., as Ex. 56. On an unknown date, Holland was with Jerl Mullen interviewing Petie Baldwin as a possible witness in the shooting death of Tony Jackson. County2640, annexed to the Harvis Decl., as Ex. 57.

236.     Det. Alger was not present at the NCPD Homicide Squad when plaintiff was being interrogated. *See* **Exhibit AAA**, p. 169, ln. 8-14.

**Response: Undisputed.**

237.     Det. Swenson does not recall if he was present with plaintiff between December 17, 1994 and December 19, 1994 at the NCPD Homicide Squad. *See* **Exhibit AA**, p. 85, ln. 15-19.

**Response: Undisputed. This is not a material fact.**

238.     Det. Sgt. Severin rarely participated in interrogations while he was a supervisor with the NCPD Homicide Squad. *See* **Exhibit KK,** p. 86, ln. 13-18.

**Response: Plaintiff agrees that Severin supervised the interrogations.**

239.     Det. Sgt. Severin was present during a portion of plaintiff's time in custody at the NCPD Homicide Squad between December 17, 1994 and December 19,

1994, and while Det. Sgt. Severin was present, plaintiff was not physically abused or beaten. *See* **Exhibit KK**, p. 126, ln. 19 – p. 127, ln. 4.

> **Response: Disputed**. Plaintiff was abused while Severin was there. Jackson Dep., Harvis Decl., Ex. 1, 122:10-123:15; Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 72:8-75:17, 54:22-55:13, 66:4-19, 67:3-68:4, 61:14-63:25, 64:10-65:5; *see* Cleary Expert Report, Harvis Decl., Ex. 41, pp. 10-23; *see* Dempsey Dep., Harvis Decl., Ex. 17, 41:14-42:21, 47:17-25, 43:13-44:17, 52:16-55:13, 66:20-23, 67:3-69:4, 72:17-24, 77:4-11, 77:12-82:20, 82:21-25, 85:9-87:3, 87:4-9; Lee Verdict Sheet, Harvis Decl., Ex. 44, p. 5; Fed. R. Evid. 608(b)(1). Defendants lack a good faith basis to present this assertion as undisputed.

240.     Det. Mullen did not speak with Richard "Woody" Miller prior to speaking with plaintiff on December 18, 1994. *See* **Exhibit E**, p. 1402, ln. 25 – p. 1403, ln. 13.

**Response: Undisputed.** This is not a material fact.

241.     Det. Abbondandelo went to MCS Security, obtained a log book which indicated the coming and going of each employee, with the log book that he obtained started on March 24, 1994. *See* **Exhibit E**, p. 1299, ln. 6 – p. 1300, ln. 6. Prior to March 24, 1994, MCS Security did not have a log book, and information about the employee's comings and goings were written on a piece of paper, which were disposed of. *See* **Exhibit E**, p. 1300, ln. 3-10.

**Response: Undisputed.**

242.     On December 19, 1994, at approximately 3:35 a.m., Det. Dempsey and Det. Abbondandelo transported plaintiff to the NCPD Records Bureau to be processed on the drug charge and the outstanding valid warrants. *See* **Exhibit PP**, p. 7; *see also* **Exhibit G**, p. 128, ln. 5- 8; *see also* **Exhibit WW**, p. 23.

**Response: Undisputed.**

243.     On December 19, 1994, at approximately 4:05 a.m., plaintiff signed a Physical Condition Questionnaire Form while at the NCPD Detention Desk. *See* **Exhibit B**, p. 119, ln. 8 –p. 120, ln. 2; *see also* Physical Condition Questionnaire signed by Plaintiff on December 19, 1994 (**Exhibit UU**).

**Response: Undisputed.**

244.     As of December 19, 1994, plaintiff was not criminally charged for the murder of Jason. *See* **Exhibit G**, p. 126, ln. 13-19; *see also* **Exhibit F**, p. 269, ln. 4-9; *see also* **Exhibit H**, p. 78, ln. 15-17; *see also* **Exhibit EEEE**, p. 18, ln. 6-10.

> **Response: Disputed in part.** Plaintiff was not charged because the District Attorney would not approve of the arrest. Abbondandelo Dep., Harvis Decl., Ex. 6, 416:19-417:6; Deposition Transcript of Gary Abbondandelo, February 14, 2022, annexed to the Harvis Decl., as Ex. 65 ("Abbondandelo Dep. II") 14:16-24.

245.     On Monday, December 19, 1994, plaintiff was arraigned on criminal sale of a controlled substance charges. *See* **Exhibit H**, p. 78, ln. 8-14; *see also* **Exhibit EEEE**, p. 18, ln. 6-10. On March 6, 1995, plaintiff made bail on the criminal sale of a controlled substance charges and had a court appearance the next day, March 7, 1995. *See* **Exhibit H**, p. 78, ln. 18-22.

> **Response:** Plaintiff respectfully objects on the grounds that this assertion violates this Honorable Court's Individual Practice Rule III.G.1., which states: "Each numbered paragraph in the Rule 56.1 Statement must contain only one factual assertion." **Undisputed**.

246.     On March 7, 1995, plaintiff was arrested in Freeport for the murder of Jason. *See* **Exhibit F**, p. 273, ln. 16-20; *see also* **Exhibit H**, p. 78, ln. 18 – p. 79, ln. 18; *see also* NCPD Arrest Report from March 7, 1995 (**Exhibit RRRR**); *see also* **Exhibit FFFF**, p. 39, ln. 9-25; p. 40, ln. 15 – p. 41, ln. 3.

> **Response: Undisputed.**

247.     Criminal defense attorney Eugene Cordero ("Cordero") was originally assigned to defend plaintiff. *See* **Exhibit B**, p. 71, ln. 17-23; *see also* Scott Brettschneider EBT Transcript (**Exhibit III**), p. 11, ln. 11-14.

> **Response: Undisputed.**

248.     Per Det. Abbondandelo, Witherspoon was a witness to Jason's shooting because she was with Jason right before he was shot, saw the interaction where a gun was pointed at Jason, could identify the shooter, and heard gun shots immediately after she turned to run back to the American Legion Hall. *See* **Exhibit L**, p. 34, ln. 18 – p. 35, ln. 19, p. 38, ln. 23 – p. 39, ln. 17.

> **Response: Undisputed that Abbondandelo testified as such.** This is not

a material fact.

249.     Det. Abbondandelo believed that Campbell's observations were more credible than those of Montes and Larrea since Campbell "was right there at the scene at the time [of the shooting]. She saw… these two [men] running to a car and fleeing with the lights out down the road." *See* **Exhibit L**, p. 60, ln. 21 – p. 61, ln. 14.

>     **Response: Undisputed that Abbondandelo testified as such.** This is not a material fact.

250.     After reviewing Larrea's and Montes' statements, and learning Larrea shouted "that's the guy", Det. Abbondandelo believed that Larrea was referring to the person that he tried to stop, not Jason's shooter. *See* **Exhibit L**, p. 47, ln. 12 – p. 47, ln. 18.

>     **Response: Undisputed that Abbondandelo testified as such.** This is not a material fact.

251.     The person that Larrea and Montes encountered was not a person of interest because numerous people were running from the scene in all different directions. *See* **Exhibit L**, p. 116, ln. 7-17. Based on Det. Abbondandelo's investigation, he discredited the account given by Montes. *See* **Exhibit L**, p. 229, ln. 15 – p. 233, ln. 8.

>     **Response: Disputed in part. The police obviously considered the person who Montes and Larrea chased a person of interest.** *See, e.g.,* Skillings Note, Harvis Decl., Ex. 50, County2636 (noting that "Mike Skills might be dark skin short haircut 5'9" skinny kid running thru bushes"). Plaintiff agrees that Abbondandelo now claims he discredited Montes and Larrea's account, but notes that Abbondandelo cannot explain why he failed to turn over the statements (or the Valdez and 911 information). *See* Anania Dep., Harvis Decl., Ex. 28, 126:21-128:6.

252.     When Det. Sgt. Severin arrived at the scene on March 20, 1994, he was told "that they have two witnesses. Two females. [Witherspoon] [who] was right with [Jason] when he was shot. And [Campbell] seeing the person that did the shooting, running through the parking lot, going behind the building…and getting into a car and going southbound on Guy Lombardo Avenue [Freeport]. [Witherspoon] says she saw the person shoot Steven Jason and run towards the parking lot." *See* **Exhibit KK**, p. 73, ln. 21 – p. 74, ln.  8.

**Response: Undisputed that Severin testified along these lines.**

253.       Det. Sgt. Severin did not believe Larrea's or Montes' account was a, logical, or credible lead in the investigation given that, as compared to Witherspoon and Campbell who were actually at or in close proximity to the crime scene when the shooting occurred and saw the shooter running through the parking lot and get into a car going South on Guy Lombardo Avenue, and since Larrea and Montes were in a moving vehicle and would not be able to get a clear description of what happened. *See* **Exhibit KK**, p. 219, ln. 19 – p. 221, ln. 20; p. 73, ln. 19 – p. 77, ln. 5.

**Response:** The County's official findings are contrary to Severin's mistaken belief, which is immaterial in any event. *See* § 440.10 Motion, Harvis Decl., Ex. 29, P013-P017 (seeking judicial relief on behalf of the County because of alleged *Brady* violations).





**Plaintiff's Response to**
**Paragraph 253 – Exhibit X, Page 3**

Skwanitra Witherspoon running away after seeing the lips of a hooded 5'7" male

Martha Campbell hearing shots and seeing a 5'8" male

Montes and Larrea driving directly past crime scene before chasing 5'8" shooter

COUNTY003393

**253a)**     Campbell walking to American Legion – When Campbell arrived to the Guy Lombardo Avenue entrance of the Blimpies parking lot, she saw a "lite colored car" back up the wall of Blimpies which was closed. See Exhibit X, p. 2-3.

**Response: Undisputed.**

253b) While Campbell was walking, she heard gun shots, saw a male black run from the street, get into the passenger side of the "lite-colored" car, and then saw this car drive southbound on Guy Lombardo Avenue with the lights off. *See* **Exhibit X**, p. 2-3.

**Response: Undisputed.** This male was 5'8". *See* Campbell Statement, Harvis Decl., Ex. 10, p. 2.

253c) Campbell told Det. Abbondandelo that "she was walking towards the American Legion when she heard several shots. She looked up and immediately saw two fellas running to a car that was in the Blimpies parking lot and exit the parking lot and head southbound on Guy Lombardo [Avenue]." *See* **Exhibit L**, p. 59, ln. 18 – p. 60, ln. 10.

> **Response: Disputed.** Abbandandelo never spoke to Campbell. Abbondandelo Dep., Harvis Decl., Ex. 6, 233:9-234:10

253d) Prior to shooting, Jenkins saw Jason's car in the Blimpies parking lot and told plaintiff that he was standing by Jason's car. *See* **Exhibit E**, p. 747, ln. 13 – p. 748, ln. 5; *see also* **Exhibit I**, p. 34, ln. 3-14. After the shooting, Jenkins saw plaintiff run away towards Jason's car and the Blimpies parking lot. *See* **Exhibit I**, p. 39, ln. 19 – p. 40, ln. 2, p. 34, ln. 3-14. *see also* **Exhibit E**, p. 766, ln. 3-19, p. 747, ln. 13 – p. 748, ln. 5.

> **Response: Disputed.** This compound statement is duplicative of defendants' Facts 41, 44 and 54, *supra*. Jenkins never spoke to plaintiff or observed plaintiff at the scene or running away because plaintiff was not present, and Jenkins was likely the shooter. Jackson Dep., Harvis Decl., Ex. 1, 100:23-101:6, 107:8-14, 217:11-21, 101:19-21; Anania Memo and Notes, Harvis Decl., Ex. 2, County2852-2853; Miller Aff., Harvis Decl., Ex. 9 at ¶¶3-24. Defendants lack a good faith basis to present this assertion as undisputed.

253e)Per Witherspoon, Jason and the man with the gun were standing on the side of Blimpies in the parking lot near the first window. *See* **Exhibit E**, p. 1073, ln. 20 – p. 1075, ln. 14. Witherspoon was on sidewalk in the front corner of Blimpies. *See* **Exhibit E**, p. 1073, ln. 20 – p. 1075, ln. 14.

> **Response: Plaintiff objects on the grounds that this compound assertion is duplicative of defendants' Facts 96-102,** *supra.* Plaintiff agrees that Witherspoon testified a 5'7" perpetrator approached her and Jason near the Blimpie's parking lot.

254.     Det. Abbondandelo also did not retrieve any records related to the phone call that Larrea made to law enforcement because he did not believe Larrea's phone call would assist in the investigation other than the time the phone call was made. *See* **Exhibit L**, p. 140, ln. 8 – p. 141, ln. 16.

> **Response: Disputed in part.** Plaintiff agrees that Abbondandelo did not retrieve the records (or document the call) but disputes his reasoning: Abbondandelo wanted to hide Larrea. Either way, defendants are culpable for failing to obtain and disclose the records. Anania Dep., Harvis Decl., Ex. 28, 221:3-11.

255.     In March of 1994, a 911 call from a payphone made within the Village of

Freeport would have been received, initially, by the NCPD Communications Bureau. *See* Declaration of Jan Gaddist, dated September 20, 2019 (**Exhibit FFF**), ¶3. After the 911 operator determined that the emergency was within the Village of Freeport, which had (and has) its own independent Police Department, the call could have been transferred to FPD. *See* **Exhibit FFF,** ¶4. In 1994, as well as currently, 911 calls received by the NCPD's Communications Bureau were automatically recorded. *See* **Exhibit FFF,** ¶4. In the case of a call transferred to a local police department, the NCPD's audio recording of the call would have ended after the call was transferred to the local department and the NCPD operator disconnected. *See* **Exhibit FFF,** ¶6.

> **Response: Plaintiff objects on the grounds that this assertion aggregates at least five facts in contravention of the Court's Individual Practices.** Plaintiff does not dispute that Gaddist, who has no personal knowledge of these events, provided an affidavit to this effect in 2019. This is not material to summary judgment.

256.     The NCPD and the FPD are two separate independent police departments that have their own communications bureau's with separate recording systems for emergency calls. *See* Declaration of Jan Gaddist, dated July 27, 2022 (**Exhibit GGG**), ¶¶3-4. In March of 1994, a phone call from a payphone made within the Village of Freeport, and made directly to the FPD would have been received by the Village of Freeport. *See* **Exhibit GGG,** ¶¶3-4. If this call was made to the FPD directly, the NCPD Communications Bureau would have never received this call, would never have recorded this call because it was never received, and there would be no documentation or paperwork within the possession of the NCPD Communications Bureau that this phone call was ever made to the FPD. *See* **Exhibit GGG**, ¶5.

> **Response: Plaintiff objects on the grounds that this assertion aggregates at least five facts in contravention of the Court's Individual Practices.** Plaintiff does not dispute that Gaddist, who has no personal knowledge of these events, provided an affidavit to this effect in 2019. This is not material to summary judgment.

257.     Per Larrea, he "called I don't know if I called Freeport numbers 378-0700 or I might have just called 911. I don't remember exactly. I just remember saying that there was shooting." *See* **Exhibit CC**, p. 26, ln. 14-24, p. 36, ln. 8-12, p. 117, ln. 18-23.

**Response: Undisputed that Larrea did not remember which number he dialed 28 years later.** However, Larrea's 1994 statement states that he "dialed 911" and that he also told that to Anania in 2017. Larrea Statement, Harvis Decl., Ex. 27; Anania Memo and Notes, Harvis Decl., Ex. 2, County2844-2845, 2849-2850. This is not a material fact.

258.    Larrea also stated that he believed the person that he was speaking to was with the FPD, and not the NCPD. *See* **Exhibit CC**, p. 118, ln. 15-19, p. 119, ln. 8-12, p. 142, ln. 23-25.

**Response: Undisputed that Larrea testified along these lines.** This is not a material fact.

259.    After the initial scene investigation, Det. Sgt. Severin was informed that there was no 911 call made by Larrea. *See* **Exhibit KK**, p. 218, ln. 20 – p. 219, ln. 9.

**Response: Disputed.** This vague, self-serving testimony finds no support in the record and is contradicted by the testimony of Abbandandelo, the lead detective. Even if it were true, it would not explain the failure to document or disclose that Larrea claimed he called 911. *See* Abbondandelo Dep., Harvis Decl., Ex. 6, 139:18-140:16, 165:6-10; 191:12-20; Walsh Dep., Harvis Decl., Ex. 3, 143:18-144:13.

260.    Det. Herts tried to retrieve a copy of the call Larrea made to law enforcement and learned that the NCPD Communications Bureau had no record of it. *See* **Exhibit Y**, p. 80, ln. 4- 16.

**Response: Disputed.** This vague, self-serving testimony finds no support in the record and is contradicted by the testimony of Abbandandelo, the lead detective. Even if it were true, it would not explain the failure to document or disclose that Larrea claimed he called 911. *See* Abbondandelo Dep., Harvis Decl., Ex. 6, 139:18-140:16, 165:6-10; 191:12-20; Walsh Dep., Harvis Decl., Ex. 3, 143:18-144:13.

261.    Within a few days after Jason's murder on March 20, 1994, Det. Abbandandelo spoke with ADA Klein about the evidence identified thus far in the case, disclosed that Montes and Larrea gave written statements, and discussed the substance of these statements with him. *See* **Exhibit L**, p. 96, ln. 11 – p. 97, ln. 15; p. 252, ln. 5-8.

**Response: Disputed.** This did not happen. Klein testified that if he had been told about a 911 call he would have documented it and obtained the records and Klein does not recall ever hearing about an intoxicated off-duty NYPD witness to a homicide. Klein Dep., Harvis Decl., Ex. 5, 84:21-85:10, 116:17-117:14. Defendants' Fact 261 is also disproven by the morning report (County970-73s) (which makes no mention of Montes or Larrea), Abbondandelo's testimony at the hearings (same) and the reinvestigation findings and underlying evidence, which were submitted to the state court and reflect that the trial prosecutor, Mr. Walsh, claimed he had no knowledge of the statements. *See* § 440.10 Motion, Harvis Decl., Ex. 29; Fed. R. Evid. 803(8)(A)(iii). Defendants lack a good faith basis to present this assertion as undisputed.

262.    Det. Abbondandelo told ADA Klein that Montes and Larrea saw an individual running but "he obviously wasn't the shooter." *See* **Exhibit L**, p. 101, ln. 23 – p. 102, ln. 2.

**Response: Disputed.** This did not happen. Klein testified that if he had been told about a 911 call he would have documented it and obtained the records and Klein does not recall ever hearing about an intoxicated off-duty NYPD witness to a homicide. Klein Dep., Harvis Decl., Ex. 5, 84:21-85:10, 116:17-117:14. Defendants' Fact 261 is also disproven by the morning report (Morning Report annexed to the Harvis Decl., as Ex. 114, County970-973) (which makes no mention of Montes or Larrea), Abbondandelo's testimony at the hearings (same) and the reinvestigation findings and underlying evidence, which were submitted to the state court and reflect that the trial prosecutor, Mr. Walsh, claimed he had no knowledge of the statements. *See* § 440.10 Motion, Harvis Decl., Ex. 29; Fed. R. Evid. 803(8)(A)(iii). Defendants lack a good faith basis to present this assertion as undisputed.

263.    Based on Larrea's statement, ADA Klein believed a criminal defendant would not necessarily have to be made aware of this witness. *See* ADA Klein EBT Transcript (**Exhibit YY**), p. 119, ln. 3-8.

**Response: Disputed**. Klein's subsequent testimony controverts this assertion. *See* Klein Dep., Harvis Dep., Ex. 5, 119:13-120:18 (acknowledging that Klein is not competent to offer an opinion on materiality); Fed. R. Evid. 106.

264.    Det. Swenson told Det. Abbondandelo about his conversation with Valdez, gave Det. Abbondandelo the notes from his conversation with Valdez, and these notes became part of Det. Abbondandelo's case file. *See* **Exhibit AA**, p. 70, ln. 20 – p. 71, ln. 14, p. 139, ln. 11-16.

> **Response: Disputed**. Swenson never mentioned anything about Valdez to Abbondandelo and, if he had, Abbondandelo would have "definitely" investigated. Abbondandelo Dep., Harvis Decl., Ex. 6, 258:11-19. According to defendant Severin, who supervised the homicide investigation, it was Abbondandelo's responsibility to reach out to Swenson and decide what course of action to take. Severin Dep., Harvis Decl., Ex. 11, 107:24-109:2.

265.    ADA Michael Walsh ("ADA Walsh") was assigned to this investigation by ADA Klein. *See* **Exhibit L**, p. 242, ln. 4-10; *see also* ADA Walsh EBT Transcript (**Exhibit XX**), p. 97, ln. 4-19; *see also* ADA Walsh Declaration (**Exhibit EEEEE**), ¶3.

> **Response: Plaintiff objects to the Walsh Declaration on the grounds that it was prepared for the purposes of summary judgment in violation of Fed. R. Civ. P. 37(c)(1) and should not be considered as part of the record for reasons addressed in plaintiff's memorandum of law**. In any event, plaintiff respectfully submits that it is immaterial why ADA Walsh was assigned to the investigation.

266.    Montes' and Larrea's statements stayed in Det. Abbondandelo's file the whole time. *See* **Exhibit L**, p. 239, ln. 8-12; *see also* **Exhibit KK**, p. 73, ln. 3-6. Det. Abbondandelo brought the homicide case file to the NCDA's office, which contained Larrea and Montes' statements, and was left in ADA Walsh's office for a period of time. *See* **Exhibit L**, p. 240, ln. 13 – p. 241, ln. 16; p. 113, ln. 9 – p. 115, ln. 5; *see also* **Exhibit KK**, p. 59, ln. 21 – p. 60, ln. 14.

> **Response: Disputed.** If the statements had been a part of the file or Abbondandelo had mentioned them to Klein or Walsh, the statements would have been 1) made a part of the DA's file (and disclosed to plaintiff), 2) recalled by either Walsh or Klein and the DA's office would have 3) obtained the 911 evidence. *See* § 440.10 Motion, Harvis Decl., Ex. 29. (NB: The District Attorney, realizing the strength of the defense now available to plaintiff, would also likely have declined to authorize the

murder charge instead of indicting the case without knowing about the statements.)

267.     Det. Abbondandelo did not try to hide Montes' and Larrea's statement. *See* **Exhibit L**, p. 254, ln. 16 – p. 255, ln. 5.

> **Response: Disputed.** Abbondandelo's subjective intent is immaterial to plaintiff's claims. To the extent it is material, the record establishes that the cited testimony is false: Abbondandelo lied at the hearing and claimed that Skwanitra Witherspoon was the only eyewitness, he suppressed the Valdez note, preventing the DA from discovering or producing it, coerced plaintiff's false confession, purloined the perjurious testimony of Peddie Jenkins and left Montes and Larrea off the morning report, the homicide worksheet and every other document related to the case. *See* §440.10 Motion, Harvis Decl., Ex. 29.

268.     Det. Abbondandelo discussed Montes' and Larrea's statements with ADA Walsh. *See* **Exhibit L**, p. 242, ln. 11-25.

> **Response: Disputed**. According to Walsh, Abbandandelo has always maintained that he does not recall the statements and Walsh himself did not see the statements until 2017. Walsh Dep., Harvis Decl., Ex. 3, 56:6-59:15, 62:21-16, 64:11-22, 103:23-104:16, 135:15-139:25, 196:5-12, 196:22-197:6; *see* §440.10 Motion, Harvis Decl., Ex. 29, ¶¶ 20, 27.

269.     Det. Abbondandelo had a conversation with ADA Walsh about Montes' and Larrea's statements, and told ADA Walsh that he does not think that these statements had much value as a result of Witherspoon's and Campbell's observations. *See* **Exhibit L**, p. 242, ln. 17-25.

> **Response: Disputed**. According to Walsh, Abbandandelo has always maintained that he does not recall the statements and Walsh himself did not see the statements until 2017. Walsh Dep., Harvis Decl., Ex. 3, 56:6-59:15, 62:21-16, 64:11-22, 103:23-104:16, 135:15-139:25, 196:5-12, 196:22-197:6; *see* §440.10 Motion, Harvis Decl., Ex. 29, ¶¶ 20, 27.

270.     ADA Walsh believes that the Montes and Larrea statements would have had no impact on the outcome of the case. *See* **Exhibit XX**, p. 54, ln. 23 – p. 56, ln. 5.

> **Response: Disputed.** ADA Walsh concedes that the District Attorney

concluded the material was *Brady*, and the District Attorney did not even consider the Valdez material or Dempsey's history of coercing confessions. Anania Memo and Notes, Harvis Decl., Ex. 2, generally; §440.10 Motion, generally, Harvis Decl., Ex. 29; Walsh Dep., Harvis Decl., Ex. 3, 232:13-21.

271.     ADA Walsh knew about Montes and Larrea, spoke with NCPD detectives about them, was aware of the existence of their statements. *See* **Exhibit XX**, p. 137, ln. 14 – p. 143, ln. 17; *see also* **Exhibit EEEEE, ¶¶**6, 8. In his opinion, these statements were not reliable because, among other things, he believed Montes and Larrea were intoxicated and it was highly implausible that Montes and Larrea were chasing the person that shot Jason. *See* **Exhibit XX**, p. 137, ln. 14 –p. 143, ln. 17; *see also* **Exhibit EEEEE, ¶¶**6, 8.

> **Response: Disputed.** This is a compound statement. Even if Walsh believed the statements were unreliable, which is inconsistent with his 2017 statements to Anania that he did not recall them, Nassau County concedes that Walsh would have been required to disclose them to plaintiff. However, on defendants' summary judgment motion and viewing the evidence in a light most favorable to plaintiff, it is more likely that Walsh is attempting to provide testimony that is helpful to the officers. Anania Memo and Notes, Harvis Decl., Ex. 2 *generally*; §440.10 Motion, Harvis Decl., Ex. 29, *generally*; Walsh Dep., Harvis Decl., Ex. 3, 232:13-21.

272.     NCPD Detectives believed that Valdez' and Montes' observations the early morning of March 20, 1994 were of the same interaction; Valdez witnessed Montes chasing an individual who was not Jason's shooter. *See* **Exhibit AA**, p. 77, ln. 3-14; *see also* **Exhibit HHH**, p. 3; *see also* **Exhibit DD**; *see also* **Exhibit EE**; *see* **Exhibit L**, 262, ln. 1-17, p. 273, ln. 19 – p. 276, ln. 2, p. 280, ln. 8-16.

> **Response: Plaintiff objects that this is a compound statement in violation of Court rules.** Plaintiff agrees that detectives believed Montes, Larrea, Valdez and her boyfriend all saw the same event. Indeed, it is for this reason that the detectives suppressed the information, i.e. so it would not reveal Larrea and lead to him getting in trouble for lying to his command.

273.     ADA Walsh does not believe the statements from Valdez, recounting a

similar story to that of Montes and Larrea constitute *Brady* material.  *See* **Exhibit XX**, p. 183, ln. 15-23, p. 187, ln. 11-19.

> **Response: Undisputed that Walsh testified as such.** However, this is not material.

274.     On April 10, 1995, ADA Walsh submitted an Order to Show Cause to Nassau County Court Judge Ira N. Werner requesting that an order be issued directing plaintiff to participate in a physical line-up procedure on April 11, 1995. *See* Court Ordered Line-Up (**Exhibit ZZ**).  Hon. Werner ordered that plaintiff participate in a physical line-up on April 11, 1995. *See* Det. Alger EBT Transcript (**Exhibit AAA**), p. 170, ln. 12 – p. 171, ln. 2; *see also* **Exhibit ZZ**, p. 3-5.

> **Response: Plaintiff objects on the grounds that this is a compound statement.** Plaintiff agrees that a lineup was ordered.

275.     Det. Mullen called Witherspoon and told her that she needed to come to New York to look at a couple of people. *See* **Exhibit E**, p. 1067, ln. 12-24.

> **Response: Undisputed that there was testimony along these lines.** However, because Mullen is deceased and Witherspoon does not remember this interaction, there is no witness available to competently testify to these facts. *See* Dysart Expert Report, Harvis Decl., Ex. 21.

276.     Det. Mullen did not tell Witherspoon that the person who committed the crime would actually be in the line-up. *See* **Exhibit E**, p. 1068, ln. 4-7.

> **Response: Undisputed that there was testimony along these lines.** However, because Mullen is deceased and Witherspoon does not remember this interaction, there is no witness available to competently testify to these facts. *See* Dysart Expert Report, Harvis Decl., Ex. 21.

277.     On April 11, 1995, Det. Alger assisted Det. Abbondandelo with the physical line- up. *See* **Exhibit G**, p. 221, ln. 23 – p. 222, ln. 19.

> **Response: Undisputed.**

278.     Det. Alger went to Hempstead to get fillers for the line-up, with the fillers being male blacks with similar descriptions to the plaintiff. *See* **Exhibit G**, p. 222, ln. 17-21.

**Response: Disputed.** Alger agrees that the seated lineup made it "very difficult" for Skwanitra Witherspoon to discern plaintiff's height. Alger Dep., Harvis Decl., Ex. 48, 176:3-19. In selecting the fillers and preparing the lineup, Alger believed height was "clearly…not an issue" in the case. *Id.* at 48, 177:7-25. Alger made the decision that it would be a seated lineup based on the height of the fillers he had obtained, and without regard for the height discrepancy between plaintiff and the perpetrator as described by Witherspoon. *Id.* at 185:25-187:13. If the fillers had all been plaintiff's height, Alger would have likely conducted a standing lineup. *Id.* at 186:23-187:7. Alger was in the room with seated subjects when the lineup happened and cannot say whether Witherspoon made any identification. *Id.* at 188:16-192:10. Alger, who was responsible for obtaining the fillers for the Witherspoon lineup, agrees that the fillers have significantly darker complexions than plaintiff. *Id.* at 196:13-16.

279.     Det. Alger selected the fillers using a photograph of the plaintiff so that he had a "clear and accurate likeness of [the plaintiff's] description." *See* **Exhibit G**, p. 223, ln. 23 – p. 224, ln. 2.

**Response: Disputed.** Alger agrees that the seated lineup made it "very difficult" for Skwanitra Witherspoon to discern plaintiff's height. Alger Dep., Harvis Decl., Ex. 48, 176:3-19. In selecting the fillers and preparing the lineup, Alger believed height was "clearly…not an issue" in the case. *Id.* at 177:7-25. Alger made the decision that it would be a seated lineup based on the height of the fillers he had obtained, and without regard for the height discrepancy between plaintiff and the perpetrator as described by Witherspoon. *Id.* at 185:25-187:13. If the fillers had all been plaintiff's height, Alger would have likely conducted a standing lineup. *Id.* at 186:23-187:7. Alger was in the room with seated subjects when the lineup happened and cannot say whether Witherspoon made any identification. *Id.* at 188:16-192:10. Alger, who was responsible for obtaining the fillers for the Witherspoon lineup, agrees that the fillers have significantly darker complexions than plaintiff. *Id.* at 196:13-16.

280.     Det. Alger came back to the NCPD Homicide Squad with several fillers, organized the line-up room, set up the chairs, and placed the fillers and plaintiff in the line-up. *See* **Exhibit G**, p. 222, ln. 22 – p. 223, ln. 2, p. 224, ln. 5-13.

**Response: Disputed.** Alger agrees that the seated lineup made it "very

difficult" for Skwanitra Witherspoon to discern plaintiff's height. Alger Dep., Harvis Decl., Ex. 48, 176:3-19. In selecting the fillers and preparing the lineup, Alger believed height was "clearly…not an issue" in the case. *Id*. at 177:7-25. Alger made the decision that it would be a seated lineup based on the height of the fillers he had obtained, and without regard for the height discrepancy between plaintiff and the perpetrator as described by Witherspoon. *Id*. at 185:25-187:13. If the fillers had all been plaintiff's height, Alger would have likely conducted a standing lineup. *Id*. at 186:23-187:7. Alger was in the room with seated subjects when the lineup happened and cannot say whether Witherspoon made any identification. *Id*. at 188:16-192:10. Alger, who was responsible for obtaining the fillers for the Witherspoon lineup, agrees that the fillers have significantly darker complexions than plaintiff. *Id*. at 196:13-16.

281.     Det. Abbondandelo and Det. Dempsey brought plaintiff to the NCPD Homicide Squad for the physical line-up. *See* **Exhibit G**, p. 225, ln. 2-5.

     **Response: Undisputed.**

282.     When Det. Alger was organizing the line-up, he asked plaintiff's criminal defense attorney, Cordero, what position he would like the plaintiff to sit in. *See* **Exhibit G**, p. 226, ln. 9-16.  Cordero indicated that he wanted his client to sit in the middle of the line-up, and plaintiff was placed in position #4. *See* **Exhibit G**, p. 226, ln. 17 – p. 227, ln. 3.

     **Response: Undisputed.** This is not a material fact.

283.     Det. Alger randomly placed the remainder of the fillers in the line-up after plaintiff was selected to be in position #4. *See* **Exhibit G**, p. 227, ln. 4-7.

     **Response: Undisputed.** This is not a material fact.

284.     On April 11, 1995, Witherspoon appeared at the NCPD Homicide Squad to view a physical line-up. *See* **Exhibit I**, p. 53, ln. 11-18; *see also* **Exhibit E**, p. 1066, ln. 24 – p. 1067, ln. 4.

     **Response: Undisputed.** This is not a material fact.

285.     Det. Mullen picked Witherspoon up from the airport and brought her to the NCPD Headquarters. *See* **Exhibit E**, p. 1068, ln. 15-19; *see also* **Exhibit G**, p. 165, ln. 22 – p. 166, ln. 19, p. 210, ln. 24 – p. 211, ln. 4.

**Response: Undisputed.** This is not a material fact.

286.     Det. Mullen brought Witherspoon inside an office at the NCPD Headquarters. *See* **Exhibit E**, p. 1068, ln. 24 – p. 1069, ln. 20; *see also* **Exhibit G**, p. 166, ln. 17-24, p. 214, ln. 3-9.

**Response: Undisputed.** This is not a material fact.

287.     This office was on the opposite side of the hallway from the NCPD Homicide Squad. *See* **Exhibit G**, p. 214, ln. 10-13.

**Response: Undisputed.** This is not a material fact.

288.     Prior to viewing the line-up, the only people in the room with Witherspoon were Det. Mullen and ADA Walsh. *See* **Exhibit E**, p. 1069, ln. 18-25.

**Response: Undisputed.** This is not a material fact.

289.     The office that Witherspoon was initially in was not the same room where the line- up was held. *See* **Exhibit E**, p. 1070, ln. 6-9; *see also* **Exhibit G**, p. 167, ln. 19-23.

**Response: Undisputed.** This is not a material fact.

290.     The plaintiff, the other fillers, and Det. Alger could not see Witherspoon during the line-up procedure. *See* **Exhibit G**, p. 225, ln. 19 – p. 226, ln. 4.

**Response: Undisputed.** This is not a material fact.

291.     Witherspoon could not see the room where the line-up was held from the office that she was initially placed in, and the door was closed at all times prior to viewing the line-up except when ADA Walsh came inside. *See* **Exhibit E**, p. 1070, ln. 10-13; *see also* **Exhibit G**, p. 167, ln. 24 – p. 168, ln. 3, p. 214, ln. 14-19.

**Response: Undisputed.** This is not a material fact.

292.     A member from the NCPD Crime Scene Unit took photographs of the line-up plaintiff participated in on April 11, 1995. *See* Photograph of Line-up (**Exhibit BBB**); *see also* **Exhibit G**, p. 226, ln. 18-20, p. 229, ln. 21-25; *see also* **Exhibit AAA**, p. 195, ln. 2 – p. 196, ln. 12.

**Response: Undisputed.**

293.     Det. Abbondandelo came to the office where Det. Mullen and Witherspoon were located, knocked on the door and said that they were ready for the line-up. *See* **Exhibit G**, p. 170, ln. 8-11, p. 216, ln. 6-16.

**Response: Undisputed.** This is not a material fact.

294.     Det. Mullen brought Witherspoon to the room to view the line-up (the NCPD Homicide Squad) and told Witherspoon to "look into the glass and concentrate on the people that [she] would be looking at to see if [she] can recognize anyone." *See* **Exhibit E**, p. 1070, ln. 17-22; *see also* **Exhibit G**, p. 171, ln. 10-14, p. 217, ln. 7-11, p. 218, ln. 7-12, p. 223, ln. 3-5.

**Response: Undisputed.**

295.     ADA Walsh and Cordero were both present when Witherspoon viewed the line-up. *See* **Exhibit G**, p. 170, ln. 20-25; *see also* **Exhibit EEEEE**, ¶4.  Cordero did not make any objections as to the manner in which the line-up procedure was conducted. *See* **Exhibit EEEEE**, ¶4.

**Response: Undisputed.** This is not a material fact.

296.     Det. Mullen never told Witherspoon that the person who shot Jason would be in the line-up that she was going to view. *See* **Exhibit E**, p. 1070, ln. 23-25; *see also* **Exhibit G**, p. 169, ln. 22-24.

**Response: Undisputed that there was testimony along these lines.** However, because Mullen is deceased and Witherspoon does not remember this interaction, there is no witness available to competently testify to these facts. *See* Dysart Report, Harvis Decl., Ex. 21.

297.     Witherspoon viewed the line-up consisting of six (6) black males on the other side of the glass. *See* **Exhibit E**, p. 1070, ln. 13-29; *see also* **Exhibit I**, p. 53, ln. 19-21.

**Response: Disputed.** The lineup was biased and Alger admits that plaintiff had by far the lightest complexion of the group and that the seated lineup concealed plaintiff's true height and the discrepancy between plaintiff's height and the height as described by Witherspoon. *See* Dysart Report, Harvis Decl., Ex. 21; Alger Dep., Harvis Decl., Ex. 48, 176:3-19, 177:7-25, 185:25-187:13, 186:23-187:7, 188:16-192:10, 196:13-16.

298.     These six (6) black males were each wearing a cap, had a white garment covering their bodies, and were each holding a number. *See* **Exhibit G**, p. 172, ln. 15-19, p. 227, ln. 8-20.

> **Response: Disputed.** The lineup was biased and Alger admits that plaintiff had by far the lightest complexion of the group and that the seated lineup concealed plaintiff's true height and the discrepancy between plaintiff's height and the height as described by Witherspoon. *See* Dysart Report, Harvis Decl., Ex. 21; Alger Dep., Harvis Decl., Ex. 48, 176:3-19, 177:7-25, 185:25-187:13, 186:23-187:7, 188:16-192:10, 196:13-16.

299.     Plaintiff was in this line-up in position #4. *See* **Exhibit G**, p. 172, ln. 20 – p. 173, ln. 2.

> **Response: Undisputed.**

300.     Within less than thirty (30) seconds of viewing the line-up, Witherspoon recognized and positively identified the man in position #4, plaintiff, as the person who pointed the gun at Jason on March 20, 1994. *See* **Exhibit I**, p. 53, ln. 22 – p. 54, ln. 17; *see also* **Exhibit E**, p. 1071, ln. 20 – p. 1072, ln. 17; *see also* **Exhibit G**, p. 171, ln. 10 – p. 172, ln. 5, p. 218, ln. 11-16.

> **Response: Disputed.** The lineup was biased and timing and confidence of Witherspoon's selection were not recorded. *See* Dysart Report, Harvis Decl., Ex. 21, pp. 17-22; Alger Dep., Harvis Decl., Ex. 48, 176:3-19, 177:7-25, 185:25-187:13, 186:23-187:7, 188:16-192:10, 196:13-16.

301.     Det. Mullen then brought Witherspoon back to the office they were originally waiting in, prepared a written statement for Witherspoon, reviewed this written statement with her and had her sign it. *See* **Exhibit G**, p. 173, ln. 3-7, p. 218, ln. 16-19, p. 219, ln. 6-12; *see also* Witherspoon Line-Up Written Statement (**Exhibit CCC**).

> **Response: Undisputed that there was testimony along these lines.** However, because Mullen is deceased and Witherspoon does not remember this interaction, there is no witness available to competently testify to these facts. *See* Dysart Report, Harvis Decl., Ex. 21.

302.     On April 11, 1995, throughout the line-up process, Det. Alger filled in the Line-Up Worksheet. *See* NCPD Paperwork for April 11, 1995 Line-up (**Exhibit**

DDD), p. 3; *see also* **Exhibit AAA**, p. 181, ln. 6-22.  Per this Line-Up Worksheet, Det. Sgt. Severin, ADA Walsh, Cordero, Det. Abbondandelo, Det. Mullen, Det. Alger and Det. Donnelly were present for the line- up procedure. *See* **Exhibit DDD**, p. 3.

> **Response: Plaintiff objects on the grounds that this is a compound statement.**  However, plaintiff agrees that Alger filled out paperwork listing attendees. This is not a material fact.

303.    ADA Walsh prepared to present the case to the Grand Jury. *See* **Exhibit XX**, p. 97, ln. 20 – p. 98, ln. 6; *see also* **Exhibit EEEEE**, ¶¶3-5. ADA Walsh spoke with Witherspoon and Jenkins about their observations on the night Jason was murdered, and also spoke with Det. Abbondandelo, Det. Mullen and Det. Dempsey regarding their investigation into Jason's murder. *See* **Exhibit EEEEE**, ¶¶3-5.

> **Response: Disputed.** Walsh did not adequately prepare because he did not have the information necessary. Walsh did not appreciate that Montes and Larrea claimed to have witnessed the crime, called 911 and chased the shooter, that Elisa Valdez and her boyfriend could corroborate their account, and that the shooter in the alternative narrative was five inches shorter than plaintiff with much darker skin. As a result the grand jury never learned about these facts. Walsh Dep., Harvis Decl., Ex. 3, 53:24-59:15, 62:21-16, 64:11-22, 227:4-228:11.

304.    ADA Walsh began presented the case relating to Jason's murder to the Grand Jury on April 12, 1995. *See* **Exhibit I**; *see also* **Exhibit EEEEE**, ¶5. After Det. Abbondandelo, Jenkins, Witherspoon, Det. Mullen and Det. Dempsey testified (*see* **Exhibit I**), on April 19, 1995, the Nassau County Grand Jury indicted plaintiff for the following crimes related to Jason's death:  1) NYS Penal Law section 125.25(1) – Murder in the Second Degree; 2) NYS Penal Law section 215.17(1) – Intimidating a Witness in the First Degree; and 3) NYS Penal Law section 205.60 – Hindering Prosecution in the Second Degree. *See* Nassau County Indictment No. 91607-1995 (**Exhibit RR**); *see also* **Exhibit I**; *see also* **Exhibit EEEEE**, ¶5.

> **Response: Plaintiff objects on the grounds this is a compound statement.** Plaintiff does not dispute that a case against him was presented to the grand jury, but notes that the grand jury was not told about Montes and Larrea, the 911 call, Elisa Valdez and her boyfriend, Peddie Jenkins' first statement, the benefits being conveyed to Peddie Jenkins and that Skwanitra Witherspoon believed the shooter was 5'7", and was falsely

informed that Peddie Jenkins' testimony was truthful and that plaintiff had voluntarily confessed. Walsh Dep., Harvis Decl., Ex. 3, 53:24-59:15, 62:21-16, 64:11-22, 227:4-228:11.

305.　　On November 6, 1995, November 8, 1995, November 9, 1995, November 21, 1995, November 22, 1995, January 24, 1996, January 25, 1996, January 26, 1996, February 13, 1996, February 14, 1996 and February 15, 1996, a pre-trial suppression hearing relating to Nassau County Indictment Nos. 91607-1995 and 91134-1995 was held before Nassau County Court Honorable Abbey L. Boklan. *See generally* **Exhibit F, Exhibit G and Exhibit H.** ADA Walsh handled the pre-trial hearing for NCDA and plaintiff was represented by Cordero. *See generally* Exhibit F, Exhibit G and Exhibit H.

> **Response: Undisputed.** However, plaintiff respectfully objects on the grounds that this is a compound statement and notes that his former attorney's surname is "Cordaro."

306.　　Before the hearing commenced, several exhibits, which were provided to Cordero as *Rosario* material, were marked for identification as evidence. *See* **Exhibit F**, p. 2, ln. 4 – p. 7, ln. 9; *see also* **Exhibit EEEEE**, ¶6. Cordero acknowledged receipt of the *Rosario* material on the record in open court. *See* **Exhibit F**, p. 2, ln. 4 – p. 7, ln. 9.

> **Response: Undisputed.**

307.　　Exhibit 42, which included the names, contact information and addresses of Larrea and Montes, as well as a narrative indicating that they had provided written statements ("32bs"), was included in this *Rosario* material that Cordero acknowledged receipt of. *See* **Exhibit F**, p. 5, ln. 7-8, p. 7, ln. 6-9; *see also* **Exhibit HH**, p. 3, 5 and 7; *see also* **Exhibit III**, p. 50, ln. 24 – p. 52, ln. 10; *see also* **Exhibit EEEEE**, ¶6.

> **Response: Disputed.** This material was either not produced or produced in redacted form. Walsh Dep., Harvis Decl., Ex. 3, 236:12-16; Brettschneider Dep., Harvis Decl., Ex. 31, 61:8-18, 74:12-75:5, 76:20-24, 77:13-78:3; Anania Dep., Harvis Decl., Ex. 28, 223:14-21.

308.　　Det. Sorrentino, Det. Haggerty, Det. Abbondandelo, Det. Dempsey, Det. Mullen, Det. Alger, Det. Kemp, Velma Fitzptrick (CI), ADA Klein and Det. Kosior all testified during the pre-trial suppression hearing. *See generally* **Exhibit F, Exhibit G and Exhibit H.**

**Response: Undisputed.** This is not a material fact.

309.     Plaintiff also testified at the pre-trial suppression hearing on February 13, 1996 and February 14, 1996. *See* **Exhibit H**, p. 42 – p. 212.

**Response: Undisputed.**

310.     On August 12, 1996, after presiding over the pre-trial suppression hearing and hearing testimony from the plaintiff, Det. Sorrentino, Det. Haggerty, Det. Abbondandelo, Det. Dempsey, Det. Mullen, Det. Alger, Det. Kemp, Velma Fitzptrick (CI), ADA Klein and Det. Kosior, Judge Boklan issued a decision. *See* Judge Boklan's August 12, 1996 Decision (**Exhibit EEE**).

> **Response: Undisputed.** Given that Nassau County moved to vacate plaintiff's conviction and dismiss the indictment on the grounds of a *Brady* violation, this is not a material fact. The hearing court was misled under the County's own characterization of the events. *See* § 440.10 Motion, Harvis Decl., Ex. 29.

311.     Judge Boklan did not credit plaintiff's testimony at the suppression hearing. *See* **Exhibit EEE**, p. 9; *see also* **Exhibit EEEEE**, ¶6.

> **Response: Undisputed.** Given that Nassau County moved to vacate plaintiff's conviction and dismiss the indictment on the grounds of a *Brady* violation, this is not a material fact. The hearing court was misled under the County's own characterization of the events. *See* § 440.10 Motion, Harvis Decl., Ex. 29.

312.     In addition, Judge Boklan held "the credible evidence adduced at the hearing demonstrates that the delay in arraigning the defendant on the charges upon which he was taken into custody was neither 'unnecessary' nor solely purposed to obtain an uncounseled confession." *See* **Exhibit EEE**, p. 10.

> **Response: Undisputed.** Given that Nassau County moved to vacate plaintiff's conviction and dismiss the indictment on the grounds of a *Brady* violation, this is not a material fact. The hearing court was misled under the County's own characterization of the events. *See* § 440.10 Motion, Harvis Decl., Ex. 29; *see also* Dempsey Dep., Harvis Dec., Ex. 17, 169:2-16, 374:25-375:16.

313.     Judge Boklan also held that "[t]here was sufficient probable cause to arrest

[plaintiff] on narcotics charges...[and] the police had more than ample probable cause to arrest the defendant for the murder of Steven Jason." *See* **Exhibit EEE**, p. 11, 16.

> **Response: Undisputed.** Given that Nassau County moved to vacate plaintiff's conviction and dismiss the indictment on the grounds of a *Brady* violation, this is not a material fact. The hearing court was misled under the County's own characterization of the events. *See* § 440.10 Motion, Harvis Decl., Ex. 29; *see also* Dempsey Dep., Harvis Dec., Ex. 17, 169:2-16, 374:25-375:16.

314.    In addition, Judge Boklan held "[t]here is no credible evidence here to indicate that the [plaintiff] was either subjected or succumbed to continuous interrogation, intimidation, coercion, threats, improper inducements or other unfair tactics by the police which might have resulted in a false confession...the [plaintiff's] statements to the police were freely and voluntarily given. That portion of the [plaintiff's] motion seeking to suppress his statements to law enforcement authorities is in all respects denied." *See* **Exhibit EEE**, p. 15-16; *see also* **Exhibit EEEEE**, ¶6.

> **Response: Undisputed.** Given that Nassau County moved to vacate plaintiff's conviction and dismiss the indictment on the grounds of a *Brady* violation, this is not a material fact. The hearing court was misled under the County's own characterization of the events. *See* § 440.10 Motion, Harvis Decl., Ex. 29; *see also* Dempsey Dep., Harvis Dec., Ex. 17, 169:2-16, 374:25-375:16. The hearing court also did not consider Dempsey's founded history of coercive conduct, which is admissible and probative on defendants' motion. *See* Dempsey Dep., Harvis Decl., Ex. 17, 41:14-42:21, 47:17-25, 43:13-44:17, 52:16-55:13, 66:20-23, 67:3-69:4, 72:17-24, 77:4-11, 77:12-82:20, 82:21-25, 85:9-87:3, 87:4-9 (discussing examples of allegations of coercive interrogation tactics made against Dempsey over decades, none of which were investigated by Nassau County); Lee Verdict Sheet, Harvis Decl., Ex. 44, p. 5 (reflecting civil jury finding that Dempsey "affirmatively misled" Shonnard Lee into signing a false confession); *see* Fed. R. Evid. 608(b)(1).

315.    Finally, Judge Boklan held "[t]he two photopacks shown to [Skwanitra Witherspoon], as well as the corporeal lineup which she viewed, were not unduly suggestive. [citations omitted]. [Witherspoon] may therefore testify at trial regarding her identification of the [plaintiff] at the line-up. Moreover, her potential in-court testimony otherwise identifying the defendant has not been tainted by any improper or

unduly suggestive identification procedure and will therefore not be suppressed." *See* **Exhibit EEE**, p. 16; *see also* **Exhibit EEEEE**, ¶6.

> **Response: Undisputed.** However, given that Nassau County moved to vacate plaintiff's conviction and dismiss the indictment on the grounds of a *Brady* violation, this is not a material fact. In this civil action, there is significant evidence that Witherspoon's identifications were tainted, biased and suggestive. *See* Dysart Report, Harvis Decl., Ex. 21.

316.     After the pre-trial suppression hearing, plaintiff fired Cordero as his criminal defense attorney, and hired Scott Brettschneider ("Brettschneider") in his stead. *See* **Exhibit B**, p. 73, ln. 24 – p. 75, ln. 2; *see also* **Exhibit III**, p. 11, ln. 6-21.

> **Response: Disputed in part.** The discharged attorney's surname is Cordaro.

317.     Brettschneider was retained before plaintiff's criminal trial and was given at least a month to prepare for the trial. *See* **Exhibit III**, p. 11, ln. 15 – p. 12, ln. 5.

> **Response: Disputed.** Brettschneider felt the schedule did not allow him sufficient time to prepare. Brettschneider Dep., Harvis Decl., Ex. 31, 11:15-12:5.

318.     Brettschneider received a copy of Cordero's file, which included the transcripts from plaintiff's pre-trial suppression hearing. *See* **Exhibit III**, p. 78, ln. 4-19.

> **Response: Disputed in part.** Plaintiff agrees that Brettschneider received a file from Cordaro, but there is no record of its contents.

319.     The pre-trial hearing transcripts indicate that Cordero was in possession of Exhibit 42 as of at least November 6, 1995, approximately a year prior to plaintiff's criminal trial. *See* **Exhibit III**, p. 78, ln. 4-19; *see also* **Exhibit HH**; *see also* **Exhibit F**, p. 5, ln. 7-8, p. 7, ln. 6-9.

> **Response: Disputed.** Brettschneider has no recollection of seeing the Freeport Incident Report and believes it was never disclosed or disclosed only with the witness information redacted. Brettschneider Dep., Harvis Decl, Ex. 31, 36:13-27:7. Brettschneider did not know what a "32b" was and does not recall having seen a 32b in any other case. Id. at 39:21-40:17. Brettschneider does not think he received all of the pages of the Freeport Incident Report and is certain the version of the report he received was

redacted. Id. at 61:8-18, 76:20-24, 77:13-78:3. In Brettschneider's experience, names, addresses and phone numbers of witnesses were usually redacted, especially in a case like plaintiff's in which the allegation was that a potential grand jury witness was shot and killed. Id. at 74:12-75:5.

320.      ADA Walsh provided Brettschneider with *Rosario* material which consisted of 102 items. *See* **Exhibit E**, p. 462, ln. 22 – p. 463, ln. 24; *see also* Rosario List provided to Brettschneider (**Exhibit JJJ**). Included in the *Rosario* material ADA Walsh provided to Brettschneider was Exhibit 42. *See* **Exhibit E**, p. 462, ln. 22 – p. 463, ln. 24; *see also* **Exhibit JJJ**, p. 3; *see also* **Exhibit HH**.

**Response: Undisputed.**

321.      Brettschneider reviewed all the *Rosario* material given to him by ADA Walsh, requested ADA Walsh to make copies of items that he did not have, and later confirmed that he had received all *Rosario* material, which ultimately consisted of 104 items, and included Exhibit 42. *See* **Exhibit E**, p. 472, ln. 23 – p. 473, ln. 6; 475, ln. 16 – p. 476, ln. 9; *see also* **Exhibit JJJ**; *see also* **Exhibit III**, p. 57, ln. 3-20; *see also* **Exhibit HH**.

> **Response: Disputed.** Brettschneider has no recollection of seeing the Freeport Incident Report and believes it was never disclosed or disclosed only with the witness information redacted. Brettschneider Dep, Harvis Decl., Ex. 31, 36:13-27:7. Brettschneider did not know what a "32b" was and does not recall having seen a 32b in any other case. *Id.* at 39:21-40:17. Brettschneider does not think he received all of the pages of the Freeport Incident Report and is certain the version of the report he received was redacted. *Id.* at 61:8-18, 76:20-24, 77:13-78:3. In Brettschneider's experience, names, addresses and phone numbers of witnesses were usually redacted, especially in a case like plaintiff's in which the allegation was that a potential grand jury witness was shot and killed. *Id.* at 74:12-75:5.

322.      All 104 items, which included Exhibit 42, of *Rosario* material were marked by the Court reporter for identification. *See* **Exhibit E**, p. 472, ln. 23 – p. 473, ln. 6; *see also* **Exhibit III**, p. 57, ln. 3-20.

> **Response: Disputed.** Brettschneider has no recollection of seeing the Freeport Incident Report and believes it was never disclosed or disclosed only with the witness information redacted. Brettschneider Dep., Harvis Decl., Ex. 31, 36:13-27:7. Brettschneider did not know what a "32b" was

and does not recall having seen a 32b in any other case. *Id.* at 39:21-40:17. Brettschneider does not think he received all of the pages of the Freeport Incident Report and is certain the version of the report he received was redacted. *Id.* at 61:8-18, 76:20-24, 77:13-78:3. In Brettschneider's experience, names, addresses and phone numbers of witnesses were usually redacted, especially in a case like plaintiff's in which the allegation was that a potential grand jury witness was shot and killed. *Id.* at 74:12-75:5.

323.     Since Brettschneider received Exhibit 42, he had the contact information for Montes and Larrea, possessed a description of their observations the early morning of March 20, 1994, and had information in his possession that Montes and Larrea signed supporting depositions ("32bs") prior to plaintiff's criminal trial commencing. *See* **Exhibit E**, p. 472, ln. 23 – p. 473, ln. 6; 475, ln. 16 – p. 476, ln. 9; *see also* **Exhibit HH**, p. 3, 5 and 7; *see also* **Exhibit III**, p. 57, ln. 3-20.

> **Response: Disputed.** Brettschneider has no recollection of seeing the Freeport Incident Report and believes it was never disclosed or disclosed only with the witness information redacted. Brettschneider Dep., Harvis Decl., Ex. 31, 36:13-27:7. Brettschneider did not know what a "32b" was and does not recall having seen a 32b in any other case. *Id.* at 39:21-40:17. Brettschneider does not think he received all of the pages of the Freeport Incident Report and is certain the version of the report he received was redacted. *Id.* at 61:8-18, 76:20-24, 77:13-78:3. In Brettschneider's experience, names, addresses and phone numbers of witnesses were usually redacted, especially in a case like plaintiff's in which the allegation was that a potential grand jury witness was shot and killed. *Id.* at 74:12-75:5.

324.     Brettschneider did not know whether Larrea's and Montes' testimony would have been helpful to plaintiff. *See* **Exhibit III**, p. 39, ln. 6-11. Brettschneider may not have contacted Larrea and Montes because it was possible that their testimony may not have been favorable to the plaintiff. **Exhibit III**, p. 76, ln. 25 – p. 77, ln. 12.

> **Response: Undisputed.** This is a compound statement, and this testimony is predicated on Brettschneider not having the benefit of the suppressed Montes and Larrea statements.

325.     Included in the *Rosario* material provided to Brettschneider were notes of Det. Mullen's conversation with Baldwin, which was marked for identification as trial exhibit 57. *See* **Exhibit JJJJ**; *see also* **Exhibit JJJ**, p. 3.

**Response: Plaintiff agrees that notes referencing Peddie Baldwin were included in the *Rosario* disclosures.**

326.     Plaintiff's criminal trial started on November 4, 1996. *See* **Exhibit E**, p. 1. After a jury was selected, on November 13, 1996, ADA Walsh gave his opening statement for the NCDA, and Brettschneider gave his opening statement for then defendant, now the plaintiff. *See* **Exhibit E**, p. 23 – p. 507.

**Response: Undisputed.** This is not a material fact.

327.     During the criminal trial, Witherspoon identified plaintiff as the person who she saw point a gun at Jason. *See* **Exhibit E**, p. 1062, ln. 11-23, p. 1071, ln. 20 – p. 1072, ln. 17.

**Response: Disputed.** This identification is invalid because Witherspoon only saw the lips of a hooded 5'7" man before she ran away and heard shots. She was later shown a biased array and tainted lineup. *See* Dysart Report, Harvis Decl., Ex. 21. Witherspoon identifying plaintiff as having similar lips is immaterial given the suppressed evidence and fair trial deprivations. Anania Dep., Harvis Decl., Ex. 28, 103:103:14-19.

328.     During the criminal trial, Brettschneider extensively cross-examined Jenkins. *See* **Exhibit E**, p. 779, ln. 2 – p. 1018, ln. 13; p. 1036, ln. 8 – p. 1042, ln. 22; p. 1044, ln. 5-11. Jenkins identified plaintiff as the person he saw outside Blimpies who shot Jason. *See* **Exhibit E**, p. 745, ln. 25 – p. 746, ln. 12.

**Response: Undisputed.** This is not a material fact.

329.     Jenkins accurately testified at plaintiff's criminal trial that he saw plaintiff run towards the Blimpies parking lot and that he saw plaintiff shoot Jason. *See* **Exhibit K**, p. 21, ln. 10-13, p. 22, ln. 5 – p. 23, ln. 4.On December 9, 1996, the jury rendered a verdict and found plaintiff guilty of all of the criminal charges under Indictment No. 91607. *See* **Exhibit E**, p. 2535, ln. 17 – p. 2536, ln. 12.

**Response: Undisputed.** Plaintiff objects to this assertion as compound. When Jenkins spoke to investigators in 2017 he reverted to his first version of the story. Walsh Dep., Harvis Decl., Ex. 3, 127:7-129:5; Anania Memo and Notes, Harvis Decl., Ex. 2, p. 7.

330.     On January 28, 1997, Jenkins pled guilty to Criminal Facilitation in the Second Degree in connection with his involvement of the murder of Jason. *See* **Exhibit**

**K,** p. 15, ln. 11- 21; *see also* February 28, 1997 Sentencing Transcript for Jenkins (**Exhibit RRR**).

> **Response: Undisputed.**

331.     On February 28, 1997, Jenkins was sentenced to 2 to 6 years' incarceration for his role in Jason's murder. *See* **Exhibit RRR**; *see also* **Exhibit K**, p. 15, ln. 22 – p. 16, ln. 7.

> **Response: Undisputed.**

332.     On March 7, 1997, plaintiff was sentenced to 25 years to life imprisonment. *See* **Exhibit A**, at ¶106.

> **Response: Undisputed.**

333.     Brettschneider filed an appeal to the New York State Appellate Division Second Department on behalf of plaintiff. *See* NYS Appellate Division Second Department March 11, 2002 Decision (**Exhibit SSS**); *see also* **Exhibit III**, p. 13, ln. 25 – p. 14, ln. 5.  On March 11, 2002, the NYS Appellate Division Second Department issued a Decision and Order denying plaintiff's appeal. *See* **Exhibit SSS**.

> **Response: Undisputed.**

334.     After plaintiff filed a petition for Habeas Corpus under EDNY Docket Number 03- cv-0426 (DRH), on July 29, 2004, District Court Judge Denis Hurley issued a memorandum of Decision and Order denying plaintiff's Habeas Corpus petition. *See* Plaintiff's Habeas Corpus Petition (**Exhibit FFFFF**); *see also* Judge Hurley's July 29, 2004 Decision and Order (**Exhibit VVV**).

> **Response: Undisputed.**

335.     Anthony Mayol ("Mayol") was an attorney and a personal friend of plaintiff who was aware of plaintiff's case since the time of his conviction. *See* **Exhibit III**, p. 13, ln. 3-6; *see also* **Exhibit C**, p. 12, ln. 12-20.

> **Response: Plaintiff agrees that he is acquainted with Mr. Mayol and that Mayol is an attorney who has voluntarily assisted plaintiff.**

336.     At some point in time, Brettschneider gave Mayol his file with respect to plaintiff's criminal case. *See* **Exhibit III**, p. 12, ln. 10-18; *see* August 5, 2004 Letter from

Mayol to Brettschneider (**Exhibit TTT**); *see also* Brettschneider's February 7, 2005 Letter (**Exhibit UUU**).

> **Response: Undisputed.**

337.    On August 5, 2004, attorney Mayol wrote a letter to Brettschneider, which included a copy of the *Rosario* list, acknowledging that Brettschneider gave Mayol his file for plaintiff's criminal case, that he reviewed Exhibit 42, and as a result of reviewing Exhibit 42, he noticed that there were supporting depositions from Montes and Larrea that were missing from his file when the file was transferred. *See* **Exhibit TTT**; *see also* **Exhibit III**, p. 86, ln. 5-20.

> **Response: Disputed as incomplete.** A few weeks after Mayol wrote to Brettschneider, he wrote to ADA Mike Walsh and his appellate counsel Peg Manesh to formally raise the issue of the missing Montes and Larrea statements. Mike Walsh and the District Attorney's office appear to have taken no action and Walsh claims he never saw the letter and first became aware of the statements thirteen years later in 2017 when Anania showed them to him. *See*, Letters from Anthony Mayol, annexed to the Harvis Decl. as Ex. 68 ("Mayol Letters"), County213-222; Walsh Dep., Harvis Decl., Ex. 3, 149:16-157:1; Walsh Dep., Harvis Decl., Ex. 3, 158:7-23, 159:23-160:23; Plaintiff's FOIL Request, June 25, 2007, annexed to the Harvis Decl., as Ex. 69 ("FOIL Request"), County3147-3148, County3147, ¶¶ 2-3; NCDA FOIL Response, July 24, 2007, annexed to the Harvis Decl. as Ex. 70, County3151-3152 (District Attorney Foil response noting that "[T]he file related to your case does not contain a copy of any statements made by Glenn Montes or Maurice Lorea (sic) and an 'agency need not prepare any record not possessed' by such agency.'…Therefore, this portion of your request must be denied.").

338.    On December 6, 2004, plaintiff wrote a letter to District Court Judge Denis Hurley stating that for the past "two years [plaintiff wrote to] Brettschneider, requesting that he send to me the proper documents to perfect [his] appeal." *See* **Exhibit C**, p. 78, ln. 12 – p. 79, ln. 9; *see also* Plaintiff's December 6, 2005 letter to District Court Judge Denis Hurley (**Exhibit GGGG**).

> **Response: Undisputed.** This is not a material fact.

339.    On February 7, 2005, Brettschneider wrote a letter to plaintiff indicating that "all of your files that I have were turned over to Anthony Mayol." *See* **Exhibit**

UUU.

> **Response: Undisputed.** This is not a material fact.

340.     On March 18, 2005, the United States Court of Appeals for the Second Circuit issued a Mandate denying plaintiff's requests and dismissing plaintiff's appeal of District Court Judge Dennis Hurley's Decision and Order denying plaintiff's Habeas Corpus petition. *See* March 18, 2005 Mandate from Second Circuit (**Exhibit WWW**).

> **Response: Undisputed.**

341.     In 2005, Mayol sent plaintiff Exhibit 42 and told plaintiff that he needed to get Montes' and Larrea's statements referenced in the report. *See* **Exhibit C**, p. 26, ln. 19 – p. 28, ln. 15.

> **Response: Undisputed.** This is not a material fact.

342.     On June 25, 2007, Plaintiff prepared a FOIL request dated June 5, 2007 and sent it to the NCDA's Office which included a specific request for Montes' and Larrea's written statements. *See* **Exhibit C**, p. 10, ln. 4-13; *see also* Plaintiff's June 25, 2007 FOIL Request to NCDA (**Exhibit NNN**).

> **Response: Undisputed.**

343.     Plaintiff believes he received the Montes and Larrea statements with the pack of 91 documents included in the November 5, 2007 FOIL response from the NCPD. *See* **Exhibit C**, p. 23, ln. 14 – p. 25, ln. 5, p. 32, ln. 6-22, p. 33, ln. 10-23; *see also* NCPD's November 5, 2007 FOIL Response (**Exhibit OOO**);

> **Response: Undisputed.**

344.     After receiving Montes' and Larrea's statements, plaintiff claims that he wrote letters to numerous other attorneys about these statements seeking assistance on what plaintiff should do, but plaintiff did not reach out to the NCDA regarding these statements. *See* **Exhibit C**, p. 33, ln. 24 – p. 40, ln. 12.

> **Response: Disputed.** As noted above in response to Fact 337, plaintiff brought the issue of the missing Montes and Larrea statements to the attention of ADA Mike Walsh and ADA Peg Manesh in writing and the DA took no action. *See* Mayol Letters, Harvis Decl., Ex. 68, County215-222; Walsh Dep., Ex. 3, 149:16-157:1; Mayol Letters, Harvis Decl., Ex.

68, County213-222; Walsh Dep., Harvis Decl., Ex. 3, 158:7-23, 159:23-160:23; FOIL Request, Harvis Decl., Ex. 69, County3147-3148, County3147, ¶¶ 2-3. Indeed, NCDA did not create its Conviction Integrity Unit until 2013. Anania Dep., Harvis Decl., Ex. 28, 22:2-23:4.

345.    On December 15, 2021, plaintiff served a revised 30(b)(6) notice upon the County. *See* Plaintiff's revised 30(b)(6) notice (**Exhibit NNNN**).

**Response: Undisputed.** This is not a material fact.

346.    The NCPD Police Academy teaches police recruits, supervisors, and detectives within the NCPD. *See* County 30(b)(6) witness P.O. Christopher Boccio EBT Transcript (**Exhibit LLLL**), p. 14, ln. 18 – p. 15, ln. 4.

**Response: Undisputed.** This is not a material fact.

347.    A NCPD police officer promoted to the rank of detective receives approximately 69 hours of additional instruction and training which includes the Criminal Investigator Course as outlined by the Division of Criminal Justice Services ("DCJS") for New York State. *See* **Exhibit LLLL**, p. 15, ln. 5-12.

**Response: Undisputed.** This is not a material fact.

348.    NCPD detectives are trained in a course specifically devoted to the custodial interrogation of criminal suspects titled "Admissions, Confessions, and Miranda." *See* **Exhibit LLLL**, p. 15, ln. 18 – p. 16, ln. 2.

**Response: Undisputed.** This is not a material fact.

349.    Since 1974, the "Admissions, Confessions, and Miranda" course has generally retained the same format, with periodic updates and amendments based on changes and developments in law. *See* **Exhibit LLLL**, p. 17, ln. 2-12, p. 22, ln. 3-10.

**Response: Undisputed.** This is not a material fact.

350.    In the NCPD, if a new case is decided that alters the NCPD training curriculum, the NCPD Police Academy takes the case and amends the curriculum; if a case comes down that would change something that a detective currently assigned to the detective division would do, an update would be created in the form of a legal bulletin and dispersed to the entire NCPD. *See* **Exhibit LLLL**, p. 17, ln. 13 – p. 19, ln. 15.

> **Response: Undisputed.** This is not a material fact.

351.     Between 1974 and 1994, NCPD detectives who went through the basic training course also received in-service training on various topics every three to five years. *See* **Exhibit LLLL**, p. 20, ln. 7-21.

> **Response: Undisputed.** This is not a material fact.

352.     Between 1974 and 1994, members of the NCPD who were assigned to supervise detectives underwent a basic supervisor training course outlined by NYS DCJS, and these supervisors generally had experience in the detective division prior to supervising NCPD detectives. *See* **Exhibit LLLL**, p. 21, ln. 2-17.

> **Response: Undisputed.** This is not a material fact.

353.     Between 1974 and 1994, NCPD Police Academy training materials and training courses related to detectives and their supervisors were not changed or revised based solely upon allegations that had been made against the County regarding improper interrogation tactics by homicide squad detectives, or based solely upon any complaints that the County had received regarding the way interrogations were being conducted. *See* **Exhibit LLLL**, p. 22, ln. 11 – p. 23, ln. 10.   However, materials and courses were updated to account for changes in the law. *See* **Exhibit LLLL**, p. 17, ln. 13 – p. 19, ln. 15.

> **Response: Undisputed.** This is not a material fact.

354.     All complaints made against NCPD officers are reviewed by the Office of Internal Affairs. *See* County 30(b)(6) witness Inspector Arthur Pitre EBT Transcript (**Exhibit MMMM**), p. 14, ln. 8-20.

> **Response: Undisputed.** This is not a material fact.

355.     From 1974 to 1994, if a civilian has a complaint about the way that they were treated in NCPD custody, the civilian would contact NCPD, complete a complaint tracking, then the NCPD supervisor would complete the complaint tracking form, the complaint would be vetted through Internal Affairs, and then the complaint would be investigated. *See* **Exhibit MMMM**, p. 21, ln. 17 – p. 22, ln. 22, p. 24, ln. 17-24.

> **Response: Disputed.** According to John Restivo: "After being assaulted by Defendant Dempsey, I demanded to leave. They wouldn't let me

leave…They told me, 'You don't have any rights here.'" Dempsey Dep., Harvis Decl., Ex. 17, 71:10-19; Deposition Transcript of John Restivo, 06 CV 6695, June 13, 2011, annexed to the Harvis Decl., as Ex. 71 ("Restivo Dep."), 637:5-11. By letter dated March 28, 1985, Nassau County Police Commissioner Samuel Rozzi acknowledged Mr. Restivo's complaint and pledged that an inquiry would be conducted into the allegations. Dempsey Dep., Harvis Decl., Ex. 17, 67:3-69:4; *see* "PX115 Letter response about Restivo complaint," annexed to the Harvis Decl. as Ex. 72 ("Letter Response: Restivo Complaint"). No inquiry was ever conducted into Mr. Restivo's allegations against Dempsey, and Dempsey was never questioned about Restivo's allegations. Dempsey Dep., Harvis Decl., Ex. 17, 69:5-25, 72:17-24, 77:4-11.

356.    If a police officer saw a fellow police officer violating a civilian's rights, they would complete the same complaint tracking form that the civilian would complete, and police officers are obligated to report any violation of a civilian's rights. *See* **Exhibit MMMM**, p. 23, ln. 7 – p. 24, ln. 6.

> **Response: Disputed in part. D**efendants in this case have not submitted any such reports. Alger Dep., Harvis Decl., Ex. 48, 46:21-47:23; Severin Dep., Harvis Decl., Ex. 11, 82:9-13.; Dempsey Dep., Harvis Decl., Ex. 17, 26:12-15.

357.    The County, through multiple avenues, searched records, or had records searched, regarding complaints made between 1974 and 1994 to the NCPD alleging coercive interrogation tactics by homicide detectives, and located one complaint made regarding coercive interrogation tactics. *See* **Exhibit MMMM**, p. 29, ln. 13 – p. 31, ln. 9, p. 40, ln. 21 – p. 41, ln. 3.

> **Response: Plaintiff agrees that the County testified as such but does not credit this response.** *See* Dempsey Dep., Harvis Decl., Ex. 17, 41:14-42:21, 47:17-25, 43:13-44:17, 52:16-55:13, 66:20-23, 67:3-69:4, 72:17-24, 77:4-11, 77:12-82:20, 82:21-25, 85:9-87:3, 87:4-9 (discussing examples of allegations of coercive interrogation tactics made against Dempsey over decades, none of which were investigated by Nassau County); Lee Verdict Sheet, Harvis Decl., Ex. 44, p. 5 (reflecting civil jury finding that Dempsey "affirmatively misled" Shonnard Lee into signing a false confession); *see* Fed. R. Evid. 608(b)(1).

358.     Pursuant to plaintiff's revised 30(b)(6) notice, the County searched for records regarding "the nature, extent, and findings of the County's investigations into the allegations of misconduct presented by" eleven (11) different complainants, and the County located records indicating that there was an investigation for one (1) of the eleven (11) listed complainants. *See* **Exhibit NNNN**; *see also* **Exhibit MMMM**, p. 42, ln. 11 – p. 43, ln. 15.

**Response: Plaintiff agrees that these allegations were never investigated.**

359.     The County's investigation into this one complainant's allegations, which were made in 2002, was undetermined, meaning that there was no evidence to show if the allegations were founded or unfounded. *See* **Exhibit MMMM**, p. 45, ln. 6-18, p. 47, ln. 8-14.

**Response: Disputed.** There appears to have been significant evidence that Severin also supervised a false confession in the Jose Anibal Martinez case. *See* Complaint in *Jose Anibal Martinez v. Nassau County*, et al., 02 CV 4985 (JS) (WDW), DE #1, annexed to the Harvis Decl. as Ex. 73; Vargas, Theresa, New York Newsday, January 11, 2002, *Probe in Confession Case*, annexed to the Harvis Decl. as Ex. 74; *See* Gootman, Elissa, N.Y. Times, Jan. 15, 2002, *Wrongly Held in a Killing, a Man Is Freed*, annexed to the Harvis Decl. as Ex. 75; Lam, Chau, New York Newsday, April 11, 2005, *False Confessions*, annexed to the Harvis Decl. as Ex. 76.

360.     After the County conducted its search, the County did not locate any records that the remaining ten (10) complainants listed in plaintiff's revised 30(b)(6) notice made allegations to the County about the way that they were treated by homicide detectives. *See* **Exhibit MMMM**, p. 44, ln. 8-17; *see also* **Exhibit NNNN**.

**Response: Undisputed that the allegations were not investigated.**

361.     Plaintiff wrote a letter dated June 29, 2017, to the NCDA Conviction Integrity Unit ("CIU") requesting to have his conviction reviewed in light of Montes' and Larrea's statements. *See* **Exhibit C**, p. 47, ln. 12 – p. 48, ln. 10; *see* Plaintiff's June 29, 2017 letter to NCDA Conviction Integrity Unit (**Exhibit LLL**).

**Response: Undisputed.**

362.     ADA Sheryl Anania ("ADA Anania") responded to plaintiff's letter by sending plaintiff a letter dated September 27, 2017. *See* ADA Anania's September 27,

2017 letter to plaintiff (**Exhibit MMM**).

     **Response: Undisputed.** This is not a material fact.

363.    ADA Anania reviewed Montes' and Larrea's written statements, and on their face, it was not clear if their statements were material, and it was unclear to ADA Anania if Montes and Larrea were chasing the shooter. *See* ADA Sheryl Anania EBT Transcript (**Exhibit KKK**) p. 48, ln. 25 – p. 49, ln. 11.

     **Response: Disputed.** The materiality of the statements does not turn on whether Montes and Larrea were chasing the shooter. In any event, Anania concluded that they likely were, and that Peddie Jenkins may have been the shooter. Walsh Dep., Harvis Decl., Ex. 3,129:6-130:14, 253:11-254:15; Anania Dep., Harvis Decl., Ex. 28, 29:19-24, 42:12-43:9; Anania Memo and Notes, Harvis Decl., Ex. 2, p. 7.

364.    ADA Anania believes that there is evidence that corroborates the content of plaintiff's fifteen (15) page written confession and that the plaintiff told the detectives what was in plaintiff's written confession. *See* **Exhibit KKK**, p. 97, ln. 5-12; p. 99, ln. 2 – p. 102, ln. 3.

     **Response: Undisputed.** This is not a material fact.

365.    ADA Anania spoke with Witherspoon, who denied that NCPD detectives pressured her to pick someone in the photo array and line-up, and was confident that when she identified plaintiff in court, she identified Jason's murderer. *See* **Exhibit KKK**, p. 134, ln. 25 – p. 135, ln. 14.

     **Response: Disputed.** Witherspoon told Anania she saw the lips of a hooded 5'7" male and that she could not remember the identification procedures and is thus unable to bolster them. Anania Dep., Harvis Decl., Ex. 28, 27:20-29:3.

366.    ADA Anania did not come to a conclusion as to whether plaintiff was actually innocent. *See* **Exhibit KKK**, p. 116, ln. 7-9.

     **Response: Disputed.** ADA Anania, on behalf of the Nassau County District Attorney's office came to a conclusion that plaintiff was "wrongly convicted" and moved to vacate the conviction and dismiss the indictment on the basis of a constitutional violation. *See* § 440.10 Motion, Harvis Decl., Ex. 29. The proceedings were conducted in summary fashion and

no hearing was held to consider plaintiff's innocence claim. *See* Exoneration Hearing, Harvis Decl., Ex. 66.

367.    ADA Anania did not believe that the NCDA, including ADA Walsh, withheld *Brady* material. *See* **Exhibit KKK**, p. 41, ln. 10-18.

**Response: Undisputed.**

368.    ADA Anania believed that moving to vacate plaintiff's conviction pursuant to New York State Criminal Procedure Law ("CPL") § CPL 440.10(1)(h) was applicable and appropriate in this case because Montes' and Larrea's statements were not "new evidence" and since plaintiff received Exhibit 42, he knew about these statements, could have asked for them, but he did not. *See* **Exhibit KKK**, p. 120, ln. 16 – p. 121, ln. 25.

**Response: Undisputed.** This is not a material fact.

369.    On February 14, 2018, ADA Anania filed motion papers and a memorandum of law requesting to vacate plaintiff's conviction for the murder of Jason pursuant to NYS CPL § 440.10(1)(h). *See* Notice of Motion, ADA Anania's Affirmation in Support, and Memorandum of Law dated February 14, 2018 (**Exhibit XXX**).

**Response: Undisputed.**

370.    On February 14, 2018, Brettschneider filed motions papers and a memorandum of law requesting to vacate plaintiff's conviction for the murder of Jason pursuant to NYS CPL § 440.10(1)(g). *See* Notice of Motion, Brettschneider's Affirmation in Support, and Memorandum of Law dated February 14, 2018 (**Exhibit YYY**).

**Response: Undisputed.** This is not a material fact.

371.    On February 16, 2018, Hon. Teresa Corrigan vacated plaintiff's convictions under Indictment No. 91607/1995 pursuant to NYS CPL § 440.10(1)(h) (Constitutional Violation) and dismissed the Indictment pursuant to NYS CPL § 210.20(1)(i) (Interests of Justice). *See* February 16, 2018 Court Transcript (**Exhibit ZZZ**); *see also* Hon. Corrigan February 16, 2018 Decision  (**Exhibit AAAA**).

**Response: Undisputed.**

372.     On February 16, 2018, prior to plaintiff's convictions being vacated, Judge Corrigan stated "[l]et me say to [plaintiff] only you know, sir, if you committed this crime. Regardless, an error in procedure has occurred and even an unintentional error cannot be overlooked by the criminal justice system. As such, the Court believes this conviction cannot stand and the People's application to vacate your conviction under Indictment Number 91607 will be granted…the vacating of the conviction is going to be pursuant to [CPL § 440.10(1)(h)]." *See* **Exhibit ZZZ**, p. 5, ln. 4 – p. 6, ln. 1.

> **Response: Disputed to the extent it suggests that plaintiff's innocence was litigated.** *See* § 440.10 Motion, Harvis Decl., Ex. 29.

373.     On February 16, 2018, prior to plaintiff's convictions being vacated, Brettschneider requested the Court to vacate plaintiff's convictions pursuant to NYS CPL §§ 440.10(1)(b) and 440.10(1)(g). *See* **Exhibit ZZZ**, p. 4, ln. 8-12. The Court *did not* vacate plaintiff's conviction pursuant to NYS CPL § 440.10(1)(g) (Newly Discovered Evidence) and *did not* vacate plaintiff's conviction pursuant to NYS CPL § 440.10(1)(b) (Duress, Misrepresentation, Fraud). *See* **Exhibit ZZZ**; *see also* **Exhibit AAAA**.

> **Response: Undisputed.** This is not a material fact.

374.     On March 2, 2018, plaintiff served a notice of claim on the County dated February 27, 2018. *See* Notice of Claim against the County (**Exhibit DDDD**).

> **Response: Undisputed.**

375.     Plaintiff also served a notice of claim on the Village of Freeport ("Village"), and on May 3, 2018 and May 21, 2018, plaintiff gave sworn testimony at examinations held pursuant to Section 50-h of the New York General Municipal Law. *See* **Exhibit EEEE**; *see also* **Exhibit FFFF**.

> **Response: Undisputed.**

376.     On May 22, 2018, plaintiff commenced the instant action. *See* D.E. 1.

> **Response: Undisputed.**

377.     On February 11, 2020, as a result of plaintiff's vacated convictions, plaintiff filed an unjust conviction and imprisonment claim seeking damages pursuant

to New York State Court of Claims Act § 8-b. *See* Plaintiff's Verified Claim (**Exhibit VVVV**).

> **Response: Undisputed.** This is not a material fact.

378.     On March 27, 2020, plaintiff filed his Second Amended Complaint ("SAC"). *See* D.E. 278.

> **Response: Undisputed.**

379.     After the Village and the County filed motions to dismiss plaintiff's SAC, on July 28, 2021, Judge Joanna Seybert issued a decision granting in part and denying in part the County's motion to dismiss, and granted the Village's motion to dismiss. *See* D.E. 338.

> **Response: Undisputed.**

380.     On August 12, 2021, plaintiff filed his TAC.  *See* **Exhibit A.**

> **Response: Undisputed.**

381.     Plaintiff's TAC alleges nine claims for relief: (i) a Section 1983 malicious prosecution claim against Det. Abbondandelo, Det. Dempsey and Det. Sgt. Severin (*id.* at ¶¶125- 131); (ii) a Section 1983 claim alleging fabrication of evidence in violation of the 4th, 5th, 6th and 14th Amendments against Det. Abbondandelo, Det. Dempsey, Det. Alger, Det. Kosior and Det. Sgt. Severin (*id.* at ¶¶132-138); (iii) a Section 1983 coercion claim against Det. Abbondandelo, Det. Dempsey and Det. Kosior (*id.* at ¶¶139-142); (iv) a *Monell* claim against the County for failure to supervise or train (*id.* at ¶¶143-148); (v) a New York State Law claim for malicious prosecution against the County by *respondeat superior* (*id.* at ¶¶149-155); (vi) a New York State Law claim for false imprisonment against the County by *respondeat superior* (*id.* at ¶¶156-159); (vii) a Section 1983 conspiracy claim against all individual NCPD detectives named as defendants (*id.* at ¶¶160-168); (viii) a section 1983 claim alleging evidence suppression, *Brady* violations, spoliation and denial of access to courts in violation of the 5th, 6th and 14th Amendments against all individual NCPD detectives named as defendants (*id.* at ¶¶169-174); and (ix) a Section 1983 claim for "failure to intervene" pled in the alternative against all individual NCPD detectives named as defendants (*id.* at ¶¶175- 177). *See* **Exhibit A.**

> **Response: Undisputed.**

382.     On August 26, 2021, the County filed its answer to the TAC, denying all of the material allegations and asserting various affirmative defenses. *See* **Exhibit D.**

**Response: Undisputed.**

383.     After plaintiff filed a renewed motion for sanctions pursuant to Rule 37(e) alleging Defendants' alleged spoliation of evidence, specifically Larrea's speculative 911 call, on September 19, 2022, Magistrate Judge Anne Y. Shields issued a decision denying plaintiff's renewed motion for sanctions. *See* D.E. 375.

**Response: Undisputed.** This is not a material fact.

384.     On October 28, 2022, Hon. Gina M. Lopez-Summa, Judge of the Court of Claims, issued a decision granting the State of New York's motion and dismissing plaintiff's unjust conviction and imprisonment claim. *See* Judge Lopez-Summa's October 28, 2022 Decision (**Exhibit WWWW**).

**Response: Undisputed.** This is not a material fact.

Dated: February 16, 2023
   Briarcliff Manor, New York

ELEFTERAKIS, ELEFTERAKIS & PANEK

_____
Gabriel P. Harvis
Baree N. Fett
80 Pine Street, 38th Floor
New York, New York 10005
(212) 323-6880
gharvis@eeplaw.com

*Attorneys for plaintiff Joseph Jackson*