# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH JACKSON,<br><br>                    Plaintiff,<br><br>-against-<br><br>NASSAU COUNTY, et al.,<br><br>                    Defendants. | **PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**<br><br>18 CV 3007 (JS) (AYS) |

Pursuant to Rule 56.1(b) of the Local Civil Rules and Rule III.G. of the Individual Practices of this Honorable Court, plaintiff respectfully submits the following statement of additional material facts:

### Sheryl Anania

1. Executive Assistant District Attorney Sheryl H. Anania worked at the Nassau County District Attorney's office from 2006 until her retirement in 2021. Anania Dep., Harvis Decl., Ex. 28, 18:25-19:2.
2. In 2013, The Nassau County District Attorney created a Conviction Integrity Unit ("CIU") with Anania designated Chief. Anania Dep., Harvis Decl., Ex. 28, 22:2-23:4.
3. Anania was the only attorney assigned to the CIU at its inception, and Anania transitioned to part-time status in 2015. Anania Dep., Harvis Decl., Ex. 28, 23:5-24:4.
4. The mission of the CIU under Anania was to file motions to vacate convictions in cases where the District Attorney found a reasonable probability that a defendant would have been acquitted but for some identifiable defect in the prosecution of the criminal charges. Anania Dep., Harvis Decl., Ex. 28, 25:9-24.
5. During Anania's tenure as Chief of the CIU from 2006-2021, the CIU reviewed well over 100 convictions but only moved to vacate in two cases: plaintiff and Josiah Galloway. Anania Dep., Harvis Decl., Ex. 28, 25:25-26:16, 174:16-175:3; *see Galloway v. Cnty. of Nassau*, 589 F. Supp. 3d 271, 274 (E.D.N.Y. 2022) (affirming disqualification based on joint representation of Anania in Galloway's civil action

and discussing the CIU's findings in *Galloway*).

6. After plaintiff sent the CIU a letter in June 2017, Anania undertook a reinvestigation of plaintiff's case. Anania Dep., Harvis Decl., Ex. 28, 31:16-20.

7. The CIU determined that prosecutors had never been provided with the Montes and Larrea statements, constituting a *Brady* violation, and that both the Freeport and Nassau County police departments had the statements in their files. Anania Dep., Harvis Decl., Ex. 28, 185:6-15; *see* Anania Memo and Notes, Harvis Decl., Ex. 2; § 440.10 Motion, Harvis Decl., Ex. 29, P013-P017.

8. Based on the reinvestigation, the CIU recommended that plaintiff's conviction be vacated and plaintiff not retried. Anania Dep., Harvis Decl., Ex. 28, 26:17-27:19.

9. Anania concluded a retrial was unwarranted for a "number of reasons…detail[ed]…in [her] memo" including "issues with the description of the perpetrator," "obviously[ that] Glenn Montes and Maurice Larrea would've been called," "because the narrative that those two witnesses put forth was different than what had been testified to at trial," "a problem with Peddie Jenkins…[who was] a less than believable witness," as well as Skwanitra Witherspoon having suffered a stroke in 2002. Anania Dep., Harvis Decl., Ex. 28, 27:20-29:3.

10. A factor in the CIU's recommendation was that Skwanitra Witherspoon and Peddie Jenkins had conflicting descriptions of the perpetrator's clothing. Anania Dep., Harvis Decl., Ex. 28, 29:4-10.

11. The CIU also considered that the statements attributed to plaintiff and Peddie Jenkins describe a gun in the perpetrator's right hand, but Skwanitra Witherspoon claims it was the assailant's left hand. Anania Dep., Harvis Decl., Ex. 28, 29:11-18.

12. The CIU also considered that Glenn Montes said that the shooter had a dark brown face. Anania Dep., Harvis Decl., Ex. 28, 29:19-24.

13. Another factor for the CIU was that Glenn Montes, Skwanitra Witherspoon and Martha Campbell all describe a 5'7"-5'8" perpetrator, whereas plaintiff is 6 feet tall. Anania Dep., Harvis Decl., Ex. 28, 29:25-30:7, Plaintiff's Arrest Report, Harvis Decl., Ex. 22.

14. The CIU's reinvestigation "didn't really reach" the issue of whether defendant Dempsey had coerced falsely confessions because it is "very, very difficult" to prove a confession was coerced. Anania Dep., Harvis Decl., Ex. 28, 30:8-18, 36:16-37:15.

15. For this reason, if Anania believed there was a wrongful conviction she focused her attention on something like a *Brady* violation, which is easier to adjudicate objectively. Anania Dep., Harvis Decl., Ex. 28, 37:8-20.

16. Anania's goal was to "look at everything in the case[,]…speak to all the witnesses…get a clear understanding of what evidence there was, because the only way that the *Brady* issue would be important would be – if it was a very strong case,

the *Brady* issue may not have been enough to vacate the conviction…So…the confession was not something that I spent a lot of time looking at. It was mainly to see if there were recantations from other people, if the police did something else that maybe suggested something that, you know, they shouldn't have. I mean, I looked at a lot of those things. I can't say the confession was something I spent a lot of time [on]. I certainly spoke to Detective Abbondandelo as well as Detective Dempsey, so." Anania Dep., Harvis Decl., Ex. 28, 37:21-39:5.

17. Anania acknowledges that defendant Dempsey is "reputed" to have engaged in coercive conduct. Anania Dep., Harvis Decl., Ex. 28, 40:18-41:2.

18. Anania "definitely" gave "some thought" to the possibility that Peddie Jenkins could have been the shooter because he "matched the description." Anania Dep., Harvis Decl., Ex. 28, 42:12-43:9.

19. Before speaking to trial prosecutor Mike Walsh, Anania confirmed that the Montes and Larrea statements were not in the District Attorney's file or referenced in the record of the criminal prosecution. Anania Dep., Harvis Decl., Ex. 28, 44:18-46:23.

20. When Anania asked Walsh about the Montes and Larrea statements, Walsh said he did not remember seeing them. Anania Dep., Harvis Decl., Ex. 28, 50:14-18.

21. It was clear to Anania from Larrea's statement that a 911 call had been placed. Anania Dep., Harvis Decl., Ex. 28, 49:12-15; *see* Nassau County Objections, annexed to the Harvis Decl. as Ex. 79 (indicating at response 2 that the 911 evidence was not preserved).

22. Anania found no record of Larrea's 911 call in the District Attorney's files. Anania Dep., Harvis Decl., Ex. 28, 50:8-13; Ex. 79, Response 2.

23. It is significant, in Anania's view, that Larrea's 911 call is not mentioned anywhere in the record other than the Montes and Larrea statements. Anania Dep., Harvis Decl., Ex. 28, 49:21-25; Ex. 79, Response 2.

24. Anania asked Walsh to locate the 911 call but he was unable to do so. Anania Dep., Harvis Decl., Ex. 28, 153:14-16; Ex. 79, Response 2.

25. There's "no doubt" in Anania's mind that Walsh would have turned over the statements if he had known about them and that Walsh "wasn't hiding" these witnesses. Anania Dep., Harvis Decl., Ex. 28, 53:10-24.

26. Anania asked Walsh to "find out if Detective Dempsey was involved in any false confession cases," but does not remember whether Walsh was able to do so. Anania Dep., Harvis Decl., Ex. 28, 153:25-154:15.

27. Anania has "no idea" why the Montes and Larrea statements never made it into the DA's file. Anania Dep., Harvis Decl., Ex. 28, 57:10-15.

28. The CIU reinvestigation uncovered evidence suggesting plaintiff's innocence but no evidence suggesting plaintiff's guilt. Anania Dep., Harvis Decl., Ex. 28, 58:16-20.

29. If a witness statement is not in the case file when the detective brings it to the prosecutor's office, the prosecutor would not know about it. Anania Dep., Harvis Decl., Ex. 28, 75:25-76:10.

30. Anania prepared an official memorandum summarizing her investigative findings and including a summary of "trial issues" where inconsistencies in the evidence would impede successful retrial. Anania Dep., Harvis Decl., Ex. 28, 72:6-24, 79:22-80:8; Anania Memo and Notes, Harvis Decl., Ex. 2.

31. On October 2, 2017, Maurice Larrea told Anania that he "heard shots and saw a male standing over the body, shooting." Anania Dep., Harvis Decl., Ex. 28, 80:13-24; *see* Anania Memo and Notes, Harvis Decl., Ex. 2, County3394.

32. On October 19, 2017, Glenn Montes told Anania that he saw the shooter standing over the person and "is 100 percent sure that the shooter ran across the highway and climbed over the fence." Anania Dep., Harvis Decl., Ex. 28, 80:25-81:17; *see* Anania Memo and Notes, Harvis Decl., Ex. 2, County3394.

33. On October 26, 2017, Anania emailed Tammy Smiley about civil cases involving Robert Dempsey. Anania Dep., Harvis Decl., Ex. 28, 124:10-125:22.

34. When Anania spoke to Peddie Jenkins, he described the events closer to how they were presented in his first statement on November 15, 1994 than his subsequent statement and testimony. Anania Dep., Harvis Decl., Ex. 28, 84:8-16.

35. Roy Isaacs was "very reticent" about being interviewed by Anania and, when they met at a Starbucks in November 2017, Anania took no notes and found Isaacs incredible. Anania Dep., Harvis Decl., Ex. 28, 88:17-90:17.

36. Anania spoke to defendant Dempsey about some of the misconduct accusations he has faced, including the Shonnard Lee case where a jury found that he had procured a false confession, and Dempsey denied the allegations and blamed an ADA. Anania Dep., Harvis Decl., Ex. 28, 95:5-19.

37. After Dempsey denied the allegations, Anania did not investigate further and never attempted to speak to Shonnard Lee, John Restivo or any of the other defendants who have claimed Dempsey abused them. Anania Dep., Harvis Decl., Ex. 28, 97:18-98:10.

38. Skwanitra Witherspoon told Anania the gunman was wearing a hood that she saw only saw the bottom of the man's face and his lips. Anania Dep., Harvis Decl., Ex. 28, 103:103:14-19.

39. Anania's reinvestigation of plaintiff's conviction was conducted pursuant to Rule 3.8(g) of the New York Rules of Professional Conduct. Anania Dep., Harvis Decl., Ex. 28, 114:9-116:2.

40. The Montes and Larrea statement and missing 911 evidence fit the Rule 3.8(g) requirement of creating a reasonable likelihood that plaintiff did not commit the

offenses of which he was convicted. Anania Dep., Harvis Decl., Ex. 28, 117:6-118:6.

41. Anania was not aware of the Elisa Valdez note made by defendant Swenson when she was conducting the CIU reinvestigation. Anania Dep., Harvis Decl., Ex. 28, 117:6-19.

42. When he was interviewed by Anania, Defendant Abbandandelo had no explanation for why he did not turn the Montes and Larrea statements over to Walsh. Anania Dep., Harvis Decl., Ex. 28, 127:24-128:6.

43. It was Anania's impression that Glenn Montes believed the person he was pursuing was the shooter. Anania Dep., Harvis Decl., Ex. 28, 129:8-12.

44. As of February 1, 2018, the DA's Office had already determined that there would be a motion filed to vacate the conviction. Anania Dep., Harvis Decl., Ex. 28, 155:10-16.

45. Abbondandelo told Anania that he did not remember why he did not turn the Montes and Larrea statements over to Walsh. Anania Dep., Harvis Decl., Ex. 28, 126:21-128:6.

46. When it came time to file the CIU's N.Y.C.P.L. § 440.10 motion to vacate plaintiff's conviction, Anania wrestled with whether the to invoke subsection "h" (constitutional violation) or subsection "g" (newly-discovered evidence) and discussed it with then-District Attorney Madeline Singas. Anania Dep., Harvis Decl., Ex. 28, 119:3-24.

47. According to Anania, "the bottom line was that we felt we should have – 'we' being the collective law enforcement – should have turned those two statements over. And they were not turned over." Anania Dep., Harvis Decl., Ex. 28, 220:16-221:2.

48. For the purposes of the motion to vacate plaintiff's conviction, the District Attorney of Nassau County took the position that the Montes and Larrea statements were suppressed within the meaning of *Brady*. Anania Dep., Harvis Decl., Ex. 28, 221:3-11.

49. According to Anania, it "would not be normal to have provided [the Freeport Incident Report] as an unredacted copy," which Anania describes as "strange." Anania Dep., Harvis Decl., Ex. 28, 223:14-21.

50. According to Anania the form of the Freeport Incident Report is "interesting" because it "looks like whoever did this made a conscious decision not to redact Maurice Larrea and Glen Montes. It wasn't as if they didn't look at this page, because clearly they did. So I can't – I don't want to assume what was going through their head. If it had been me, I would not have included their address and phone number. But I don't know what Mr. Walsh was thinking." Anania Dep., Harvis Decl., Ex. 28, 235:7-23.

### Gary Abbondandelo

51. Defendant Abbondandelo was the lead detective in the Steven Jason homicide investigation. Pre-Tr. Hr. 1995, Harvis Decl., Ex. 32, 170:15-171:5, Abbondandelo Dep., Harvis Decl., Ex. 6, 282:6-16.

52. Abbondandelo joined the Nassau County Homicide Squad as a Detective in 1976, before Robert Dempsey, and worked there until his retirement in 1997. Abbondandelo Dep., Harvis Decl., Ex. 6, 18:21-23; 63:2-10.

53. During his police career, Abbondandelo never witnessed misconduct by a fellow officer. Abbondandelo Dep., Harvis Decl., Ex. 6, 75:10-16.

54. As of 1994, defendant Abbondandelo may have been the most senior Detective in the Homicide Squad. Abbondandelo Dep., Harvis Decl., Ex. 6, 63:14-15.

55. Defendant Abbondandelo and the prosecutor in this case, Mike Walsh, have been closely connected for many decades, with Abbondandelo's first case assigned to Walsh's father back when Walsh was playinge league. Abbondandelo Dep., Harvis Decl., Ex. 6, 250:13-23.

56. Abbondandelo was the "carrying" or lead detective in the Steven Jason homicide investigation. Pre-Tr. Hr. 1995, Harvis Decl., Ex. 32, 170:15-171:5.

57. At the conclusion of the Steven Jason homicide investigation, defendant Abbondandelo did not think there was a lot of evidence pointing to plaintiff's guilt. Abbondandelo Dep., Harvis Decl., Ex. 6, 64:20-24.

58. Based on the content of his 32b statement, Glenn Montes was an eyewitness to the murder of Steven Jason. Abbondandelo Dep., Harvis Decl., Ex. 6, 127:1-128:17.

59. Abbondandelo knew that Glenn Montes had called 911 but took no steps to obtain records related to the call. Abbondandelo Dep., Harvis Decl., Ex. 6, 139:18-140:16.

60. Abbondandelo decided not to obtain the 911 records because "all [Montes told 911 was] we saw a shooting up here. You know, we saw a guy running away or something." Abbondandelo Dep., Harvis Decl., Ex. 6, 141:9-16.

61. Defendant Abbondandelo never attempted to interview Glenn Montes or Maurice Larrea. Abbondandelo Dep., Harvis Decl., Ex. 6, 52:8-55:4; 58:6-20; 236:14-18.

62. All of defendant Abbondandelo's notes regarding his investigation of the Steven Jason homicide are contained in his notebook. Abbondandelo Dep., Harvis Decl., Ex. 6, 164:2-5.

63. Abbondandelo's notebook contains no mention of Montes or Larrea. Abbondandelo Dep., Harvis Decl., Ex. 6, 163:21-164:1; 164:6-165:5.

64. Abbandandelo's notebook contains no mention of the 911 call placed by Maurice Larrea. Abbondandelo Dep., Harvis Decl., Ex. 6, 165:6-10; 191:12-20.

65. If defendant Abbondandelo had learned that Glenn Montes believed he was chasing the shooter (as he told prosecutors in 2017), it may have impacted his investigation

of the Steven Jason homicide. Abbondandelo Dep., Harvis Decl., Ex. 6, 58:21-59:17; *see* Anania Memo and Notes, Harvis Decl., Ex. 2, County2850 (In Anania's October, 19 2017, interview with Glenn Montes he said, in part: "[Montes] saw someone run out, saw the flash of a gun and saw somebody fall. The shooter was standing over the person. The shooter ran across Sunrise Highway and [Montes] chased him in a car…[Montes] is 100% sure that the shooter ran across the highway and climbed over the fence.").

66. Without speaking to Glenn Montes or Maurice Larrea, Abbondandelo disregarded their eyewitness accounts in favor of a conflicting account based on the observations of Skwanitra Witherspoon and Martha Campbell, neither of whom had seen the crime. Abbondandelo Dep., Harvis Decl., Ex. 6, 60:21-61:15; 67:10-69:3.

67. No physical evidence of any kind, such as fingerprints, serology, DNA etc., linked plaintiff to the crime. Abbondandelo Dep., Harvis Decl., Ex. 6, 65:3-10; 66:11-15.

68. Abbondandelo was never trained, formally or informally, about *Brady* obligations. Abbondandelo Dep., Harvis Decl., Ex. 6, 89:24-90:9.

69. In his twenty-one-year career in the Homicide Squad, Abbondandelo never notified the District Attorney's office of potential *Brady* evidence. Abbondandelo Dep., Harvis Decl., Ex. 6, 86:2-20; 88:20-23.

70. Instead Abbondandelo claims that he was "pretty open with the case" when interfacing with prosecutors. Abbondandelo Dep., Harvis Decl., Ex. 6, 86:17-20 ("[E]verything I know they know.").

71. A Form 262 is an in-depth, official final report that a detective files when a homicide case is closed case that serves as a roadmap to someone picking up the file ten or twenty years later. Abbondandelo Dep., Harvis Decl., Ex. 6, 91:10-94:5; (in the Restivo/Halstead case, Detective Volpe prepared the 262 Form almost a decade after that crime, *see* DE#253-7, *Restivo, et al. v. Dempsey, et al.*, 06 CV 6695, annexed to the Harvis Decl. as Ex. 77).

72. In the police department's view, the Steven Jason homicide case was closed with plaintiff's arrest in 1994. Abbondandelo Dep. II, Harvis Decl., Ex. 65, 60:3-5.

73. Defendant Abbondandelo never prepared a 262 Form in connection with the Steven Jason homicide. Abbondandelo Dep., Harvis Decl., Ex. 6, 92:7-20 (admitting that the missing 262 Form made it "a lot more difficult" to review the investigation).

74. The Assistant District Attorney relies on the lead detective to evaluate the evidence in the homicide file and determine what is important. Abbondandelo Dep., Harvis Decl., Ex. 6, 94:18-23; 95:14-20.

75. Abbondandelo claims he specifically told then-Nassau County prosecutor Fred Klein about the Montes and Larrea statements, but Klein has no recollection of any such conversation. Abbondandelo Dep., Harvis Decl., Ex. 6, 95:21-97:15; 101:7-

20; Klein Dep., Harvis Decl., Ex. 5, 84:21-85:10.

76. Klein, who was the assigned to the case in the initial stages, testified that if he had been aware of a 911 call he would have obtained records the records. Klein Dep., Harvis Decl., Ex. 5, 116:17-117:14.

77. Abbondandelo knew that Montes and Larrea were coming from a bachelor party and had been drinking. Abbondandelo Dep., Harvis Decl., Ex. 6, 97:16-98:11.

78. Abbondandelo did not disclose to ADA Fred Klein that Larrea was intoxicated, a fact which Abbondandelo acknowledges could have affected Larrea's career if it came out. Abbondandelo Dep., Harvis Decl., Ex. 6, 106:12-18; 107:11-21.

79. Within a day or two of the homicide, Abbondandelo learned that Maurice Larrea, an off-duty NYPD officer, had notified his command (as is mandatory) about the off-duty incident involving his firearm. Abbondandelo Dep., Harvis Decl., Ex. 6, 102:19-24; 103:16-104:11.

80. According to Abbondandelo, the person Montes and Larrea confronted and chased could not have been involved in the crime because "everybody scattered" and was "running in all different directions" following the shooting, which Abbondandelo bases on the fact that no civilians were present when Abbondandelo arrived at the crime scene over two hours after the shooting. Abbondandelo Dep., Harvis Decl., Ex. 6, 116:7-23; 118:5-119:8; Crime Scene Log, annexed to the Harvis Decl. as Ex. 78, County3.

81. When Abbondandelo arrived at the scene at approximately 4:15 a.m., defendant Severin brought him up to speed and told him about Montes and Larrea. Abbondandelo Dep., Harvis Decl., Ex. 6, 119:9-120:25.

82. Defendant Severin did not tell Abbondandelo that Montes and Larrea described the shooter as have a dark brown face. Abbondandelo Dep., Harvis Decl., Ex. 6, 121:1-4.

83. All witnesses initially identified by police – Martha Campbell, Skwanitra Witherspoon, Glenn Montes and Maurice Larrea – described a witness who was 5'8-5'9 or shorter. Abbondandelo Dep., Harvis Decl., Ex. 6, 121:5-124:4; Anania Memo and Notes, Harvis Decl., Ex. 2, County2844, 2849-2850; Tr. Testimony, Harvis Decl., Ex. 113, 1116:16-1118:3; Montes Statement, Harvis Decl., Ex. 19, County28.

84. All of the bullets fired at Steven Jason came from the same gun. Abbondandelo Dep., Harvis Decl., Ex. 6, 149:8-150:17.

85. In the initial phases of the investigation, Abbondandelo knew of two witnesses who had seen the shooter, Skwanitra Witherspoon, who described him as light-skinned, and Glenn Montes, who described him as having a dark brown face. Abbondandelo Dep., Harvis Decl., Ex. 6, 171:16-174:6.

86. When the police department provided information to the press to seek the public's assistance in solving the crime, it described the shooter as having a light complexion, consistent with Skwanitra Witherspoon's account, and made no mention of Montes and Larrea. Abbondandelo Dep., Harvis Decl., Ex. 6, 174:9-23.

87. The day after the shooting, March 21, 1994, the Homicide Squad received a tip that Mike Skillings committed the murder. Abbondandelo Dep., Harvis Decl., Ex. 6, 165:17-166:24;  169:9-170:6;  175:5-178:12;  Skillings Investigation Material, Harvis Decl., Ex. 62, County6172.

88. Mike Skillings was a 5'7" light-skinned African American male who had attended the party for Steven Jason and ran from the scene after the shooting. County6185 (reflecting height and complexion); County6190.

89. Mike Skillings was interviewed, polygraphed and enrolled as an informant. Abbondandelo Dep., Harvis Decl., Ex. 6, 166:13-24.

90. Investigators also received a tip about Keith Moore. Abbondandelo Dep., Harvis Decl., Ex. 6, 165:17-166:24; 169:9-170:6; 175:5-178:12; *see also* Note on Keith Moore, annexed to the Harvis Decl. as Ex. 111, County 5539-5540.

91. Abbondandelo assumes that Keith Moore was interviewed but cannot say for certain. Abbondandelo Dep., Harvis Decl., Ex. 6, 175:17-177:14.

92. Three days after the shooting, on March 23, 1994, Abbondandelo received a tip from the Freeport Police Department that Petey Baldwin, a cousin of Tony Jackson, was the shooter. Handwritten note Petey Baldwin tip, annexed to Harvis Decl. as Ex. 110, County1655.

93. On approximately April 1, 1994, Martha Campbell was reinterviewed but no consideration was given to re-interviewing Montes and Larrea. Abbondandelo Dep., Harvis Decl., Ex. 6, 192:24-194:6.

94. On approximately April 4, 1994, Abbondandelo re-interviewed Doug Blue but received no further information. Abbondandelo Dep., Harvis Decl., Ex. 6, 194:25-196:17.

95. Abbondandelo interviewed Tamara Jeffers, who observed an automobile she believed to be a Volkswagen at the scene (the same make as the vehicle driven by Glenn Montes). Abbondandelo Dep., Harvis Decl., Ex. 6, 201:8-19.

96. On April 7, 1994, a police officer hypnotized Martha Campbell in an unsuccessful effort to improve her recollection of the license plate of the car she saw. Abbondandelo Dep., Harvis Decl., Ex. 6, 201:20-202:14.

97. Glenn Montes and Maurice Larrea were not hypnotized. Abbondandelo Dep., Harvis Decl., Ex. 6, 203:25-204:2.

98. On April 12, 1994, Abbondandelo reviewed the jail visitation list for Tony Jackson and learned that someone named Nelson Pena had visited Tony Jackson on April 1,

1994. Abbondandelo Dep., Harvis Decl., Ex. 6, 204:16-205:14.

99. On May 20, 1994 and June 29, 1994, Abbondandelo reviewed Tony Jackson's jail phone records. Abbondandelo Dep., Harvis Decl., Ex. 6, 206:6-207:8; 208:11-210:7.

100. There is no evidence that plaintiff and Tony Jackson had any contact. Abbondandallo Dep. II, Harvis Decl., Ex. 65, 63:8-10.

101. Abbondandelo considered anything Peddie Jenkins had to say implicating Joe Jackson as important. Abbondandelo Dep., Harvis Decl., Ex. 6, 212:8-19.

102. When the case was reinvestigated in 2017, Abbondandelo told Executive ADA Sheryl Anania that he remembered the Montes and Larrea statements but not their contents, but Anania somehow mistakenly declared under penalty of perjury that Abbondandelo had told he did not recall the statements. Abbondandelo Dep., Harvis Decl., Ex. 6, 214:19- 218:12.

103. Abbondandelo acknowledges that there were three eyewitnesses to the incident, Glenn Montes, Maurice Larrea and Skwanitra Witherspoon. Abbondandelo Dep., Harvis Decl., Ex. 6, 224:12-20.

104. When Abbondandelo testified at the suppression hearing in plaintiff's criminal case on November 6, 1995, he testified that there was only one eyewitness to the incident: Skwanitra Witherspoon. Abbondandelo Dep., Harvis Decl., Ex. 6, 219:5-221:23; *see also* Pre-Tr. Hr 1995., Harvis Decl., Ex. 32, 170:15-171:5.

105. According to Abbondandelo, he was aware of Montes and Larrea and their 32b statements at the time he testified at the hearings, but did not mention them because he had not spoken to them or reviewed their 32b statements when he was at the scene. Abbondandelo Dep., Harvis Decl., Ex. 6, 222:1-14.

106. According to Abbondandelo, although he had also not spoken to Witherspoon or reviewed her statement at the scene, he testified she was the only eyewitness because "this is more direct, that Skwanitra was there, and she spoke to police right there." Abbondandelo Dep., Harvis Decl., Ex. 6, 222:10-223:7.

107. In his mind and without speaking to them, Abbondandelo eliminated Montes and Larrea as eyewitnesses to the actual shooting. Abbondandelo Dep., Harvis Decl., Ex. 6, 229:3-23.

108. Without speaking to Glenn Montes or Martha Campbell or Skwanitra Witherspoon, Abbondandelo was able to determine that Glenn Montes was incredible. Abbondandelo Dep., Harvis Decl., Ex. 6, 233:9-234:10.

109. According to Abbondandelo, the *Brady* violation can be explained, in part, by the possibility that he and/or Assistant District Attorney Michael Walsh "forgot" about the Montes and Larrea statements. Abbondandelo Dep., Harvis Decl., Ex. 6, 240:22-24; 241:5-17.

110.   While on the golf course together in 2021, Michael Walsh and defendant Abbondandelo discussed the instant civil action. Abbondandelo Dep., Harvis Decl., Ex. 6, 243:24-244:25; Walsh Dep., Harvis Decl., Ex. 3, 191:12-25.

111.   During his deposition Abbondandelo first denied, then admitted, to having discussed the *Brady* violations traceable to him and Walsh. *Compare* Abbondandelo Dep., Harvis Decl., Ex. 6, 241:9-16. ("the Brady material…we didn't discuss that") *with* Abbondandelo Dep., Harvis Decl., Ex. 6, 245:3-8 (Q. So when you spoke to Mike Walsh, you discussed that there was an issue about the production of Brady evidence? A. Yes, I believe we did. I can't remember a hundred percent. I believe we did.); *see also Id.* at 246:8-248:3.

112.   Abbondandelo cannot explain why ADA Mike Walsh denied knowledge about Montes and Larrea and the 911 call during the 2017 reinvestigation when, according to Abbondandelo, Walsh was aware of the witnesses, their statements and the 911 call in March 1994. Abbondandelo Dep., Harvis Decl., Ex. 6, 251:23-255:12.

113.   At his deposition, Abbondandelo claimed to be unaware of – and to have never seen – the notes of his Homicide Squad colleague defendant Walter Swenson who documented a phone call received by police three days after the shooting:

> [Elisa Valdez] and boyfriend covering affair at 11 West Sunrise for Newsday. Journalism major. Left at 1:50 to Long Island Railroad. Heard shot, scream, four more shots. 20 seconds. Male on foot. Black jacket, hood, jeans, boots. Running under platform toward fire department with gray or white car in pursuit. No further. Cannot ID

Abbondandelo Dep., Harvis Decl., Ex. 6, 258:11-19; *see* Valdez Note, Harvis Decl., Ex. 26, County6353.

114.   Later in his deposition, Abbondandelo acknowledged that he likely saw Swenson's note about Elisa Valdez and her boyfriend, which was part of the official case file. Abbondandelo Dep., Harvis Decl., Ex. 6, 266:16-267:1.

115.   Swenson's notes documenting the call from Elisa Valdez on March 23, 1994 were never disclosed to plaintiff. Rosario List, Harvis Decl., Ex. 63.

116.   Abbondandelo noted that he "can't be redoing everybody's work," but had he known about defendant Swenson's note about Elisa Valdez and her boyfriend – which, again, was in the homicide filed and taken by a fellow Homicide Detective three days after a shooting where Abbondandelo was the carrying detective – Abbondandelo would have "definitely" looked into it further and questioned Valdez about her boyfriend and what he saw. Abbondandelo Dep., Harvis Decl., Ex. 6, 267:24-270:13; 273:4-18.

117. Abbondandelo concedes that Elisa Valdez and Montes and Larrea describe the same event (a suspect fleeing Montes and Larrea in what Valdez describes as twenty seconds after the shooting) and that no information regarding their accounts was apparently disclosed to prosecutors and that, indeed, Abbondandelo does not even believe he was aware of the material as the lead investigator. Abbondandelo Dep., Harvis Decl., Ex. 6, 274:4-280:16.

118. According to defendant Severin, who supervised the homicide investigation, it was Abbondandelo's responsibility to reach out to Swenson about the Valdez note and decide what course of action to take. Severin Dep., Harvis Decl., Ex. 11, 107:24-109:2.

119. The "only reason" Abbondandelo can give for failing to disclose the Montes, Larrea and Valdez evidence is "that I didn't believe and we all—all the other investigators didn't believe that these witnesses were seeing the defendant or the perpetrator in this case fleeing the scene, but not the shooter." Abbondandelo Dep., Harvis Decl., Ex. 6, 279:22-280:16.

120. Abbondandelo admits that little to nothing happened in the Steven Jason homicide investigation from June to November 1994. Abbondandelo Dep., Harvis Decl., Ex. 6, 283:18-285:9.

121. Peddie Baldwin (mislabeled in the transcript as Peddie Jenkins) told Detective Arthur Zimmer in a recorded interview that took place in June 1994 Baldwin saw an automobile drive past the Legion Hall at the time of the shooting. Abbondandelo Dep., Harvis Decl., Ex. 6, 287:6-21.

122. Baldwin (mislabeled in the transcript as Jenkins) also told Detective Arthur Zimmer in the recorded interview that investigators were at a "dead end" in the investigation as of June 1994. Abbondandelo Dep., Harvis Decl., Ex. 6, 287:6-21.

123. At the time the Homicide Squad received a tip in October 1994 that Peddie Jenkins was bragging about the murder to 16-year-old Darren Brennan, the Steven Jason homicide investigation was "really at a dead end." Abbondandelo Dep., Harvis Decl., Ex. 6, 316:15-23; *see also* Brennan Note, Harvis Decl., Ex. 12, County4754-55; *see also* Baldwin-Zimmer Audio recording (accessible at: https://tinyurl.com/Zimmer-baldwin).

124. Abbondandelo described his twelve-hour custodial interrogation of Peddie Jenkins as taking Jenkins into custody "briefly." Abbondandelo Dep., Harvis Decl., Ex. 6, 295:12-296:1; Blotter, Harvis Decl., Ex. 13 at pp. 1, 3 (reflecting Jenkins' time in the Homicide Squad).

125. Peddie Jenkins was taken into custody by Abbondandelo and Dempsey after they followed Jenkins to the railroad station and sent uniformed Freeport officers to apprehend him when he was leaving the house with his mother. Abbondandelo

Dep., Harvis Decl., Ex. 6, 296:2-22.

126.   The Freeport officers told Abbondandelo and Dempsey that Jenkins was claiming to be his brother Shawn Jenkins. Abbondandelo Dep., Harvis Decl., Ex. 6, 296:23-10.

127.   For several hours Jenkins maintained that he was his brother until Dempsey and Abbondandelo took Jenkins to the Freeport police station, had him fingerprinted and determined through fingerprints that he was in fact Peddie Jenkins. Abbondandelo Dep., Harvis Decl., Ex. 6, 297:11-298:11; *see* "Shawn" Jenkins Fingerprint Card annexed to the Harvis Decl. as Ex. 80, County5419.

128.   Abbondandelo "absolutely" considered Jenkins' false personation as a "red flag" in terms of Jenkins' "overall truthfulness." Abbondandelo Dep., Harvis Decl., Ex. 6, 298:22-299:9.

129.   When Abbondandelo and Dempsey questioned Jenkins on November 15, 1994, Jenkins was a suspect in the Steven Jason homicide investigation who had been bragging about his involvement in the crime – the detectives were required to advise him of his Miranda rights. Abbandandelo Dep., Harvis Decl., Ex. 6, 299:24-301:3.

130.   There is no Miranda card, signed or unsigned, related to Peddie Jenkins' twelve-hour interrogation in the Homicide Squad on November 15, 1994. *See* Peddie Jenkins Folder from Homicide File annexed to the Harvis Decl. as Ex. 81 ("Jenkins Homicide File"), County5392-5422; Abbondandelo Dep., Harvis Decl., Ex. 6, 299:17-300:17.

131.   Defendant Abbondandelo claims that Jenkins was Mirandized "orally" on November 15, 1994, but there is no mention of that happening in the nine pages of notes defendant Dempsey purportedly took of the interrogation. *See* Dempsey notes (November 1994), annexed to the Harvis Decl. as Ex. 18 ("Dempsey November Notes") at County2177-2199

132.   There is also no mention of any spoken Miranda warnings in Abbondandelo's record of interrogating Peddie Jenkins, which consists entirely of the notation "11/15/94 Peddie Jenkins all day." *See* Jenkins Homicide File, Harvis Decl., Ex. 81, County5422; Abbondandelo Dep., Harvis Decl., Ex. 6, 304:15-305:6.

133.   Abbondandelo concedes that Peddie Jenkins November 15, 1994 statement is not credible and irreconcilable with the theory advanced by the People at trial. Abbondandelo Dep., Harvis Decl., Ex. 6, 312:25-314:1.

134.   Before Peddie Jenkins was polygraphed on November 15, 1994, Abbondandelo spent approximately an hour debriefing the polygraphist, which Abbondandelo struggled to explain at his deposition, acknowledging that it was "quite a long time." Abbondandelo Dep., Harvis Decl., Ex. 6, 315:8-316:14.

135.   Abbondandelo finds it unusual that Peddie Jenkins was described by the

polygraphist as being "cheerful," "relaxed" and "positive" during the polygraphy exam on November 15, 1994. Abbondandelo Dep., Harvis Decl., Ex. 6, 314:14-315:7.

136.   According to official records, Peddie Jenkins was polygraphed as a witness as opposed to a suspect on November 15, 1994. See Peddie Jenkins Polygraph Examination Card annexed to the Harvis Decl. as Ex. 82, County8287; *see* Abbondandelo Dep., Harvis Decl., Ex. 6, 307:16-310:8.

137.   After Abbondandelo had finished interrogating Peddie Jenkins on November 15, 1994, he described Jenkins as "a young punk. He was a bragger – you know, a want-to-be gangster, and I didn't trust anything he said." Abbandandelo Dep., Harvis Decl., Ex. 6, 320:13-25.

138.   After Peddie Jenkins was interrogated on November 15, 1994 he was booked on outstanding warrants but no charges related to the Steven Jason homicide were filed against him. Abbondandelo Dep., Harvis Decl., Ex. 6, 321:1-19.

139.   After interviewing Jenkins on November 15, 1994, Abbondandelo lacked probable cause to arrest him in connection with the Steven Jason homicide. Abbondandelo Dep., Harvis Decl., Ex. 6, 321:20-322:6.

140.   Peddie Jenkins was not asked to provide a videotaped statement to the District Attorney on November 15, 1994. Abbondandelo Dep., Harvis Decl., Ex. 6, 322:9-17.

141.   On November 16, 1994, the day after Peddie Jenkins' initial interrogation, Abbondandelo spoke to Michael Skillings, who had been identified as the shooter in a March 1994 tip, for reasons that remain unclear – Abbandandelo cannot recall the purpose of the meeting and no notes were taken. *See* Jenkins Homicide File, Harvis Decl., Ex. 81, County5422.

142.   Following the interrogation of Peddie Jenkins on November 15, 1994, Tyrone Isaacs, who Jenkins had implicated in his written statement, was "absolutely" a person of interest for Abbondandelo in the Steven Jason murder investigation. Abbondandelo Dep., Harvis Decl., Ex. 6, 322:18-323:5; *see also* Jenkins Statement dated November 15, 1994, annexed to the Harvis Decl. as Ex. 83 ("Jenkins Statement I"), P36-P37, ("…I then saw…[Tyrone Isaacs] holding a small dark automatic pistol in his left hand…")

143.   Although Abbondandelo's handwritten timeline states that detectives brought Peddie Jenkins back to the Homicide Squad on November 18, 1994 – before police spoke to Tyrone Isaacs and his brother Roy – records reveal the opposite: the Isaacs brothers were in custody and polygraphed a day earlier than Jenkins, on November 17, 1994. *See* Abbondandelo Dep., Harvis Decl., Ex. 6, 323:24-327:20, 329:1-330:5; *see also* Polygraph Consent Forms for Tony Isaacs and Roy Isaacs, annexed

to the Harvis Decl. as Ex. 84, County8238, County8262.

144.   Indeed, records reveal that the Isaacs Brothers were held inside the Homicide Squad for approximately 28 hours, from noon on November 17th until 5:00 p.m. on November 18th. Abbondandelo Dep., Harvis Decl., Ex. 6, 345:9-20.

145.   Tyrone Isaacs was polygraphed as a suspect. Abbondandelo Dep., Harvis Decl., Ex. 6, 330:6-10; Polygraph Examination Card for Tyrone Isaacs annexed to the Harvis Decl. as Ex. 85 ("T. Isaacs Polygraph Exam Card"), County8233.

146.   The polygraphist, Edward Goutink, determined that Tyrone Isaacs was employing deception and should be re-examined. Abbondandelo Dep., Harvis Decl., Ex. 6, 330:20-331:7; T. Isaacs Polygraph Exam Card, Harvis Decl., Ex. 85, County8233.

147.   Tyrone Isaacs was never re-examined or charged in connection with the homicide of Steven Jason, even though he admitted to signaling Peddie Jenkins when Steven Jason was leaving the party. Abbondandelo Dep., Harvis Decl., Ex. 6, 331:10-16; Tyrone Isaacs written statement, annexed to the Harvis Decl. as Ex. 86; *see also* Anania Memo and Notes, Harvis Decl., Ex. 2, County2851, p. 9.

148.   Abbondandelo would not charge Tyrone Isaacs based on Peddie Jenkins' allegations because "I wouldn't charge anyone with that." Abbondandelo Dep., Harvis Decl., Ex. 6, 331:17-332:7.

149.   After Tyrone Isaacs was interviewed on November 17, 1994, Abbondandelo conducted no further investigation of him. Abbondandelo Dep., Harvis Decl., Ex. 6, 332:13-19.

150.   Abbondandelo asked the crime lab to compare fingerprint evidence from the crime scene to Mike Skillings' fingerprints. Abbondandelo Dep., Harvis Decl., Ex. 6, 333:15-334:2; Latent Fingerprint Comparison Report annexed to the Harvis Decl. as Ex. 87, County900-01.

151.   But Abbondandelo never attempted to compare the fingerprint evidence from the crime scene to plaintiff's fingerprints. Abbondandelo Dep., Harvis Decl., Ex. 6, 334:3-336:12; *see also* Dempsey Dep., Harvis Decl., Ex. 17, 148:5-9.

152.   In 1994, there was no process for recording the physical condition of a prisoner when they were brought to the Homicide Squad. Abbondandelo Dep., Harvis Decl., Ex. 6, 343:3-7.

153.   Roy Isaacs was also polygraphed and determined to be lying. Polygraph Examination Card for Roy Isaacs, annexed to the Harvis Decl. as Ex. 88, County8261; Abbondandelo Dep., Harvis Decl., Ex. 6, 344:3-5.

154.   Although the polygraphist recommended that Roy Isaacs be re-examined, he was not. Abbondandelo Dep., Harvis Decl., Ex. 6, 344:6-11.

155.   Abbondandelo and Dempsey then went to the courthouse where Peddie Jenkins

was being released from custody and brought him back to the homicide squad. Abbondandelo Dep., Harvis Decl., Ex. 6, 347:5-18.

156. Abbondandelo wanted to go over Peddie Jenkins' initial statement and "make corrections, if necessary," based on what he had learned from the Isaacs brothers. Abbondandelo Dep., Harvis Decl., Ex. 6, 347:19-348:8.

157. Abbondandelo and other detectives told Jenkins that they believed he was lying and was going to "get involved over his head with this case if he won't tell us the truth." Abbondandelo Dep., Harvis Decl., Ex. 6, 348:13-23.

158. Abbandandelo described Jenkins' affect as "jovial." Abbondandelo Dep., Harvis Decl., Ex. 6, 349:7-19.

159. Abbondandelo then "let him have it with the lies" and Jenkins "came up with version Number 2 of the story." Abbondandelo Dep., Harvis Decl., Ex. 6, 350:1-21; see Jenkins November 18, 1994 Statement annexed to the Harvis Decl. as Ex. 112.

160. Abbondandelo considered Peddie Jenkins' second statement was truthful based on a gut feeling. Dep., Harvis Decl., Ex. 6, 357:8-18.

161. As of November 18, 1994, Abbondandelo had no evidence connecting plaintiff to the Steven Jason homicide except Peddie Jenkins' second statement, but Abbondandelo considered plaintiff the prime suspect in the shooting. Abbondandelo Dep., Harvis Decl., Ex. 6, 359:10-23.

162. Between when Abbondandelo obtained the second statement from Peddie Jenkins on November 18, 1994 and when plaintiff was taken into custody on December 17, 1994, Abbondandelo took no steps to verify the information provided by Peddie Jenkins. Abbondandelo Dep., Harvis Decl., Ex. 6, 360:12-25; 362:11-23.

163. Abbondandelo did not consider showing Joe Jackson's photograph to Glenn Montes or Maurice Larrea. Abbondandelo Dep., Harvis Decl., Ex. 6, 362:24-363:2.

164. On his next day of work, Abbondandelo ordered Freeport police to take plaintiff into custody. Abbondandelo Dep., Harvis Decl., Ex. 6, 364:12-365:3.

165. Abbondandelo has never seen any video evidence that plaintiff sold drugs in August 1993. Abbondandelo Dep., Harvis Decl., Ex. 6, 365:4-17.

166. Abbondandelo's legal authority to detain plaintiff was probable for a homicide charge. Abbondandelo Dep., Harvis Decl., Ex. 6, 367:13-369:9.

167. Even if plaintiff had not had a warrant, Abbondandelo would still have ordered him detained based on probable cause for the homicide. Abbondandelo Dep., Harvis Decl., Ex. 6, 369:7-9; *but see* Pr.-Tr. Hr. 1995, Harvis Decl., Ex. 32, 267:24-268:14.

168. The video that supposedly depicted plaintiff selling drugs was of extremely low fidelity. Abbondandelo Dep., Harvis Decl., Ex. 6, 374:25-375:16.

169.   While plaintiff was in custody, Abbondandelo put together a photo pack and had an informant select plaintiff. Abbondandelo Dep., Harvis Decl., Ex. 6, 376:3-10.

170.   Abbondandelo was not aware that plaintiff had been shot in the stomach twice in the year prior to his interrogation. Abbondandelo Dep., Harvis Decl., Ex. 6, 378:21-379:2.

171.   Abbondandelo did not know when plaintiff had last eaten or slept. Abbondandelo Dep., Harvis Decl., Ex. 6, 379:6-24.

172.   When plaintiff was brought to the Homicide Squad on December 17, 1994, it was near the end of Abbondandelo's shift, and Abbondandelo was awake for 30-40 hours or more during the interrogation. Abbondandelo 3 Dep., Harvis Decl., Ex. 6, 79:25-381:14.

173.   Long shifts without sleep might affect the detectives' cognition, but if there was a problem they are always confirming with supervisor Daniel Severin. Abbondandelo Dep., Harvis Decl., Ex. 6, 381:15-382:1.

174.   Abbondandelo would become more relaxed after thirty hours without sleep. Abbondandelo Dep., Harvis Decl., Ex. 6, 382:7-18.

175.   During the interrogation, plaintiff provided truthful information regarding his residence and consistently denies involvement in the homicide. Abbondandelo Dep., Harvis Decl., Ex. 6, 383:23-384:15.

176.   After plaintiff completed the polygraph examination, Abbondandelo lied and told plaintiff that he had been identified as the perpetrator by multiple witnesses, when the one witness Abbondandelo arguably had, Peddie Jenkins, who was not credible. Abbondandelo Dep., Harvis Decl., Ex. 6, 395:3-17.

177.   The goal was to get plaintiff to admit that he had committed murder. Abbondandelo Dep., Harvis Decl., Ex. 6, 395:18-25.

178.   When prisoners stayed at the homicide overnight, the "normal way" for them to sleep was between to chairs or on the floor or on a desk. Abbondandelo, Dep., Harvis Decl., Ex. 6, 396:22-397:20.

179.   Abbandendelo does not consider Takita Dorsey's "qualified truth" polygraph result as being truthful but Dempsey admits that it has "some credence." Abbondandelo Dep., Harvis Decl., Ex. 6, 414:6-415:14; Dempsey Dep., Harvis Decl., Ex. 17, 232:16-18; Polygraph Examination Card for Takita Dorsey, annexed to the Harvis Decl. as Ex. 109 ("Dorsey Polygraph Card"), County5034.

180.   Had Takita Dorsey's result been truthful, it might have impacted Abbondandelo's view of the validity of plaintiff's confession. Abbondandelo Dep., Harvis Decl., Ex. 6, 415:15-23.

181.   After plaintiff's confession was obtained, Abbondandelo and Detective Mullen traveled to Pittsburgh to conduct an identification procedure. Abbondandelo Dep.,

Harvis Decl., Ex. 6, 415:24-416:18.

182.   The procedure was not time sensitive but the district attorney requested the identification because they would not authorize the arrest of plaintiff on homicide charges without it. Abbondandelo Dep., Harvis Decl., Ex. 6, 416:19-417:6; Abbondandelo Dep., II, Harvis Decl., Ex. 65, 14:16-24.

183.   No notes were taken of the Witherspoon identification procedure. Abbondandelo Dep., Harvis Decl., Ex. 6, 419:1-6.

184.   Dempsey and Abbondandelo discussed the failure to disclose Brady material to plaintiff, and Dempsey told Abbondandelo that he did not recall the Montes and Larrea statements. Abbondandelo Dep., II, Harvis Decl., Ex. 65, 10:7-11:16.

185.   Abbondandelo does not know what Mullen said to Witherspoon before they traveled to Pittsburgh. Abbondandelo Dep., II, Harvis Decl., Ex. 65, 12:24-13:4.

186.   The Pittsburgh trip with Mullen to see Witherspoon was the only trip Abbondandelo had ever taken out of town to administer a photo array. Abbondandelo Dep., II, Harvis Decl., Ex. 65, 14:2-24.

187.   At trial Skwanitra Witherspoon described the perpetrator as five-foot-seven. Abbondandelo Dep., II, Harvis Decl., Ex. 65, 18:12-15.

188.   Abbondandelo agrees that standing face to face with someone can allow you to assess their height, and that five-foot-seven is different from six feet. Abbondandelo Dep., II, Harvis Decl., Ex. 65, 18:16-25.

189.   Skwanitra Witherspoon only had a short time to see the perpetrator, who was brandishing a gun. Abbondandelo Dep., II, Harvis Decl., Ex. 65, 20:21-21:9.

190.   A photo array does not reveal height. Abbondandelo Dep., II, Harvis Decl., Ex. 65, 23:7-23.

191.   The police department had technology to record the identification procedure with Skwanitra Witherspoon in Pittsburgh, but it was not used. Abbondandelo Dep., II, Harvis Decl., Ex. 65, 28:23-29:23.

192.   Abbondandelo took no notes in Pittsburgh. Abbondandelo Dep., II, Harvis Decl., Ex. 65, 32: 7-9.

193.   Abbondandelo and Mullen did not disclose to Witherspoon that plaintiff is six feet tall. Abbondandelo Dep., II, Harvis Decl., Ex. 65, 32:21-25.

194.   Abbondandelo agrees that plaintiff is either the only light-skinned male in the array shown to Witherspoon or one of only two. Abbondandelo Dep., II, Harvis Decl., Ex. 65, 36:16-37:20.

195.   Skin color is not a "major factor" when putting together a photo array. Abbondandelo Dep., II, Harvis Decl., Ex. 65, 38:8-13.

196.   Abbondandelo never considered showing Skwanitra Witherspoon a photograph of Peddie Jenkins. Abbondandelo Dep., II, Harvis Decl., Ex. 65, 40:17-20.

197.  Takita Dorsey's truthful denials of involvement had no impact on Abbondandelo's view of the case. Abbondandelo Dep., II, Harvis Decl., Ex. 65, 51:3-9; Dorsey Polygraph Card, Harvis Decl., Ex. 109, County5034.

198.  "Somewhere along the line" Abbondandelo attempted to obtain information from Richard "Woody" Miller, a barber who had been near the scene of the crime. Abbondandelo Dep., II, Harvis Decl., Ex. 65, 62:3-15.

199.  Woody alleges that the police pressured him to accuse plaintiff of shooting Steven Jason. Miller Aff., Harvis Decl., Ex. 9.

200.  The man next to the Blimpie's was not plaintiff. Miller Aff., Harvis Decl., Ex. 9.

201.  Woody's observations suggest the defendants were attempting to frame plaintiff. Miller Aff., Harvis Decl., Ex. 9.

202.  In the 36-minute Zimmer-Baldwin interview, Baldwin never mentions plaintiff. Baldwin-Zimmer Audio recording (accessible at: https://tinyurl.com/Zimmer-baldwin).

203.  The Zimmer-Baldwin interview was never produced to plaintiff. Rosario List, Harvis Decl., Ex. 63; https://tinyurl.com/Zimmer-baldwin.

204.  On April 4, 1995 (nearly a year after Zimmer-Baldwin), Petey Baldwin was brought to the DA's office, resulting in notes purporting to memorialize hearsay implicating plaintiff. Abbondandelo Dep., II, Harvis Decl., Ex. 65, 62:19-23.

205.  Abbondandelo admits that the fillers in the April 11, 1995 lineup viewed by Skwanitra Witherspoon had different complexions and characteristics from plaintiff. Abbondandelo Dep., II, Harvis Decl., Ex. 65, 66:8-21; Dysart Report, Harvis Decl., Ex. 21.

206.  The lineup was not recorded and no notes were taken. Abbondandelo Dep., II, Harvis Decl., Ex. 65, 74:12-16, 76:10-16; Dysart Report, Harvis Decl., Ex. 21.

### Robert Dempsey

207.  Dempsey does not recall speaking to EADA Sheryl Anania. Dempsey Dep., Harvis Decl., Ex. 17, 12:25-13:4.

208.  Dempsey worked for the Nassau County Police Department from September 21, 1962 until March 23, 2001, and joined the homicide squad in January 1979. Dempsey Dep., Harvis Decl., Ex. 17, 13:5-7, 14:15-17, 28:16-18.

209.  Dempsey started his police career before the *Miranda* case was decided. Dempsey Dep., Harvis Decl., Ex. 17, 15:6-25.

210.  Dempsey was a homicide detective for about 23 years. Dempsey Dep., Harvis Decl., Ex. 17, 19:5-7.

211.  Dempsey never used a recording device during an interrogation. Dempsey Dep., Harvis Decl., Ex. 17, 22:8-13.

212.  Dempsey has never used physical violence against a suspect or threatened a

suspect with violence. Dempsey Dep., Harvis Decl., Ex. 17, 22:24-23:8.

213. Dempsey threatened people with long jail sentences if they didn't talk, but does not recall ever lying to a suspect. Dempsey Dep., Harvis Decl., Ex. 17, 23:20-25.

214. During his career, Dempsey has never seen a fellow officer use force against a suspect in custody or otherwise commit misconduct. Dempsey Dep., Harvis Decl., Ex. 17, 26:3-6, 16-19.

215. If Dempsey saw a fellow officer violating a suspect's rights, Dempsey does not know if he would have an obligation to report it. Dempsey Dep., Harvis Decl., Ex. 17, 26:7-11.

216. Dempsey has never reported misconduct by a fellow officer. Dempsey Dep., Harvis Decl., Ex. 17, 26:12-15.

217. Dempsey has never questioned a suspect in custody without administering Miranda warnings. Dempsey Dep., Harvis Decl., Ex. 17, 26:20-23.

218. Dempsey has never questioned a suspect that he knew was represented by counsel. Dempsey Dep., Harvis Decl., Ex. 17, 27:6-8.

219. When Dempsey was a detective, there was no rule book to which detectives could refer. Dempsey Dep., Harvis Decl., Ex. 17, 27:20-28:2.

220. When Dempsey joined the Homicide Squad there was no formal training and he learned from experience and other detectives. Dempsey Dep., Harvis Decl., Ex. 17, 28:19-29:8.

221. Dempsey's first homicide case was Cristobal Rivera, which involved a stabbing where a pizza delivery worker confessed in Spanish. Dempsey Dep., Harvis Decl., Ex. 17, 29:9-17.

222. In the Rivera case, the suspect asked if he needed a lawyer and detectives responded "only if you did something wrong." Dempsey Dep., Harvis Decl., Ex. 17, 29:19-23.

223. In 1981, Judge Harold E. Collins suppressed a statement obtained by defendant Dempsey following a three-and-a-half-hour interrogation on the grounds that detectives knew the suspect, Brian Wendel, was represented by an attorney. *See* Echikson, William, New York Newsday*, June 23, 1981, *Murder-Case Statement Disallowed*," annexed to the Harvis Decl. as Ex. 89; Dempsey Dep., Harvis Decl., Ex. 17, 35:14-36:24.

224. Nassau County never investigated Mr. Wendel's allegations against defendant Dempsey. Dempsey Dep., Harvis Decl., Ex. 17, 37:4-8.

225. Nassau County never interviewed Dempsey regarding Wendel's allegations. Dempsey Dep., Harvis Decl., Ex. 17, 37:9-14.

226. Nassau County never disciplined Dempsey regarding Brian Wendel's allegations. Dempsey Dep., Harvis Decl., Ex. 17, 37:23-25.

227.   Nassau County never retrained Dempsey following Brian Wendel's allegations. Dempsey Dep., Harvis Decl., Ex. 17, 38:2-5.

228.   Nassau County took no action as a result of Mr. Wendel's allegations. Dempsey Dep., Harvis Decl., Ex. 17, 38:6-9.

229.   Dempsey was the carrying detective in the case against Joseph Ross, who was accused of the shooting death of his wife. Dempsey Dep., Harvis Decl., Ex. 17, 38:17-39:8.

230.   Dempsey interrogated Ross and obtained a confession from him. Dempsey Dep., Harvis Decl., Ex. 17, 39:9-40:6.

231.   In January 1984, Joseph Ross accused Dempsey of threatening him repeatedly during the interrogation, including threatening to tear out Ross's kneecap with his bare hands if Ross did not confess to the killing. Dempsey Dep., Harvis Decl., Ex. 17, 41:14-42:21, 47:17-25.

232.   Ross also accused Dempsey of kicking him in the leg, punching him eight or nine times, squeezing his stitches and making antisemitic remarks. Dempsey Dep., Harvis Decl., Ex. 17, 43:13-44:17; *see* Bell, Dennis and Hevesi, Dennis, New York Newsday, January 21, 1984, *Murder Suspect: Cop Threatened Me*, annexed to the Harvis Decl., as Ex. 90.

233.   Ross accused Dempsey of serious misconduct. Dempsey Dep., Harvis Decl., Ex. 17, 45:9-14.

234.   Nassau County did not investigate Ross's allegations against Dempsey. Dempsey Dep., Harvis Decl., Ex. 17, 45:18-23.

235.   Dempsey was never interviewed or disciplined in connection with Ross's allegations. Dempsey Dep., Harvis Decl., Ex. 17, 46:2-9.

236.   Dempsey was never retrained in connection with the allegations made by Joseph Ross. Dempsey Dep., Harvis Decl., Ex. 17, 48:13-17.

237.   Nassau County took no action in response to the allegations from Joseph Ross. Dempsey Dep., Harvis Decl., Ex. 17, 18-23.

238.   It was Nassau County Police Department policy that police officers wrote out statements for criminal suspects. Dempsey Dep., Harvis Decl., Ex. 17, 50:13-51:11.

239.   In his career, Dempsey never had a criminal suspect write out a statement in their own handwriting. Dempsey Dep., Harvis Decl., Ex. 17, 51:12-16.

240.   Dempsey was involved in the interrogation of Robert Golliver, a suspect in the stabbing and sodomy of a newsboy in Rockville Centre. Dempsey Dep., Harvis Decl., Ex. 17, 49:5-50:4.

241.   Also in January 1984, Mr. Golliver, who had been arrested as a minor, accused Dempsey of misleading him, ignoring his requests for a lawyer for nine or ten hours and falsely claiming that his lawyer was on his way. Dempsey Dep., Harvis Decl.,

Ex. 17, 52:16-55:13; *see* Bell, Dennis and Hevesi, Dennis, New York Newsday, January 31, 1984, *Newsboy Murder Suspect: Confused Into Confession*, annexed to the Harvis Decl. as Ex. 91.

242.   Golliver also accused Dempsey of picking up a typewriter and threatening to crash it into Golliver's head. Dempsey Dep., Harvis Decl., Ex. 17, 59:15-25; *see* O'Hearn, Bradford, New York Newsday, April 4, 1984, *Golliver Admitted Killing Newsboy, Detective Says*, annexed to the Harvis Decl. as Ex. 92.

243.   Nassau County never investigated Golliver's allegations. Dempsey Dep., Harvis Decl., Ex. 17, 55:15-20; 61:9-12.

244.   Dempsey was never interviewed regarding Golliver's allegations. Dempsey Dep., Harvis Decl., Ex. 17, 55:21-25.

245.   Dempsey was never retrained in connection with Golliver's allegations. Dempsey Dep., Harvis Decl., Ex. 17, 56:2-4.

246.   In the homicide squad, the commanding officer assigned cases to a detective and a supervisor. Dempsey Dep., Harvis Decl., Ex. 17, 56:15-58:18.

247.   During the Theresa Fusco murder investigation, Dempsey was accused of beating up John Restivo. Dempsey Dep., Harvis Decl., Ex. 17, 66:20-23.

248.   According to Restivo: "After being assaulted by Defendant Dempsey, I demanded to leave. They wouldn't let me leave…They told me, 'You don't have any rights here.'" Dempsey Dep., Harvis Decl., Ex. 17, 71:10-19; Restivo Dep., Harvis Decl., Ex. 71, 637:5-11.

249.   By letter dated March 28, 1985, Nassau County Police Commissioner Samuel Rozzi acknowledged Mr. Restivo's complaint and pledged that an inquiry would be conducted into the allegations. Dempsey Dep., Harvis Decl., Ex. 17, 67:3-69:4; *see* Letter Response: Restivo Complaint, Harvis Decl., Ex. 72.

250.   No inquiry was ever conducted into Mr. Restivo's allegations against Dempsey, and Dempsey was never questioned about Restivo's allegations. Dempsey Dep., Harvis Decl., Ex. 17, 69:5-25, 72:17-24, 77:4-11.

251.   Dempsey was never disciplined or retrained in connection with Restivo's allegations. Dempsey Dep., Harvis Decl., Ex. 17, 72:25-73:8.

252.   Dempsey was not required to pay any of the civil damages award resulting from Mr. Restivo's wrongful conviction lawsuit. Dempsey Dep., Harvis Decl., Ex. 17, 74:6-75:5.

253.   In the mid-1980s, two criminal defendants, Darryl Grate and Charles Clink, accused Dempsey of putting words into the statements attributed to them. Dempsey Dep., Harvis Decl., Ex. 17, 77:12-82:20; *see* Colwell, Caroyln, December 10, 1985, *Detective Grilled in Slaying Case*, annexed to the Harvis Decl. as Ex. 93; Colwell, Carolyn, Brasely, Patrick, March 19, 1986, *Man Is Convicted In Holdup-Murder*,

annexed to the Harvis Decl. as Ex. 94.

254.   Nassau County never investigated the allegations made Darryl Grate or Charles Clink. Dempsey Dep., Harvis Decl., Ex. 17, 82:21-25.

255.   Dempsey was never interviewed, disciplined or retrained in connection with the allegations made by Grate and Clink. Dempsey Dep., Harvis Decl., Ex. 17, 83:2-8.

256.   In 1987, Dempsey interrogated Joseph Porto, who was accused of strangling Kathleen Holland, the daughter of a Nassau County Police Department Detective Sergeant. Dempsey Dep., Harvis Decl., Ex. 17, 83:9-84:18.

257.   Joseph Porto was seventeen when he was arrested and his parents claimed that homicide squad detectives including Dempsey misled them and conducted an illegal interrogation. Dempsey Dep., Harvis Decl., Ex. 17, 85:9-87:3; *see* Topping, Robin, New York Newsday, July 7, 1987, *Teen Says Police Violated His Rights In Murder Case*, annexed to the Harvis Decl. as Ex. 95.

258.   Nassau County never investigated the allegations of Joseph Porto and his family. Dempsey Dep., Harvis Decl., Ex. 17, 87:4-9.

259.   Dempsey was never interviewed, disciplined or retrained in connection with th allegations of Joseph Porto and his family. Dempsey Dep., Harvis Decl., Ex. 17, 87:12-18.

260.   Shonnard Lee was accused of killing Sammy Jones with a baseball bat in February 1997 and Dempsey was the carrying detective on the case. Dempsey Dep., Harvis Decl., Ex. 17, 87:23-88:10.

261.   Less than a week after Jones was murdered, Ragan Martin was arrested and told Dempsey that Corey Jones had committed the crime. Dempsey Dep., Harvis Decl., Ex. 17, 88:18-24.

262.   Ragan Martin signed a statement, passed a polygraph test and, when presented with a photo array by Dempsey, identified Corey Jones as the perpetrator. Dempsey Dep., Harvis Decl., Ex. 17, 88:25-89:17.

263.   Ragan Martine was then brought to the District Attorney's office and recorded a video statement. Dempsey Dep., Harvis Decl., Ex. 17, 89:18-21; Order, PSNY v. Shonnard Lee, August 19, 1998, annexed to the Harvis Decl. as Ex. 96 ("Lee Order"), p. 3.

264.   In an affidavit dated February 10, 2003, Jeffrey Bourne accused Dempsey of having pressured Bourne into falsely claiming that Shonnard Lee, who was charged with killing Sammy Jones, had confessed to him. *See* Affidavit of Jeffrey Bourne, annexed to the Harvis Decl. as Ex. 97; Dempsey Dep., Harvis Decl., Ex. 17, 90:15-91:23.

265.   A state court determined that the exculpatory information Ragan Martin provided to Dempsey was not disclosed to Shonnard Lee in violation of *Brady* and

dismissed the indictment.  Lee Order, Harvis Decl., Ex. 96, pp. 3-7; Dempsey Dep., Harvis Decl., Ex. 17, 93:3-97:15.

266.  After the disclosure violation was uncovered in the Shonnard Lee case, Nassau County conducte d no investigation into the matter and never interviewed, disciplined or retrained Dempsey. Dempsey Dep., Harvis Decl., Ex. 17, 102:7-103:2.

267.  In a civil suit later brought by Shonnard Lee, a jury determined that Dempsey affirmatively misled Shonnard Lee as to the true nature of the document he was signing and thereby tricked him into signing an involuntary confession. Dempsey Dep., Harvis Decl., Ex. 17, 117:6-118:25; *see* Lee Verdict Sheet, Harvis Decl., Ex. 44, p. 2.

268.  The jury awarded Shonnard Lee $2,000,000. *see* Lee Verdict Sheet, Harvis Decl., Ex. 44, p. 5; Dempsey Dep., Harvis Decl., Ex. 17, 120:17-121:17; *see* Lam, Chau, New York Newsday, May 19, 2004, *$2M in Faulty Arrest*, annexed to the Harvis Decl., as Ex. 98.

269.  The jury concluded that Dempsey had manufactured evidence against Lee, commenced a prosecution against Lee without probable cause and acted with actual malice. *Id.*

270.  The jury verdict was paid by Nassau County and Dempsey did not contribute. Dempsey Dep., Harvis Decl., Ex. 17, 121:18-22.

271.  After the jury's findings, Dempsey does not know if Nassau County investigated Shonnard Lee's allegations, but Dempsey was not interviewed. Dempsey Dep., Harvis Decl., Ex. 17, 121:23-122:6.

272.  Other than being cited in 1963 when he first joined the force, Dempsey was never disciplined by the Nassau County Police Department. Dempsey Dep., Harvis Decl., Ex. 17, 46:10-47:12.

273.  In 2001, Jose Anibal Martinez was interrogated inside the Nassau County Homicide Squad under the supervision of defendant Severin until he signed a confession that was later determined to be false. *See* Complaint in *Jose Anibal Martinez v. Nassau County*, et al., 02 CV 4985 (JS) (WDW), DE #1, annexed to the Harvis Decl. as Ex. 73; Vargas, Theresa, New York Newsday, January 11, 2002, *Probe in Confession Case*, annexed to the Harvis Decl. as Ex. 74; *See* Gootman, Elissa, N.Y. Times, Jan. 15, 2002, *Wrongly Held in a Killing, a Man Is Freed*, annexed to the Harvis Decl. as Ex. 75; Lam, Chau, New York Newsday, April 11, 2005, *False Confessions*, annexed to the Harvis Decl. as Ex. 76.

274.  After Martinez was held for five months he was freed and made public allegations of coercion, claiming that Det. Edwin Trujillo, under Severin's supervision, had, *inter alia*, slapped and yelled at him "making him afraid not to sign the false

statement of guilt." *Id.*

275. Martinez sued the County and defendants Severin and Holland, and the matter was settled during a telephone conference before the Hon. William D. Wall on June 17, 2004 and dismissed by this Honorable Court. *See* Civil Docket Sheet, 02 CV 4985, annexed to the Harvis Decl., as Ex. 99, Docket Entry Nos. 54-58.

276. Defendant Severin could not recall the Anibal Martinez matter at his deposition. Severin Dep., Harvis Decl., Ex. 11, 29:8-30:13.

277. Between June 1994 and December 1994, Dempsey was attempting to interview plaintiff in connection to Tony Jackson's murder, but plaintiff was avoiding him. Dempsey Dep., Harvis Decl., Ex. 17, 132:15-22, 137:11-18.

278. Dempsey was told by associates and friends of plaintiff that plaintiff and Tony Jackson were like brothers. Dempsey Dep., Harvis Decl., Ex. 17, 133:10-15.

279. When Dempsey was interrogating plaintiff, he did not know that Montes and Larrea had witnessed the Steven Jason homicide. Dempsey Dep., Harvis Decl., Ex. 17, 98:2-99:2.

280. In Dempsey's view, it could have been helpful if he had known about Montes and Larrea and their account when he was questioning plaintiff. Dempsey Dep., Harvis Decl., Ex. 17, 99:3-11.

281. At some point prior to Dempsey's retirement, Mike Walsh, the trial prosecutor, asked Dempsey if he knew Montes and Larrea, and Dempsey said he did not. Dempsey Dep., Harvis Decl., Ex. 17, 104:12-106:14.

282. Dempsey made no notes of the conversation decades earlier but remembers it. Dempsey Dep., Harvis Decl., Ex. 17, 106:8-17.

283. Walsh did not mention the 32b statements. Dempsey Dep., Harvis Decl., Ex. 17, 107:12-15.

284. Dempsey considers the Montes and Larrea statements relevant to the Steven Jason homicide investigation, but believes they arrived at the scene after the fact and did not witness the shooting. Dempsey Dep., Harvis Decl., Ex. 17, 108:17-109:9.

285. If Dempsey had been aware of the content of Glenn Montes' 32b statement, he probably would have told Mike Walsh to speak with Montes and Larrea. Dempsey Dep., Harvis Decl., Ex. 17, 113:5-18

286. Dempsey does not know whether the District Attorney was given the Montes and Larrea statements. Dempsey Dep., Harvis Decl., Ex. 17, 114:2-24.

287. Dempsey's first involvement in the Steven Jason homicide was December 17, 1994 when plaintiff was brought to the homicide squad. Dempsey Dep., Harvis Decl., Ex. 17, 139:14-20.

288. After Steven Jason's death, Peddie Jenkins tried to be a police informant. Dempsey Dep., Harvis Decl., Ex. 17, 140: 14-19; *but see* Jenkins Dep., Harvis Decl.,

Ex. 4, 42:9-14 (denying).

289.   Dempsey did not trust Peddie Jenkins. Dempsey Dep., Harvis Decl., Ex. 17, 139:14-20, 142:23-143:3.

290.   There was no physical evidence that plaintiff killed Steven Jason. Dempsey Dep., Harvis Decl., Ex. 17, 139:14-20, 147:25-148:8.

291.   Dempsey offered leniency to plaintiff when he took his confession. Dempsey Dep., Harvis Decl., Ex. 17, 139:14-20, 147:5-13.

292.   Defendant Daniel Severin, then a Detective Sergeant, supervised both the Steven Jason and Tony Jackson homicide investigations on behalf of Nassau County. Dempsey Dep., Harvis Decl., Ex. 17, 139:14-20, 149:22-151:4; *see* Alger Dep., Harvis Decl., Ex. 48, 59:7-17.

293.   As the supervisor of the Steven Jason homicide investigation, Severin had weekly meetings with Abbondandelo during the period March to December 1994 and maintained a working knowledge of the status of the case. Severin Dep., Harvis Decl., Ex. 11, 103:7-104:3.

294.   In his second statement to the police and court testimony, Peddie Jenkins claimed he was unarmed at the American Legion. Dempsey Dep., Harvis Decl., Ex. 17, 156:18-157:2.

295.   Dempsey found Peddie Jenkins second statement truthful because "the description of what Joseph Jackson was wearing…seemed to be accurate…the Philadelphia Eagles jacket…seemed to be accurate…," but Dempsey admitted that he first heard about the Eagles jacket from Jenkins. Dempsey Dep., Harvis Decl., Ex. 17, 157:22-159:25.

296.   At the time plaintiff was brought to the homicide squad on December 17, 1994, police had no evidence that plaintiff killed Steven Jason other than the word of Peddie Jenkins. Dempsey Dep., Harvis Decl., Ex. 17, 161:12-2.

297.   Jenkins' statement implicating plaintiff lacked corroboration. Dempsey Dep., Harvis Decl., Ex. 17, 161:21-162:20.

298.   Dempsey did nothing to attempt to corroborate Peddie Jenkins' statement before plaintiff was brought to the homicide squad on December 17, 1994. Dempsey Dep., Harvis Decl., Ex. 17, 163:3-8.

299.   Dempsey is unable to say whether plaintiff was a suspect in the Steven Jason homicide before detectives interrogated him on December 17, 1994. Dempsey Dep., Harvis Decl., Ex. 17, 164:5-24.

300.   Dempsey is unable to say whether police had probable cause to arrest plaintiff when they held him for thirty-nine hours inside the homicide squad beginning on December 17, 1994. Dempsey Dep., Harvis Decl., Ex. 17, 164:25-166:2.

301.   When plaintiff was taken to the homicide squad on December 17, 1994, it was

solely for the purpose of interrogating him about the Steven Jason homicide and unrelated to any warrants or drug crimes. Dempsey Dep., Harvis Decl., Ex. 17, 169:8-16; Severin Dep., Harvis Decl., Ex. 11, 133:21-134:21.

302.   Because the warrants concerned unrelated, arraigned misdemeanors for which plaintiff had been assigned counsel and probable cause to detain plaintiff on drug sale charges was lacking, plaintiff's custodial interrogation beginning on December 17, 1994 had no lawful basis. Dempsey Dep., Harvis Decl., Ex. 17, 169:2-16.

303.   Dempsey did not know whether plaintiff was represented by counsel on the open cases and it did not matter to him. Dempsey Dep., Harvis Decl., Ex. 17, 181:24-183:2.

304.   In Dempsey's view there was no time limit in terms of how long plaintiff could have been held in the homicide squad beginning December 17, 1994. Dempsey Dep., Harvis Decl., Ex. 17, 183:3-8.

305.   Dempsey's notes of plaintiff's interrogation contain an approximately thirty-hour gap before plaintiff is alleged to have "confessed" and signed the statement written by Dempsey. Dempsey Dep., Harvis Decl., Ex. 17, 99:12-25; *see* Dempsey December Notes, Harvis Decl., Ex. 35; Dempsey Dep., Harvis Decl., Ex. 17, 241:11-15.

306.   Dempsey and the other officers used violence and threats of violence during the 39-hour interrogation process. Jackson Dep., Harvis Decl., Ex. 1, 122:10-123:15 ("…Officer Dempsey slapped me around, beat on me, screamed in my face, starved me, antagonized me, and had other officers come through there and join in the fun. I was sleep deprived. I didn't get nothing to eat. I couldn't use the bathroom. I was already injured from previously being shot in the stomach. He was punching me in my stomach. Beating on my legs. Slapping me in my face, like I was a child. Making me say things that I did not have nothing to do with whatsoever, and he knew it…"); Dempsey Dep., Harvis Decl., Ex. 17, 203:3-12; *see also* Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 70:2-10 ("…I asked Detective Dempsey on several occasions…could I speak to a lawyer…But he told me he didn't give a fuck. He was running the show; if I did what he said to do, or I was going to get fucked, either way."); Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 61:19-62:3 ("Every few minutes…I would ask the same questions…Can I talk to my lawyer. What am I being held for. I didn't do nothing…"); Severin Dep., Harvis Decl., Ex. 11, 129:2-6.

307.   Dempsey recalls that plaintiff was "more cooperative" than John Restivo and "very cooperative." Dempsey Dep., Harvis Decl., Ex. 17, 203:13-20.

308.   Dempsey has a temper and barely slept while plaintiff was in custody. Dempsey Dep., Harvis Decl., Ex. 17, 217:5-10.

309.   Lack of sleep can make Dempsey "more irritable." Dempsey Dep., Harvis Decl.,

Ex. 17, 218:2-5.

310.   Plaintiff "kept denying he was there" from the time he arrived in the homicide squad on December 17, 1994. Dempsey Dep., Harvis Decl., Ex. 17, 213:12-18; Plaintiff's Arrest Report, Harvis Decl., Ex. 22.

311.   Dempsey and others threatened and tortured plaintiff for more than thirty hours, including by threatening to smash his head through a filing cabinet if he told them one more time that he didn't do it and punching him in the stomach on the way to the polygraph exam. *See* Jackson Dep., Harvis Decl., Ex. 1, 122:10-123:15 ("…Officer Dempsey slapped me around, beat on me, screamed in my face, starved me, antagonized me, and had other officers come through there and join in the fun. I was sleep deprived. I didn't get nothing to eat. I couldn't use the bathroom. I was already injured from previously being shot in the stomach. He was punching me in my stomach. Beating on my legs. Slapping me in my face, like I was a child. Making me say things that I did not have nothing to do with whatsoever, and he knew it…").

312.   Ultimately, plaintiff's will was overborn, and he agreed to sign a fabricated statement written entirely by the officers. Dempsey Dep., Harvis Decl., Ex. 17, 222:17-223:11; *see also* Jackson Dep.., Harvis Decl., Ex. 1, 158:25-159:13; 166:9-167:22; 170:3-17; Dempsey Dep., Harvis Decl., Ex. 17, 248:8-249:2.

313.   Plaintiff did not make any admissions during the interrogation and did not "blurt" anything "out". *See* Jackson Dep., Harvis Decl., Ex. 1, 122:10-123:15, 125:4-24; 158:25-159:13; 166:9-167:22; 170:3-17.

314.   Coercing plaintiff's false confession was a joint effort by defendants Dempsey, Abbondandelo, Severin and Herts (the late Jerl Mullen was also involved but his administrator was dismissed at the Rule 12 stage). Dempsey Dep., Harvis Decl., Ex. 17, 198:22-25, 218:15-21, Dempsey Dep., Harvis Decl., Ex. 17, 219:7-20, 221:18-222:8, 230:19-21; *See* Jackson Dep., Harvis Decl., Ex. 1, 122:10-123:15, 125:4-24.

315.   Plaintiff never said, "I shot Steven Jason." Dempsey Dep., Harvis Decl., Ex. 17, 219:21-23; *See* Jackson Dep., Harvis Decl., Ex. 1, 122:10-123:15, 125:4-24, 158:25-159:13; 166:9-167:22; 170:3-17.

316.   Plaintiff never told Abbondandelo that he "did it out of love for his friend, Tony Jackson." Dempsey Dep., Harvis Decl., Ex. 17, 225:17-24; Jackson Dep. 1., Harvis Decl., Ex. 1, 158:25-159:13; 166:9-167:22; 170:3-17.

317.   Defendants, and not plaintiff, are the source of the narrative Dempsey describes at pp. 226-229 of his deposition. Dempsey Dep., Harvis Decl., Ex. 17; Jackson Dep., Harvis Decl., Ex. 1, 158:25-159:13; 166:9-167:22; 170:3-17.

318.   Dempsey admits that the Montes statement contradicts the statement attributed to plaintiff. Dempsey Dep., Harvis Decl., Ex. 17, 232:24-236:14.

319.   Dempsey admits that police had an obligation to provide Glenn Montes's 32b

statement to prosecutors. Dempsey Dep., Harvis Decl., Ex. 17, 237:3-7.

320.  After plaintiff signed the statement Dempsey had written, Dempsey took no steps to corroborate it. Dempsey Dep., Harvis Decl., Ex. 17, 243:4-6.

321.  Dempsey did not know at the time of his grand jury testimony that there had been an off-duty police officer and his friend that were witnesses to the crime. Dempsey Dep., Harvis Decl., Ex. 17, 245:21-25.

322.  Dempsey admits that there was a problem with the radiator in the interview room and that it may have been cold but testified that it "wasn't freezing." Dempsey Dep., Harvis Decl., Ex. 17, 249:14-250:7.

323.  Dempsey would normally obtain a 911 call if he knew about it. Dempsey Dep., Harvis Decl., Ex. 17, 252:9-15.

<u>Michael Walsh</u>

324.  Michael Walsh was the Assistant District Attorney assigned by Nassau County to prosecute plaintiff. Walsh Dep., Harvis Decl., Ex. 3, 35:12-17.

325.  Fred Klein was Walsh's supervisor. Walsh Dep., Harvis Decl., Ex. 3, 41:15-24.

326.  Under established *Brady* principles in effect in 1994, Walsh had a duty to disclose favorable evidence to plaintiff. Walsh Dep., Harvis Decl., Ex. 3, 32:13-23, 34:12-15, 36:16-19.

327.  Walsh considers a prosecutors' *Brady* obligations "an important responsibility." Walsh Dep., Harvis Decl., Ex. 3, 36:20-37:19.

328.  Prosecutors are also ethically mandated under Rule 3.8(b) of the New York Rules of Professional Conduct to "make timely disclosure to counsel for the defendant …of the existence of evidence or information known to the prosecutor…that tends to negate the guilt of the accused…" Walsh Dep., Harvis Decl., Ex. 3, 51:17-53:23.

329.  In another prosecution where Walsh failed to turn over written statements, a state court reversed the defendant's conviction on *Brady* grounds. Walsh Dep., Harvis Decl., Ex. 3, 38:15-40:24.

330.  In 1994, in most cases if Walsh was aware there was a 911 call, he would obtain and review the 911 evidence. Walsh Dep., Harvis Decl., Ex. 3, 48:21-50:2.

331.  Walsh concedes that an argument can be made that the Montes and Larrea statements are *Brady* because they "potentially give a defense lawyer the opportunity to present an alternative theory to a jury." Walsh Dep., Harvis Decl., Ex. 3, 53:24-56:5.

332.  Walsh has no memory of seeing the Montes and Larrea statements prior to the reinvestigation and concedes that they were not turned over to plaintiff or his counsel or contained in the DA's file. Walsh Dep., Harvis Decl., Ex. 3, 56:6-59:15, 62:21-16, 64:11-22.

333.  On October 25, 2017, Executive Assistant District Attorney Sheryl Anania,

Chief of the Nassau County District Attorney Conviction Integrity Unit, who was reviewing plaintiff's case, asked Mike Walsh to "get [her] Peddie Jenkins' phone number, "locate the 911 call" and "find out if Dempsey was involved in any false confession cases." Walsh Dep., Harvis Decl., Ex. 3, 68:8-69:14

334.   Mike Walsh has stayed in touch with Peddie Jenkins over the last twenty years. Walsh Dep., Harvis Decl., Ex. 3, 69:20-70:7.

335.   Walsh does not remember searching for or locating the 911 call. Walsh Dep., Harvis Decl., Ex. 3, 75:9-78:9.

336.   Walsh also did not investigate Dempsey's involvement in false confession cases. Walsh Dep., Harvis Decl., Ex. 3, 78:10-79:2.

337.   As of 1994, the District Attorney was required to disclose benefits provided to witnesses. Walsh Dep., Harvis Decl., Ex. 3, 83:4-84:4.

338.   In exchange for testimony against Joseph Jackson, Peddie Jenkins was only charged with criminal facilitation (instead of murder), was given a strong recommendation from the District Attorney for a lenient two to six year sentence on the facilitation charge and had unrelated charges dismissed. Walsh Dep., Harvis Decl., Ex. 3, 87:24-96:21.

339.   Peddie Jenkins did not have a written cooperation agreement, but Nassau County disclosed the material terms of the benefits conveyed to him on the record when Jenkins testified before the grand jury.  Walsh Dep., Harvis Decl., Ex. 3, 84:5-87:23.

340.   When Jenkins testified before the grand jury, it was only revealed that Jenkins was receiving a lesser charge; the County's efforts to have Jenkins favorably sentenced and have unrelated charges dismissed were not disclosed. *See* Grand Jury Testimony, annexed to the Harvis Decl. as Ex. 101, 20:5-11.

341.   On the afternoon of December 4, 2017, Sheryl Anania asked Mike Walsh to contact Gary Abbondandelo and Robert Dempsey and put them in touch with her. Walsh Dep., Harvis Decl., Ex. 3, 100:14-103:22.

342.   Walsh then spoke to Abbondandelo and Dempsey and told them he did not remember seeing the Montes and Larrea statements. Walsh Dep., Harvis Decl., Ex. 3, 103:23-104:16.

343.   Abbondandelo and Dempsey each told Walsh that they also did not remember the Montes and Larrea statements. Walsh Dep., Harvis Decl., Ex. 3, 104:17-23.

344.   Based on Anania's notes of her interview with Maurice Larrea, Mike Walsh agrees that Larrea was an eyewitness to the murder. Walsh Dep., Harvis Decl., Ex. 3, 106:17-107:2.

345.   Based on Anania's notes of her interview with Glenn Montes, Mike Walsh agrees that Montes was also an eyewitness to the murder. Walsh Dep., Harvis Decl., Ex. 3,

107:10-108:25.

346.  In the State's presentation of the case against Joseph Jackson, the two eyewitnesses to the crime identified by the state were Skwanitra Witherspoon and Peddie Jenkins. Walsh Dep., Harvis Decl., Ex. 3, 112:12-25.

347.  At the time plaintiff's conviction was vacated, the government did not have the ability to successfully retry him. Walsh Dep., Harvis Decl., Ex. 3, 117:7-15.

348.  The Nassau County District Attorney believes that production of the Montes and Larrea statements would have likely changed the outcome of plaintiff's trial. Walsh Dep., Harvis Decl., Ex. 3, 118:19-120:9.

349.  Peddie Jenkins contradicted his grand jury and trial testimony when he was interviewed by prosecutors during their 2017 reinvestigation, further diminishing his credibility. Walsh Dep., Harvis Decl., Ex. 3, 127:7-129:5; Anania Memo, Harvis Decl. Ex., 2, p. 7.

350.  There were discrepancies in the description of the shooter's clothing provided by Witherspoon, Jenkins, Montes and Larrea. Walsh Dep., Harvis Decl., Ex. 3, 129:6-130:14; Anania Memo and Notes, Harvis Decl., Ex. 2, p. 7.

351.  Walsh cannot explain how he could have known that Montes and Larrea provided written statements to police but never asked to see the statements to determine whether they were *Brady* material, which is apparently what happened. Walsh Dep., Harvis Decl., Ex. 3, 135:15-139:25.

352.  If any of the detectives had told Walsh about Larrea's 911 call, Walsh would have taken action to investigate and obtain the 911 records. Walsh Dep., Harvis Decl., Ex. 3, 143:18-144:13; *see* Nassau County Objections, Ex. 79 (indicating at response 2 that the 911 evidence was not preserved).

353.  By letter dated August 30, 2004, a volunteer attorney assisting plaintiff, Anthony Mayol, brought the withheld Montes and Larrea statements to Walsh's attention. *See* Mayol Letters, Harvis Decl., Ex. 68, County215-222; Walsh Dep., Harvis Decl., Ex. 3, 149:16-157:1.

354.  Five months later, Mayol spoke with a colleague of Walsh, Appeals ADA Peg Manesh, and again raised the issue of the missing statements. *See* Mayol Letters, Harvis Decl., Ex. 68, County215-222.

355.  Walsh spoke to Mayol and saw the letter Mayol sent Walsh in 2004 but claims that he never knew Mayol was making an issue of the Montes and Larrea statements and took no steps to investigate the issue. Walsh Dep., Harvis Decl., Ex. 3, 158:7-23, 159:23-160:23.

356.  By letter dated June 25, 2007, plaintiff filed a FOIL request with the Nassau County District Attorney's office. *See* FOIL Request, Harvis Decl., Ex. 69, County3147-3148.

357.   Plaintiff specifically requested the Montes and Larrea statements. FOIL Request, Harvis Decl., Ex. 69, County3147, ¶¶ 2-3.

358.   When the District Attorney's Office responded by letter dated July 24, 2007, it stated, in pertinent part: "[T]he file related to your case does not contain a copy of any statements made by Glenn Montes or Maurice Lorea (sic) and an 'agency need not prepare any record not possessed' by such agency.'…Therefore, this portion of your request must be denied." *See* NCDA FOIL Response, Harvis Decl., Ex. 70, County3151-52.

359.   The Freeport Incident Report is awkwardly phrased and difficult to decipher. Walsh Dep., Harvis Decl., Ex. 3, 167:5.

360.   Walsh has never seen a report phrased like the Freeport Incident Report and considers it unusual. Walsh. Dep., Harvis Decl., Ex. 3, 169:2-16.

361.   Walsh came to believe that Montes and Larrea were unreliable because one or more detectives gave Walsh that impression, and not based on the Freeport Incident Report. Walsh Dep., Harvis Decl., Ex. 3, 172:11-174:6.

362.   Walsh does not recall seeing Swenson's note about the telephone call from Elisa Valdez. Walsh Dep., Harvis Decl., Ex. 3, 178:8-13.

363.   Walsh can see how Swenson's note regarding Valdez could have been used by plaintiff's criminal defense counsel to suggest an "alternative theory" and concedes that without disclosure by the government plaintiff would have no way to know about or investigate Valdez or her boyfriend. *See* Walsh Dep., Harvis Decl., Ex. 3, 183:24-187:10, 189:19-191:14.

364.   Walsh does not recall Abbondandelo or Dempsey ever indicating that they had any recollection of the Montes or Larrea statements. Walsh Dep., Harvis Decl., Ex. 3, 196:5-12, 196:22-197:6.

365.   When Abbondandelo testified on cross-examination at the pre-trial hearings that Skwanitra Witherspoon was the only eyewitness, Walsh believed that was an accurate statement of the record. Walsh Dep., Harvis Decl., Ex. 3, 224:19-225:6; *see also* Pre-Tr. Hr. 1995, Harvis Decl., Ex. 32, 170:15-171:5.

366.   If Walsh had appreciated that Montes was an eyewitness to the homicide at the time of Abbondandelo's testimony at the hearings, Walsh would have likely notified the court that there was some sort of error in the testimony (as he did when he mischaracterized the polygraph evidence). Walsh Dep., Harvis Decl., Ex. 3, 225:7-12, 45:8-21.

367.   Skwanitra Witherspoon testified that the perpetrator was "between five foot seven and five foot eight" and "definitely not six feet tall." Witherspoon Tr., Harvis Decl., Ex. 25, 1116:16-1118:3; Walsh Dep., Harvis Decl., Ex. 3, 225:13-17.

368.   Plaintiff is six feet tall. Plaintiff's Arrest Report, Harvis Decl., Ex. 22.

369.   Witherspoon described the perpetrator as left-handed. Anania Memo and Notes, Harvis Decl., Ex. 2, County2844, p. 2.

370.   According to the statements attributed to plaintiff and Peddie Jenkins, the gun was in plaintiff's right hand. Anania Dep., Harvis Decl., Ex. 28, 29:11-18.

371.   The grand jury was never told about the height discrepancy. Witherspoon Grand Jury Testimony, Harvis Decl. as Ex. 101, 50:8-52:17.

372.   Witherspoon only saw the lips of the perpetrator with a gun pointed in her face, making her statements unreliable. Anania Memo and Notes, Harvis Decl., Ex. 2, County2850, p. 8.

373.   The photo array shown to Witherspoon was biased. Dysart Report, Harvis Decl., Ex. 21, pp. 14-22.

374.   The lineup was biased. Dysart Report, Harvis Decl., Ex. 21, pp. 14-22.

375.   The grand jury was never told that Peddie Jenkins had signed a written statement on November 15, 1994 that was inconsistent with his grand jury testimony. Jenkins Grand Jury Testimony, Harvis Decl., Ex. 101, pp. 12-46; Walsh Dep., Harvis Decl., Ex. 3, 226:21-227:3.

376.   Exculpatory information must be disclosed to the grand jury and the grand jury cannot be misled. Walsh Dep., Harvis Decl., Ex. 3, 227:4-228:4.

377.   The grand jury was never told about Montes and Larrea or the 911 call or Elisa Valdez or her boyfriend. Grand Jury Testimony, Harvis Decl., Ex. 101, *generally*; Walsh Dep., Harvis Decl., Ex. 3, 228:5-11.

378.   The jury never got to hear the differences between what Glenn Montes and Maurice Larrea said and what Skwanitra Witherspoon said. Walsh Dep., Harvis Decl., Ex. 3, 231:18-22.

379.   The Nassau County District Attorney determined that the Montes and Larrea statements constitute *Brady* material. Anania Memo and Notes, § 440,10 Motion, Harvis Decl., Ex. 29; Walsh Dep., Harvis Decl., Ex. 3, 232:13-21.

380.   Mike Walsh concedes that Peddie Jenkins is the same height as the shooter as described by Montes, Larrea, Witherspoon and Campbell, and that Jenkins admits to participation and presence at homicide, but Walsh never considered that Jenkins might have been the perpetrator. Walsh Dep., Harvis Decl., Ex. 3, 253:11-254:15.

381.   Walsh has "no idea" what Maurice Larrea said to 911. Walsh Dep., Harvis Decl., Ex. 3, 254:24-255:3.

### Daniel Severin

382.   Severin worked for Nassau County from 1971 to 2002 and was promoted to detective in 1983 and detective sergeant in 1987. Severin Dep., Harvis Decl., Ex. 11, 30:17-31:23.

383.   Severin worked in the homicide squad from 1989 to 2002. Severin Dep., Harvis

-33-

Decl., Ex. 11, 33:21-25.

384.  During Severin's time in the homicide squad he never reported any kind of serious violation by a fellow officer up the chain of command. Severin Dep., Harvis Decl., Ex. 11, 82:9-13.

385.  That is because Severin has never witnessed a serious violation by a fellow officer. Severin Dep., Harvis Decl., Ex. 11, 82:10-17.

386.  Severin was one of three homicide squad supervisors and supervised a team of detectives. Severin Dep., Harvis Decl., Ex. 11, 35:4-17.

387.  Every year for than a decade, many of the defendants in this case including Robert Dempsey, Gary Abbondandelo, Anthony Kosior, Martin Alger, Walter Swenson, Daniel Severin and sometimes plaintiff's trial prosecutor Mike Walsh, travel to Ocean City, MD to play golf. The men share hotel rooms and spouses are not invited. Kosior Dep., Harvis Decl., Ex. 36, p. 30; *see also* Kosior Dep., Harvis Decl., Ex. 36, 74:5-20; Abbondandelo Dep., Harvis Decl., Ex. 6, 248:16-249:2; Dempsey Dep., Harvis Decl., Ex. 17, 244:25-245:16; Walsh Dep., Harvis Decl., Ex. 3, 200:16-204:15.

388.  The golf trips are organized by Severin. Abbondandelo Dep., Harvis Decl., Ex. 6, 249:13-250:6.

389.  At his deposition, Severin testified that he and the other defendants had all "retired and gone their separate ways" and that they "haven't really had contact," neglecting to mention that they take yearly golf outings together that Severin organizes. Severin Dep., Harvis Decl., Ex. 11, 49:25-51:13 ("Most of the people that you're referring to on this list, I have not seen over the years…"), *Id.* at 143:6-15 (admitting he saw ADA Mike Walsh at a "golf outing" and discussed the case with him, without mentioning the yearly trips or other defendants and suggesting the outing was a "one-time thing"), *Id.* at 71:3-5 (Q: …[H]ave you kept in touch with [defendant Anthony Kosior]? A. No, sir.), *Id.* at 67:24-68:2 (denying regular contact with defendant Abbondandelo); *Id.* at 69:10-20 (Severin claims he is not in touch with defendant Alger), *Id.* at 69:21-70:16 (claiming to not be sure when he last spoke to defendant Swenson) ; *but see* Plaintiff's Additional Fact #1, *supra* (collecting testimony regarding the yearly golf outings Severin has organized for over a decade).

390.  Severin initially testified that he had never discussed the Montes and Larrea statements with Abbondandelo or Dempsey. Severin Dep., Harvis Decl., Ex. 11, 54:18-25, 53:5-9.

391.  In subsequent testimony, Severin admitted he had called Abbondandelo after reviewing plaintiff's complaint in the instant action to discuss the case and the Montes and Larrea statements. Severin Dep., Harvis Decl., Ex. 11, 55:2-10, 58:20-

66:19, 67:10-15, 71:6-12.

392.   During the call (which may have lasted half an hour), Abbondandelo did not mention discussing the Montes and Larrea statements with prosecutors, but rather told Severin the statements, which Abbondandelo had "disregarded from the get-go[] because of what was said in them," were included in a large box of material that Abbondandelo allegedly brought to the District Attorney's office and left with ADA Mike Walsh "for a period of time." Severin Dep., Harvis Decl., Ex. 11, 60:5-14, 71:10-73:9.

393.   Severin has never seen Dempsey or any other officer cross the line with a suspect during an interrogation and has never reported misconduct by a fellow officer. Severin Dep., Harvis Decl., Ex. 11, 81:2-6, 82:9-22, 86:1-12.

394.   There is no such thing as an index sheet that records the contents of a homicide file, but the carrying detective must be very thorough in keeping track of the evidence in the case file. Severin Dep., Harvis Decl., Ex. 11, 90:9-91:15, 165:13-166:2.

395.   A responsible homicide detective will check leads against other evidence that's been developed in a case. Severin Dep., Harvis Decl., Ex. 11, 92:15-20

396.   Severin cannot think of an interrogation during his career that lasted longer than plaintiff's December 1994 interrogation. Severin Dep., Harvis Decl., Ex. 11, 131:23-132:5.

397.   Maurice Larrea says he laughed with defendant Severin inside the Freeport Police Station on March 20, 1994, but Severin claims he has never spoken to Larrea. Severin Dep., Harvis Decl., Ex. 11, 145:6-14; Larrea Dep., Harvis Decl., 23, 79:11-22.

398.   If a detective has a question about evidence in a case, they would discuss it with the assigned ADA. Severin Dep., Harvis Decl., Ex. 11, 155:2-25.

399.   The way the process ordinarily works is that the prosecutor learns about evidence because the detective gets it into the DA's file. Severin Dep., Harvis Decl., Ex. 11, 156:2-157:3.

400.   To the extent Abbondandelo (or any detective) brought material from the Steven Jason case file to the District Attorney's office in 1994, it would not have been documented and cannot be verified. Severin Dep., Harvis Decl., Ex. 11, 158:8-159:9, 166:3-11.

401.   In its official training, the Nassau County Police Department emphasized the need to turn over favorable evidence to criminal defendants. Severin Dep., Harvis Decl., Ex. 11, 172:20-24.

402.   Back in the nineties, the District Attorney's office had a video camera, but the police department did not, and interrogations inside the homicide squad were not

recorded. Severin Dep., Harvis Decl., Ex. 11, 177:7-182:11.

403.    The decision about whether or not to arrest a homicide suspect was made by the District Attorney after the police described the evidence. Severin Dep., Harvis Decl., Ex. 11, 183:18-184:13.

404.    Severin would use a pad to take notes on each homicide – he looked for his pad from the Steven Jason homicide but cannot find it and may have thrown his notes away. Severin Dep., Harvis Decl., Ex. 11, 199:14-201:10.

405.    At the scene of the homicide, Severin learned that an off-duty police and his friend had driven past the murder. Severin Dep., Harvis Decl., Ex. 11, 211:12-15, 216:19-218:19.

406.    Severin initially decided not to obtain the 911 evidence but believes he may have been notified at a later point by an unidentified person that, contrary to Maurice Larrea's statement and testimony, there was "no 911 call." Severin Dep., Harvis Decl., Ex. 11, 218:20-219:15.

407.    Severin recalls participating in a discussion that included Abbondandelo and possibly other detectives where it was agreed that the account of Skwanitra Witherspoon and Martha Campbell "would be the version that would form the basis of the police investigation" and not the version presented by Montes and Larrea. Severin Dep., Harvis Decl., Ex. 11, 219:9-221:20, 240:5-241:18, 258:22-259:8.

408.    Severin, Abbondandelo and other detectives "decided" that they would not investigate the version of events presented by Montes and Larrea involving two perpetrators. Severin Dep., Harvis Decl., Ex. 11, 259:22-260:21.

409.    Severin agrees that plaintiff would have wanted to know about Montes and Larrea's account in order to defend himself. Severin Dep., Harvis Decl., Ex. 11, 280:7-281:3.

410.    Severin knew Maurice Larrea was a police officer, but denies laughing and joking with Larrea about how drunk Larrea was. Severin Dep., Harvis Decl., Ex. 11, 283:19-286:4.

411.    Severin has "no idea" whether Skwanitra Witherspoon or Martha Campbell had been drinking when they made their observations. Severin Dep., Harvis Decl., Ex. 11, 242:9-13.

412.    Severin did not see the written statements of Glenn Montes or Maurice Larrea on March 20, 1994. Severin Dep., Harvis Decl., Ex. 11, 250:9-15, 268:16-22.

413.    Severin agrees that a police officer who confronted a civilian with their service weapon while drunk and then lied about it could potentially be in trouble. Severin Dep., Harvis Decl., Ex. 11, 287:12-25.

414.    Severin agrees that the version of the crime he discussed with the press was the version described by Witherspoon and Campbell. Severin. Severin Dep., Harvis

Decl., Ex. 11, 291:10-297:25; Winslow, Olivia, March 21, 1994, N.Y. Newsday, *He Couldn't Beat the Odds This Time*, annexed to the Harvis Decl. as Ex. 115.

415.   Severin does not know why Abbondandelo testified at the hearings that Witherspoon was the only eyewitness, but that testimony was incorrect. Severin Dep., Harvis Decl., Ex. 11, 313:12-314:5.

416.   Severin has "no idea" why the witness section of the homicide worksheet is blank. Severin Dep., Harvis Decl., Ex. 11, 316:16-317:16; *see* Homicide Worksheet annexed to the Harvis Decl. as Ex. 102.

417.   Severin spoke to ADA Klein at 9:00 a.m. on March 20, 1994, but does not recall the conversation. Severin Dep., Harvis Decl., Ex. 11, 319:16-25, 320:22-321:6.

418.   Severin agrees that Glenn Montes's statement contains more detail about the way the crime was committed than Martha Campbell's statement. Severin Dep., Harvis Decl., Ex. 11, 250:16-25.

419.   Skwanitra Witherspoon and Glenn Montes "give two completely different descriptions" of how the crime took place. Severin Dep., Harvis Decl., Ex. 11, 258:12-21.

420.   Severin never discussed Montes and Larrea or his discussions about their credibility with ADA Walsh or ADA Klein. Severin Dep., Harvis Decl., Ex. 11, 221:25-222:24.

421.   Severin concedes that Montes's written statement provides information that "would have been useful…[for] investigating the facts of the homicide." Severin Dep., Harvis Decl., Ex. 11, 237:12-22.

422.   "[S]omething is wrong with the times [on the Crime Scene Log]…Holland couldn't be driving in a vehicle at five o'clock in the morning, leaving the crime scene and taking a deposition." Severin Dep., Harvis Decl., Ex. 11, 239:12-21.

423.   On November 22, 1994, attorney Robert Gottlieb called the homicide squad and said he represented Roy and Tyrone Isaacs and emphasized that he "didn't want any trouble." Severin Dep., Harvis Decl., Ex. 11, 354:23-355:12.

424.   Severin was present for most of the 39-hour period when plaintiff was held in the homicide squad. Severin Dep., Harvis Decl., Ex. 11, 360:15-22.

425.   It was possible for suspects to be abused inside the homicide squad in a way that supervisors would not hear or notice. Severin Dep., Harvis Decl., Ex. 11, 362:23-363:5.

426.   The District Attorney did not believe defendants had probable cause to arrest plaintiff for the homicide after he signed the statement on December 18, 1994. Severin Dep., Harvis Decl., Ex. 11, 377:19-378:7.

427.   Severin acknowledges that seated lineups make it more difficult to discern the height of the subjects. Severin Dep., Harvis Decl., Ex. 11, 395:20-396:2.

428.   Severin agrees that the Montes and Larrea statements should have been turned over to prosecutors. Severin Dep., Harvis Decl., Ex. 11, 435:16-436:3.

### Peddie Jenkins

429.   Peddie Jenkins "used to give the police lots of given names" when he was arrested because he "wanted to be freed up immediately." Jenkins Dep., Harvis Decl., Ex. 4, 33:15-24.

430.   Jenkins admits that he was not truthful as a young man. Jenkins Dep., Harvis Decl., Ex. 4, 83:17-84:16.

431.   On several occasions, including when he was arrested on November 15, 1994 in connection with the Steven Jason homicide, Jenkins gave police the name of his younger brother, Shawn. Jenkins Dep., Harvis Decl., Ex. 4, 33:25-34:11; *see* "Shawn Jenkins" Fingerprint Card, Harvis Decl., Ex. 80, County5419.

432.   Jenkins was convicted of felony drug charges in 1994 and 1998, pled guilty to felony criminal facilitation in connection with the Steven Jason homicide, pled guilty to stabbing his girlfriend in a 2001 incident, was arrested for forcible touching and endangering the welfare of a child in 2009 and was arrested for drug sale charges again in 2012. Jenkins Dep., Harvis Decl., Ex. 4, 39:8-12, 40:3-6; *see Man gets seven years in prison for stabbing*, annexed to the Harvis Decl. as Ex. 103; *Man loses lawsuit over drug arrest*, annexed to the Harvis Decl. as Exhibit 116.

433.   While Jenkins was in custody, detectives threatened him with murder charges and a 25-to-life prison sentence if he refused to implicate plaintiff, whose picture Jenkins saw hanging in the stationhouse as a suspect while he was in custody. *See* Jenkins Dep., Harvis Decl., Ex. 4, 45:24-46:11, 47:11-22; *but see* Trial Tr, Harvis Decl. as Ex. 113, p. 1228, ln. 19-22 ("Nothing was talked about sentencing [during the Jenkins interrogation].").

434.   By the time Jenkins was brought back to the Homicide Squad on November 18, 1994, Abbondandelo, Dempsey and others had, over the course of 28 hours, obtained a statement from Tyrone Isaacs implicating Jenkins in the Steven Jason homicide. *See* Jenkins Dep., Harvis Decl., Ex. 4, 45:24-46:11, 47:11-22; Abbondandelo Dep., Harvis Decl., Ex. 6, 345:9-20.

435.   Detectives told Jenkins that they had a statement from Tyrone Isaacs that implicated Jenkins and if Jenkins didn't want to get charged with murder he should say that plaintiff had committed the crime and Jenkins would then only face lesser charges. Jenkins Dep., Harvis Decl., Ex. 4, 48:18-49:16, 51:15-20.

436.   The detectives mentioned plaintiff to Jenkins when they interrogated Jenkins and it was clear plaintiff was already a target of the investigation. Jenkins Dep., Harvis Decl., Ex. 4, 70:9-21.

437.   Jenkins' mother told him he should blame plaintiff. Jenkins Dep., Harvis Decl.,

Ex. 4, 58:19-59:3.

438.   At his deposition, Jenkins acknowledged that his November 15, 1994 statement was fabricated and attempted to rely on his subsequent statements and testimony. Jenkins Dep., Harvis Decl., Ex. 4, 31:24-32:17.

439.   But in 2017 when Jenkins was interviewed by Nassau County prosecutors reinvestigating plaintiff's conviction, Jenkins offered the false account from November 15, 1994. Anania Memo and Notes, Harvis Decl., Ex. 2, County2849.

440.   Peddie Jenkins resembles Joseph Jackson but is at least five inches shorter. Jenkins Dep., Harvis Decl., Ex. 4, 57:15-17, 59:4-5; *see also* Jenkins Arrest Report, November 18, 1994, annexed to the Harvis Decl. as Ex. 105, reflecting height.

441.   Jenkins testified that he was unarmed at the party and after ducking next to a car and seeing the crime he went into the party and then walked away when police arrived. Trial Tr., Harvis Decl., Ex. 113, 842:8-16, 768:12- 769:9, 771:3-10.

442.   Contrary to his prior statements and testimony, Jenkins testified at his deposition that he ran northbound while being chased by individuals on foot and in a vehicle. Jenkins Dep., Harvis Decl., Ex. 4, 57:15-17, 59:4-5, 59:8-63:2.

443.   Jenkins also testified, contrary to his prior statements, that he fled from the scene with Steven Jason's blood on his clothing armed with a handgun and that he disposed of the gun and blood-soaked clothes. Jenkins Dep., Harvis Decl., Ex. 4, 57:15-17, 59:4-5, 59:8-63:2.

444.   Jenkins testified that he has "watch[ed] a lot of shootings" and has shot people himself. Jenkins Dep., Harvis Decl., Ex. 4, 57:15-17, 59:4-5, 65:24-66:17.

445.   Jenkins testified that Steven Jason owed Jenkins money at the time of Jason's murder and that Jenkins was "happy" that Jason had been killed. Jenkins Dep., Harvis Decl., Ex. 4, 57:15-17, 59:4-5, 67:4-68:14.

### Fred Klein

446.   Klein worked as a prosecutor in the Nassau County District Attorney's office from 1979 until he was fired in 2006. Klein Dep., Harvis Decl., Ex. 5, 23:17-22, 18:5-7.

447.   Klein became Chief of the Major Offense Bureau in March 1994.  Klein Dep., Harvis Decl., Ex. 5, 52:6-15.

448.   On behalf of Nassau County, Klein prosecuted and convicted John Restivo, Dennis Halstead and John Kogut in connection with the rape and murder of Theresa Fusco. Klein Dep., Harvis Decl., Ex. 5, 13:3-24.

449.   Klein was not consulted or interviewed during the reinvestigation of plaintiff's conviction by the District Attorney's Conviction Integrity Unit. Klein Dep., Harvis Decl., Ex. 5, 31:2-32:8.

450.   In a typical homicide case, evidence that the police collected would be transferred

from the police file to the DA's file. Klein Dep., Harvis Decl., Ex. 5, 43:2-6.

451.   After interviewing Peddie Jenkins on November 18, 1994, Klein disapproved of plaintiff's arrest and communicated that to the police department. Klein Dep., Harvis Decl., Ex. 5, 82:6-12, 97:11-19.

452.   Klein was never told that Peddie Jenkins had made a prior statement. Klein Dep., Harvis Decl., Ex. 5, 84:11-14.

453.   Klein was never told about an off-duty police officer and his friend witnessing a homicide. Klein Dep., Harvis Decl., Ex. 5, 85:3-10.

454.   When Klein was assigned as the prosecutor for a case, he would "absolutely" speak to the eyewitnesses in the case. Klein Dep., Harvis Decl., Ex. 5, 106:21-107:2.

455.   Klein has no recollection of Maurice Larrea's written statement. Klein Dep., Harvis Decl., Ex. 5, 115:13-24.

456.   If Klein had read Maurice Larrea's written statement when he was handling the Steven Jason homicide case, he would have obtained the 911 call referenced in the statement. Klein Dep., Harvis Decl., Ex. 5, 115:13-117:14.

457.   Klein believes that Maurice Larrea was a witness to the homicide based on Larrea's written statement. Klein Dep., Harvis Decl., Ex. 5, 117:20-118:9.

458.   Without knowing the facts, Klein cannot opine on the materiality of Larrea's statement for the purposes of *Brady*. Klein Dep., Harvis Decl., Ex. 5, 119:14-120:18.

### 30(b)(6) Witness – Christopher Boccio

459.   During the period 1974-1994, Nassau County did not revise its training materials based on any allegations made regarding improper interrogation tactics by homicide squad detectives. Deposition Transcript of Christopher Boccio, Nassau County 30(b)(6) Witness, May 17, 2022, annexed to the Harvis Decl. as Ex. 106, 22:11-23.

### 30(b)(6) Witness – Arthur Pitre

460.   Other than Jose Anibal Martinez, who was arrested in 2001, Nassau County has not investigated a single allegation of improper interrogation by homicide squad detectives. Deposition Transcript of Arthur Pitre, Nassau County 30(b)(6) Witness, May 17, 2022, annexed to the Harvis Decl. as Ex. 107 ("Pitre Dep."), 29:13-31:4, 40:21-41:3, 42:11-43:22.

461.   In the investigation into Jose Anibal Martinez's false confession, Internal Affairs concluded that the allegations were "undetermined." Pitre Dep., Harvis Decl., Ex. 107, 45:6-10.

462.   Nassau County agrees that keeping a suspect for 30-40 hours in the homicide squad can, under certain circumstances, constitute a coercive interrogation tactic. Pitre Dep., Harvis Decl., Ex. 107, 32:14-33:2.

463.   Nassau County does not know what search terms were used to search for complaints responsive to plaintiff's Fed. R. Civ. P. 30(b)(6) notice. Pitre Dep., Harvis Decl., Ex. 107, 35:6-8.

464.   An unknown number of County Police Internal Affairs records may have been destroyed in a computer crash. Pitre Dep., Harvis Decl., Ex. 107, 38:2-38:23.

465.   The Nassau County Police Department does not investigate reversed convictions or claims raised in lawsuits, except at the direction of the Police Commissioner. Pitre Dep., Harvis Decl., Ex. 107, 49:21-53:8.

### Martin Alger

466.   Martin Alger worked for the Nassau County Police Department from 1969 until he retired in 2000, and was a detective in the homicide squad beginning in 1983. Alger Dep., Harvis Decl., Ex. 48, 10:5-23.

467.   On November 18, 1994, Alger went to District Court with defendant Dempsey to pick up Peddie Jenkins and bring him to homicide squad. Alger Alger Dep., Harvis Decl., Ex. 48, 117:6-20.

468.   Alger signed every page of Peddie Jenkins statement on November 18, 1994 and Dempsey's notes suggest Alger was present for the interrogation. Alger Dep., Harvis Decl., Ex. 48, 34:19-24, 82:6-20, 113:16-115:12.

469.   Alger did not know that Peddie Jenkins had given a statement on November 15, 1994. Alger Dep., Harvis Decl., Ex. 48, 84:7-15.

470.   Based on Dempsey's notes, Peddie Jenkins' statement was written between 18:20 and 21:55 on November 18, 1994. Alger Dep., Harvis Decl., Ex. 48, 133:13-24.

471.   Alger never heard about an off-duty NYPD officer and his friend witnessing the Steven Jason homicide. Alger Dep., Harvis Decl., Ex. 48, 36:23-37:4.

472.   When Alger was working as a detective, during case preparation he would review the case evidence in the case file with the assigned prosecutor. Alger Dep., Harvis Decl., Ex. 48, 41:6-23.

473.   During case preparation meetings "[i]t was just a matter of reviewing the contents of that particular case, all parts of that case, every piece of paper with the case file." Alger Dep., Harvis Decl., Ex. 48, 44:8-44:19.

474.   During his 31-year career with the police department, Alger never saw or reported an officer violating the rights of a criminal suspect. Alger Dep., Harvis Decl., Ex. 48, 46:21-47:23.

475.   As of March 25, 1994, likely at the direction of defendant Severin, the Steven Jason homicide was assigned to a task force led by defendant Abbondandelo and including defendants Swenson and Herts. Alger Dep., Harvis Decl., Ex. 48, 51:4-18.

476.   Homicide lead sheets were regularly used in the homicide squad in 1994. Alger

Dep., Harvis Decl., Ex. 48, 58:6-11.

477.   The purpose of a lead sheet was to document information related to a lead so it could be included in the file for the case. Alger Dep., Harvis Decl., Ex. 48, 58:12-23.

478.   For the Steven Jason homicide investigation, Alger would have turned the lead sheet in to Abbondandelo, defendant Severin, or a member of the task force, possibly Herts. Alger Dep., Harvis Decl., Ex. 48, 59:7-17.

479.   Lead sheets were not logged or aggregated in homicide squad case files. Alger Dep., Harvis Decl., Ex. 48, 60:7-15, 66:20-67:18.

480.   On March 24, 1994, Alger documented a tip regarding the Steven Jason homicide from Loretta Wilcox. Alger Dep., Harvis Decl., Ex. 48, 57:19-23.

481.   According to the homicide squad blotter, Dempsey, Swenson, Severin and Abbondandelo made backdated entries related to Peddie Jenkins and the Isaacs brothers on November 17-18, 1994. Alger Dep., Harvis Decl., Ex. 48, 100:18-106:25; *see* Blotter, Harvis Decl., Ex. 13.

482.   Before he interviewed Tyrone Isaacs, Alger got up to speed on the Steven Jason homicide investigation by speaking to or more individuals. Alger Dep., Harvis Decl., Ex. 48, 121:19-122:10.

483.   Alger did not, however, review Peddie Jenkins statement from November 15, 1994, which describes Tyrone as brandishing a gun at the scene of the shooting. Alger Dep., Harvis Decl., Ex. 48, 146:16-148:7.

484.   Tyrone Isaacs was not administered Miranda warnings. Alger Dep., Harvis Decl., Ex. 48, 133:25-134:16.

485.   The polygraph card for Tyrone Isaacs suggests that he was viewed as a potential suspect in the Steven Jason homicide. Alger Dep., Harvis Decl., Ex. 48, 154:2-20.

486.   In Alger's experience, lineups have been conducted standing up and without hats, but the lineup involving plaintiff was seated with hats. Alger Dep., Harvis Decl., Ex. 48, 174:2-18.

487.   Tyrone Isaacs' statement does not mention plaintiff. Alger Dep., Harvis Decl., Ex. 48, 128:15-129:3.

488.   Abbondandelo directed the Witherspoon lineup on April 5, 1995, assisted by Alger, and some of the paperwork was completed by Severin. Alger Dep., Harvis Decl., Ex. 48, 181:10-182:25.

489.   Alger agrees that the seated lineup made it "very difficult" for Skwanitra Witherspoon to discern plaintiff's height. Alger Dep., Harvis Decl., Ex. 48, 176:3-19.

490.   In selecting the fillers and preparing the lineup, Alger believed height was "clearly…not an issue" in the case. Alger Dep., Harvis Decl., Ex. 48, 177:7-25.

491. Alger made the decision that it would be a seated lineup based on the height of the fillers he had obtained, and without regard for the height discrepancy between plaintiff and the perpetrator as described by Witherspoon. Alger Dep., Harvis Decl., Ex. 48, 185:25-187:13.

492. If the fillers had all been plaintiff's height, Alger would have likely conducted a standing lineup. Alger Dep., Harvis Decl., Ex. 48, 186:23-187:7.

493. Alger was in the room with seated subjects when the lineup happened and cannot say whether Witherspoon made any identification. Alger Dep., Harvis Decl., Ex. 48, 188:16-192:10.

494. Alger, who was responsible for obtaining the fillers for the Witherspoon lineup, agrees that the fillers have significantly darker complexions than plaintiff. Alger Dep., Harvis Decl., Ex. 48, 196:13-16.

### Anthony Kosior

495. Anthony Kosier was the polygraphist for John Restivo. Kosior Dep., Harvis Decl., Ex. 36, 16:12-17:22.

496. Six polygraph examinations were conducted in connection with the Steven Jason homicide – Michael Skillings, Peddie Jenkins, Tyrone Isaacs, Roy Isaacs, Takita Dorsey and Joseph Jackson. Kosior Dep., Harvis Decl. Ex. 36, 82:18-21; 84:3-10.

497. It was critical to the process – and required under Nassau County policy – for Kosior to learn the case facts and why the detectives wanted each suspect tested. Kosior Dep., Harvis Decl. Ex. 36, 72:2-74:3.

498. Normally, detectives would provide a written synopsis of the case, including how the suspect fit into the detectives' theory in an official document maintained in the Scientific Investigation Bureau's file known as a Polygraph Worksheet. *See* Kosior Dep., Harvis Decl. Ex. 36, 122:13-123:21.

499. Polygraph Worksheets were maintained by the Polygraphy Section in paper form in filing cabinets. Kosior Dep., Harvis Decl. Ex. 36, 59:6-62:8.

500. Contrary to governing policy, there was no polygraph worksheet created for the Steven Jason homicide case (Homicide Case No. 242-94) (or if it was created it was not preserved), thus there is no record of the "facts" the homicide detectives provided to defendant Kosior when he examined plaintiff. Kosior Dep., Harvis Decl. Ex. 36, 62:20-63:4; Kosior Dep., Harvis Decl. Ex. 36, 163:19-25; Polygraph Procedures, Harvis Decl., Ex. 37, County7834-7836.

501. The investigating detective should have completed a polygraph worksheet. Kosior. Kosior Dep., Harvis Decl. Ex. 36, 35:16-25.

502. Anxiety, nervousness, lack of sleep, hunger and physical discomfort can impact the reliability of polygraph examinations. Kosior Dep., Harvis Decl. Ex. 36, 37:9-39:8; 56:13-57:9.

503. Kosior knew that plaintiff had not eaten or slept when he began interviewing him shortly after 8:00 p.m. on December 17, 1994. Kosior Dep., Harvis Decl. Ex. 36, 92:16-97:6.

504. According to Kosior's notes, plaintiff reported that he had recently been shot twice in the stomach and was suffering cramping in his abdomen at the time he was examined. *See* Kosior Dep., Harvis Decl. Ex. 36, 104:14-108:18; 166:18-167:11.

505. Prior to undergoing a polygraph examination, plaintiff signed a document captioned "Consent to Polygraph Examination" form, which stated "I understand that…the results of this polygraph exam will not be used as evidence in court." County1072; *see* Kosior Dep., Harvis Decl. Ex. 36, 211:15-23; Dempsey Dep., Harvis Decl., Ex. 17, 212:3-9.

506. To initially calibrate the polygraph machine, plaintiff was required to provide false information. *See* Kosior Dep., Harvis Decl. Ex. 36, 114:17-117:15; 154:5-155:8; 217:15-24.

507. Plaintiff was also instructed to falsely answer the question "besides what you told me, during your entire life can you remember hurting even one other person?" ("Question 6"). Kosior Dep., Harvis Decl. Ex. 36, 177:16-178:9; 181:15-182:4.

508. The false answer plaintiff was instructed to give to Question 6 was recorded in the official Polygraph Examination Sheet related to plaintiff's polygraph examination. Polygraph Question Sheet, Harvis Decl., Ex. 40, County1070; Kosior Dep., Harvis Decl. Ex. 36, 187:12-20.

509. Before the polygraph exam began, in addition to answering "no" to Question 6 as instructed, plaintiff also answered Question 6 affirmatively and described for the polygraphist several instances in which he had hurt people, including describing emotional pain he had caused, which Kosior noted on a separate page from the responses. Kosior Dep., Harvis Decl. Ex. 36, 182:5-186:23; Polygraph Scoring, Harvis Decl., Ex. 64, County1090.

510. During the hearings in plaintiff's criminal case, ADA Mike Walsh extensively cross-examined plaintiff about having supposedly answered "no" to Question 6 during the polygraph examination. Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33, 91:13-109:4.

511. To impeach plaintiff regarding his allegedly false answer to Question 6 as recorded in County1090, ADA Walsh extensively cross-examined plaintiff about violent conduct in his past, significantly tainting the proceedings with inflammatory and highly prejudicial conduct. Pre-Tr. Hr. 1996, Harvis Decl., Ex. 33; 93:3-100:20; Walsh Dep., Harvis Decl., Ex. 3, 45:8-21.

512. During the hearings in plaintiff's criminal case, the results of plaintiff's examination were entered as evidence in court. Plaintiff's Polygraph Exam Card,

Harvis Decl., Ex. 39, County799 (reflecting that plaintiff's polygraph results were admitted as Hearing Exhibit 17); Pre-Tr. Hr. 1995, Harvis Decl., Ex. 32, 138:22-140:4; Pre-Tr. Hr. 1995, Harvis Decl., Ex. 33, 235:18-25; *see* Order Denying Suppression, Harvis Decl., Ex. 34, County262 at p. 5.

513.    ADA Walsh cannot remember another case where anything like that has come up. Walsh Dep., Harvis Decl., Ex. 3, 45:22-46:12.

514.    While Kosior was examining plaintiff, Detective Mullen and defendant Dempsey were in an adjacent room equipped with a 2-way mirror. Kosior Dep., Harvis Decl. Ex. 36, 102:6-12; 150:9-151:12.

515.    Defendant Kosior believed that plaintiff was not represented by an attorney at the time of the polygraph examination. Kosior Dep., Harvis Decl. Ex. 36, 152:4-13.

516.    During the polygraph examination, plaintiff denied involvement in the Steven Jason homicide. Kosior Dep., Harvis Decl. Ex. 36, 165:19-166:9.

517.    Defendant Kosior was trained using the Arthur Technique. Kosior Dep., Harvis Decl. Ex. 36, 35:1-36:3.

518.    Using the Arthur Technique, a polygraphist can conclude that a subject is being truthful or untruthful, and the opinion can also be qualified or inconclusive. Kosior Dep., Harvis Decl. Ex. 36, 39:12-40:13; 68:19-69:25.

519.    Polygraphist Edward Goutink qualified his opinion that Takita Dorsey was truthful in her polygraph examination because she suffered from allergies and had nasal congestion during a portion of the test. Kosior Dep., Harvis Decl. Ex. 36, 284:5-285:21; Dorsey Polygraph Card, Harvis Decl., 109, County5034.

520.    Defendant Kosior did not qualify his opinion that plaintiff was lying even though plaintiff had recently been shot in the stomach and had obvious signs of distress. Kosior Dep., Harvis Decl. Ex. 36, 285:22-286:4; Plaintiff's Polygraph Exam Card, Harvis Decl., Ex. 39, Def799.

### Scott Brettschneider

521.    Scott Brettschneider was an attorney admitted to practice law in the state of New York from 1987 until his disbarment for a federal felony conviction in 2019. Brettschneider Dep., Harvis Decl., Ex. 31, 7:16-8:25.

522.    After another attorney, Eugene Cordaro, had represented plaintiff at the pre-trial hearings, Brettschneider was retained to represent plaintiff "shortly before trial," and was only allowed weeks to prepare. Brettschneider Dep., Harvis Decl., Ex. 31, 11:15-12:5.

523.    Brettschneider is not expecting any compensation from plaintiff, regardless of the outcome of the instant civil action, and helped plaintiff on a pro bono basis out of a sense of obligation once he saw the Montes and Larrea statements and knew they

had not been turned during plaintiff's prosecution. Brettschneider Dep., Harvis Decl., Ex. 31, 20:10-22:11.

524.   Brettschneider is certain that the Montes and Larrea statements were not mentioned either the hearings or during the trial. Brettschneider Dep., Harvis Decl., Ex. 31, 25:4-25:5.

525.   Brettschneider's practice was to always obtain 911 evidence in the cases he handled, but he did not know there had been a 911 call in plaintiff's case. Brettschneider Dep., Harvis Decl., Ex. 31, 33:7-34:5.

526.   Brettschneider has no recollection of seeing the Freeport Incident Report and believes it was never disclosed or disclosed only with the witness information redacted. Brettschneider Dep., Harvis Decl., Ex. 31, 36:13-27:7.

527.   Scott Brettschneider did not know what a "32b" was and does not recall having seen a 32b in any other case. Brettschneider Dep., Harvis Decl., Ex. 31, 39:21-40:17.

528.   Brettschneider did not know that plaintiff wrote the CIU in June 2017. Brettschneider Dep., Harvis Decl., Ex. 31, 43:6-11.

529.   Brettschneider does not think he received all of the pages of the Freeport Incident Report and is certain the version of the report he received was redacted. Brettschneider Dep., Harvis Decl., Ex. 31, 61:8-18, 76:20-24, 77:13-78:3.

530.   In Brettschneider's experience, names, addresses and phone numbers of witnesses were usually redacted, especially in a case like plaintiff's in which the allegation was that a potential grand jury witness was shot and killed. Brettschneider Dep., Harvis Decl., Ex. 31, 74:12-75:5.

531.   If Brettschneider had been provided the 32b statements of Montes and Larrea his defense strategy would "obviously" have been different. Brettschneider Dep., Harvis Decl., Ex. 31, 75:6-15.

### Michael Herts

532.   Herts worked for the Nassau County Police Department from 1966 until his retirement in early 1995. Herts Dep., Harvis Decl., Ex. 49, 14:20-15:2.

533.   Herts, then a detective in the First Squad of the Nassau County Police Department, responded to the crime scene with Detective Holland, a colleague, and was assigned to assist in the Steven Jason homicide investigation for at least several weeks. Herts Dep., Harvis Decl., Ex. 49, 26:22-30:18.

534.   Herts recalls several detectives being assigned to the Steven Jason homicide, including himself, defendant Severin, defendant Abbondandelo, Jerl Mullen, defendant Holland and defendant Swenson, but he does not think it was labeled a task force. Herts Dep., Harvis Decl., Ex. 49, 32:7-25.

535.   On the morning of March 20, 1994, Herts took a statement from Maurice

Larrea. Herts Dep., Harvis Decl., Ex. 49, 34:14-22; *see* Larrea Statement, Harvis Decl., Ex. 27.

536.   Herts took no notes when he was speaking to Maurice Larrea. Herts Dep., Harvis Decl., Ex. 49, 39:21-40:2.

537.   Herts did not suspect that Maurice Larrea was intoxicated. Herts Dep., Harvis Decl., Ex. 49, 42:5-8.

538.   Larrea "obviously" got a look at the man he stopped on Sunrise Highway, but Herts did not ask him if he could provide a description. Herts Dep., Harvis Decl., Ex. 49, 44:9-16.

539.   Herts does not know if Larrea said he could identify the person he chased. Herts Dep., Harvis Decl., Ex. 49, 44:17-45:2.

540.   Herts can't recall why he would not have had Larrea look at photographs to see if he could identify the person he chased, but Herts did not do that. Herts Dep., Harvis Decl., Ex. 49, 46:3-12.

541.   After Herts took the statement from Maurice Larrea, he eventually gave it to someone in homicide. Herts Dep., Harvis Decl., Ex. 49, 47:7-13.

542.   Aside from turning the statement over to homicide, Herts took no steps to investigate the crime based on the information he learned from Larrea. Herts Dep., Harvis Decl., Ex. 49, 47:23-48:12.

Dated: February 16, 2023
          Briarcliff Manor, New York

                                    ELEFTERAKIS, ELEFTERAKIS & PANEK

                                    _____
                                    Gabriel P. Harvis
                                    Baree N. Fett
                                    80 Pine Street, 38th Floor
                                    New York, New York 10005
                                    (212) 323-6880
                                    gharvis@eeplaw.com

                                    *Attorneys for plaintiff Joseph Jackson*