## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

JOSEPH JACKSON,

                    Plaintiff,                    18 CV 3007 (JS) (AYS)

          -against-

NASSAU COUNTY, et al.,

                    Defendants.

Plaintiff's Memorandum of Law in Opposition to
Defendants' Motion for Summary Judgment

Elefterakis, Elefterakis & Panek
80 Pine Street, 38th Floor
New York, New York 10005

February 16, 2023

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................i

INTRODUCTION .............................................................................................................1

STANDARD OF REVIEW ................................................................................................3

FACTS .............................................................................................................................4

    I.    Joseph Jackson is innocent of the murder of Steven Jason ...............................4

    II.    Defendants Abbondandelo, Severin, Herts, Holland and Swenson decide early on to suppress the Montes and Larrea statements and 911 call and never mention the evidence to the District Attorney ......................................5

    III.    With the Jason investigation at a dead end, defendants Dempsey and Abbondandelo conspire with Peddie Jenkins to falsely accuse plaintiff ............6

    IV.    Defendants Dempsey, Abbondandelo, Herts and Severin coerce plaintiff to falsely confess over 39 hours ................................................................7

    V.    Defendants Abbondandelo and Alger use suggestion to fabricate identifications from Skwanitra Witherspoon ................................................8

    VI.    Plaintiff is wrongfully convicted without the benefit of *Brady* material based on Witherspoon's false identification, plaintiff's false confession and Jenkins ..........................................................................................10

    VII.    Plaintiff notifies the District Attorney about the Montes and Larrea statements in 2004 but Nassau County takes no action ...............................12

    VIII.    Nassau County reinvestigates and exonerates plaintiff in 2018, but plaintiff is not granted a hearing and the County only investigates the *Brady* violation and not the false confession, the trail of misconduct allegations against Dempsey or the 911 call .................................................12

ARGUMENT ..................................................................................................................13

    1)    Defendants systematically deprived plaintiff of a fair trial ...............................13

        A.    Defendants suppressed exculpatory evidence...........................................15

            I.    Defendants Abbondandelo, Severin and Dempsey deliberately suppressed the Montes and Larrea statements and Valdez information .................................................................................16

        B.    Defendants Dempsey, Severin, Abbondandelo, Swenson, Alger and Herts conspired with Peddie Jenkins to present false testimony .......................20

        C.    Abbondandelo obtained the Witherspoon identification through impermissible suggestion ...................................................................21

D.   Dempsey, Severin, Abbondandelo and Herts Fabricated Plaintiff's False Confession ................................................................23

E.   Defendants are not entitled to qualified immunity for their fair trial violations ...............................................................25

2)   Defendants maliciously prosecuted plaintiff ...................................................27

I.   Plaintiff's plea to low-level drug charges does not bar or limit his § 1983 malicious prosecution claims arising from his wrongful murder conviction ............................................................27

II.   Defendants' favorable termination arguments are frivolous .................31

III.   Defendants lacked probable cause .......................................................31

IV.   Defendants initiated the prosecution against plaintiff.........................34

V.   Malice can be inferred from a lack of probable cause ...........................34

VI.   Defendants are not entitled to qualified immunity for their malicious prosecution of plaintiff ........................................................35

3)   Disputes of fact preclude summary judgment on plaintiff's *Monell* Claim ...35

4)   There is no basis to dismiss plaintiff's failure to intervene claims. ....................38

CONCLUSION ..........................................................................39

# TABLE OF AUTHORITIES

## CASES

*Banks v. Dretke*, 540 U.S. 668 (2004) ........................................................... 19

*Batista v. Rodriguez*, 702 F.2d 393 (2d Cir. 1983) ........................................ 36

*Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3d Cir. 1996) ........................ 36

*Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019)............................ 3

*Bermudez v. City of New York*, 790 F.3d 368 (2d Cir. 2015)......................... 21

*Binder & Binder PC v. Barnhart*, 481 F.3d 141 (2d Cir. 2007)..................... 3

*Bordanero v. McLeod*, 871 F.2d 1151 (1st Cir. 1989)................................... 37

*Boyd v. City of New York*, 336 F.3d 72 (2d Cir. 2003) ................................. 32

*Boyette v. Lefevre*, 246 F.3d 76 (2d Cir. 2001)............................................ 25

*Brown v. Bryan County*, 219 F.3d 450 (5th Cir. 2000) ................................ 36

*Castellanos v. Kirkpatrick*, 10 CV 5075 (MKB), 2017 WL 2817048 (E.D.N.Y. June 29, 2017) ............................................................................................................ 24

*Chepilko v. City of New York*,  06 CV 5491 (ARR) (LB), 2012 WL 398700 (E.D.N.Y. Feb. 6, 2012) ...................................................................................................... 37

*Chimurenga v. City of New York*, 45 F. Supp. 2d 337 (S.D.N.Y. 1999).............................. 27

*Colon v. City of New York*, 60 N.Y.2d 78 (1983).......................................... 32

*Cox v. County of Suffolk*, 780 F. Supp. 103 (E.D.N.Y. 1991) ...................... 26

*DaCosta v. Tranchina*, 281 F. Supp. 3d 291 (E.D.N.Y. 2017), *reconsideration denied*, 285 F. Supp. 3d 566 (E.D.N.Y. 2018)..................................................................... 26

*Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30 (2d Cir. 2019) ........................ 3

*Dickerson v. Fogg*, 692 F.2d 238 (2d Cir. 1982) ........................................ 22

*Dufort v. City of New York*, 874 F.3d 338 (2d Cir. 2017) ............................ 22

*Fiacco v. City of Rensselaer*, 783 F.2d 319 (2d Cir. 1986) ............................ 36, 37

*Garnett v. Undercover Officer C0039*, 838 F.3d 265 (2d Cir. 2016) ........................ 21

*Gentile v. County of Suffolk*, 926 F.2d 142 (2d Cir. 1991).............................. 36

*Greene v. City of New York*, 08 CV 243 (AMD) (CLP), 2017 WL 1030707 (E.D.N.Y. Mar. 15, 2017) .......................................................................................................... 17

*Griffin v. City of OpaLocka*, 261 F.3d 1295 (11th Cir. 2001) ............................ 37

*Guerrero v. City of New York*, 16 CV 516 (JPO), 2017 WL 2271467 (S.D.N.Y. May 23, 2017) ............................................................................................................ 38

*Harris v. City of Pagedale*, 821 F.2d 499 (8th Cir. 1987)............................ 37

*Haynes v. City of New York*, 29 A.D. 3d 521 (2d Dep't 2006)........................ 32

*Heck v. Humphrey*, 512 U.S. 477 (1994) ...................................................... 29

*Henry v. County of Shasta*, 132 F.3d 512 (9th Cir. 1997)............................ 37

*Hincapie v. City of New York*, 18 CV 3432 (PAC), 2022 WL 2870411 (S.D.N.Y. July 21, 2022) ............................................................................................................ 24

*In re Dana Corp.*, 574 F.3d 129 (2d Cir. 2009) ............................................ 3

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019)............................ 30

*Jackson v. Fogg*, 589 F.2d 108 (2d Cir. 1978) .................................................................... 14

*Jackson v. Nassau Cnty.*, 552 F. Supp. 3d 350 (E.D.N.Y. 2021) ...................................... 16

*Janetka v. Dabe*, 892 F.2d 187 (2d Cir. 1989) ................................................................... 28

*Jeffes v. Barnes*, 208 F.3d 49 (2d Cir. 2000) ..................................................................... 36

*Kyles v. Whitley*, 514 U.S. 419 (1995) ............................................................................... 15

*Lanning v. City of Glens Falls*, 908 F.3d 19 (2d Cir. 2018) ............................................... 31

*Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001) .................................................................. 25

*Lewis v. Comm'r of Corr.*, 790 F.3d 109 (2d Cir. 2015) ..................................................... 19

*Manganiello v. City of New York*, 612 F.3d 149 (2d Cir. 2010) .......................................... 32

*Marrero v. City of N.Y.,* 2013 U.S. Dist. LEXIS 165925 (S.D.N.Y. Nov. 19, 2013) .......... 28

*Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978) .......................................................... 36

*Morel v. Reed*, 11 CV 1808 (DLI) (LB), 2015 WL 3755976 (E.D.N.Y. June 16, 2015) ..... 33

*Morse v. Fusto*, 804 F.3d 538 (2d Cir. 2015) ...................................................................... 21

*Motrade v. Rizkozaan, Inc.*, 95 CV 6545 (DC), 1998 WL 108013 (S.D.N.Y. Mar. 11, 1998)
....................................................................................................................................... 18

*Murphy v. Lynn*, 118 F.3d 938 (2d Cir. 1997) ..................................................................... 34

*Okin v. Village of Cornwall-on-Hudson Police Dept.*, 577 F.3d 415 (2d Cir. 2009) ............. 36

*Parrish v. Luckie*, 963 F.2d 201 (8th Cir. 1992) .................................................................. 37

*People v. Marshall*, 26 N.Y.3d 495, 502 (2015) ................................................................. 14

*People v. Santiago*, 17 N.Y.3d 661 (2011) .......................................................................... 14

*Pinsky v. Duncan*, 79 F.3d 306 (2d Cir. 1996) .................................................................... 34

*Poventud v. City of New York*, 07 CV 3998, 2015 WL 1062186 (S.D.N.Y. Mar. 9, 2015) . 25

*Poventud v. City of New York*, 750 F.3d 121 (2d Cir. 2014) ................................................ 15

*Raheem v. Kelly*, 257 F.3d 122 (2d Cir. 2001) ...................................................................... 9

Rentas v. Ruffin, 816 F.3d 214 (2d Cir. 2016) ..................................................................... 24

*Ricciuti v. N.Y.C. Transit. Auth.*, 124 F.3d 123 (2d Cir. 1997) ..................................... 20, 25

*Ricciuti v. N.Y.C. Trans. Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) ..................................... 38

*Rosario v. City of N.Y.*, 2021 U.S. Dist. LEXIS 10465 (S.D.N.Y. Jan. 20, 2021) .............. 28

*Shih Wei Su v. Filion*, 335 F.3d 119 (2d Cir. 2003) ...................................................... 19, 20

*Smith v. Cain*, 565 U.S. 73 (2012) ...................................................................................... 25

*Tankleff v. Cnty. of Suffolk*, 09 CV 1207 (JS) (AYS), 2017 WL 2729084 (E.D.N.Y. June 23,
2017) ............................................................................................................................. 24

*Tankleff v. Cty. of Suffolk*, 09 CV 1207 (JS) (AYS), 2017 WL 2729084 (E.D.N.Y. June 23,
2017) ............................................................................................................................. 33

*Terebesi v. Torreso*, 764 F.3d 217 (2d Cir. 2014) ............................................................... 39

*Thompson v. Clark* 142 S. Ct. 1332 (2022) .......................................................................... 31

*Torres v. Jones*, 47 N.E.3d 747 (2016) ........................................................................... 26, 32

*Turpin v. Mailet*, 619 F.2d 196 (2d Cir. 1980) ................................................................... 37

*U.S. v. Rittweger*, 524 F.3d 171 (2d Cir. 2008) .................................................................. 27

*United States ex rel. Meers v. Wilkins*, 326 F.2d 135 (2d Cir. 1964) .................................. 26

*United States v. Fernandez*, 456 F.2d 638 (2d Cir. 1972) ................................................... 21

*United States v. Ford*, 435 F.3d 204 (2d Cir. 2006)...........................................................18

*United States v. Jackson*, 345 F.3d 59 (2d Cir. 2003) ......................................................19

*United States v. Nolan*, 956 F.3d 71 (2d Cir. 2020) .........................................................14

*United States v. Payne*, 63 F.3d 1200 (2d Cir. 1995) .......................................................19

*United States v. Tarantino*, 08 CR 655 (JS), 2011 WL 1153914 (E.D.N.Y. Mar. 27, 2011)
..............................................................................................................................18

*US. v. Cooper,* 90 CR 514 (DNE), 1991 WL 60371 (S.D.N.Y. Apr. 9, 1991)....................24

*Vazquez v. City of New York*, 10 CV  6277(JMF), 2014 WL 4388497 (S.D.N.Y. Sept. 5,
2014) .....................................................................................................................32

*Vineyard v. County of Murray*, 990 F.2d 1207  (11th Cir. 1993)........................................36

*Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992)..................................................18

*Walker v. Sankhi*, 494 F. App'x 140 (2d Cir. 2012) .........................................................28

*White v. Frank*, 855 F.2d 956 (2d Cir. 1988) .................................................................26

*Woodman v. WWORTV, Inc.*, 411 F.3d 69 (2d Cir. 2005) ...............................................38

*Zahra v. Town of Southold*, 48 F.3d 674 (2d Cir. 1995)...................................................36

*Zahrey v. City of New York*, 98 V 4546 (DCP) (JCF), 2009 WL 1024261 (S.D.N.Y. Apr. 15,
2009) .....................................................................................................................26

*Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000) ..............................................................25

S<small>TATUTES</small>

42 U.S.C. § 1983 ........................................................................................................35

R<small>ULES</small>

Fed. R. Civ. P. 11(b)(2) ..............................................................................................31

Fed. R. Civ. P. 56(a) ..................................................................................................3

Fed. R. Evid. 803(8)(A)(iii) .........................................................................................17

## INTRODUCTION

Joseph Jackson, an innocent man, was wrongly imprisoned 23 years for shooting Steven Jason on March 20, 1994 on Sunrise Highway in Freeport, New York. Plaintiff was exonerated and freed in 2018 after the Nassau County District Attorney discovered that police had suppressed material evidence of plaintiff's innocence. The instant civil rights action was then instituted and, at the motion to dismiss phase, this Honorable Court deemed plaintiff's pleadings sufficient. Civil discovery has since unearthed further evidence corroborating plaintiff's allegations and raised new factual questions regarding defendants' misconduct.

If it should please the Court, the criminal case against plaintiff was weak at the time it was prosecuted. There was no physical evidence and the only witnesses identifying plaintiff were Peddie Jenkins, a known liar with criminal exposure desperate to avoid murder charges, and Skwanitra Witherspoon, who did not see the shooting, described an assailant she barely glimpsed as five inches shorter than plaintiff and has since had a stroke rendering her amnesiac – defendants used suggestive procedures to manipulate Witherspoon into identifying plaintiff. Defendants' brazen effort to frame plaintiff included taking him into custody for 39 hours on a concededly pretextual basis so that Dempsey and others could abuse and threaten him inside the homicide squad – as they had many others before – until plaintiff relented and signed a 15-page confession authored by defendants and used against plaintiff that is provably false.

All along defendants misled the factfinders – the prosecutors, grand jury, hearing court and trial jury – by claiming the confession and eyewitness evidence was legitimate while suppressing the divergent counternarrative of eyewitnesses Glenn Montes, Maurice Larrea, Elisa Valdez

and her boyfriend, which critically undermined the prosecution's theory and if disclosed would have led to plaintiff's acquittal, as the District Attorney rightly argued in 2018.

At his recent deposition, Peddie Jenkins contradicted his grand jury and trial testimony and admitted that more than one person, including someone in a vehicle, chased Jenkins northbound from the crime scene while Jenkins was armed with a gun and covered in Steven Jason's blood. This strongly suggests Jenkins shot Jason and, in any event, means that Jenkins was almost certainly the shorter, darker-skinned man that Montes and Larrea pursued (and whom Elisa Valdez and her boyfriend saw them chasing), underscoring the potential of this admittedly suppressed evidence to impeach Jenkins' testimony and exonerate plaintiff.

And it is equally clear that Nassau County proximately caused the violations by turning a blind eye to publicly reported, persistent coercion allegations against Dempsey and the homicide squad under defendant Severin, including several cases resulting in civil actions adjudicated under the supervision of this Honorable Court and at least one case where a jury entered admissible adverse credibility findings against Dempsey. There is also compelling evidence in the summary judgment record of a pattern of *Brady* violations, including in the Shonnard Lee case and here, involving the homicide squad and District Attorney's office that plaintiff respectfully submits present triable *Monell* issues.

In this context, defendants offer summary judgment arguments lacking color and fail to acknowledge, let alone reckon with, Nassau County's 2018 findings as presented in its state court petition to overturn plaintiff's conviction. Instead of honoring its prior position, Nassau County's motion seeks to undercut its own District Attorney's well-founded conclusions with

citation to deeply disputed evidence and inferences drawn to favor the County in violation of Rule 56.

But a rational jury could conclude that defendants manufactured and suppressed evidence to secure plaintiff's wrongful conviction and frame him for a crime he did not commit, and defendants' motion should therefore be denied in its entirety.

## STANDARD OF REVIEW

Summary judgment is improper unless defendants show there is no genuine issue of material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007). The Court may not make credibility determinations or weigh the evidence, but instead "must draw all reasonable inferences in favor of" plaintiff, "even though contrary inferences might reasonably be drawn." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 46 (2d Cir. 2019) (internal quotation marks, citation, and emphases omitted). Because "a jury is free to believe part and disbelieve part of any witness's testimony," the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (internal quotation marks, citations, and emphases omitted). Defendants' motion may not be granted unless "resolving all ambiguities and drawing all permissible factual inferences in favor of [plaintiff] the record taken as a whole could not lead a rational trier of fact to find for [Plaintiff]." *Bellamy v. City of New York*, 914 F.3d 727, 744 (2d Cir. 2019) (citation omitted).

<u>FACTS</u>

I.   **Joseph Jackson is innocent of the murder of Steven Jason**

At approximately 2:00 a.m. on March 20, 1994, Peddie Jenkins and another man chased Steven Jason through a lot near Guy Lombardo Avenue in Freeport, until Jason dove into the parking lane of Sunrise Highway and one of the men shot him several times and killed him. D99-100; P30-32, 200, 318, 331, 345, 438-443.[1] At the time of his death, Steven Jason was a drug dealer in business with Peddie Jenkins who owed Jenkins money. P445. Jenkins fled the scene and, within twenty seconds, was stopped at gunpoint by off-duty NYPD Detective Maurice Larrea, who, on the way back from a bachelor party, had witnessed the shooting while driving past the scene with his friend Glenn Montes and encountered Jenkins after calling 911. D132, 135, 142; P117, 538.

Jenkins stopped in the middle of Sunrise Highway and Larrea and Montes both saw his face (Larrea yells "that's him, that's the guy") before Jenkins fled northbound with Montes and Larrea in pursuit. D135, 142. Jenkins ultimately evaded capture and made his way to the home of his aunt, Kim Prunty, where Jenkins disposed of the bloody clothing and gun. P443; D142. Glenn Montes, Maurice Larrea and Freeport Officer Robert Melendez drove up and down the streets where Jenkins was last seen and then went to the Freeport stationhouse and gave written statements. D150-51. Larrea remembers laughing with defendant Severin about

---

[1] References to plaintiff's 56.1 statements herein are as follows: "P" for Plaintiff's Statement of Additional Material Facts and "D" for Plaintiff's Response to Defendants' Statement of Undisputed Facts, followed by the paragraph number.

how drunk Larrea was and lying to his NYPD supervisors about the interaction, jeopardizing his career. P397, 410.

Plaintiff is factually innocent of Steven Jason's murder. P180, 187, 198-202, 487, 519-20. No credible evidence connects plaintiff to the crime or the victim, plaintiff is five inches taller than the gunman as described by all eyewitnesses and plaintiff has an alibi that he immediately provided to police. P83, 440; D15, 100, 219, 251, 253b, 304, 327. Moreover, the linchpin of plaintiff's supposed confession, that Takita Dorsey was an intermediary between plaintiff and Tony Jackson, is disproven by Dorsey's polygraph results, leaving the statement uncorroborated. P98-100, 179, 519. Indeed, if the Montes and Larrea evidence had not been suppressed, plaintiff would have never been convicted. P6-13, 18-24, 28-34, 38, 41-43, 45, 47-49, 347-351.

## II. Defendants Abbondandelo, Severin, Herts, Holland and Swenson decide early on to suppress the Montes and Larrea statements and 911 call and never mention the evidence to the District Attorney

Within days of Steven Jason's murder, defendant Severin, a supervisor in the homicide squad, created a task force staffed with detectives from the homicide and first squads, including defendants Abbandandelo, Herts, Swenson, Holland and Jerl Mullen, to investigate the crime. P173, 229, 292, 475, 478, 534; D234. During one early discussion, Severin, Abbandandelo and others agreed that the account of Skwanitra Witherspoon and Martha Campbell "would be the version that would form the basis of the police investigation" and not the version presented by Montes and Larrea. P407. Severin, Abbandandelo and other detectives decided

that they would not investigate the version of events presented by Montes and Larrea involving two perpetrators and a suspect fleeing northbound. P408.

Fred Klein, the prosecutor initially assigned to the Steven Jason homicide, was never told about Montes or Larrea or the 911 call. P75-76, 78, 325, 417, 420, 453-57; D261-62, 266. This is consistent with the morning report and homicide worksheet, police documents which were prepared the morning of March 20, 1994 and omit any reference to Montes or Larrea or the chase of Peddie Jenkins. D261, 267; P416. It is also consistent with ADA Mike Walsh, who took over the case from Klein, also having never been told about Montes and Larrea or their statements. D20-25.

Thereafter, when other leads came in containing information that might have corroborated the Montes and Larrea account or led back to Maurice Larrea, such as the information provided by Elisa Valdez and her boyfriend, defendants ignored and suppressed them, preventing the information from being disclosed to plaintiff or investigated or utilized by him. D129, 251, 264, 267, 270, 272, 303-04; P41, 113-19, 362-63, 377.

### III.  With the Jason investigation at a dead end, defendants Dempsey and Abbondandelo conspire with Peddie Jenkins to falsely accuse plaintiff

In October 1994, defendants, who had made no appreciable headway in solving the Steven Jason homicide, received a tip that Peddie Jenkins, a 17-year-old, was bragging about his responsibility for the shooting. P123. On November 15, 1994, Jenkins was brought to the homicide squad and interrogated without *Miranda* warnings over the course of twelve hours,

telling defendants a series of lies and signing an 11-page statement written by the officers. D67-68; P129-32, 433-436, 438.

After Jenkins was released, defendants took brothers Tyrone and Roy "Moosey" Isaacs, who had been mentioned by Jenkins in his statement, into custody, attempting over the course of 28 hours to develop evidence that could be used to further pressure Jenkins. P144-54. Jenkins was then brought back to the homicide squad on November 18, 1994, confronted with Tyrone Isaac's statement (which does not mention plaintiff, P487) and threatened with murder charges and life in prison if he refused to cooperate with police and provide a false statement implicating plaintiff. P433-36.

Once Jenkins agreed and signed a statement, defendants brought Jenkins to the District Attorney's office to be interviewed on camera by ADA Fred Klein, who defendants never told about Jenkins' prior false statements or the Montes and Larrea evidence. D85. The meeting did not go well, and afterward ADA Klein told defendants that the District Attorney would not authorize plaintiff's arrest. D85; P451. In exchange for his testimony against plaintiff at trial Jenkins received significant benefits that were not disclosed. P337-40, 433, 435.

## IV. Defendants Dempsey, Abbondandelo, Herts and Severin coerce plaintiff to falsely confess over 39 hours

On December 17, 1994, plaintiff was arrested and brought to the homicide squad. Plaintiff was never administered *Miranda* warnings and plaintiff's repeated requests for an attorney were denied. D221; P301-02. Plaintiff believed that if he took a lie detector test and passed, defendants would acknowledge his innocence and allow him to leave, as he understood had

happened to Roy Isaacs. *See* P505-12. But defendants became violent after they told plaintiff he failed the polygraph. *See* D207 ("…Officer Dempsey slapped me around, beat on me, screamed in my face, starved me, antagonized me, and had other officers come through there and join in the fun. I was sleep deprived. I didn't get nothing to eat. I couldn't use the bathroom. I was already injured from previously being shot in the stomach. He was punching me in my stomach. Beating on my legs. Slapping me in my face, like I was a child. Making me say things that I did not have nothing to do with whatsoever, and he knew it…"). After approximately 39 hours, plaintiff ultimately signed a statement and immediately recanted. *Id.*; *see* D207, 212-235.

## V. Defendants Abbondandelo and Alger use suggestion to fabricate identifications from Skwanitra Witherspoon

Despite plaintiff's "confession" and the statements from Peddie Jenkins, the District Attorney refused to authorize defendants to arrest plaintiff. P182. Thus, defendant Abbondandelo flew to Pittsburgh with two sets of photo arrays, one black and white and one color, designed to suggestively accentuate plaintiff's lips and the lightness of his skin, which the police knew Witherspoon had emphasized (resulting in a procedure that plaintiff's expert Dr. Jennifer Dysart describes as a "significant concern"), without revealing that plaintiff is six feet tall, a height discrepancy that Witherspoon's testified at trial meant plaintiff could "definitely not" have been the perpetrator. D99, 108, 112-13, 119, 275, 296; P187, 189, 373. Given the resemblance between Peddie Jenkins and plaintiff and the difference in stature, a reasonable jury could conclude Witherspoon selected plaintiff from the array based on having

observed Jenkins at the scene and because defendants constructed the array in a biased manner.
P12, 18, 443.

Because according to Witherspoon's statements she was focused on the lips and complexion of the suspect. P38, 372. As described in the Expert Report of Dr. Jennifer Dysart, Witherspoon's trial testimony reveals how identification procedures defendants constructed led Witherspoon to select plaintiff:

> Q.   Now, when you looked at the different people [in the] line-up, were they all people in their twenties?
> A.   Not that I could tell.
> Q.   Were they all light-skinned?
> A.    No.
> Q.   They were not?
> A.   No.
> Q.   In fact, there were several people who were dark-skinned; is that correct?
> A.   Yes.
> Q.   When you were looking in the line-up, you were looking for a light-skinned individual; am I correct?
> A.   Yes.
> Q.   With big lips; is that correct?
> A.   Yes.
> Q.   Other than -- if you recall -- other than Mr. Jackson, who's sitting here, were there other people who were light-skinned in that line-up?
> A.   I think there was one other person that was light-skinned.
> Q.   Do you know if he was black or Hispanic?
> A.   He looked Hispanic.

P305, 486-92; *see* Exhibit 21, pp. 14-22 (quoting Trial Transcript, 1133-34); *see Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001) ("Suggestive identification procedures increase the likelihood of misidentification, and it is the likelihood of misidentification which violates a defendant's right to due process.") (citations, brackets and quotation marks omitted). Further,

given Witherspoon's stroke she now has no recollection of the procedures and gaps in the factual record surrounding the identifications must be resolved by a jury. P9.

### VI. Plaintiff is wrongfully convicted without the benefit of *Brady* material based on Witherspoon's false identification, plaintiff's false confession and Jenkins

The 2017 District Attorney reinvestigation concluded that, at the time of trial, neither plaintiff nor prosecutors were aware of the Montes and Larrea 32b statements. P42, 45, 48; D261. There is also no dispute that the Valdez material was withheld, which supports the inference that defendants categorically suppressed evidence that would reveal the alternate account centered around Montes, Larrea and Jenkins. D169. It is also undeniable that such information would have vitally assisted plaintiff and his criminal defense attorney and likely changed the outcome of trial. D319 (plaintiff's trial counsel did not know the meaning of the term "32b", D350). Making matters worse, the pre-trial process was tainted by misconduct.

Initially, the grand jury never learned of or heard from Montes, Larrea, Valdez or her boyfriend; never learned of or heard the 911 call; never learned that eyewitnesses described a shooter much shorter than plaintiff with a much darker complexion; never learned that Witherspoon only saw the hooded suspect's lips; never learned about Peddie Jenkins' false statements or that he ran northbound and was stopped by Larrea; never learned the benefits actually provided to Jenkins; never learned that Takita Dorsey passed a lie detector test; never learned that Dempsey had been credibly accused of coercive conduct by a dozen criminal suspects; and never learned that a civil jury had discredited Dempsey and ruled that he had fraudulently obtained Shonnard Lee's confession. D221, 303-04; P339-40, 349, 371, 375-77.

During the hearings, defendant Abbondandelo took the stand on cross-examination and affirmatively misrepresented the record, proving that the Montes and Larrea alternative narrative had been suppressed:

> Q.   Detective, I'm going to direct your attention to the on-the-scene investigation that you discussed, which took place on March 20, 1994 regarding the death of Steven Jason?
> A:   Yes, sir.
> Q:   Can you tell me what detective from the homicide squad was assigned to the investigation?
> A:   I was, sir.
> Q:   You were the primary detective; is that right?
> A:   Yes, sir.
> Q:   During the course of your investigation at the scene, did you determine whether there were any eyewitnesses to this incident?
> A:   Yes, sir.
> Q:   Can you tell me how many eyewitnesses were identified as eyewitnesses to this incident?
> A:   There was one, to my knowledge.
> Q:   Was that Ms. Witherspoon?
> A:   That's correct.

P104. As Walsh conceded at his deposition, the fact that Walsh never corrected these statements by Abbondandelo proves that Walsh, and by extension the District Attorney's office, was not aware that Montes and Larrea were eyewitnesses to the crime. P343-45, 364-366.

And there can be no question that Walsh would have spoken up if he believed Abbondandelo had mischaracterized the record because Walsh did just that after impeaching plaintiff's credibility under false pretenses at the hearings, a development that significantly prejudiced plaintiff before the hearing court. P365-65, 505-11. This aspect of the hearings also violated the government's representation to plaintiff when he signed the polygraph

11

consent form that the polygraph results would not be admitted in court. Plaintiff's polygraph results were discussed before the hearing court by multiple government witnesses, despite their supposed inadmissibility. P512.

Plaintiff was tried, convicted, and sentenced to 25 years to life in prison. D332. Plaintiff's appeals were denied. D333-34.

### VII. Plaintiff notifies the District Attorney about the Montes and Larrea statements in 2004 but Nassau County takes no action

In 2004, a few weeks after plaintiff's pro bono counsel Anthony Mayol wrote to trial counsel Scott Brettschneider about the Montes and Larrea statements, Mayol wrote to ADA Mike Walsh and appellate counsel Peg Manesh at the District Attorney's office to formally raise the issue of the missing statements. D337. Three years later and still without the statements in 2007, plaintiff submitted a FOIL request to the Nassau County District Attorney's office, which responded that it did not have the statements. P358.

Meanwhile, Nassau County apparently took no action to investigate the matter and ADA Walsh claims he never saw Mayol's letter (or spoke to Manesh about the issue) and first became aware of the Montes and Larrea statements thirteen years later in 2017 when Sheryl Anania showed them to him during the reinvestigation. D337.

### VIII. Nassau County reinvestigates and exonerates plaintiff in 2018, but plaintiff is not granted a hearing and the County only investigates the *Brady* violation and not the false confession, the trail of misconduct allegations against Dempsey or the 911 call

After plaintiff obtained the Montes and Larrea statements, he sent them to the Nassau County District Attorney's Conviction Integrity Unit ("CIU"), led by Sheryl Anania, in 2017.

P4-7; D361. Anania reinvestigated plaintiff's case on behalf of the CIU and – for the first time since the CIU was established in 2013 – moved to vacate plaintiff's conviction and dismiss his indictment on the grounds that plaintiff was wrongly convicted. P6-13, 31-34. During the reinvestigation, Walsh, Dempsey and Abbondandelo each officially told Anania that they had no recollection of the Montes and Larrea statements or explanation for why they were not given to the District Attorney. P20, 42, 45, 184, 364.

The CIU investigation did not reach whether plaintiff's confession had been coerced, whether plaintiff was innocent or what happened to the 911 call, because the CIU established that the suppression of the Montes and Larrea statements constituted *Brady* violations and that was sufficient to overturn the conviction. P7-8, 16, 19-25, 27-30, 40, 58-60. The CIU did, however, take note of some of the prior coercion allegations against defendant Dempsey, but it did not investigate them or meet with John Restivo, Shonnard Lee, or any of the others who had credibly accused Dempsey of similar misconduct. P36-37, 221-75.

When plaintiff was exonerated on the District Attorney's motion, there was no hearing, and plaintiff was not permitted to offer evidence of his innocence. D371-72.

## ARGUMENT

### 1)   Defendants systematically deprived plaintiff of a fair trial

Plaintiff's prosecution was marred by irregularities. Basic documents completed in every case, such as a Nassau County 262 Form detailing the homicide investigation and a Polygraph Examination Worksheet reflecting detectives' theory of the case, are missing from the file without explanation. P71-73, 498-501. Evidence, like the stated polygraph examination

results, sealed arrests of plaintiff and plaintiff's false confession, were improperly admitted against plaintiff to his prejudice, while the factfinders were kept in the dark about a universe of exculpatory information, including the truth about how the witness testimony was procured. The case was built on defendants' credibility in claiming plaintiff voluntarily confessed and that eyewitness testimony from Jenkins and Witherspoon was trustworthy. "Centuries of experience in the administration of criminal justice have shown that convictions based solely on testimony that identifies a defendant previously unknown to the witness is highly suspect. Of all the various kinds of evidence it is the least reliable, especially where unsupported by corroborating evidence." *Jackson v. Fogg*, 589 F.2d 108, 112 (2d Cir. 1978).

> Eyewitness identification testimony is notoriously prone to error. As the Supreme Court recognized over a half-century ago, the vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.…A growing body of scientific research, moreover…indicates that certain circumstances surrounding a crime — including…the presence of a weapon, the stress of the situation…, the passage of time between observation and identification, and the witness's exposure to the defendant through multiple identification procedures — may impair the ability of a witness…to accurately process what she observed.

*United States v. Nolan*, 956 F.3d 71, 75, 80 (2d Cir. 2020) (citations omitted); *People v. Marshall*, 26 N.Y.3d 495, 502, 45 N.E.3d 954 (2015) ("Wrongful convictions based on mistaken eyewitness identifications pose a serious danger to defendants and the integrity of our justice system."); *see People v. Santiago*, 17 N.Y.3d 661, 669 (2011) ("[M]istaken eyewitness identifications play a significant role in many wrongful convictions.").

14

Plaintiff should never have been convicted, and absent defendants' wrongful conduct throughout the investigation—suppressing exculpatory evidence, fabricating evidence, and using impermissible suggestion to obtain identifications—he would not have been.

A. Defendants suppressed exculpatory evidence

It is undisputed that "[w]hen police officers withhold exculpatory or impeaching evidence from prosecutors, they may be held liable under § 1983 for violating…*Brady*." *Bellamy*, 914 F.3d at 751; *see also Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (en banc). Plaintiff must show he was prejudiced by the suppression because there is "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different"—for example, "he would have been acquitted based on reasonable doubt or convicted on a lesser charge." *Bellamy*, 914 F.3d at 751 (internal quotation marks omitted). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Here, defendants suppressed critical evidence, including: evidence severely undermining the reliability of the only two identifications offered against plaintiff at trial (Skwanitra Witherspoon and Peddie Jenkins); evidence from another witness—Elisa Valdez—that corroborated Montes and Larrea and supported plaintiff's innocence; and additional evidence of defendants' misconduct throughout the investigation which impeached the detectives and undermined the reliability of the investigation as a whole.

15

## I. Defendants Abbondandelo, Severin and Dempsey deliberately suppressed the Montes and Larrea statements and Valdez information

As Nassau County argued in state court and admitted at depositions, the Montes and Larrea statements are favorable to plaintiff because, among other reasons, they tend to negate plaintiff's guilt and undermine the prosecution's theory and witnesses. P7-13, 18-24. It is beyond dispute and defendants have admitted that the Montes and Larrea statements were suppressed at the time of trial in the sense that they were functionally unknown to both the prosecution and the defense and were not included in the District Attorney's file, and a rational jury could conclude that defendants Abbondandelo, Dempsey and Severin intentionally suppressed this material (because, among other reasons, the Valdez note and 911 records were also suppressed, Severin made no mention of Montes and Larrea in the Morning Report or to ADA Klein and Abbondandelo testified falsely at the hearings about eyewitnesses). P48, 104, 113, 123; D262, 266-67, 407, 420; *see Jackson v. Nassau Cnty.*, 552 F. Supp. 3d 350, 374 (E.D.N.Y. 2021) ("The Second Circuit has clarified that fraudulent omissions, like the one alleged here, can serve as fabricated evidence for the purposes of a claim for denial of a fair trial.") (collecting cases) (citations omitted).

Defendants have also previously admitted and cannot credibly dispute that plaintiff was prejudiced because he was deprived of evidence Nassau County agrees had a reasonable probability of changing the outcome of plaintiff's criminal trial. P7, 9, 39-40.

Defendants' arguments against the *Brady* claim are failing and merely highlight disputes of fact that must be resolved by a jury. First, defendants argue that ADA Mike Walsh was aware

of the existence of the Montes and Larrea statements by the time of trial, that the statements were contained in a box of material homicide detectives left at the District Attorney's office and that this satisfies defendants' *Brady* obligations. Def. Mem., p. 14. However, according to official findings admissible under Fed. R. Evid. 803(8)(A)(iii), Walsh told the CIU in 2017 that he did not remember the statements, which is consistent with the fact they were not in Walsh's file or mentioned on the record and that Walsh never knew about the 911 call or Elisa Valdez and did not correct Abbondandelo when he testified at the hearings that Witherspoon was the only eyewitness. P19-25, 41, 45, 47-48, 335-36, 342-45, 365-66, 415, 452-454. It is also consistent with Abbondandelo and Dempsey telling Walsh and the CIU that they do not recall the statements, and offering no explanation for why they were not turned over to the District Attorney's office.[2] *Id.*

The cases cited by defendants are also readily distinguishable from the instant facts and unavailing. *See* Def. Mem., p. 14. In *Greene v. City of New* York, 08 CV 243 (AMD) (CLP), 2017 WL 1030707, *27 (E.D.N.Y. Mar. 15, 2017), *aff'd*, 742 F. App'x 532 (2d Cir. 2018), the Hon. Ann M. Donnelly granted summary judgment to defendants on a *Brady* claim because there was an "absence of evidence that the prosecution actually withheld exculpatory materials from defense counsel" in that case, whereas Nassau County here admits that the Montes and Larrea statements and Valdez information were *never* provided to plaintiff prior to trial (and plaintiff only first received the statements in response to his own FOIL request in

---

[2] Defendants impermissibly rely, in part, on the Declaration of Michael Walsh dated January 16, 2023, submitted as Exhibit EEEEE to defendants' motion. But because this declaration was not produced in discovery, it should not be considered at summary judgment. Fed. R. Civ. P. 37(c)(1).

17

2007, D343). P48. Indeed, that concession formed the basis of Nassau County's 2018 motion to vacate plaintiff's conviction and, as such, precludes defendants from taking a contrary position at this juncture. P7; *see Motrade v. Rizkozaan, Inc.*, 95 CV 6545 (DC), 1998 WL 108013, *6 (S.D.N.Y. Mar. 11, 1998) ("Once a party has 'sold' its position to one court it cannot turn around and repudiate it in order to have a second victory. The doctrine seeks to insure the sanctity of the oath and the integrity of the judicial process.") (citations and internal quotation marks omitted) (collecting cases); *United States v. Tarantino*, 08 CR 655 (JS), 2011 WL 1153914, *2 (E.D.N.Y. Mar. 27, 2011) (Seybert, J.) ("As the Government acknowledges, a Government lawyer's statement may in certain circumstances be used against the Government as a party.") (citing *United States v. Ford*, 435 F.3d 204 (2d Cir. 2006)).

The other case defendants offer, *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992), also supports plaintiff's position. *See* Def. Mem. at 14. In *Walker*, it was stipulated that that the police had "shared all exculpatory evidence with the prosecutor," which is the opposite of both plaintiff's allegations and Nassau County's own findings in this case. P20, 48. Plaintiff respectfully submits that the aspect of *Walker* that is relevant to this case is its recognition that "withholding *Brady* material will virtually always lead to a substantial violation of constitutional rights." 974 F.2d at 300.

Second, defendants argue the Montes and Larrea statements and Valdez information were not "suppressed" because plaintiff was aware of the "essential facts" they contained. Def. Mem. 15-17. But the exception to the *Brady* rule for facts a defendant "knew or should have known" speaks only "to facts already within the defendant's purview, not those that might be

18

unearthed. It imposes no duty upon a defendant, who was reasonably unaware of exculpatory information, to take affirmative steps to seek out and uncover such information." *Lewis v. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015); *accord Banks v. Dretke*, 540 U.S. 668, 696 (2004) (admonishing that this type of "prosecutor may hide, defendant must seek" standard "is not tenable in a system constitutionally bound to accord defendants due process").

Thus, in *United States v. Payne*, the Second Circuit held that a witness's affidavit was "suppressed," even though it was available in a public court file and the identity of the witness was known to the defendant. 63 F.3d 1200, 1208-09 (2d Cir. 1995). The court explained that, although the defendant theoretically had access to the affidavit and knew some information about the witness, he had no reason to believe that the additional document existed—and therefore no obligation under *Brady* to seek it out. *Id.* at 1209; *see also United States v. Jackson*, 345 F.3d 59, 73 (2d Cir. 2003) (evidence pertaining to a nontestifying confidential informant was suppressed as there was no basis to conclude defendants "knew or should have known about these materials or their contents," despite fact that the government had identified the informant to defendants).

The Second Circuit acknowledged this exact point in an analogous scenario. In *Shih Wei Su v. Filion*, the government argued that due diligence required the defense to learn through cross-examination that the government's previous representations about a witness were erroneous. 335 F.3d 119 (2d Cir. 2003). Rejecting that argument, the court observed that "in order to do what the state suggests [plaintiff] should have done, [plaintiff] would have been required to assume that the prosecutor had lied. This would involve enormous tactical danger."

*Id.* at 128. The court pointed out that because "conscientious counsel can rely on prosecutors to live up to their obligations," the plaintiff could not be faulted "for not proceeding in his cross-examination on the assumption that the prosecutor is a liar." *Id.*[3] The record shows that defendants Abbondandelo, Severin and Dempsey—each of whom was unquestionably a member of the prosecutorial team with *Brady* obligations, *see Kyles*, 514 U.S. at 437—failed to disclose material information that was unknown to the defense. These acts violate *Brady*. *See Banks*, 540 U.S. at 696; *Lewis*, 790 F.3d at 121.

Defendants not only suppressed Montes and Larrea's exculpatory statements regarding the homicide, but they also affirmatively misrepresented that Witherspoon was the only eyewitness to the crime. Plaintiff was therefore "reasonably unaware" of the Montes, Larrea, Valdez and 911 information—just as the prosecutor was. P48.

B.  Defendants Dempsey, Severin, Abbondandelo, Swenson, Alger and Herts conspired with Peddie Jenkins to present false testimony

There is no dispute that "a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable corruption of the truth-seeking function of the trial process." *Ricciuti v. N.Y.C. Transit. Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (internal quotation marks omitted). To prove his fabrication claim, plaintiff must show that "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict,

---

[3] Moreover, proper disclosure of *Brady* material is imperative so that the defense can effectively prepare for trial. *See*, *e.g.*, *Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir 2001); *St. Germain v. United States*, 03 CV 8006, 99 CR 339, 2004 WL 1171403, *18 (S.D.N.Y. May 11, 2004). Allowing the defendants to conceal *Brady* material pre-trial and thereafter punish plaintiff for not seeking it out during trial would be contrary to the Court's guidance in *Banks*, 540 U.S. at 696.

(4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016). Fabricated evidence "may be 'false' if material omissions render an otherwise true statement false." *Morse v. Fusto*, 804 F.3d 538, 548 (2d Cir. 2015).

Here, the jury can find that defendants threatened, cajoled and ultimately conspired with Peddie Jenkins to present false testimony against plaintiff in exchange for inducements that were not adequately disclosed to plaintiff. D67-68, 85; P123, 129-32, 144-54, 337-40, 433-436, 438, 451.

C. Abbondandelo obtained the Witherspoon identification through impermissible suggestion

The Second Circuit has made clear that officers may be held liable in a § 1983 action for using impermissibly suggestive identification procedures to obtain identifications that are subsequently used to convict a suspect. *See Bermudez v. City of New York*, 790 F.3d 368, 374-376 (2d Cir. 2015). Defendants do not dispute that the identification procedures described above—using a biased array where plaintiff the lightest-skinned subject with the most pronounced lips, when the officers know, but do not disclose, that Witherspoon was focused on those features and that plaintiff's height was disqualifying—would be impermissibly suggestive. Nor could they. *See, e.g.*, *United States v. Fernandez*, 456 F.2d 638, 641–42 (2d Cir. 1972) (holding impermissibly suggestive a photo array in which the accused was the only person with the same skin tone and hairstyle as the perpetrator). Rather they dispute the facts,

21

claiming there was no suggestion in the identification procedures at all. Because the jury could find there was, that provides no defense at this stage.

Defendants curiously assert the suggestive identification procedures could not have harmed plaintiff because there was no testimony about the improper means used to obtain the identifications, just the ultimate identification by the witness. That is exactly backward. As has been recognized for decades, the danger of an unduly suggestive identification procedure is that it causes an irreparable misidentification—that is, that it so taints any subsequent identification testimony as to render it fundamentally unreliable. *See Dickerson v. Fogg*, 692 F.2d 238, 244 (2d Cir. 1982). Thus, when the procedure is suggestive enough, any identification testimony from that witness cannot be introduced consistent with Due Process. *See, e.g.*, *Raheem*, 257 F.3d at 133–34; *Dickerson*, 692 F.2d at 247; *Dufort v. City of New York*, 874 F.3d 338, 348 (2d Cir. 2017) (describing as "paradigmatic example of an improperly suggestive" procedure where suspect was only one wearing clothing like that worn by the assailant). There is no dispute identification testimony was used against plaintiff at trial; that was the sole evidence of his guilt. But the material facts surrounding the identification evidence, including Jenkins' unreliability, Witherspoon's flawed observations and the degree to which both witnesses were undercut by the Montes and Larrea evidence, was withheld from the prosecutors, causing them to wrongly believe the identifications were reliable. *See Bermudez*, 790 F.3d at 376 (holding defendants could be proximate cause of due process deprivation where they failed to inform the prosecutor about problems in the initial

questioning of witnesses which "could have prevented [the prosecutor] from making an informed decision about the reliability of that evidence").

For the same reasons, the lineup cannot cure the constitutional violation. As plaintiff's eyewitness expert, Dr. Jennifer Dysart, explains in her report - the initial flawed identification procedures permanently tainted the witnesses' memory, and any subsequent identifications were caused by the first procedure. As in *Bermudez*, the jury can find that Witherspoon's subsequent identifications can be explained by the suggestive identification procedure—"they might very well have decided to stick with that story (or become convinced that it was true), and for that reason…misinformed the ADA when [she] subsequently questioned them." 790 F.3d at 375–76.

D. Dempsey, Severin, Abbondandelo and Herts Fabricated Plaintiff's False Confession

As this Honorable Court has explained:

> A plaintiff may bring a Section 1983 coercion claim if coercion was applied to obtain a waiver of the plaintiff's rights against self-incrimination and/or to obtain inculpatory statements, and the statements thereby obtained were used against the plaintiff in a criminal proceeding. To establish a violation of the accused's Fifth Amendment right against self-incrimination, a plaintiff must point to circumstances indicating that he could not make a knowing and voluntary decision. The test for whether a statement was improperly obtained by coercion is determined by the totality of the circumstances. The assessment of voluntariness is a fact-intensive inquiry during which the court should consider the accused's characteristics, the conditions of the interrogation, and the conduct of law enforcement officials. When a confession is obtained under circumstances that overbear the defendant's will at the time it is given, it is not voluntary.

*Tankleff v. Cnty. of Suffolk*, 09 CV 1207 (JS) (AYS), 2017 WL 2729084, *16 (E.D.N.Y. June 23, 2017) (citations, brackets and internal quotation marks omitted). Here, plaintiff respectfully submits that if his own testimony (which has not changed in nearly three decades, *see* D207), is credited, as it must be on summary judgment, plaintiff's coercion claim must survive against defendants Dempsey, Herts, Severin and Abbondandelo. *See Bellamy*, 914 F.3d at 746 ("[A] § 1983 plaintiff's testimony alone may be independently sufficient to raise a genuine issue of material fact.") (citing *Rentas v. Ruffin*, 816 F.3d 214, 221 (2d Cir. 2016)).

Defendants' only argument against plaintiff's coercion claim is that plaintiff's account is too implausible to be credited on defendants' summary judgment motion. Def. Mem., 24-28. But plaintiff respectfully submits that, given the troubling pattern of similar allegations against defendant Dempsey, including the admissible jury finding in the Shonnard Lee matter, *see* D221, it is reasonable to credit plaintiff's detailed allegations at this stage. *Bellamy*, 914 F.3d at 746; *see Hincapie v. City of New York*, 18 CV 3432 (PAC), 2022 WL 2870411, *10 (S.D.N.Y. July 21, 2022) (denying summary judgment on § 1983 coercion claim where degree of personal involvement by individual defendants in coercing plaintiff's confession was in dispute); *see, e.g., Castellanos v. Kirkpatrick*, 10 CV 5075 (MKB), 2017 WL 2817048, *18 (E.D.N.Y. June 29, 2017) (finding prior allegations against a police officer to be "relevant support" for habeas petitioner's "theory that [his] confession was false") (citation omitted); *see also*, *e.g.*, *US. v. Cooper,* 90 CR 514 (DNE), 1991 WL 60371, *6 (S.D.N.Y. Apr. 9, 1991) ("Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue,

especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct.").

E.   Defendants are not entitled to qualified immunity for their fair trial violations

For over 20 years, the Second Circuit has consistently held that qualified immunity is unavailable in cases where law enforcement officers fabricate evidence. *See, e.g.*, *Ricciuti*, 124 F.3d at 130; *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000); *Morse*, 804 F.3d at 546–50; *Garnett*, 838 F.3d at 276–80; *Bellamy*, 914 F.3d at 745. It has also long been "clearly established under Supreme Court and Second Circuit case law that the Government has a duty to disclose…exculpatory and impeachment evidence." *Poventud v. City of New York*, 07 CV 3998, 2015 WL 1062186, *8 (S.D.N.Y. Mar. 9, 2015); *see also Walker*, 974 F.2d at 299 (recognizing a cause of action against police for suppressing exculpatory evidence from the prosecution).

Here, any reasonable officer would know that the suppressed evidence more than undermined the word of Skwanitra Witherspoon – it "would have had a seismic impact" at trial. *Leka*, 257 F.3d at 106–107 (reversing a denial of habeas based on testimony contradicting two eyewitness identifications, the only evidence of guilt); *see Smith v. Cain*, 565 U.S. 73, 76 (2012) (holding that where eyewitness identification "was the *only* evidence" linking defendant to the crime, undisclosed impeachment evidence was "plainly material"); *Boyette v. Lefevre*, 246 F.3d 76, 92 (2d Cir. 2001) (reversing a denial of habeas and holding that impeachment material of sole eyewitness "seriously undermines confidence in the outcome at trial") (internal quotation marks omitted); *United States ex rel. Meers v. Wilkins*, 326 F.2d 135, 137–38 (2d

Cir. 1964) (Marshall, J.) (holding that "it is hard for us to think of any testimony that might have been more helpful to the defense in establishing its case" than testimony contradicting eyewitness identifications); *Brandon*, 705 F.Supp.2d at 276 (noting that the Second Circuit has permitted "claims for both malicious prosecution and a denial of [the] right to [a fair] trial based on the same alleged fabrication of evidence") (citing *Ricciuti*, 124 F.3d at 130-31); *Zahrey v. City of New York*, 98 CV 4546 (DCP) (JCF), 2009 WL 1024261, *8 n.14 (S.D.N.Y. Apr. 15, 2009) ("Because evidence fabrication serves to both improperly charge and/or arrest a plaintiff as well as unfairly try him, the [manufacturing of false evidence], in its essence, involves aspects of both the Fourth Amendment and procedural due process."); *Torres v. Jones*, 47 N.E.3d 747, 747 (2016) ("[T]he police's transmission of the fabricated evidence can overcome the presumption of probable cause arising from a grand jury's indictment of the plaintiff."); *White v. Frank*, 855 F.2d 956, 961-62 (2d Cir. 1988) ("[The indictment] presumption may be rebutted by proof that the defendant misrepresented, withheld, or falsified evidence."); *Cox v. County of Suffolk*, 780 F. Supp. 103, 108 (E.D.N.Y. 1991) (no qualified immunity for malicious prosecution where officer-defendants unreasonably ignored evidence indicating plaintiff's innocence, despite circumstances that superficially suggested plaintiff had committed crime); *DaCosta v. Tranchina*, 281 F. Supp. 3d 291 (E.D.N.Y. 2017), *reconsideration denied*, 285 F. Supp. 3d 566 (E.D.N.Y. 2018), *rev'd on other grounds*, 784 Fed. App'x 54 (2d Cir. 2019) ("[W]hen evidence of known dubious value— whether a potentially falsified confession, or an unreliable eyewitness identification—is presented to the grand jury, and the grand jury is not apprised of its limited probative value, the presumption of probable

cause created by the indictment is rebutted."); *U.S. v. Rittweger*, 524 F.3d 171, 181 (2d Cir. 2008) ("The fact that the government may have some evidence that a particular defendant is guilty does not negate the exculpatory nature of the testimony of a witness with knowledge that a defendant did not commit the crime as charged."); *Chimurenga v. City of New York*, 45 F. Supp. 2d 337, 343 (S.D.N.Y. 1999) (noting the existence of a "triable dispute as to whether genuine probable cause existed or whether the individual defendants manufactured it falsely" which "not only prevents the Court from granting summary judgment on the ground that probable cause is lacking but dictates the conclusion that a triable issue exists as to the fourth and final element of a malicious prosecution claim: malice").

Citing only inapplicable cases arising in the malicious prosecution context, defendants do not attempt to argue that they are qualifiedly immune from the evidence fabrication and suppression claims. *Walker*, 974 F.2d at 293 (describing "the duty not to lie or persecute the innocent" as one of the "basic norms of human conduct"). Accordingly, and since defendants have not even raised the qualified immunity defense with respect to plaintiff's fair trial claims, defendants should not be granted qualified immunity.

2)  <u>Defendants maliciously prosecuted plaintiff</u>

I.  **Plaintiff's plea to low-level drug charges does not bar or limit his § 1983 malicious prosecution claims arising from his wrongful murder conviction**

Defendants' primary argument in their brief is that plaintiff's guilty plea to an unrelated low-level drug crime prevents him from satisfying the liberty-deprivation element for federal malicious prosecution. Def. Mem., p. 4. This argument fails for several reasons.

27

First, it is undisputed that plaintiff was released on bail on the unrelated charge at the time he was arrested and jailed for the Steven Jason homicide and thus not in custody. D245-46. If plaintiff was free on bail on the low-level drug charge and then taken into custody for 23 years for killing Steven Jason as per defendants' facts, the murder and witness tampering charges were plainly the proximate cause of plaintiff's liberty deprivation, and not the minor drug charge. *See Janetka v. Dabe*, 892 F.2d 187, 190 (2d Cir. 1989) ("If the dispositive factor is whether, as the district court held, the charge resulting in acquittal 'arose out of events that occurred on the same occasion' as a charge resulting in conviction, then police officers could add unsupported serious charges to legitimate minor charges with impunity.").

Indeed, the quoted language in the three cases defendants cite for this proposition makes clear that their logic does not extend to this situation, where plaintiff was at liberty when he was charged with the Jason homicide. *See* Def. Mem., p. 4 (citing *Marrero v. City of N.Y.,* 2013 U.S. Dist. LEXIS 165925, *9-10 (S.D.N.Y. Nov. 19, 2013), *Walker v. Sankhi*, 494 F. App'x 140, 142-43 (2d Cir. 2012) and *Rosario v. City of N.Y.*, 2021 U.S. Dist. LEXIS 10465, at *29 (S.D.N.Y. Jan. 20, 2021) for the proposition that a plaintiff who "remains in custody…throughout the pendency" of the prosecution may not establish a liberty deprivation). Here by defendants' own recitation of the facts we have the opposite situation – plaintiff had just posted bail on the unrelated, low-level drug charges and would have remained free (or likely had the charges dismissed) had he not been falsely accused of murdering Steven Jason by the defendants on a fabricated and manipulated record. D245-46.

Second, plaintiff's guilty plea to an unrelated drug charge is irrelevant because plaintiff is not challenging that drug conviction or seeking relief that is inconsistent with having sold $20 worth of drugs thirty years ago. *See Hincapie*, 2022 WL 2870411 at *7 ("In *Heck v. Humphrey*, the Supreme Court held that when a state prisoner seeks damages in a § 1983 suit, the district court 'must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of *his* conviction or sentence' and, if so, dismiss the plaintiff's claims unless the plaintiff demonstrates that *his* conviction or sentence has been reversed, expunged, invalidated, or 'called into question' through the issuance of a habeas writ. 512 U.S. 477, 487 (1994).") (emphasis in original). In other words, whether plaintiff pled guilty to this or any other unrelated charge, or had the unrelated charge dismissed, is legally irrelevant to the question of whether defendants subjected plaintiff to malicious prosecution by charging him with shooting Steven Jason. *Janetka*, 892 F.2d at 190.

Third, plaintiff respectfully submits that a rational jury could conclude that plaintiff would have remained on bail on the low-level drug charge and, had it not been for the murder charges, potentially been sentenced to time served, a diversionary program, or some other lesser sentence and not given the two-year sentence he received on the case in 1997 as a predicate felon. *See Garnett*, 838 F.3d at 277 ("The setting of bail, which may make the difference between freedom and confinement pending trial, and the prosecutor's decision to pursue charges rather than to dismiss the complaint without further action, may depend on the prosecutor's and magistrate's assessments of the strength of the case, which in turn may be critically influenced by fabricated evidence. Thus, a further deprivation of liberty can result

29

from the fabrication of evidence even if the initial arrest is lawful.") (citing *Ricciuti*, 124 F.3d at 123).

Furthermore, as the Second Circuit has made clear, fabricated evidence may cause a liberty deprivation in multiple ways. If the prosecutor accepted defendants' falsified evidence, "[she] might have been led to conclude, incorrectly, that any defects in the witnesses' identifications were minor matters and for that reason could be ignored." See *Bermudez*, 790 F.3d at 375. Indeed, prosecutors testified in this case that they did not know about the key facts that rendered the Witherspoon and Jenkins identifications less reliable, including the Valdez note. P113, 119. Accordingly, "there are triable issues of fact concerning whether [the prosecutor's] decision to bring charges was tainted by misleading information." *Id.* at 376. The impermissible admission of plaintiff's polygraph results and criminal history also provide grounds to deny summary judgment. *See Bellamy*, 914 F.3d at 748–49 (reversing summary judgment where fabrication that was the basis for a prosecutor's question caused the jury to have an "incorrect impression" that eyewitness made an identification even where the witness failed to identify the plaintiff at trial and the report was not entered into evidence); *see also Jackson v. City of Cleveland*, 925 F.3d 793, 816 (6th Cir. 2019) (holding fabricated evidence could affect the decision of the jury, and thereby cause a wrongful conviction, even where it was not introduced into evidence, if it was "used to obtain evidence later shown to the jury" or "used as the basis for a criminal charge").

Accordingly, this branch of defendants' motion should be denied.

## II.   Defendants' favorable termination arguments are frivolous

Defendants' next argument, citing *Lanning v. City of Glens Falls*, 908 F.3d 19, 22 (2d Cir. 2018), is that the Court should dismiss plaintiff's malicious prosecution claims because plaintiff's innocence cannot be sufficiently established based on the colloquy and dicta at the brief court appearance in February 2018 when plaintiff was released without a hearing. Def. Mem., pp. 4-5.

However, the Supreme Court overruled *Lanning's* innocence requirement in *Thompson v. Clark*, a case omitted from defendants' brief. *See Thompson v. Clark* 142 S. Ct. 1332, 1333 (2022) (Kavanaugh, J.) (holding that favorable termination element in § 1983 action asserting Fourth Amendment malicious prosecution claim does not require affirmative indication of innocence and abrogating *Lanning*) ("Questions concerning whether a criminal defendant was wrongly charged, or whether an individual may seek redress for a wrongful prosecution, cannot reasonably depend on whether the prosecutor or court happened to explain why charges were dismissed."); *see* Fed. R. Civ. P. 11(b)(2).

Because this prong of defendants' motion is premised on a case that had already been overruled by the Supreme Court, it should be denied.

## III.   Defendants lacked probable cause

"Although a grand jury indictment gives rise to a presumption that probable cause exists...that...presumption may be rebutted by evidence of various wrongful acts on the part of police." *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006); *Torres v. Jones*, 47 N.E.3d

747, 747 (2016) ("[T]he police's transmission of the fabricated evidence can overcome the presumption of probable cause arising from a grand jury's indictment of the plaintiff.").

Specifically, plaintiff can rebut the presumption of probable cause by showing police "failed to make a complete and full statement of facts to the District Attorney, misrepresented or falsified evidence, withheld evidence or otherwise acted in bad faith," *Manganiello v. City of New York*, 612 F.3d 149, 160-63 (2d Cir. 2010) (internal quotation marks omitted); *see also Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003); *Colon v. City of New York*, 60 N.Y.2d 78, 82-83 (1983), or by showing that the police "failed to make further inquiry when a reasonable person would have done so," *Haynes v. City of New York*, 29 A.D. 3d 521, 523 (2d Dep't 2006); or by showing "that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures,'" *Vazquez v. City of New York*, 10 CV 6277(JMF), 2014 WL 4388497, *9 (S.D.N.Y. Sept. 5, 2014). Although plaintiff need only provide proof of any one of the forms of police misconduct to rebut the presumption of probable cause, the record—the suppression of the Montes and Larrea and Valdez evidence, the fabrication of the Jenkins and Witherspoon evidence in bad faith, the coercion of plaintiff's false confession in bad faith—meets all of them. D129, 207, 212-235, 251, 261-62, 264, 266, 267, 270, 272, 303-04; P41, 75-76, 78, 113-19, 325, 362-63, 377, 417, 420, 453-57.

Indeed, many courts, including this Honorable Court, have held that where, as here, a prosecution is commenced based upon a coerced false confession, that alone is sufficient to raise triable issues as to probable cause. *See Tankleff v. Cty. of Suffolk*, 09 CV 1207 (JS) (AYS),

2017 WL 2729084, *21 (E.D.N.Y. June 23, 2017) ("If...Plaintiff's statements were coerced and the prosecution was initiated based on a confession fabricated by Defendants, the factfinder could conclude that no reasonable officer would believe that there was probable cause to prosecute.") (collecting cases); *id.* ("If the confession was fabricated, that alone could be sufficient to rebut the presumption of probable cause.") (citation omitted); *Morel v. Reed*, 11 CV 1808 (DLI) (LB), 2015 WL 3755976, *4 (E.D.N.Y. June 16, 2015) ("The case law...is incredibly clear. When law enforcement officers fabricate evidence...the existence of probable cause based on non-fabricated evidence ceases to be a defense for the fabricator.") (citations and internal quotation marks omitted) (collecting cases)

The only thing defendants contend creates probable cause is the alleged identifications by Witherspoon, which is the same argument defendants presented at the Rule 12 stage. But the jury can conclude the Witherspoon identifications were so suggestive they cannot be relied upon. D112; *see Stansbury*, 721 F.3d at 90–91 (holding two positive identifications from single photographs were "too problematic...to provide probable cause" on their own); *Dufort*, 874 F.3d at 348 (holding identification from unduly suggestive procedure "should not factor into any probable cause analysis"). Furthermore, "[r]eview for probable cause should encompass 'plainly exculpatory evidence' alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest." *Stansbury*, 721 F.3d at 93. Here, defendants were aware of "plainly exculpatory" evidence including the Montes, Larrea and Valdez evidence, as well as evidence that Peddie Jenkins was lying. D18. A reasonable jury could plainly find there was no probable cause. *See*

*Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) ("Where the question of whether an arresting officer had probable cause is predominantly factual in nature, as where there is a dispute as to the pertinent events, the existence vel non of probable cause is to be decided by the jury.").

### IV.   Defendants initiated the prosecution against plaintiff

A "jury may permissibly find that a defendant initiated a prosecution where he filed the charges or prepared…alleged false [evidence] and forwarded it to prosecutors." *Manganiello*, 612 F.3d at 163. Because there is sufficient evidence to conclude that Abbondandelo, Dempsey, Severin, Swenson, Alger and Herts each "actively elicited inculpatory statements from witnesses…whose veracity in making such statements was circumstantially suspect," "forwarded those statements to the ADA," and testified in pretrial and trial proceedings, plaintiff has satisfied this element. *Id*.

### V.   Malice can be inferred from a lack of probable cause

Abundant evidence demonstrates malice. "A lack of probable cause generally creates an inference of malice." *Boyd*, 336 F.3d at 78. Malice may also be shown "by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff." *Pinsky v. Duncan*, 79 F.3d 306, 313 (2d Cir. 1996). Aside from the evidence that defendants lacked probable cause to prosecute plaintiff, malice can also be shown through the repeated misconduct of each defendant, as well as defendants' "apparently myopic focus on" plaintiff—conspiring with Peddie Jenkins and ignoring

exculpatory evidence that should have led them to discontinue the prosecution. *See Manganiello*, 612 F.3d at 164.

### VI.   Defendants are not entitled to qualified immunity for their malicious prosecution of plaintiff

Finally, defendants claim they are entitled to qualified immunity on plaintiff's § 1983 malicious prosecution claim, asserting they had at least "arguable" probable cause. But as the Second Circuit held in *Dufort*, evidence of defendants' intentional misconduct throughout the investigation makes qualified immunity inappropriate: "Dufort has established a dispute of material fact as to whether the Defendants intentionally withheld or manipulated key evidence during his arrest and prosecution. He has introduced sufficient evidence from which a reasonable jury could conclude that the Defendants placed him in a deeply defective lineup, … and then withheld the suspect nature of this identification from prosecutors and the grand jury. Such a "knowing" violation of his Fourth and Fifth Amendment rights would, if proven, be enough to overcome the protection of qualified immunity." 874 F.3d at 354. *Dufort* applies here, given plaintiff's ample evidence of misconduct. Therefore, qualified immunity should be denied.

### 3)      Disputes of fact preclude summary judgment on plaintiff's *Monell* Claim

Defendants contend there is no basis for plaintiff's *Monell* claim, arguing the County had no prior notice and plaintiff cannot rely on newspaper articles. But there is substantial evidence that constitutional violations were the proximate result of the County's failure to supervise, investigate Dempsey and the other defendants in the homicide squad during the era of plaintiff's conviction raising triable issues under *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658

(1978). *See Okin v. Village of Cornwall-on-Hudson Police Dept.*, 577 F.3d 415, 439-40 (2d Cir. 2009); *Walker*, 974 F.2d at 297-98.

Courts in and out of this Circuit have consistently recognized failure to supervise and discipline as a viable theory of *Monell* liability. *See, e.g., Gentile v. County of Suffolk*, 926 F.2d 142, 152 (2d Cir. 1991) (sustaining malicious prosecution claim against governmental entity based on county's failure to properly discipline officers); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328-32 (2d Cir. 1986) (sustaining *Monell* jury verdict on proof City had a policy of failing to supervise and discipline police officers that amounted to deliberate indifference to the officers' use of excessive force); *Jeffes v. Barnes*, 208 F.3d 49, 62-64 (2d Cir. 2000); *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983); *Brown v. Bryan County*, 219 F.3d 450, 462-63 (5th Cir. 2000) (upholding municipal liability based on failure to train and supervise particular officer despite notice of risk he would violate constitutional rights); *Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3d Cir. 1996) (holding jury could find inadequate procedures for investigating civilian complaints caused constitutional violations); *Vineyard v. County of Murray*, 990 F.2d 1207, 1212-13 (11th Cir. 1993) (upholding jury verdict that inadequate procedures for handling complaints against officers caused constitutional violations).

Here, the record establishes that the County ignored a multitude of credible allegations against Dempsey making it probable that plaintiff's rights would be violated. P219-276, 329, 460-65, 495; *see Okin*, 577 F.3d at 439-41; *Walker*, 974 F.2d at 298 (finding that lack of police *Brady* policy supports *Monell* claim if police withhold *Brady* material from prosecutor);

36

*Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir. 1980) ("[W]here senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts."); *Griffin v. City of OpaLocka*, 261 F.3d 1295, 1308-14 (11th Cir. 2001); *Parrish v. Luckie*, 963 F.2d 201, 203-06 (8th Cir. 1992); *Harris v. City of Pagedale*, 821 F.2d 499, 504-06 (8th Cir. 1987); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328, 331-32 ("Whether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers had used excessive force," and thus "the very failure of the City defendants to conduct a nonsuperficial investigation into civilian claims" amounted to deliberate indifference.); *Henry v. County of Shasta*, 132 F.3d 512, 519-20 (9th Cir. 1997) ("we reiterate our rule that postevent evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry."); *Bordanero v. McLeod*, 871 F.2d 1151, 1166–67 (1st Cir. 1989) (same); *Chepilko v. City of New York*,  06 CV 5491 (ARR) (LB), 2012 WL 398700, *15 (E.D.N.Y. Feb. 6, 2012) ("Subsequent or contemporaneous conduct can be circumstantial evidence of the existence of preceding municipal policy or custom.").

In short, there is ample evidence for a jury to find that despite clear notice of ongoing constitutional violations, Nassau County buried its head, refusing to investigate or discipline its homicide detectives for blatantly unconstitutional conduct, and effective ratifying their misconduct. *See Okin*, 577 F.3d at 439-41 (reversing grant of summary judgment on *Monell*

claim); *Walker*, 974 F.2d at 300 (holding that "[i]f Walker can produce some evidence that policymakers were aware of a pattern of perjury by police officers but failed to institute appropriate training or supervision, his claim can survive summary judgment."); *Ricciuti v. N.Y.C. Trans. Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) ("The inference that a policy existed may, however, be drawn from circumstantial proof, such as evidence that the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction, or evidence that the municipality was on notice of but repeatedly failed to make any meaningful investigation into charges that police officers had used [conduct] in violation of the complainants' civil rights.") (citations omitted); *see also Woodman v. WWORTV, Inc.*, 411 F.3d 69, 84 n.14 (2d Cir. 2005) (Knowledge may be established either through proof of actual knowledge or through proof of conscious avoidance or willful blindness).

Plaintiff's *Monell* raises triable issues and summary judgment should be denied.

4)   <u>There is no basis to dismiss plaintiff's failure to intervene claims.</u>

Defendants' only arguments against plaintiff's failure to intervene claim are that plaintiff did not suffer a constitutional violation and the officers cannot be liable on both a direct and derivative basis. However, on defendants' motion plaintiff has presented sufficient evidence that his rights were violated – indeed, Nassau County conceded as much in its 2018 motion in state court – and the law allows for alternative pleading. *Guerrero v. City of New York*, 16 CV 516 (JPO), 2017 WL 2271467, *4 (S.D.N.Y. May 23, 2017) (collecting cases); *see Terebesi*

*v. Torreso*, 764 F.3d 217, 244 (2d Cir. 2014) ("Whether the officer had a realistic opportunity to intervene is normally a question for the jury…") (citation and quotation marks omitted).

<u>CONCLUSION</u>

For the foregoing reasons, plaintiff respectfully requests that the Court deny County defendants' motion to dismiss in its entirety and grant such other and further relief as the Court deems just and proper.

Dated:     February 16, 2023
           Briarcliff Manor, New York


                         Elefterakis, Elefterakis & Panek

                         _____
                         Gabriel P. Harvis
                         Baree N. Fett
                         80 Pine Street, 38th Floor
                         New York, New York 10005
                         (212) 532-1116

                         *Attorneys for plaintiff*