VOL. - OF II

Dr 322

1

2   COUNTY COURT : NASSAU COUNTY
3            PART I

4   ----------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK

5

6                          Indt# 91607
          -against-

7

8   JOSEPH JACKSON,
                     Defendant.

9   ----------------------------------------X

10

11                      Mineola, New York
                     November 4, 1996

12

13   B E F O R E:
14            HON. ABBEY L. BOKLAN,
                    County Court Judge

15

16   A P P E A R A N C E S:

17

18           Michael Walsh, ESQ.,
          Assistant District Attorney,
19                  For the People

20

21           Scott Brettschneider, ESQ.,
               For the Defendant

22

23          (Minutes of Jury Trial)

24               RICHARD D. GLEN, CSR
25               Official Court Reporter

COUNTY CLERK OF NASSAU COUNTY    DEC 0 8 1999    FILED    NASSAU INDEX    079767

Richard D. Glen, C.S.R.

1   Peo. vs. Jackson

2           THE CLERK:  Case on trial.

3           People vs. Joseph Jackson, Indictment Number

4   91607.

5           People ready?

6           MR. WALSH:  People are ready.

7           THE CLERK:  Defendant ready?

8           MR. BRETTSCHNEIDER:  Yes, your Honor.

9           THE COURT:  All right.  Okay, good morning

10  everyone.  For a while I didn't think we would

11  make it this morning.  The calendars are getting

12  so immense.

13          The jury is in route.  We have some further

14  preliminaries to do before their arrival.

15          On our other preliminaries, counselor, your

16  client waived his Antommarchi rights, and you

17  indicated you would like the voir dire recorded.

18          MR. BRETTSCHNEIDER:  Yes.

19          THE COURT:  I told the court reporter.  We

20  have, we'll have a different one tomorrow.  I'll

21  ask this court reporter just to remind me to tell

22  the new reporter tomorrow to record as well.

23          We have a few things to go over that I would

24  like you to approach the bench on so we can

25  discuss them, such as the length of time, et

1    Peo. vs. Jackson

2              cetera.  We can do that now.

3                   (Conference.)

4              THE COURT:  All right.  We'll go over a few

5         of the things now that we discussed at the

6         bench.

7              It's my understanding, People, that you are

8         not consenting to the jury not being sequestered,

9         is that correct?

10             MR. WALSH:  That's correct.

11             THE COURT:  So, without the consent, of

12        course, of both parties I have to sequester the

13        jury.

14             Mr. Brettschneider:  There was a motion

15        filed by the District Attorney's office for the

16        use of the felony exam minutes, and it's my

17        understanding that you are not contesting their

18        right to use them, is that correct?

19             MR. BRETTSCHNEIDER:  That's correct, your

20        Honor.

21             THE COURT:  All right.  We went over the

22        schedule at the bench, and it's my understanding

23        as well that both of you feel, if I tell the jury

24        we'll be finished early to mid-December, that

25        would be accurate?

1    Peo. vs. Jackson

2                    MR. WALSH:  I believe so, your Honor.

3                    THE COURT:  Mr. Brettschneider?

4                    MR. BRETTSCHNEIDER:  Yes.

5                    THE COURT:  Now, a witness list.

6            People, do you have one for me?

7                    MR. WALSH:  I do, your Honor.

8            (Hands.)

9                    THE COURT:  Have you had the opportunity to

10           give a copy to Mr. Brettschneider?

11                   MR. WALSH:  I'm doing so right now.

12           (Hands.)

13                   THE COURT:  Mr. Brettschneider, as we

14           discussed on the prior date, I don't require

15           defense counsel to give me a list.  However, I'm

16           very happy to have one to inquire of the jury.

17                   Is there any list that you wish to submit?

18                   MR. BRETTSCHNEIDER:  No, your Honor.

19                   THE COURT:  All right.  We have a Sandoval

20           to do.  Let's do that.

21               I have found the easiest way is if the

22           District Attorney will indicate which ones they

23           want to use, and then I'll give defense attorney

24           the opportunity to be heard, and then I'll give

25           you the opportunity to be heard further if you so

1    Peo. vs. Jackson

2              wish.

3                    MR. WALSH:  Thank you, your Honor.

4              Your Honor, based upon my reading of the

5         defendant's NYSIIS, it appears to me that there

6         are seven prior convictions that appear on the

7         NYSIIS; one actually for a violation, six

8         criminal convictions, one of those for a Class E

9         felony, attempted assault in the third degree.

10              I would be asking the Court's permission to

11        use those seven prior convictions that appear on

12        the rap sheet, three of those as far as

13        cross-examination into what the crime was and the

14        underlying facts.

15              I would also be asking the Court with

16        respect to his felony conviction for permission

17        to inquire of the defendant whether or not he was

18        ever convicted of a felony without going into

19        the, either the nature of that conviction or the

20        underlying fact of that conviction.

21                    THE COURT:  It's easier for me if you go

22        down the sheet.

23                    MR. WALSH:  Sure.

24                    THE COURT:  One at a time as to which ones

25        you are asking for.  Are you starting --

1  Peo. vs. Jackson

2          MR. WALSH:  The juvenile delinquent, I would

3      not be asking for permission to cross-examine him

4      as to anything relating to that juvenile

5      delinquent arrest for burglary in the 2nd degree.

6          THE COURT:  All right.

7          MR. WALSH:  The next conviction that appears

8      on the rap sheet is one for criminal possession

9      of a weapon in the 4th degree.  My understanding

10     is that that involved the use or the possession

11     of metal knuckles.

12         I will not be asking permission to inquire

13     into that particular prior conviction.

14         THE COURT:  All right.

15         MR. WALSH:  The next conviction appearing on

16     the NYSIIS is the one from December 21, 1988.  It

17     is the conviction for assault in the 3rd degree,

18     a Class A misdemeanor.

19         I would also not be seeking permission of

20     the Court to inquire as to that particular

21     conviction.

22         THE COURT:  All right.

23         MR. WALSH:  The next conviction that appears

24     on the NYSIIS is one for criminal facilitation in

25     the 4th degree.

1 | Peo. vs. Jackson

2              I am going to ask the Court for permission

3      to inquire of the defendant into that criminal

4      conviction.  He received a sentence of nine

5      months.  The conviction was for a Class A

6      misdemeanor.

7              Does the Court wish me to advise the Court

8      of the underlying facts of that case?

9              THE COURT:  Yes, thank you.

10              MR. WALSH:  Your Honor, that was an incident

11      where the defendant pled guilty on November 16,

12      1989 based upon an incident that occurred in July

13      of 1989.

14              There was some cross-examination of this

15      incident during the hearings.  In this case the

16      facts, as I am aware of them, are that the

17      defendant was essentially helping an individual

18      sell crack/cocaine.

19              He approached a man on the street, the

20      defendant did, who turned out to be an undercover

21      police officer, asking that undercover police

22      officer what it was that he wanted.  When the

23      undercover officer told the defendant that he

24      wanted to buy crack/cocaine, the defendant then

25      escorted him over to a third person and

Richard D. Glen, C.S.R.

1   Peo. vs. Jackson

2          instructed that third person to sell cocaine to

3          the undercover officer.

4              He told him to, "Give my man a dime." That

5          was the phrase that was allegedy used. And the

6          third person then went about selling the

7          crack/cocaine to the undercover police officer.

8              The next conviction that appears on the

9          NYSIIS is one for petit larceny. And I believe

10         there was also an assault 3rd conviction in

11         connection with that same case. The NYSIIS only

12         reflects the conviction for petit larceny.

13             There was also a plea of guilty to assault

14         3rd in that same case. That's something that was

15         also brought up at the time of, of the hearings,

16         your Honor. I would be asking the Court's

17         permission to cross-examine the defendant on that

18         case.

19             That incident occurred on March 31, 1990

20         outside of a bar in Roosevelt. It started with

21         the defendant having an argument with an

22         individual by the name of Roosevelt Alexander.

23             Allegedly the defendant slapped him in the

24         head outside of the bar. When Mr. Alexander hit

25         the defendant back he then, "he" being Mr.

Richard D. Glen, C.S.R.

Peo. vs. Jackson

1
2  Alexander, ran with the defendant and two of the
3  defendant's friends chasing him.
4  They chased him to a senior citizens home
5  where the victim attempted to climb over a fence
6  to get away from the defendant and the two
7  individuals he was with.  The defendant actually
8  chased him over that fence.  When the defendant
9  caught him, the defendant began hitting Mr.
10  Alexander in the head.
11  During the course of that assault one of the
12  defendant's associates, Mr. Davis, took a gold
13  chain from the neck of Mr. Alexander.  And the
14  defendant allegedly assisted Mr. Davis in doing
15  so by continuing to hit the victim.
16  The victim was hospitalized for the injuries
17  that he, that he suffered and the defendant plead
18  guilty to not only the assault 3rd degree but the
19  petit larceny for the, the theft of the chain as
20  well.
21  The next conviction appearing on the NYSIIS
22  is one for criminal possession of a controlled
23  substance in the 7th degree.  Now, the NYSIIS
24  reflects a charge of criminal sale of a
25  controlled substance in the 3rd degree.  It also

Richard D. Glen, C.S.R.

1   Peo. vs. Jackson

2              reflects a sentence of ten months incarceration,

3              but I don't believe that the rap sheet indicates

4              what the conviction was for.

5                   THE COURT:  No.

6                   MR. WALSH:  I have the file from our office

7              on that case.  I researched the records and the

8              defendant was, in fact, convicted of criminal

9              possession of a controlled substance in the 7th

10             degree, a Class A misdemeanor.

11                  That is the -- this is the third criminal

12             conviction which I would be asking the Court for

13             permission to use on cross-examination.

14                  It involved an incident that occurred in

15             August of 1990 in Roosevelt.  Once again, it

16             involved the sale of crack/cocaine.  There was a

17             man who turned out to be an undercover police

18             officer who asked the defendant whether he had

19             works.  The defendant asked the undercover

20             officer what he was looking for.

21                  The undercover officer said he wanted a dime

22             of crack/cocaine.  And at that time the defendant

23             pointed out another individual who was in the

24             vicinity who was sitting on a bicycle and told

25             the undercover police officer to see the guy on

1    Peo. vs. Jackson

2                the bicycle over there.

3                    The undercover police officer went to the

4                man on the bicycle, bought cocaine from the

5                person on the bicycle for $10.00.

6                    So those, those essentially are the three I

7                wish to use, your Honor.

8                    I believe there is one prior assault charge

9                that appears on the NYSIIS from October of 1993.

10               There's no disposition reported.  I'm aware that

11               that resulted in a conviction for harassment as a

12               violation, and I would not be seeking permission

13               to use that.

14                   Other than the three I brought to the

15               attention of the Court as far as the underlying

16               facts, again going back to the second conviction

17               that appears on the NYSIIS for a felony,

18               attempted assault in the 2nd degree, while I

19               would not ask the Court to use the underlying

20               facts or the nature of that conviction, given the

21               similarity to what we're trying here, I would ask

22               for the Court's permission to inquire as to

23               whether or not the defendant had ever been

24               convicted of a felony.

25                   THE COURT:  Thank you.  Mr. Brettschneider?

12

Peo. vs. Jackson

   MR. BRETTSCHNEIDER:  Your Honor, I would

consent to the Sandoval compromise with regard to

the felony conviction.

   THE COURT:  All right.

   MR. BRETTSCHNEIDER:  Your Honor, what next

comes about is obviously a bigger question which

I, I will address now:

   When I reviewed the hearing minutes, there

obviously is a question as to why Mr. Jackson was

brought into the precinct on, on the date and the

day subsequent in which he gave his, his

statement to the police.  There was a question as

to whether he was arrested with regard to a

criminal sale of a controlled substance.

   And what I, what -- I would like a ruling at

this time, and I would make a motion in limini,

that the People not be allowed to bring up the

reason for that arrest and the reason that he was

in the police precinct, and that any information

that was testified to with regard to the

narcotics detectives who testified at the

hearing, with regard to the identification made

of Mr. Jackson, by both the confidential

informant and by the undercover police officers

Richard D. Glen, C.S.R.

Peo. vs. Jackson

1

2          in that case, that all of that be precluded from

3          this trial.

4                And the reason I'm asking that is that if

5          the Court should rule that the People be allowed

6          to bring in the criminal facilitation charge and

7          the criminal possession in the 7th degree

8          charges, I think that would have an impact upon

9          my client and also would have an impact based on

10         the evidence that this jury would hear with

11         regard to the incidents that happened with regard

12         to the the drug sale that brought him into the

13         precinct on that date.

14               So, based on, on the Court's ruling with

15         regard to that matter, I would oppose the People

16         being allowed to go into the criminal

17         facilitation and the criminal possession in the

18         7th degree.

19               I would also be opposed to them bringing in

20         the petit larceny as again, I would ask for a

21         Sandoval compromise and just ask whether my

22         client was convicted of a misdemeanor.

23               There are certain aspects of that case with

24         regard to the assault, and I have -- the only

25         thing that I see here on the rap sheet that I

Peo. vs. Jackson

have is that he was convicted of petit larceny.
I don't see anything with regard to him pleading
guilty to an assault charge on the April 4th --
excuse me, on the March 31, 1990 arrest.

Not -- I'm not denying, you know, that may
have happened, and I don't know what certificates
of disposition Mr. Walsh has with regard to that
particular case, but at this point I would oppose
that.

THE COURT:  Mr. Walsh, I would like you to
respond to the issue of whether you will be
bringing up any evidence of the drug sale for
the, for which the defendant was brought into the
precinct.

MR. WALSH:  I have no intention to, your
Honor.  I don't think it really relates to this
case.  It, of course, it, it came out during the
hearings because we wanted to consolidate the
hearings for the purpose of doing it all at once.

But as far as the trial is concerned, I
don't see any relevance.  I don't see the
relevance Mr. Jackson's open drug case has to
this particular case.  I don't have any intention
of, of introducing any of that evidence.

Richard D. Glen, C.S.R.

1    Peo. vs. Jackson

2              As far as I'm concerned, for the purpose of

3    this case, Mr. Jackson was arrested on the date

4    he was arrested because he was a suspect in a

5    homicide.

6              It's always been my contention that the

7    detectives had probable cause to place him under

8    arrest for the homicide on that date in addition

9    to any open warrants he may have had, which I

10   will not bring up anyway.

11             I have no intention of introducing any

12   evidence of the open drug case.

13             THE COURT:  You have your answer, Mr.

14   Brettschneider.

15             MR. BRETTSCHNEIDER:  Your Honor, while on

16   this subject, I would also like to know whether

17   the People are going to introduce any evidence

18   with regard to the -- that my client took a

19   polygraph examination.

20             There was testimony in the hearing minutes

21   with regard to a polygraph examination.

22   Certainly there's going to be a question as to

23   the period of time that my client was in Mineola

24   in custody.  And certainly there may be a

25   situation in which we're going to have to deal

1   Peo. vs. Jackson

2            with a period of time in which the police are

3            going to say, We're waiting for a polygraph test.

4               But, of course, I would ask that not be

5            permitted into evidence.  And I think that there

6            has to be some sort of explanation to the jury

7            other than that or, or some sort of language

8            which would allow the jury to know that my client

9            was in custody for that period of time without

10           knowing there was a polygraph test that was

11           conducted in this case.

12               THE COURT:  Before I hear from Mr. Walsh, I

13           have a further question on that issue:  Are you

14           going to be contesting the voluntariness of the

15           statement before the jury?

16               MR. BRETTSCHNEIDER:  Yes.

17               THE COURT:  Of course, you have the right to

18           do that.

19               MR. BRETTSCHNEIDER:  Yes.

20               THE COURT:  Mr. Walsh?

21               MR. WALSH:  Your Honor, I have, I've thought

22           about this, and I've had the opportunity to

23           review a couple of prior trials that were done, I

24           don't know if one was before your Honor, and

25           these detectives were involved in it as well, and

Peo. vs. Jackson

I think there's a way around the problem.

I have minutes from an old trial that I was going to guide myself by as far as how to approach this particular issue.

Basically, and I'll show the minutes to Mr. Brettschneider and the Court as well and we can discuss this further, but basically I would have Detective Abbondandelo testify that he and Dempsey spoke with the defendant up until, I believe on that date, about 6 o'clock when the defendant was asked to take a polygraph. Of course, there will be no mention of the polygraph.

Detective Abbondandelo will testify in sum and substance that he was taken, the defendant was taken to meet a Detective Kosior for further interviewing at that point in time. I may have Detective Kosior testify that he interviewed the defendant, that he had asked the defendant to sign a consent form, that he had a conversation with him, but I don't have any intention at this point in time of bringing up the fact that the defendant was asked to or took a polygraph, and certainly, I don't intend to introduce any

1  Peo. vs. Jackson

2          results.

3                THE COURT:  Of course, we know no results

4          can come in, but it's a, awhile since I did the

5          hearing, but it was my recollection that the

6          detectives later on, in fact, were saying to the

7          defendant that you failed it, you are lying, we

8          know you are lying.

9                We have to be very careful.

10               MR. WALSH:  Right.  I understand.  And I, I

11         have already discussed that with Detective

12         Abbondandelo, and I'll certainly discuss it with

13         him further.

14               I certainly think that I should be permitted

15         to inquire of Detective Abbondandelo and Dempsey

16         whether or not they confronted the defendant in

17         the case and whether they accused him of lying.

18               I don't know that I have to bring up the

19         fact that there was a polygraph result that

20         caused them to accuse the defendant of lying.

21               THE COURT:  Well, I'm in agreement.  You can

22         -- the detective can say, We don't believe him.

23         My only concern is that they don't say that you

24         failed the polygraph test.

25               MR. WALSH:  Right.  We don't believe you

1   Peo. vs. Jackson

2          because you took a polygraph.  I don't intend to

3          to do that.

4                  MR. BRETTSCHNEIDER:  Again, your Honor, it's

5          just a matter of what words you use.  I mean, I

6          certainly don't want the jury to speculate as to

7          what evidence these detectives may have had.

8                  I would prefer just that they couch it in

9          that they told the defendant that they did not

10         believe him and that they believed that he was

11         lying, rather than say we have other evidence.

12                 Because certainly, there is always the

13         question as to a polygraph whether the -- I mean,

14         whether it was properly administered and all

15         kinds of things that, that go along with it.

16                 So, I would just leave it at that point,

17         that, that they confronted him and they said they

18         did not believe him.

19                 THE COURT:  Well, they have other, they have

20         evidence other than -- sir, you are not a

21         prospective juror, are you?

22                 A VOICE:  No.

23                 THE COURT:  Okay, then welcome.  You can sit

24         down.

25                 They have additional evidence, including

Richard D. Glen, C.S.R.

1    Peo. vs. Jackson

2              statements he had made to relatives, et cetera,

3              allegedly.  The fact that we have evidence

4              doesn't necessarily mean a polygraph.

5              My concern is that there be no mention of a

6              polygraph or any indication -- they can, of

7              course, say we have a a detective who is not here

8              who will be coming in.  Will you be willing to

9              talk to him?  Which, of course, is the polygraph

10             technician, without saying "polygraph

11             technician".

12             I think Mr. Walsh basically understands his

13             responsibility and would be willing to discuss it

14             with you --

15             MR. WALSH:  I will.

16             THE COURT:  -- off the record how he intends

17             to put it in, and then if you have any issues

18             with what he intends to do, you can bring it to

19             the Court's attention.

20             MR. WALSH:  I don't intend to play games by

21             mentioning other evidence that's left unexplained

22             that would be hanging out there for the jury to

23             speculate on.

24             MR. BRETTSCHNEIDER:  Okay.

25             THE COURT:  All right.

Peo. vs. Jackson

1

2                    Anything further on the Sandoval?

3                    MR. BETTSCHNEIDER:  No.

4                    THE COURT:  All right.  Then this is my

5          ruling as follows:

6                    On the attempted assault where you wish to

7          inquire simply whether he was convicted of a

8          felony, the compromise you may do that; and that

9          is also on consent.

10                   You may use the conviction for the petit

11         larceny but you may not go into the underlying

12         which involves the situation of the assault and

13         you may not say, he's been convicted of an

14         assault as well.

15                   MR. WALSH:  Yes, your Honor.

16                   THE COURT:  Unless, of course, he denies it,

17         should he take the stand.

18                   MR. WALSH:  Yes, your Honor.

19                   THE COURT:  If he denies the conviction for

20         petit larceny then, of course, you would have the

21         right to inquiry further.

22                   On the '89 criminal facilitation, you may

23         inquire as to the conviction as well as the

24         underlying facts.

25                   And the same with '94, because he introduced

Richard D. Glen, C.S.R.

1    Peo. vs. Jackson

2              the police officer to buy crack/cocaine, I will

3              allow it because that goes more to his

4              credibility than for his own personal use.

5                   Any questions on the Sandoval decision?

6                   MR. WALSH:  No.  Thank you.

7                   MR. BRETTSCHNEIDER:  No.

8                   THE COURT:  All right.

9                   Does anyone have anything else to do?  We

10             had indicated previously that you wanted in the

11             Court's voir dire that they may not consider the

12             defendant's failure to take the stand.

13                  MR. BRETTSCHNEIDER:  Yes.

14                  THE COURT:  Anything else?

15                  (No response.)

16                  THE COURT:  Can someone tell the jurors who

17             are standing outside, please, that we're waiting

18             for additional jurors, and that is the reason for

19             the delay.

20                  All right.  Thank you very much.

21                  (Recess.)

22                  THE CLERK:  Bring the jury in, please.

23                  (Prospective panel in the courtroom.)

24                  THE COURT:  Good afternoon, ladies and

25             gentlemen.  Sorry to those of you who came on the

1  Peo. vs. Jackson

2          earlier buses and were standing in the halls for

3          so long but it takes the buses a long time.  We

4          had to wait for everyone to begin.

5               Welcome to County Court.  My name is Judge

6          Abbey Boklan, and I will be the Presiding Judge

7          at this trial.

8               Can all of you hear me?

9               (No response.)

10              THE COURT:  Some of you are about to be

11         selected as jurors.  I will explain briefly what

12         the trial involves and what roles the judge and

13         the jury play.  We will also determine who will

14         actually sit as a juror in this case.

15              Relax, be comfortable, and I'll try to

16         familiarize you with what is about to happen.

17         We're only going to go a little while.  We're

18         already into the luncheon hour, but I want to at

19         least get started, especially for those who have

20         been standing here.

21              The trial which is about to be commenced is

22         a criminal action entitled the People of the

23         State of New York against Joseph Jackson who is

24         referred to as the defendant.

25              The trial involves the following charges,

Peo. vs. Jackson

1

2        the following allegations:  Murder in the 2nd

3        degree, with the alleged victim being Steven

4        Jason and the alleged weapon a handgun;

5        intimidating a victim or witness in the 1st

6        degree; and hindering prosecution in the 2nd

7        degree.

8            As jurors, you are going to be called upon

9        to determine whether or not the evidence which

10       you shall see and hear in this case establishes

11       the defendant's guilt of the charges beyond a

12       reasonable doubt.

13           In order to do this, you will have to

14       evaluate all of the evidence at the end of the

15       trial to determine whether what you have heard

16       from the witnesses and seen as exhibits is true

17       and what it all means.

18           This is called finding the facts.  That will

19       be your function at this trial.  I will find no

20       facts in this trial.

21           Your ultimate decision is called a verdict.

22       Your verdict will either be guilty or not

23       guilty.  An attorney presents the evidence

24       usually by calling witnesses and only you can

25       decide what really happened and the verdict as to

1  Peo. vs. Jackson

2            each of the counts will remain your decision

3            alone.

4            As Judge I will make no determination of

5            whether the defendant is guilty or not guilty.

6            My role at trial is to ensure that you reach your

7            verdict in accordance with the law.  And I will

8            explain to you what the law is as to all the

9            issues at this trial.

10            I may have to rule on questions concerning

11            the conduct of the trial.  Those rulings have

12            nothing to do with whether the defendant is

13            guilty or not guilty.

14            I may also rule on questions concerning what

15            evidence you may consider and for what purpose.

16            When I make a ruling concerning whether you may

17            hear some testimony or see some exhibit which is

18            offered as evidence, I will be ruling on whether

19            or not you are permitted to hear it or see it as

20            a matter of law.

21            Likewise, if I instruct you to disregard

22            something you might have heard, I will do so

23            because that's the law.  None of my rulings

24            should be taken by you as any indication at all

25            of whether you should believe any or all of what

Peo. vs. Jackson

is offered as evidence or that the defendant is
guilty or not guilty.  That is solely your job to
determine.

        But you must accept the law as I give it to
you if the defendant and the People are to have
the fair trial to which they are entitled.

        The People are represented by the District
Attorney of this county, Mr. Denis Dillon.  Mr.
Michael Walsh, who is now standing, an assistant
district attorney, will be presenting the
People's case.

        The defendant is represented by his
attorney, Mr. Brettschneider, who is now standing
as well.

        MR. BRETTSCHNEIDER:  Good afternoon.

        THE COURT:  And sitting next to Mr.
Brettschneider is the defendant, Mr. Joseph
Jackson.  You may stand up, Mr. Jackson, as
well.

        The fact that this action is brought in the
name of the People or that the evidence is
presented by a public official does not in any
way indicate that the public wants a specific
verdict.  The People of this state are served by

1    Peo. vs. Jackson

2              whatever verdict is justified by the evidence.

3              You may hear reference to the fact that the

4         defendant was indicted by a grand jury.  This too

5         is not and must not be taken as any evidence of

6         guilt.  As a trial jury you must consider an

7         indictment as simply a piece of paper by which a

8         defendant is accused of a crime.

9              Only you, as members of the trial jury, can

10        determine guilt, and the defendant is presumed

11        innocent unless and until you do find him

12        guilty.

13             Serving on a jury is a vital function for

14        citizens under our system of laws.  It is also a

15        very great responsibility, that is, to accord the

16        defendant and the People a fair trial.  In order

17        to do so you must be free from any preconceived

18        notions or any sympathies or prejudices that

19        might prevent you from returning a fair and just

20        verdict based solely on the evidence or the lack

21        of evidence.

22             To help to ensure this our first order of

23        business is to conduct an examination of the

24        prospective jurors.  I will ask some questions of

25        you and after I am finished the attorneys for

Richard D. Glen, C.S.R.

1    Peo. vs. Jackson

2                both parties will ask questions as well.

3                     The purpose of the questions is not to

4                embarrass you or to discover any personal details

5                about your lives.  It is simply to determine

6                whether or not you are qualified to sit as jurors

7                in this case.

8                     A number of you will not be selected.  Some

9                of you may be excused because you are not

10               qualified to sit as a matter of law.  That is

11               called excused for cause.  Others may be excused

12               peremptorily which means by one of the attorneys

13               without any cause being given.

14                    Being excused is not a reflection on you

15               either as a citizen or as a person.  It is simply

16               a determination under the rules by one or more of

17               the parties or by me that you are not to sit on

18               this particular case.

19                    Now, I'm sure all of you are concerned about

20               scheduling.  Let me tell you a little bit of how

21               this trial will run.

22                    First of all, as you know we have many

23               holidays coming up.  First one being tomorrow,

24               Election Day.  The Court will not be in session.

25                    Additionally, on Monday, the 11th, we have

1    Peo. vs. Jackson

2                    Veterans Day.  The Court will not be in session.

3                        And also for the month of December we will

4            not been working on Fridays on this trial --

5            excuse me, the month of November we will not be

6            working Fridays.

7                        So, basically, the month of November, and I

8            must not forget Thanksgiving, so the month of

9            November we will not actually be working on this

10           case seven working days, will not be on this

11           case.

12                       Let me repeat again, no Fridays in

13           November.  Obviously not Thanksgiving, not

14           Election Day and not Veterans Day.

15                       Even taking into consideration the fact that

16           we will not be working on these days and that

17           this is a case involving a charge of murder,

18           which is always a more complicated case, usually

19           a trial takes longer, the attorneys have assured

20           me that we will finish this case no later than

21           mid-December.

22                       Now, how do the days themselves work?  We

23           here in Nassau County were one of the originators

24           of a system used throughout the state.  It's

25           called the individual assignment system.  It's a

Richard D. Glen, C.S.R.

1   Peo. vs. Jackson

2              fancy name, but what it means is a judge gets a

3              case for all purposes from the very beginning.

4              So, at the same time that I'm trying this

5              case I am trying to juggle approximately 150

6              other cases that I'm doing things on such as

7              sentencing, motions, pleas, et cetera.

8              So, you will have your early morning to

9              yourselves when we are working.  I find that it's

10             most convenient for jurors and for me to get my

11             work out of the way first thing in the morning

12             and call you in about 11 o'clock.  So, you'll

13             have your early mornings.

14             Normally, we break for lunch between the

15             hours of 12:30 and 2.  And I will try to have

16             you, when you are not deliberating, out of the

17             courtroom at approximately 4:30, quarter to 5

18             each day.

19             Now, when you are deliberating, just during

20             final deliberations only, ladies and gentlemen,

21             the jurors will be sequestered at all times.

22             This means that should the jury continue to

23             deliberate for more than one day, then our law

24             requires hotel accommodations be made available

25             and the jury be sequestered each night before

Peo. vs. Jackson

resuming their deliberations on each following day.

Now, I will not be doing the examination of the individual jurors until after the luncheon recess, but after the luncheon recess I want to make sure that none of you has any pressing family or business obligations or any physical problems that would prevent you from serving on this jury.

Please, do not seek to avoid jury service because it is inconvenient.  I regret the inconvenience, but our system of trial by jury, one of the most basic elements of our whole system of justice depends upon citizens who are willing to sacrifice their time when called upon to judge another person.

Also, ladies and gentlemen, being excused from this trial does not excuse you from jury duty.  It only means you go back to Central Jury when you are excused from this case.

I'm going to ask the clerk to swear all of you to answer truthfully and then we'll break after that for the luncheon recess.

THE CLERK:  Ladies and gentlemen, please

1   Peo. vs. Jackson

2             rise and raise your right hand.

3             (Jury sworn.)

4             THE COURT:  Please be seated for one

5   moment.

6             Ladies and gentlemen, you have

7   questionnaires.  I don't know if all of you had

8   the opportunity to fill them out.  Please bring

9   them back with you after the luncheon recess.

10  Finish them over the luncheon recess, if you

11  haven't had the opportunity to do it previously.

12            And also one other thing if you could please

13  do for us over the luncheon recess, not now, is

14  to separate the pages for us if you have not

15  already done that.

16            I'm going to give you now some brief

17  admonitions:  Do not discuss the case among

18  yourselves or with anyone else.

19            Do not read or listen to any accounts or

20  discussions of the case reported by newspapers or

21  other news media.

22            Do not visit or view the premise or any

23  place the offenses charged were allegedly

24  committed or any other premises or place involved

25  in the case.

Richard D. Glen, C.S.R.

```
 1   Peo. vs. Jackson
 2                Promptly report to the Court any incident
 3           involving any attempt by any person to influence
 4           any member of the jury or to discuss the case.
 5                Do not form any opinions.  Keep an open mind
 6           until the case is completed.
 7                We'll see you outside the courtroom at 2
 8           o'clock.  Have a good lunch.  We'll see you
 9           then.
10                (Jury out.)
11                (Recess.)
12                A-F-T-E-R-N-O-O-N  S-E-S-S-I-O-N
13                THE COURT:  Good afternoon, ladies and
14           gentlemen.  Before we recessed I had told you a
15           little bit about the trial schedule and, of
16           course, a need for jurors such as yourselves to
17           serve, but if any of you cannot serve for a
18           reason, now please raise your hand.
19                All right.  We'll hear you one at a time at
20           the bench.  The court officer will line you up.
21                Counsel, please approach.
22                (Following occurred at sidebar:)
23           (Individual excuses were heard at the bench.)
24                (Open court.)
25                THE COURT:  Ladies and gentlemen, thank you
```

1    Peo. vs. Jackson

2              very much for remaining, even those who are

3              remaining reluctantly.  We need jurors.  We

4              realize that this is a burden, but we would have

5              to shut down our entire criminal justice system

6              if people would not be willing to sit.

7              Now, at this time the law requires that the

8              names of 12 of you be drawn and those persons

9              take seats in the jury box.

10             And, ladies and gentlemen, those of you who

11             are not selected right now, I ask you to listen

12             carefully to the questions.  You will find that

13             after the first round we move much more rapidly

14             and it's very likely that you will be asked some

15             of the same questions.

16             I have actually 14 seats in my jury box, so

17             we're now going to call 14 of you to come into

18             the box.  Please have your questionnaires ready

19             for us when you are called.

20             (Box filled.)

21             THE COURT:  Some of you might have heard me

22             say it when you were called to the bench, if not

23             if it's any consolation to any of you, misery

24             loves company or whatever you want to call it, I

25             have already filled out my jury questionnaire and

1    Peo. vs. Jackson

2            I am going to be expected to be called for jury

3            service as well.

4            I will have to shut down my Part.  And it's

5            my understanding that the chief judge of the

6            state was also called for jury duty.  We all now

7            share equally, which is a little different.

8            My first series of questions will concern

9            your backgrounds in order to determine anything

10           that may give rise to a feeling or an attitude

11           that might prevent you from judging this case

12           fairly.

13           Your answers to these questions will not

14           necessarily qualify you or disqualify you.  If

15           any of you wishes to respond affirmatively,

16           either yes or no or you are not sure, please

17           raise your hand as soon as I complete the

18           question.

19           And if you don't understand the question,

20           say so.  You may ask to approach the bench and

21           respond to any question you may prefer to discuss

22           privately.

23           The defendant, the defendant's attorney, the

24           prosecuting attorney have all been identified to

25           you.  Do any of you know any of these

1  Peo. vs. Jackson

2          participants to the proceedings?

3                  (No response.)

4          THE COURT:  Now, among the witnesses who may

5  be called in the case are the following, and I

6  caution you that my mentioning the name imposes

7  no burden on either side to call that person as a

8  witness nor does it mean that the list may not be

9  expanded:

10         Detective Gary Abbondandelo, Homicide Squad;

11  Detective Robert Dempsey, Homicide Squad; these

12  are all Nassau County; Detective Jerry Mullen,

13  also of the same squad; Detective Peter Donato,

14  same squad; Police Officer Richard Paulik of the

15  Freeport Police Department; Police Officer

16  Michael Pomorico of the Freeport Police

17  Department; Detective Joseph Marino, Crime Scene

18  Search Section, Nassau County Police Department;

19  Detective Nicholas Mattia, Scientific

20  Investigation Bureau of the Nassau County Police

21  Department; Mr. Michael Herts, whose a retired

22  detective initially of the 1st Squad, Nassau

23  County Police Department; Detective Brian Parpan,

24  Homicide Squad; Detective Frank Allaire, 1st

25  Squad Nassau County, Detective William Tweedie

1    Peo. vs. Jackson

2              1st Squad, Nassau County Police Department;

3         Detective Edward Haggerty, Freeport Police

4         Department; Mr. William Wallace, A.D.A., Nassau

5         County District Attorney's Office, Michael

6         Dimartino, M.D., Deputy Medical Examiner; Nassau

7         County Nassau Clerk's Office, Mr. Christopher M.

8         Jordan; Court Reporter, Miss Isabelle Vailes;

9         Mrs. Skwanitra Witherspoon.  First name is

10        spelled S-K-W-A-N-I-T-R-A, and Witherspoon is

11        W-I-T-H-E-R-S-P-O-O-N; Mr. Peddy, that's spelled

12        P-E-D-D-Y Jenkins; Mr. Tyrone Isaac; and Mr. Roy

13        Isaac.

14             Do any of you know any of the prospective

15        witnesses in this case?

16             (No response.)

17             THE COURT:  Now, I've told you very little

18        about this case.  I've told you the nature of the

19        charges.  The day, the alleged date of the crime

20        was March 20, 1994.

21             I told you that the alleged victim is Steven

22        Jason.  And in the third count, the hindering

23        prosecution count, it's alleged that the

24        defendant rendered criminal assistance to one,

25        Tony Jackson.

Richard D. Glen, C.S.R.

1    Peo. vs. Jackson

2              Do any of you know anything about this case

3         other than what we have told you here in the

4         courtroom?

5              (No response.)

6              (Voir Dire examination by the Court.)

7              THE COURT:  After we take a short recess you

8         will be asked various questions by the attorneys

9         starting with the assistant district attorney.

10        Their questions, like mine, are only designed to

11        determine whether they think you are qualified to

12        sit in this case.

13             If they inadvertently ask you a question

14        which is embarrassing or very personal to you,

15        you may say so.  If the question is not proper, I

16        will tell you that you do not have to answer it.

17        And if the answer involves some personal

18        information I will permit you to answer it in

19        private rather than in open court.

20             You are sworn to tell the truth and must

21        answer every question truthfully unless I rule

22        that it is not necessary to answer.

23             We'll take now approximately a 5 to 10

24        minute recess and then we'll resume again.

25             Please take the jury out.

1    Peo. vs. Jackson

2                (Recess.)

3                MR. COURT:  Mr. Walsh.

4                MR. WALSH:  Thank you.

5                THE COURT:  Can someone help him with the

6        lectern.

7                Ladies and gentlemen, just so you

8        understand, I give the attorneys 20 minutes the

9        first round, 15 minutes every round thereafter.

10               So, when I say "one minute," that is just me

11       giving them a one minute warning.

12               Begin.

13               (Voir dire examination by Mr. Walsh.)

14               THE COURT:  Thank you, Mr. Walsh.

15               Mr. Brettschneider, is the jury board up

16       there?

17               MR. WALSH:  No, it's not.

18               MR. BRETTSCHNEIDER:  I don't need it.

19       (Voir dire examination by Mr. Brettschneider.)

20               (Following occured at sidebar:)

21               THE COURT:  Each side has 20 preempts.  The

22       first 12, first 12 people in the box first

23       through Maloney, okay.

24               Challenges cause, People?

25               MR. WALSH:  Before we do that, I just have

```
 1   Peo. vs. Jackson
 2              one question:  I don't know if I heard correctly
 3              what somebody said, and I was wondering if
 4              anybody can help me.
 5              Mr. Harris, number 6, something about a
 6              background check?
 7              MR. BRETTSCHNEIDER:  Yes.
 8              MR. WALSH:  At the end.
 9              MR. BRETTSCHNEIDER:  I was afraid to follow
10              up on that.
11              THE COURT:  He said he would give a
12              background check to everybody to check them out.
13              MR. WALSH:  Right.  That is what I thought
14              he said.
15              THE COURT:  If you want the exact words, we
16              can read it back to you.
17              MR. WALSH:  That's what I thought I heard.
18              It was a little surprising, that's all.  So, I
19              thought I would ask.  Okay.
20              THE COURT:  Cause, first 12?
21              MR. WALSH:  Number 3, Mr. Shelson (Ph.)
22              MR. BRETTSCHNEIDER:  Consent.
23              THE COURT:  Granted.
24              MR. WALSH:  I don't know if counsel agrees
25              but I would also challenge Mr. Harris in light of
```

```
 1   Peo. vs. Jackson

 2           that last comment.

 3                   MR. BRETTSCHNEIDER:  Consent.

 4                   THE COURT:  Consent.

 5                   MR. WALSH:  And number 11, Miss Berrucum

 6           (Ph.) with her language difficulty.

 7                   MR. BRETTSCHNEIDER:  Consent.

 8                   THE COURT:  Consent.

 9                   MR. WALSH:  That's all I have.

10                   THE COURT:  All right.  Cause for you?

11                   MR. BRETTSCHNEIDER:  No.

12                   THE COURT:  Peremptories, People?

13                   MR. WALSH:  4, 10, 9.  Three, your Honor.

14                   THE COURT:  All right.

15                   MR. WALSH:  4, 9 and 10.

16                   THE COURT:  4, 9 and 10.

17                   MR. WALSH:  4, 9 and 10, yes, your Honor.

18                   THE COURT:  All right.  That's three

19           challenges, People.

20           All right.  Peremptories, counsel, just of

21           the first 12?

22                   MR. BRETTSCHNEIDER:  4, 8 -- 5, 8 and 12.

23                   THE COURT:  All right.  That gives us three

24           jurors, correct?

25                   MR. WASLH:  Right.
```

Richard D. Glen, C.S.R.

```
1    Peo. vs. Jackson

2              THE COURT:  1, 2 and 7 remain.

3              MR. WALSH:  Yes.

4              MR. BRETTSCHNEIDER: Yes.

5              THE COURT:  All right.  Now, the last two,

6         challenges, cause, People?

7              MR. WALSH:  I thought both of them indicated

8         that they could not be fair, Your Honor.  I would

9         challenge both for various reasons.

10             MR. BRETTSCHNEIDER: I think, I think they

11        both said they could be fair.

12             THE COURT:  Let's do one at a time.

13             Miss Edelman indicated that she felt she,

14        because of the intimidation of the charges, she

15        felt fear and that would influence her even

16        though she hedged on certain other things.

17             She mentioned that word "fear."  I'm going

18        to grant that.

19             MR. BRETTSCHNEIDER: I agree.  I forgot

20        about that.  I agree.

21             THE COURT:  All right.  That is for cause.

22             Now, Miss Branzinski (Ph.) is not

23        comfortable with the nature of the charge.  Not

24        sure if she could give a fair trial.  Worried

25        about making a decision on someone's life.
```

1    Peo. vs. Jackson

2              But she also said she had no bias.  So,

3         unless there's consent on that one that I will

4         not deny -- I will deny that one.

5              (Conference.)

6              MR. BRETTSCHNEIDER:  Consent.

7              MR. WALSH:  Consent.

8              THE COURT:  For cause, all right.  That

9         gives us three jurors.

10             We'll swear them and then we'll adjourn for

11        the day.

12             (Open court.)

13             THE CLERK:  Will the following please remain

14        seated.

15             (Indicated jurors excused.)

16             THE CLERK:  Are the remaining jurors

17        satisfactory to the People?

18             MR. WALSH:  Yes, your Honor.

19             THE CLERK:  Satisfactory to the defendant?

20             MR. BRETTSCHNEIDER:  Yes, your Honor.

21             (Jurors sworn.)

22             THE CLERK:  Please be seated.

23             THE COURT:  All right.  Now, to conduct your

24        deliberations in an orderly fashion you must have

25        a foreperson.

1  Peo. vs. Jackson

2              Of course, his or her vote is entitled to

3         greater weight than that of any other juror.

4         Under our law, the juror whose name was first

5         drawn and called must be designated by the Court

6         as the foreperson.

7              So, Mr. Diamond, you will be the Foreman of

8         the jury and will report the verdict in open

9         court.

10             And, Ma'am, after you've had the opportunity

11        to speak to your husband, if there's going to be

12        a problem that you need us to intervene with the

13        fire department to assist you at the time of

14        deliberations, please let us know as early as

15        possible so that we can start making those calls

16        up the line of command if we have to.

17             Ladies and gentlemen, that basically

18        concludes the proceedings for today.  I'm going

19        to give you the admonitions and the instructions

20        in a moment.

21             Tomorrow is a holiday.  It's Election Day.

22        Please, everybody remember to vote.  We meet

23        again on Wednesday.  Wednesday at 11 in the

24        morning.

25             Those jurors who have not yet been called in

Richard D. Glen, C.S.R.

1　Peo. vs. Jackson

2　　　the box, you'll be called into the box on

3　　　Wednesday.  Please bring your questionnaires back

4　　　with you at that time.

5　　　　　As to all of you, do not discuss the case

6　　　among yourselves or with others.

7　　　　　Do not read or listen to any accounts or

8　　　discussions of the case if it is reported by

9　　　newspapers or any other news media.

10　　　　Do not visit or view the premises or any

11　　　place where the offenses charged were allegedly

12　　　committed or any other premises or place involved

13　　　in the case.

14　　　　Promptly report to the Court any incident

15　　　involving any attempt by any person to influence

16　　　any member of the jury or to discuss the case.

17　　　　Do not form any opinions.  Keep an open mind

18　　　until the case is completed.

19　　　　Also, in the morning, the parking situation

20　　　gets very bad after 9:30.  So leave yourself

21　　　plenty of time to find a parking space.

22　　　　If you want to come early, there are various

23　　　restaurants across the street.  There's a coffee

24　　　shop downstairs.  I do not recommend nor do I say

25　　　don't go there.  I haven't eaten there in years.

Richard D. Glen, C.S.R.

```
 1    Peo. vs. Jackson

 2              I don't have any idea what they're serving.

 3              However, I ask you not to visit any other

 4         courtrooms while you are waiting to come in here,

 5         and I will not permit you to enter this courtroom

 6         until this case begins.

 7              Also, all of us who are participants in this

 8         trial, we're friendly, but if any of you should

 9         see us in the halls we cannot even discuss the

10         weather with you.  And that's to protect the

11         integrity of the case.

12              Have a good day off tomorrow, and we'll see

13         you Wednesday at 11.

14              (Jury out.)

15

16

17

18

19

20

21

22

23

24

25
```

```
1                                                            47

2    STATE OF NEW YORK  :  NASSAU COUNTY

3         COUNTY COURT PART I

4    - - - - - - - - - - - - - - - - - - - -x

5    THE PEOPLE OF THE STATE OF NEW YORK,    :

6                   -against-               :Ind. # 91607

7    JOSEPH JACKSON,                         :

8                         Defendant.         :

9    - - - - - - - - - - - - - - - - - - - -x

10                             November 6, 1996
                               262 Old Country Road
11                             Mineola, New York

12
     B E F O R E :
13
          HON. ABBEY L. BOKLAN,
14                        County Court Judge,
                                    and a jury
15

16   A P P E A R A N C E S:

17        HON. DENIS DILLON
          Nassau County District Attorney
18        BY:   MICHAEL WALSH, ESQ., of Counsel
               Assistant District Attorney
19                    for the People

20

21        SCOTT BRETTSCHNEIDER, ESQ.
                    for the Defendant
22

23          -Jury Selection and Trial Minutes-

24
                             JERRI KREVOFF, CSR, RPR
25                           Official Court Reporter
```

48

THE CLERK:   Case on trial, People vs. Joseph Jackson.

THE COURT:   Counsel, please approach.

(Whereupon the following side bar conference took place outside the hearing of the jury:)

THE COURT:   Counsel, I have just been handed a note.  I might have to send the other jurors out, so that your client can hear this, as well.  Judge Boklan, sworn juror, last name, Diamond, that's our foreman, juror has just been accepted at Fordham University.  Must move into Manhattan immediately.  Also has plane tickets for the day before Thanksgiving.  He would like to speak with you.

Counsel, do you want to go back and see whether your client wants to waive his right to be present at this.  Otherwise, I have to send the prospective jurors outside the door, and we'll do it in open Court.

MR. BRETTSCHNEIDER:   Why don't we do it in the open courtroom.

THE COURT:   Fine.  I'll have the two

1

2      other sworn jurors brought back into the

3      jury room.

4              (Whereupon the following took place

5      back within the hearing of the courtroom:)

6              THE COURT:  Ladies and gentlemen, I

7      have a note from one of the sworn jurors

8      that I have to handle in the courtroom,

9      outside the presence of the prospective

10     jurors, as well as the other sworn jurors.

11             I'm going to ask -- I'm sorry --

12     everybody seated in the back, to just step

13     outside the door for a couple of minutes.

14     My other sworn jurors, please just follow my

15     court officer.

16             (Whereupon the prospective jurors and

17     the sworn jurors left the courtroom, and the

18     following occurred in their absence:)

19             THE COURT:  All right.  Mr. Diamond, I

20     received your note.  I'm going to read it

21     into the record.

22             "Judge Boklan, the sworn juror, last

23     name, diamond, juror has just been accepted

24     at Fordham University.  Must move into

25     Manhattan immediately.  Also has plane

2    tickets for day before Thanksgiving, and

3    would like to speak with you."   It's signed

4    by Sergeant Scalisi.

5              Mr. Diamond, you can --

6              MR. DIAMOND:  I can talk?

7              THE COURT:  Yes.

8              MR. DIAMOND:  The other day, Monday

9    night, I applied to the MBA program at

10   Fordham.  I was accepted.  So that I have

11   orientation.  I have plans to move into the

12   City.  I also found out my parents made a

13   reservation for Thanksgiving, which I wasn't

14   aware of.

15             Unfortunately, I don't think I'll be

16   able to serve.  I have to register,

17   orientation and look for a place in the

18   City.  I have a letter.

19             THE COURT:  I'll take your word for it.

20   When does registration and orientation

21   start?

22             MR. DIAMOND:  The second week in

23   December.  Registration; registration is the

24   second week in December.

25             THE COURT:  What day?

1                                                            51

2              MR. DIAMOND:  I haven't accepted yet.

3        But I am.  Again, I got it Monday.  I have

4        to accept it.  After I accept, then I get

5        the material, registration materials, find

6        out when I have to go.

7              THE COURT:  If you just be seated for a

8        moment.  Counsel, when you're ready to make

9        a -- have a discussion with me at the Bench,

10       after you speak to your client, please

11       approach.

12             (The following sidebar conference took

13       place outside the hearing of the open

14       courtroom, in the presence of the Court and

15       both counsel:)

16             THE COURT:  What is your pleasure?

17             MR. BRETTSCHNEIDER:  What do you want

18       to do?

19             THE COURT:  Do you want to go off the

20       record?

21             MR. BRETTSCHNEIDER:  Yes.

22             (Whereupon there was a discussion off

23       the record)

24             THE COURT:  Mr. Brettschneider, you're

25       consenting to his removal?

1                                                                  52

2                    MR. BRETTSCHNEIDER:  Yes.  And I have

3          discussed this with my client, and he

4          agreed.

5                    THE COURT:  Mr. Walsh?

6                    MR. WALSH:  I consent, as well.

7                    (Whereupon the following took place

8          back within the hearing of the courtroom:)

9                    THE COURT:  Mr. Diamond, all

10         participants have consented to excuse you,

11         and with wishes for good luck in your

12         schooling.

13                   (Whereupon Juror #1 was excused)

14                   THE COURT:  Bring back all the jurors

15         and prospective jurors, please.

16                   (Whereupon the sworn jurors, and the

17         panel of prospective jurors were brought

18         into the courtroom, and the following took

19         place:)

20                   THE COURT:  Thank you, ladies and

21         gentlemen.  What had happened is,

22         Mr. Diamond, who, in fact, was our jury

23         foreman, has just been accepted at Fordham

24         University.  He found out yesterday.  He's

25         going to move into the City, immediately.

He will start his orientation and
registration.

So all participants have consented to
let him start his university career.  So
that Mrs. Longarden; you're now our
forewoman.  You will be reporting the
verdict of the jury.

We are now ready to continue with our
jury selection.  Let's please fill the box.

(Whereupon the jury box was filled with
fourteen people)

THE COURT:  Good morning, again, ladies
and gentlemen.  Do any of you know anything
about the case; other than what we have told
you?  Any of the prospective witnesses, any
of the participants at all; anyone?

Now, comes really the most important
question of all.  I should really always do
it first:  Do any of you know of any reason
you can't fairly and impartially sit in this
case?  Please approach, sir.

(Whereupon the following side bar
conference took place outside the hearing of
the open courtroom:)

54

THE COURT:  Yes, Mr. Basile?

MR. BASILE:  I have family who was convicted of crimes and stuff.  I don't think I could be giving a fair decision.

THE COURT:  You're excused.  Thank you.

(The following took place back within the hearing of the open courtroom:)

THE COURT:  Fill the seat, please.

(Whereupon the vacant seat was filled)

THE COURT:  Mrs. Shanley, can you fairly and impartially sit on the case?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Do know anything about the case, that we haven't told you?  Any of the prospective witnesses, any of the participants?

PROSPECTIVE JUROR:  No.

THE COURT:  Ms. Baldwin, please tell me about victim of a crime?

PROSPECTIVE JUROR:  My girlfriend was raped.

THE COURT:  How long ago?

PROSPECTIVE JUROR:  Four years.

THE COURT:  Anyone apprehended?

1

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  Was there a proceeding in

4         the case?

5              PROSPECTIVE JUROR:  Yes.

6              THE COURT:  Did you attend any of the

7         proceedings?

8              PROSPECTIVE JUROR:  No.

9              THE COURT:  Did you have any

10        discussions with your friend about the

11        proceedings?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  Anything about that

14        horrible incident, or the trial, or the

15        discussions that would affect your ability

16        to be fair in this case?

17             PROSPECTIVE JUROR:  No.

18             THE COURT:  Tell me about law

19        enforcement.

20             PROSPECTIVE JUROR:  My boyfriend is a

21        retired police officer, Marine Bureau,

22        Nassau County.

23             THE COURT:  Can you judge a police

24        officer the same as any other human being?

25        You don't decide in advance if you believe

1

2    or disbelieve them --

3          PROSPECTIVE JUROR:  Yes.  I have to

4    mention I was in the Police Academy for a

5    brief time.

6          THE COURT:  How long ago?

7          PROSPECTIVE JUROR:  Thirteen years.

8          THE COURT:  You never became a police

9    officer?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Anything that would affect

12    your ability to be fair in that experience?

13    I'm sure you learned your fellow students

14    were human beings just like the rest of us.

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Mr. Minerva, your wife is a

17    bookkeeper for what type of a firm?

18          PROSPECTIVE JUROR:  Village of New Hyde

19    Park.

20          THE COURT:  You served on a grand jury?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Was that state or federal?

23          PROSPECTIVE JUROR:  It was state.  In

24    the grand jury.

25          THE COURT:  That's a different

1

2    proceeding. the defense attorney doesn't

3    cross-examine. No Judge sits to make a

4    ruling. Can you assure me that duty will,

5    in no way, interfere with your ability to be

6    fair in this case?

7            PROSPECTIVE JUROR: Yes.

8            THE COURT: Tell me about victim of a

9    crime.

10           PROSPECTIVE JUROR: About twenty years

11   ago, my house was burglarized.

12           THE COURT: Anyone apprehended?

13           PROSPECTIVE JUROR: No.

14           THE COURT: Would that affect you in

15   this case?

16           PROSPECTIVE JUROR: No.

17           THE COURT: Tell me about law

18   enforcement.

19           PROSPECTIVE JUROR: I have a cousin who

20   is a retired New York City police officer,

21   on my wife's side. We have one uncle whose

22   son is a retired New York City police

23   officer and a son who is presently a Suffolk

24   County police officer.

25           THE COURT: Anything in those

1                                                                    58

2              relationships that would affect you in this

3         case?

4                   PROSPECTIVE JUROR:   No.

5                   THE COURT:   Can you judge a police

6         officer as a human being, the same as anyone

7         else?

8                   PROSPECTIVE JUROR:   Yes.

9                   THE COURT:   Mrs. Snider, have you ever

10        been employed outside of the home?

11                  PROSPECTIVE JUROR:   No.

12                  THE COURT:   Your husband's occupation,

13        prior to his retirement?

14                  PROSPECTIVE JUROR:   General contractor.

15                  THE COURT:   I see you have a child who

16        is a police officer.

17                  PROSPECTIVE JUROR:   Yes.

18                  THE COURT:   What jurisdiction?

19                  PROSPECTIVE JUROR:   Nassau.

20                  THE COURT:   Not the Homicide Bureau?

21                  PROSPECTIVE JUROR:   No.

22                  THE COURT:   Male or female?

23                  PROSPECTIVE JUROR:   Male.

24                  THE COURT:   Has he ever discussed cases

25        with you.

1

2          PROSPECTIVE JUROR:   No.

3          THE COURT:   Anything in the

4     relationship that would prevent you from

5     being fair?

6          PROSPECTIVE JUROR:   No.

7          THE COURT:   Can you judge a police

8     officer the same as anyone else who takes

9     the stand?

10         PROSPECTIVE JUROR:   I can.

11         THE COURT:   I see you have had jury

12    experience, both civil and criminal.   I

13    don't want to know the verdict in the

14    criminal.   Is that the one there was a

15    verdict in?

16         PROSPECTIVE JUROR:   Yes.

17         THE COURT:   What type of charge was

18    that?

19         PROSPECTIVE JUROR:   Setting off fire

20    alarms.

21         THE COURT:   Possession of firearms?

22         PROSPECTIVE JUROR:   No.   Setting off

23    fire alarms.

24         THE COURT:   Anything in that experience

25    that would prevent you from being fair in

1

2          this case?

3                  PROSPECTIVE JUROR:   No.

4                  THE COURT:   Anyone, other than your

5          son, involved in law enforcement?

6                  PROSPECTIVE JUROR:   No.

7                  THE COURT:   Mr. McKenna, you say

8          production editor.  For what type of an

9          organization?

10                 PROSPECTIVE JUROR:   Publishing firm.

11         We handle physics work.

12                 THE COURT:   Tell me about law

13         enforcement.

14                 PROSPECTIVE JUROR:   I have two cousins

15         who are police officers; one in Albany and

16         one, I think, retired from Nassau County.

17                 THE COURT:   Will you Judge the police

18         officers the same as anyone else who takes

19         the stand?

20                 PROSPECTIVE JUROR:   Yes.

21                 THE COURT:   Executive recruiter for

22         what type of firm?

23                 PROSPECTIVE JUROR:   For health care and

24         marketing areas.

25                 THE COURT:   I see that your wife is

1                                                        61

2              employed by a legal firm.  Do they practice

3              in the field of criminal law?

4                   PROSPECTIVE JUROR:  No.

5                   THE COURT:  You, sir, have served on a

6              grand jury?

7                   PROSPECTIVE JUROR:  Yes.

8                   THE COURT:  State or federal?

9                   PROSPECTIVE JUROR:  I don't recall.  I

10             think it was state.

11                  THE COURT:  Was it in this building?

12                  PROSPECTIVE JUROR:  Yes.

13                  THE COURT:  That's state.  It would

14             have been probably the assistant district

15             attorney from the Nassau County District

16             Attorney's Office presenting cases to you.

17             Of course, I spoke to our other prospective

18             jurors.  It's a very different proceeding.

19                  PROSPECTIVE JUROR:  Yeah.

20                  THE COURT:  Can you assure me there is

21             nothing in that experience that would affect

22             your ability to be fair in this case?

23                  PROSPECTIVE JUROR:  I can.

24                  THE COURT:  Tell me -- you had a car

25             stolen.  Anyone apprehended.

1                                                          62

2              PROSPECTIVE JUROR:  Not that I know of.

3              THE COURT:  Would that, in any way,

4         affect you?

5              PROSPECTIVE JUROR:  No.

6              THE COURT:  You had a brother who was a

7         former police officer?

8              PROSPECTIVE JUROR:  Yeah.  That was

9         over twenty years ago, in New York City.  He

10        served for about five years.

11             THE COURT:  Would you be affected by

12        that relationship?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  Can you judge a police

15        officer the same as any other human being?

16             PROSPECTIVE JUROR:  Yes, I can.

17             THE COURT:  You say you have a strong

18        anti-gun feeling.  Well, so do I.  That

19        doesn't affect my impartiality.  We are not

20        here to determine whether we are for or

21        against guns.  We are here to determine only

22        if the district attorney proves their case

23        beyond a reasonable doubt.

24             Can you assure me that your feelings

25        about handguns will not interfere with your

63

ability to be fair?

PROSPECTIVE JUROR:  I can't give you a guarantee.  It really depends on the situation.  I don't believe that citizens should have handguns.  How the handgun was used, or how it was obtained -- I really --

THE COURT:  I don't know if we are going to hear evidence about how a handgun was obtained.  Just that a handgun was used to kill someone.  We're not here to determine whether that's good or bad.  The legislature has determined it's bad to kill someone with a gun.

You are going to be here to determine if the district attorney can prove his case beyond a reasonable doubt; just on the facts of this case.  You have to shut out your feelings about guns, about everything else that doesn't have to do with the case in this courtroom.  Can you do that?

PROSPECTIVE JUROR:  I think so.

THE COURT:  I'm sure the attorneys will have some further questions for you.  You'll have the opportunity to think about it.

1

2           Mrs. Collins, you are a registered

3    nurse.  I have to ensure if there is medical

4    testimony, you will not become the resident

5    expert on the jury in medicine.

6           PROSPECTIVE JUROR:  No.

7           THE COURT:  I see that your husband is

8    a Lieutenant in the Police Department, New

9    York City.  Can you assure the participants

10    to this proceeding, and me, as well, that

11    you will not be affected by that

12    relationship in this case?

13           PROSPECTIVE JUROR:  Right.

14           THE COURT:  You're not going to worry

15    about, no matter what your verdict is,

16    whether it displeases or pleases anyone,

17    including your husband?

18           PROSPECTIVE JUROR:  Right.

19           THE COURT:  You will not decide in

20    advance to believe anyone, including a

21    police officer, a judge, a fireman.  Doesn't

22    matter who the person is, what the

23    employment title is.  You listen and use

24    your common sense.  Can you do that?

25           PROSPECTIVE JUROR:  Yes.

65

          THE COURT:  Any law enforcement people,
     other than your husband?

          PROSPECTIVE JUROR:  His brother is also
     a New York City policeman.

          THE COURT:  You would answer the same
     if I asked you those same questions
     regarding his brother?

          PROSPECTIVE JUROR:  Yes.  I have to say
     one thing.  He mentioned a car stolen.  I
     forgot about that.  My car was stolen about
     six years ago.

          THE COURT:  Would that affect your
     ability to be fair?

          PROSPECTIVE JUROR:  No.

          THE COURT:  Mrs. Kudak, your husband is
     in law school.  What year?

          PROSPECTIVE JUROR:  Finishing his third
     year.

          THE COURT:  Has he ever discussed with
     you, criminal law, constitutional law or
     procedures?

          PROSPECTIVE JUROR:  Yes.

          THE COURT:  Can you assure me you would
     put aside anything you learned in those

66

discussions and take the law as I give it to you?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Tell me about victim or witness to a crime?

PROSPECTIVE JUROR:  Witness to a crime in the subway.  I saw someone's jewelry being stolen.  My brother-in-law was shot at.

THE COURT:  Shot at; not hit?

PROSPECTIVE JUROR:  Not hit but shot at.

THE COURT:  Anything in either of those experiences that would prevent you from being fair in this case.

PROSPECTIVE JUROR:  No.

THE COURT:  When you were a witness to the taking of a chain, was anyone apprehended in that case.

PROSPECTIVE JUROR:  I don't know.

THE COURT:  You had no opportunity to testify in any proceeding.

PROSPECTIVE JUROR:  No.

THE COURT:  Tell me about law

67

2          enforcement.

3                  PROSPECTIVE JUROR:  I have two good

4          friends.  One is a cop -- was a cop.  He's

5          now a fireman.  The other one is a

6          correction officer in Mineola.

7                  THE COURT:  Anything in any of your

8          discussions, your relationships with these

9          individuals, that would affect your ability

10         to be fair?

11                 PROSPECTIVE JUROR:  No.

12                 THE COURT:  Mr. Arsteri, you are a

13         police officer, yourself?

14                 PROSPECTIVE JUROR:  Yes.

15                 THE COURT:  Where?

16                 PROSPECTIVE JUROR:  I'm a sergeant in

17         New York City, Brooklyn.

18                 THE COURT:  Have you ever been involved

19         in any homicide investigations.

20                 PROSPECTIVE JUROR:  Yes.

21                 THE COURT:  Do you understand that if

22         you are chosen for this jury, you can't put

23         yourself forward as an expert in any sort of

24         investigative techniques?

25                 PROSPECTIVE JUROR:  Yes.

1                                                                68

2                THE COURT:  Can you judge a police

3        officer the same as any other human being

4        who takes the stand?

5                PROSPECTIVE JUROR:  Yes, I could.

6                THE COURT:  Tell me about victim and

7        witness to a crime.

8                PROSPECTIVE JUROR:  A lot of

9        situations.

10               THE COURT:  In your capacity as a

11       police officer?

12               PROSPECTIVE JUROR:  Right.

13               THE COURT:  Did you testify, yourself,

14       in any proceedings?

15               PROSPECTIVE JUROR:  Yes.

16               THE COURT:  You testified before the

17       grand jury?

18               PROSPECTIVE JUROR:  Yes.

19               THE COURT:  You know it's very

20       different from a trial.  Did you testify at

21       a trial?

22               PROSPECTIVE JUROR:  Yes.

23               THE COURT:  Can you assure me you're

24       not going to favor one side or another;

25       because you, yourself, may have had the

1                                                                      69

2              opportunity to work with the assistant

3              district attorney, on the direct examination

4              of you, or perhaps a defense attorney

5              cross-examine you; none of those things will

6              affect your ability to be fair.

7                   PROSPECTIVE JUROR:  Yes.

8                   THE COURT:  Mrs. Henshe, what do you

9              teach?

10                  PROSPECTIVE JUROR:  Third grade.

11                  THE COURT:  I don't remember if you

12             ever approached the Bench about the

13             responsibilities of and staying overnight.

14             What's the problem about being sequestered?

15                  PROSPECTIVE JUROR:  We're in the

16             process of selling our house.  We are buying

17             another house.  I have an eleven year old

18             child who I can't leave in a strange house

19             in a strange neighborhood alone after

20             school.

21                  THE COURT:  When are you due to move?

22                  PROSPECTIVE JUROR:  Probably, by

23             December 15th.

24                  THE COURT:  There's no one who could

25             assist you in that?

                    jerri krevoff, csr, rpr

1

2          PROSPECTIVE JUROR:   I have my

3     stepfather.   I don't know if he would be

4     available.

5          THE COURT:   We are hoping, of course,

6     to be finished in around that time.   There's

7     never a guarantee.   If you are chosen for

8     the jury, would you be able to manage for a

9     couple of days?

10          PROSPECTIVE JUROR:   Yes.

11          THE COURT:   You're willing to serve?

12          PROSPECTIVE JUROR:   Yes.

13          THE COURT:   Mr. Ninn, you are a

14     financial controller for what type of firm

15     or organization?

16          PROSPECTIVE JUROR:   Consumer goods.

17          THE COURT:   Tell me about victim of a

18     crime.

19          PROSPECTIVE JUROR:   My parents were

20     mugged.

21          THE COURT:   How long ago?

22          PROSPECTIVE JUROR:   About five years.

23          THE COURT:   Anyone apprehended?

24          PROSPECTIVE JUROR:   No.

25          THE COURT:   Was there a handgun used?

1

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  Anything in that experience

4      that would affect your ability to be fair?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Tell me about law

7      enforcement?

8          PROSPECTIVE JUROR:  My cousin is an FBI

9      agent.

10         THE COURT:  Anything in that

11     relationship that would affect you?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  Can you judge a police

14     officer the same as any other human being?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Mrs. Burrows, prior to your

17     being a homemaker, what did you teach.

18         PROSPECTIVE JUROR:  Social studies,

19     seventh and eight grade.

20         THE COURT:  Your husband, prior to his

21     retirement, what did he sell?

22         PROSPECTIVE JUROR:  Plastic bags.

23         THE COURT:  Tell me about victim of a

24     crime.

25         PROSPECTIVE JUROR:  Two.  My husband

1

2      was mugged at gunpoint four years ago.  And

3      a very close friend of ours was beaten to

4      death two years ago.

5           THE COURT:  Let's start with your

6      husband being robbed by someone with a gun.

7      You heard there is an allegation of a gun in

8      this case.  I want to make sure what

9      happened to your husband, and of course, in

10      the other case, won't carry over to this

11      case.

12           PROSPECTIVE JUROR:  I'm not sure.

13           THE COURT:  Then I can't take a

14      chances.  You're excused.

15           Fill the seat.

16           (Whereupon the vacant seat was filled)

17           THE COURT:  Ms. Abraham, I remember

18      that you had come up to the Bench.  You were

19      very reluctant to stay here with us.  All

20      sorts of problems.  I kind of coerced you a

21      little.

22           Now that you're in the box, I want to

23      make sure you will not be a reluctant juror.

24      That you'll be able to stay, if chosen.

25           PROSPECTIVE JUROR:  Yes.

jerri krevoff, csr, rpr

1

2              THE COURT:   You can put aside all your

3         problems?

4              PROSPECTIVE JUROR:   Yes.

5              THE COURT:   Do you know any of the

6         participants to the proceedings, or any of

7         the witnesses?

8              PROSPECTIVE JUROR:   No.

9              THE COURT:   Do you know anything about

10        the case, other than what we have told you?

11             PROSPECTIVE JUROR:   No.

12             THE COURT:   Can you be a fair and

13        impartial juror?

14             PROSPECTIVE JUROR:   Yes.

15             THE COURT:   Your husband is a manager

16        of what type of a firm?

17             PROSPECTIVE JUROR:   Supermarket.

18             THE COURT:   You served on a grand jury?

19             PROSPECTIVE JUROR:   Yes.

20             THE COURT:   Was it federal or state?

21             PROSPECTIVE JUROR:   I think it's the

22        state.

23             THE COURT:   Here, in this building?

24             PROSPECTIVE JUROR:   No.  In Queens.

25             THE COURT:   Can you assure me that

those experiences will not carry over to
this case?

PROSPECTIVE JUROR:  Yes.

THE COURT:  You're willing to be
sequestered?

PROSPECTIVE JUROR:  Yes.

THE COURT:  I don't mean to ignore you,
but I have no questions for you,
Mrs. Shannon.

Mr. Gallagher, I see one of your
children is an attorney.  Male or female?

PROSPECTIVE JUROR:  Male.

THE COURT:  Does he or did he, ever
practice in the field of criminal law?

PROSPECTIVE JUROR:  No.

THE COURT:  When he was in law school,
did he ever discuss with you criminal law,
or procedure?

PROSPECTIVE JUROR:  No.  I mentioned to
him -- I mentioned to him one time about his
studies.  He said, going fine.  But I don't
want to discuss it.

THE COURT:  Mrs. Silk, what do you
teach?

1

2          PROSPECTIVE JUROR:  Fourth grade.

3          THE COURT:  You indicate that a close

4   friend was in law enforcement.  Would that

5   affect your ability to be fair?

6          PROSPECTIVE JUROR:  I don't think so.

7          THE COURT:  You'll judge a police

8   officer the same as anyone else?

9          PROSPECTIVE JUROR:  Yes.

10         THE COURT:  I think you had come up and

11  discussed with me the problems about staying

12  overnight; had you not?

13         PROSPECTIVE JUROR:  I don't think I

14  discussed the problems of staying overnight

15  with you, no.  I don't believe so.

16         THE COURT:  Do you have problems?

17         PROSPECTIVE JUROR:  I do.  I don't have

18  any child care overnight.

19         THE COURT:  What about your husband?

20         PROSPECTIVE JUROR:  As you see, he's a

21  principal.  A lot of the times, he has

22  meetings at night.  Almost four out of five

23  nights a week, he's not home until late.  He

24  just stays sometimes.

25         THE COURT:  You can't -- you have no

1

2      one to stay with your young children?

3   A   I have nobody around.

4          THE COURT:  It could be that you're

5      sequestered.  I have to excuse you.  Thank

6      you.

7          Fill the empty seat.

8          We only have three remaining jurors in

9      the audience.  We are going to call you into

10     those three seats we have just arranged.

11     Wait until yours names are called.

12         (Whereupon the remaining seats were

13     filled)

14         THE COURT:  To the four of you just

15     seated, can you all the be fair and

16     impartial?  No; and one maybe.

17         Please approach.

18         (Whereupon the following side bar

19     conference took place outside the hearing of

20     the jury panel:)

21         THE COURT:  Mr. Hurt, please approach.

22         PROSPECTIVE JUROR:  My girlfriend was

23     mugged, or my fiancee.  Mugged at

24     knifepoint.  I don't think I can be

25     impartial.

```
 1                                                        77

 2              THE COURT:  You're excused.  Just wait

 3         on the side for a minute.

 4              All right.  Now, Ms. Versaci.  Yes.

 5              PROSPECTIVE JUROR:  In college, my car

 6         got stolen.  I went to St. John's

 7         University.  It was a mixed crowd.

 8              THE COURT:  You mean, racially mixed?

 9              PROSPECTIVE JUROR:  Yes.  My wallet was

10         stolen from work.  My father has his

11         business robbed; my house was robbed;

12         several things I am not very comfortable

13         with.  I don't think I could be impartial.

14              THE COURT:  Thank you.

15              All right.  Now, Mr. Bescar.

16              PROSPECTIVE JUROR:  Yes.

17              THE COURT:  Your hand went up, but kind

18         of hesitantly.

19              PROSPECTIVE JUROR:  I was thinking

20         about whether I could be impartial in this

21         jury.  I, myself, have been a victim of a

22         crime.  My wife has been a victim of a

23         crime.  In both cases, the people involved

24         were black young males.  Just, I probably

25         have a point of view, that could get me
```

1                                                          78

2              away --

3                    THE COURT:   You're excused.

4                    Thank you for your candor.

5                    (Whereupon the following took place

6              back within the hearing of the open

7              courtroom)

8                    THE COURT:   Mr. Alcade, do you know

9              anything about the case; any of the

10             prospective witnesses, or the participants?

11                   PROSPECTIVE JUROR:   No.

12                   THE COURT:   Now, we're all together

13             again.   Do any of you have any friends or

14             relatives or, in fact, do you have any cases

15             pending before the District Attorney's

16             Office or the Police Department?

17                   As jurors, your verdict must be

18             unanimous.   When it comes time to

19             deliberate, it's your duty to express your

20             views; listen to the views of your fellow

21             jurors and be an active participant in the

22             deliberations.

23                   Can everyone promise all of us that you

24             can do that?   Anyone who can't?

25                   Now, we'll move to some of the

1

2    questions on the law. Every person accused

3    of a crime is presumed innocent; that is, he

4    stands innocent in the eyes of the law. The

5    People must rebut this presumption, if they

6    can, by the presentation of evidence which

7    convinces you beyond a reasonable doubt of

8    the defendant's guilt.

9        In a criminal case, the burden of proof

10    is on the People, remains on the People

11    throughout the trial. The defendant is not

12    required to prove or disprove anything.

13        As I mentioned to the other jurors, if

14    defense counsel chose to sit there silently

15    throughout the trial, he could do that.

16        Can you all accept the presumption of

17    innocence, the burden of proof?

18        I will explain at the close of the

19    case, the meaning of reasonable doubt. But

20    you will be required to acquit if, at the

21    end of the case, because of the evidence or

22    the lack of evidence presented to you, you

23    have a reasonable doubt as to guilt.

24        Can you all accept the standard of

25    proof in all criminal cases? Everyone?

80

Are there any who would hold the People
to a higher standard of guilt than that
required by law?

Sympathy, thoughts of punishment, those
thoughts do not belong in the jury room.
Can you all promise me that you will put
aside any sympathies, sympathy for the
defendant, or the victim's family, thoughts
of punishment; can you put those things
aside?

The defendant is not obligated to take
the witness stand or call any witnesses, or
explain his actions, in any way.  You must
not draw any inference unfavorable to the
defendant from this fact.

Are there any of you who will or might
allow the fact that the defendant may not
testify, to influence you in your
deliberations?  If so, just raise your hand.

Are there any of you who have any
feelings about the police that would give
you -- excuse me -- that would cause you to
give a police officer any greater
credibility or any less credibility before

```
 1
 2            even listening?
 3                    Thank you.  Mr. Walsh, you may proceed.
 4                    PROSPECTIVE JUROR:  Judge, I also had
 5            my car stolen.
 6                    THE COURT:  How long ago?
 7                    PROSPECTIVE JUROR:  About four years
 8            ago.
 9                    THE COURT:  Would that affect you in
10            this case?
11                    PROSPECTIVE JUROR:  No.
12                    MR. WALSH:  I intend to be a lot
13            briefer than yesterday.  Everybody heard the
14            comments that I made, that
15            Mr. Brettschneider made yesterday.  I'm
16            going to go through as quickly as I possibly
17            can.
18                    Yesterday, one of the first questions I
19            asked was whether or not the nature of the
20            charges in this case that you heard the
21            indictment, murder in the second degree,
22            intimidating a victim or a witness,
23            hindering prosecution, I asked you whether
24            those charges, or the nature of the case,
25            caused anyone to feel they would be unable
```

jerri krevoff, csr, rpr

1

2    to sit on this jury, or to be fair and

3    impartial.  Is there anyone who feels that

4    way?

5         Mr. McGuire, I'm going to come back to

6    you.  I know one of the last things the

7    Judge said to you was, you'll have a little

8    time to think.  Maybe you can come up with

9    something definitive.  Maybe you can't.

10   Your answer may very well be, I don't know

11   if I can be fair and impartial.  If that's

12   your answer, that's the way you feel.

13   You've had a little time to think.

14        PROSPECTIVE JUROR:  It hasn't help me

15   verbalize it better.  It's an emotional

16   thing.  I feel that --

17        THE COURT:  Just speak up a little

18   louder.

19        PROSPECTIVE JUROR:  I have a cold.  I

20   just feel that civilians shouldn't have

21   handguns or anything that can kill another

22   human being, or anything for that matter.  I

23   don't have any experience with it.  It's

24   just something that I support in

25   associations and groups.  I'm as active as I

jerri krevoff, csr, rpr

1
2    can be.

3          MR. WALSH:  You may have heard me say,

4    on Monday, I don't think there's anybody

5    here who is in favor of people using

6    handguns to hurt other people.  I think you

7    had commented, well, it depends on how the

8    handguns were used or obtained.  You know

9    what the indictment charges, and what Judge

10   Boklan said to you.  The defendant is

11   charged with using a handgun and shooting

12   and killing someone.

13         Now, bear in mind that I have to prove

14   this to you.  As I said, I don't think

15   there's anybody here, in this courtroom, who

16   is in favor of shooting or killing people

17   with a handgun.  The question though, is,

18   whether or not the defendant, in fact, shot

19   and killed someone with a handgun and

20   whether I could prove that to you beyond a

21   reasonable doubt.

22         PROSPECTIVE JUROR:  Right.

23         MR. WALSH:  If he didn't do it, if I

24   can't prove to you that the defendant shot

25   and killed somebody with a handgun, do you

84

think that your feelings are such that you
might be likely to hold me to possibly a
lesser burden than I have, because of your
feelings about handguns?  In other words, is
there a danger --

PROSPECTIVE JUROR:  These are two
separate issues.  My feeling is that if
you -- I don't want to get into your case.
If you can't tie him to the gun, then that's
going to be probably leaning toward a not
guilty verdict.

If you can tie him to the gun, and you
prove it to me, with evidence and so on, I'm
going to vote that way.

MR. WALSH:  That's exactly what I'm
getting as at.  The bottom line is this:  I
would like to have twelve jurors who are of
the mindset that if I prove my case to you
beyond a reasonable doubt, you can walk back
in this courtroom, look at the defendant and
find him guilty of second degree murder.

If I don't prove my case beyond a
reasonable doubt, then you walk into the
courtroom, stand up and tell the defendant,

1                                                              85

2          he's not guilty.

3                Whatever your verdict is, what I would

4          like to be sure of, if I could possibly be,

5          and I would like you to be sure of, that

6          your verdict will be based on the evidence

7          in the case, and only the evidence, without

8          regard to any outside feelings or influences

9          you may have.

10               PROSPECTIVE JUROR:  I can give you that

11         assurance.

12               MR. WALSH:  Thank you.  Sir, you're

13         currently a sergeant in the New York City

14         Police Department.

15               PROSPECTIVE JUROR:  Yeah.

16               MR. WALSH:  Where do you work?

17               PROSPECTIVE JUROR:  Brooklyn.

18               MR. WALSH:  You're going to -- you

19         heard the witness list read?

20               PROSPECTIVE JUROR:  Yes.

21               MR. WALSH:  Probably over half the

22         names were police officers.  You are

23         certainly, if chosen as a jury, going to

24         listen to police officers testify.  Do you

25         believe, as you sit here now, that a police

officer is any more likely to tell the truth
on the witness stand than anyone else?

PROSPECTIVE JUROR:  No.

MR. WALSH:  After this case is over --
say you're chosen as a juror, and the case
is over, you're going to go back to work, in
the New York City Police Department.  And
you'll possibly discuss what happened with
some of the people you work with.  In your
position, Sergeant in the Police Department,
you may have to go back, and if you find the
defendant not guilty, tell your fellow
officers that you came in here on a murder
trial and found the defendant not guilty.
If that happens, will you be able to do
that?

PROSPECTIVE JUROR:  Yes.

MR. WALSH:  You feel that you could
give both sides a fair shake; People and the
defendant?

PROSPECTIVE JUROR:  Yes.

MR. WALSH:  I'm sure Mr. Brettschneider
will be interested in this.  Does he have
anything to worry about, that he has a juror

1                                                          87

2              who won't give his client a fair shake?

3                   PROSPECTIVE JUROR:  No.

4                   MR. WALSH:  A number of you said you

5              had friends or relatives who were in law

6              enforcement.  I won't talk to everybody.

7                   Ms. Collins, your husband is a

8              Lieutenant in the New York City Police

9              Department.  I'll ask you the same question

10             that Judge Boklan alluded to.  This case is

11             over, you go home and speak to your husband.

12             Are you going to be reluctant to come to a

13             verdict in this case, that's going to cause

14             you some difficulty in going back and

15             speaking to your husband?

16                  PROSPECTIVE JUROR:  I don't think so.

17             I think he thinks of me as a fair person.

18                  MR. WALSH:  I'll ask you the same

19             question I did Mr. McGuire.  Whatever your

20             verdict is, do you feel confident that your

21             verdict will be based on the evidence, and

22             nothing else; but whether or not I prove the

23             case?

24                  PROSPECTIVE JUROR:  Yes.

25        Q    Mr. McKenna, how about yourself?  Two

                    jerri krevoff, csr, rpr

1

2 cousins in law enforcement.

3                   PROSPECTIVE JUROR: Yes.

4                   MR. WALSH: Do you agree with

5 Ms. Collins and Mr. McGuire: Whatever your

6 verdict is, it will be based on the

7 evidence, and nothing but the evidence?

8                   PROSPECTIVE JUROR: Yes.

9                   MR. WALSH: Ms. Schneider, you said I

10 think, you sat on a criminal jury. Was that

11 in Nassau County?

12                   PROSPECTIVE JUROR: Yes.

13                   MR. WALSH: Police officers testified

14 in that case?

15                   PROSPECTIVE JUROR: Yes -- no. I don't

16 remember.

17                   MR. WALSH: It's good that you don't

18 remember. My next question was, were you

19 left with any particular feelings one way or

20 the other about police officers.

21                   PROSPECTIVE JUROR: No.

22                   MR. WALSH: Do you feel you could give

23 both sides a fair shake in this case?

24                   PROSPECTIVE JUROR: Yes.

25                   MR. WALSH: Mr. Manerva, I think you

1                                                                89

2          said you sat on a grand jury?

3                 PROSPECTIVE JUROR:  Yes.

4                 MR. WALSH:  Was that a state grand

5          jury?

6                 PROSPECTIVE JUROR:  It was in

7          Riverhead.  I believe it was state.

8                 MR. WALSH:  You heard the district

9          attorney present evidence on various cases?

10                 PROSPECTIVE JUROR:  Yes.

11                 MR. WALSH:  Did you hear police

12          officers testify?

13                 PROSPECTIVE JUROR:  Yes.  They were

14          regular police officers, undercover drug

15          cases.

16                 MR. WALSH:  Did that experience leave

17          you with any feelings about police officers?

18                 PROSPECTIVE JUROR:  No.

19                 MR. WALSH:  Ms. Baldwin, you were in

20          the police academy.  Could you give either

21          side a fair trial?

22                 PROSPECTIVE JUROR:  Yes.

23                 MR. WALSH:  On Monday, I asked a few

24          jurors a series of questions about the

25          victim in this case.  Ms. Shanley, Judge

1                                                    90

2          Boklan didn't ask you any questions.  I'll

3          pick on you.  Remember I asked, the other

4          day, does it matter to you in this case,

5          whether the victim was black or white.  How

6          do you feel about that?  Does it matter to

7          you whether he's young or old, male or

8          female.

9               PROSPECTIVE JUROR:  No.

10               MR. WALSH:  It doesn't affect whether

11          or not I can prove my case to you beyond a

12          reasonable doubt.  Who the victim is, who he

13          might have been during the course of his

14          life, doesn't change what the defendant

15          either did or didn't do.  Agreed?

16               PROSPECTIVE JUROR:  Agreed.

17               MR. WALSH:  If I were to tell you, or

18          if you were to find out during the course of

19          the case, that the victim sold drugs during

20          the course of his life, does that change

21          your opinion?

22               PROSPECTIVE JUROR:  No.

23               MR. WALSH:  Same reason:  It doesn't

24          affect whether or not the defendant

25          committed this crime or not.  The reason I

ask these questions, is because I am

concerned that there will be somebody on the

jury that will tend to take this case less

seriously because of who the victim was; or

who anybody else was, in this case.

Let me ask a general question of

everyone:  If anybody were to find out that

the victim in this case sold drugs during

the course of his life, or there was

something about the victim you didn't like,

does anybody here feel they would take the

case less seriously than they otherwise

would?

Again, I get back to the same thing I

said before.  It's so important.  Whatever

your verdict is in this case, whether it's

guilty or not guilty, do I have everybody's

assurances that your verdict will be based

on what the evidence is, and not any outside

influence; such as the ones we were talking

about; whether it's sympathy or anger, or

who the victim is or isn't.  Or possibly,

Mr. McGuire, like you said, feelings that

you have about issues of guns and whether

1                                                                    92

2              people should own them.  The question is

3              whether or not the charges are proven beyond

4              a reasonable doubt.

5                   Remember Judge Boklan said, you are a

6              fact-finding body.  You're here to determine

7              what happened.  And you do that by listening

8              to, and seeing the evidence in the case.

9              Everybody's verdict will be based upon the

10             evidence and nothing else?

11                  Thank you.

12                  THE COURT:  Thank you.

13        Mr. Brettschneider.

14                  MR. BRETTSCHNEIDER:  Good morning,

15        everybody.  One of the things I guess that

16        we talked about on Monday, was whether you

17        had to hear two sides of a story in a

18        particular case.

19                  Of course, the Judge has already

20        instructed you that the law is that the

21        defendant has no burden of proof and doesn't

22        have to present any witnesses.  Does anybody

23        feel opposite to what the law is.

24        Basically, the question I'm asking is, can

25        you follow the law; or is there something

1

2          inside of you that says I need to hear

3          another side of the story.

4              What about you, Mr. Alkay?  Can you

5          just hear the prosecution's case; make a

6          decision, not hear from the defendant, not

7          hear any witnesses on the defendant's

8          behalf, and still be able to find the

9          defendant not guilty?

10             PROSPECTIVE JUROR:  Yes.

11             MR. BRETTSCHNEIDER:  Why do you feel

12         that way?

13             PROSPECTIVE JUROR:  I have to just go

14         according to the proof that he shows me.

15             MR. BRETTSCHNEIDER:  Mr. Gallagher, the

16         same question.

17             PROSPECTIVE JUROR:  Same answer.

18             MR. BRETTSCHNEIDER:  Certainly, you

19         know, in these situations, you're going to

20         see witnesses.  Witnesses are going to have

21         different motivation as to whether they're

22         telling the truth, or not telling the truth.

23         Mr. Gallagher, in your experience, have you

24         known someone to lie to you, and not

25         understand the motive behind that person not

1

2 telling the truth?

3 　　　PROSPECTIVE JUROR:  Probably, I have.

4 Nothing that I can remember.  I'm sure I

5 have.

6 　　　MR. BRETTSCHNEIDER:  Is it possible

7 that somebody can swear to tell the truth,

8 get up on the witness stand and not tell the

9 truth?

10 　　　PROSPECTIVE JUROR:  Yes, sir.

11 　　　MR. BRETTSCHNEIDER:  Have there been

12 situations in your life, where you dealt

13 with someone, whether in business or your

14 own person life, in which you started

15 talking with the person.  They tell you a

16 story, one day.  Then you see them maybe a

17 few weeks later.  They tell you something

18 completely different than what they told

19 you.  What do you feel about that person's

20 credibility, as to whether they told you the

21 truth the first time or the second time?

22 　　　PROSPECTIVE JUROR:  I probably would

23 have doubt --

24 　　　THE COURT:  I'm sorry.  We can't hear

25 you.

PROSPECTIVE JUROR:  I probably would have doubts about their story, if I ever had to speak to them about something again.

MR. BRETTSCHNEIDER:  Mr. Shandley, basically, the same question:  If a witness gets on the witness stand and testifies to one thing, or they told somebody something on one day, and then they're brought back a couple of days or a week later, and asked to tell the story again, and they tell a different story, what would you feel about that witness's credibility?

PROSPECTIVE JUROR:  I could not believe him, if he keeps changing the story.

MR. BRETTSCHNEIDER:  Do you think -- you know, certainly, there's always going to be variations on story.  If you think if somebody tells a story one time, and then they tell it another time, and then a third story, that they may have a motive behind what they're saying, to lie?

PROSPECTIVE JUROR:  Yes.

MR. BRETTSCHNEIDER:  Ms. Abraham, one of the things I think the Judge asked you

1

2     about was, there were circumstances on

3     Monday, in which you said you weren't sure

4     you could be a juror, because of a personal

5     situation.

6          PROSPECTIVE JUROR:  It's not a personal

7     situation.  It was my job.

8          MR. BRETTSCHNEIDER:  That's all cleared

9     up?

10         PROSPECTIVE JUROR:  Yeah.

11         MR. BRETTSCHNEIDER:  If you had to stay

12    until the beginning of December, or

13    mid-December, you could give your full

14    attention to this case?

15         PROSPECTIVE JUROR:  Yes.

16         MR. BRETTSCHNEIDER:  Let me ask you a

17    question, with regard to your own position,

18    your own work.  In your work, you have to

19    deal with a lot of different people?

20         PROSPECTIVE JUROR:  Yes.

21         MR. BRETTSCHNEIDER:  As far as being

22    able to do a competent job, do you have to

23    trust other people, as far as what they tell

24    you is the truth; and you have to rely on

25    them as to whether you can efficiently do

1

2       your job?

3               PROSPECTIVE JUROR:  Yes.

4               MR. BRETTSCHNEIDER:  If somebody lied

5       to you -- well, let me ask you this:

6       Somebody gets on the witness stand, swears

7       they're going to tell the truth, are you

8       going to automatically believe they're

9       telling the truth?

10              PROSPECTIVE JUROR:  No.  I have to have

11      evidence.

12              MR. BRETTSCHNEIDER:  Mr. McKenna,

13      Mr. Jackson sits here, he's presumed

14      innocent.  The fact that he is sitting here

15      as a defendant, certainly, something that is

16      probably unusual to most of us.  Is that, in

17      any way, the fact that he's just here and

18      accused of a crime, somehow going to say to

19      you, well, they say he's presumed innocent.

20      But he's here.  How do you feel about that?

21              PROSPECTIVE JUROR:  Just the fact that

22      he's sitting here, doesn't prove that

23      anything happened in his particular case.  I

24      would have to see proof that he was

25      responsible for the crimes he's accused of.

1                                                              98

2                    MR. BRETTSCHNEIDER:  Ms. Schneider,

3          same situation.  The fact is, someone has

4          accused Mr. Jackson of extremely, extremely

5          serious crimes.  He's sitting here, he's in

6          Court, on trial.  The old expression is, you

7          know, where there's smoke, there's fire.

8          The fact that he's here, how do you feel?

9                    PROSPECTIVE JUROR:  I find it

10         disturbing.

11                   MR. BRETTSCHNEIDER:  Disturbing to the

12         point where you may feel that you can't be

13         fair; or that the expression, or what is the

14         law, that he's presumed innocent, somehow

15         that would be a problem?

16                   PROSPECTIVE JUROR:  I couldn't accept

17         the responsibility of finding someone guilty

18         or not guilty.  I just have a problem with

19         that.

20                   MR. BRETTSCHNEIDER:  Ma'am, I mentioned

21         that you've had discussions about the law.

22         Certainly, the law, as it's going to be

23         given to you, may be different than even

24         discussions that lawyers have about these

25         things.

1                                                          99

2            Mr. Jackson is sitting here.  He's

3       accused of very serious crimes.  How do you

4       feel about that?  Do you -- the concept and

5       the law is, that he's presumed innocent.

6       Does that, in any way, the fact that he's

7       sitting here, he's accused of this crime,

8       have any influence on you?

9            PROSPECTIVE JUROR:  No.  I don't

10      understand someone not speaking on their

11      behalf.

12           MR. BRETTSCHNEIDER:  Do you remember, I

13      guess, the concept or the hypothetical that

14      I gave on Monday.  Witness number one gets

15      on the stand.  Using your life's experience,

16      common sense, you say, witness number one

17      isn't telling the truth.

18           Then witness number two gets on the

19      stand, and you don't believe that witness.

20      Then witness number three gets on the stand.

21      He tells an entirely different story from

22      witness number one and two.  The district

23      attorney sits down and says, I rest.

24           Based on the fact that the law says

25      that the district attorney has to prove his

jerri krevoff, csr, rpr

1

2        case to a jury, beyond a reasonable doubt,

3        the Judge instructs you that this is the

4        law, and asks you to go in and deliberate.

5        Based on the fact that what you heard, what

6        was presented to you, what the evidence was,

7        was such that you didn't believe any of

8        these witnesses. Could you then find

9        Mr. Jackson not guilty?

10            PROSPECTIVE JUROR: Yes.

11            MR. BRETTSCHNEIDER: If you did didn't

12       hear from him, based on the scenario I gave

13       you, could you find him not guilty?

14            PROSPECTIVE JUROR: Yes.

15            MR. BRETTSCHNEIDER: Ms. Baldwin, same

16       question. Certainly, I mean, we have

17       always -- we grow up. If there's a fight

18       between kids or siblings, or -- it's always,

19       you know, what's your story; what is your

20       story. Can you abide by the law which says

21       that the defendant doesn't have to testify?

22            PROSPECTIVE JUROR: Definitely.

23            MR. BRETTSCHNEIDER: If you didn't hear

24       anything on his behalf, and had to just

25       depend on the witnesses for the prosecution,

1                                                          101

2              could you make a determination in this case?

3                       PROSPECTIVE JUROR:  Yes.

4                       MR. BRETTSCHNEIDER:  Could you find

5              Mr. Jackson not guilty, if the prosecution

6              didn't prove his case?

7                       PROSPECTIVE JUROR:  Definitely.

8                       MR. BRETTSCHNEIDER:  You mentioned that

9              you were in the Police Academy and your

10             boyfriend is an ex-police officer.  I'm not

11             going to ask you the reason why you decided

12             not to become a police officer.  Do you

13             ever, you know, discuss between you and your

14             boyfriend, things that may have happened in

15             his career?  You have a certain --

16                      PROSPECTIVE JUROR:  He's retiring in a

17             week.

18                      MR. BRETTSCHNEIDER:  You really never

19             had -- that won't have any influence?

20                      PROSPECTIVE JUROR:  No.

21                      MR. WALSH:  Sir, before you were a

22             sergeant in Brooklyn, where else did you

23             work within the police department?

24                      PROSPECTIVE JUROR:  Bronx and Queens.

25                      MR. BRETTSCHNEIDER:  Where were you in

102

Queens?

       PROSPECTIVE JUROR:  The 110th Precinct.

       MR. BRETTSCHNEIDER:  How long were you there?

       PROSPECTIVE JUROR:  Four years.

       MR. BRETTSCHNEIDER:  When were you switched over to Brooklyn?

       PROSPECTIVE JUROR:  June.

       MR. BRETTSCHNEIDER:  I mean, certainly, you know, one of the things that Mr. Walsh mentioned, certainly a concern is, there's going to be police officers testifying.  The question really is, a police officer gets on the stand and testifies.  If a police officer gets on the stand, would you think that somehow he would not have a motive to lie?

       PROSPECTIVE JUROR:  No.

       MR. BRETTSCHNEIDER:  Could you explain to me, you know, your thoughts on a police officer as a witness.

       PROSPECTIVE JUROR:  Well --

       MR. BRETTSCHNEIDER:  You've testified before?

1

2          PROSPECTIVE JUROR:  Yes.

3          MR. BRETTSCHNEIDER:  You must have

4    discussed cases with other police officers.

5    Have you ever known a police officer to take

6    the stand and not tell the truth?

7          PROSPECTIVE JUROR:  You never hear

8    another person actually testify.

9          MR. BRETTSCHNEIDER:  Well, you've had

10   discussions with other people.  I mean, is

11   there ever a situation where you say, you

12   know --

13         PROSPECTIVE JUROR:  Well, I have

14   cops -- have cops lied in their testimony?

15   Yes.  We all know that.  You know, you're

16   outside a room when other people actually

17   testify.

18         MR. BRETTSCHNEIDER:  Certainly, as a

19   Sergeant now, and even when you worked on

20   the force, has there ever been a situation,

21   where somebody came and said they made an

22   arrest; and you say, sound like it's BS?

23         PROSPECTIVE JUROR:  Yes.

24         MR. BRETTSCHNEIDER:  Ms. Collins, I

25   think you made yourself extremely clear, as

1

2       far as your independence.  Really, the

3       question I have is, somebody gets on the

4       stand.  There is a police officer or a

5       detective.  The fact that they are a

6       detective, would you give them any more

7       credibility, in the sense that as far as

8       motivation to lie?  I mean, or would you say

9       to yourself, hey, I don't understand.

10      There's all kinds of secret motives that

11      people have.

12          How would you feel about evaluating the

13      testimony of a police officer or a

14      detective; somebody from the police force?

15          PROSPECTIVE JUROR:  I don't think I

16      would give it any extra credence than

17      anybody else.

18          MR. BRETTSCHNEIDER:  The fact is, if

19      somebody says, I have been on the police

20      force twenty-five or thirty years?

21          PROSPECTIVE JUROR:  I would hope that

22      everybody would be honest.  I would hope

23      that everybody would tell the truth.  I

24      don't think I would give law enforcement any

25      extra credence.  I think sometimes, the

1

2          truth is -- it could be someone's own

3          perception.  You can get varied stories.

4              MR. BRETTSCHNEIDER:  Thank you.

5              Mr. Flynn, certainly, --

6              THE COURT:  You have one minute,

7          counsel.

8              MR. BRETTSCHNEIDER:  Certainly, you

9          probably walked into the courtroom and you

10         heard this was a murder case.  How do you

11         feel about it?

12             PROSPECTIVE JUROR:  It's a lot of

13         responsibility.  When I first heard it, I

14         was taken back.  It's a lot of time and a

15         lot of things to take into account.  I just

16         feel that people have to do it.  We need to

17         be here.

18             MR. BRETTSCHNEIDER:  Thank you.

19             THE COURT:  Before you sit down, I

20         would like to discuss something with you at

21         the Bench.

22             (Whereupon the following side bar

23         conference took place outside the hearing of

24         the open courtroom:)

25             THE COURT:  I didn't know if you wanted

1                                                    106

2              to discuss this before you made your

3              selection.  I have another note from a court

4              officer.  Sworn juror in green, Mrs. Capri,

5              would like to speak to the Judge.

6                   MR. BRETTSCHNEIDER:  I think we should

7              talk to her.

8                   THE COURT:  Maybe we should let the

9              ones sitting in the box go outside and

10             relax.  We'll put the sworn jurors in the

11             jury room and find out what the problem is

12             with Ms. Capri.

13                  (Whereupon the following took place

14             back within the hearing of the open

15             courtroom:)

16                  THE COURT:  Ladies and gentlemen, I

17             have another note that I have to handle.

18             Since we're going to be spending a little

19             time making the selection, I'm going to ask

20             you to just step outside for a few moments.

21             Don't leave.  We'll call you in shortly.

22                  Also, the forewoman can go into the

23             back, also.

24                  (Whereupon the sworn juror and

25             prospective jurors left the courtroom)

1                                                              107

2              THE COURT:  Mrs. Capri, I received an

3    indication from my court officer that you

4    wished to see me.  You are a sworn juror.  I

5    don't see you privately.  What is the

6    problem?

7              THE FOREWOMAN:  I want to serve on the

8    jury, your Honor.  You had mentioned,

9    however, on Monday, that this trial should

10   come to a conclusion sometime in the middle

11   of December.  In the event that it doesn't

12   and it goes into January, I have a problem.

13   I have reservations and hotel accommodations

14   from January 23rd to March 4th.  This is in

15   Florida, and Saint Thomas.

16             The tickets are in hand already.

17             THE COURT:  I am confident that you

18   will be able to take your trip with no

19   problem; barring something completely

20   unforeseen.  For example, God forbid, I'm in

21   some terrible accident and the trial shuts

22   down.  I'm sure even then, we would have to

23   make other arrangements.  Don't concern

24   yourself.  We were being as realistic as we

25   could.

1                                                        108

2                (Whereupon the jury forewoman left the

3           courtroom)

4                THE COURT:  Counsel, you can make your

5           decision.  Then we'll bring the jury back

6           in.

7                All right.  Approach the Bench.

8                We have two sworn jurors.  We're doing

9           the first ten.

10               Challenges for cause, People?

11               MR. WALSH:  I would imagine

12          Mrs. Snider, number three --

13               MR. BRETTSCHNEIDER:  I consent.

14               THE COURT:  She couldn't accept the

15          responsibility of finding somebody guilt or

16          not guilty.  That's granted.  Anything else?

17               MR. WALSH:  No.

18               MR. BRETTSCHNEIDER:  Number five,

19          Mr. McGuire.  The reason is, I know that

20          there was a point where he basically

21          rehabilitated himself.  But he mentioned

22          something that really concerned me.  It was

23          almost as though he's adding an additional

24          burden, as to where the gun came from.

25               There is going to be testimony in this

 1

 2     case, that my client bought the gun from a

 3     crackhead for two hundred dollars.  And I

 4     think based on what this -- what Mr. McGuire

 5     testified to, as to how the gun was

 6     purchased, it was purchased on the street.

 7     Some sort of convoluted theories that he

 8     has, I just don't know whether he can be a

 9     fair juror in this case; based on the

10     circumstances which he's laid out.

11          MR. WALSH:  I'll make it easy and

12     consent.

13          THE COURT:  Fine.

14          Any other challenges for cause?

15          MR. BRETTSCHNEIDER:  No.

16          THE COURT:  Peremptory, People?

17          MR. WALSH:  Number nine.  That's

18     Barbara Henshy.  And that's all.

19          THE COURT:  Defendant, first ten,

20     peremptories.

21          MR. BRETTSCHNEIDER:  Number two, number

22     six, number seven, number eight and number

23     ten.

24          THE COURT:  That only gives us two more

25     jurors, Ms. Baldwin and Mr. McKenna.

1                                                            110

2                    MR. WALSH:  Yes.

3                    MR. BRETTSCHNEIDER:  Yes.

4                    THE COURT:  The remaining ones in the

5          box, challenges for cause?

6                    MR. WALSH:  No.

7                    MR. BRETTSCHNEIDER:  No.

8                    THE COURT:  Peremptory, People?

9                    MR. WALSH:  Ms. Abraham.

10                   THE COURT:  All right.  That's all.

11         Defendant?

12                   MR. BRETTSCHNEIDER:  Number thirteen.

13                   THE COURT:  That gives us two more.  We

14         have six sworn.

15                   (Whereupon the following took place

16         back in open court:)

17                   THE COURT:  Let's bring all the

18         prospective jurors, and our sworn jurors,

19         back in.

20                   THE CLERK:  Will the following please

21         remain seated:  Geraldine Baldwin, Brian

22         McKenna, Nancy Shanley and Anthony Alcaid.

23         Everyone else is excused with the thanks of

24         the Court.

25                   (Whereupon the remaining prospective

1

2          jurors that were in the jury box left the

3          courtroom)

4              THE CLERK:  Are the remaining jurors

5          satisfactory to the People?

6              MR. WALSH:  Yes.

7              THE CLERK:  And to the defendant?

8              MR. BRETTSCHNEIDER:  Yes.

9              (Whereupon jurors numbers two through

10         six were sworn by the Clerk of the Court)

11             THE COURT:  You may be seated.  Ladies

12         and gentlemen, I'm going to excuse you all

13         for lunch, now.  Then I'm going to bring in

14         the one hundred new jurors, and tell them a

15         little bit about the case.

16             Do not discuss the case among

17         yourselves or with others.  Do not read or

18         listen to any accounts or discussions of the

19         case, reported by newspapers or other news

20         media.

21             Do not visit or views the premises or

22         any place where the offenses charged were

23         allegedly committed, or any other premises

24         or place involved in the case.

25             Promptly report to the Court any

jerri krevoff, csr, rpr

112

incident by any person to influence any
member of the jury or to discuss the case.

Do not form any opinions.  Keep an open
mind until the case is completed.

We'll see you back here at two o'clock.

(Whereupon the sworn jurors were
removed from the courtroom)

THE COURT:  Let's bring in the new
panel.

(Whereupon a new panel of prospective
jurors were brought into the courtroom)

THE COURT:  Good afternoon, ladies and
gentlemen.  Welcome to County Court.  My
name is Judge Abbey Boklan.  I will be the
presiding Judge at this trial.

My apologies to those of you who came
in the first buses.  Because we had to wait
until everyone got here to begin.

We are in the middle of a jury
selection.  We have six sworn jurors.  We
are going to be picking six more jurors, and
three alternates.

Normally, I would try, because you had
to wait outside for us, to work a little

1

2     into the luncheon recess.  However, in this

3     case, I have a special meeting upstairs.  We

4     call it our judges lunch and learn.  Today,

5     we're learning a little more about cloning

6     of cellular phones.  I'm supposed to be up

7     there five minutes ago.

8              Let me just tell you what this case

9     involved.  The allegation is, the charges in

10    the indictment, are murder in the second

11    degree, intimidating a victim or witness in

12    the first degree, and hindering prosecution.

13    I don't know if all of you have had the

14    opportunity to fill out your questionnaires.

15    If you haven't, I ask you to please do that

16    over the luncheon recess.  We will be taking

17    those from you when you are called into the

18    box.

19              I will explain to you in detail, when

20    we come back after lunch, a little more

21    about what the trial involves, our

22    scheduling.  I will introduce the

23    participants to you.

24              At this time, I'm going to give you

25    some very brief admonitions, since you have

1

2          already been called into the courtroom; and

3          even though just the nature of the charges.

4               Do not discuss the case amongst

5          yourselves, or with others.  Do not read or

6          listen to any account or discussions of the

7          case reported by newspapers or other news

8          media.

9               Do not visit or view the premises or

10         any place where the offenses charged were

11         allegedly committed, or other premises or

12         place involved in the case.  Promptly report

13         to the Court any incident involving any

14         attempt by any person to influence any

15         member of the jury, or to discuss the case.

16         Do not form any opinions.  Keep an open mind

17         until the case is completed.

18               We are going to have our luncheon

19         recess.  Do not go back after lunch to

20         central jury.  Meet outside this courtroom.

21               All of you, please meet outside of this

22         courtroom at to two o'clock.

23               (Whereupon there was a luncheon recess,

24         after which Richard Glen recorded the

25         afternoon session)

115

```
1

2    COURT COURT :  NASSAU COUNTY
          PART I
3
     -------------------------------------X
4
     THE PEOPLE OF THE STATE OF NEW YORK
5
            -against-
6
     JOSEPH JACKSON,
7                              Defendant.

8    -------------------------------------X

9                  November 6, 1996
                   262 Old Country Road
10                 Mineola, New York

11   B e f o r e:

12                 HON: ABBEY L. BOKLAN,
                       County Court Judge
13
     A P P E A R A N C E S:
14
                   (As before noted.)
15                        ***

16                 A-F-T-E-R-N-O-O-N   S-E-S-S-I-O-N.

17                 THE COURT:  All right.  Let's get everybody

18        in.

19                 (Prospective panel in the courtroom.)

20                 THE COURT:  Good afternoon, ladies and

21        gentlemen.  I am happy to see you all back here.

22                 One of the more interesting things I learned

23        at lunch is that if you have a phone, even if you

24        are not using it unless the power is off, it's

25        still sending a signal out.
```

Richard D. Glen, C.S.R.

1

2          But I'm going to now explain briefly, ladies

3     and gentlemen, what this trial involves and what

4     roles the Judge and jury play.  We will also

5     determine who will actually sit as a juror in

6     this case.  So, just relax, get comfortable and

7     I'll try to familiarize you with what is about to

8     happen.

9          My apologies to my six sworn jurors that

10     have to go through this again.  I know you all

11     have heard it before.

12          The trial which is about to be commenced is

13     a trial action entitled, "The People of the State

14     of New York against Joseph Jackson," who is

15     referred to as the defendant.

16          The case involves the following charges:

17     Murder in the 2nd degree, intimidating a victim

18     or witness in the 1st degree and hindering

19     prosecution in the 2nd degree.

20          The alleged day of occurrence is March 20,

21     1994, the alleged victim is Steven Jason.  And

22     the alleged victim of the hindering of

23     prosecution -- strike that, hindering prosecution

24     charge alleges criminal assistance was given to

25     Tony Jackson.

1  Peo. vs Jackson

2            Now, as jurors, you are going to be called

3       upon to determine whether or not the evidence

4       which you shall hear and see in this case

5       establishes the defendant's guilt of the charges

6       beyond a reasonable doubt.

7            In order to do this you will have to

8       evaluate all of the evidence at the end of the

9       trial to determine whether what you have heard

10      from the witnesses and seen as exhibits is true

11      and what it all means.

12           This is called finding the facts.  That will

13      be your function alone.  I will find no facts in

14      in trial.

15           Your ultimate decision is called a verdict.

16      Your verdict will either be guilty or not

17      guilty.

18           An attorney presents the evidence usually by

19      calling witnesses and only you can decide what

20      really happened, and the verdict as to each of

21      the counts will remain your decision alone.  As

22      Judge I will make no determination of whether the

23      defendant is guilty or not guilty.  My role at

24      trial is to ensure that you reach your verdict in

25      accordance with the law.

```
1   Peo. vs Jackson
2               And I will explain to you what the law is as
3        to all of the issues at this trial.
4               At times I may have to rule on questions
5        concerning the conduct of the trial.  Those
6        rulings have nothing to do with whether this
7        defendant is guilty or not guilty.
8               I may also rule on questions concerning what
9        evidence you may consider and for what purpose.
10       When I make a ruling concerning whether you may
11       hear some testimony or see some exhibits which is
12       offered as evidence, I will be ruling on whether
13       or not you are permitted to hear it or see it as
14       a matter of law.
15              Likewise, if I instruct you to disregard
16       something that you might have heard, I will do so
17       because that is the law.  None of my rulings
18       should be taken by you as any indication of
19       whether you should believe all or part of what is
20       offered as evidence or that the defendant is
21       guilty or not guilty.
22              That is solely your job to determine.  But
23       you must accept the law as I give it to you if
24       the defendant and the People are to have a fair
25       trial to which they are entitled to.
```

Richard D. Glen, C.S.R.

119

1  Peo. vs Jackson

2          The People are represented by the District

3     Attorney of this county, Mr. Denis Dillon.  Mr.

4     Michael Walsh, who is now standing, is an

5     assistant district attorney --

6          MR. WALSH:  Good afternoon.

7          THE COURT:  -- will be presenting the

8     People's case.

9          The defendant is represented by his

10    attorney, Mr. Scott Brettschneider.  And that is

11    Mr. Brettschneider who is now standing.

12          MR. BRETTSCHNEIDER:  Afternoon.

13          THE COURT:  And sitting next to Mr.

14    Brettschneider is Mr. Joseph Jackson, the

15    defendant.  You may stand up as well, Mr.

16    Jackson.

17          The fact that this action is brought in the

18    name of the People or that the evidence is

19    presented by a public official does not in any

20    way indicate that the public wants a specific

21    verdict.  The People of this state are served by

22    whatever verdict is justified by the evidence.

23          You may here reference to the fact that the

24    defendant was indicted by a grand jury.  This to

25    is not and must not be taken as any evidence of

1    Peo. vs Jackson

2              guilt.

3              As a trial jury you must consider an

4        indictment as simply a piece of paper by which a

5        defendant is accused of a crime.  Only you, as

6        members of the trial jury, can determine guilt

7        and the defendant is presumed innocent unless and

8        until you do find him guilty.

9              Serving on a jury is a vital function for

10       citizens under our system of laws.  It is also a

11       very great responsibility, that is to accord to

12       the defendant and the People a fair trial.

13             In order to do so you must be free from any

14       preconceived notions or any sympathies or

15       prejudices that might prevent you from returning

16       a fair and just verdict based solely on the

17       evidence or the lack of evidence.

18             To help to ensure this, our first order of

19       business is to conduct an examination of the

20       prospective jurors.  I will ask some questions of

21       you and after I'm finished the attorneys for both

22       parties will ask questions as well.

23             The purpose of these questions is not to

24       embarrass you or to discover any personal details

25       about your lives.  It is simply to determine

Richard D. Glen, C.S.R.

Peo. vs Jackson

        whether or not you are qualified to sit as jurors
        in this case.

            A number of you will not be selected.  Some
        of you may be excused because you are not
        qualified to sit as a matter of law.  That is
        called excused for cause.  Others may be excused
        peremptorily which means by one of the attorneys
        without any cause being given.

            Being excused is not a reflection on you
        either as a citizen or as a person.  It is simply
        a determination under the rules by one or more of
        the parties or by me that you are not to sit on
        this particular case.

            Now, let's talk a little about scheduling.
        I'm sure that's something that interests all of
        you.  As I explained to our sworn jurors, we here
        in Nassau County were one of the originators of a
        system now used throughout the state.

            Now, it has a fancy name.  It's called the
        IAS system, the Individual Assignment System.
        What it means is that a judge gets the case from
        the very beginning.

            So, at the same time that I'm handling this
        trial I'm trying to juggle approximately 150

122

1  Peo. vs Jackson

2            other cases with their motions, their pleas,

3            their sentences, their applications.

4                 So, what I do to make it as convenient for

5            all of you as possible is I try to do that first

6            thing in the morning.  I get it out of the way so

7            I don't have to interrupt the trial.

8                 Except for when you are deliberating, you'll

9            normally have your early morning to youself.  I

10           usually have you come here at 11.  We take a

11           luncheon recess between the hours of 12:30 and

12           2.  And except when you are deliberating, I will

13           try to have you out of the courtroom every day

14           between approximately 4:30 and a

15           quarter-to-five.

16                Because this is a criminal trial, however,

17           when you are actually deliberating you will be

18           sequestered at all times.  This means that should

19           you continue to deliberate for more than one day,

20           then our law requires that hotel accommodations

21           be made available and that the jury be

22           sequestered each night before resuming their

23           deliberations on each following day.

24                Now, a little bit about the vacation

25           schedule here.  You know we have some holidays

1  Peo. vs Jackson

2              coming up.  We are closed for Veterans Day, the

3              11th.  We are closed for Thanksgiving day, the

4              28th.  And we will not be working on this trial

5              any Friday in the month of November.

6                   So, even with being down those days we are

7              confident, and the attorneys have assured me,

8              that we will be finished with this case no later

9              than mid-December.

10                  Now, before we start the examination I want

11             to make sure that none of you has any pressing

12             family or business obligations or any physical

13             problems that would prevent you from serving on a

14             jury.

15                  Please, do not seek to avoid jury service

16             merely because it is inconvenient.  I regret the

17             inconvenience but our whole system of trial by

18             jury, one of the most basic elements of our whole

19             system of justice, depends upon citizens who are

20             willing to sacrifice their time when called upon

21             to judge another person.

22                  But if any of you cannot serve at this time,

23             please raise your hands now so we see.

24                  Those who just raised your hands stand up,

25             please so I can do a count.

1   Peo. vs Jackson

2              Counsel, may I see you at the bench.

3              (Conference.)

4              THE COURT:  All right.  No one else please

5         stand because we've got our count now and, of

6         course, we'll try and go with those that are

7         willing to serve.  If I see more people standing

8         up, I will not do it.  We've had more people

9         standing up.  Some others saw you and they got up

10        too.  That's the problem.

11             All of you who didn't stand up originally,

12        please be seated.  I think there was some back

13        there also, those who didn't stand originally.

14             All right.  Those who are standing, please

15        meet outside the courtroom now because we have to

16        get your names and your pills.  You are going

17        back to jury selection.  You are going back to

18        Central Jury.  You are not excused from jury

19        duty.

20             If any of you want to sit and change your

21        mind when you hear that, you can sit.  But don't

22        nobody else stand up.

23             (Indicated jurors excused.)

24             THE COURT:  All right.  Let's count how many

25        we have left.  About 50, counsel.  All right.

1   Peo. vs Jackson

2           Get the names, and I don't know how you are going

3           to do that.  Maybe take the questionnaires and

4           then you can let them go back.

5           My thanks, ladies and gentlemen.  I know

6           that when we ask for this amount of time out of

7           your lives we're asking a lot.  But if we didn't

8           get jurors such as yourselves, and my sworn

9           jurors who are willing to serve, we might as well

10          shut down the criminal justice system.

11          Now, at this time the law requires that the

12          names of 12 of you be drawn and those persons

13          take seats in the jury box.  I ask those of you

14          who are not called into the jury box initially to

15          listen carefully because you will find that

16          you'll be asked many of the same questions.

17          And both I and the attorneys move much more

18          rapidly through the first -- after the first

19          round.

20          Before we do that, I'm going to ask the

21          clerk to swear all prospective jurors to answer

22          truthfully.

23          THE CLERK:  Ladies and gentlemen, please

24          rise and raise your right hand.

25          (Jury sworn.)

1    Peo. vs Jackson

2                    THE COURT:  All right.  Now, we're going to

3            play musical chairs.  We're going to move all of

4            you in the box back, to the back.

5                    (Box filled.)

6                    THE COURT:  Now, ladies and gentlemen, my

7            first series of questions will concern your

8            backgrounds in order to determine whether there

9            may be anything in them that may give rise to a

10           feeling or an attitude which might prevent you

11           from deciding this case solely on the evidence

12           alone.

13                   I will start by asking them of all of you.

14           Your answers to these questions will not

15           necessarily qualify you or disqualify you.

16                   If any of you wishes to respond

17           affirmatively or is not sure, please raise your

18           hand as soon as I've completed the question.  If

19           you do not understand the question, please say

20           so.

21                   The defendant, the defendant's attorney,

22           have all been identified to you as well as the

23           prosecuting attorney.

24                   Do any of you know any of the prospective or

25           any of the participants to this proceeding?

Richard D. Glen, C.S.R.

1   Peo. vs Jackson

2           Anyone?

3               (No response.)

4           THE COURT:  Now, among the witnesses who may

5       be called in this case are the following, and I

6       caution you that my mentioning the name imposes

7       no burden on either side to call that person as a

8       witness, nor does it mean the list may not be

9       expanded:

10              Detective Gary Abbondandelo, Homicide Squad,

11      Nassau County Police Department; Detective Robert

12      Dempsey, same squad; Detective Jerl Mullen, same

13      squad; Detective Peter Donato, same squad; Police

14      Officer Richard Paul Paulik, Freeport Police

15      Department; Police Officer Michael Pomorico,

16      Freeport; Detective Joseph Marino, Crime Scene

17      Search Unit, Nassau County; Detective Nicholas

18      Mattia, Scientific Investigation Bureau of the

19      Nassau County Police Department; Mr. Michael

20      Herts, retired detective from the 1st Squad,

21      Nassau County Police Department; Detective Brian

22      Parpan, Homicide Squad, Nassau County Police

23      Department; Detective Frank Allaire, 1st Squad,

24      Nassau County Police Department; Detective

25      William Tweedie, 1st Squad, Nassau County, Police

1  Peo. vs Jackson

2          Department; Detective Edward Haggerty, Freeport

3          Police Department, Mr. William Wallace, an

4          Assistant District Attorney from the Nassau

5          County District Attorney's Office; Michael

6          DiMartino, MD, Deputy Medical Examiner, Nassau

7          County Medical Examiner's Office; Mr. Christopher

8          M. Jordan; Official Court Reporter, Miss Isabelle

9          Vailes; Miss Skwanitra Witherspoon; Mr. Peddy

10         Jenkins; Mr. Tyrone Isaac; and Mr. Roy Isaac.

11             Do any of you know any of the prospective

12         witnesses in this case?

13             (No response.)

14             THE COURT:  Now, I have just told you the

15         nature of the charges, the nature of the

16         charges.  I think I mentioned the alleged date of

17         occurrence, the name of the alleged victim,

18         Stephen Jason.

19             Do any of you know anything about this case

20         other than what I have told you here in this

21         courtroom?  Anyone?

22             (No response.)

23         (Voir dire examination by the Court.)

24             THE COURT:  Mr. Walsh.

25             (Voir dire examination by Mr. Walsh.)

1    Peo. vs Jackson

2              THE COURT:  Counsel.

3         (Voir dire examination by Mr. Brettschneider.)

4              THE COURT:  When you are ready, please

5    approach.

6              (Following occurred at sidebar:)

7              THE COURT:  We have 6 jurors, so we'll do

8    the first 6 first.

9              First 6, challenges for cause, People?

10             MR. WALSH:  I would say number four, your

11   Honor, given his --

12             MR. BRETTSCHNEIDER:  I consent.

13             THE COURT:  I beg your pardon?

14             MR. BRETTSCHNEIDER:  I consent.

15             THE COURT:  All right.

16             Any others?

17             MR. WALSH:  No.

18             THE COURT:  Cause, first 6?

19             MR. BRETTSCHNEIDER:  Number 5.

20             MR. WALSH:  We consent to number 5, your

21   Honor.

22             THE COURT:  All right.

23             Peremptories in that first 6?

24             MR. WALSH:  2.

25             THE COURT:  Defendant, peremptories?

Richard D. Glen, C.S.R.

1   Peo. vs Jackson

2           MR. BRETTSCHNEIDER:  Number 1 and number 6.

3           THE COURT:  All right.

4           That gives us one juror, okay.

5           MR. WALSH:  Yes.

6           MR. BRETTSCHNEIDER:  Yes.

7           THE COURT:  Now we have 7.  Next 5 jurors,

8   cause, People?

9           MR. WALSH:  Number 11.

10          MR. BRETTSCHNEIDER:  I consent.

11          THE COURT:  All right.  Anyone else?

12          MR. WALSH:  There were two, I would say that

13  there were two in particular, Miss Huso (Ph.) and

14  Miss Pullick (Ph.), who both indicated that they

15  had problems being uncomfortable sitting for a

16  length of time, Miss Huso, because of financial

17  difficulties.  Miss Pullick said she was

18  uncomfortable sitting for a long time.

19          I challenge both for cause; 9 and 10.

20          MR. BRETTSCHNEIDER:  I'll leave it up to

21  you.

22          THE COURT:  I beg your pardon?

23          MR. BRETTSCHNEIER:  I consent.

24          THE COURT:  Okay.  Cause, defendant?

25          MR. BETTSCHNEIDER:  No.

Richard D. Glen, C.S.R.

```
 1   Peo. vs Jackson
 2                THE COURT:   Cause, People -- excuse me,
 3           peremptory?
 4                MR. WALSH:   Both.
 5                THE COURT:   All right.   That's everybody in
 6           that group.
 7                Now, the last group, last 3 cause, People?
 8                MR. WALSH:   I would say Miss Schissel (Ph.),
 9           number 12.
10                MR. BRETTSCHNEIDER:   Consent.
11                THE COURT:   Cause?
12                MR. WALSH:   No.
13                THE COURT:   Defendant, cause?
14                MR. BRETTSCHNEIDER: No.
15                THE COURT:   Peremptories, People?
16                MR. WALSH:   No.
17                THE COURT:   Peremptories, defendant?
18                MR. BRETTSCHNEIDER: Both.
19                THE COURT:   We'll take a short recess at
20           this time.
21                (Open court.)
22                THE CLERK:   Carlos Rasha (Ph.), please
23           remain seated.   Everyone else is excused with the
24           thanks of the Court.
25                THE CLERK:   Will the remaining juror please
```

1   Peo. vs Jackson

2              rise and raise your right hand.

3                   THE CLERK:   Remaining juror satisfactory to

4         the People?

5                   MR. WALSH:   Yes.

6                   THE CLERK:   Satisfactory to the defendant?

7                   MR. BRETTSCHNEIDER:   Yes.

8                   (Juror sworn.)

9                   THE CLERK:   Please have a seat on the other

10        side there.

11                  A JUROR:   Could I have some water, please?

12                  THE COURT:   Yes.

13                  THE COURT:   Ladies and gentlemen, we're

14        going to take a short recess.   Short with this

15        many people, we'll try to keep it under 10

16        minutes.

17             We'll resume again as soon as we get

18        everybody back together again.   We'll see you in

19        approximately 10 minutes.

20             (Recess.)

21                  MR. BRETTSCHNEIDER:   May I approach?

22                  THE COURT:   Yes.

23             (Conference.)

24             (Prospective panel in the courtroom.)

25                  THE COURT:   All right.   Let's fill the box.

1   Peo. vs Jackson

2               (Box filled.)

3               THE COURT:  I'll start with the most

4          important question first:  Is there anyone who

5          feels that they cannot fairly and impartially sit

6          in this case?  Anyone?

7               (Following occurred at sidebar:)

8               THE COURT:  Mr. Green?

9               A JUROR:  Yes.  Well, I had a friend, he was

10         murdered this year and they didn't find any

11         witness or any -- no one was arrested for the

12         charges.

13              So, I feel kind of bad for the family and

14         stuff like that.  I mean, still in my mind as of

15         today, because only happened like 2 months ago, I

16         think --

17              THE COURT:  You feel that would affect you?

18              A JUROR:  Yeah, and this case -- yes.

19              THE COURT:  All right.  Thank you.  You are

20         excused.

21              (Open court.)

22              (Box Filled.)

23              THE COURT:  Ma'am, can you be fair and

24         impartial?

25              A JUROR:  Yes.

1   Peo. vs Jackson

2                    THE COURT:  Do any of you know any of the

3           participants or any of the prospective witnesses

4           or know anything about the case other than what

5           we have told you?  Anyone?

6                Yes?

7                A JUROR:  I believe I read something.

8                (Following occurred at sidebar:)

9                A JUROR:  I recall it being reported in

10          Newsday when it first happened, and --

11               THE COURT:  Start by telling us everything

12          that you remember.

13               A JUROR:  Okay, I don't remember the

14          specific -- I remember there was a murder, and I

15          remember that it was not flattering to the

16          plaintiff.  I guess that's all I remember though.

17               THE COURT:  All right.  Are you talking

18          about the defendant?  You said plaintiff.

19               A JUROR:  Yes, sorry.

20               THE COURT:  How is this going to affect you

21          in this case?

22               A JUROR:  I don't think it will.

23               THE COURT:  All right.  If I tell you now

24          sometimes I go home and I read a story about even

25          a proceeding in the courtroom and I don't

1  Peo. vs Jackson

2          recognize that I was in the same courtroom.

3              A JUROR:  Yes.

4              THE COURT:  He's laughing, but it's true.

5      Obviously, anything that you read in the Newsday

6      you can't take as being the facts of this case.

7              A JUROR;  Can't always trust the media.

8              THE COURT:  Besides that, they don't know,

9      they haven't heard the evidence.

10             A JUROR:  Yeah.

11             THE COURT:  Can you assure us that you will

12     put aside anything that you vaguely remember.

13             A JUROR:  Yes.

14             THE COURT:  All right.  Including the fact

15     that you, something might not have been

16     flattering?

17             A JUROR:  Yes.

18             THE COURT:  Any questions?

19             MR. BRETTSCHNEIDER:  Do you remember

20     anything about the case?

21             A JUROR:  I can't remember.  I can't

22     remember.

23             THE COURT:  Sorry?

24             A JUROR:  I believe it was on page 3 on one

25     of the early pages, which is usually --

1    Peo. vs Jackson

2              MR. BRETTSCHNEIDER:  If, if there's

3         something that comes out during the trial do you

4         think it might jar your memory?

5              A JUROR:  I don't think so, but I'm not

6         sure.

7              MR. BRETTSCHNEIDER:  The fact that you

8         remember this particular, this particular event

9         and that it was unflattering, is there something

10        -- this in your mind, will you say this, this

11        guy has done something because it was in the

12        newspaper?

13             A JUROR:  I don't think so.

14             MR. BETTSCHNEIDER:  Okay.

15             THE COURT:  Anything?

16             MR. WALSH:  No.

17             THE COURT:  All right.

18             (Open court.)

19             THE COURT:  Does anybody else know anything

20        about the case?

21             (Voir dire examination by the Court.)

22             THE COURT:  All right.  Ladies and

23        gentlemen, that concludes our proceedings for

24        today.  We'll be beginning tomorrow morning with

25        the question from the attorneys starting with the

1   Peo. vs Jackson

2           assistant district attorney.

3                   I'm going to give you some admonitions in a

4           moment.

5                   Tomorrow we will meet at 11, 11 in the

6           morning.  My court officers will tell you all

7           where to meet and, of course, they will direct my

8           sworn jurors as well.

9                   Do not discuss the case among yourselves or

10          with others.

11                  Do not read or listen to any accounts or

12          discussions of the case reported by newspapers or

13          any other news media.

14                  Do not visit or view the premises or any

15          place where the offenses charged were allegedly

16          committed or any other premises or place involved

17          in this case.

18                  Promptly report to the Court any incident

19          involving any attempt by any person to influence

20          any member of the jury or to discuss the case.

21                  Do not form any opinions.

22                  Keep an open mind until the case is

23          completed.

24                  Have a very good evening.  We'll see you all

25          at 11.

1  Peo. vs Jackson

2              Those of you in the back, ladies and

3        gentlemen, when you meet us tomorrow bring with

4        you your questionnaires so we'll have them when

5        you are called into the box.

```
 1                                                    139

 2   STATE OF NEW YORK  :  NASSAU COUNTY

 3        COUNTY COURT PART I

 4   - - - - - - - - - - - - - - - - - - -x

 5   THE PEOPLE OF THE STATE OF NEW YORK,   :

 6                -against-              :Ind. # 91607

 7   JOSEPH JACKSON,                        :

 8                     Defendant.          :

 9   - - - - - - - - - - - - - - - - - - -x

10                          November 7, 1996
                            262 Old Country Road
11                          Mineola, New York

12
     B E F O R E :
13
         HON. ABBEY L. BOKLAN,
14                    County Court Judge,
                                     and a jury
15

16
     A P P E A R A N C E S:
17

18              (As Previously Noted)

19              *      *      *      *      *

20

21              THE CLERK:  People vs. Joseph Jackson.

22              Are the People ready?

23              MR. WALSH:  Yes.

24              THE CLERK:  Is the defendant ready?

25              MR. BRETTSCHNEIDER:  Yes.
```

```
1                                                    140
2                   THE COURT:   Counsel, please approach.
3                   (Whereupon the following side bar
4              conference took place out of the hearing of
5              the open courtroom:)
6                   THE COURT:   All right.   Counselor, this
7              is juror number thirteen, Ms. Rothbaum.   She
8              just asked to approach.
9                   JUROR #13:   You asked if any member of
10             your family has been a victim of a crime.
11             I'm sorry, I forgot.   My mother had her
12             purse snatched some years ago.
13                  THE COURT:   Anyone apprehended?
14                  JUROR #13:   No.
15                  THE COURT:   Would that affect your
16             ability to be fair?
17                  PROSPECTIVE JUROR:   No.   The other
18             thing is, a couple of years before, my
19             sister had her car broken into and her bag
20             stolen.
21                  THE COURT:   Would that affect you?
22                  JUROR #13:   No.
23                  (Whereupon the following took place
24             back within the hearing of the open
25             courtroom:)
```

1                                                         141

2              THE COURT:  Good morning, everyone.

3         We're ready to continue.

4              Mr. Walsh?

5              MR. WALSH:  Yes.  You've heard probably

6         everything I'm going to ask already.  I

7         don't know if you were here yesterday.  It

8         might have been during the first panel that

9         was here.  One of the prospective jurors,

10        when asked about how they felt about sitting

11        on a jury, especially in a case like this, I

12        think the comment made by the juror was that

13        she felt she couldn't accept the

14        responsibility of finding someone either

15        guilty or not guilty.

16             I don't know if you remember yesterday,

17        when I got up, I asked everybody whether or

18        not they felt that because of the nature of

19        the charges here, what's involved, they

20        would have any difficulty being a fair and

21        impartial juror.

22             Now, does anyone feel that way; that

23        because of what's involved here, they would

24        have a difficult time sitting on this jury.

25             PROSPECTIVE JUROR:  I would like to

1

2        approach.

3              THE COURT:  One at a time.  Juror

4        number six was first.  Ms. Williamson.

5              PROSPECTIVE JUROR:  It's okay.  I can

6        say it here.  Last night, it was really

7        bothering me.  I didn't think I would have a

8        problem with it.  All night long, it's been

9        on my mind.  I don't think, unless I witness

10       something, I could really make a decision

11       like that; or morally, want to make a

12       decision like that.  It's very upsetting to

13       me.

14             THE COURT:  Mr. Ridgey?

15             PROSPECTIVE JUROR:  Yes.  I would like

16       to come up there.

17             (Whereupon the following side bar

18       conference took place outside the hearing of

19       the open courtroom:)

20             THE COURT:  Yes?

21             PROSPECTIVE JUROR:  In this particular

22       incident, like I said on the paper, I had a

23       lot of things happening with me, as far as

24       criminal things.  Everything that happened,

25       as far as the car, my wife, always involved

1                                                        143

2          a black man.  I have become very, very

3          prejudice.

4               THE COURT:  That's enough.  Thank you

5          for telling us.  There's no sense in your

6          even sitting here through the rest of this.

7          You're excused.  Mr. Ridgey is excused.  Do

8          you want me to excuse Ms. Williamson?

9               MR. BRETTSCHNEIDER:  Yes.

10              MR. WALSH:  I think so.

11              (Whereupon the following took place

12         back in the hearing of the open courtroom:)

13              THE COURT:  Ms. Williamson, you're

14         excused.

15              (Whereupon the following side bar

16         conference took place outside the hearing of

17         the open courtroom:)

18              THE COURT:  Ms. Caraldo, do you want --

19         you wanted to approach?

20              PROSPECTIVE JUROR:  I filled out my

21         sheet, actually, incorrectly.

22              THE COURT:  What number are you?  Seat

23         number nine.

24              PROSPECTIVE JUROR:  It says convicted

25         of a crime, somebody in the family.

```
 1                                                      144
 2              THE COURT:  Your close friend, family
 3         members or yourself.
 4              PROSPECTIVE JUROR:  Actually, my
 5         grandfather has been incarcerated for ten
 6         years.  I actually can't do this.  I think
 7         this whole thing is a big joke.  He's
 8         eighty-three years old.  He can't get out.
 9              THE COURT:  I don't want anybody
10         sitting on a murder trial who thinks it's a
11         big joke.  You're excused.
12              (The following took place back within
13         the hearing of the open courtroom:)
14              THE COURT:  Mr. Leutia?  What's your
15         problem, sir?
16              PROSPECTIVE JUROR:  Well, I just want
17         to make the distinction between being fair
18         and being equitable.  I think being fair, I
19         could judge a person's testimony in a fair
20         way.  I don't think I would be able to be
21         equitable in believing a police officer
22         testimony, as opposed to a person who has a
23         track record of committing crimes.  There's
24         a difference between being fair and
25         equitable.
```

1

2          THE COURT:  What you're saying is

3     completely logical and makes sense.  But

4     what we're talking about is, even before you

5     hear someone's qualifications, criminal

6     record, making a decision purely because of

7     their occupation, in advance of listening.

8          We're not asking you to not do what you

9     just said.  That's what you should be doing.

10    You should be weighing credibility.  One of

11    the factors you can consider, is someone's

12    prior criminal record; someone's employment

13    experiences, training, all those things.

14    You should be considering those.  We're

15    concerned with a closed mind before you

16    listen.  That you make a determination that

17    you believe or not believe someone.

18         PROSPECTIVE JUROR:  At the beginning,

19    at the top, just based on a person's

20    background, I think in the back of my mind,

21    I would more tend to believe one than the

22    other.  That's what I'm trying to relay

23    here.

24         THE COURT:  Before you even listen and

25    hear their background?

1

2          PROSPECTIVE JUROR: That could be

3     changed, depending on what I hear. But

4     before I hear them, I would tend to believe

5     a person who's life is devoted to protecting

6     the people, as opposed to someone selling

7     drugs, or involved in some other crime.

8          THE COURT: You won't certainly know if

9     a person is involved in selling drugs or

10    some other crime, until you hear the

11    witness. You won't be able to hear if a

12    police officer's life is devoted to his

13    community, or something is the matter with

14    him, either, until you stop and listen to

15    the person. You listen to the

16    cross-examination, if there is any.

17          All we're asking is for you to have an

18    open mind. Not leave your common sense

19    behind. Do you think you could do that:

20    Keep an open mind; listen, wait until you

21    learn and hear, before you make a decision?

22          PROSPECTIVE JUROR: Sure. But I'm just

23    letting you know that there is that --

24          THE COURT: We appreciate your candor.

25    It's easy to give us the answers you think

we want to hear.

MR. WALSH:  I'm going to keep picking on you, Mr. Leutia.  I mentioned to the group yesterday that there is a very good possibility that one of the witnesses that I called, would be somebody who might have been convicted of a crime before; and who you may find was involved in this case, as well, even as an accomplice to some extent.

Now, you have just made your feelings known; I think very reasonably, by the way. Somebody's background, whether it be their criminal record, motivations they may have; anything that they bring to the witness stand, is something that you're going to consider in evaluating their credibility.

I think you remember yesterday, I said that you should.  You have every right to consider someone's background in evaluating their credibility.  You should do that, in the very same manner that you said.

What I am concerned about is, that somebody's feelings, such as yours, go to the extent that if they were to hear from

148

someone who has a criminal record, or who
may have been involved in this incident, as
well, that you're just going to say, you
know what, I don't like who they are.  I
don't approve of their lifestyle.  I don't
like what they're involved in.  I don't want
to hear what they have to say.  I'm not
going to even consider what they have to
say.

What I would like to have is somebody
who, as I said, would consider background or
anything else; but would say, I'm going to
give a fair shake.  I'm going to listen to
what they have to say.  Maybe see if what
they have to say is consistent with other
evidence in the case; other evidence you
find credible in the case.  Wait to see if
what the person says, makes sense, before
you make an evaluation.

As we said before, I don't want you to
tell me what I want to hear.  I don't want
to have you tell me what you think the right
answer is.  I want your gut feeling.  Do you
think you could give a witness like that a

149

fair shake, in the manner that I have
described.

PROSPECTIVE JUROR:  As far as listening
to what they have to say, yes.  As far as
believing what they have to say, maybe not.

MR. WALSH:  All right.  When you say,
as far as believing what they have to say,
are you feeling such that you would feel
that there is a chance that you would
automatically say, I don't believe what they
have to say?

PROSPECTIVE JURO:  No.

MR. WALSH:  In other words, just
knowing that, and before you really listen,
before you compare it to other evidence that
you hear in the case, to see if it makes
sense or it's consistent --

PROSPECTIVE JUROR:  I don't think so.

MR. WALSH:  You may not be able to tell
me, yes, I can; no, I can't.  Is there a
danger that you wouldn't be able to give me
a fair shake?

PROSPECTIVE JUROR:  I don't think so.
However, I just want everyone to know that I

did have that concern.

MR. WALSH:  Yesterday, do you remember I asked people, a whole bunch of people, whether it would matter to them whether the victim was black or white, or young or old; male or female.  Does any of that matter to you?

PROSPECTIVE JUROR:  No.

MR. WALSH:  I also said, what if you found out that the victim had sold drugs during the course of his life.  Would that matter to you, to the extent that you would tend to take this case less seriously than some other case you might sit on?

PROSPECTIVE JUROR:  I wouldn't take the case less seriously.  I would take, maybe, the testimony that that person is giving less seriously than in comparison to another person who doesn't have that track record.

MR. WALSH:  In this case, the charge is murder.  You're not going to have a victim testify.  The victim isn't with us anymore. So his credibility is not an issue in the case.  You're not going to have to evaluate

1                                                              151

2          his truthfulness.

3                  Knowing that -- and this is what I'm

4          getting at -- would the fact that you found

5          out that he had sold drugs during his

6          lifetime, would that influence your decision

7          in any way; whether or not this defendant is

8          guilty or not guilty?

9                  PROSPECTIVE JUROR:  No.

10                 MR. WALSH:  What I'm getting at

11         ultimately, is this:  Whatever your verdict

12         is in this case, be it guilty or not guilty,

13         what I would like to have is any juror on

14         this case, their assurance, that that

15         verdict would be based on the evidence, and

16         nothing else.  Whether it's emotional

17         considerations, sympathy, feeling about who

18         the victim was; any outside restraining

19         influences.  Can you put those aside and

20         just determine the case based upon the

21         evidence?

22                 PROSPECTIVE JUROR:  You're saying that

23         one of the people who will testify may have

24         been involved in the case?

25                 MR. WALSH:  Yes.

1                                                            152

2              PROSPECTIVE JUROR:  I might have a hard

3       time putting that aside.  The way I would

4       look at the testimony, if I found out the

5       victim sold drugs, I would find that very

6       hard to put aside.

7              MR. WALSH:  Let's take the victim.

8       Hard to put aside, in what way?

9              PROSPECTIVE JUROR:  Which one?

10             MR. WALSH:  Say you found out the

11      victim in this case, who was killed, sold

12      drugs during the course of his lifetime.

13             PROSPECTIVE JUROR:  Can I come up?

14             THE COURT:  Certainly,

15             (Whereupon the following side bar

16      conference took place outside the hearing of

17      the open courtroom:)

18             PROSPECTIVE JUROR:  My gut reaction

19      might be, maybe he or she deserved it.

20             THE COURT:  Take that to the extreme.

21      You decide the world may be better off

22      without this person.  Will you still be able

23      to make a fair determination as to whether

24      the defendant is guilty or not guilty?

25             PROSPECTIVE JUROR:  I'm not sure.

1

2          THE COURT:  Well, then, I can't take

3     the chance.  I'm excusing you.

4          (The following took place back within

5     the hearing of the open courtroom:)

6          MR. WALSH:  As you can just see, what I

7     said before, I think is really true.  Your

8     answers that you think might be the right

9     answers, and answers that are truthful, and

10    come from your gut -- you know, while the

11    right answer may be, or what you think the

12    right answer may be, it doesn't matter to me

13    who the victim was.  I'm going to evaluate

14    this case based on the evidence, alone.

15    Some people can't do that.  That's okay.

16         What I would ask -- a couple of people

17    have spoken up.  What I would ask, is that

18    if that's the case with you, that you let us

19    know now.

20         PROSPECTIVE JUROR:  What you're asking

21    us, is not to be human.  We're all based on

22    emotion and factors like that.  If the

23    testimony is based on evaluating different

24    personalities, also.  If I look at the

25    person, and I say, geez, I don't believe

1                                                           154

2              anything he has to say; that doesn't occur

3              until you see the person.

4                   MR. WALSH:  Right.  Please don't

5              misunderstand what I'm asking of you.  I am

6              not asking you not to be human.  I'm not

7              asking you not to feel any emotion that you

8              would otherwise feel.  That's not what I'm

9              asking.

10                  If you remember yesterday, I had said

11             to the people who were here, you should

12             consider somebody's background.  You should

13             consider who a person is, in evaluating

14             their credibility.  You're not going to know

15             that, until you see them up on that witness

16             stand testifying.  That's fine.

17                  What I was getting at was, we have a

18             case here where the charge is murder.

19             Obviously, the victim isn't with us anymore.

20             As a result, you're not going to see the

21             victim get on the witness stand and testify.

22             His credibility, whether or not he tells the

23             truth or not, isn't an issue in the case.

24             You're not going to have any testimony from

25             him to evaluate.

What I'm concerned about is, if you find out during the course of the case, that the victim was somebody whose lifestyle you might not approve of, who did some things that you wouldn't do, and you wouldn't approve of anybody doing, would that tend to make you take this case and what happened to this person less seriously than you would if the victim was somebody else?  I'm not talking about evaluating truthful testimony.

PROSPECTIVE JUROR:  Given the scenario that you gave me, if somebody was involved with crime and was a victim, and somebody who was an upstanding citizen in all respects, yeah.  Obviously, I would have some prejudices.

MR. WALSH:  I'm hoping I didn't mislead you.  I want to see if I did.  When I talk about the victim in this case, I said you may find out that he had sold drugs in the past.  What I think you'll find is that that was unrelated to anything that happened in this case.  It's something you may learn about him; but not something that would

156

affect whether or not Joseph Jackson
committed this crime or not.  I hope I
didn't mix the two together.

On the one hand, I was talking about a
witness who may testify, who has a criminal
record; as opposed to a victim who will not
testify, and has a criminal record.  His
criminal record doesn't affect what happened
in this case.

Would that, as far as who a victim was,
would that tend to make you take the case
any less seriously?

PROSPECTIVE JUROR:  No.  I would be
prejudice.

MR. WALSH:  Anybody else?  I'm going to
sit down in a moment.  Before I sit down,
any reason -- I know I didn't get a chance
to speak to all of you.  Any reason anyone
else, why they feel they might not be fair
and impartial?

Thank you.

THE COURT:  Mr. Brettschneider?

MR. BRETTSCHNEIDER:  Thank you.  Just
want to follow up on a few things Mr. Walsh

157

1

2          touched on, with regard to potential

3          witnesses in this case.

4              Certainly, there has been mention of

5          the fact that people who have criminal

6          records may testify in this case.  Does the

7          fact that somebody does have a criminal

8          record -- of course, that doesn't indicate

9          that their testimony should not be worthy of

10         belief -- but would you suspect that if a

11         person had been involved from the time they

12         were a young person until the present in

13         criminal activity, that they may have some

14         sort of hidden motive, and may have a

15         propensity to lie?

16             PROSPECTIVE JUROR:  It's a possibility.

17             THE COURT:  Could you speak up, please?

18             PROSPECTIVE JUROR:  I would hope I

19         would evaluate the case on the facts as they

20         were given.

21             MR. BRETTSCHNEIDER:  So even though

22         somebody may have been in trouble in the

23         past, that doesn't mean that they're not

24         telling the truth.

25             PROSPECTIVE JUROR:  Exactly.

jerri krevoff, csr, rpr

1

2          MR. BRETTSCHNEIDER:  In this situation,

3     one of the things that may potentially

4     happen, is that there will be police

5     officers who will testify in this case.

6     Certainly, from the time that we've been

7     young -- you know, we were told the police

8     are here to protect us.  They're also here

9     to do a job.  People do jobs and people do

10    things in their jobs for whatever reasons.

11    You, in your own experience, knowing people

12    you have worked with, who, for whatever

13    reason, have done something that's

14    unexplainable, as far as not doing what they

15    were supposed to do, or even to the point of

16    not telling the truth in completing, you

17    know, something they were supposed to do.

18         PROSPECTIVE JUROR:  Other than a police

19    officer?

20         MR. BRETTSCHNEIDER:  Right.

21         PROSPECTIVE JUROR:  Oh, sure,

22         MR. BRETTSCHNEIDER:  Let's take a

23    police officer.  Is it possible that a

24    police officer could do the same thing --

25         PROSPECTIVE JUROR:  Sure.

1                                                    159

2              MR. BRETTSCHNEIDER:  Is it possible

3         that a police officer may get on the witness

4         stand and, for whatever reason, unbeknownst

5         to you or any members of the jury, but based

6         on your common sense and life experience,

7         know that even though he's raised his hand

8         to tell the truth, he is not telling the

9         truth?

10             PROSPECTIVE JUROR:  Sure.

11             MR. BRETTSCHNEIDER:  Why do you feel

12        that way?

13             PROSPECTIVE JUROR:  Because of stories

14        that I have read.  I guess that's what I

15        have read about.

16             MR. BRETTSCHNEIDER:  Ms. Randazzo, we

17        talked yesterday about the fact that this is

18        a murder case.  There may be pictures that

19        may be graphic.  In looking at the pictures

20        and seeing that someone was killed -- and

21        certainly there has to be a sense of

22        sympathy for anyone, no matter who that

23        person is -- would that sympathy come to a

24        point where it may affect your judgment as

25        to whether you could be fair to Mr. Jackson?

1

2          PROSPECTIVE JUROR:  No.

3          MR. BRETTSCHNEIDER:  Why do you feel

4      that way?

5          PROSPECTIVE JUROR:  I would say just

6      looking at the pictures is just confirming

7      that something did happen.  All the facts

8      determine that decision.

9          MR. BRETTSCHNEIDER:  If Mr. Jackson

10     didn't testify in this case, you didn't hear

11     from him, would that have some sort of

12     negative impact upon you, in making a

13     determination as to whether he was guilty or

14     not?

15         PROSPECTIVE JUROR:  If he did not

16     testify?

17         MR. BRETTSCHNEIDER:  Right.

18         PROSPECTIVE JUROR:  I don't think so.

19         MR. BRETTSCHNEIDER:  Mr. Whence, what

20     about you?  The fact that you didn't hear

21     from Mr. Jackson, went through a complete

22     trial, three, four weeks of testimony, and

23     that at the end of the trial, you heard all

24     the evidence.  Somehow, you haven't heard

25     from Mr. Jackson.

1                                                      161

2            PROSPECTIVE JUROR:  I know if I was up

3       there, I would be screaming bloody murder

4       that I want my side of the story.  Even

5       though my attorney may say, leave it alone,

6       I would still want to say something.

7            MR. BRETTSCHNEIDER:  Let's say you were

8       sitting where Mr. Jackson is sitting.  Using

9       your common sense and life experience, you

10      sat where Mr. Jackson was sitting.  You

11      heard a number of witnesses.  You said to

12      yourself, you know something, they're all

13      lying.  They're all lying.  They're not

14      telling the truth.  The jury has to feel the

15      same as I do.  These witnesses are not

16      telling the truth.

17            And your lawyer says to you,

18      Mr. Whence, don't go up there.  The jury is

19      going to make a determination on the

20      evidence that they have heard.  What would

21      you do?

22            PROSPECTIVE JUROR:  It's my life.  I

23      would go up.

24            MR. BRETTSCHNEIDER:  If you didn't hear

25      from Mr. Jackson, you would have some sort

1                                                              162

2              of -- it would have an influence on you, on

3              making a determination?

4                    PROSPECTIVE JUROR:  Honestly, yes.

5                    MR. BRETTSCHNEIDER:  Ms. Kelly, what

6              about you?  Same question:  You didn't hear

7              from Mr. Jackson.  You heard three weeks of

8              testimony.  You didn't hear from

9              Mr. Jackson.  Would that have an influence

10             upon you?

11                   PROSPECTIVE JUROR:  No.

12                   MR. BRETTSCHNEIDER:  Why do you feel

13             that way?

14                   PROSPECTIVE JUROR:  I guess it's just

15             my work experience.

16                   MR. BRETTSCHNEIDER:  Let's talk about

17             your work experience.  Certainly, before

18             attorneys were allowed to be on juries, we

19             never had a problem wondering whether a

20             person who was sitting there knows more than

21             the person who's standing here.

22                   PROSPECTIVE JUROR:  I assure you I do

23             not.

24                   MR. BRETTSCHNEIDER:  Well, I'm sure you

25             do remember things from law school.  Just

163

from your general knowledge of the law. How
will that impact on you making a
determination? If you hear an instruction
from the Judge as to what the law is, and
somehow, in the back of your mind, you say,
you know, I remember reading a case back in
law school. I think the Judge is wrong.
Would you still follow the Judge's
instruction?

PROSPECTIVE JUROR: My personal opinion
is that lawyers would be able to follow the
law, probably better than most non-lawyers.

MR. BRETTSCHNEIDER: Do you feel
comfortable sitting on a case such as this?

PROSPECTIVE JUROR: Yes.

MR. BRETTSCHNEIDER: You're a nurse,
ma'am.

PROSPECTIVE JUROR: Yes, sir.

MR. BRETTSCHNEIDER: One of the things
I asked everybody yesterday, was with regard
to paperwork that had to be prepared. In
your job, you do prepare a great deal of
paperwork.

PROSPECTIVE JUROR: Yes.

jerri krevoff, csr, rpr

1

2          MR. BRETTSCHNEIDER:  It's important,

3     based on the fact that there may be

4     witnesses who are going to testify as to

5     their paperwork.  If there would be a

6     continuing pattern of, for lack of a better

7     word, let's say, sloppiness, would you

8     question their reliability as far as being a

9     witness?

10          PROSPECTIVE JUROR:  If they used the

11     paperwork to read it, to refresh their

12     memory, no.  If they used the paperwork

13     solely as their testimony, probably, yes.

14          MR. BRETTSCHNEIDER:  Let's say, for

15     instance, somebody testified that an arrest

16     happened on a particular day.  And then,

17     somehow, someone shows him something else, a

18     paper that he prepared, which indicates

19     something different.  Would you then

20     question the reliability of that witness?

21          PROSPECTIVE JUROR:  I would question

22     the reliability of his memory of it, yes.

23          MR. BRETTSCHNEIDER:  Mr. Dunne,

24     certainly, in being a good juror, you have

25     to evaluate witnesses.  I know some of the

things you were talking about with

Mr. Walsh.  I think they're very relevant

and extremely important.

In judging other people in your own

life, what do you look for in make making a

determination?  One would be the example I

used.  Often times, we have repairmen to

come to our house to fix a television or

washing machine.  They show you something

about as big as an inch.  They say, you need

to replace this.  It's going to cost you

seven hundred fifty dollars.  You don't know

the repairman.  How do you know whether to

trust that person.

PROSPECTIVE JUROR:  Do I have to make

that decision immediately?  Or do I have

time to research it?

MR. BRETTSCHNEIDER:  You probably have

some time to research it.

PROSPECTIVE JUROR:  Then I say, I'll

give you an answer in a day or so.

MR. BRETTSCHNEIDER:  If, in this case,

as a juror, certainly you are going to not

have to make a decision right away.  But

166

you're going to have to make a determination
as far as the witnesses' testimony.  Are you
going to also look to other witnesses, in
making a determination as to whether that
testimony is worthy of belief, as far as
corroboration of one witness's testimony
with another one; in regard to, again, not
making a snap judgment on the witness, but
looking at the whole bigger picture?

PROSPECTIVE JUROR:  Yes.

MR. BRETTSCHNEIDER:  What are the
things that you look for in making a
determination whether someone is telling the
truth?

PROSPECTIVE JUROR:  The consistency.
Whether the testimony is consistent.  Based
on life knowledge; whether it sounds true or
not; things like that.

MR. BRETTSCHNEIDER:  Mr. Leutia, one of
the questions I asked, I think two days ago,
if you were in a situation where there
was -- it was eleven to one.  You were asked
to deliberate.  You were the one person
sitting on the jury, for four or five weeks.

1

2          The inclination is to want to go home.  If

3          you were the one person who disagreed with

4          the other eleven members, what would you do

5          in that situation?  If you had eleven people

6          yelling at you, saying, listen, let's get

7          out of here.  You're holding us up.  It's

8          over.  Just change your vote.

9              PROSPECTIVE JUROR:  I would need them

10         to show me how I was wrong, in any way.  If

11         they could show me, in one instance or three

12         instances, how my thinking was wrong, I

13         would change.  If they could not show me, in

14         any instance how my thinking was wrong, I

15         don't know exactly the process, but I would

16         have to stick it out.

17             MR. BRETTSCHNEIDER:  Let me ask you the

18         same question, sir.  It sounds good when

19         you're asking this question at the beginning

20         of the trial.  Just think of coming here for

21         five weeks; listening to testimony, staying

22         here until four-thirty in the afternoon, and

23         this is an important question.  At some

24         point, it's a very serious decision that has

25         to be made.  What would you do?

1                                                    168

2                PROSPECTIVE JUROR:  Well, if I had came

3         to my decision, I consider myself a fairly

4         intelligent person.  I would have to agree

5         with him.  Prove me wrong.  This is what --

6         this is the information I gathered from the

7         testimony.  This is what I believe.  Show me

8         that I'm wrong.  Show me if I made a

9         mistake.  Is my thinking wrong.

10               MR. BRETTSCHNEIDER:  Great in theory.

11        Right answer.  It's December.  It's snowing,

12        it's cold.  People are saying to you, change

13        your mind.

14               PROSPECTIVE JUROR:  No.  A man's life

15        is on the line.

16               MR. BRETTSCHNEIDER:  I have nothing

17        further.

18               THE COURT:  When you're ready,

19        approach.

20               (Whereupon the following side bar

21        conference took place outside the hearing of

22        the open courtroom:)

23               THE COURT:  Counsel, we have seven

24        jurors.  We're talking about the first five

25        first.  That's the first row.  Challenges

                 jerri krevoff, csr, rpr

1                                                                          169

2              for cause, People?

3                     MR. WALSH:  No.

4                     THE COURT:  For cause, defendant?

5                     MR. BRETTSCHNEIDER:  Number two.

6                     MR. WALSH:  I consent.

7                     THE COURT:  Granted.

8                     Any further for cause?

9                     MR. BRETTSCHNEIDER:  No.

10                    THE COURT:  Peremptory, People?

11                    MR. WALSH:  Numbers three and five.

12                    THE COURT:  Defendant?

13                    MR. BRETTSCHNEIDER:  Both.

14                    THE COURT:  Now, we're on the last

15            three in the box.  Challenges for cause,

16            People?

17                    MR. WALSH:  No.

18                    THE COURT:  Cause, defendant?

19                    MR. BRETTSCHNEIDER:  No.

20                    THE COURT:  Peremptory, People?

21                    MR. WALSH:  I'm afraid so.  Number

22            eleven and thirteen.

23                    THE COURT:  Peremptory, defendant?

24                    MR. BRETTSCHNEIDER:  No.

25                    THE COURT:  That gives us one juror.

1                                                          170

2                    (Whereupon the following took place

3            back within the hearing of the open

4            courtroom:)

5                    THE CLERK:  Mrs. Randazzo, please

6            remain seated.

7                    Everyone else is excused with the

8            thanks of the Court.

9                    (Whereupon the remaining prospective

10           jurors left the jury box)

11                   THE CLERK:  Is the remaining juror

12           satisfactory to the People?

13                   MR. WALSH:  Yes.

14                   THE CLERK:  And to the defendant?

15                   MR. BRETTSCHNEIDER:  Yes.

16                   (Whereupon Juror Number Eight was duly

17           sworn by the Clerk of the Court)

18                   THE COURT:  Please fill the box.

19                   (Whereupon fourteen prospective jurors

20           were called to the jury box)

21                   THE COURT:  Counsel, approach the

22           Bench.

23                   (Whereupon the following side bar

24           conference took place outside the hearing of

25           the open courtroom:)

1                                                    171

2              THE COURT:  We have a juror in the back

3         now, who indicates that he had left early

4         yesterday, and was told to come back today.

5         Do you want him?  I'll be guided by you.

6              MR. WALSH:  I don't think it's a good

7         idea.  He wasn't here for your admonitions.

8              MR. BRETTSCHNEIDER:  I agree.

9              THE COURT:  I'm excusing him.

10             (Whereupon the following took place

11        back within the hearing of the open

12        courtroom:)

13             THE COURT:  Mr. Esposito, you're

14        excused from this case.

15             Everyone, I'm going to ask the most

16        important question first.  You've been

17        listening here now for most of yesterday;

18        and, of course, this morning.  Does anyone

19        know of any reason that you can't fairly and

20        impartially sit in this case?  I'm going to

21        take you one at a time at the Bench.

22             (Whereupon the following side bar

23        conference took place outside the hearing of

24        the open courtroom:)

25             THE COURT:  Mr. Carbone, what's the

172

2    problem?

3         PROSPECTIVE JUROR:  I was arrested for

4    possession of firearms.

5         THE COURT:  Certainly, you feel it

6    would not be a good case for you.

7         PROSPECTIVE JUROR:  Yes.

8         THE COURT:  You're excused.

9         All right.  Mrs. Margolies?

10        PROSPECTIVE JUROR:  I work three days.

11   I have a four year old and seventeen month

12   old.  On the dates I don't work, I'm the

13   primary care giver.  It's very hard.  I have

14   no family here to care for the children.

15   Beside that, I'm a business consultant who,

16   with my business as well as other

17   businesses, it's coming to the fiscal year

18   end.  There's a lot of things that need to

19   take place.

20        THE COURT:  Well, I'm concerned with

21   the young children.

22        PROSPECTIVE JUROR:  I'm concerned about

23   that, too.

24        THE COURT:  Your husband would not be

25   able to take over for you?

1                                                            173

2                    PROSPECTIVE JUROR:  No.

3                    THE COURT:  You're excused.

4                    Mrs. Ditore.

5                    PROSPECTIVE JUROR:  I can't do this,

6          your Honor.  Morally, I feel that -- I'm

7          shaking already.  I can't go through with

8          the graphic pictures, because they would

9          upset me very much.

10                   THE COURT:  You're excused.

11                   Mr. Budmore.

12                   PROSPECTIVE JUROR:  I'm a police

13         officer in Brooklyn.  I don't think I could

14         do this fairly.

15                   THE COURT:  Thank you.  You're excused.

16                   Mr. Santangelo.

17                   PROSPECTIVE JUROR:  Just thinking about

18         the case last night.  I know the question

19         was, if you had a close friend who was the

20         victim of a crime.  We had a double murder

21         in the office last year.  It was business

22         associates that I knew quite well.  After

23         thinking about this case, I honestly

24         wouldn't be able to be impartial.

25                   THE COURT:  Excused.

                    jerri krevoff, csr, rpr

1

2          Sir?

3          PROSPECTIVE JUROR:  I feel a little bad

4     for saying this.  A little over a year ago,

5     my brother was arrested.  He was set up by

6     some detectives, as part of a drug deal.  He

7     did not sell drugs.  He was not involved in

8     it.  It dragged on for quite a long time.

9     It's costing him well over ten thousand

10    dollars in legal fees.  It's just finally

11    being settled.  I don't feel I could be very

12    fair in looking at police officers;

13    although --no.  I don't think I could be

14    impartial.

15          THE COURT:  Thank you.  You're excused.

16          Ms. Sinclaire.

17          PROSPECTIVE JUROR:  I don't know that I

18    would be very fair, because of my career.  I

19    am in sales.  It's toward the end of the

20    year.  I'm very preoccupied with quota and

21    things.  I think if it was on a prolonged

22    basis, I must succumb to, like your question

23    before, if I was the only one that didn't go

24    along with the rest of the jury.

25          THE COURT:  There is no duty to hold

175

out, if you are convinced.  But if it's just
the time, I think what counsel was trying to
say, if you're concerned about the time or
getting back to your job, or it's due to
snow, or anything like that.  That can't be
the reason.

          Are you telling me because you would be
concerned about getting back to work, you
would want to just get it over with?

          PROSPECTIVE JUROR:  I might.  I think
I'm preoccupied as it is.  Never mind having
gone on for six weeks.

          THE COURT:  You're excused.

          Mr. Warden?

          PROSPECTIVE JUROR:  I have a few police
officers in my family.  I believe in the
integrity of the police officers.  What they
say, as far as I'm concerned, goes.

          THE COURT:  You're excused.  Thank you.

          Yes, sir?

          PROSPECTIVE JUROR:  The reason I wrote
at the bottom of the paper, is not because I
don't feel I'll be unfair.  I just want to
say that a long, long time along, I used

1                                                      176

2              drugs.  I used marijuana.  I don't know if

3              that's part of it.  I just want to be as

4              honest as possible.

5                     THE COURT:  How long ago?

6                     PROSPECTIVE JUROR:  Eighteen years ago.

7              I was sixteen years old.

8                     THE COURT:  Were you ever arrested?

9                     PROSPECTIVE JUROR:  No.  Just a few

10             times.  I would like to admit that.  Because

11             I don't know how that bears on the case.  I

12             want to just be as honest as possible.

13                    THE COURT:  You used marijuana for

14             personal use?

15                    PROSPECTIVE JUROR:  Yes.

16                    THE COURT:  You never sold it to

17             anybody else?

18                    PROSPECTIVE JUROR:  No.  Just for my

19             own stupidity.

20                    THE COURT:  That does not disqualify

21             you.

22                    PROSPECTIVE JUROR:  I just wanted to be

23             as honest as possible.  This is the first

24             time I'm on a jury.

25                    THE COURT:  Will that affect your

1                                                            177

2              ability to be fair?

3                   PROSPECTIVE JUROR:  No.  I think I'll

4              be fair.

5                   THE COURT:  Any questions?

6                   MR. WALSH:  No.  As long as you can be

7              fair.

8                   PROSPECTIVE JUROR:  I just wanted to

9              admit to it.  It's kind of embarrassing.

10                  THE COURT:  No problem.

11                  Yes, sir, Mr. Dougherty?

12                  PROSPECTIVE JUROR:  In the interest of

13             time and privacy, I prefer not to be

14             questioned.  I'm a special agent, with

15             twenty years in law enforcement.

16                  THE COURT:  Including the D.A.?

17                  PROSPECTIVE JUROR:  Yes.

18                  THE COURT:  You may hear testimony, as

19             counsel indicated, about possible drugs use

20             of the victim, or drug dealing.

21                  PROSPECTIVE JUROR:  I believe I could

22             be impartial.  I don't know if the other

23             officers of the Court would find me

24             credible.

25                  THE COURT:  If you feel you could be

1

2      fair, you're not disqualified by the fact

3      that you, yourself, were a D.A. intelligence

4      officer.

5           Let's go to the other step.  You say

6      the fact that some of the -- the victim used

7      or sold drugs, would not affect your ability

8      to determine the case.  This is not an issue

9      of a self-defense type.

10          PROSPECTIVE JUROR:  No.  In terms of, I

11     have taken many -- I have done many

12     interviews, interrogations.  I have taken

13     depositions; some complaints.  I could be

14     impartial, as far as evidence, as far as --

15          THE COURT:  How about as far as police

16     officers?

17          PROSPECTIVE JUROR:  As far as a

18     witness, though.  I think that I probably

19     would have an above average ability to

20     determine falsehood or pick up something

21     that doesn't ring true.

22          THE COURT:  That's not bad.  But what

23     I'm asking you is, the fact that someone is

24     a law enforcement officer --

25          PROSPECTIVE JUROR:  No.  There's no --

179

THE COURT:  You wouldn't pre-judge because someone has law enforcement, they were necessarily truthful?  That's what I'm asking.

PROSPECTIVE JUROR:  I don't believe that the glove was planted.  But he did lie on the stand.  That's just the way it is.

THE COURT:  You know there are officers who lie, or who are mistaken.

PROSPECTIVE JUROR:  I'm just saying, if I'm going to be disqualified by virtue of this, by either side, I would rather not be questioned in open Court about my career.

THE COURT:  You're not disqualified, so far.  What I'm going to ask the attorneys to do, here at the Bench, is to examine you about your career.  Then they can ask benign questions later on.

Mr. Walsh?

MR. WALSH:  Witness to a crime, I would imagine that has to do with your duties?

PROSPECTIVE JUROR:  Yes.

MR. WALSH:  The only question I have, really, is what I asked everybody else:

1                                                      180

2              Whether you feel a police officer is any

3              more to likely to be truthful than anyone

4              else; or less likely?

5                  PROSPECTIVE JUROR:  It's not about

6              that, as far as I'm concerned.  It's about

7              listening to the testimony, and the

8              responsibility lies with you and the other

9              attorney to bring out whatever is brought

10             out.  I'll listen to it.

11                 THE COURT:  This is just on his career,

12             counsel.

13                 MR. BRETTSCHNEIDER:  I have a few

14             questions.  You said that you have been

15             involved in interrogations.  In this case,

16             there may be a possibility that a police

17             officer testified about the interrogation.

18             Could that interrogation or a statement that

19             a defendant made in this case, be falsified

20             by a police officer?  Or do you think that

21             would ever happen?

22                 PROSPECTIVE JUROR:  I don't think it

23             would never happen.  It has happened.

24             Things happen.  People aren't given their

25             rights.  I don't work in a state or local

1                                                                          181

2              system.   I have been federal all my life.

3                       MR. BRETTSCHNEIDER:   I have nothing

4              further.

5                       THE COURT:   Take your seat, sir.

6                       (Whereupon the following took place

7              back within the hearing of the open

8              courtroom:)

9                       THE COURT:   Do any of you know any of

10             the prospective witnesses, anything about

11             the case; anything about the proceedings;

12             any participants?

13                      Do any of you have any business pending

14             before the police department or the district

15             attorney's office?

16                      Mrs. Schrifken, tell me about victim of

17             a crime.

18                      PROSPECTIVE JUROR:   Someone entered my

19             home during the day, through my front door.

20                      THE COURT:   Anyone apprehended?

21                      PROSPECTIVE JUROR:   No.

22                      THE COURT:   Anything in that experience

23             that would affect you in this case?

24                      PROSPECTIVE JUROR:   No.

25                      THE COURT:   Mr. Dougherty, no further

1                                                          182

2              questions for you.

3                     Mrs. Evlack, what was your occupation

4              prior to retirement?

5                     PROSPECTIVE JUROR:  Teaching;

6              elementary.

7                     THE COURT:  Tell me about victim of a

8              crime.

9                     PROSPECTIVE JUROR:  My husband's young

10             cousin was run down.  His blood showed high

11             levels of alcohol.

12                    THE COURT:  Was the victim alive

13             afterwards?

14                    PROSPECTIVE JUROR:  He was killed.

15                    THE COURT:   That's a horrendous

16             incident.  Can you be fair and impartial in

17             a case such as this?

18                    PROSPECTIVE JUROR:  I can try.

19                    THE COURT:  Mr. Horowitz, is there

20             anything you prefer to discuss privately at

21             the Bench?

22                    PROSPECTIVE JUROR:  Yes.

23                    THE COURT:  Approach.

24                    (Whereupon the following side bar

25             conference took place outside the hearing of

183

the open courtroom:)

THE COURT:  Tell me about accused of a crime; convicted of a crime.

PROSPECTIVE JUROR:  I have a son who was convicted of weapons possession.  I was convicted of felony, about six years ago, as a white collar crime.

THE COURT:  Federal conviction?

PROSPECTIVE JUROR:  State.

THE COURT:  Do you remember the nature of the crime?

PROSPECTIVE JUROR:  Scheme to defraud.

THE COURT:  Was it here in Nassau County?

PROSPECTIVE JUROR:  No; it was Queens.

THE COURT:  May I ask what your sentence was?

PROSPECTIVE JUROR:  I received five years probation.

THE COURT:  That probation is over now?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you have any feelings about your on experience that would carry over to this case?

184

2          PROSPECTIVE JUROR:  Obviously.

3          THE COURT:  I'm excusing you.  Thank

4     you.

5          (Whereupon the following took place

6     back within the hearing of the open

7     courtroom:)

8          THE COURT:  Mr. Matusio, was your wife

9     ever employed outside of the home?

10         PROSPECTIVE JUROR:  She used to be a

11    manager of a bakery.

12         THE COURT:  You indicated some problems

13    with the English language.

14         PROSPECTIVE JUROR:  Well, so far, I

15    understand everything.  Just when they use,

16    like old English, that's when I probably

17    don't know the word.

18         THE COURT:  You mean, when I'm going to

19    be defining the law?

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  If you don't understand

22    something, you just tell me.  You write me a

23    note.

24         PROSPECTIVE JUROR:  I will.

25         THE COURT:  How long have you been in

185

2    the United States?

3         PROSPECTIVE JUROR:  Fifteen years.

4         THE COURT:  You speak very well.

5         PROSPECTIVE JUROR:  Thank you.

6         THE COURT:  We'll start with victim of

7    a crime.  Mrs. Low?

8         PROSPECTIVE JUROR:  Yes.

9         THE COURT:  Go ahead.

10        PROSPECTIVE JUROR:  I got mugged in the

11   street once.

12        THE COURT:  Anyone apprehended?

13        PROSPECTIVE JUROR:  No.

14        THE COURT:  Would that affect your

15   ability to be fair in this case?

16        PROSPECTIVE JUROR:  No.

17        THE COURT:  You indicate that you have

18   a pet at home, which could be a problem in a

19   long overnight stay.  I can't tell you even

20   if you would be overnight.  I can tell you

21   in my fourteen years on the Bench, I have

22   never had a jury more than two days.  That

23   doesn't mean it couldn't be more.  Would you

24   be -- would you be able to make arrangements

25   for your pet?  My concern is, you're not

1

2   going to sit in that deliberating room and

3   look at your watch and be saying, well, I

4   really am just going to vote to get this

5   over with, because I'm concerned with my

6   animal.

7           PROSPECTIVE JUROR:  If it's too long --

8           THE COURT:  What's too long?

9           PROSPECTIVE JUROR:  Like a month.

10          THE COURT:  Sequestered for a month?

11  That won't happen.  Sometimes, I think that

12  the trial of the century has changed so much

13  all of our lives and expectations.  It's

14  important to do real jury service.

15          You have to help me with the

16  pronunciation of your name.

17          PROSPECTIVE JUROR:  Kedish.

18          THE COURT:  Please tell me about victim

19  of a crime, and witness to a crime.

20          PROSPECTIVE JUROR:  My car was

21  burglarized and a neighbor's car was

22  burglarized.  I saw that happen.

23          THE COURT:  Was anyone apprehended?

24          PROSPECTIVE JUROR:  Yeah.

25          THE COURT:  Did you have the

jerri krevoff, csr, rpr

1

2       opportunity to testify at any proceeding or

3       a grand jury?

4            PROSPECTIVE JUROR:  When the police

5       made the arrest, within minutes, neither me

6       or my neighbor could actually specify which

7       of the four broke into the car.  We couldn't

8       tell.

9            THE COURT:  Do you have any feelings

10      about that incident that would carry over to

11      this case?

12           PROSPECTIVE JUROR:  No.

13           THE COURT:  You indicate you have

14      friends in law enforcement?

15           PROSPECTIVE JUROR:  I have friends who

16      are court officers in Queens.

17           THE COURT:  Anything in those

18      relationships that would prevent you from

19      being fair?

20           PROSPECTIVE JUROR:  No.

21           THE COURT:  You're considered -- you'll

22      consider a law enforcement individual the

23      same as anyone else.  You don't decide in

24      advance to believe or disbelieve anyone?

25           PROSPECTIVE JUROR:  Yes.

1                                                          188

2              THE COURT:  Mr. Cavores, has your wife

3         ever been employed outside the home?

4              PROSPECTIVE JUROR:  Yes.  Legal

5         secretary for Maritime law.

6              THE COURT:  Not criminal law?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  Tell me about victim of a

9         crime; witness to a crime.

10             PROSPECTIVE JUROR:  I was robbed while

11        working at a store, armed robbery.  A person

12        was never apprehended.  I had my car

13        burglarized a couple of times.  Two attempts

14        on two different cars.  I also witnessed a

15        couple of incidents where I work.  Nobody

16        was apprehended.

17             THE COURT:  In the robbery of you in

18        the store, what -- was a handgun used.

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  I want to make sure that

21        that experience won't, in any way, carry

22        over to you in this case.  You understand,

23        of course, the allegation, is that there was

24        a handgun used in the killing of the victim

25        in this case?

1

2         PROSPECTIVE JUROR:  Yes.  I don't feel

3    it will have any affect on me.  It's been a

4    long time.

5         THE COURT:  How long ago was that?

6         PROSPECTIVE JUROR:  That was the same

7    time as the other thing I told you about.

8    Long time ago.

9         THE COURT:  Can you all assure me that

10    at the time deliberations begin, you will be

11    able to express your views, listen to the

12    views of your fellow jurors?  Is there

13    anyone who can't do that?

14         Can you all accept the presumption of

15    innocence, burden of proof, as I have

16    explained it to you earlier, and will

17    explain to you in detail at the end of the

18    trial?  Can you all accept that?

19         Can you all accept that the defendant

20    does not have to prove anything.  That

21    Mr. Brettschneider, if he so desired, could

22    sit there silently throughout the trial.

23         Sympathy, thoughts of punishment, they

24    don't belong in the jury deliberation room.

25    Can you assure me you will put aside those

1                                                           190

2              thoughts when you deliberate?  The defendant

3              is not obligated to take the witness stand

4              of call witnesses, or explain his actions in

5              any way.  You must not draw any inference

6              unfavorable to the defendant.

7                   Are there any of you who will or might

8              allow the fact that the defendant does not

9              testify to influence you in your

10             deliberations?

11                  Do any of you have any feelings about

12             the police that would affect your ability to

13             be fair and impartial in this case, that

14             would cause you to prejudge any police

15             officer or law enforcement officer?

16                  Do you want to get started?

17                  MR. WALSH:  Sure.

18                  Good afternoon.  I'm going to make this

19             real brief.  Earlier this morning, I had

20             mentioned what somebody had said yesterday,

21             about serving on jury duty.  Basically, they

22             said they would have difficulty accepting

23             the responsibility in finding somebody

24             guilty or finding somebody not guilty in a

25             case like this.

It's very easy to sit, you know, in your living room, talk to your family and friends about serving on jury duty.  Once you step inside this courtroom, and you know, you could hear when the Judge read the charges, you hear the reaction in the back of the courtroom.  It's a lot different when you walk in here and you have to sit here on a jury and come to a verdict in a criminal case.  It's a difficult thing to come in here and do.

Ms. Lipkin, do you share the feelings of the person I quoted that said they would have a difficult time with the responsibility of finding somebody guilty or not guilty?

PROSPECTIVE JUROR:  I wouldn't have a difficult time with the responsibility.  The only thing I would have a difficult time with is that my responsibility to my business.

MR. WALSH:  Tell me about that.

PROSPECTIVE JUROR:  I work for a restaurant caterer.  We do an enormous

1

2    business every holiday season.  Thanksgiving

3    is an enormous holiday season for us.  I'm

4    the only one who does what I do.  If I had

5    to be here, and then go to my office after

6    work, I might be stressed.  I might be

7    wondering how they're getting along.

8         MR. WALSH:  That's the concern?

9         PROSPECTIVE JUROR:  That's my concern.

10        MR. WALSH:  Whether or not your

11   attention will be fully with us, or --

12        PROSPECTIVE JUROR:  I know I'm going to

13   be worried about all the work that I

14   normally would do.

15        MR. WALSH:  How about you, Ms. Flynn?

16   What I had indicated that that prospective

17   juror said about responsibility of finding

18   guilt or not guilty.  Is there any problem?

19        PROSPECTIVE JUROR:  No.

20        THE COURT:  Sir, how about you?

21        PROSPECTIVE JUROR:  Not at all.

22        THE COURT:  Ma'am?

23        PROSPECTIVE JUROR:  No.

24        MR. WALSH:  Ms. Lowe, how about you?

25        PROSPECTIVE JUROR:  No.

1

2           MR. WALSH:  Let me ask it this way:  At

3      the end of the case, after you've heard all

4      the evidence, you may go back into the jury

5      room, if you're selected to be on the jury,

6      and evaluate the case.

7           I'm going to ask you to assume for the

8      purposes of what I'm about to ask you, that

9      you're convinced after this case is over,

10     beyond a reasonable doubt, that the

11     defendant committed the crimes that he's

12     charged with in the indictment.  Do you have

13     any problem, or any difficulty, with walking

14     back out in this courtroom, standing up,

15     looking at the defendant, and finding him

16     guilty of second degree murder?

17           PROSPECTIVE JUROR:  No.  No problem.

18           MR. WALSH:  If I don't prove my case

19     beyond a reasonable doubt, you'll walk back

20     in the courtroom, stand up and find him not

21     guilty.  Any problem with that?

22           PROSPECTIVE JUROR:  I have no problem.

23           MR. WALSH:  Whatever your verdict is,

24     will be based on what the evidence is, and

25     nothing else?

1

2          PROSPECTIVE JUROR:  Yes.

3          PROSPECTIVE JUROR:  Second degree means

4     it's not capital.

5          THE COURT:  This is not a capital case.

6          PROSPECTIVE JUROR:  I have a problem

7     with capital punishment.

8          MR. WALSH:  You don't have to worry

9     about that.  Anybody else, the question I

10    asked about, basically, your verdict being

11    based on the evidence and nothing else.

12    Anybody feels any differently than the views

13    expressed by the other jurors?  If I prove

14    my case beyond a reasonable doubt, you walk

15    back in the courtroom, look at the

16    defendant, find him guilty?  I don't prove

17    my case, you do just the opposite:  Walk in

18    here, find him not guilty.  Whatever your

19    verdict is, it's based on the evidence and

20    whether it's proven to you beyond a

21    reasonable doubt.  Everybody feels the same

22    way?  Okay.

23         What we said about police officer

24    testimony.  Anybody here have reason to

25    believe a police officer is any more or less

1                                                    195

2                   likely to be truthful?  Does it matter to

3                   any of you ladies and gentlemen, as far as

4                   taking this case as seriously as you would

5                   any other, who the victim was?  Whether you

6                   approve of his lifestyle, whether he's alive

7                   or not.

8                        Can everybody give this case the same

9                   attention they would for anybody else?

10                       Before I sit down, any reason at all,

11                  any of you feel that you couldn't be fair

12                  and impartial in this case, to either side?

13                  Thank you.

14                       THE COURT:  Mr. Brettschneider.

15                       MR. BRETTSCHNEIDER:  I just want to

16                  make something clear.  You mentioned the

17                  fact that this is not a capital punishment

18                  case.  That you feel somewhat relieved.  Do

19                  you still take this, you know, extremely

20                  seriously?  I mean, certainly --

21                       PROSPECTIVE JUROR:  My problem is that

22                  in -- I just don't believe in capital

23                  punishment.  I would have a problem if this

24                  were a first degree murder case.

25                       MR. BRETTSCHNEIDER:  You would still

196

1

2      deal with it as serious --

3              PROSPECTIVE JUROR:  Absolutely.

4              MR. BRETTSCHNEIDER:  Understand the

5      consequences.

6              PROSPECTIVE JUROR:  Absolutely.  And

7      probably because there is not a capital

8      punishment involved, probably be more open.

9      I'll be able to listen.

10             MR. BRETTSCHNEIDER:  Mr. Matteos, you

11     drive a bus.  Are you involved with school

12     children?

13             PROSPECTIVE JUROR:  Yes.

14             MR. BRETTSCHNEIDER:  There must be

15     occasions where kids have problems on the

16     bus.  There may have been an occasion, where

17     they said, this is what happened, and you

18     hear two sides of a story.  In this or any

19     criminal case, the defendant is not required

20     to put on his side of the story.  Would that

21     be a problem to you?

22             PROSPECTIVE JUROR:  No.  What I do is

23     just listen both sides.  From there, I take

24     my decision.

25             MR. BRETTSCHNEIDER:  Well, you may not

1

197

2    hear both sides.  The only side that you may

3    hear with regard to my questioning, is the

4    only way you can consider the two sides, is,

5    I'm getting up on behalf of the defendant

6    and cross-examining witnesses.  Basically,

7    I'm trying to elicit information from a

8    witness that the district attorney does not

9    want to elicit.

10          The fact that Mr. Jackson doesn't

11   testify in this case, is that going to have

12   an influence on you, as to whether you can

13   come to a decision for finding him not

14   guilty.

15          PROSPECTIVE JUROR:  I don't think so.

16   Because what I said before.  I listen when

17   you -- I listen to you, and from there,

18   compare what he has.  I take my decision

19   from there, without listening to him.

20          MR. BRETTSCHNEIDER:  Mr. Dedash, I know

21   you're self-employed.  I think somebody else

22   mentioned the possibility of being out of

23   work for a period of time.  How would that

24   influence you, if you had to be on a jury

25   until, let's say, the middle of December.

198

Would that be a hardship?

PROSPECTIVE JUROR:  The way it was
described, no.

MR. BRETTSCHNEIDER:  Again, my question
is, would you need to hear two sides of the
story, in this case?

PROSPECTIVE JUROR:  Would I need to
hear two sides?  I understand that it's the
prosecutor's job to prove his case.  If you
wanted to, you wouldn't have to really call
anybody.

MR. BRETTSCHNEIDER:  That's the law.

PROSPECTIVE JUROR:  I understand the
law.

MR. BRETTSCHNEIDER:  Do you have a
problem with that?

PROSPECTIVE JUROR:  None at all.

MR. BRETTSCHNEIDER:  Is this going to
be a situation where, six weeks from now,
you're sitting in the jury room, you're
saying, I wish I could have heard from the
defendant.  If I heard from the defendant, I
would feel much better?

PROSPECTIVE JUROR:  Well, let me answer

1                                                        199

2          that this way:  If you advise him not to

3          take the stand -- and that's your call --

4          and you're comfortable with it, obviously,

5          something in what you heard, we heard,

6          convinced you that you didn't have to do

7          that.

8              MR. BRETTSCHNEIDER:  Same question to

9          you, sir.

10             PROSPECTIVE JUROR:  I would feel that

11         if he testified, it would probably -- I

12         would feel it would be better to hear from

13         him, also.  If he doesn't -- if you feel he

14         doesn't have to testify, the prosecution

15         still has to prove their case.  Obviously,

16         if they don't prove their case, he doesn't

17         have to testify.

18             But yeah, it's always good to hear both

19         sides of a story.  Somewhere in the middle,

20         the truth lies.  That's my belief.

21             MR. BRETTSCHNEIDER:  Based on what

22         you're saying to me, is that going to be an

23         impediment --

24             PROSPECTIVE JUROR:  No.  I'm expressing

25         my feelings.  I don't feel it's going to be

1                                                    200

2          an impediment.  I would like to think it

3          won't.

4               MR. BRETTSCHNEIDER:  Thank you.

5               PROSPECTIVE JUROR:  If the prosecution

6          proves his case beyond a reasonable doubt,

7          and I am satisfied with the prosecution's

8          case, that's one thing.  If the prosecution

9          fails to do it completely, a reasonable

10         doubt, of whatever that is, and there is

11         questions, wouldn't hearing from the

12         defendant help make a juror come to a

13         decision?

14              MR. BRETTSCHNEIDER:  Well, I understand

15         what you're saying.  The words are not

16         guilty or guilty.  It's not innocent.

17              PROSPECTIVE JUROR:  I understand.  But

18         it's not guilty beyond a reasonable doubt.

19              MR. BRETTSCHNEIDER:  It's guilty --

20         they have to prove guilt beyond a reasonable

21         doubt.  It doesn't rise to that level.  The

22         Judge is going to instruct you that you

23         would have to find the defendant not guilty.

24         That's why there are certain situations in

25         which we can't prove our innocence.

1

2          PROSPECTIVE JUROR:  I see.

3          MR. BRETTSCHNEIDER:  The standard of

4    law is, not guilty or guilty.

5          PROSPECTIVE JUROR:  I see.

6          MR. BRETTSCHNEIDER:  Does anybody have

7    a problem with that concept?  The fact is,

8    there may be a situation in which you may

9    have questions.  There may not be answers.

10   A lot of times, you will hear the term in

11   Court, that a trial is looking for the

12   truth.  Sometimes you may not find the

13   truth.

14        The fact that you may not hear

15   everything that you want to hear, is that

16   going to be an influence upon you?

17        PROSPECTIVE JUROR:  No.

18        MR. BRETTSCHNEIDER:  You don't hear

19   from a defendant, you don't hear witnesses

20   on his behalf; you don't know where he was

21   at the time the crime was committed.  Is

22   that going to have an impact on you?

23        PROSPECTIVE JUROR:  No.  Because it's

24   not the defendant's job to defend.  It's the

25   prosecutor's job to prosecute.  The

1

2          prosecutor has to indicate beyond a

3          reasonable doubt that the person is guilty

4          of the crime.  If he can't do that, it

5          doesn't matter what the defendant says.

6              MR. BRETTSCHNEIDER:  Thank you.

7          Ms. Lowe, the fact that this is a murder

8          case.  Certainly, when you came for jury

9          duty, you probably didn't realize you were

10         going to sit on a case such as this.  How do

11         you feel about that?

12             PROSPECTIVE JUROR:  I feel that I have

13         to hear both lawyers' facts about the whole

14         case.  Then I could determine --

15             MR. BRETTSCHNEIDER:  Do you have any

16         problems sitting on a case where, you know,

17         you don't have to explain to anybody the

18         importance of this situation.  You to feel

19         comfortable to the point you feel you could

20         be a good juror?

21             PROSPECTIVE JUROR:  Yes.

22             MR. BRETTSCHNEIDER:  Let me ask you

23         about your work.  Is this going to have an

24         impact on you sitting here for six weeks,

25         sir?

```
 1                                                    203
 2              PROSPECTIVE JUROR:  No.
 3              MR. BRETTSCHNEIDER:  I have nothing
 4         further.
 5              THE COURT:  When you're ready, please
 6         approach.
 7              (Whereupon the following side bar
 8         conference took place outside the hearing of
 9         the open courtroom:)
10              THE COURT:  Counsel, we have eight
11         jurors.  We're doing the first four.
12         Challenge for cause?
13              MR. WALSH:  Number three.  She
14         indicated that she would have difficulty
15         concentrating on the case.
16              MR. BRETTSCHNEIDER:  Consent.
17              THE COURT:  Only because it's consent.
18         Any others?
19              MR. WALSH:  No.
20              THE COURT:  Cause, defendant?
21              MR. BRETTSCHNEIDER:  No.
22              THE COURT:  Peremptory, People?
23              MR. WALSH:  Number seven and number
24         nine.
25              THE COURT:  There is one remaining in
```

1

2        that group.

3                MR. BRETTSCHNEIDER:  I challenge him.

4                THE COURT:  Now, we're moving to the

5        next four.  That's everybody else in the

6        box.  For cause, People?

7                MR. WALSH:  No.

8                MR. BRETTSCHNEIDER:  No.

9                THE COURT:  Peremptory, People?

10               MR. WALSH:  Ms. Lowe.

11               THE COURT:  Defendant?

12               MR. BRETTSCHNEIDER:  Number fifteen.

13               THE COURT:  All right.  That gives us

14       two more jurors.  That makes a total of ten.

15               Now, before you leave the Bench, I'm

16       sending for another panel.  We'll tell

17       everyone not to be back until 2:15.

18               However, what I want to ask is that, if

19       you want to consent to have the ten come

20       back on Tuesday, rather than --.

21               MR. WALSH:  I think that's a good idea.

22               MR. BRETTSCHNEIDER:  So do I.  I

23       consent.

24               THE COURT:  All right.  Fine.

25               (Whereupon the following took place

205

back within the hearing of the open
courtroom:)

THE CLERK:  The following two please
remain seated.  Karen Shiplano and Charles
Kedish.

Everyone else is excused with the
thanks of the Court.

(Whereupon the remaining prospective
jurors were excused)

THE CLERK:  Are the he remaining jurors
satisfactory to the People?

MR. WALSH:  Yes.

THE CLERK:  And to the defendant?

MR. BRETTSCHNEIDER:  Yes.

THE COURT:  All right.  Please swear
them.

(Whereupon Jurors Number nine and ten
were duly sworn by the Clerk of the Court)

THE COURT:  All right.  I have good
news, and I have bad news.  The bad news is
that we don't have a completed jury.  We
still have two more jurors and three
alternates to select.

I have to send for another panel.

1

2          you, that all of the participants have

3          agreed that you don't have to sit here this

4          afternoon while we keep going.  Basically,

5          now, you're going to be excused until

6          Tuesday morning.

7              Remember, Friday, we're not working on

8          the case.  Monday is Veteran's Day.  We will

9          resume again on Tuesday at eleven.

10             Do not discuss the case amongst

11         yourselves, are or with others.

12             Do not read or listen to any accounts

13         or discussions of the case reported by

14         newspapers or other news media.  Do not

15         visit or view the premises, or any place

16         where the offenses charged were allegedly

17         committed, or any other promise premises or

18         place involved in the case.

19             Promptly report to the Court any

20         incident involving any attempt by any person

21         to influence any member of the jury, or to

22         discuss the case.

23             Do not form any opinions.  Keep an open

24         mind.  Tuesday morning, eleven o'clock.

25             (Whereupon there was a luncheon recess)

jerri krevoff, csr, rpr

```
 1                                                     207

 2            A F T E R N O O N    S E S S I O N

 3

 4                 THE CLERK:   Case on trial, People vs.

 5            Joseph Jackson.

 6                 THE COURT:   Unfortunately, central jury

 7            was only able to get us thirty jurors, who

 8            are now outside.

 9                 Do you have a suggestion,

10            Mr. Brettschneider?

11                 MR. BRETTSCHNEIDER:   Yes.   With the

12            consent of my client, I think that to

13            alleviate all kinds of time constraints and

14            not waste the Court's time, why don't we ask

15            them if they would be interested on serving

16            on a trial that may end some time in

17            mid-December; rather than going into the

18            Court's instructions at the beginning, or

19            even giving them -- I guess you could give

20            them bare bones about what the case is

21            about.

22                 Other than that, I think that really is

23            a pertinent question, with regard to whether

24            they're willing to serve.

25                 THE COURT:   Mr. Walsh, are you in
```

1

2       agreement?

3              MR. WALSH:  Yes.

4              THE COURT:  We'll do that.  We might

5       not keep very many.

6              Bring them in.

7              (Whereupon the jury panel was brought

8       into the courtroom)

9              THE COURT:  Good afternoon, ladies and

10      gentlemen.  Welcome to County Court.  My

11      name is Judge Abbey Boklan and I will be the

12      presiding judge at this trial.

13             First of all, I wish to apologize to

14      you for having to stand in the hall.

15      Unfortunately, we had another matter that we

16      had to handle before we continued with this

17      trial.

18             We are in the middle of jury selection

19      right now, ladies and gentlemen.  The reason

20      you don't see any jurors here is, that we

21      have excused them for the afternoon, while

22      we try to conclude our actual jury

23      selection.  We have ten sworn jurors.  We're

24      going to be picking two more and three

25      alternates.

209

I would like to introduce to you, ladies and gentlemen, the participants to this proceeding, and just give you a very little information at this stage about the nature of the charges.

The nature of the charges are murder in the second degree, intimidating a witness in the first degree; and hindering prosecution in the second degree.

I would like to introduce Mr. Michael Walsh, assistant district attorney, who will present the case on behalf of Denis Dillon, the District Attorney of this county.

I would like to introduce to you, Mr. Scott Brettschneider, who is an attorney who will be representing Mr. Joseph Jackson, who is referred to as the defendant in this case.  He's sitting next to Mr. Brettschneider.

Before going through my other part of my introduction to you, I wanted to tell you a little bit about scheduling in this trial, to ensure that all of you are willing to participate here with us.  It's a little

1                                                                210

2                  unusual procedure.   We find this, in the

3                  end, does save some time.

4                       In November, of course, as you know,

5                  there are various holidays.   We have

6                  Veterans Day, which is Monday.   We're closed

7                  then, and we're closed Thanksgiving Day.   We

8                  will not work on this case on any Friday in

9                  November.

10                       Even if you exclude all those dates and

11                 the nature of the charges, the attorneys

12                 have assured me we should be finished by

13                 mid-December.

14                       If there are any of you who cannot sit

15                 on this -- I assure you it will be a very

16                 interesting case with two fine attorneys --

17                 if there are any of you who cannot sit on

18                 this case, please raise your hands, now.

19                       Well, how many are willing to stay with

20                 us and sit with us?   Five people.

21                 Counselors, can I see you informally at the

22                 Bench.

23                       (Whereupon the following side bar

24                 conference took place outside the hearing of

25                 the open courtroom:)

1

2          THE COURT:  Only five are willing.  Are

3     you sure you don't want me to go through

4     excuses?  I might be able to salvage some.

5          MR. WALSH:  It's fine with me.  If we

6     get a couple of more, it might help us.

7     We're only going to work with this group

8     this afternoon.

9          THE COURT:  I'm going to take excuses.

10          (Whereupon the following took place

11     back within the hearing of the open

12     courtroom:)

13          THE COURT:  The five of you who raised

14     your hands, we're going to separate you for

15     a minute.  We thank all of you.  But because

16     so many of the others of you have raised

17     your hand, unfortunately, I'm going to go

18     through my whole portion of my introduction.

19     I'll hear your excuses.  I won't just

20     release you.  So the five volunteers, if you

21     can just step over here.

22          As you heard, you're going to be called

23     upon to determine whether or not the

24     evidence which you shall hear and see in

25     this case establishes the defendant's guilt

1                                                                    212

2              of the charges beyond a reasonable doubt.

3                   In order to do this, you will have to

4              evaluate all of the evidence at the end of

5              the trial, to determine whether what you

6              have heard from the witnesses and seen as

7              exhibit is true, and what it all means.

8              This is called finding the facts.  That will

9              be your function alone.  I will find no

10             facts in this trial.

11                  Your ultimate decision is called a

12             verdict.  Your verdict will be either guilty

13             or not guilty.

14                  An attorney presents the evidence,

15             usually by calling witnesses.  Only you can

16             decide what really happened.  And the

17             verdict as to each of the counts remains

18             your decision alone.  As Judge, I will make

19             no determination of whether the defendant is

20             guilty or not guilty.

21                  My role at trial is to ensure that you

22             reach your verdict in accordance with the

23             law.  I will explain to you what the law is,

24             as to all the issues at this trial.  I may

25             have to rule on questions concerning the

213

conduct of the trial.  Those rulings have nothing to do with whether the defendant is guilty or not guilty.

I may also rule on questions concerning what evidence you may consider, and for what purpose.

When I make a ruling concerning whether you may hear some testimony or see some exhibits which is offered as evidence, I will be ruling on whether or not you are permitted to hear it or see it, as a matter of law.

Likewise, if I instruct you to disregard something you might have heard, I will do so because that is the law.  None of my rulings should be taken by you as any indication at all of whether you should believe all or part of what is offered as evidence; or that the defendant is guilty or not guilty.  That is solely your job to determine.

But you must accept the law as I give it to you, if the People and the defendant are to have a fair trial to which they are

2      entitled.

3            The fact that this action is brought in

4      the name of the People, or the evidence is

5      presented by a public official, does not, in

6      any way, indicate that the public wants a

7      specific verdict.  The People in this state

8      are served by whatever verdict is justified

9      by the evidence.

10           You may hear reference to the fact that

11     the defendant is indicted by a grand jury.

12     This, too, is not and must not be taken as

13     any evidence of guilt.

14           As a trial jury, you must consider an

15     indictment as simply a piece of paper by

16     which a defendant is accused of a crime.

17     Only you as members of the trial jury, can

18     determine guilt, and the defendant is

19     presumed to be innocent, unless and until

20     you do find him guilty.

21           Serving on a jury, ladies and

22     gentlemen, is a vital function for citizens

23     under our system of laws.  It is also a very

24     great responsibility; that is, to accord the

25     defendant and the People a fair trial.

215

In order to do so, you must be free from any preconceived notions or any sympathies or prejudices that might prevent you from returning a fair and just verdict based upon the evidence or the lack of evidence.  To help to ensure this, our first order of business is to conduct an examination of the prospective jurors.

I will ask questions of you, and after I am finished, the attorneys for both parties will ask questions, as well.  The purpose of the questions, is not to embarrass you, or to discover any personal details about your lives.  It is simply to determine whether you are qualified to sit in this particular case.

Some of you may be excused because you are not qualified to sit as a matter of law.  That is called excused for cause.

Others may be excused peremptorily, which means by one of the attorneys, without any cause being given.  Being excused is not a reflection on you either as a citizen or a person.  It is simply a determination under

1

2       the rules by one or more of the parties or

3       by me, that you are not to sit in this

4       particular case.

5              I am now going to hear the reasons that

6       you feel that you cannot sit on this case.

7       I regret the inconvenience.  I understand

8       that this is a long trial.

9              However, we are being very realistic in

10      telling you the time frame.  We are trying

11      to be as accurate as possible.  Please do

12      not seek to avoid jury service because it is

13      inconvenient.  I regret the inconvenience.

14      If you're not willing to serve, we cannot

15      try cases, and we certainly cannot try the

16      important cases that take more than a few

17      days.

18             If you all feel the same way now, I

19      will hear you on an individual basis.  Do I

20      have any further volunteers.

21             (Whereupon the following side bar

22      conference took place outside the hearing of

23      the open courtroom:)

24             THE COURT:  Yes?  We need your name.

25             PROSPECTIVE JUROR:  As to the -- I'm

1                                                           217

2              the only would be working in my household.

3              My wife does not work.  She's got a chronic

4              bad back.  I do the household work.  I do

5              not get paid --

6                   THE COURT:  All right.  You're excused.

7                   Next.

8                   PROSPECTIVE JUROR:  M-O-L-Z-O-N.  I

9              have my own business with four people.  This

10             is going to cause me a lot of harm.

11                  THE COURT:  What kind of business?

12                  PROSPECTIVE JUROR:  Import customs

13             brokerage.  There's only four people in the

14             company.

15                  THE COURT:  Do you have any partners?

16                  PROSPECTIVE JUROR:  Yes.  I have one.

17             I also have panic attacks.

18                  THE COURT:  You're excused.

19                  Next?

20                  PROSPECTIVE JUROR:  Last name,

21             M-A-R-R-Y.  Currently, I'm six months

22             pregnant, carrying twins.  My doctors, by

23             seven months, he doesn't want me to work.

24                  THE COURT:  Good luck.  You're excused.

25                  PROSPECTIVE JUROR:  Debbie Grillo.

1                                                                                    218

2                    About two weeks ago, we found out my

3                    mother-in-law was operated on for cancer.

4                    We have two vacations scheduled -- she lives

5                    in Florida -- to visit with her for

6                    Thanksgiving and Christmas.  And we have a

7                    cruise scheduled in January.

8                         THE COURT:  January, you don't have to

9                    worry about.

10                        PROSPECTIVE JUROR:  We have already

11                   purchased tickets for November 28th through

12                   December 3rd.  And 18th through -- 21st

13                   through 31st of December.

14                        THE COURT:  We can't shut down for two

15                   days in December.  You're excused.

16                        PROSPECTIVE JUROR:  S-V-I-R-I-D-A.  I

17                   teach school and we have parent conferences

18                   twice a year.  My appointments have been

19                   already made.

20                        THE COURT:  I keep my teachers.  I do

21                   not excuse teachers.  You get paid.

22                   Unfortunately, the parents will have to be

23                   compensated by the fact that this is a

24                   wonderful learning experience for you.

25                   You're not excused.

```
1                                                    219

2                  PROSPECTIVE JUROR:  C-E-T-T-A.  I'm

3        leaving on my honeymoon Thursday.

4             THE COURT:  Have a wonderful time.

5             PROSPECTIVE JUROR:  Richter.  Your

6        husband treated my son for hemophilia.

7        Steven still has hemophilia.  He needs me

8        for his --

9             THE COURT:  How old is he?

10            PROSPECTIVE JUROR:  Twenty-seven.

11            THE COURT:  He can't give himself --

12            PROSPECTIVE JUROR:  Yes, he does.  At

13       times, his elbow presents -- I still have to

14       go with him, very, very often.

15            THE COURT:  You know, you would be

16       going home every day at four-thirty.

17            PROSPECTIVE JUROR:  I can't be away.  I

18       can't leave Marilyn alone with him.  It

19       hasn't changed since he's six months old.

20            THE COURT:  Is he well, otherwise?

21            PROSPECTIVE JUROR:  Yeah.  He's an

22       attorney, as a matter of fact.

23            THE COURT:  I think he would want you

24       to serve.

25            PROSPECTIVE JUROR:  It's a must
```

1                                                     220
2          situation.
3                  THE COURT:  You're excused.  Next
4          person.
5                  PROSPECTIVE JUROR:  Two things.
6                  THE COURT:  Your name?
7                  PROSPECTIVE JUROR:  G-O-R-D-O-N.  I got
8          a prostate problem.  I can't sit for maybe
9          two hours, and I have to go to the bathroom.
10                 THE COURT:  No problem.  Next.
11                 PROSPECTIVE JUROR:  Tomorrow, I'm
12         leaving for Florida, and come back the
13         beginning of the year.
14                 THE COURT:  Have a good trip.
15                 PROSPECTIVE JUROR:  Palladino.
16         P-A-L-L-A D I N O.  I have a four year old
17         daughter at home.  It's hard for me to stay
18         for such a long time.  I also have a job.
19                 THE COURT:  What kind of a job?
20                 PROSPECTIVE JUROR:  I work for a
21         computer consulting firm.
22                 THE COURT:  Will they pay you while
23         you're here?
24                 PROSPECTIVE JUROR:  Yeah.  But I don't
25         know how long they'll pay me for.

1                                                      221

2              THE COURT:  If you were working, you

3       wouldn't be home with your child, anyway.

4       If they're paying you, you might as well be

5       with us.

6              Not excused.  Next.

7              PROSPECTIVE JUROR:  D-U-N-N.  I teach

8       theology to high school students in a

9       private high school.  They couldn't find a

10      sub for that subject matter for this period

11      of time.

12             THE COURT:  I don't excuse my teachers.

13      I have to hold them, because they get paid.

14             PROSPECTIVE JUROR:  But it's a private

15      high school.  Theology is the subject.  They

16      couldn't find a substitute teacher.

17             THE COURT:  They'll have to, for a few

18      weeks, do without.  You get paid?

19             PROSPECTIVE JUROR:  Yeah.  I'm not

20      worried about that.

21             THE COURT:  Not excused.  Next.

22             PROSPECTIVE JUROR:  Helen Glenby.  I am

23      an alcohol counselor.  As of November 15th,

24      I'm opening my own facility.  I have people

25      in treatment that can't wait that long.

```
 1                                              222
 2              THE COURT:  There's nobody else?
 3              PROSPECTIVE JUROR:  I'm going to be the
 4     only counselor.
 5              THE COURT:  You're excused.  Next.
 6              PROSPECTIVE JUROR:  I have three kids.
 7     I'm in the middle of divorce.  I have nobody
 8     to take care of my kids.
 9              THE COURT:  Excused.  Next.
10              PROSPECTIVE JUROR:  S-I-C-I-N-S-K-I.  I
11     have vacation plans for the week of
12     Thanksgiving.
13              THE COURT:  What day?
14              PROSPECTIVE JUROR:  I'm leaving the
15     Monday before and I'll be back the Friday
16     after Thanksgiving.
17              THE COURT:  Excused.  Next.
18              PROSPECTIVE JUROR:  I'm a single
19     divorced parent --
20              THE COURT:  You didn't give your name.
21              PROSPECTIVE JUROR:  Striker.  I work at
22     Long Island Lighting Company.  I'm in fear
23     of losing my job.  There's no way I can make
24     up that work.
25              THE COURT:  There's no way LILCO can
```

223

fire you for this.

PROSPECTIVE JUROR:  But I would have to work at night to make up all my work, and how would I do it?

THE COURT:  Wait a minute.  LILCO has other employees.  They will be able to take care of it.

PROSPECTIVE JUROR:  Right now, I have to work at night for the two days I've been here.

THE COURT:  What kind of work do you do?

PROSPECTIVE JUROR:  I'm an internal auditor.

THE COURT:  They don't have anybody else?

PROSPECTIVE JUROR:  No.  My work is my work.

THE COURT:  They have to make arrangements for you.  The child care is another story.  Do you have anyone to stay with them at night.

PROSPECTIVE JUROR:  No.  That's the other thing.  I can't stay overnight.

```
 1                                                    224
 2                  THE COURT:  You're excused.  Next.
 3                  PROSPECTIVE JUROR:  P-T.  I own a small
 4          garden center and landscaping business.  I
 5          am the sole proprietor.  I have people
 6          working for me on a day-to-day basis.  I
 7          could never put in three or four weeks.  My
 8          business would fall apart.
 9                  THE COURT:  You're excused.  Next.
10                  PROSPECTIVE JUROR:  F-I-L-A-R-D-O.  My
11          husband is scheduled to go in on the 13th,
12          to Sloan Kettering.  Depending on the tests,
13          he may have to have an operation.
14                  THE COURT:  You're excused.  I hope he
15          feels better.  Next.
16                  PROSPECTIVE JUROR:  Navetta.
17          N-A-V-E-T-T A.  It's very hard for me to
18          make decisions.  My ex-sister-in-law was
19          convicted of a crime.  It would be hard for
20          me to make a decision.
21                  THE COURT:  Excused.  Next.
22                  PROSPECTIVE JUROR:  C-E-R-A-M-I.  I
23          have two elderly parents in their eighties.
24          My mother has cancer.  I take her for
25          chemotherapy.
```

1

2          THE COURT:  No one else can take her?

3     They have no service from the hospital?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  You're excused.  Next.

6          PROSPECTIVE JUROR:  My name is Robert

7     Schneider.  I'm retired from the New York

8     City Fire Department.  I have a heart

9     disability.  I don't think I could stand

10    this many days.  I have high blood pressure.

11         THE COURT:  You mean, the stress would

12    be too much, physically?

13         PROSPECTIVE JUROR:  I think so.

14         THE COURT:  You're excused.  Next.

15         PROSPECTIVE JUROR:  B-A-S-S-O.  Years

16    ago, I was involved in a crime and indicted

17    on it.  I don't think I could fairly sit.

18         THE COURT:  Excused.  Next.

19         PROSPECTIVE JUROR:  I'm already

20    nervous.  I have already convicted him.

21         THE COURT:  You're excused.  Next.

22         PROSPECTIVE JUROR:  Gillman.

23    G-I-L-L-M-A N.  I have a family member who

24    was shot and killed, last year.

25         THE COURT:  You couldn't be fair?

1                                                              226

2              PROSPECTIVE JUROR:  I don't think I

3        could.

4              THE COURT:  You're excused.  Next.

5              PROSPECTIVE JUROR:  I have two

6        reasons --

7              THE COURT:  Can we have your last name.

8              PROSPECTIVE JUROR:  M-E-L-L-E-N.  I

9        have two reasons I would find it very

10       difficult to serve.  One is that I was

11       accosted by a black man when I was in my

12       twenties.

13             I also have a son that we have just

14       gone through criminal charges.  He has a

15       Y.O. status.  For the past three years,

16       we've been in and out of the criminal court

17       system.

18             THE COURT:  You don't think you could

19       be fair?

20             PROSPECTIVE JUROR:  I think it's just

21       too stressful.

22             THE COURT:  You're excused.  Next.

23             PROSPECTIVE JUROR:  Kathryn Walsh.  My

24       son is a Nassau County police officer.  My

25       husband is a retired --

1                                                           227

2                    THE COURT:  Danny Walsh?

3                    PROSPECTIVE JUROR:  Denny.  My son --

4          my husband is a retired police detective.  I

5          was a victim of a crime, while -- my wallet

6          was taken in the night and my face was

7          knifed.

8                    THE COURT:  Being a victim of a crime

9          or related to a police officer, doesn't

10         excuse you.  You have to tell me whether you

11         could be fair.

12                   PROSPECTIVE JUROR:  No.

13                   THE COURT:  Then you're excused.  Next.

14                   PROSPECTIVE JUROR:  D-O-M, G-A-L-A.

15         I'm leaving on the 16th to go out to my

16         daughter in Nevada.  I won't be back until

17         March.

18                   THE COURT:  Have a good trip.

19                   PROSPECTIVE JUROR:  Oh, thank you.

20                   THE COURT:  Off the record.

21                   (Whereupon there was a discussion off

22         the record)

23                   THE COURT:  All right.

24                   (Whereupon the following took place

25         back within the hearing of the open

```
1                                                    228
2         courtroom:)
3              THE COURT:  At this point, I'll ask the
4         clerk to swear all the prospective jurors,
5         to answer truthfully.
6              (Whereupon the entire jury panel was
7         sworn)
8              THE COURT:  Fill the box.
9              (Whereupon the jury box was filled)
10             THE COURT:  All the parties have been
11        identified to you.  Do any of you know the
12        participant to this proceeding?
13             Among the witnesses who may be called,
14        are the following -- and I caution you that
15        my mentioning the name imposes no burden on
16        either side to call that person as a
17        witness:  Detective Abbondandelo, Homicide
18        Squad.  These are all Nassau County Police
19        Department.  Detective Robert Dempsey,
20        Homicide Squad.  Detective Jerl Mullen,
21        Homicide Squad.  Detective Peter Donato,
22        Homicide Squad.  Police officer Richard
23        Paulik, Freeport Police Department.  Police
24        officer Michael P-O-M-O-R-I-C-O, Freeport
25        Police Department.  Detective Joseph Marino,
```

Crime Scene Search Unit, Nassau County.

Detective Nicholas Mattia, M-A-T-T-I-A of

the Scientific Investigation Bureau.

Mr. Michael Herts.  He's a retired detective

from the First Squad.  Detective Brian

Parpan, Homicide Squad.  Detective frank

Allaire, A-L-L-A-I-R-E, First Squad.

Detective William Tweedie, First Squad.

Detective Edward Heggerty, Freeport Police

Department.  Mr. William Walsh, Assistant

District Attorney, Nassau County District

Attorney's Office.  Michael DeMartino, MD,

Deputy Medical Examiner, Nassau County

Medical Examiner's Office.  Mr. Christopher

M. Jordan, Official Court Reporter.

Ms. Isabel Valese.  Miss Skwanitra

Witherspoon.  Mr. Peddie Jenkins.

Mr. Tyrone Isaac and Mr. Roy Isaac.

Do any of you know the prospective

witnesses to this action?

I have told you the nature of the

charges, the alleged date of occurrence.

That's the 20th day of March, 1994.  The

alleged victim is Steven Jason.  It

1                                                    230

2              alleges -- the indictment, alleges the use

3              of a handgun.  Does this case mean anything

4              to anyone?  Does anyone know anything about

5              it, other than what I have told you?

6                  Mrs. Weber, your husband's occupation

7              prior to retirement?

8                  PROSPECTIVE JUROR:  He was a manager in

9              a supermarket.

10                 THE COURT:  Ms. Landon, tell me about

11             victim of a crime.

12                 PROSPECTIVE JUROR:  I was mugged.

13                 THE COURT:  How long ago?

14                 PROSPECTIVE JUROR:  1983 or '84.

15                 THE COURT:  Anyone apprehended?

16                 PROSPECTIVE JUROR:  No.

17                 THE COURT:  Anything in that experience

18             that would affect you in this case?

19                 PROSPECTIVE JUROR:  I don't think so.

20                 THE COURT:  I see that you are a

21             registered nurse, yourself.  We do have the

22             medical examiner who may be testifying.  I

23             want to make sure you won't become the

24             medical expert on the jury.  Can you assure

25             me you won't?

```
 1                                              231
 2              PROSPECTIVE JUROR:  I assure you.
 3              THE COURT:  Mrs. Martin, what type of
 4         counselor are you?
 5              PROSPECTIVE JUROR:  Psychiatric.
 6              THE COURT:  Before your divorce, was
 7         your husband employed outside the home?
 8              PROSPECTIVE JUROR:  No.
 9              THE COURT:  Is there anything you
10         prefer to discuss privately?
11              PROSPECTIVE JUROR:  Yes.
12              THE COURT:  Please approach.
13              (Whereupon the following side bar
14         conference took place outside the hearing of
15         the open courtroom:)
16              THE COURT:  Tell us about accused of a
17         crime, convicted of a crime.
18              PROSPECTIVE JUROR:  It was my
19         ex-husband.
20              THE COURT:  What was the crime?
21              PROSPECTIVE JUROR:  Robbery.
22              THE COURT:  He was convicted?
23              PROSPECTIVE JUROR:  Yes.
24              THE COURT:  Was that in Nassau County?
25              PROSPECTIVE JUROR:  It was in Suffolk,
```

```
 1                                                    232
 2          in 1976.
 3                  THE COURT:  Did he go to jail?
 4                  PROSPECTIVE JUROR:  Yes.
 5                  THE COURT:  For how long?
 6                  PROSPECTIVE JUROR:  Zip-five.
 7                  THE COURT:  Are you close at all to
 8          your ex-husband?
 9                  PROSPECTIVE JUROR:  Just in contact
10          with the daughter.
11                  THE COURT:  Do you have any feelings
12          about what happened to him, that would
13          affect your ability to be fair in this case?
14                  PROSPECTIVE JUROR:  No.
15                  THE COURT:  You don't blame the police
16          department or the district attorney?
17                  PROSPECTIVE JUROR:  No.
18                  THE COURT:  Any questions?
19                  MR. WALSH:  Do you feel he was treated
20          fairly by the police and by whoever
21          prosecuted him?
22                  PROSPECTIVE JUROR:  I think I'm lucky.
23                  MR. BRETTSCHNEIDER:  No questions.
24                  (Whereupon the following took place
25          back within the hearing of the open
```

1                                                       233

2          courtroom:)

3                THE COURT:  Mrs. Benz, your occupation

4          prior to retirement?

5                PROSPECTIVE JUROR:  A receptionist for

6          a legal firm.

7                THE COURT:  Did they practice in the

8          field of criminal law?

9                PROSPECTIVE JUROR:  Some.  Well, they

10         were of counsel to us.  It wasn't actually

11         our firm.

12               THE COURT:  Anything that you may have

13         learned in the course of your occupation

14         that would carry over to this case?

15               PROSPECTIVE JUROR:  I would say so.

16               THE COURT:  Let me be more specific.

17         Will you be able to take the law as I give

18         it to you, and put aside any legal matters,

19         or any law you might have learned in your

20         job?

21               PROSPECTIVE JUROR:  Yes, I would.

22               THE COURT:  Your husband's occupation

23         prior to retirement?

24               PROSPECTIVE JUROR:  Hardware buyer.

25               THE COURT:  Is there anything you

234

prefer to discuss privately?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Please approach.

(Whereupon the following side bar
conference took place outside the hearing of
the open courtroom:)

PROSPECTIVE JUROR:  It was a son-in-law
who was convicted of a felony, and served a
prison term.

THE COURT:  What felony?

PROSPECTIVE JUROR:  Snatched a purse.

THE COURT:  Was anyone hurt?

PROSPECTIVE JUROR:  There was some
minor injury; nothing serious.

THE COURT:  Was that here in Nassau
County?

PROSPECTIVE JUROR:  Yes.

THE COURT:  What was the result of
that?  Was there a trial?

PROSPECTIVE JUROR:  It was a plea
bargain.

THE COURT:  Did he go to jail?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Anything in that, that

1

2     would carry over to this case?

3              PROSPECTIVE JUROR:  I just came and I

4     volunteered only -- I came to you, because

5     my husband was on a jury duty service and

6     was disqualified because of that, by one of

7     the attorneys.

8              THE COURT:  Well, I don't know what's

9     going to happen as far as the attorneys.

10    Let's talk about whether you can be fair.

11             PROSPECTIVE JUROR:  I volunteered.  I

12    hope to be.  I'm not certain, in all

13    aspects.

14             THE COURT:  What aspects are you not

15    certain?

16             PROSPECTIVE JUROR:  I'm concerned

17    whether anything that happened to this boy

18    might reflect on my feelings.  I don't know

19    yet, until I hear the case.

20             THE COURT:  Once you hear the case,

21    it's too late.  You have to tell us now if

22    you're going to be affected by the fact that

23    you had a son who was in trouble and was

24    prosecuted and went to jail.

25             PROSPECTIVE JUROR:  I better not serve.

236

THE COURT:  You're excused.

(Whereupon the following took place back within the hearing of the open courtroom:)

THE COURT:  Ms. Schlissel, what was your husband's occupation prior to retirement?

PROSPECTIVE JUROR:  He was with Time Warner Corporation.

THE COURT:  Is there anything that you prefer to discuss privately?

PROSPECTIVE JUROR:  Yes.

(Whereupon the following side bar conference took place outside the hearing of the open courtroom:)

THE COURT:  Tell us about convicted of a crime.

PROSPECTIVE JUROR:  I have a brother who was in prison for seven years for drug charges.

THE COURT:  Was that here in Nassau County?

PROSPECTIVE JUROR:  No.

THE COURT:  Do you have any feelings

1                                              237

2          about the Police Department, or the district

3          attorney's office, from that experience?

4               PROSPECTIVE JUROR:  No.

5               THE COURT:  Do you think he was fairly

6          treated?

7               PROSPECTIVE JUROR:  Yes.

8               THE COURT:  You may hear some testimony

9          that the victim, the person who is dead in

10         this case, might have been involved in

11         dealings drugs, using drugs, whatever.  I

12         haven't heard the evidence.  Would that, in

13         any way, affect your ability to be fair?

14              PROSPECTIVE JUROR:  I don't think so.

15              THE COURT:  You understand we're here

16         to just try the facts of this case?

17              PROSPECTIVE JUROR:  I understand.

18              THE COURT:  Mr. Walsh?

19              MR. WALSH:  Nothing.

20              MR. BRETTSCHNEIDER:  No.

21              (The following took place back within

22         the hearing of the open courtroom:)

23              THE COURT:  Before I have my court

24         reporter go back, Mr. Dunne, is there

25         anything you prefer to discuss privately?

1                                                              238

2                    PROSPECTIVE JUROR:  No.

3                    THE COURT:  Tell me about convicted of

4            a crime.

5                    PROSPECTIVE JUROR:  My best friend was

6            convicted of marijuana possession with

7            intent to sell.

8                    THE COURT:  How long ago?

9                    PROSPECTIVE JUROR:  Early Eighties.

10                   THE COURT:  Was that here in Nassau

11           County?

12                   PROSPECTIVE JUROR:  No.  Morristown,

13           New Jersey.

14                   THE COURT:  After the conviction, do

15           you remember the sentence?

16                   PROSPECTIVE JUROR:  It was time served,

17           which was probably something like ninety

18           days, plus probation.

19                   THE COURT:  Anything that would carry

20           over to this case from what happened to your

21           friend.

22                   PROSPECTIVE JUROR:  No.

23                   THE COURT:  You won't hold it against

24           the Police Department or the District

25           Attorney of this county for what happened.

239

PROSPECTIVE JUROR:  No.

THE COURT:  You feel your friend was fairly treated.

PROSPECTIVE JUROR:  Yes.

THE COURT:  Tell me about law enforcement.

PROSPECTIVE JUROR:  My father is retired from the New York City Police Department, twenty years.  Additional ten years as bailiff.

THE COURT:  I tell you, as I do all my prospective jurors, the police officers are human beings.  You don't decide to believe or disbelieve anyone because of their occupation, before you even listen.  You listen, you keep an open mind and you use your common sense.  Do you have any problem with that?

PROSPECTIVE JUROR:  Using my common sense?  No.

THE COURT:  What about giving a police officer any greater believability or lesser believability than anyone else, without even listening.

1                                                          240

2              PROSPECTIVE JUROR:  No.   I think I

3      would treat them fairly.

4              THE COURT:  You have to treat them the

5      same, no matter what the person's occupation

6      was, be it a priest, a fireman, a judge.

7      You listen, use your common sense, as you

8      said.

9              Mrs. Palladino, you told us about your

10     occupation previously.

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  I see your husband is a

13     member of the New York Police Department.

14             PROSPECTIVE JUROR:  Right.

15             THE COURT:  Can you fairly and

16     partially sit in a case where we have

17     numerous witnesses who will be testifying

18     who are members of law enforcement.

19             PROSPECTIVE JUROR:  I can be objective.

20             THE COURT:  Can you judge a police

21     officer the same as anyone else who takes

22     the stand.

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Any other law enforcement

25     people, in addition to your husband.

```
1                                                    241
2                PROSPECTIVE JUROR:  No.
3                THE COURT:  You also came up, ma'am, to
4          tell us you were teaching.  I forgot what
5          grade it was.
6                PROSPECTIVE JUROR:  First grade.
7                THE COURT:  You sat in a civil case.
8          It's very different, you can see already.
9          There are different burdens of proof.  I
10         want to make sure you can put aside anything
11         you learned in that civil case.  Tell me
12         about law enforcement people.
13               PROSPECTIVE JUROR:  My husband was a
14         case worker for probation and parole for one
15         year.
16               THE COURT:  Did he ever discuss any of
17         his cases with you.
18               PROSPECTIVE JUROR:  I suppose he
19         probably did.
20               THE COURT:  Anything in the discussions
21         or the relationship with your husband, that
22         would carry over to this case.
23               PROSPECTIVE JUROR:  No.
24               THE COURT:  You could be fair and
25         impartial.
```

242

PROSPECTIVE JUROR:  Yes.

THE COURT:  Do any of you have any business pending before the district attorney's office or the Police Department?

As jurors, your verdict must be unanimous.  Twelve jurors seldom agree immediately.  You will therefore be called upon to deliberate.

Can everyone on the jury promise the parties that at the time deliberations begin, you will participate in those deliberations and express your views?  In other words, are you all willing to participate?

PROSPECTIVE JUROR:  I didn't get a chance to respond to what you said earlier. I do have a civil case pending.

THE COURT:  I'm interested in cases pending before the district attorney's office or the Police Department; which would be criminal cases.

PROSPECTIVE JUROR:  No.

THE COURT:  Do any of you know of any reason you can't fairly and impartially sit

in this case?

My second series of questions concerns your willingness to follow my instructions on the law.  In order to be jurors in the case, you do not have to know anything about the law.  It is my function to explain the law to you.  It is your function to determine the facts and apply the law to those facts; thereby rendering a fair and just verdict.

If you are selected as jurors, I will explain the law in detail to you at the end of the case.  But it is important to know, at this stage, that you will follow the law as I give it to you.  I will therefore, describe, a few basic principles to make sure you ask follow them.  Every person accused of a crime is presumed innocent. That is, he stands innocent in the eyes of the law.  The People must rebut this presumption, if they can, by the presentation of evidence which convinces you beyond a reasonable doubt of the defendant's guilt.

        In a criminal case, the burden of proof
is on the People and remains on the People
throughout the trial.  The defendant is not
required to prove or disprove anything.  In
fact, if he so desired, Mr. Brettschneider
could sit there silently throughout the
trial.

        Can you all accept the presumption of
innocence?

        I will explain to you at the close of
the case exactly what reasonable doubt
means.  You will be required to acquit if,
at the end of the case, because of the
evidence or the lack of evidence presented
to you, you have a reasonable doubt as to
guilt.  Can you all accept the standard of
proof in all criminals cases:  Beyond a
reasonable doubt?  Everyone accepts that.

        Is there anyone who would hold the
People to a higher standard of proof than
that required by law?

        Your job in this case will end when you
determine whether or not the defendant has
been proven guilty.  If the defendant is to

245

be punished, punishment is a job for the
Court exclusively. The jury will have no
role to play. You are not permitted to
consider the possibility of punishment in
your deliberations. You may not include any
recommendation as to sentence in your
verdict. Can you all do that?

Under our system of law, the defendant
is not obligated to take the witness stand
or call any witnesses, or explain his
actions, in any way. You must not draw any
inference unfavorable to the defendant from
this fact. Are there any of you who will or
might allow the fact that the defendant may
not testify to influence you in your
deliberations.

It is not essential that you agree with
or even like these principles of law. You
must be willing to follow the law as I give
it to you. Can you do that?

Do any of you have any feelings about
the police that would lead you to give a
police officers' testimony any greater or
lesser weight than anyone else's, without

1                                                          246

2          even listening.

3               In this case, after we select our

4          twelve jurors and three alternates, we will

5          proceed to the trial.  I ask you to continue

6          to participate in this process of jury

7          selection in accordance with the terms and

8          spirit of the oath which you have all taken.

9          Those of you who will be selected, must be

10         prepared to sit on the case for as long as

11         the trial may last; and until a verdict is

12         rendered.

13              Let me tell you, also, another things

14         about our schedule, which might help a

15         little bit.  While I am trying this case, I

16         am trying to juggle approximately one

17         hundred fifty other cases, as well.  I

18         usually do that in the early morning.

19         Except for the day you deliberate, you won't

20         have to be here until eleven o'clock in the

21         morning.  We take lunch between the hours of

22         twelve-thirty and two.  I will try to have

23         you out of the courtroom between four-thirty

24         and quarter of five, every day.

25              Also, this is a criminal trial, ladies

247

and gentlemen.  During the final
deliberations, you will be sequestered at
all times.  This means, that should the jury
continue to deliberate for more than one
day, our law requires that hotel
accommodations be made available, and the
jury sequestered each night before resuming
the deliberations on each following day.

Mr. Walsh?

MR. WALSH:  Yes.

As Judge Boklan told you, my name is
Michael Walsh.  I'm an assistant district
attorney here in Nassau County.  My
responsibility is to present the evidence to
you during the course of this trial.

The most important thing that I can say
to you, the most important thing that I can
ask of you right now, is that there are no
right or wrong answers to questions that we
ask you.  Whether I'm asking you questions,
or Mr. Brettschneider, Judge Boklan.  The
only good answer that you can give us is the
most honest and candid one you possibly can.

A lot of people feel that this process

1

2      is the most important part of a trial.

3      Without getting twelve jurors who can be

4      fair and impartial to each side, the rest of

5      the trial essentially becomes a waste of

6      time.  The system depends on the twelve

7      people who can truly give both sides a fair

8      trial.

9          What I would ask you to do is,

10     sometimes there's a temptation on the part

11     of people who are sitting where you are, to

12     perhaps give us what you think the right

13     answer might be.  Or maybe the answer that

14     you think we might want to hear.  I'm asking

15     you not to do that.

16         Give us the most honest and candid

17     answer you possibly can.  Whether or not

18     it's what you think we want to hear.  That's

19     the only way we can get a fair and impartial

20     jury to both sides.

21         Everybody heard what the charges are.

22     Judge Boklan told you, they were murder in

23     the second degree, intimidating a witness in

24     the first degree, hindering prosecution in

25     the second degree.

1                                                      249

2                    Without hearing anything else, without

3            more, is there anything about the nature of

4            those charges that would cause any of you to

5            feel that you couldn't be fair and

6            impartial?

7                    We had a juror -- again, we have gone

8            through a number of rounds of jury

9            selection.  One of the prospective jurors

10           yesterday, when I got into that question,

11           said something like, I don't know that I can

12           handle the responsibility in a case like

13           this, of either finding somebody guilty or

14           not guilty.  Does anybody share those

15           feelings?

16                   PROSPECTIVE JUROR:  It's not a judgment

17           that we're making or an opinion?

18                   MR. WALSH:  What you're asked to do is,

19           essentially this:  You listen to the

20           evidence, you listen to witnesses testify,

21           or anything you might see.

22                   Based upon that, you determine whether

23           or not I have proven to you beyond a

24           reasonable doubt, that Joseph Jackson is

25           guilty of the crimes charged in the

250

1

2      indictment.  That's essentially what it

3      involves.

4            Your verdict has to be based upon the

5      evidence; and nothing else.  That's the

6      reason I asked this question.  It's very

7      easy for people, when they're sitting in

8      their living room, talking to their family

9      or friends, to talk about how nice it would

10     be to be on a jury.  Once you step into the

11     courtroom and Judge Boklan reads an

12     indictment that says, murder in the second

13     degree, reality kind of sets in.

14            What I like to ask, is this question:

15     Assume you're chosen as a juror.  You hear

16     all the evidence.  After the evidence, just

17     assume for the purpose of my questioning,

18     you're convinced beyond a reasonable doubt

19     that Joseph Jackson is guilty of the crimes

20     charged in the indictment.  You go back in

21     the jury room.  All of you -- you and all

22     your fellow jurors -- come to that

23     conclusion.  Can you walk back out in this

24     courtroom, stand up and look at the

25     defendant, and find him guilty of murder in

1

2          the second degree?

3                  PROSPECTIVE JUROR:  I would have a hard

4          time rendering such an opinion.  Maybe it's

5          just me inside having a hard time.  I don't

6          want to be judgmental, because everything is

7          based on the evidence.  It has to come from

8          the information.  I think it's just me.  I

9          don't want to make a judgment.  I don't feel

10         I have that right to make judgment.  If it's

11         an opinion, I feel I have an entitlement.

12         Do you understand that?

13                 MR. WALSH:  Only sort of.  I'm having a

14         hard time drawing a distinction between what

15         you mean.

16                 THE COURT:  Can you make a decision?

17                 PROSPECTIVE JUROR:  That's a better

18         word.

19                 THE COURT:  Can you make a decision on

20         whether someone is guilty or not guilty,

21         based on the evidence?

22                 PROSPECTIVE JUROR:  As long as -- I'm

23         talking for me.  I could separate judgment

24         from opinion.  I know what I'm saying

25         inside.  I'm not explaining it right.  To

```
 1                                                    252
 2             make a decision based upon the information,
 3             it's enough here to go on.  That's why we
 4             make a decision.
 5                  MR. WALSH:  The reason I asked that
 6             last question, is because what I usually
 7             follow up with, is, whatever your verdict
 8             is, whether guilty or not guilty, I want to
 9             make sure that that verdict is based upon
10             the evidence; and nothing else.  That's what
11             I'm concerned with.  Do you think you can do
12             that?
13                  PROSPECTIVE JUROR:  I have no problem
14             with that.
15                  THE COURT:  How about you,
16             Ms. Landetta?
17                  PROSPECTIVE JUROR:  Yes.
18                  MR. WALSH:  Based upon the evidence
19             that you have.  Let me ask you the question
20             again.  If I prove my case to you, if you
21             listen to the evidence, beyond a reasonable
22             doubt, do you have any problem walking into
23             the courtroom, looking at the defendant and
24             finding him guilty of second degree murder?
25                  PROSPECTIVE JUROR:  No.
```

jerri krevoff, csr, rpr

253

MR. WALSH:  If I don't prove any case, you can find him not guilty?

PROSPECTIVE JUROR:  That's right.

MR. WALSH:  Anybody else feel any differently?  After listening to what I said, and some of your fellow prospective jurors said, does anybody feel they would have a difficult time with this case?

Judge Boklan read to you a list of witnesses; potential witnesses you might hear during the course of the case. Probably over half of those witnesses are police officers.  If you are chosen to sit on this case, you are going to hear testimony from police officers.  I think that the most important question really, essential question, when you're talking about evaluating testimony of police officers, is whether or not any of you believe that a police officer is any more likely or any less likely to tell the truth on the witness stand just by virtue of the fact that they're a police officer.  That's really the question.  Does anybody have any

1

2    feelings one way or the other about that.

3            PROSPECTIVE JUROR:  I think they're no

4    different than anybody else.  People are

5    people.

6            MR. WALSH:  Great.  They're human

7    beings.  They're subject to the same

8    frailties as you are.

9            PROSPECTIVE JUROR:  Right.  They bleed

10   the same way.

11           MR. WALSH:  Because a police officer

12   wears a uniform and badge, do you feel you

13   would tend to believe what that person says,

14   more than anybody else; all other things

15   being equal.

16           PROSPECTIVE JUROR:  No.

17           PROSPECTIVE JUROR:  I agree with her.

18           MR. WALSH:  Does anybody disagree?  Or

19   does anybody feel they would TEND to believe

20   what a police officer said any more or any

21   less than anyone else?

22           Ms. Paladino, does it matter to you

23   whether the victim was black or white?

24           PROSPECTIVE JUROR:  No.

25           MR. WALSH:  Does it matter to you

1                                                    255

2              whether the victim is young or old?

3                   PROSPECTIVE JUROR:  No.

4                   MR. WALSH:  Does it matter whether the

5              victim is male or female.

6                   PROSPECTIVE JUROR:  No.  Regardless,

7              it's a shame.

8                   MR. WALSH:  You wouldn't take this case

9              any more or less serious based upon anything

10             that was just mentioned.

11                  PROSPECTIVE JUROR:  No.

12                  MR. WALSH:  What if you found out,

13             during the course of the trial, that the

14             victim, the individual who was killed, sold

15             drugs during the course of his life?  What

16             would you think of the case.

17                  PROSPECTIVE JUROR:  I would have to see

18             the circumstances, in order to make an

19             opinion.

20                  MR. WALSH:  First of all, it's not

21             something you approve of.

22                  PROSPECTIVE JUROR:  Right.

23                  MR. WALSH:  Is it something that would

24             make you take this case any less seriously

25             than you otherwise would?

```
 1                                                    256
 2                PROSPECTIVE JUROR:   No.  Serving as a
 3       juror is a serious service, to be taken with
 4       importance.
 5                MR. WALSH:  My concern is -- let me go
 6       back.  I spoke about, basically, the job of
 7       a jury determining what happened.  Based on
 8       the evidence, determine whether or not the
 9       defendant committed the crime with which he
10       was charged.  Who the victim was, whether or
11       not you like what you hear about him,
12       whether or not you approve of what his
13       lifestyle was, has nothing to do with
14       whether or not this defendant committed the
15       crime that he's charged with.  Right?
16                PROSPECTIVE JUROR:  Right.
17                MR. WALSH:  I'm concerned that if you
18       hear things you don't like about the victim
19       in this case, that it would cause you or
20       anybody else to take the case less seriously
21       than you otherwise would.
22                Can everybody separate those two
23       things?  Does anybody feel differently?
24       Again, at the beginning, I said, please be
25       honest.
```

```
 1                                                    257

 2                PROSPECTIVE JUROR:   I think I would be

 3           more empathetic toward the defendant if the

 4           victim were a criminal, himself.  I really

 5           do.

 6                MR. WALSH:   Thank you.  Again, I said

 7           at the outset, it may not be what everybody

 8           considers the right answer.  If that's the

 9           way you feel, we need to know that.  Does

10           anybody feel the same way?  I would just

11           ask, before I sit down, there are a couple

12           of you who came up to the Bench earlier.

13           You expressed reservations.  My concern, and

14           I would think everybody's concern here, is

15           that we have twelve jurors who are not only

16           fair and impartial, but who are going to be

17           giving us their full attention and giving

18           the case the full attention; should you be

19           chosen as a juror.

20                Is there anybody who's going to have a

21           problem with that?  Specifically, Mr. Dunne,

22           you were at the Bench before.  Do we have

23           anything to be concerned about, as far as

24           that's concerned; your being here but not

25           being here?
```

1                                              258

2              PROSPECTIVE JUROR:  No.  If I'm chosen,

3       I will fill it one hundred -- I will devote

4       one hundred percent to the case.

5              MR. WALSH:  Ms. Paladino, how about

6       yourself?

7              PROSPECTIVE JUROR:  It's just that I

8       have a four year old daughter, and if she

9       should get sick, I would have to stay home

10      and watch her.  I don't know how that

11      affects the jury.  I can't promise that

12      she's not going to get sick.

13             THE COURT:  We can never promise that

14      with a four year old.  There is no other day

15      care available?  I know you mentioned, you

16      do work.

17             PROSPECTIVE JUROR:  I have a

18      babysitter.  Usually, when she is sick, I do

19      take off from work.  I don't leave her with

20      my sitter.  That's my only concern.

21             THE COURT:  If she did get sick, for

22      example, you were deliberating, or going

23      into deliberations, you realize you couldn't

24      go home.  Certainly, with any jury, if there

25      were an emergency during the course of a

259

1

2     trial, we would try to accommodate you.

3          PROSPECTIVE JUROR:  I could probably

4     work things out with my husband.  I always

5     like knowing what's going on with her.  If

6     she got sick, how would that affect it?

7          THE COURT:  It would.  Certainly, if

8     she had a cold, a nose cold, you would still

9     have to come in and serve on the jury.

10          PROSPECTIVE JUROR:  All right.

11          THE COURT:  If there was something, God

12     forbid, serious --

13          PROSPECTIVE JUROR:  Oh, no.  God

14     forbid.  I would make arrangements.

15          MR. WALSH:  If you're chosen to be

16     here, you'll be with us.

17          PROSPECTIVE JUROR:  With my undivided

18     attention.

19          PROSPECTIVE JUROR:  May I ask a

20     question?  Your Honor, does the Court have,

21     you know, the overrule with our jobs, that

22     we can't lose our jobs if we remain on here?

23          THE COURT:  The legislature has passed

24     laws that you can't lose your job.  However,

25     we can't force anyone to pay you.  They

260

can't punish you for being on jury duty.  If

you felt you were being punished for that, I

guess you would go to the Commissioner of

Jurors.  That is against the law.

PROSPECTIVE JUROR:  But if, right now,

they pay us for jury duty, is there a

certain time that, you know, that they only

pay us up to?

THE COURT:  They don't have to pay you

for very long.  They certainly wouldn't pay

you are to five weeks.  For instance, LILCO,

school districts, they all pay.  If they

don't pay you, would that be a hardship?

PROSPECTIVE JUROR:  Yeah.  Because

that's my source of income.

THE COURT:  What type of organization

do you he work for?

PROSPECTIVE JUROR:  Long Island Jewish.

THE COURT:  I'll allow you to make a

phone call.  We'll continue with the jury

selection.  I'm going to have my law

secretary from inside, call the Long Island

Jewish Hospital, Hillside Division and find

out what their policy is.

261

PROSPECTIVE JUROR:  I could give you the number.  It will be a lot easier to ask them directly.  I would appreciate it.

PROSPECTIVE JUROR:  I might have a problem with that, also.  I don't know how long they pay me for.

THE COURT:  We'll have to let you make a call, or call on your behalf.  Do you have a preference?

PROSPECTIVE JUROR:  I can call.

THE COURT:  We'll continue.  Then before we make the final determination, we'll let you go out an make a telephone call.  In the meantime, let's go through the questions.

MR. WALSH:  Do you have any reason you feel you couldn't be fair and impartial?

PROSPECTIVE JUROR:  No.

MR. WALSH:  Anything that I said or Judge Boklan said, bother you?

PROSPECTIVE JUROR:  No.

MR. WALSH:  Cause you any problem.

PROSPECTIVE JUROR:  No.

MR. WALSH:  Basically, I prove my case

```
 1                                                  262
 2              to you beyond a reasonable doubt, you walk
 3              out here and you find him guilty.
 4                   PROSPECTIVE JUROR:  Yes.  If it's
 5              proven beyond a reasonable doubt.
 6                   MR. WALSH:  If I don't, you find him
 7              not guilty.
 8                   PROSPECTIVE JUROR:  That's right.
 9                   MR. WALSH:  Whatever your verdict is,
10              it's based on the evidence.
11                   PROSPECTIVE JUROR:  The evidence only.
12                   MR. WALSH:  Is there anything that I
13              haven't covered, before I sit down, any
14              reason that any of you feel you would have
15              difficulty being fair and impartial?
16                   PROSPECTIVE JUROR:  The only thing I
17              wish was covered now and not later, would be
18              the definition of reasonable doubt, since
19              that is such a major thing we would have to
20              hear and agree to.
21                   THE COURT:  It is.  It's complicated.
22              I will explain it at the end of the case,
23              where it makes more sense to you, as well.
24              All you have to know, at this point is, to
25              the best of your ability, will you follow
```

263

the law as I give it to you, and the
explanation that I give you.

PROSPECTIVE JUROR:  I guess I'm going
to have to wait to hear it.

MR. WALSH:  You definitely will have to
wait to hear it.  You seem troubled by that.

PROSPECTIVE JUROR:  Yeah.  Because it's
such a vague term.  Not to know what the
definition is, and if I could commit to
agreeing to it is troublesome; yes.

THE COURT:  Well, you have to agree to
whatever I say, whether you agree with it or
you disagree with it.  So that, basically,
whatever the definition is, you have to be
willing at this time to following the law.

PROSPECTIVE JUROR:  Judge, as you well
know, there are parameters to definitions
and some interpretation, I'm sure.

THE COURT:  There's a lot of
interpretation, to what constitutes beyond a
reasonable doubt.  I will explain that law
to you.  Then you have to get into the jury
room and determine whether you feel that
that standard has been reached.  I don't --

264

it's not like a philosophical or theological question, where it's a play on words.

I tell you this is the standard.  Then you get into the jury room; and you have to make sure that all of you are in agreement that that standard has been reached.  If I give you a bottom line sentence now, it won't be -- it will be out of context with the entire charge.  It doesn't make as much sense as it does at the end.

MR. WALSH:  What we have to try to get, if we possibly can -- and the answer might be that you can't give us any such assurances -- what we have to try to get is, your assurance that you will follow the law as Judge Boklan instructs you that it is. That's even if you don't agree with it.  If the Judge tells you at the end of the case, it's against the law to stand with your left hand in your pocket, that may seem ridiculous to you.  But your obligation is to follow the law as the Judge gives it to you; whether you agree with it, or whether you like it or not.  Whatever that law is,

```
 1                                              265
 2            whatever definition she gives you.  Do you
 3            think you can do that?
 4                 PROSPECTIVE JUROR:  Yeah.  Just as long
 5            as we admit that when each person, there's
 6            some latitude with their interpretation of
 7            what the definition means.
 8                 MR. WALSH:  One person could find that
 9            something is proven to them beyond a
10            reasonable doubt.  Somebody else might feel
11            it's not.
12                 THE COURT:  You're out of time.
13                 MR. WALSH:  We have your assurance that
14            whatever the law is that the Judge gives to
15            you, you will do your best to follow it.
16                 PROSPECTIVE JUROR:  Yes.
17                 THE COURT:  Mr. Brettschneider?
18                 MR. BRETTSCHNEIDER:  Yes.  One of the
19            things that obviously has to be discussed
20            with anyone who is a prospective juror is
21            the nature of the case and whether this case
22            is right for them.  And whether a case is
23            right for us, is based upon your common
24            sense and life experience.  I don't know
25            what's gone on in your life, which would
```

266

either make you fair or unfair as
prospective jurors.

Now, Mr. Dunne, I just want to continue
on with what was discussed with Mr. Walsh.
It's not in the sense of putting you on the
spot.

Basically, one of the things that any
attorney would want to know is, can a juror
follow the law.  Certainly, as a teacher of
theology, you know different things that --
you know, with regard to bigger questions
than some of the things that we settle here
in a Court of law.  Of course, this is an
extremely serious case.  There may be things
that you may feel as though you couldn't
follow the law.

What the Judge is going to explain with
regard to reasonable doubt, I'm not going to
tell you what reasonable doubt is, is that
there are certain things that are reasonable
doubt, and certain things that are not.

If you felt, based on your own common
sense and your life experience, that what
the Judge was telling you, you could not

1                                                              267

2              agree with, would you do something other

3              than what the law was.

4                   PROSPECTIVE JUROR:  If, during the

5              explanation, there was a serious

6              disagreement that I could not fulfill any

7              obligation, and take the instruction of the

8              Judge, serious disagreement?

9                   MR. BRETTSCHNEIDER:  Because basically,

10             when you swear an oath as a juror, you're

11             saying I can follow the law.  At this point,

12             since you don't know the law, would you have

13             a problem sitting as a juror.

14                  PROSPECTIVE JUROR:  Well, one of the

15             reasons I raised the issue is so that we

16             could clarify that.  So I could say for

17             sure, I could follow the law.  Without

18             having heard that, I don't know.

19                  MR. BRETTSCHNEIDER:  Let me give you an

20             example.  If the defendant did not choose to

21             take the witness stand and you didn't hear

22             from him, would that create a problem in

23             your mind as to whether you could find him

24             not guilty.

25                  PROSPECTIVE JUROR:  No.

                    jerri krevoff, csr, rpr

1

2        MR. BRETTSCHNEIDER:  What if there were

3    no witnesses on his behalf.

4        PROSPECTIVE JUROR:  No.

5        MR. BRETTSCHNEIDER:  What if there was

6    evidence which would tend for you to believe

7    that someone other than the defendant

8    committed this crime?  Could you find him

9    not guilty.

10        PROSPECTIVE JUROR:  Yes.

11        MR. BRETTSCHNEIDER:  Now, one of the

12    things that was discussed is that you're a

13    teacher.  There were concerns about, you

14    know, teaching your students.  The other

15    question I think Mr. Walsh touched on,

16    briefly is, somewhere in the middle of

17    December you get a call from people at your

18    school, and they say, listen, you know.

19    Parents are calling.  They're unhappy.

20    Where's Dunne.  He's sitting on a jury in

21    Mineola.  Well, that's not good enough.

22    Somebody calls you and says, hey, when are

23    you coming back.  Will that distract you to

24    the point that you couldn't sit as an

25    effective juror.

269

PROSPECTIVE JUROR:  No.  I don't think that would.

MR. BRETTSCHNEIDER:  In this case, you may not hear from Joseph Jackson.  The fact that he sits at the defense table and he's accused of murder, does that say something to you?  Or do you -- I mean, from the time -- you've heard the term, presumed innocent.  The law says he's presumed innocent.  The fact is, he's sitting over there.  You've heard he's accused of an extremely serious crime.  Could you put that aside.

PROSPECTIVE JUROR:  Yeah.

MR. BRETTSCHNEIDER:  Yes.

PROSPECTIVE JUROR:  Would I take into consideration that he's still innocent until proven guilty?

MR. BRETTSCHNEIDER:  Yes.

PROSPECTIVE JUROR:  Absolutely.

MR. BRETTSCHNEIDER:  The fact is that you've heard that Joseph Jackson doesn't have to testify.  Nobody has to testify in his behalf.  Yet, all along, you always

270

hear -- there's always two sides of a story. The Court says, doesn't have to be two sides. Agree or disagree with that proposition, that you don't have to hear two sides of a story this case?

PROSPECTIVE JUROR: I would like to hear his side. I would probably say to myself, well, if he's innocent, why not tell the Court his side of the story.

MR. BRETTSCHNEIDER: Let me propose this to you: Let's say witness number one gets on the witness stand. The district attorney goes first, because he's proving his case. Witness number one gets on the stand. Using your common sense, your life experience, you say witness number one is not telling the truth.

Witness number two gets on the stand. Again, you don't believe witness number two. Witness number three gets on the stand and tells a contradictory story as to witness number one and witness number two. The district attorney stands up and says, I rest. He says no more witnesses.

271

2    I get up, I say, no witnesses.

3        The Judge instructs you on the law and

4    asks you to deliberate and come up with a

5    verdict.  Based upon the fact that you've

6    heard three witnesses, none of whom you

7    believe, that's the evidence that's

8    presented to you.

9        You haven't heard from Mr. Jackson; you

10   haven't heard from anyone on his behalf.

11   Could you find him not guilty.

12       PROSPECTIVE JUROR:  Yes.  I would find

13   him not guilty.

14       MR. BRETTSCHNEIDER:  Same question.

15   You don't hear from Mr. Jackson, but you

16   don't believe any of the witnesses.  But

17   there is somewhere a sense that says, boy,

18   there must be situations in which it's

19   impossible to prove innocence.  That's why

20   the terms are not guilty and guilty.  Bottom

21   line is, do you need to hear two sides of

22   the story in this case?

23       PROSPECTIVE JUROR:  If I don't get two

24   sides, I have to go with what I have.

25       MR. BRETTSCHNEIDER:  The law says I'm

272

1

2      not obligated to provide you with a second

3      side of the story.

4              PROSPECTIVE JUROR:  No problem.

5              MR. BRETTSCHNEIDER:  You're a nurse.

6      I'm sure you prepare a lot of paperwork in

7      your field.

8              PROSPECTIVE JUROR:  Yes.

9              MR. BRETTSCHNEIDER:  Is accuracy

10     important.

11             PROSPECTIVE JUROR:  Very important.

12             MR. BRETTSCHNEIDER:  There may be

13     witnesses in this case who prepared reports.

14     And certainly, in a case as important as

15     this -- there's no hiding what the

16     consequences are in a case such as this.

17     I'm not asking you to hold anybody to a

18     higher standard.  If someone's paperwork is,

19     to term it, sloppy, or inadequate, in your

20     opinion, would you trust that person's

21     reliability as to what they testified to,

22     based on the fact that their paperwork

23     wasn't correct.

24             PROSPECTIVE JUROR:  It depends on how

25     uncorrect it was.

273

MR. BRETTSCHNEIDER:  Let's say someone gets on the stand and testifies to a certain arrest date.  You find out on his paperwork, he has a date two months different from what he testified to.  Would you question his reliability.

PROSPECTIVE JUROR:  I might.

MR. BRETTSCHNEIDER:  Let me ask you, as far as, here's a situation in which you are sitting in judgment on a murder case.  There may be graphic pictures.  There may be things you're going to hear.  The fact that you see a person who has died.  I mean, there's a natural inclination to feel sorry. The fact that there is a victim in this case, will that sympathy somehow interfere with your ability to be fair in making an evaluation as to the evidence in this case?

PROSPECTIVE JUROR:  No; I don't think so.

THE COURT:  Before you get to Ms. Paladino, I have the answer for her.  We don't have a definitive answer for you, Mrs. Martin.

1                                                          274

2              Mrs. Palladino, your people will pay

3         for only two weeks.

4              PROSPECTIVE JUROR:  That would be a

5         problem.

6              THE COURT:  That would be a hardship

7         for you?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  You're excused.

10             Mrs. Martin, Long Island Jewish thinks

11        it's three weeks, but they're checking it.

12             PROSPECTIVE JUROR:  If it's three

13        weeks, I'm going to have a problem, because

14        that's what I live off.

15             THE COURT:  I'm sorry, counsel.

16             MR. BRETTSCHNEIDER:  That's all right.

17             One of the things we were talking

18        about, sympathy -- there was a situation in

19        which somebody died, no matter who that

20        person was, there is generally a feeling of

21        sympathy.  Will that interfere with your

22        ability to give Mr. Jackson a fair trial?

23        Put aside the fact that someone died in this

24        situation, or -- can you put that aside and

25        give him a fair trial.

PROSPECTIVE JUROR:  I could give him a fair trial, according to the evidence.  If it was proven to me that he was guilty, I would then render a verdict of guilty.  If it was proved he was innocent, I would render a verdict of innocent.

MR. BRETTSCHNEIDER:  There may be police officers who are going to testify in this case.  For example, let's say that that police officer got on the stand and he testified that he received a confession or a statement from a witness in this case.  The fact that he's a police officer, does that make it so.

PROSPECTIVE JUROR:  No.  I don't think it would make it so.  He's human.  He could be telling us that this is what happened, and it really didn't.  I would take it into consideration.  He's a human being.

MR. BRETTSCHNEIDER:  Same question.  The fact that a police officer gets on the stand and says, listen, I got a statement from this person.  This person said X, Y and Z.  Does that make it so, that X, Y and Z

1                                                              276

2        was said by that person.

3                PROSPECTIVE JUROR:   If I believe he was

4        telling the truth.

5                MR. BRETTSCHNEIDER:   What if you didn't

6        believe he was telling the truth.

7                PROSPECTIVE JUROR:   Then I wouldn't

8        believe him.

9                MR. BRETTSCHNEIDER:   The fact is, would

10       you give a police officer some sort of

11       higher standing; in the sense that, do you

12       believe that a police officer has no motive

13       to lie.

14               PROSPECTIVE JUROR:   No.

15               MR. BRETTSCHNEIDER:   Have there been

16       times on your own job, in which you question

17       somebody as far as maybe not understanding

18       why they didn't do something, or they may

19       not have told the truth.  You can't figure

20       out their motive as to why they may not be

21       telling the truth.  There may be an

22       indication where you may feel, based on your

23       common sense, your life experience, somebody

24       is not telling the truth on the witness

25       stand.  Would you use what you have learned

1                                                              277

2              at work, and within your personal life, in

3              making that determination.

4                   PROSPECTIVE JUROR:  I think so.  Yes.

5                   MR. BRETTSCHNEIDER:  One of the things

6              that is different probably than judgments we

7              make in our own personal life, is that we

8              know people.

9                   THE COURT:  Before you continue with

10             Mrs. Martin, unfortunately, we just found

11             out, she works part-time only.  They won't

12             pay, at all.

13                  PROSPECTIVE JUROR:  That's news.  When

14             I was here, they said they would pay me for

15             jury duty.

16                  THE COURT:  They just checked it and

17             called back.  You say you need that money to

18             live on.

19                  PROSPECTIVE JUROR:  Yes.

20                  THE COURT:  I'm going to excuse you.  I

21             can't take away your salary for five weeks.

22             I'm sorry.

23                  Mr. Dunne, what are we checking for

24             you?

25                  PROSPECTIVE JUROR:  To see if I get

278

paid.

MR. BRETTSCHNEIDER:  Mr. Dunne, while you're here, a lot of times, what I was saying to Ms. Martin is, we know people.  We know whether to trust their word or not. When you meet a person for the first time, you're going to be meeting witnesses for the first time, and you're going to have to trust whether they're telling the truth.

What are the things you look for in whether a person is telling the truth or not.

PROSPECTIVE JUROR:  I would look for consistency in what they're saying.  See if it makes sense.  See if it's reasonable. See if it's prefabricated, kind of coached kind of testimony.  Hopefully, with questioning, it would give me an overview of how they respond to things they not be prepared for.  If they respond quickly and honestly.

MR. BRETTSCHNEIDER:  Same question.

PROSPECTIVE JUROR:  I like people who look at you when you talk to them.

279

MR. BRETTSCHNEIDER:  If you have
somebody who gets on the stand, you find out
that they've been in trouble from the time
they were a teen-ager to the present, how
would you feel about that type of person?

PROSPECTIVE JUROR:  I would have to sit
and really search my soul to listen to a
person like that.  I would have my doubts.

MR. BRETTSCHNEIDER:  Same question.
Somebody has been in trouble from the time
they have been a teenager to the minute they
walked on that witness stand.  How do you
look at that person in regard to
credibility, as to what that person is
telling you.

PROSPECTIVE JUROR:  I'm going to have
some difficulties with it.  I might have
some difficulty believing them.  It would
depend on what they say.

MR. BRETTSCHNEIDER:  How about you.

PROSPECTIVE JUROR:  I would have a hard
time believing that person.

MR. BRETTSCHNEIDER:  I have nothing
further.

1                                                          280

2              THE COURT:  Counsel, when you're read,

3         approach.

4              (Whereupon the following side bar

5         conference took place outside the hearing of

6         the jury:)

7              THE COURT:  I'm missing my clerk.

8              Counselor, we have ten jurors.  So

9         we'll do the first two first.  Challenges

10        for cause?

11             MR. WALSH:  No.

12             THE COURT:  Defendant?

13             MR. BRETTSCHNEIDER:  No.

14             THE COURT:  Peremptory, People?

15             MR. WALSH:  Yes.  Number one.

16             THE COURT:  Defendant?

17             MR. BRETTSCHNEIDER:  Yes.

18             THE COURT:  The next two.  That's seats

19        five and six.  Challenges for cause?

20             MR. WALSH:  I'm going to challenge both

21        of them for cause.  Taking number five

22        first, the last thing she said was, she

23        would have to search her soul to listen to a

24        person who has been in trouble before.

25        That's much different than what Ms. Weber

281

said, she would have trouble believing
someone.  She said she would have to search
her soul.

      MR. BRETTSCHNEIDER:  I consent.

      THE COURT:  All right.  How about
Mr. Dunne?

      MR. WALSH:  I want to make sure I heard
this right.

      THE COURT:  He said if there was a
serious disagreement, he could not follow my
instructions on the law.

      MR. WALSH:  I challenge him.

      MR. BRETTSCHNEIDER:  I consent.

      THE COURT:  All right.  We're up to
seat number eight.

      MR. WALSH:  Yes.  I challenge for
cause.  If the individual was involved in
selling drugs, she said she would take the
case less seriously.

      MR. BRETTSCHNEIDER:  She did -- I would
consent.

      THE COURT:  All right.

      (Whereupon the following took place
back within the hearing of the open

1                                                    282

2          courtroom)

3               THE CLERK:  All jurors in the box,

4          please step down.  You have been excused

5          with the thanks of the Court.

6               THE COURT:  All right.  Counsel, we are

7          now adjourned until Tuesday.  I would prefer

8          to do it as you initially suggested,

9          Mr. Brettschneider, to find out right away

10         how many were willing to stay with us.

11         Because even though we have some additional

12         people during the questioning, of course,

13         later on, we had to let them go, in any

14         event.

15              Do you suggest I try to get another

16         seventy-five or one hundred?  You're down

17         to -- this is not the official count.  The

18         People have used, I think, sixteen

19         challenges.  The defendant has used

20         eighteen.  With that in mind, we'll try to

21         get one hundred.

22              MR. WALSH:  Why not.  It can't hurt.

23              THE COURT:  Once we start with the

24         alternates, you have of course, two

25         challenges per seat.

1                                                                           283

2                     MR. BRETTSCHNEIDER:  Your Honor, just

3          some business with regard to Rosario

4          material.  I don't know if Mr. Walsh has the

5          rest of my Rosario material, or whether he

6          wants to put it on the record.

7                     There's one other issue I want to bring

8          up, which I was alerted to yesterday.  It

9          regards one of Mr. Walsh's witnesses.  I

10         don't know whether Mr. Walsh want to address

11         it today or on Tuesday.

12                    I have information that Peddie Jenkins,

13         one of the witnesses who will testify

14         against Mr. Jackson, is an eyewitness.  I

15         was informed by members of the family --

16         because Mr. Jenkins is a member of

17         Mr. Jackson's family -- that during the time

18         he has been incarcerated, he tried to commit

19         suicide by lighting himself on fire.

20                    Additionally, he has been treated by

21         either a psychiatrist or a psychologist

22         while he's been incarcerated.

23                    I would like to find out from the

24         prosecution whether that information is

25         correct.  I would also like to have any

1
2      psychiatric records of Mr. Jenkins before he
3      testifies in Court.
4           THE COURT:  Mr. Walsh?
5           MR. WALSH:  I'll take what
6      Mr. Brettschneider said first, about Rosario
7      material.  I have turned over a Rosario
8      list, as well as Rosario material to be
9      marked with the court reporter.
10          I will -- if Mr. Brettschneider
11     desires, I will provide him with the entire
12     set of Rosario material before he leaves the
13     building today.  This way, he can have it.
14          As far as Mr. Jenkins is concerned, I
15     have not heard, other than from
16     Mr. Brettschneider, either of those two
17     things.  I would be very surprised if --
18     especially, his attempting to light himself
19     on fire -- I don't know if it's true or not.
20     I don't know if he has a psychiatric history
21     at the jail.  I can't help
22     Mr. Brettschneider one way or another.  I
23     don't know that the fact that somebody goes
24     to see a psychiatrist or a psychologist, for
25     counseling, has any bearing on that person's

1

2          credibility, however.  Many people go to

3          mental health professionals.  I don't think

4          that has any bearing on whether they are

5          likely to be truthful or not as witnesses.

6               THE COURT:  Is he incarcerated in the

7          jail?

8               MR. WALSH:  He is.

9               THE COURT:  Perhaps, to save time, why

10         don't we get the records.

11              MR. WALSH:  All right.

12              THE COURT:  They always can be -- there

13         can be an application for in camera review,

14         for anything that could affect his

15         credibility; if that application is made.

16              MR. WALSH:  That's what I was going to

17         ask your Honor; if, in fact, your Honor

18         would sign a subpoena for those records.  I

19         would ask the Court to inspect the records

20         first, before anything is turned over.

21              THE COURT:  Why don't you get them.

22         See if there is any validity to the setting

23         on fire, or to the fact that he even saw a

24         psychiatrist.  We'll take it one step at a

25         time.

```
 1                                                    286
 2              I think it's best to get the records in
 3         hand.
 4              MR. WALSH:  Fine.
 5              THE COURT:  Do you need a so-ordered
 6         subpoena?  I will not be here tomorrow.
 7              MR. WALSH:  I don't know that the jail
 8         will comply without a Judge's signature.
 9              THE COURT:  You have my authorization
10         to tell the motion judge that you need it.
11              If need be, you can have my clerk
12         notify the chief clerk that I have
13         authorized it.
14              (Whereupon the trial was adjourned
15         until November 12, 1996)
16
17
18
19
20
21
22
23
24
25
```

```
 1                                                    287

 2   STATE OF NEW YORK  :  NASSAU COUNTY

 3        COUNTY COURT PART I

 4   - - - - - - - - - - - - - - - - - - - - -x

 5   THE PEOPLE OF THE STATE OF NEW YORK,    :

 6                  -against-              :Ind. 91607

 7   JOSEPH JACKSON,                         :

 8                        Defendant.        :

 9   - - - - - - - - - - - - - - - - - - - - -x

10                          November 12, 1996
                             262 Old Country Road
11                           Mineola, New York

12
     B E F O R E :
13
          HON. ABBEY L. BOKLAN,
14                       County Court Judge

15

16   A P P E A R A N C E S:

17             (As Previously Noted)

18                  *      *      *      *      *

19

20             THE CLERK:  People vs. Joseph Jackson.

21             Are the People ready?

22             MR. WALSH:  Yes.

23             THE CLERK:  Is the defendant ready?

24             MR. BRETTSCHNEIDER:  Yes.

25             THE COURT:  We have one hundred jurors
```

288

1
2          in the hallway.
3                    Mr. Walsh, you indicated that you
4          wanted to place something on the record
5          about one of the sworn jurors?
6                    MR. WALSH:  Yes.  As I had begun to
7          indicate to the Court and
8          Mr. Brettschneider, there is a sworn
9          juror -- I think his name is Kedesh.  I
10         believe he's the last juror who was sworn.
11         As it turns out, I found out after Court
12         Thursday, he knows a friend of mine, who
13         actually lives directly across the street
14         from me.
15                   As I was coming into Court for the
16         session -- Mr. Kedesh was in the box for
17         Thursday -- I ran into my friend, who was
18         out in the rotunda.  He came over because he
19         thought he wanted to catch opening
20         statements.
21                   I spoke to my friend, who came in.  As
22         it turns out, I was informed by my friend,
23         that just prior to my speaking with him, he
24         had run into Mr. Kedesh; who he knew he said
25         from a long time ago.  They began to speak.

1

2      Mr. Kedesh said he was here on jury duty.

3      My friend said he was here because I was a

4      friend of his and he wanted to catch opening

5      statements.

6           At that time, Mr. Kedesh said, I can't

7      talk to you.  I have to go.  I'm on a jury

8      panel.

9           I just thought it was something that I

10     should bring to everyone's attention.  I

11     don't know what the Court or

12     Mr. Brettschneider wants to do.  I don't

13     know -- according to my friend, they hadn't

14     seen each other for years and years.

15     They're not particularly close.

16          THE COURT:  Thank you.  I appreciate

17     that.

18          Mr. Brettschneider?

19          MR. BRETTSCHNEIDER:  Your Honor, I

20     think maybe the best thing, at this point,

21     is possibly to interview Mr. Kedesh, and

22     find out if there is any problem with the

23     fact that this situation has arisen; and

24     whether he can be fair; or he somehow feels

25     obligated to Mr. Walsh's friend, to come in

1                                                                      290

2              with a verdict.   Certainly, on a case where

3              we've taken this long to select a jury, I

4              think that's the least we can do.

5                   THE COURT:   Mr. Walsh, do you wish to

6              be heard?

7                   MR. WALSH:   No.   Actually, I agree.

8                   THE COURT:   That's a good idea.   Does

9              your client waive his presence?   Or does he

10             want it done in the open Court?

11                  MR. BRETTSCHNEIDER:   I would prefer it

12             be done in open Court.

13                  THE COURT:   Fine.   That's what we'll

14             do.   As soon as the jury comes down, we'll

15             bring Mr. Kedesh in.

16                  (Whereupon the juror referred to was

17             brought into the courtroom, after which the

18             following took place:)

19                  THE COURT:   Good morning, sir.   The

20             reason I have asked you to step in, in the

21             absence of the other sworn jurors, is that

22             Mr. Walsh informed me that you know a friend

23             of his, who you met in the courthouse before

24             we adjourned the other day.

25                  SWORN JUROR:   Right.

1                                                         291

2                    THE COURT:  I just want to make sure

3          that, now knowing someone you knew and were

4          friendly with, and is also a friend of

5          Mr. Walsh, will not, in any way, interfere

6          with your ability to be fair?

7                    MR. BRETTSCHNEIDER:  It won't.

8                    THE COURT:  You won't favor one side or

9          another?

10                   SWORN JUROR:  No.

11                   THE COURT:  We know you did not discuss

12         the case.  So that's not --

13                   SWORN JUROR:  No.  I saw him come in.

14         He said he was here to visit one of the

15         attorneys here.  I told him I was on the

16         case.  We said we shouldn't talk.  He was

17         going to introduce me.  I said, no, because

18         I'm going to be selected for a jury, maybe,

19         in that case.

20                   THE COURT:  We appreciate the way you

21         handled it, which was perfect.  Does anyone

22         have any questions?

23                   MR. BRETTSCHNEIDER:  No.

24                   MR. WALSH:  No.

25                   THE COURT:  We'll bring in the rest of

292

1

2          the jury.

3                  (Whereupon the sworn juror was removed

4          from the courtroom)

5                  THE COURT:  Wait a minute.  We have

6          another problem.  While we were here, a note

7          was just received.  Juror Shanley, Nancy

8          Shanley, juror number five, feels -- this is

9          what she told my court officer -- feels that

10         her nerves are such that she can't sit on

11         this trial.

12                 What would you like me to do?  Would

13         you like me to call her in here, to see what

14         the problem is?

15                 MR. BRETTSCHNEIDER:  Yes.

16                 (Whereupon Sworn Juror Number Five was

17         brought into the courtroom)

18                 THE COURT:  Good morning.  My court

19         officer just tells me that you feel your

20         nerves are such that you cannot sit on this

21         trial?

22                 JUROR #5:  Yes.

23                 THE COURT:  Can you tell me what the

24         problem is.

25                 JUROR #5:  I really can't explain it.

jerri krevoff, csr, rpr

1                                                    293

2          Ever since I left here on Thursday, I can't

3          sleep.  I don't think I can handle this.  I

4          can't come to a definite decision.

5               THE COURT:  Just step right outside the

6          door for a moment, while I confer with

7          counsel.

8               (Whereupon Juror #5 left the courtroom)

9               THE COURT:  The juror seems in obvious

10         distress.  Before I question her more, I

11         want to see if you both consent to excusing

12         her.  She did indicate she doesn't think she

13         could reach a verdict.

14              MR. WALSH:  I consent.

15              MR. BRETTSCHNEIDER:  We would, also.

16              THE COURT:  Bring her in here.

17              (Whereupon Juror #5 was brought into

18         the courtroom)

19              THE COURT:  Ms. Shanley, none of us

20         want you to be ill.  All the participants

21         have consented to you being excused from the

22         case.

23              (Whereupon Juror #5 was excused)

24              MR. BRETTSCHNEIDER:  Your Honor,

25         there's a question now, with the way I

                    jerri krevoff, csr, rpr

1                                                    294

2              utilize my challenges.  I have only two

3              challenges left.  I think Mr. Walsh has

4              four.  Based on the fact that she was juror

5              number five, a lot of challenges that I

6              utilized were based on the fact that we had

7              a certain amount of jurors.

8                   I would ask for another challenge,

9              based on the fact that Ms. Shanley has asked

10             to be excused prior to the end of jury

11             selection.

12                   THE COURT:  Mr. Walsh?

13                   MR. WALSH:  I object.  I don't think

14             the law provides for any additional

15             challenges for either attorney because a

16             juror becomes unqualified.  I object.  I

17             don't think it's appropriate.

18                   THE COURT:  The application is denied.

19                   Let's bring in the sworn jurors and the

20             prospective panel outside.

21                   It is my intention to tell the jury

22             that Ms. Shanley could no longer serve and

23             not go into any explanation.

24                   Is everyone in agreement with that?

25                   MR. WALSH:  Yes.

1                                                              295

2                    MR. BRETTSCHNEIDER:  Yes.

3                    THE COURT:  All right.  Let's bring in

4          the new panel.

5                    (Whereupon the jury panel was brought

6          into the courtroom)

7                    THE COURT:  All right.  We're just

8          waiting for our sworn jurors.

9                    (Whereupon the sworn jurors were

10         brought into the courtroom)

11                   THE COURT:  Good morning.  I apologize,

12         first of all, for my voice.  There isn't too

13         much of it.  I'm going to do the best I can.

14         Because I am so nasal.

15                   If, at any time, you can't understand

16         what I'm saying, please raise your hand and

17         I'll have the court reporter read it back.

18                   To my sworn jurors, first of all,

19         welcome.  We were hoping to have a full

20         complement of jurors for you to begin the

21         trial this morning.  Unfortunately, central

22         jury had very few jurors to send us on

23         Thursday afternoon.  So that we could not

24         accomplish that.  As you can tell, we have

25         now lost Ms. Shanley, who was unable to

296

2    serve.

3            Ladies and gentlemen, we are in the

4    middle of our jury selection.  We have nine

5    sworn jurors.  We are going to be selecting

6    three additional jurors, as well as three

7    alternate jurors.

8            My name is Judge Abbey Boklan.  I am

9    the presiding Judge at this trial.  I will

10   explain briefly what the trial involves, and

11   what roles the Judge and jury play.  So just

12   relax, be comfortable.  It's rather warm in

13   the courtroom.  If any of you want to take

14   off your coats, please do so now.  Anyone

15   who would like to, we'll take a moment for

16   you to do that.

17           The trial which is about to be

18   commenced is a criminal action, entitled the

19   People of the State of New York against

20   Joseph Jackson, who is referred to as the

21   defendant.

22           The case involves the following

23   charges:  Murder in the second degree,

24   intimidating a victim or witness in the

25   first degree; and hindering prosecution in

297

the second degree.  The alleged date of
incident is March 20, 1994.  The alleged
victim of the murder is one Steven Jason.

As jurors, you are going to be called
upon to determine whether or not the
evidence which you shall hear and see in
this case establishes the defendant's guilt
of the charges beyond a reasonable doubt.

In order to do this, you will have to
evaluate all the evidence at the end of the
trial, to determine whether what you have
heard from the witnesses and seen as
exhibits is true, and what it all means.
This is called finding the facts.  This will
be your function alone.  I will find no
facts in this trial.

Your ultimate decision is called a
verdict.  Your verdict will be either guilty
or not guilty.

An attorney presents the evidence
usually by calling witnesses; and only you
can decide what really happened.  And the
verdict as to each of the counts remains
your decision alone.

298

As Judge, I will make no determination of whether the defendant is guilty or not guilty. My role at trial is to ensure that you reach your verdict in accordance with the law. I will explain to you what the law is as to all the issues at this trial. I may have to rule on questions concerning the conduct of the trial. Those rulings have nothing to do with whether the defendant is guilty or not guilty. I may also rule on questions concerning what evidence you may consider, and for what purpose.

When I make a ruling concerning whether you may hear some testimony or see some exhibit which is offered as evidence, I will be ruling on whether or not you are permitted to hear it or see it, as a matter of law.

Likewise, if I instruct you to disregard something you might have heard, I will do so because that is the law.

None of my rulings should be taken by you as any indication of whether you should believe all or part of what is offered as

2    evidence; or that the defendant is guilty or

3    not guilty.  That is solely your job to

4    determine.  But you must accept the law as I

5    give it to you, if the defendant and the

6    People are to have the fair trial to which

7    they are entitled.

8    The People are represented by the

9    District Attorney in this county, Mr. Denis

10    Dillon.  Mr. Michael Walsh, an assistant

11    district attorney, who is now standing, will

12    be presenting the People's case.

13    The defendant is represented by his

14    attorney, Mr. Scott Brettschneider.

15    Mr. Brettschneider is now standing.

16    Sitting next to Mr. Brettschneider is

17    the defendant, Joseph Jackson.  Mr. Jackson,

18    you may stand.

19    The fact that this action is brought in

20    the name of the People or that the evidence

21    is presented by a public official, does not

22    in any way indicate that the public wants a

23    specific verdict.  The People of this state

24    are served by whatever verdict is justified

25    by the evidence.

1

2              You may hear reference to the fact that

3        the defendant was indicted by a grand jury.

4        This, too, is not and must not be taken as

5        any evidence of guilt.  As a trial juror,

6        you may consider an indictment as simply a

7        piece of paper by which a defendant is

8        accused of a crime.

9              Only you as members of the trial jury

10       can determine guilt.  The defendant is

11       presumed innocent unless and until you do

12       find him guilty.

13             Serving on a jury is a vital function

14       for citizens under our system of law.  It is

15       also a great responsibility; that is, to

16       accord the defendant and the People a fair

17       trial.

18             In order to do so, you must be free

19       from any preconceived notions or any

20       sympathies or prejudices that might prevent

21       you from returning a fair and just verdict

22       based on solely the evidence or lack of

23       evidence.  To help to ensure this, our first

24       order of business is to conduct an

25       examination of the prospective jurors.

301

1
2          I will ask questions of you, and after
3      I am finished, the attorneys for both
4      parties will ask questions, as well.  The
5      purpose of the questions is not to embarrass
6      you, or to discover any personal details
7      about your lives.  It is simply to determine
8      whether or not you are qualified to sit as
9      jurors in this case.
10         A number of you will not be selected.
11     Some of you may be excused because you are
12     not qualified to sit, as a matter of law.
13     That is called, excused for cause.
14         Others may be excused peremptorily,
15     which means by one of the attorneys, without
16     any cause being given.
17         Being excused is not a reflection on
18     you, either as a citizen or a person.  It is
19     simply a determination under the rules by
20     one or more of the parties, or by me, that
21     you are not to sit on this particular case.
22         Now, let's talk about scheduling.  I'm
23     sure this is something that interests all of
24     you.  For the month of November, we are not
25     working on Fridays on this case.  So you

will always have Fridays off.  Of course, we

have the Thanksgiving holiday, and we will

not work on that day.

Now, how long will the trial take?  The

attorneys have assured me that we should be

finished by mid-December.  On a daily basis,

you have a schedule that I tried to fashion

to be as convenient to you as possible.  At

the same time I try this case, I have my

regular calendar of approximately one

hundred fifty other cases.  I handle those

the first thing in the morning.  I have you

come in usually at eleven, except for the

day you deliberate.  Your lunch time is

usually from twelve-thirty to two.  I try to

have you out of the courthouse between

four-thirty and quarter of five, each day.

Because this is a criminal trial, at

the end of the trial, during final

deliberations -- and I'm only talking about

during final deliberations -- the jury is

sequestered, at all times.  This means that,

should the jury continue to deliberate for

more than one day, then our law requires

1

2      that hotel accommodations be made available

3      and the jury be sequestered each night

4      before resuming their deliberations on each

5      following day.

6           Before I continue, I'm going to ask the

7      clerk to swear all the prospective jurors to

8      answer truthfully.

9           (Whereupon the entire jury panel was

10     sworn)

11          THE COURT:  Before we start, I want to

12     make sure that none of you has any pressing

13     business or family obligations, or any

14     physical problems, such as heart disease,

15     that you feel this would be too difficult

16     for you to serve on this case.  These are

17     the only things that would prevent you from

18     serving on this jury.

19          Please do not seek to avoid jury

20     service merely because it is inconvenient.

21     I regret the inconvenience.  Our whole

22     system of trial by jury, one of the most

23     basic elements of our whole system of

24     justice, depends upon citizens who are

25     willing to sacrifice their time when called

304

upon to judge another person.

Understand also, that I will not be
excusing you from jury duty; only from this
case.  If any of you cannot serve at this
time, please raise your hands now.

(Whereupon the following took place at
the Bench, in the presence of the Court, and
both counsel:)

PROSPECTIVE JUROR:  W-H-A-L-E-N.  I'm a
private duty nurse.  My patient is on life
support.  It would be extremely difficult
for them to get nurses to cover me.

THE COURT:  You're already assigned to
a specific person?

PROSPECTIVE JUROR:  I have been on the
case for five years.

THE COURT:  You're excused.

Next.

PROSPECTIVE JUROR:  Peter.  D-I
C-A-P-U A.  I am a real estate executive.
We're in the midst of doing budgets for next
year.  I would not be able to serve through
the middle of December.  Plus, I'm also a
foster parent with my wife.  We have three

1

2      foster children with us right now. It's an

3      impossibility for being sequestered.

4           THE COURT: Excused. Next.

5           PROSPECTIVE JUROR: Your Honor, I'm a

6      practicing litigation and labor attorney. A

7      multi-week trial would render my practice

8      virtually impossible. I have discovery

9      deadlines. Also, even collective bargaining

10     negotiations on the -- with New York City

11     unions. I work for Coney Island Hospital.

12          THE COURT: You're excused. Next.

13          PROSPECTIVE JUROR: Carol Laris. My

14     spiritual beliefs would not make me a good

15     juror on a criminal case. I would find it

16     impossible to pass judgment on another human

17     being.

18          THE COURT: You're excused. Next.

19          PROSPECTIVE JUROR: Molly Friedman. I

20     can't be out of my job for this period of

21     time.

22          THE COURT: What kind of job?

23          PROSPECTIVE JUROR: Librarian at a high

24     school.

25          THE COURT: You get paid for your

1                                                                    306

2          entire jury service.

3                    PROSPECTIVE JUROR:  That's right.  I

4          have also the sole responsibility of a

5          mentally ill --

6                    THE COURT:  That's different.  You're

7          excused.  Next.

8                    PROSPECTIVE JUROR:  Andrew

9          D-A-L-E-S-S-A N D R O.  I have a hearing

10         impairment in my left ear.  I watch my two

11         granddaughters and take them to school in

12         the morning; prepare them.  I have to be

13         available for them at three-thirty.  Plus

14         I'm a self-employed business man.

15                   THE COURT:  You're excused.  Next.

16                   PROSPECTIVE JUROR:  My name is Jacob

17         Kaufman.  I have heart problem.  I'm

18         currently taking part in vacation.  I have a

19         business of my own.  Volunteering for the

20         jury -- but to be sequestered, I couldn't to

21         do that because of my business.

22                   THE COURT:  I'm more concerned --

23         before we get to that, you say have you have

24         a heart problem?

25                   PROSPECTIVE JUROR:  Yes.

                    jerri krevoff, csr, rpr

```
1                                              307
2               THE COURT:  Would that give you stress?
3               PROSPECTIVE JUROR:  Very much so.
4               THE COURT:  You're excused.  Next.
5               PROSPECTIVE JUROR:  Dave Berger.  I'm a
6       doctor.  There's no way I can go past this
7       week.  I heard you say, toward December.
8               THE COURT:  What type of physician are
9       you?
10              PROSPECTIVE JUROR:  Internist.
11              THE COURT:  You have a private
12      practice?
13              PROSPECTIVE JUROR:  Yes.
14              THE COURT:  You're excused.  Next.
15              PROSPECTIVE JUROR:  Goldstein.  I'm
16      saying kadish for my mother.
17              THE COURT:  I'm sorry for your loss.
18      You're excused.  Next.
19              PROSPECTIVE JUROR:  Hanson.  Two
20      things, your Honor.  There's a two-man
21      repair shop.  I'm the repairer.
22              THE COURT:  You're excused.  Next.
23              PROSPECTIVE JUROR:  Kelly.  I'm
24      self-employed.  My son works for me.  I have
25      another guy working.  If I don't work,
```

```
1                                                    308
2        nobody works.
3              THE COURT:  You're excused.  Next.
4              PROSPECTIVE JUROR:  The only thing that
5        concerns me is the deliberation period.  I'm
6        a single parent.  It would be hard for me to
7        find coverage for more than a day or two for
8        my son.
9              THE COURT:  I can tell you, it's very
10       unlikely that it would be more than a day or
11       two.  I can't promise that.  If you want to
12       go, I'll excuse you.  If you're willing to
13       find coverage, we would love to have you.
14             PROSPECTIVE JUROR:  I do want to serve.
15       I feel it's my duty.  I'm going with your
16       initial, that it might not take more than
17       two days.
18             THE COURT:  Do you understand that once
19       you're deliberating, you can't stop.
20             PROSPECTIVE JUROR:  I understand.  I'll
21       take my chances.
22             THE COURT:  Staying.  Next.
23             PROSPECTIVE JUROR:  My wife is
24       currently on treatment for leukemia.
25             THE COURT:  I hope she's better.
```

1                                                               309

2              You're excused.  Next.

3                   PROSPECTIVE JUROR:  I can't be

4         sequestered.  I have a young child at home.

5                   THE COURT:  Nobody can take care of it?

6                   PROSPECTIVE JUROR:  Not overnight.  I

7         am also scheduled for surgery December 16th.

8                   THE COURT:  You're excused.  Good luck

9         with your surgery.  Next.

10                  PROSPECTIVE JUROR:  Diana Prevett.  I'm

11        a practicing attorney in this county, and

12        have been for about fifteen years.  I also

13        have two small children.  I think this would

14        be a problem for me.

15                  THE COURT:  Your husband --

16                  PROSPECTIVE JUROR:  He works in

17        Manhattan.  He has --

18                  THE COURT:  Otherwise, when you're

19        deliberating, I'm very prompt.

20                  PROSPECTIVE JUROR:  I understand.  But

21        I can't -- although, I get paid, I have to

22        go back to my office at lunch, and also,

23        after jury service, to get work done.

24                  THE COURT:  How young are your

25        children?

1                                                          310
2              PROSPECTIVE JUROR:  Six and nine.
3              THE COURT:  You're excused.  Next.
4              PROSPECTIVE JUROR:  Rogers.  I'm an
5      only child.  I have an extremely ill
6      seventy-five year old father, who's on
7      oxygen twenty-four hours a day.
8              THE COURT:  You're excused.  Next.
9              PROSPECTIVE JUROR:  I'm a medical
10     assistant, in an office.  To take off that
11     amount of time, being that I'm the only one
12     that assists the doctor, is very difficult.
13             THE COURT:  Would he pay you?
14             PROSPECTIVE JUROR:  Only for a week's
15     worth.
16             THE COURT:  you're excused.  Next.
17             PROSPECTIVE JUROR:  Rand.  I have plane
18     tickets for Hawaii in December.
19             THE COURT:  December what?
20             PROSPECTIVE JUROR:  23rd.
21             THE COURT:  We'll be finished.
22             PROSPECTIVE JUROR:  Also, I'm a
23     substitute teacher, and I lose a lot of time
24     from my job.  If I don't go to work, I don't
25     get paid.

1                                                              311

2                    THE COURT:  Would it be a financial

3          hardship for you?  Do you need that money?

4                    PROSPECTIVE JUROR:  Yes.

5                    THE COURT:  You're excused.  Next.

6                    PROSPECTIVE JUROR:  I have school two

7          nights a week, at four-thirty.  My finals

8          are in mid-December.

9                    THE COURT:  We could be in test time.

10         You're excused.  Next.

11                   PROSPECTIVE JUROR:  I work in an office

12         where a lot of people have been out.  One

13         person, specifically, is out having surgery.

14         I think I could be away for a week or two

15         weeks.  I don't think I would be able to be

16         away for a month.  I'm responsible for

17         everything in the office.  We're a state

18         agency.  We can't get --

19                   THE COURT:  What agency?

20                   PROSPECTIVE JUROR:  Vocational services

21         for individuals with disabilities.

22                   THE COURT:  Will they pay you the whole

23         time you're on jury duty?

24                   PROSPECTIVE JUROR:  I don't know how

25         that works.  I guess.

312

1

2       THE COURT:  I have a hold on state and

3   county employees; just as I am expected to

4   be called soon, for jury duty.  Although my

5   courtroom would have to shut down, I go.

6   I'm not going to excuse you.  If you find

7   out you won't be paid, you let us know.  You

8   can check over lunch and tell me over lunch.

9   But if you get paid, you stay.  Sorry.

10  Next.

11      PROSPECTIVE JUROR:  Robert Kennedy.

12  Three things.  One, I have a traffic Court

13  date this coming Thursday.  Second thing is,

14  I'm in the heating business, which we're

15  exceptionally busy.  Third thing is, I have

16  a vacation planned around Thanksgiving week.

17      THE COURT:  The whole week?

18      PROSPECTIVE JUROR:  Yes.

19      THE COURT:  You're excused.  Next.

20      PROSPECTIVE JUROR:  Guzmanes.  I have

21  difficulty understanding English.

22      THE COURT:  You're excused.  Next.

23      PROSPECTIVE JUROR:  I'm --

24      THE COURT:  Last name?

25      PROSPECTIVE JUROR:  Renner.  I'm a high

jerri krevoff, csr, rpr

313

school teacher.  I'm chair of my department.

One of my jobs is to organization support

for kids taking the ROTC in January, who

might fail, or might not graduate.  I feel

it's important for me to be there, at this

time.

THE COURT:  I keep all my teachers,

because they get paid.  I'm sorry.  Next.

PROSPECTIVE JUROR:  O'Hara.  Over the

last year and-a-half, I have had two

angioplasties at Saint Francis.  I just

changed jobs --

THE COURT:  You're excused.  Next.

PROSPECTIVE JUROR:  I have a two month

old son, who has had some cardiac surgery.

My wife -- he has to have additional tests

in the coming weeks.

THE COURT:  You're excused.  I hope

he's better.  Next.

PROSPECTIVE JUROR:  I'm self-employed.

I handle an account with the visiting nurse

association.  I'm handling all of their --

THE COURT:  I can't hear you.

PROSPECTIVE JUROR:  All their marketing

```
 1                                                   314
 2          and promotional things.
 3                  THE COURT:  Excused.  Next.
 4                  PROSPECTIVE JUROR:  Next --
 5                  THE COURT:  Last name.
 6                  PROSPECTIVE JUROR:  Wendy  P-A-R-R.
 7          All next week, I have business meetings, in
 8          Germany.  Thanksgiving, I'm going to visit
 9          family.
10                  THE COURT:  Have a good trip.  Next.
11                  PROSPECTIVE JUROR:  Millie Diel.  I
12          feel any long term jury trial would cause me
13          undue financial hardship.  I have just
14          gotten employed again.  I have been
15          unemployed for a while.
16                  THE COURT:  They won't pay you?
17                  PROSPECTIVE JUROR:  No.
18                  THE COURT:  Excused.  Next; last name.
19                  PROSPECTIVE JUROR:  Bass.  I guess
20          because I can't be impartial, because my
21          cousin was murdered.
22                  THE COURT:  You're excused.  Next.
23                  PROSPECTIVE JUROR:  Last name, Wahl.  I
24          have substantial business commitments.
25          Staying that long would represent a real
```

315

1

2          hardship for me.

3                    THE COURT:  What type of work do you

4          do?

5                    PROSPECTIVE JUROR:  I'm a commercial

6          lending officer for Chase Manhattan bank.

7                    THE COURT:  Would you be paid?

8                    PROSPECTIVE JUROR:  Yes.

9                    THE COURT:  I'm keeping everyone who's

10         getting paid or works for a large

11         organization or government.  Not excused.

12         Next.

13                   PROSPECTIVE JUROR:  Hirsch.  I'm my

14         only means of support.  I can't afford to be

15         out of work that long.

16                   THE COURT:  You don't get paid?

17                   PROSPECTIVE JUROR:  Not for the whole

18         time.

19                   THE COURT:  You're excused.  Next.

20                   PROSPECTIVE JUROR:  Donald Mitchell.  A

21         few problems.  I have heart angina and

22         hypertension.

23                   THE COURT:  You're excused.  Next.

24                   PROSPECTIVE JUROR:  Sharon Rabinowitz.

25         I'm a physician over at Winthrop.  I have

316

arranged for days of coverage.

THE COURT:  Are you a resident?

PROSPECTIVE JUROR:  No.  I'm an attending.  My husband was an ADA with Nassau County for four years.  He trained with Pat McCloskey.  Ben Rabinowitz.

THE COURT:  Do you feel you could be fair?

PROSPECTIVE JUROR:  No.

THE COURT:  Excused.  Next.

PROSPECTIVE JUROR:  Valerie Peekan. I'm a public school teacher.  It would be difficult for me to be out of school.

THE COURT:  Unfortunately, I'm keeping all the my teachers.  They get paid.  It's a wonderful experience to tell your children about.  You're not excused.  Next.

PROSPECTIVE JUROR:  I'm scheduled for an echocardiogram and stress test.

THE COURT:  You're excused.  Next.

PROSPECTIVE JUROR:  I have diabetes and high blood pressure.

THE COURT:  You're excused.  Next.

PROSPECTIVE JUROR:  Siebert.  I'm a

1                                                            317

2          practicing attorney.  I have some major

3          conflicts coming up in the next three to

4          four weeks.  I'm a sole practitioner.

5               THE COURT:  You're excused.   Next.

6               PROSPECTIVE JUROR:  I'm a medical

7          doctor in private practice.  I won't be able

8          to arrange coverage that lasts that long.

9               THE COURT:  Did we get your last name?

10              PROSPECTIVE JUROR:  Stern.

11              THE COURT:  You're excused.  Next.

12              PROSPECTIVE JUROR:  Castellano.  I

13         recently lost my job in the Chemical-Chase

14         merger.  I just got a new one.  To be here

15         more than a week is a problem.

16              THE COURT:  Also for a bank?

17              PROSPECTIVE JUROR:  An insurance

18         company.

19              THE COURT:  You're excused.   Next.

20              PROSPECTIVE JUROR:  J-A-N-G-D-A.  I'm a

21         medical Doctor.  One month would be too

22         long.

23              THE COURT:  Are you an attending?

24              PROSPECTIVE JUROR:  Yes.  Attending

25         physician, working in a hospital out-patient

```
 1                                                      318
 2              clinic, and emergency room.
 3                   THE COURT:  Are you a salaried
 4              employee?
 5                   PROSPECTIVE JUROR:  Yes.
 6                   THE COURT:  Nassau County Medical
 7              Center?
 8                   PROSPECTIVE JUROR:  No.  In the Bronx.
 9                   THE COURT:  Would they pay you for the
10              whole time?
11                   PROSPECTIVE JUROR:  No.  Only for one
12              week.
13                   THE COURT:  You're excused.  Next.
14                   PROSPECTIVE JUROR:  Jenks.  I have
15              hypertension and arthritis.
16                   THE COURT:  You're excused.  Next.
17                   PROSPECTIVE JUROR:  My name is
18              Sorenson.  I am a commissioned salesman.  I
19              receive no salary if I'm away from my job
20              for a month.
21                   THE COURT:  Excused.  Next.
22                   PROSPECTIVE JUROR:  I know you.  I'm
23              your mailman.
24                   THE COURT:  That doesn't matter.
25                   PROSPECTIVE JUROR:  Bob Donohoe.
```

1                                                                    319

2              THE COURT:  Is that your only problem?

3              PROSPECTIVE JUROR:  Well, all my family

4      is involved in law enforcement; my uncles,

5      cousins.  I have been on jury duty several

6      others times.  They have disqualified me.

7              THE COURT:  That doesn't disqualify

8      you, unless you feel that you can't be fair

9      and impartial.

10             PROSPECTIVE JUROR:  Well, that's the

11     way -- since I know them so personally, I

12     feel I'm going to weigh their decision more

13     than --

14             THE COURT:  Then you're excused.  Thank

15     you.  Next.

16             PROSPECTIVE JUROR:  S-C-H-W-A-M.  I'm a

17     correction officers at the Nassau County

18     Jail.

19             THE COURT:  You're excused.  Next.

20             PROSPECTIVE JUROR:  Hein.  H-E-I-N.  I

21     work as a secretary in a very large high

22     school in the guidance office.  November and

23     December is like the busiest time of the

24     year.

25             THE COURT:  Would you be paid when

320

you're here?

PROSPECTIVE JUROR:  I'm paid.  It would be a very great hardship.

THE COURT:  I know.  I keep all my school employees.  Not excused.

PROSPECTIVE JUROR:  But we process hundreds of college applications at this time.

THE COURT:  They'll have to get a substitute.  I have to keep my people who are paid.

PROSPECTIVE JUROR:  It really would be very hard.  I'm practicing -- I'm training somebody to do an application.  It's very, very difficult.

THE COURT:  You're not the only person in the office?

PROSPECTIVE JUROR:  Yes.  We're shorthanded.  We lost another girl.

THE COURT:  I cannot let go people who get paid.  It'll be a hardship when I have to shut down my courtroom and I have to go on jury duty.  This is what our system is about.  Next.

1

2          PROSPECTIVE JUROR:  Muratore.  I have

3     two medical appointments Thanksgiving week

4     that I cannot postpone.

5          THE COURT:  We're closed the 28th and

6     29th.

7          PROSPECTIVE JUROR:  One is for a

8     mammogram.  The other is with my breast

9     surgeon.

10         THE COURT:  You're excused.  Next.

11         PROSPECTIVE JUROR:  Saslow.  I'm on

12    high blood pressure medication and

13    tranquilizers.

14         THE COURT:  You're excused.

15         PROSPECTIVE JUROR:  Does that mean

16    permanently?

17         THE COURT:  No.  Next.

18         PROSPECTIVE JUROR:  Posen.  I have two

19    small children.  I have no way -- I have

20    them four days a week.  I work, I'm a

21    teacher.  To be off four days a week for an

22    entire month would be very difficult for me.

23         THE COURT:  The working -- teachers,

24    I'm holding, because they get paid.  You

25    don't have a husband at home?

1                                                              322

2                  PROSPECTIVE JUROR:  Well, he works

3         until nine o'clock every night.

4                  THE COURT:  Your babysitter leaves at

5         four?

6                  PROSPECTIVE JUROR:  That's it.

7                  THE COURT:  Excused.  Next.

8                  PROSPECTIVE JUROR:  Sebolt.  I'm

9         pregnant.  I would be having a lot of

10        problems.

11                 THE COURT:  You're excused.  Next.

12                 PROSPECTIVE JUROR:  My son is

13        recuperating from a car accident.  I have

14        been taking him for follow-up to his

15        accident.  He almost died.

16                 THE COURT:  You're excused.  Next.

17                 PROSPECTIVE JUROR:  Phillip.  I'm an

18        attorney.  I have discovery deadlines at the

19        end of December.  I have discovery motion

20        for December 7th on another case.

21                 THE COURT:  There's no one else in the

22        office who can handle it?

23                 PROSPECTIVE JUROR:  I'm the senior

24        associate.  This is a consideration that you

25        could take into account.

323

THE COURT:  If it's a large firm, and
they can cover, I have been letting senior
practitioner attorneys go.  Will they pay
you?

PROSPECTIVE JUROR:  They will.  Yes.

THE COURT:  You're not excused.  Next.

PROSPECTIVE JUROR:  Presta.  Time isn't
my problem.  My son is a New York City
detective.

THE COURT:  The next question is, can
you fairly sit in a criminal case?

PROSPECTIVE JUROR:  I really don't
think so.

THE COURT:  Thank you.  You're excused.
Next.

PROSPECTIVE JUROR:  My husband is an
officer in the Department of Defense.  I
didn't know if I could serve on this.  Also,
Judge, can I ask you, does this have
anything to do with drug-related?

THE COURT:  You could hear something
about drugs during the course of the trial.
Would that affect your ability?

PROSPECTIVE JUROR:  Yes.

1                                                    324

2             THE COURT:  If you heard, for example,

3       that the victim may have been dealing in

4       drugs, would you be able to sit fairly.

5             PROSPECTIVE JUROR:  No.

6             THE COURT:  Excused.  Next.

7             PROSPECTIVE JUROR:  Agasetta.  My son

8       is in jail right now.

9             THE COURT:  In Nassau County?

10            PROSPECTIVE JUROR:  No.

11            THE COURT:  Upstate?

12            PROSPECTIVE JUROR:  British West Indes,

13      Camen Island.

14            THE COURT:  For what?

15            PROSPECTIVE JUROR:  Drug smuggling.

16            THE COURT:  Now, there could be

17      testimony during this case that, for

18      example, the victim may have been dealing

19      drugs.  Is that going to afect you?

20            PROSPECTIVE JUROR:  I really couldn't

21      say.  I don't know how I would react.

22            THE COURT:  I can't take the chance.

23      This must be very terrible for you.  You're

24      excused.

25            PROSPECTIVE JUROR:  It is.  Thank you.

```
 1                                                        325
 2                THE COURT:  Next.
 3                PROSPECTIVE JUROR:  Z-A-N-O-N-E.  I go
 4        on vacation the 24th of November.
 5        Otherwise, I have no problem.  I have some
 6        appointments in two weeks.
 7                THE COURT:  Have a good vacation.
 8                PROSPECTIVE JUROR:  Sefalou.  I just
 9        want to know if this had anything to do with
10        drugs.
11                THE COURT:  There will be some evidence
12        perhaps, that you'll hear.  For example, the
13        victim, the deceased person was dealing in
14        drugs.
15                PROSPECTIVE JUROR:  Because I have two
16        family members that are very heavily
17        involved in drugs.  I don't think I could be
18        unbiased.
19                THE COURT:  You're excused.  Next.
20                PROSPECTIVE JUROR:  Bennett.  I am a
21        veterinarian, private practitioner.  I'm
22        self-employed.  I have no employees.  This
23        would be a hardship.
24                THE COURT:  You're excused.  Next.
25                PROSPECTIVE JUROR:  Vitale.  I have a
```

```
 1                                              326
 2            dear friend who's got breast cancer.  I go
 3            with her to LIJ twice a week for radiation
 4            treatment.
 5                 THE COURT:  You're excused.
 6                 (Whereupon the following took place
 7            back within the hearing of the open
 8            courtroom:)
 9                 THE COURT:  Thank you all.  As I said,
10            we couldn't function if we didn't have
11            jurors willing to sit.
12                 I am going to ask those of you in the
13            box, to go into the back and just sit in the
14            vacant seats.  We're going to fill the jury
15            box.
16                 I ask those of you not called into the
17            box to please pay careful attention.  Let's
18            fill the box.
19                 (Whereupon the jury box was filled with
20            fourteen people)
21                 THE COURT:  My first series of
22            questions concerns your background.  Your
23            answers to these questions will not
24            necessarily qualify nor disqualify you.  If
25            any of you wishes to respond yes, or is not
```

1
2    sure, please raise your hand.  If you don't
3    understand a question, or you do not hear
4    me, please say so.
5         The defendant, his attorney, the
6    prosecuting attorney have all been
7    identified to you.  Do any of you know any
8    of the prospects -- any of the participants
9    to this proceeding?
10        Among the witnesses who may be called,
11   are the following -- and I caution you that
12   my mentioning the name, imposes no burden on
13   either side to call that witness; nor does
14   it mean that the list may not be expanded.
15        All of these police officers will be
16   from Nassau County Police Department, unless
17   I tell you otherwise:  Detective Gary
18   Abbondandelo, Homicide Squad; Detective
19   Robert Dempsey, Homicide; Detective Jerl
20   Mullen, Homicide Squad; Detective Peter
21   Donato, Homicide Squad; Police Officer
22   Richard Paulik, Freeport Police Department;
23   Police Officer Michael Pomerico, Freeport
24   Police Department; Detective Joseph Marino,
25   Crime Scene Search Unit; Detective Nicholas

1                                                      328

2          Mattia, Scientific Investigation Bureau;

3          Mr. Michael Hertz, a retired detective,

4          previously with the First Squad; Detective

5          Brian Parpan, Homicide Squad; Detective

6          Frank Allaire, First Squad; Detective

7          William Tweedie, First Squad; Detective

8          Edward Hegerty, Freeport Police Department;

9          Mr. William Wallace, a district attorney for

10         Nassau County District Attorney; Michael

11         DiMartino, Deputy Medical Examiner.

12         Mr. Christopher Jordan, Official Court

13         Reporter.  Ms. Isabella Vales.  Skwanitra

14         Witherspoon; Mr. Peddie Jenkins; Mr. Tyrone

15         Isaac, Roy Isaac.

16              Do any of you know any of the

17         prospective witnesses?

18              PROSPECTIVE JUROR:  William Tweedie.

19              (Whereupon the following took place at

20         the Bench outside the hearing of the open

21         courtroom:)

22              THE COURT:  Just to make sure we have

23         the same William Tweedie.  Where do you know

24         him from?

25              PROSPECTIVE JUROR:  I know him from a

1

2     restaurant I worked in.  He frequented it.

3     He was a friend of the owner.  We often sat

4     and ate dinner together.

5          THE COURT:  Where was the restaurant

6     located?

7          PROSPECTIVE JUROR:  Wantagh Avenue in

8     Wantagh.

9          THE COURT:  Do you know where he lives?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Can you describe him?

12          PROSPECTIVE JUROR:  Tall.  He has, I

13    guess, greyish-blondish hair.

14          THE COURT:  Age, approximately?

15          PROSPECTIVE JUROR:  Late forties, early

16    fifties.

17          MR. WALSH:  Is he heavyset?

18          PROSPECTIVE JUROR:  I guess he's

19    probably around six foot tall, and medium

20    build.  I won't say heavy.

21          MR. WALSH:  It could be him.

22          THE COURT:  Let's assume it's the right

23    person.

24          PROSPECTIVE JUROR:  I know he's a

25    detective.  He spoke often about his work.

329

```
 1                                            330
 2              THE COURT:  You used to eat with him?
 3              PROSPECTIVE JUROR:  Yes.
 4              THE COURT:  I think it's best to excuse
 5        you.
 6              MR. WALSH:  If it makes a difference or
 7        not, I would say the chances of him
 8        testifying are almost none.
 9              THE COURT:  It would have to be none.
10              MR. WALSH:  Now, it's none.  He's not
11        going to testify.
12              THE COURT:  We have now eliminated
13        Mr. Tweedie.  You can stay.
14              MR. WALSH:  It would have been either
15        he or Donato.
16              (The following took place back within
17        the hearing of the open courtroom:)
18              THE COURT:  Mr. Tweedie will no longer
19        be a witness in the case.  Anyone else?
20        Does anyone know anything about the case,
21        other than what I have told you so far.
22              Mr. Blakley, you are a semi-retired
23        from sales.  What type of sales were you
24        involved in?
25              PROSPECTIVE JUROR:  I worked for
```

331

national business kit.

        THE COURT:  Your wife, what type or
firm or organization does she work?

        PROSPECTIVE JUROR:  A bank.

        THE COURT:  Tell me about victim of a
crime and witness to a crime.

        PROSPECTIVE JUROR:  My son was killed
eleven years ago by a hit and run.

        THE COURT:  Of course, that's a
horrible thing.  Can you fairly and
partially sit in a murder case?  There's no
allegation of any car.

        PROSPECTIVE JUROR:  Well, the trial was
here.  It was eleven years ago.  The
defendant was sentenced for six months and
five and-a-half years probation.

        THE COURT:  All of that considered,
let's start with the first question.  Can
you sit fairly and impartially in a criminal
case involving a charge of murder?

        PROSPECTIVE JUROR:  I believe I can.
Yes.

        THE COURT:  Do you feel that there's
anything about the case or the way the

```
 1                                               332
 2          police handled it, or the district attorney,
 3          that would, in any way, affect your ability
 4          to be fair?
 5               PROSPECTIVE JUROR:  I don't really know
 6          anything about the case.
 7               THE COURT:  Well, you know what the
 8          charge is.
 9               PROSPECTIVE JUROR:  Yes.
10               THE COURT:  What I'm trying to ensure,
11          is that nothing in that incident involving
12          your child, or the trial afterwards, the
13          defendant in that case, nothing would carry
14          over to your feelings about this case?
15               PROSPECTIVE JUROR:  No.  I don't
16          believe it would.
17               THE COURT:  Witness to a crime?
18               PROSPECTIVE JUROR:  Armed robbery in a
19          supermarket in Brooklyn.
20               THE COURT:  You witnessed that?
21               PROSPECTIVE JUROR:  I was in the store
22          at the time.
23               THE COURT:  Were you a victim, as well?
24               PROSPECTIVE JUROR:  No.  The people
25          that were holding up the store approached me
```

333

first; and then went on and held up the
store.

THE COURT:   There are allegations in
this case that the death of the victim was
caused by a handgun.  Do you have any
feelings about what happened in that
robbery, or guns in general, that would
determine your ability -- would affect your
ability to be fair in this case?  You
understand that we're all against guns.  The
issues is whether it --

PROSPECTIVE JUROR:   I believe I could
be fair in this case.

THE COURT:   What about law enforcement
people.

PROSPECTIVE JUROR:   I have a nephew in
the Nassau County Police Department.  I have
retired members of my family in the New York
City Police Department.

THE COURT:   I tell you, as I do all
prospective jurors, that a police officer is
a human being.  You don't decide to believe
or disbelieve anyone in advance because of
their occupation.  You listen, you use your

334

common sense.  You can listen to what they
say.  Listen to their cross-examination, if
any.  Use your common sense.  You decide
whether you believe the person.  You
shouldn't have any predisposition that
you're going to believe someone or not,
because of their occupation.

Can you do that?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Can the rest of you?

Mr. Beralisa, I'm having a problem
reading your writing.  Your wife is
deceased?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Was she employed outside of
the home?

PROSPECTIVE JUROR:  Machinist.

THE COURT:  She was.

PROSPECTIVE JUROR:  Nachinist.

THE COURT:  Your wife.

PROSPECTIVE JUROR:  My wife is dead.

THE COURT:  I'm asking you, your wife,
before she died, did she work outside the
home.

1                                                      335

2              PROSPECTIVE JUROR:   Worked in a store.

3              THE COURT:   Do you understand what I'm

4       asking you.

5              PROSPECTIVE JUROR:   Yes.

6              THE COURT:   You are a nachinist.

7              PROSPECTIVE JUROR:   Yes.

8              THE COURT:   I can't read what you wrote

9       for the question, seven, years of education

10      or highest degree attained.   Was that high

11      school.

12             PROSPECTIVE JUROR:   Yeah.

13             THE COURT:   How long have you been in

14      the United States.

15             PROSPECTIVE JUROR:   Sixteen years.

16             THE COURT:   You will be able to

17      understand the English language, when the

18      witnesses testify?

19             PROSPECTIVE JUROR:   Yes.

20             THE COURT:   You checked that you never

21      served on a jury.   You never sat on a jury.

22             PROSPECTIVE JUROR:   No.

23             THE COURT:   Then you checked yes, that

24      it reached a verdict.   I'm a little

25      confused.   Did you ever sit on a jury.

```
 1                                                        336
 2                PROSPECTIVE JUROR:  No.  This is my
 3         first time.
 4                THE COURT:  Could you stay overnight,
 5         if it was necessary, during deliberations,
 6         in a hotel.
 7                PROSPECTIVE JUROR:  Yes.
 8                THE COURT:  Ms. Jackson, tell me about
 9         law enforcement.
10                PROSPECTIVE JUROR:  My fiance is a New
11         York City police officer.
12                THE COURT:  You heard what I said.  Can
13         you judge every police officer as an
14         individual.
15                PROSPECTIVE JUROR:  Yes.
16                THE COURT:  You're not going to be
17         concerned when you get to see your fiance,
18         after the trial, whether he's pleased or
19         displeased with your verdict.
20                PROSPECTIVE JUROR:  Oh, no.
21                THE COURT:  Ms. Bolan, what is an asset
22         recovery coordinator.
23                PROSPECTIVE JUROR:  I bring machines
24         back from various warehouses around the
25         country, where we keep them when they come
```

1                                                              337

2              out of major accounts.

3                   THE COURT:   What kind of machines.

4                   PROSPECTIVE JUROR:   Copiers and fax

5              machines.

6                   THE COURT:   Tell me about law

7              enforcement.

8                   PROSPECTIVE JUROR:   My uncle is a

9              retired motorcycle police officer in the

10             city.   I have two cousins, one a DEA agent

11             in the city; and one a sergeant in Brooklyn.

12                  THE COURT:   Can you assure me that

13             there is nothing about any of those

14             relationships, or your friendships with any

15             of the police, including the one you

16             sometimes used to eat with, that will affect

17             your ability to be fair in this case.

18                  PROSPECTIVE JUROR:   I honestly don't

19             know.

20                  THE COURT:   If you don't know, I can't

21             chance it.   Do you think you would be

22             affected and believe someone because of

23             their occupation?

24                  PROSPECTIVE JUROR:   I believe it could

25             be a possibility.

1                                                            338

2               THE COURT:  Thank you for telling us.

3       I can't take a chance.  Fill the seat.

4               (Whereupon the vacant seat was filled)

5               THE COURT:  I know when you came up to

6       the Bench, you initially asked to be excused

7       because of your occupation.  I denied that.

8               But I see that you have a physical

9       problem, as well.  Do you feel that the

10      medication and your physical condition could

11      be affected by being on this case?

12              PROSPECTIVE JUROR:  Yes.

13              THE COURT:  You're excused.  I don't

14      want anyone to become ill.

15              (Whereupon the vacant seat was filled)

16              THE COURT:  Ms. Carlson, do you know

17      any of the prospective witnesses, any of the

18      participants; anything about the case.

19              PROSPECTIVE JUROR:  No.

20              THE COURT:  Is there anything you

21      prefer to discuss privately at the Bench, on

22      your questionnaire.

23              PROSPECTIVE JUROR:  No.

24              THE COURT:  Victim of a crime.

25              PROSPECTIVE JUROR:  My brother.  He was

```
1                                                        339

2               murdered in Manhattan, some years ago.

3                     THE COURT:  How long ago.

4                     PROSPECTIVE JUROR:  Twenty-six years.

5                     THE COURT:  You heard the charge in

6               this case.  It's a murder case.  Can you

7               fairly and impartially sit in that kind of

8               case, having had your brother murdered?

9                     PROSPECTIVE JUROR:  I think I could.

10                    THE COURT:  Tell me about accused or

11              convicted of a crime.

12                    PROSPECTIVE JUROR:  Accused and

13              convicted was also a brother, robbery.

14                    THE COURT:  Did the brother who was

15              convicted of robbery go to trial.

16                    PROSPECTIVE JUROR:  I'm not really sure

17              about that.

18                    THE COURT:  Anything in that experience

19              that would prevent you from being fair.

20                    PROSPECTIVE JUROR:  I don't believe so.

21                    THE COURT:  Was it here in Nassau

22              County, that that occurred?

23                    PROSPECTIVE JUROR:  No.  It was in

24              Pennsylvania, I believe.

25                    THE COURT:  Do you have any feelings
```

1                                                          340

2          about the police, because of either of those

3          incidents, the brother who was murdered or a

4          brother who was convicted of a robbery.

5                  PROSPECTIVE JUROR:  No.

6                  THE COURT:  Can you judge a police

7          officer the same as any other human being.

8                  PROSPECTIVE JUROR:  Absolutely.

9                  THE COURT:  Tell me about law

10         enforcement.

11                 PROSPECTIVE JUROR:  My nephew is a New

12         York City police officer.

13                 THE COURT:  Mr. Count, I'm going to

14         skip down to the question that you answered

15         about physical and mental condition.  You

16         indicated that you have some physical

17         problem.

18                 PROSPECTIVE JUROR:  Yes.  I think you

19         specified heart condition, initially.  It's

20         not heart condition.

21                 THE COURT:  Is it something you feel

22         could be -- the condition could be damaged

23         by sitting on this case?

24                 PROSPECTIVE JUROR:  I'm not really

25         certain.

1

2          THE COURT:   Would you prefer to discuss

3     it privately at the Bench?

4          PROSPECTIVE JUROR:   Yes.

5          (Whereupon the following side bar

6     conference took place outside the hearing of

7     the open courtooom:)

8          THE COURT:   Yes, sir?

9          PROSPECTIVE JUROR:   Very simply.   It's

10    a prostate situation that I just discovered.

11    I'm in the process of getting involved with

12    the VA, and all kinds of things.

13         THE COURT:   Are you on medication?

14         PROSPECTIVE JUROR:   Yes.

15         THE COURT:   Would you be needing

16    treatment during the time you're sitting in

17    this case?

18         PROSPECTIVE JUROR:   No.   That's why I

19    say it's an uncertain thing.   It's something

20    that I'm trying to live with.

21         THE COURT:   You have to tell me whether

22    physically you can stay or not.   If you

23    feel, in any way, that you don't want to sit

24    because you're concerned about your health,

25    I'll let you go.

342

PROSPECTIVE JUROR:  I would prefer that.

THE COURT:  All right.  You're excused. Next.

(Whereupon the following took place back within the hearing of the open courtroom:)

THE COURT:  Ms. Rizzipolos, do you know any anything about the case, any of the witnesses or participants?

PROSPECTIVE JUROR:  No.

THE COURT:  Tell me about victim of a crime.

PROSPECTIVE JUROR:  My father was in his store when two people came in to burglarize.  Because he wouldn't give them the merchandise, they hit him on the head with a gun.  He was almost killed.

THE COURT:  Would that affect your ability to sit in a criminal case.

PROSPECTIVE JUROR:  I believe it will.

THE COURT:  You're excused.

(Whereupon the vacant seat was filled)

THE COURT:  Ms. Ruggerio, do you know

1                                                                    343

2              anything about the case; any of the

3              prospective witnesses or any of the

4              participants?

5                   PROSPECTIVE JUROR:   No.

6                   THE COURT:   What do you teach.

7                   PROSPECTIVE JUROR:   Elementary school

8              in Copiague.

9                   THE COURT:   I see your husband is a

10             police officer.   Is he a police officer in

11             Nassau County.

12                  PROSPECTIVE JUROR:   No.

13                  THE COURT:   Will you be able to judge a

14             police officer the same as any other human

15             being that takes the stand?

16                  PROSPECTIVE JUROR:   I believe so.

17                  THE COURT:   The attorneys may have some

18             further questions about that, because of

19             semantics.   I believe so, as opposed to,

20             yes, I will.   I'm sure they are going to

21             want you to assure them.

22                  Can you assure me you would be able to

23             judge the police officer the same as anyone

24             else who takes the stand?

25                  PROSPECTIVE JUROR:   I believe so.

1                                                    344

2              THE COURT:  You're not going to be

3         concerned, no matter what your verdict is,

4         whether it's going to please or displease

5         your husband, or anyone else?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  Tell me about victim of a

8         crime.

9              PROSPECTIVE JUROR:  I was mugged a

10        couple of years ago.

11             THE COURT:  Anyone apprehended?

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  Would that affect your

14        ability to be fair?

15             PROSPECTIVE JUROR:  In some way.  I was

16        angry.

17             THE COURT:  Well, you should be.

18        That's very normal.  But of course, this

19        case and Mr. Jackson had nothing to do with

20        that.  I have to be assured that how you

21        felt, justifiably, about the person who did

22        that to you, won't carry over to this case.

23             PROSPECTIVE JUROR:  No.

24             THE COURT:  Any law enforcement people,

25        in addition to your husband.

```
1                                                    345
2               PROSPECTIVE JUROR:  My father is a
3          police officer.
4               THE COURT:  You still believe you could
5          be fair and impartial.
6               Ms. Telese, you're a sales
7          representative for what type of a firm?
8               PROSPECTIVE JUROR:  Magazines.
9               THE COURT:  I see that your husband is
10         a New York City detective.  Same question as
11         I asked the juror before you:  Can you
12         fairly and impartially sit in a case and
13         judge a police officer the same as any other
14         human being.
15              PROSPECTIVE JUROR:  No; I don't think
16         so.  I think I would favor the police
17         officer.
18              THE COURT:  Even before you listened to
19         them?
20              PROSPECTIVE JUROR:  Yes.
21              THE COURT:  Thank you for telling us.
22         You're excused.
23              (Whereupon the vacant seat was filled)
24              THE COURT:  Do you know any of the
25         participants, anything about the case, any
```

```
1                                                    346
2              of the prospective witnesses?
3                   PROSPECTIVE JUROR:  No.
4                   THE COURT:  You sat on a civil case.
5              You can see already how different it is,
6              Mrs. Janow.  I'm just asking you to put that
7              aside and judge this case.
8                   PROSPECTIVE JUROR:  No problem.
9                   THE COURT:  I see you have a relative
10             or friend who is a corrections officer.
11             Would that affect your ability to be fair?
12                  PROSPECTIVE JUROR:  No.
13                  THE COURT:  You would judge a law
14             enforcement official the same as any other
15             human being?
16                  PROSPECTIVE JUROR:  Yes.
17                  THE COURT:  Mr. Westfall, you are a
18             police officer.
19                  PROSPECTIVE JUROR:  Yes.
20                  THE COURT:  You're a police officer in
21             Nassau County?
22                  PROSPECTIVE JUROR:  No.
23                  THE COURT:  In the city.
24                  PROSPECTIVE JUROR:  Yes.
25                  THE COURT:  Can you fairly and
```

```
 1                                                  347
 2              impartially sit on a criminal case,
 3              involving -- you heard the list?
 4                   PROSPECTIVE JUROR:  Yes.
 5                   THE COURT:  An awful lot of police
 6              officers will testify.
 7                   PROSPECTIVE JUROR:  Yes.
 8                   THE COURT:  You can.
 9                   PROSPECTIVE JUROR:  Yes.
10                   THE COURT:  Can you judge the police
11              officers the same as anyone else?  Will you
12              listen and use your common sense?
13                   PROSPECTIVE JUROR:  Yes.
14                   THE COURT:  Tell me about victim of a
15              crime.
16                   PROSPECTIVE JUROR:  I had a girlfriend
17              four years ago, that had a chain snatched.
18                   THE COURT:  Anything in that experience
19              would that would affect you.
20                   PROSPECTIVE JUROR:  No.
21                   THE COURT:  Witness to a crime, is that
22              your capacity as a police officer?
23                   PROSPECTIVE JUROR:  Yes.
24                   THE COURT:  Do you work in the Homicide
25              Squad.
```

348

PROSPECTIVE JUROR:  No.

THE COURT:  The law enforcement people are all friends that you work with, and associates?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Mr. Kalow, you were one of our slightly unhappy jurors about remaining because of your job.  I want to make sure those job concerns will not affect your ability to listen; that you won't be worrying about what's happening there, you won't be worrying about whether things are getting done, and will allow those kinds of concerns to affect you.

PROSPECTIVE JUROR:  I'll be worrying about them.  I won't let them affect me.

THE COURT:  Is there anything you prefer to discuss privately?

PROSPECTIVE JUROR:  No.

THE COURT:  Start with victim of a crime.

PROSPECTIVE JUROR:  I got mugged a long time ago, when I was in college.

THE COURT:  Anyone apprehended?

```
 1                                           349
 2              PROSPECTIVE JUROR:  No.
 3              THE COURT:  Would that affect your
 4         ability to be fair?
 5              PROSPECTIVE JUROR:  No.
 6              THE COURT:  Tell me about accused or
 7         convicted of a crime.
 8              PROSPECTIVE JUROR:  I had an uncle who
 9         was accused of bookmaking and he went to
10         jail.
11              THE COURT:  How long ago.
12              PROSPECTIVE JUROR:  I would say about
13         ten years.
14              THE COURT:  Was that here in Nassau
15         County?
16              PROSPECTIVE JUROR:  No.
17              THE COURT:  Do you have to any feelings
18         about the Police Department or district
19         attorney's office that would carrying over
20         to this case?
21              PROSPECTIVE JUROR:  No.
22              THE COURT:  Mr. Cargetta, tell me about
23         victim of a crime.
24              PROSPECTIVE JUROR:  I had a cousin that
25         was robbed of three hundred dollars.
```

1                                                       350

2               THE COURT:  Anyone apprehended?

3               PROSPECTIVE JUROR:  No.

4               THE COURT:  Would that affect your

5          ability to be fair?

6               PROSPECTIVE JUROR:  No.

7               THE COURT:  Are you in college now?

8               PROSPECTIVE JUROR:  Not this semester.

9               THE COURT:  When you were, what was

10         your field of specialty?

11              PROSPECTIVE JUROR:  Electrical

12         engineering.

13              THE COURT:  I'm going to skip down to

14         the bottom, Ms. Neis.  You indicate that

15         your ability to stay would depend upon the

16         night.  I can't guarantee the night.

17         Whenever it occurs, that's when it occurs.

18         Will you be able to stay and deliberate --

19              PROSPECTIVE JUROR:  The problem is, I

20         teach at nights.  I teach computers.  The

21         people I work for don't understand it.  They

22         wouldn't be able to teach it.  With the

23         holidays coming up, they can't cancel the

24         class.  My only concerns is that --

25              THE COURT:  It's a real concern.  You

jerri krevoff, csr, rpr

351

1

2   have to be willing to stay with us whenever

3   it would occur.

4            PROSPECTIVE JUROR:  I guess I would

5   have no choice.

6            THE COURT:  Are you willing to do that?

7            PROSPECTIVE JUROR:  Yeah.

8            THE COURT:  Ms. Renner, you had come up

9   to the Bench.  You were concerned about the

10  young people you teach.  I told you I keep

11  my teachers because they get paid.

12           I also want to be sure that you're not

13  going to be the kind of juror who will be so

14  concerned about what's happening back at

15  school, that you will be distracted or be

16  watching the clock, or hurrying your verdict

17  because of it.

18           PROSPECTIVE JUROR:  I won't.

19           THE COURT:  What type of sales is your

20  husband in.

21           PROSPECTIVE JUROR:  He was in.  Selling

22  Xerox.

23           THE COURT:  Victim of a crime.

24           PROSPECTIVE JUROR:  My home was

25  burglarized.

```
 1                                                    352
 2                 THE COURT:   Anyone apprehended.
 3                 PROSPECTIVE JUROR:   No.
 4                 THE COURT:   Would that affect your
 5          ability to be fair.
 6                 PROSPECTIVE JUROR:   No.
 7                 THE COURT:   You have a relative in law
 8          enforcement?
 9                 PROSPECTIVE JUROR:   My brother-in-law
10          is a New York City policeman.
11                 THE COURT:   Would that affect your
12          ability to be fair?
13                 PROSPECTIVE JUROR:   No.
14                 THE COURT:   Would you judge the police
15          officers as any other human being who takes
16          the stand?
17                 PROSPECTIVE JUROR:   Yes.
18                 THE COURT:   Ms. Acuri, tell me about
19          law enforcement.
20                 PROSPECTIVE JUROR:   My cousin is a cop
21          in the city.
22                 THE COURT:   Would you be affected by
23          that?
24                 PROSPECTIVE JUROR:   No.
25                 THE COURT:   Would you judge the police
```

1

2        officers as anyone else who takes the stand?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  Mrs. Thompson, your

5        occupation prior to retirement?

6              PROSPECTIVE JUROR:  Bank worker.

7              THE COURT:  Anything that you prefer to

8        discuss privately.

9              PROSPECTIVE JUROR:  Yes.

10            (Whereupon the following side bar

11       conference took place outside the hearing of

12       the open courtroom:)

13            THE COURT:  Tell me about crimes.

14            PROSPECTIVE JUROR:  I'm willing to

15      serve.  I don't know if I would be accepted.

16      The crime is about twenty years ago in the

17      bank.  My bank guard was shot.  I witnessed

18      it.  He died six weeks after.  I went to

19      Court and the convict was put away for life.

20            THE COURT:  Would you be affected by

21      that?

22              PROSPECTIVE JUROR:  No.

23              THE COURT:  Let's go to accused of a

24      crime.

25              PROSPECTIVE JUROR:  My son was picked

1                                                                354

2              up with a cellular phone a couple of years

3              ago.  It was his friend's phone.  He

4              wouldn't tell about the friend.  I think the

5              case was dismissed.  He had to pay for the

6              phone.  That was it.

7                   THE COURT:  Would that, in any way,

8              affect your ability to be fair?

9                   PROSPECTIVE JUROR:  No.

10                  THE COURT:  Was it in Nassau County.

11                  PROSPECTIVE JUROR:  Yes.

12                  THE COURT:  Were the Nassau County

13             police involved?

14                  PROSPECTIVE JUROR:  Yes.

15                  THE COURT:  Do you have any feelings

16             about the police?

17                  PROSPECTIVE JUROR:  No.

18                  THE COURT:  What about the district

19             attorney's office?

20                  PROSPECTIVE JUROR:  No.

21                  THE COURT:  Do you feel your son was

22             fairly treated?

23                  PROSPECTIVE JUROR:  I think so.

24                  THE COURT:  Any questions?

25                  MR. WALSH:  You think your son was

1                                                                    355

2              treated fairly by the police?

3                   PROSPECTIVE JUROR:  I think so.  There

4         was some thought whether he should have been

5         searched, because he was just driving his

6         Jeep.  He was picked up.  He didn't know

7         they were policemen.  They were plain

8         clothes men.  But I don't know.  I maintain

9         that if he were in school, that wouldn't

10        have happened.

11                  MR. WALSH:  Okay.

12             How far did that case actually go?

13                  PROSPECTIVE JUROR:  It went to Court.

14        He was discharged.  He had to pay for the

15        phone.  The case was dismissed.

16                  MR. WALSH:  That was in Nassau County.

17                  PROSPECTIVE JUROR:  Yes.

18                  MR. WALSH:  How do you feel he was

19        treated by the district attorney's office.

20                  PROSPECTIVE JUROR:  It was fine.  I

21        think they wanted him to give a source.

22        They kept on asking for a source, source,

23        source.  He just said he knew nobody.  It

24        was his friend's phone.

25                  From that point of view, he said, I

                    jerri krevoff, csr, rpr

1                                                                    356

2              can't call my friend's name.  I don't want

3              to get him in trouble.  I think he was

4              fairly treated.

5                    THE COURT:  Any questions?

6                    MR. BRETTSCHNEIDER:  No.

7                    THE COURT:  All right.

8                    (Whereupon the following took place

9              back within the hearing of the open

10             courtroom:)

11                   THE COURT:  Mrs. Reisch, were you ever

12             employed outside of the home?

13                   PROSPECTIVE JUROR:  Many years ago.

14                   THE COURT:  What did you do.

15                   PROSPECTIVE JUROR:  I worked for a

16             weekly newspaper.

17                   THE COURT:  Tell me about victim of a

18             crime.

19                   PROSPECTIVE JUROR:  My parked car was

20             broken into, and some things stolen.  My

21             house was burglarized.

22                   THE COURT:  Anyone apprehended in

23             either case?

24                   PROSPECTIVE JUROR:  No.

25                   THE COURT:  Anything in those incidents

```
1                                                    357
2           that would affect your ability to be fair?
3                    PROSPECTIVE JUROR:  No.
4                    THE COURT:  Mrs. Feine, you're a
5           program analyst for what type of firm?
6                    PROSPECTIVE JUROR:  Insurance company.
7                    THE COURT:  Prior to your husband's
8           death, what type of work did he do?
9                    PROSPECTIVE JUROR:  He was in
10          computing, also.
11                   THE COURT:  You have a child that's an
12          attorney.  Male or female.
13                   PROSPECTIVE JUROR:  Female.
14                   THE COURT:  Does she practice in the
15          feel of criminal law?
16                   PROSPECTIVE JUROR:  No.
17                   THE COURT:  Has she ever discussed with
18          you criminal law or procedure?
19                   PROSPECTIVE JUROR:  No.
20                   THE COURT:  Tell me about victim of a
21          crime.
22                   PROSPECTIVE JUROR:  Three, actually.
23          My car was broken into.  I was mugged.  My
24          home was burglarized.
25                   THE COURT:  Anyone apprehended.
```

1                                                              358

2                    PROSPECTIVE JUROR:  No.

3                    THE COURT:  Would those incidents, in

4           any way, affect your ability to be fair in

5           this case?

6                    PROSPECTIVE JUROR:  No.

7                    THE COURT:  We're going to stop now.

8           I'm going to read you some admonitions,

9           ladies and gentlemen.

10                   Do not discuss the case amongst

11          yourselves or with others.

12                   Do not read or listen to any accounts

13          or discussions of the case reported by

14          newspaper or any other news media.

15                   Do not visit or view the premises or

16          any place where the offenses charged were

17          allegedly committed, or any other premises

18          or place involved in the case.

19                   Promptly report to the Court any

20          incident involving any attempt by any person

21          to influence any member of the jury or to

22          discuss the case.

23                   Do not form any opinions.  Keep an open

24          mind until the case is completed.

25                   We'll see all of you at two.  Bring

359

1

2          your questionnaires back with you.

3          Actually, everyone except for the sworn

4          jurors, two o'clock, outside of this

5          courtroom.

6               (Whereupon the sworn jurors and

7          prospective jurors left the courtroom)

8               THE COURT:   All right, two o'clock,

9          everyone.

10              MR. WALSH:   Yes, Judge.

11              (Whereupon there was a luncheon recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                                          360

2              A F T E R N O O N     S E S S I O N

3

4              THE CLERK:  People vs. Joseph Jackson.

5              Are the People ready?

6              MR. WALSH:  Yes.

7              THE CLERK:  Is the defendant ready?

8              MR. BRETTSCHNEIDER:  Yes.

9              THE COURT:  All right.  Please bring

10       the panel in.

11              (Whereupon the jury panel was brought

12       into the courtroom)

13              THE COURT:  While we're waiting for our

14       sworn jurors, Ms. Renner, did you want to

15       discuss something with me?

16              PROSPECTIVE JUROR:  Yes.

17              (Whereupon the following side bar

18       conference took place outside the hearing of

19       the open courtroom:)

20              PROSPECTIVE JUROR:  I have to say, I'm

21       torn.  I reconsidered the question you asked

22       about, will I be so concerned about my work

23       that I won't be able to put my mind

24       completely here.  I feel I would be so

25       concerned about my work.

1                                                           361

2                THE COURT:  All right.  Then I'm going

3       to excuse you.  I can't have someone whose

4       mind he is elsewhere.

5                PROSPECTIVE JUROR:  Thank you very

6       much.

7                (Whereupon the following took place

8       back within the hearing of the open

9       courtroom:)

10               THE COURT:  Please fill the seat.

11               (Whereupon the sworn jurors were

12      brought into the courtroom)

13               (Whereupon the vacant seat was filled)

14               THE COURT:  I remember you had come up

15      to the Bench, and indicated your business

16      concerns.  After Ms. Renner had time over

17      the luncheon recess to think about it, she

18      thought her mind would be elsewhere because

19      she would be so concerned about her business

20      while we were in the course of this trial.

21      I want to make sure you have no such

22      problems.

23               PROSPECTIVE JUROR:  That wouldn't be

24      the case with me.

25               THE COURT:  Have you ever practiced in

```
 1                                              362
 2         the field of criminal law, yourself.
 3              PROSPECTIVE JUROR:  No, I haven't.  My
 4         wife did.
 5              THE COURT:  You also, of course, in
 6         becoming an attorney, had criminal
 7         procedure, criminal law, constitutional law.
 8         I just want to make sure there would be no
 9         problems, that you would become a legal
10         adviser to the jury, if chosen.  No problems
11         with that?
12              PROSPECTIVE JUROR:  I wouldn't have a
13         problem.
14              THE COURT:  Tell me about victim of a
15         crime.
16              PROSPECTIVE JUROR:  I was mugged on a
17         New York City subway in 1988; lost three
18         dollars.  Didn't even report it to the
19         police.
20              THE COURT:  Would that incident affect
21         you in this case?
22              PROSPECTIVE JUROR:  No.
23              THE COURT:  Do you know any of the
24         participants, anything about the case; other
25         than what we have told you?
```

1                                                              363

2                    PROSPECTIVE JUROR:  No, I do not.

3                    THE COURT:  Now, ladies and gentlemen,

4          we're all back together again.  Do any of

5          you have any business pending before the

6          district attorney's office or the Police

7          Department?

8                    As jurors, your verdict must be

9          unanimous.  Twelve jurors seldom agree

10         immediately.  And you will therefore be

11         called upon to deliberate.

12                   Can you all promise the parties that at

13         the time the deliberations begin, you will

14         express your views, listen to the views of

15         your fellow jurors and keep an open mind?

16         Can you all do that; everyone?

17                   Do any of you know any reason that you

18         can't fairly and impartially sit in this

19         case?  Anyone?

20                   PROSPECTIVE JUROR:  I think I might

21         have a preconceived idea.

22                   THE COURT:  I'm going to excuse you.

23         You're excused.  Fill the seat, please.

24                   (Whereupon the vacant seat was filled)

25                   THE COURT:  Ms. Gladstone, do you know

```
 1                                              364
 2              anything about the case; any of the
 3              prospective witness or the participants?
 4                   PROSPECTIVE JUROR:  No.
 5                   THE COURT:  I see you're an attorney.
 6                   PROSPECTIVE JUROR:  Yes.
 7                   THE COURT:  Have you ever practiced in
 8              the field of criminal law?
 9                   PROSPECTIVE JUROR:  Yes.
10                   THE COURT:  What type of work did you
11              do?
12                   PROSPECTIVE JUROR:  Criminal work in
13              Manhattan.
14                   THE COURT:  Can you assure me that from
15              all of your experiences, that you would be
16              fair and impartial in this case; and not
17              favor one side or another?
18                   PROSPECTIVE JUROR:  Yes.
19                   THE COURT:  You will not become the
20              legal adviser to the jury?
21                   PROSPECTIVE JUROR:  No.
22                   THE COURT:  As well, you know,
23              sometimes, the law can change even in
24              twenty-four hours.  Even if you think I'm
25              wrong, you must take the law as I give it to
```

365

you.  No problem with that?

PROSPECTIVE JUROR:  I understand.

THE COURT:  Does your husband practice in the field of criminal law?

PROSPECTIVE JUROR:  No.

THE COURT:  Tell me about witness to a crime.

PROSPECTIVE JUROR:  My friend was, her wallet was taken from her on the street.

THE COURT:  Will that incident affect you in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  What about law enforcement people?

PROSPECTIVE JUROR:  My son-in-law is a police officer in Ohio.

THE COURT:  Can you judge a police officer the same as any other human being who takes the stand.

PROSPECTIVE JUROR:  Yes.  Your Honor, I have a trial scheduled to begin December 2nd.  I don't know -- that's in Civil Court in Manhattan.

THE COURT:  This will take precedence

366

2          over that.  All right.

3                  You would be actively engaged as a

4          juror, if you are chosen.

5                  PROSPECTIVE JUROR:  Thank you.

6                  THE COURT:  Any problems with the

7          Judge, you let me know.  Can you be a fair

8          and impartial juror in this case?

9                  PROSPECTIVE JUROR:  Yes, I can.

10                  THE COURT:  My second series of

11          questions concerns your willingness to

12          follow my instructions on the law.

13                  In order to be jurors in the case, you

14          do not have to know anything about the law.

15          As you saw, I told the attorneys who do know

16          the law, they must put it aside and take the

17          law as I give it to them.  It is my function

18          to explain the law.  It is your function to

19          determine the facts and apply the law to

20          those facts; thereby rendering a fair and

21          just verdict.

22                  If you are selected as jurors, I will

23          explain the law to you in detail, at the end

24          of the case.  But it is important to know at

25          this stage, that you will follow the law as

I give it to you.  I will therefore describe

a few basic principles to make sure that you

can follow them.

Every person accused of a crime is

presumed innocent.  That is, he stands

innocent in the eyes of the law.  The People

must rebut this presumption, if they can, by

the presentation of evidence which convinces

you beyond a reasonable doubt of the

defendant's guilt.

In a criminal case, the burden of proof

is on the People, and remains on the People

throughout the trial.  The defendant is not

required to prove or disprove anything.

Mr. Brettschneider, if he so desired, could

sit there silently throughout the trial.

Can you all accept the presumption of

innocence?

I will explain to you at the close of

the case exactly what reasonable doubt

means.  But you will be required to acquit

if, at the end of the case, because of the

evidence or lack of evidence presented to

you, you have a reasonable doubt as to

368

guilt.  This is a higher standard than those
of you who sat in a civil case applied
there.

Are there any of you who, in your own
mind, cannot require that the defendant be
proven guilty beyond a reasonable doubt
before you would convict?  Anyone?

Now, the People are not obligated to
prove guilt beyond all doubt.  Nothing in
life is absolutely certain.  Are there any
of you who would hold the People to a higher
standard of proof than that required by law?

Your job in this case will end when you
determine whether or not the defendant has
been proven guilty.  If the defendant is to
be punished, punishment would be a job for
the Court exclusively, and the jury has no
role to play.  You're not permitted to
consider the possibility of punishment in
your deliberations.  And you may not include
any recommendations as to sentence in your
verdict.

Are there any of you who feel that you
cannot render your verdict free from

369

sympathy, without considering the
possibility of punishment?

Under our system of law, the defendant
is not obligated to take the witness stand
or call any witnesses, or explain his
actions in any way.  You must not draw any
inference unfavorable to the defendant from
this fact.

Are there any of you who will or might
allow the fact that the defendant may not
testify to influence you in your
deliberations?

It is not essential that you agree with
or like these principles of law as I have
set them forth.  Under my oath, I must
instruct you as to the law as I understand
it to be.  Under your oath as jurors, you
must accept the law as I explained it to
you.  Can you all do that?

You have heard us mention that a police
officer is the same as any other human being
who takes the stand.  Do any of you have any
feelings about the police that would lead
you to give a police officer's testimony any

370

greater or any lesser weight, without even
listening?

As I told you, we have already got nine
jurors.  We're going to pick three more and
three alternates.  If one of you is excused
by the Court, or on request of either of the
attorneys, please do not regard that as a
personal affront or a disparaging gesture on
the part of counsel or the Court.
Understand that the selection of jurors, is
a longstanding selection and based upon
recognized principles of justice.

Therefore, I ask you to continue to
participate in this process of jury
selection in accordance with the terms and
spirit of the oath which you have all taken.
Those of you who will be selected must be
prepared to sit on the case for as long as
the trial may last, and until a verdict is
rendered.

You will now be asked various questions
by the attorneys, starting with the
assistant district attorney.  Their
questions like mine, are only designed to

371

1

2        determine whether they think you are

3        qualified to sit in this case.  If they

4        inadvertently ask a question which is

5        embarrassing or very personal to you, you

6        may say so.

7              If the question is not proper, I will

8        tell you that you do not have to answer it.

9        If the answer involves some personal

10       information, I will permit you to answer it

11       in private, rather than in open Court.

12             You are sworn to tell the truth and

13       must answer every question truthfully,

14       unless I rule that it is not necessary to

15       answer.

16             The attorneys now will be starting to

17       question you.  They have a time limit.  They

18       are allowed twenty minutes the first round

19       and fifteen minutes every round thereafter.

20       I will give them one minute's notice.

21             MR. WALSH:  My name is Michael Walsh.

22       I'm an assistant district attorney.  My

23       responsibility in this case is to present

24       the evidence to you on behalf of the People

25       of the State of New York.

372

                 With apologies to our sworn jurors, who

        have heard this about three or four times,

        there is something that I like to say to

        each new panel as you come in.  That is,

        that during this process, there are no right

        or wrong answers to the questions that we

        ask you.  Whether it's myself or

        Mr. Brettschneider, or Judge Boklan, who was

        asking the questions.  The only good answer

        that any of you can give us, is the most

        honest and candid one you possibly can.

        Many people feel that this is the most

        important part of a criminal trial.  We are

        attempting to pick from among you, twelve

        people who can truly be fair and impartial

        to both sides in this case.  It's only

        through the selection of twelve fair and

        impartial jurors that the system actually

        works.  Without twelve fair and impartial

        jurors, the rest of the trial can become a

        waste of time.

                 So what I would ask of you is that you

        resist the temptation, if it creeps in, to

        give us answers that you think we might want

1                                                              373

2              to hear; or to tell us what you think the

3              right answer might be.  Please be as honest

4              and candid as you possibly can.  It's only

5              in that way that we can truly pick a jury

6              that's going to give both sides a fair

7              trial.

8                   Everybody heard Judge Boklan read

9              through the indictment, or at least outline

10             what the charges were.  Is there anybody

11             among you who feels that based upon the

12             nature of the charges, that they would have

13             a difficult time sitting on this jury or

14             being a fair and impartial juror?

15                  PROSPECTIVE JUROR:  Can you go through

16             the charges?

17                  MR. WALSH:  The defendant is charged in

18             the indictment that Judge Boklan referred

19             to, with murder in the second degree,

20             hindering prosecution in the second degree,

21             and intimidating a witness or a victim in

22             the first degree.

23                  Knowing that, or having heard that

24             again, does that cause you any problems?

25                  PROSPECTIVE JUROR:  Well, intimidating

1                                                                    374

2              does a little bit.  It just bothers me.

3                   MR. WALSH:  Okay.  I guess what I'm

4              really -- does it cause you any problems as

5              far as being fair and impartial to one side

6              or the other?  It should bother you.  Nobody

7              in this courtroom is in favor of any of the

8              charges in the indictment.  It's good that

9              it bothers you.

10                  PROSPECTIVE JUROR:  I just wonder where

11             it comes from.  Something had to happen

12             there, for that charge to even come about.

13                  MR. WALSH:  Any time a defendant walks

14             into a courtroom and is charged with a

15             crime, that's true of any defendant.

16             Anybody who is here.

17                  Does the fact that the defendant is

18             sitting here in this chair, in any way, mean

19             that he's guilty or not guilty of the

20             charges against him?  In other words, Judge

21             Boklan explained to you that right now, as

22             the defendant sits here, he's presumed

23             innocent.  You have to apply that

24             presumption of innocence.

25                  Does the fact that he was charged with

1                                                          375

2              a crime in an indictment, cause you in any

3              way to be unable to apply that presumption?

4                   PROSPECTIVE JUROR:  Well, I guess not

5              yet.

6                   MR. WALSH:  That's what we ask.

7              Basically, as you sit here, do you feel that

8              you could be fair and impartial to each

9              side.  And whatever your -- say you're

10             chosen as a juror -- whatever your verdict

11             is in the end of the case, do you feel you

12             could give us your assurance that whatever

13             it is, it is based on the evidence and

14             nothing else?

15                  PROSPECTIVE JUROR:  Sure.

16                  MR. WALSH:  Anybody else?  I think it

17             was on last Thursday, which was the last day

18             we were actually in the courtroom, one of

19             the prospective jurors said they would have

20             a difficult time with the responsibility of

21             finding someone guilty or not guilty, such

22             that they felt they couldn't serve.  Does

23             anyone else feel that way?  As I have asked

24             Mrs. Petrico, and I'll ask everybody the

25             same question, whatever your verdict might

be, if you're chosen as a juror, can you
each assure me that your verdict will be
based on the evidence and nothing else,
other than the evidence?

Everybody heard the witness list read
by the Judge.  I think over half of the
witnesses were -- or prospective
witnesses -- were police officers.  I know
that a number of you have friends or
relatives in the Police Department.  We have
one police officer on our panel.  In my
opinion, really, the central question, when
you're talking about the testimony of a
police officer is, whether or not any of you
believe that a police officer, just by
virtue of the fact that they're a police
officer and wear a gun and a badge, are any
more or less likely to be truthful as
witnesses on the witness stand.  To me,
that's the most important question there is.
Ms Ruggerio, I am going to start with you.
The way we left it this morning, was that
you believed you could be fair and
impartial.  I'm going to try to push a

377

little bit.  Ultimately, understanding your
answer may be, I believe so.

PROSPECTIVE JUROR:  I'm questioning
myself.  Because I want to be fair and
impartial.  I just know so much of what I
hear is very biased toward one side.  I feel
a little bit uncomfortable.  I would hope
that I would be.  That's why I said I
believe so.

MR. WALSH:  Let me get your gut
reaction to the question I just asked.  Do
you feel that a police officer, just by
virtue of the fact that they're a police
officer, is any more likely to tell the
truth when they get up on the witness stand
than anyone else?

PROSPECTIVE JUROR:  I believe so.

MR. WALSH:  Why is that.

PROSPECTIVE JUROR:  Because they take
an oath when they become a police officer,
to serve.  Although, I know that's not one
hundred percent the case.  It's my position,
if they took the oath, they should hold it
seriously.

1

2          MR. WALSH:  Mr. Westfall, how about

3     yourself?  You're a New York City police

4     officer.  Are you assigned to any particular

5     squad or unit?

6          PROSPECTIVE JUROR:  Actually, now, I'm

7     in charge of the auxiliary police in the

8     Burough of Queens.

9          MR. WALSH:  Do you feel a police

10    officer who gets up on the witness stand is

11    any more likely or less likely to tell the

12    truth?

13         PROSPECTIVE JUROR:  I feel I have no

14    problem with that.  Are you asking me --

15         MR. WALSH:  In general, do you think a

16    police officer is any more likely to tell

17    the truth when they get up on the stand?

18         PROSPECTIVE JUROR:  No.

19         MR. WALSH:  That's really what I'm

20    getting at.  They're human beings like

21    anybody else.  They have the same frailties

22    as anyone else.  A police officer isn't

23    going to start off up here, and somebody

24    else down here?

25         PROSPECTIVE JUROR:  No.

1

2          MR. WALSH:  Anybody else -- let me just

3     generally ask this question, Ms. Gladstone.

4     How much of your practice is devoted to

5     criminal law?

6          PROSPECTIVE JUROR:  Right now, almost

7     none.  That was -- I started doing civil

8     litigation about a year ago.

9          MR. WALSH:  You've been involved I

10    imagine, in criminal litigation, as well?

11         PROSPECTIVE JUROR:  At the moment, no.

12         MR. WALSH:  How do you feel about what

13    we're talking about.  Police officers,

14    whether they're any more likely or less

15    likely to tell the truth?

16         PROSPECTIVE JUROR:  They're just

17    people.

18         MR. WALSH:  It's hard for me to get

19    used to actually having lawyers, and

20    criminal lawyers, on jury panels now.  To

21    tell the truth, I haven't figured out

22    whether or not -- what kind of an effect a

23    criminal defense lawyer's background would

24    have on their ability to serve fairly and

25    impartially.  If you were me standing up

```
 1                                                      380
 2              here asking you the questions, would you be
 3              concerned about having you as a juror?
 4                   PROSPECTIVE JUROR:  Probably.
 5                   MR. WALSH:  Why is that.
 6                   PROSPECTIVE JUROR:  Only because I am a
 7              lawyer.  I have represented one side.  I
 8              don't think I would be any less likely to be
 9              a problem than anyone else.  I think I could
10              be impartial.
11                   MR. WALSH:  Just as anyone else.  You
12              don't think your background would hurt your
13              ability to be fair and impartial to either
14              side.  Again, I haven't really figured
15              out -- it's something that could cut both
16              ways, actually.
17                   PROSPECTIVE JUROR:  Of course, it
18              could.
19                   MR. WALSH:  You feel it's not going to
20              be a problem, and you could be fair and
21              impartial?
22                   PROSPECTIVE JUROR:  I think I can be.
23              Yes.
24                   MR. WALSH:  You had indicated
25              Mrs. Carlson, that you had a brother who had
```

1                                                          381

2              been convicted of a crime.

3                   PROSPECTIVE JUROR:  Yes.

4                   MR. WALSH:  First of all, how do you

5              feel that he was treated; first by the

6              police, in the case he was involved in.

7                   PROSPECTIVE JUROR:  I'm not really

8              aware of how he was treated, at all.  I was

9              much younger.  You know, he did go to prison

10             for his crime.

11                  MR. WALSH:  Where did that occur.

12                  PROSPECTIVE JUROR:  The actual

13             incident, I'm not really sure.  I believe it

14             was Pennsylvania.

15                  MR. WALSH:  Were you left with any

16             impression, one way or the other, about the

17             criminal justice system?  I know you said

18             you were young.  Would that cause you any

19             problems as far as sitting fairly and

20             impartially?

21                  PROSPECTIVE JUROR:  No.  Not at all.

22                  MR. WALSH:  The horrible incident

23             involving your brother, the brother who was

24             murdered -- twenty-six years ago?

25                  PROSPECTIVE JUROR:  Right.

```
1                                                        382
2                 MR. WALSH:  How -- do you feel that
3        that would affect your ability to be fair in
4        this case?
5                 PROSPECTIVE JUROR:  I don't think so.
6                 MR. WALSH:  Any other reasons you feel
7        you would have any difficulty being a fair
8        and impartial juror?
9                 PROSPECTIVE JUROR:  I don't think I
10       would have any difficulty.
11                MR. WALSH:  Mr. Perilis, I know you had
12       indicated on your questionnaire that you
13       possibly had difficulty staying overnight.
14       Do you foresee that being a problem?
15                PROSPECTIVE JUROR:  No.
16                MR. WALSH:  Up until this point in
17       time, I know that you said you've been in
18       the country for sixteen years.  Have you had
19       any difficulty understanding anything that I
20       have said or Judge Boklan has said?  In
21       other words, do you feel that language could
22       be a difficulty for you, if you were chosen?
23                PROSPECTIVE JUROR:  No.
24                MR. WALSH:  Any other reason -- any
25       reason you feel you couldn't be fair and
```

383

impartial.

PROSPECTIVE JUROR:  Yes.

MR. WALSH:  You feel you could be fair?

PROSPECTIVE JUROR:  Yes.

MR. WALSH:  Mr. Blakely, I know you told us about an incident involving your son.

PROSPECTIVE JUROR:  That's right.

MR. WALSH:  I noticed you had brought up what the sentence was.  Were you left with anything from that experience, the incident involving your son, that would cause you any difficulty sitting in this case?

PROSPECTIVE JUROR:  The defendant went to trial and was sentenced.  It was fair, I felt it was a fair trial.  He had diminished capacity.  He just was driving a car without a license or registration.  He claimed he wasn't really responsible.

MR. WALSH:  Do you feel the police handled that --

PROSPECTIVE JUROR:  It was handled very well.

384

MR. WALSH:  Did that occur here in
Nassau County?

PROSPECTIVE JUROR:  It did.

MR. WALSH:  Did you deal with the
district attorney's office?

PROSPECTIVE JUROR:  Yes.

MR. WALSH:  How did you feel the
district attorney's office handled the case?

PROSPECTIVE JUROR:  They prosecuted the
case with the evidence they had.

MR. WALSH:  Were you satisfied with the
job they did?

PROSPECTIVE JUROR:  Yes.

MR. WALSH:  Any reason you couldn't
give the defendant a fair trial?

PROSPECTIVE JUROR:  This case has no
relevance to what happened to my son.

MR. WALSH:  How about you, Mr. Keller?
I know you indicated that you had an uncle
who was convicted of a crime.

First of all, were you left with any
feelings, given that incident, about the
police, or how they handled that case?

PROSPECTIVE JUROR:  No.

385

1

2              MR. WALSH:  Where did that occur?

3              PROSPECTIVE JUROR:  I believe it was

4         Suffolk.

5              MR. WALSH:  How about the district

6         attorney's office?

7              PROSPECTIVE JUROR:  I really didn't

8         have any involvement, as far as the details.

9              MR. WALSH:  Any reason you feel you

10        couldn't be fair and impartial?

11             PROSPECTIVE JUROR:  No.

12             MR. WALSH:  Mr. Mastelone, I'm going to

13        ask you a few questions.  Does it matter to

14        you, in this case, whether the victim is

15        black or white?

16             PROSPECTIVE JUROR:  Not at all.

17             MR. WALSH:  Does it matter to you in

18        this case, whether the victim is male or

19        female?

20             PROSPECTIVE JUROR:  No.

21             MR. WALSH:  Young or old?

22             PROSPECTIVE JUROR:  Well, no; it

23        doesn't.

24             MR. WALSH:  If I were to tell you that

25        the victim in this case, the person who was

killed, sold drugs during the course of his
lifetime, would that matter to you, as far
as whether or not you would take this case
as seriously?

    PROSPECTIVE JUROR:  That wouldn't
matter to me.

    MR. WALSH:  Ma'am, how about you?  Same
questions.  First of all, does it matter
whether the victim is black or white, male
or female?

    PROSPECTIVE JUROR:  No.

    MR. WALSH:  That has nothing to do with
whether or not I prove to you beyond a
reasonable doubt that this defendant
committed the crime.

    Now, none of those things would cause
you to take the case any more or less
seriously?

    PROSPECTIVE JUROR:  Right.

    MR. WALSH:  What if you found out, and
unrelated to whether or not I actually prove
the charges beyond a reasonable doubt, that
the victim was somebody who sold drugs
during the course of his lifetime?

387

PROSPECTIVE JUROR:  That doesn't matter.

MR. WALSH:  Would that tend to make you take the case any less seriously?

PROSPECTIVE JUROR:  No.

MR. WALSH:  Ms. Thompson, how about you?

PROSPECTIVE JUROR:  No.

MR. WALSH:  You wouldn't take the case any more or less seriously, depending on who the victim was, or what he or she may have been during the course of their lives; as long as it had no relation to whether or not I proved the case to you beyond a reasonable doubt?

PROSPECTIVE JUROR:  Right.

MR. WALSH:  How about you, Mrs. Reisch?

PROSPECTIVE JUROR:  No.

MR. WALSH:  Anybody who would have any difficulty with that?

PROSPECTIVE JUROR:  It would matter to me -- how young was the victim?  I work with children a lot.  It would matter to me if it was a child.  I would probably be more

388

sympathetic if it was a child.

MR. WALSH:  I don't think you're going
to find the victim was a child.  If the
Court wouldn't mind me saying, it was
somebody probably in their twenties.

Based on what you said, let me ask you
a few more questions.  You mentioned
sympathy.  Given, in your case, if the
victim was young, that's something that
might affect you.  You would have maybe more
sympathy for the victim?

PROSPECTIVE JUROR:  Right.

MR. WALSH:  If you remember, one of the
first things the Judge said when you came
into the courtroom, was that your job as a
juror, and a jury, is to find the facts.
Basically, to determine what happened here.
That's based upon whether or not, as I said
before, I prove to you, beyond a reasonable
doubt, that the defendant committed the
crime he's charged with.

Emotional considerations, sympathy, or
even anger for one side or the other, don't
play any role in a juror's job, basically,

1                                                          389

2              of finding the facts.  All the sympathy or

3              the anger you could have for either the

4              victim or the defendant, can't change what

5              happened and whether or not I prove it to

6              you beyond a reasonable doubt.

7                   So you're asked to basically evaluate

8              the evidence and come to a verdict, if you

9              possibly can, without regard to emotional

10             considerations.  That's a very easy thing

11             for me to get up here and ask you to do.

12             It's a very difficult thing for people

13             sitting in your position to put into

14             practice.

15                  Do you think you might have difficulty

16             with that part of being a juror?

17                  PROSPECTIVE JUROR:  I don't think so.

18             No.

19                  MR. WALSH:  Anybody else feel they

20             would have any difficulty with that?

21                  Let me ask it another way.

22             Ms. Thompson, assume, for the purposes of

23             the question I'm going to ask you, that

24             you're chosen as a juror.  You listen to the

25             evidence.  You go back into the jury room to

390

deliberate.  At the end of it all, you're
convinced beyond a reasonable doubt that I
have proven that the defendant committed the
crimes that are charged in the indictment.
Would you have any difficulty, if you felt
any type of emotion creeping in -- whether
sympathy or anger -- would you have any
difficulty setting that aside, and only if I
prove the case to you beyond a reasonable
doubt, come back in this courtroom, stand
up, face the defendant and find him guilty
of murder in the second degree?

PROSPECTIVE JUROR:  Would I have any
difficulty?  No, I wouldn't.  If he's
guilty, he's guilty.

MR. WALSH:  If I don't prove the case,
you'll come in here and find him not guilty?

PROSPECTIVE JUROR:  Not guilty.

MR. WALSH:  Whatever your verdict is,
can we have your assurance, if you could
possibly give it to us, that it will be
based on the evidence and nothing else?

PROSPECTIVE JUROR:  Yes.

MR. WALSH:  That's basically the

391

question that I'm asking all of you right
now.  That's the question you have to answer
when you talk about sympathy.  Do I have
everybody's assurance, that whatever your
verdict is, it will be based upon the
evidence and nothing else?

Before I sit down, is there any reason
I haven't brought up, or Judge Boklan hasn't
addressed, why any of you feel you couldn't
be fair and impartial in this case?

Thank you very much.

THE COURT:  Mr. Brettschneider.

MR. BRETTSCHNEIDER:  Good afternoon.
I'm going to get right to the heart of it.
Certainly when you walked into the
courtroom, you probably didn't realize at
that time, that you potentially could sit on
a murder case.  Certainly, I don't have to
tell you what's at stake for Mr. Jackson in
this case.

So let me reiterate what the Judge said
and Mr. Walsh said about being as honest and
as truthful as you could be, as to whether
this case is right for you.

Essentially, I ask -- you know, you may be a perfect juror for another type of case. Based on your background or affiliation, this case may not be right for you.

Mr. Blakely, I need to find out from you, based upon -- I mean, a horrible experience. You went through the criminal justice system as a victim's parent. Now, you're being asked to sit as a juror, and be impartial as you possibly can be, in a case which is, you know, extremely serious.

Based on what you went through, and based upon what you went through as part of the criminal justice system from the other side, do you feel this case is right for you?

PROSPECTIVE JUROR: I don't feel totally comfortable with a murder. Nobody would. What I went through is considered to be a vehicle homicide. The defendant was sentenced. You know, he was given a sentence that I thought was kind of light. Yet, he wasn't really responsible.

MR. BRETTSCHNEIDER: I think when you

1

2          told the story, when people heard six months

3          and five years probation, it normally would

4          be -- without being present at the trial --

5          anybody would say, it seems to be a light

6          sentence.  Based upon the fact that it was a

7          light sentence and something that you

8          probably don't feel --

9              PROSPECTIVE JUROR:  I didn't feel

10         totally comfortable with it.

11             MR. BRETTSCHNEIDER:  Based on that, and

12         you're sitting here.  Right now, you may

13         feel you could be fair.  I want to know if,

14         halfway through the trial, you may say to

15         yourself, this brings back certain feelings

16         that I haven't had for maybe ten years.

17         What I'm asking you now is, whether there's

18         a possibility that those feelings could come

19         back --

20             PROSPECTIVE JUROR:  It's possible;

21         sure.  Sure, it's possible.

22             MR. BRETTSCHNEIDER:  In a negative

23         sense.

24             PROSPECTIVE JUROR:  Well, it would be

25         negative, I would think.  I need to hear

1

2    both sides of the case.  I would make a

3    judgment.  It brings back a lot of memories;

4    sure.

5        MR. BRETTSCHNEIDER:  Ms. Carlson, same

6    question.  Certainly, although it's been

7    many, many years.  Loved ones are never

8    forgotten.  A situation such as what

9    happened in your past, somewhere in the

10   middle of the trial, or even if you go home

11   and the Judge says to you, listen, you're

12   not supposed to talk about the case.  You

13   tell your family members, I'm on a murder

14   trial.  Somebody brings back what happened

15   to your brother.  Somewhere down deep as you

16   sit and listen to evidence, is something

17   going to come back to you, or are you going

18   to have certain emotions that maybe you

19   don't feel like you'll have now; but I mean,

20   even sitting here, how do you feel about

21   sitting on this case?

22       PROSPECTIVE JUROR:  I'm fine with it.

23   I was a small child at the time, as tragic

24   as it was.  I can definitely be fair.

25       MR. BRETTSCHNEIDER:  I have to ask the

1

2      question, because sometimes you shake your

3      head yes, sometimes, you shake your head,

4      no.  Looking at your background and your

5      education, there's a lot of things you bring

6      with you as a juror.  This particular case,

7      based on the number of police witnesses,

8      somewhere along the line, you're going to

9      listen to many police officers and say, you

10     know something.  They don't really have a

11     motive to lie.  Based on maybe just your

12     experiences with your husband, do you feel

13     as though this is the right case for you?

14          PROSPECTIVE JUROR:  No.  Because it is

15     such a serious thing.  I would want very

16     much to be impartial.  I can't guarantee you

17     that I would be.

18          MR. BRETTSCHNEIDER:  You had some

19     concerns.  I'm going to ask you the same

20     question.  Based on what you have heard so

21     far, and the fact that there may be

22     photographs of the deceased, which may be

23     graphic.  Based on your own emotions, is

24     this case right for you?

25          PROSPECTIVE JUROR:  Some of it bothers

2    me already; some of the charges.

3         MR. BRETTSCHNEIDER:  Bothering you to

4    the point where, somewhere in the back of

5    your mind, you're saying, I don't know if I

6    can be fair.

7         PROSPECTIVE JUROR:  Probably.

8         MR. BRETTSCHNEIDER:  Anybody else feel

9    the same way, based on just what they heard?

10   Ms. Janow, certainly, there is a victim in

11   this case.  Whatever he did during his

12   lifetime, I mean, that may come out during

13   the trial.  Someone did die.

14        Certainly, our sympathy always goes out

15   to a victim.  You may see photographs of the

16   deceased in this case.  You may hear what

17   happened, which certainly may have an

18   effect.  Could sympathy outweigh your

19   ability to be fair and impartial?

20        PROSPECTIVE JUROR:  I don't think so.

21        MR. BRETTSCHNEIDER:  Why do you feel

22   that way?

23        PROSPECTIVE JUROR:  Why do I feel that

24   way?  I take what the Judge said very

25   seriously.  I'm not going to have any

1                                                    397

2          predisposition.

3               MR. BRETTSCHNEIDER:  Mr. Westfall, have

4          you ever, in your career as a police

5          officer, ever dealt with a homicide case?

6               PROSPECTIVE JUROR:  Yes.

7               MR. BRETTSCHNEIDER:  On how many

8          occasions?

9               PROSPECTIVE JUROR:  Directly as the

10         assigned officer?

11              MR. BRETTSCHNEIDER:  No.  Could have

12         come to the scene.

13              PROSPECTIVE JUROR:  Maybe a dozen or so

14         times.

15              MR. BRETTSCHNEIDER:  Based on these

16         experiences, which I'm sure, no matter how

17         long you've been a police officer, they're

18         not pleasant experiences --

19              PROSPECTIVE JUROR:  No.

20              MR. BRETTSCHNEIDER:  Really what I want

21         to know is, based on what you've seen and

22         observed as to police officers, sitting on a

23         case such as this; and also the knowledge

24         that you have, you may know as a police

25         officer, do you feel you could be fair?

```
 1                                              398

 2              PROSPECTIVE JUROR:  I feel I can be

 3      impartial and just view the evidence.

 4              MR. BRETTSCHNEIDER:  Let me give you a

 5      situation and see how you feel about this.

 6      Detective gets on the stand, says, I've been

 7      a detective for twenty years.  I took a

 8      statement from a witness.  The witness told

 9      me X, Y and Z.  The fact that he took the

10      statement from a witness, does that

11      necessarily mean the witness was telling the

12      truth?

13              PROSPECTIVE JUROR:  No.

14              MR. BRETTSCHNEIDER:  What about if it

15      was a statement by the defendant in this

16      case.  It was taken by a police officer

17      during an interrogation.  Does that

18      necessarily mean that whatever the defendant

19      told the police officers is the truth?

20              PROSPECTIVE JUROR:  No.

21              MR. BRETTSCHNEIDER:  Is it possible

22      somebody could be forced to make a statement

23      against his will by a police officer?

24              MR. WALSH:  Objection.

25              THE COURT:  Sustained.
```

1                                                    399

2              MR. BRETTSCHNEIDER:   Well, in your

3        experience, have you ever taken a statement

4        from somebody who was arrested for a crime?

5              PROSPECTIVE JUROR:   Yes.

6              MR. BRETTSCHNEIDER:   Are you skilled in

7        interrogation techniques?   Were you trained?

8              PROSPECTIVE JUROR:   I'm not a

9        detective.   We have had -- we do first

10       on-the-scene-type of preliminary statements.

11       They're always interviewed by detectives

12       later on.

13             MR. BRETTSCHNEIDER:   You say you have

14       worked with auxiliary police officers in

15       Queens?

16             PROSPECTIVE JUROR:   Yes.

17             MR. BRETTSCHNEIDER:   How long have you

18       worked in Queens County.

19             PROSPECTIVE JUROR:   1981.

20             MR. BRETTSCHNEIDER:   What precinct.

21             PROSPECTIVE JUROR:   113, 103, 101, 104.

22             MR. BRETTSCHNEIDER:   Ms. Jackson, you

23       have a fiance who's a police officer.

24       Certainly, based on the situation that there

25       are going to be police officers testifying

```
1                                                      400
2          in this case, how do you feel about that?
3              PROSPECTIVE JUROR:  Doesn't affect me
4          either way.
5              MR. BRETTSCHNEIDER:  Why.
6              PROSPECTIVE JUROR:  I'll listen to the
7          evidence and take it for what it's worth.
8              MR. BRETTSCHNEIDER:  A police officer
9          get on the stand, raises his right hand and
10         says, I swear to tell the truth.  Does that
11         mean it's so?
12             PROSPECTIVE JUROR:  Not necessarily.  I
13         assume everybody will say that.  I have to
14         take it for what they give me.
15             MR. BRETTSCHNEIDER:  If, for example,
16         somebody gets on the witness stand and tells
17         a story as to occurrences that happened over
18         a certain period of time.  Then it comes out
19         that that witness has told a story in the
20         past, and it's inconsistent.  What would you
21         think about that person's reliability as far
22         as their truthfulness?
23             PROSPECTIVE JUROR:  I may have a little
24         bit of doubt about it; depending on what --
25         what relationship they had to the case,
```