```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
JOSEPH JACKSON,

                 Plaintiff,                MEMORANDUM & ORDER
                                           18-CV-3007(JS)(AYS)
     -against-

NASSAU COUNTY; DETECTIVE ROBERT
DEMPSEY;     DETECTIVE     GARY
ABBONDANDELO; DETECTIVE JOHN M.
HOLLAND; DETECTIVE MICHAEL HERTS;
DETECTIVE MARTIN ALGER; DETECTIVE
WALTER SWENSON; DETECTIVE ANTHONY
KOSIOR;   DETECTIVE  SERGEANT  DAN
SEVERIN; and JOHN and JANE DOE 1
through 20,

                 Defendants.
-------------------------------X
APPEARANCES
For Plaintiff:        Baree N. Fett, Esq.
                      Gabriel Paul Harvis, Esq.
                      Elefterakis, Elefterakis & Panek
                      80 Pine Street, 38th Floor
                      New York, New York  10005


For Defendant         Allison Michelle Holubis, Esq.
Nassau County &       Janine A. Mastellone, Esq.
Individual Police     John Martin Flannery, Esq.
Officer Defendants:   John Vitagliano, Esq.
                      Peter A. Meisels, Esq.
                      Wilson, Elser, Moskowitz, Edelman & Dicker,
                      LLP
                      113 Westchester Avenue
                      White Plains, New York  10604
```

SEYBERT, District Judge:

Presently before the Court is the Summary Judgment Motion of The County of Nassau (the "County"), Robert Dempsey, Gary Abbondandelo, John M. Holland, Michael Herts, Martin Alger, Walter Swenson, Anthony Kosior, and Dan Severin (collectively, the "Individual Defendants" and together with the County "Defendants"), filed pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking summary judgment on all claims alleged by Joseph Jackson (hereafter, the "Plaintiff") in his Third Amended Complaint (hereafter, the "TAC") (see ECF No. 339). For the reasons that follow, Defendants' Motion is GRANTED IN PART AND DENIED IN PART for the reasons set forth herein.

[Remainder of page intentionally left blank]

BACKGROUND

I.   Facts[1]

---

[1] The facts set forth herein are taken from the parties' respective Rule 56.1 Statements and the exhibits attached thereto. Defendants' Rule 56.1 Statement is located at ECF No. 385-2; hereafter, it will be cited as "Defs' 56.1 Stmt.". Plaintiff's Rule 56.1 Counterstatement is located at ECF No. 389-1; hereafter, it will be cited as "Pl's 56.1 Counterstmt.". Plaintiff's Rule 56.1 Statement of Additional Facts is located at ECF No. 389-2; hereafter it will be cited as "Pl's 56.1 Stmt. Add'l Facts". Defendants' Rule 56.1 Counterstatement is located at ECF No. 394-10; hereafter, it will be cited as "Defs' 56.1 Counterstmt.". Plaintiff's declaration authenticating his exhibits is located at ECF No. 389; Plaintiff's exhibits are numbered 1-116. (See id.) Defendants' declaration authenticating their exhibits is located at ECF No. 385-1; Defendants' exhibits are lettered A-FFFFF. (See id.)

Unless otherwise noted, a standalone citation to a party's Rule 56.1 statement throughout this Order means the Court has deemed the underlying factual assertion undisputed. Any citation to a Rule 56.1 statement incorporates by reference the documents cited within. Where relevant, however, the Court may also cite directly to an underlying document. The Court has deemed true undisputed facts averred in a party's Rule 56.1 statement to which the opposing party cites no admissible evidence in rebuttal. See Steward v. Fashion Inst. of Tech., No. 18-CV-12297, 2020 WL 6712267, at *8 (S.D.N.Y. Nov. 16, 2020) ("[P]ursuant to Local Civil Rule 56.1 [the movant's] statements are deemed to be admitted where [the non-moving party] has failed to specifically controvert them with citations to the record." (quoting Knight v. N.Y.C. Hous. Auth., No. 03-CV-2746, 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007))); Lumbermens Mut. Cas. Co. v. Dinow, No. 06-CV-3881, 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Local Rule 56.1 requires . . . that disputed facts be specifically controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything."). "Additionally, to the extent [a party's] 56.1 statement 'improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts,' the Court has disregarded [such] statement[s]." McFarlance v. Harry's Nurses Registry, No. 17-CV-6360, 2020 WL 1643781, at *1 n.1 (E.D.N.Y. Apr. 2, 2020); see also Taveras v. HRV Memt., Inc., No.

A. The Parties

Plaintiff "is a resident of Nassau County, New York."
(Defs' 56.1 Stmt. ¶ 1.)

─────────────

17-cv-5211, 2020 WL 1501777, at *2 (E.D.N.Y. Mar. 24, 2020) ("Legal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded.").

Likewise, to the extent either party made an argument or claim in said party's 56.1 statement but omitted said argument or claim from their supporting/opposing memorandum, the Court has deemed such claim and/or argument abandoned. See Ramirez v. Michael Cetta Inc., No. 19-CV-0986, 2020 WL 5819551, at *5 n.2 (S.D.N.Y. Sept. 30, 2020) (deeming argument abandoned, notwithstanding inclusion of argument in 56.1 statement, because plaintiff did not include argument in opposition memorandum); see also Camarda v. Selover, 673 F. App'x 26, 30 (2d Cir. 2016) (finding claims abandoned when not addressed in plaintiff's memorandum of law despite plaintiff having addressed those claims in response to defendants' Rule 56.1 statement); Grandy v. Manhattan and Bronx Surface Transit Operating Auth., No. 16-CV-6278, 2018 WL 4625768, at *3 (S.D.N.Y. Sept. 26, 2018) (stating, "[i]f a party moves for summary judgment on particular claims, and the non-moving party fails to address those claims in her response papers, a court may deem those claims abandoned" because it is the non-moving party's obligation "to defend her claims with legal argument and citations to the record in her memoranda of law, not merely with . . . responses in her Rule 56.1 Statement").

In view of the foregoing, the Court declines to strike paragraphs from Plaintiff's 56.1 submissions in piecemeal fashion. (See Reply, ECF No. 394-11, 2-9.) Instead, the Court will apply the above legal principles and simply disregard, or deem undisputed, paragraphs of Plaintiff's 56.1 submissions that interject improper argument, mischaracterizes evidence, or cite only to inadmissible evidence in support. Accord Mayaguez S.A. v. Citigroup, Inc., No. 16-CV-6788, 2021 WL 1799653, at *6 (S.D.N.Y. Apr. 30, 2021); see also Fujifilm N. Am. Corp., v. PLR IP Holdings, LLC, 17-CV-8796, 2024 WL 3520231 (S.D.N.Y. July 24, 2024) (stating, the district court has discretion to "rely on its own review of the record" where a party's 56.1 statement fails to comply with local court rules).

Steven Jason (hereafter, "Victim") was murdered on March 20, 1994. (Id. ¶ 3.) On December 9, 1996, Plaintiff was convicted of Victim's murder. (Id.)

Nassau County "is a municipal corporation organized under the laws of the state of New York." (Id. ¶ 2.)

At all relevant times from March 20, 1994, to December 9, 1996:

1. "retired Detective Robert Dempsey" (hereafter, "Dempsey"), "was a member of the Nassau County Police Department" (hereafter, the "NCPD"), "with the rank of Detective." (Id. ¶ 3);

2. "retired Detective Gary Abbondandelo" (hereafter, "Abbondandelo") "was a member of the NCPD with the rank of Detective." (Id. ¶ 4.) Abbondandelo was the "carrying", or "lead," detective in Victim's homicide investigation. (Pl's 56.1 Stmt. Add'l Facts ¶ 51, 56);

3. "retired Detective John M. Holland" (hereafter, "Holland") "was a member of the NCPD with the rank of Detective." (Defs' 56.1 Stmt. ¶ 5);

4. "retired Detective Michael Herts" (hereafter "Herts") "was a member of the NCPD with the rank of Detective." (Id. ¶ 6);

5. "retired Detective Martin Alger" (hereafter, "Alger") "was a member of the NCPD with the rank of Detective." (Id. ¶ 7);

6. "retired detective Walter Swenson" (hereafter "Swenson") "was a member of the NCPD with the rank of Detective." (Id. ¶ 8);

7. "retired Detective Anthony Kosior" (hereafter "Kosior") "was a member of the NCPD with the rank of Detective." (Id. ¶ 9); and

8. "retired Detective Sergeant Dan Severin" (hereafter, "Severin") "was a member of the NCPD with the rank of Detective Sergeant." (Id. ¶ 10.)

Lionel Olige (hereafter, "Friend") was Plaintiff's childhood friend. (Id. ¶¶ 11-12.) Plaintiff's friendship with Friend "continued after they were children." (Id. ¶ 12.)

Peddie Jenkins (hereafter "Cousin") is Plaintiff's cousin. (Id. ¶ 13.) Cousin referred to Plaintiff as "Star" because Plaintiff went by the nickname "Starking." (Id.) Cousin testified he was acquainted with Victim because they went to Freeport High School together. (Id.)

B. Friend's Alleged Shooting of Victim

"On December 7, 1993, [Friend] allegedly shot and injured [Victim]"; consequently, Friend was "arrested and charged with assault in the first degree and criminal use of a firearm in the second degree." (Id. ¶ 16.)

"On January 3, 1994, [Victim] testified at a Felony Exam that [Friend] shot him on December 7, 1993." (Id. ¶ 17.)

6

In prior testimony, Cousin asserted Plaintiff told him that Friend shot Victim, and, as a result of the shooting, Friend was arrested and in jail. (Id. ¶ 18.) Likewise, Cousin testified Plaintiff informed him "[P]laintiff knew [Victim] was 'snitching' on [Friend] and that [Victim] was going to testify in the Grand Jury against [Friend]." (Id.) Further, Cousin testified Plaintiff told him "[Plaintiff] wanted to kill [Victim] because [Victim] 'was a bitch ass nigger for snitching on [Friend] because [Victim] had supposedly pulled a gun out on [Friend]", which gun Friend had subsequently "took . . . from [Victim]," and used to shoot Victim. (Id. ¶ 22.)

### C. Victim's Subsequent Murder

On March 20, 1994, Victim was murdered. (Id. ¶ 24.) "[Victim] was shot on the sidewalk of Sunrise Highway in Freeport, New York in the vicinity of the Blimpies restaurant and the American Legion Hall." (Id.) An autopsy performed upon Victim's body revealed he "was shot four times, and that [he] died as a result of multiple gunshot wounds to his chest and abdomen." (Id. ¶ 25.)

#### 1. The NCPD's Initial Response to Victim's Shooting

In 1994, Abbondandelo "was assigned to the NCPD Homicide"; Abbondandelo "had been assigned to the Homicide Squad for approximately 19 years." (Id. ¶ 26.) "In the early morning of March 20, 1994," Abbondandelo "received a call, was informed

that there had been a shooting in the vicinity of the Blimpies restaurant on Sunrise Highway in Freeport, New York, and responded to the scene . . . at approximately 4:15 a.m." (Id. ¶¶ 26-27.) Swenson, who "was assigned to the NCPD homicide squad in 1993 . . . was assigned to assist . . . Abbondandelo in investigating [Victim's] Murder.". (Id. ¶ 29.) Herts and Holland, both NCPD First Squad detectives, were also assigned to assist in Victim's homicide investigation. (Id. ¶ 28.) Herts and Holland "arrived at the crime scene together on March 20, 1994 at approximately 4:42 a.m." (Id.) "On March 20, 1994, . . . Severin was the on-call supervisor for the NCPD Homicide Squad." (Id. ¶ 30.) "Severin responded to the scene well after the shooting occurred . . . at approximately 4:10 a.m." (Id.)

### 2. Cousin's Second Account of Victim's Murder Becomes the NCPD's Theory of the Shooting

According to Cousin, Cousin allegedly "told Plaintiff that [Victim] was throwing a party."[2] (Id. ¶ 35.) "Blimpies is on the same block, the same side of the street (Sunrise Highway)

---

[2] Throughout Cousin's deposition in this matter, he repeatedly represented to Plaintiff's Counsel that he was relying upon the testimony he had given at trial, together with his written statement, for many of the details related to his recollection of Victim' murder. (See, e.g., Jenkins Dep. Tr., Ex. K, ECF No. 385-19, 31:24-32:17; 65:3-16.) For purposes of ruling upon Defendants' instant motion and over Plaintiff's objection, the Court deems such prior testimony admissible pursuant to Federal Rule of Evidence 804(b)(1).

and in close proximity to the American Legion Hall where [Victim's] party was taking place."  (Id. ¶ 40.)

Cousin attended Victim's party, and testified "[d]uring the party, [Cousin] stepped outside of the American Legion Hall, walked towards Blimpies, and saw [P]laintiff."   (Id. ¶ 41.) Plaintiff disputes [Cousin's] testimony arguing he was not present at that location on March 20, 1994.  (See Pl's Counterstmt. ¶ 41.) According to Cousin, "Plaintiff asked [Cousin] to let him know when [Victim] was coming outside"; Cousin agreed to do so.  (Defs' 56.1 Stmt. ¶¶ 42-43.)  "After speaking with [P]laintiff, [Cousin allegedly] went back to the American Legion Hall."  (Id. ¶ 45.)

Cousin avers, "[w]hen [Cousin] went back inside the American Legion Hall, he saw Tyrone Isaac and asked Tyrone Isaac to let him know when [Victim] was coming outside," which Tyrone Isaac did.   (Id. ¶¶ 46-47.)   Cousin testified he "then went outside, ran down to Blimpies and told Plaintiff that [Victim] was coming outside."  (Id. ¶ 48.)

Next according to Cousin, "[Victim] walked outside and started walking towards Blimpies."  (Id. ¶ 50.)  Cousin allegedly "followed [Victim] outside and hid behind a car."  (Id. ¶ 51.) Cousin testified "[a]s [Victim] approached Blimpies, [Cousin] saw [P]laintiff pull out a black gun, point it at [Victim] and then heard several gun shots."  (Id. ¶ 52.)  Cousin estimated "Plaintiff was approximately three to five feet away from [Victim] when he

pointed the gun at him." (Id. ¶ 53.) Cousin then claims to have observed "[P]laintiff run away from the shooting towards [Victim's] car and the Blimpies parking lot." (Id. ¶ 54.) "[Cousin] then got up, ran over to [Victim] and saw [Victim] holding his chest." (Id. ¶ 55.) Cousin testified Victim seemed to be in shock and kept saying "Star." (Id. ¶ 56.)

Next, Cousin testified he "ran back inside the American Legion Hall and announced that [Victim] [had been] shot." (Id. ¶ 58.) "Everybody at the party then ran outside the American Legion Hall." (Id. ¶ 59.) Cousin avers he "left the American Legion Hall through the front door," a few minutes later, before heading "to the Freeport cab station." (Id. ¶ 60.)

Cousin testified, the following morning, he "saw [P]laintiff at [P]laintiff's apartment in Hempstead, New York." (Id. ¶ 62.) Cousin claims he spoke "with [P]laintiff about the party and [P]laintiff told [Cousin] to 'shut [his] mouth and go back to the group home.'" (Id. ¶ 63.)

### 3. Cousin's Subsequent Arrest and Initial False Statement to NCPD Regarding Victim's Murder

On October 18, 1994, Severin spoke with, what was at the time, an anonymous caller, but who was later identified as Darren Brennan; Darren reported that Cousin had been bragging about setting up Victim's murder. (See id. ¶ 64; see also Severin Dep. Tr., Ex. KK, ECF No. 390-11, 332:17-333:16; Pl's 56.1 Stmt. Add'l

Facts ¶ 123.)  "At the time the Homicide Squad received" the tip,
the investigation into Victim's homicide had stalled.  (Pl's 56.1
Stmt. Add'l Facts ¶ 123.)

Subsequently, "[o]n November 15, 1994, at approximately
3:25 p.m., [Cousin] was brought to NCPD police headquarters in
Mineola, New York by F[reeport ]PD police officers."  (Defs' 56.1
Stmt. ¶ 65.)  For the first few hours Cousin was in NCPD custody,
Cousin denied his identity and claimed he was his younger brother.
(See Abbondandelo Dep. Tr. I, Ex. 6, ECF No. 389-6, 296:2-298:11.)
Cousin initially maintained "he was not at [Victim's] party at the
American Legion Hall."  (Defs' 56.1 Stmt. ¶ 67.)  "[Cousin] then
told the NCPD Detectives that he was at [Victim's] party, that he
saw [P]laintiff pointing a gun at [Victim], that he knew [Victim]
had just been shot, and signed a written statement to that effect."
(Id. ¶ 68.)  In his November 15, 1994, statement, Cousin also
implicated Tyrone Isaacs, who, afterwards, became a person of
interest for Abbondandelo.[3]  (See Pl's 56.1 Add'l Facts ¶ 142.)

---

[3]   Specifically, Cousin's November 15 statement to NCPD avers,
after he stepped outside the American Legion Hall, Cousin observed
Plaintiff "standing to [Cousin's] left side . . . holding a gun
that was black in color in his right hand."  (Jenkins' Nov. 15,
1994, Stmt., ECF No. 392-22, at 8.)  Cousin stated Plaintiff "was
pointing this gun directly at [Victim] who was leaning up against
a black colored station wagon."  (Id.)  Cousin claimed he looked
at Victim and "knew that [Victim] had just gotten shot because
[Cousin] could smell the gun powder."  (Id.)  Cousin continued by
stating: Plaintiff "was about 5-6 feet away from [Victim], and he
looked as if he was going to fire his gun again"; "[Plaintiff]
then looked at [Cousin] with a surprised look . . . like what was

11

"When [Cousin] spoke with NCPD Detectives on November 15, 1994, he did not tell them everything that happened."  (Defs' 56.1 Stmt. ¶ 69.)  "On November 16, 1994, at approximately 3:00 a.m., [Cousin] was transported from the NCPD Homicide Squad to NCPD Detention by . . . Abbondandelo and . . . Dempsey to be processed on open warrants."  (Id. ¶ 70.)

    4. <u>Roy and Tyrone Isaac's Statements to NCPD Implicating Cousin & Plaintiff in Victim's Murder</u>

Following Cousin's implication of Tyrone Isaac, "NCPD Detectives . . . located and spoke with Roy Isaac[] and Tyrone Isaac[], and both provided written statements about their knowledge of the events and circumstances surrounding [Victim's] death."[4]  (Id. ¶ 71.)  Tyrone Isaac signed a written statement alleging "[Cousin] asked Tyrone Isaac to let him know when [Victim] was coming out of the party, that [Cousin] walked outside, that [Victim] walked out of the party" with a female named Skwanitra Witherspoon (hereafter, "Witherspoon") "and that he heard gun shots."  (Id. ¶ 72.)  In his statement, Tyrone claimed Cousin had paid him to tell Cousin when Victim left the party.  (Tyrone Isaac

_____

[he] doing there"; Cousin "then saw Tyrone Isaac standing between [Cousin] and [Plaintiff].  [Tyrone] was holding a small black colored automatic pistol in his left hand, and he was putting the pistol into his pants waistband."  (Id. at 8-9.)  Cousin's statement concluded that Cousin "then saw [Plaintiff] . . . and Tyrone Isaac run away."  (Id. at 9.)

[4]  Roy Isaac is Tyrone Isaac's brother; Roy also attended Victim's party at the American Legion Hall.

Stmt., Ex. O, ECF No. 385-23, at 3; see also Jenkins Dep. Tr., 48:18-24.).

Roy Isaac also signed a written statement; in his statement, Roy stated "that in December of 1993, [P]laintiff told Roy Isaac that he wanted to 'get' [Victim] for putting [Friend] in Jail, and that in April of 1994, [P]laintiff told Roy Isaac that he had 'handled that beef' with [Victim]." (Defs' 56.1 Stmt. ¶ 73.) Following NCPD's interrogation of the Isaac brothers, "it was decided to bring [Cousin] back in for further questioning." (Id. ¶ 76.)

### 5. Cousin's Second Statement to NCPD, Which Abbondandelo Credits as Being Consistent with the Facts

"On November 18, 1994, [Cousin] had a court appearance at Nassau County District Court, and after he was released, NCPD Detectives brought [Cousin] back to the NCPD Homicide Squad to speak with [Cousin] again." (Id. ¶ 77.) NCPD Detectives "told [Cousin] that they did not believe what [Cousin] had told them on November 15, 1994." (Id. ¶ 78.) "Detectives [also] told [Cousin] that they had a statement from Tyrone Isaac[] that implicated [Cousin]" in Victim's murder. (Pl's 56.1 Stmt. Add'l Facts ¶ 435.) Thereafter, Cousin told NCPD Detectives a different account of the murder. (Defs' 56.1 Stmt. ¶ 79.) In this second version, Cousin stated "he saw [P]laintiff shoot [Victim], and signed a written

statement to that effect." (Defs' 56.1 Stmt. ¶ 80.)[5] Abbondandelo credited Cousin's second version of events because it "included admissions against his own penal interests, [and] was more consistent with the facts." (Id. ¶ 82.)

"On November 18, 1994, [Cousin] was arrested for criminal facilitation in the second degree as a result of his involvement with [Victim's] murder." (Id. ¶ 83.) Plaintiff then became "the prime suspect in [Victim]'s murder." (Id. ¶ 84.)

6. Witherspoon's Account of the Shooting and Her Positive Identification of Plaintiff as Victim's Shooter

Witherspoon "grew up with [Victim] and [Victim's] sister." (Id. ¶ 87.) At the time of Victim's murder, "Witherspoon was dating [Victim] and they were in a long distance relationship." (Id. ¶ 89.) "In March of 1994, Witherspoon was living outside of the state of New York." (Id. ¶ 88.) Witherspoon "came back to Freeport to attend" Victim's birthday party and was one of those present at the American Legion Hall on March 19, 1994. (Id.) "Witherspoon stayed at the party for a few hours and left a short time after 1:30 a.m." (Id. ¶ 93.)

In prior testimony, Witherspoon stated she "left the party with [Victim], and [Victim] was going to drive her home."

---

[5] Cousin's Second Statement to NCPD is recounted in greater detail supra. (See Part I.C.2.)

(Id.)  "When they left the party, [Victim] and Witherspoon walked towards the parking lot next to Blimpies to get into [Victim's] car."  (Id. ¶ 94.)  Witherspoon testified she and Victim were "walking westbound on Sunrise Highway."  (Id. ¶ 94.)  "[Victim] was a few steps ahead of Witherspoon and turned the corner towards the parking lot next to Blimpies before Witherspoon did."  (Id. ¶ 95.)  "After Witherspoon turned the corner, she [testified she] saw a man standing on the side of Blimpies."  (Id. ¶ 96.)  According to Witherspoon, the "man pulled out a black gun from his pocket and pointed the gun at [Victim's] head."  (Id. ¶ 98.)  Witherspoon estimated "[t]he man with the black gun was arm's length from [Victim]" and that "[t]his man . . . was directly in front of Witherspoon[,] . . . approximately 'two steps away' from her." (Id. ¶ 99.)  "When [Witherspoon] saw the man with the gun, Witherspoon did not do anything."  (Id. ¶ 100.)  Witherspoon claimed "[t]he man with the gun said something to [Victim], but [she] was [unsure] what he said."  (Id.)

    By Witherspoon's account, "[Victim] and the man with the gun were standing on the side of Blimpies in the parking lot near where the first window close[s]t to the street is located."  (Id. ¶ 101.)  "Witherspoon was standing on the sidewalk on the front corner of Blimpies."  (Id.)  "[Victim] then started to run"; afterwards, "Witherspoon turned around and ran back to the party." (Id. ¶ 102.)  When fleeing, both Witherspoon and Victim "turned

left back towards the party." (Id.) "While Witherspoon was running back towards . . . the party, she heard gun shots." (Id. ¶ 103.) Witherspoon then "ran back inside the American Legion Hall." (Id. ¶ 104.)

When NCPD Detectives arrived at the American Legion Hall, after the shooting, and asked if there were any witnesses to the shooting, Witherspoon identified herself as "the only person with [Victim]" at the time. (Id. ¶¶ 105-06.) "Witherspoon spoke with multiple police officers early that morning", including FPD Officer Barry McGovern, and NCPD First Squad Detective William Tweedie, in each instance signing a written statement about the shooting. (Id. ¶ 108.) According to Herts' notes, taken shortly after the shooting, Witherspoon initially described the perpetrator she saw as a "light skin male, black" who was approximately five feet ten inches tall.[6] (Defs' Counterstmt. ¶ 83; see also Herts Dep. Tr., Ex. Y, ECF No. 385-33, 107:6-109:17.) At Plaintiff's trial, Witherspoon added to her description of the perpetrator that "[h]e had big lips." (Id. ¶ 38.)

---

[6] At trial, Witherspoon initially testified that she could not estimate the shooter's height, but then testified he may have been between five feet seven inches and five feet nine inches in height. (Defs' 56.1 Counterstmt. ¶ 83.)

"On December 20, 1994, NCPD Detectives met with Witherspoon to continue the investigation into" Victim's murder. (Defs' 56.1 Stmt. ¶ 109.)[7] Specifically, Mullen and Abbondandelo "flew to Pittsburgh, Pennsylvania to meet with Witherspoon . . . to show her a photo array containing six (6) pictures of people, one of them being [P]laintiff." (Id. ¶¶ 110-11.) Abbondandelo arranged "two separate photo arrays to be prepared" and shown to Witherspoon: "[T]he first photo array was six black and white photographs of individuals with caps on their heads, and the second photo array was six color photographs of individuals without caps on their heads." (Id. ¶ 112.) Plaintiff's photograph "was included in each of these two photo arrays in position number '1'." (Id. ¶ 113.) "The photographs of the six (6) individuals in the black and white photo array were the same six (6) individuals included in the color photo array, and each individual was in the same position in both photo arrays." (Id. ¶ 115.) The photo array did not reveal the heights of the black males pictured. (Pl's 56.1 Stmt. Add'l Facts ¶ 190.) Similarly, the black males pictured in the photo array had a variety of complexions ranging from light, to medium, to dark.

---

[7] To be clear, Witherspoon's identification of Plaintiff from the photo-array occurred two days _after_ Plaintiff confessed to the murder. (_See_ _infra_ at Part I.D.6.iii.)

(Abbondandelo Dep. Tr. II, Ex. L, ECF No. 385-20, 36:16-23; <u>see</u> <u>also</u> Color Photo Array, Ex. 25, ECF No. 389-28.)

Mullen and Abbondandelo "met with Witherspoon at approximately 5:15 p.m. on December 20, 1994" during which "[t]here were no other police officers present . . . ." (Defs' 56.1 Counterstmt. ¶ 116.) During this meeting:

> Mullen placed the photo arrays on the table
> and told Witherspoon "I'm going to show you 12
> photographs. One is black and white and one
> is color. But the six (6) pictures are the
> same. So just take a look at both sets and
> let me know if you recognize anyone in the
> photographs . . . . I want you to see if you
> recognize the person that shot [Victim]."

(<u>Id.</u> ¶ 117.) Abbondandelo testified neither he, nor Mullen, told Witherspoon that the individual police suspected of shooting Victim was part of the photo array. (<u>Id.</u> ¶ 118.) Witherspoon reviewed both photo arrays "and identified [P]laintiff's photograph in position #1 as the man who pointed the gun at [Victim]." (<u>Id.</u> ¶ 119.) Witherspoon was "very positive" about her identification of Plaintiff as Victim's shooter; Abbondandelo estimated it took Witherspoon "less than ten seconds" to make her selection. (Abbondandelo Dep. Tr. II, 30:16-31:20.) "Witherspoon signed the back side of each of the photo arrays, and also signed a written statement regarding these photo arrays." (Defs' 56.1 Stmt. ¶ 121.) Abbondandelo "never considered

18

showing . . . Witherspoon" Cousin's photograph.  (Pl's 56.1 Stmt.
Add'l Facts ¶ 196.)

### 7. Martha Campbell Witnesses a Black Male Flee the Scene of the Shooting in a Light Colored Car

"On March 20, 1994, at approximately 1:45 a.m., Martha
Campbell" (hereafter, "Campbell") "was walking to the party at the
American Legion Hall on Sunrise Highway in Freeport."  (Defs' 56.1
Stmt. ¶ 122.)  "When Campbell arrived [at] the Guy Lombardo Avenue
entrance of the Blimpies parking lot, she saw a 'li[gh]t[] colored'
car back up to the wall of Blimpies[,] which was closed."  (Id.
¶ 123.)  "While Campbell was walking, she heard several gun shots,
then saw a male black run from the street, get into the passenger
side of this 'li[gh]t[]-colored' car, and then saw this car drive
southbound on Guy Lombardo Avenue with the lights off."  (Id.
¶ 124.)  "Campbell then saw [Victim] laying in the street shaking."
(Id. ¶ 125.)

"After the police arrived, Campbell spoke with FPD
Detective Arthur Zimmer and signed a written statement about what
she witnessed."  (Id. ¶ 126.)  Campbell also recounted what she
saw to Abbondandelo.  (Id. ¶ 127.)  Afterwards, Swenson and Herts
"spoke with Campbell and went with her to trace her route from her
house to Blimpies."  (Id. ¶ 128.)  Campbell recounted to Swenson
that the black male she observed get into the passenger side of
the light-colored car appeared to be in his twenties.  (Id. ¶ 129.)

Campbell estimated that the black male she observed running was of average height, about five feet eight inches tall.  (See Campbell Stmt., Ex. 10, ECF No. 389-13.)  Swenson "created a sketch [of the alleged shooter] after speaking with Campbell."  (Defs' 56.1 Stmt. ¶ 130.)

### 8. Maurice Larrea's and Glenn Montes' Pursuit of a Black Male in the Vicinity of the Shooting

"On March 20, 1994, in the early morning, Maurice Larrea" (hereafter, "Larrea") "was in the passenger seat of a moving car being driven by" his friend Glenn Montes (hereafter, "Montes"). (Defs' Stmt. ¶ 132.)  Larrea[8] and Montes were coming from a bachelor party and had been drinking.  (Larrea Dep. Tr., Ex. CC, ECF No. 390-3, 52:24-53:11.)  They were "heading eastbound on Sunrise Highway in Freeport."  (Defs' Stmt. ¶ 132.)  The parties dispute whether the vehicle was in motion or was stationary when Montes and Larrea experienced the shooting; however, Larrea testified they drove past the scene at approximately 30 miles per hour.  (See id. ¶ 133; see also Pl's 56.1 Counterstmt. ¶ 133.)  According to Larrea's written statement, as the vehicle "approach[ed] the intersection of Sunrise Highway and Guy Lombardo [Avenue]" he "heard [three] or [four] gunshots."[9]  (Larrea Stmt., at 2.)  After

---

[8]  Larrea was an off-duty police officer.  (See Larrea Stmt., Ex. DD, ECF No. 390-4.)

[9]  The parties dispute whether Larrea simply heard gunshots or whether he observed the shooting.  The admissible evidence,

hearing the shots, Larrea testified he "looked in the direction of where the shots came from, which was to his right." (Defs' 56.1 Stmt. ¶ 134.) "Montes did not stop the moving vehicle after Larrea heard the gunshots." (Id.) Larrea testified he neither saw the shooting, nor the shooter. (Id. ¶ 135.)

In his written statement, Montes, likewise, described to police that as the car was "at the intersection of Guy Lombardo" he "saw two male blacks chasing another male black in the parking lot of Blimpies." (Montes Stmt., Ex. EE, ECF No. 390-5, at 2.) Montes continued, "[a]s the male black who was being chased got close to the sidewalk at the end of the building [he] saw [a black male] ducking or diving to the ground." (Id.) Next, Montes stated "[o]ne of the male blacks chasing [the man on the ground] stood directly behind [the man on the ground] about 5 to 7 feet away[,] pointed a gun at [the man on the ground] and fired two to three shots." (Id.) Montes claimed he "saw the muzzle flashes from the gun." (Id.) According to Montes' statement, "[t]he other male black[,] with the [person] who was shooting[,] was standing about [six] or [seven] feet behind [the shooter] towards the middle of the parking lot." (Id.)

---

including Larrea's own deposition testimony, establishes Larrea heard shots but did not see the shooter.

Upon hearing the shots, "Larrea told Montes to pull over
to the next payphone, located on Church Street, which was one block
away from where the car was when he heard the gun shots." (Defs'
56.1 Stmt. ¶ 137.)   In his written statement, Larrea described
calling 911 upon reaching the payphone; however, when deposed in
this matter, he was unable to recall whether he "called Freeport
numbers 378-0700 or . . . 911." (Id. ¶ 138.)   At his deposition,
Larrea testified he "believed the person that he was speaking to
was with the FPD not the NCPD." (Id. ¶ 140.)   "Larrea was on the
phone reporting th[e] shooting for approximately 30 seconds." (Id.
¶ 139.)

Subsequently, Larrea testified, as he "was still on the
phone hanging up[,] going back to the car" he "saw someone coming
at [him]" (Larrea Dep. Tr, 41:11-16.)   Larrea described this man
as a "black male" in his mid-twenties, wearing a "black, medium
length [leather] jacket" and a "black colored hooded sweatshirt"
with the hood drawn down.  (Larrea Stmt., at 3.)   "Larrea was
unable to see the face of this male" and told NCPD that he could
not identify the man.  (Defs' 56.1 Stmt. ¶ 142; see also Larrea
Dep. Tr, 90:6-14.)   Larrea believed that the man running towards
him had been involved in the shooting "because he was running from
the scene." (Larrea Dep. Tr., 119:24-120:8.)   Next, Larrea "took
out [his] revolver and told [the black male] to stop." (Larrea
Stmt., at 3.)   The black male stopped momentarily but then

22

proceeded to "run across Sunrise Highway into the OTB parking lot" and towards the railroad station. (Id.)

Montes, who had driven his car back towards the location of the shooting, stated "[a]s [he] got opposite the Blimpies on the northside of Sunrise, [he] saw [Larrea] pointing at a [black male] who was in the middle of Sunrise [Highway] running towards OTB on the northside of Sunrise." (Montes Stmt., at 2.) Montes claimed he "heard [Larrea] saying 'that's him, that's the guy.'" (Id.) Consequently, Montes "made a u-turn and followed [the black male] through the parking lot of OTB." (Id.) According to Montes, the black male, "continued to run under the tracks across Brooklyn Ave[nue] and then on the side of the Pennysaver building to the rear of [the] firehouse next to the building." (Id. at 2-3.) According to his statement, Montes then "drove around to the other side of the firehouse into the Municipal lot behind it" where he observed the black male run "to the fence on the other side of the lot and jump[] over into the back yard of the first house behind the cleaners." (Id. at 3.) Montes attempted to pursue, driving "slowly looking down the driveways but [he] couldn't see anyone"; Montes then returned to the scene of the shooting where he encountered the police. (Id.; see also Defs' 56.1 Stmt. ¶ 147.) According to Montes' statement to police, he could "only describe the male/black [he] was following." (Id.; see also Montes Dep.

23

Tr., Ex. FF, ECF No. 390-6, 84:2-85:2.[10]   Montes described the black male as "about [five foot nine inches, to five foot ten inches], [with a] [m]edium build, [and] dark brown face, [who was in his] early [twenties], [with] close cut dark short hair, [and who] appeared to be clean shaven." (Montes Stmt., at 3.)   The black male was further described as wearing "a bulky dark jacket which was a little below his waist," with what looked to be a hood attached, and dark colored shoes and pants. (Id.)

"In 1994, Larrea knew FPD police officer Robert Melendez" (hereafter, "Melendez"), but the two were not close. (Defs' 56.1 Stmt. ¶ 148.)   "Melendez was the first police officer that Larrea spoke with after the shooting; Larrea first encountered [] Melendez in the vicinity of the crime scene and told him what he observed." (Id. ¶ 150.)   Thereafter, Melendez, together with Larrea, canvassed the area in a squad car before returning to the crime scene. (Id. ¶ 151.)

---

[10]   When Montes was confronted with an alleged statement he had made to ADA Sheryl Anania (hereafter, "Anania") in 2017, in which Montes had claimed he was 100 percent sure that the person he was chasing was the shooter, Montes claimed he was unable to recall giving the 2017 statement to Anania, and, instead, relied upon his written statement given to NCPD the night of the shooting. (See Montes Dep. Tr., 42:10-22; 43:9-16.)

D. <u>The Initial Police Investigation into Victim's Shooting</u>

   1. <u>Montes' & Larrea's Respective Written Statements,
        and the Freeport Incident Report</u>

Afterwards, "Larrea and Montes . . . went to the FPD Police Station." (<u>Id.</u> ¶ 152.) While at the FPD Police Station, Larrea spoke with Herts and signed a written statement about his recollection of what transpired on the early morning of March 20, 1994. (<u>Id.</u> ¶ 153.) Prior to March 20, 1994, Herts had neither heard of, nor met, Montes or Larrea. (<u>Id.</u> ¶ 158.) "After Larrea signed the written statement, . . . Herts gave Larrea's statement to one of the NCPD Homicide Squad Detectives, and [it was] ultimately given to . . . Abbondandelo." (<u>Id.</u> ¶ 154.)

Likewise, "Montes spoke with . . . Holland and signed a written statement about his recollection of what transpired." (<u>Id.</u> ¶ 155.) Holland's regular practice after taking "a witness statement in connection with a homicide . . . was to turn it over to the NCPD Homicide Squad detective in charge of the case", which, in this case, was Abbondandelo. (<u>Id.</u> ¶ 156.) Prior to March 20, 1994, Holland had neither heard of, nor met, either Montes or Larrea. (<u>Id.</u> ¶ 157.)

The initial Freeport Incident Report (hereafter, "Exhibit 42") detailing Victim's shooting was written by Melendez, and "marked as Exhibit 42 at [P]laintiff's pre-trial suppression hearing and [P]laintiff's criminal trial." (<u>Id.</u> ¶ 161.) The

parties dispute whether Plaintiff was provided an unredacted or
redacted copy of Exhibit 42. (See id. ¶ 162; see also Pl's
Counterstmt. ¶ 162.) "In [the unredacted version of] Exhibit
42, . . . Melendez listed [Victim] as 'fatally shot', and included
information for Witherspoon, Campbell, Larrea (Party #4), and
Montes (Party #5)." (Id.) The unredacted version of Exhibit 42
contained "Larrea's name, phone number and that he worked for the
New York City Police Department", as well as "Montes' name,
address, and phone number." (Id.) Furthermore, Exhibit 42
contained "a narrative of [Melendez's] involvement [in Victim's
homicide investigation], as well as that of Larrea and Montes."
(Id. ¶ 164.) Additionally, "[i]n Exhibit 42, . . . Melendez wrote
down that Larrea and Montes gave written statements" detailing
their accounts. (Id. ¶ 165.)

2. Swenson's Notes Memorializing his Conversation
with Elisa Valdez

On March 23, 1994, "Swenson had a phone conversation
with Elisa Valdez" (hereafter, "Valdez") and memorialized his
conversation in his notes (hereafter, the "Valdez Notes"). (Id.
¶ 166.) In her statement, Valdez told Swenson:

> [S]he was a journalism major, was with her
> boyfriend on March 20, 1994, was working for
> Newsday and covering a fire on West Sunrise
> Highway, left at about 1:50 a.m. to go to the
> Long Island [Railroad] Station, heard gun
> shots, saw a male, who she could not identify,
> and saw this male run on foot under the train

26

> platform towards the fire department with a
> gray or white car in pursuit.

(Id. ¶ 167.)  "Swenson believed that Valdez and Campbell observed two different people on the early morning of March 20, 1994." (Id. ¶ 168.)  Swenson testified he told Abbondandelo "about his conversation with Valdez" and gave Abbondandelo the Valdez Notes. (Id. ¶ 169.)  Abbondandelo testified he could not recall seeing the Valdez Notes, notwithstanding the Valdez Notes did become part of Abbondandelo's case file.  (Pl's Counterstmt. ¶ 169.)  The Valdez Notes were never disclosed to Plaintiff.  (Pl's 56.1 Add'l Facts ¶ 115.)

### 3. NCPD Receive a Potential Tip that Petey Baldwin Was Victim's Shooter

On March 23, 1994, Abbondandelo "received information that Petey Baldwin" (hereafter, "Baldwin"), who was Friend's cousin, may have killed Victim.  (Defs' 56.1 Stmt. ¶ 170.)  "On June 6, 1994, FPD Det. Zimmer interviewed Baldwin and audio recorded this interview."  (Id. ¶ 171.)  "The Zimmer-Baldwin interview was never produced to [P]laintiff."  (Pl's 56.1 Add'l Facts ¶ 203.)  Prior to December 17, 1994, Mullen had also interviewed Baldwin, and memorialized his conversations with Baldwin in his notes.  (Defs' 56.1 Stmt. ¶ 172.)  Mullen's notes were disclosed to Plaintiff and contained "substantially the same information contained [in] the recorded [Zimmer-Baldwin] interview."  (Def's 56.1 Counterstmt. ¶ 203.)

4. NCPD's Theory of the Motive Behind Victim's Murder

The Nassau County District Attorney's Office (hereafter, the "NCDA") "was scheduled to present [Friend's] shooting of [Victim] to a Nassau County Grand Jury on March 23, 1994." (Defs' 56.1 Stmt. ¶ 173.)  "[Victim] was subpoenaed to testify as a witness in the Grand Jury against [Victim]."  (Defs' 56.1 Stmt. ¶ 174.)  "Throughout the investigation, it was believed that [Victim] may have been killed in order to prevent him from testifying against [Friend] for the December 17, 1993 shooting." (Id. ¶ 176.)

5. Plaintiff's Initial Arrest by the FPD on a Drugs Charge

"In 1994, NCPD Detective Anthony Sorrentino" (hereafter, "Sorrentino") "was assigned to the NCPD Narcotics Squad and had been assigned to the Narcotics Bureau for several years."  (Id. ¶ 178.)  Similarly, at that time "NCPD Detective Laurette Kemp" (hereafter, "Kemp") "was assigned to the NCPD Narcotics Squad and had been assigned to the Narcotics Bureau for several years."  (Id. ¶ 179.)  On August 9, 1994, Sorrentino and Kemp were working, together with a confidential informant (hereafter, the "CI"), "preparing to conduct undercover drug buys throughout Nassau County."  (Id. ¶¶ 180-81.)

As part of the undercover drug buys, "[t]he CI would go out with NCPD detectives and attempt to purchase controlled

28

substances." (Id. ¶ 182.) For example, "[o]n August 9, 1994, at approximately 8:15 p.m.," Sorrentino, Kemp, and the CI "were in the Village of Freeport." (Id. ¶ 183.) Kemp, "acting undercover, went with the CI to conduct a drug buy." (Id. ¶ 184.) Kemp and the CI were together in an unmarked police vehicle. (Id.) "The CI exited . . . Kemp's vehicle and went around the corner in front of a deli." (Id. ¶ 184.) "After the CI went to the deli, the CI came back around the corner with a male black." (Id. ¶ 185.) Kemp observed that the black male "was on a bicycle, took out a plastic bag from his sock, reached inside the plastic bag and handed the CI" what Kemp thought were illegal drugs. (Id.) In exchange, the CI paid the black male twenty dollars "and had a short conversation with [him] before meeting back up with . . . Kemp and getting back into . . . Kemp's vehicle." (Id. ¶ 186.) "The CI then gave . . . Kemp two yellow bags containing a white rock-like substance that . . . Kemp believed to be crack- cocaine." (Id.) Subsequent testing confirmed that the substance contained in the zip lock bags was cocaine. (Id. ¶ 188.)

When making the buy, the CI was equipped with a recording device which captured a video of the transaction. (Id. ¶ 189.) In late August 1994, Sorrentino reviewed the video recording with FPR Detective Edward Haggerty (hereafter, "Haggerty"); Haggerty "believed that the [P]laintiff was [the man] depicted on the video during th[e] drug transaction." (Id. ¶ 191.) "Prior to viewing

29

this video in late August of 1994, . . . Haggerty knew
[P]laintiff, had previously spoken with [P]laintiff[,] and had
come into contact with [P]laintiff about a dozen times." (Id.
¶ 192.)

"On August 26, 1994, a bench warrant was issued for
Plaintiff to appear under Nassau County First District Court Docket
No. 08864/1992 where Plaintiff was originally charged with New
York State Penal Law Sections 120.00 (Assault in the Third Degree)
and 240.25 (Harassment in the First Degree)." (Id. ¶ 194.)
Similarly:

> On October 29, 1994, an arrest warrant was
> issued for [P]laintiff to appear under Nassau
> County First District Court Docket No.
> 31032/1994, where the [P]laintiff was to
> appear for an arraignment on criminal charges
> for NYS Penal Law Sections 221.05 (Unlawful
> Possession of Marijuana in the Second Degree)
> and 100.00 (Criminal Solicitation in the Fifth
> Degree).

(Id. ¶ 195.) Plaintiff's criminal record demonstrated, prior to
December 17, 1994, he had numerous interactions with police. (Id.
¶ 196.)

"In November of 1994, after Plaintiff became a suspect
in [Victim's] murder, . . . Abbondandelo became aware that
[P]laintiff had several outstanding warrants." (Id. ¶ 197.) "On
December 17, 1994, an anonymous phone call was received indicating
that the [P]laintiff was standing on a corner in the Village of
Freeport." (Id. ¶ 198.) "Haggerty and other FPD officers went to

Graffing Place and East Dean Street in the Village of Freeport."
(Id. ¶ 200.)  "Haggerty saw [P]laintiff standing on the corner
with two other males."  (Id.)  When Plaintiff saw Haggerty he began
to run, which prompted Haggerty to pursue.  (Id.)  "Haggerty
ordered [P]laintiff to stop, told him to get on the ground and
ultimately placed handcuffs on [P]laintiff."  (Id.)

### 6. Plaintiff's Transportation to the NCPD Homicide Squad

#### i.  The *Miranda* Rights Card

"On December 17, 1994, [P]laintiff was transported by
FPD police officers and arrived at the NCPD Homicide Squad at
approximately 1:30 p.m."  (Id. ¶ 202.)  Plaintiff's first
interaction with Dempsey and Abbondandelo occurred on this date.
(Id. ¶ 205.)  The Parties dispute when, and whether, Plaintiff was
advised of his Miranda rights; what cannot be disputed is that, at
some point, Plaintiff "signed a Miranda rights card" acknowledging
he had been advised of his rights and was waiving them.  (Id.
¶ 207; Pl's 56.1 Counterstmt. ¶ 207.)  Review of the Miranda rights
card, which is part of the record, shows it was signed by
Plaintiff, and witnessed by Dempsey and Abbondandelo. (See Miranda
Card, Ex. CCCC, ECF No. 387-2.)  "[O]ther police officers were
present" when Plaintiff signed the Miranda rights card "but
[Plaintiff] does not recall exactly" who.  (Defs' 56.1 Stmt.
¶ 208.)  Plaintiff had received, and previously signed, a Miranda

rights card on April 4, 1990, "with respect to an unrelated Assault." (Defs' 56.1 Stmt. ¶ 209.)

Plaintiff testified at his pre-trial hearing that the Miranda card he was asked to sign "was folded in half" such that he was unable to read the lower portion of it. (Pre-Trial Hr'g Tr., Ex. 33, ECF No. 391-7, 51:2-12.) Additionally, Plaintiff maintained he was misled into believing the card he was signing was for permission to conduct a lie detector test. (Id.)

ii.  Plaintiff's Polygraph Examination

"On December 17, 1994, . . . Kosior was assigned to the NCPD Scientific Investigation Bureau, specifically the Polygraph Section, as a polygraphist." (Defs' 56.1 Stmt. ¶ 210.) "On December 17, 1994, . . . Kosior was called to administer a polygraph examination and arrived [at] the Polygraph Section of the NCPD at approximately 5:45 p.m." (Defs' 56.1 Stmt. ¶ 211.) "[A]t approximately 7:39 p.m., . . . Kosior completed drafting his test questions and was ready to have [P]laintiff come to the NCPD Polygraph Section to administer the test." (Id. ¶ 212.) Plaintiff's examination began at approximately 7:58 p.m.; Plaintiff consented to the polygraph test. (Id. ¶ 213.) "On December 17, 1994, . . . Kosior interviewed Plaintiff which started at 8:12 p.m. and ended at 8:23 p.m." (Id. ¶ 214.) "On December 17, 1994, at approximately 10:38 p.m., [P]laintiff's polygraph examination was completed." (Id. ¶ 215.) "The results

32

from Plaintiff's polygraph test were that he was not being truthful in denying responsibility for [Victim's] death." (Id. ¶ 216.) From 7:58 p.m. through 10:38 p.m. there were "no other NCPD Detective[s] . . . in the examination room" with Plaintiff and Kosior. (Id. ¶ 217.) When the polygraph examination was concluded, Dempsey, together with Abbondandelo, escorted Plaintiff back to the NCPD Homicide Squad. (Id. ¶ 218.)

Plaintiff disputes the validity of the polygraph procedure. (See Pl's 56.1 Counterstmt. ¶ 216.) Nervousness can affect the measurements recorded by the polygraph instruments. (See Kosior Dep. Tr., Ex. PPP, ECF No. 386-16, 38:5-8.) Likewise, "being unreasonably tired and being hungry, [can] have some impact on the outcome of a polygraph examination." (Id. at 56:13-57:9.) It was Kosior's regular practice to ask an examinee whether he was hungry and if he wanted something to eat before the test. (Id. at 93:3-94:12.) In the instant case, Plaintiff had informed Kosior he had slept "a couple of hours" the night prior to the polygraph test. (Id. at 93:12-96:15.)

### iii.  Plaintiff Confesses to Victim's Murder

According to Defendants, "[o]n the morning of December 18, 1994, at approximately 7:30 a.m., . . . Mullen was at the NCPD Homicide Squad, walked into the room where [P]laintiff was in, and spoke with [P]laintiff." (Defs' 56.1 Stmt. ¶ 219.) According to Defendants, Plaintiff told Mullen "that he worked for MCS

33

Security"; Plaintiff contends this fact was known to NCPD much earlier than December 18. (Id.; see also Pl's Counterstmt. ¶ 219.) Abbondandelo was able to procure a logbook from MCS Security which detailed "the coming and going of each employee"; however, the logbook started on March 24, 1994. (Id. ¶ 241.) Prior to that date, "MCS Security did not have a [logbook], and information about the employee's comings and goings were written on a piece of paper" which had since been disposed. (Id.)

"On the morning of December 18, 1994 (a Sunday), . . . Abbondandelo called the Nassau County District Court police liaison office, and learned that [P]laintiff was unable to be arraigned on the outstanding warrants" on that day. (Id. ¶ 220.) Defendants represent, on December 18, 1994, at approximately 6:45 p.m., "[P]laintiff was read his Miranda rights" a second time before confessing to Victim's murder approximately five minutes later. (Id. ¶ 221.) Plaintiff's confession was written by Dempsey, allegedly while speaking with Plaintiff. (Id. ¶ 222.) It is undisputed Plaintiff's signature appears on every page of the written statement. (Id. ¶ 223.)

Plaintiff disputes that his confession was voluntary; instead, Plaintiff maintains he signed the confession, prepared by NCPD, only after being coerced into doing so. (See Pl's 56.1 Counterstmt. ¶ 221.) Specifically, Plaintiff contends:

> There was a time when . . . a stack of papers
> [was] placed in front of me.  They told me
> they was doing me a favor.  To do what they
> said, or my career was ended.  I would never
> see my children again.  Detective Dempsey
> asked me to sign some papers.  I told him I
> wasn't going to sign anything unless I saw my
> lawyer.  He struck me again . . . In the
> face . . . Abbondandelo was in the
> room . . . At that time, I started signing the
> papers.  He flipped—he handed the first one,
> like, sign here.  I signed.  Then he flipped
> it.  He said, sign here.  I signed.  He kept
> flipping pages, kept telling me to sign.  I
> just signed . . . It was already signed, with
> [Dempsey's] signature and Abbondandelo's
> signature.  They left a space in the middle
> for me to sign.

(Id.)  Plaintiff's recitation of what transpired prior to his confession is in stark contrast to the narrative offered by Defendants.  During his deposition, Plaintiff elaborated:

> There was a time when I told Dempsey I didn't
> want to talk.  I just was fed up with talking.
> I said if you are going to arrest me, arrest
> me.  If not, I would like to talk to my family
> or my lawyer.  He said you're not talking to
> nobody.  He slapped me.  He was sitting in
> front of me, beating on my knees, talking loud
> and aggressive; spitting in my face.  If I
> didn't do what was right, I was surely getting
> twenty-five to life.
>
> Mullen came back in the room and told me I was
> a son-of-a-bitch.  I was a liar.  He knew I
> was lying the whole time.  If I told another
> lie, he would slap my head through the file
> cabinet.
>
> Mullen left out and Dempsey came back
> in . . . Dempsey told me I was a piece of
> shit . . . He said if you tell me another
> lie, I'll fuck you up.  He slapped me in my
> face.

35

(Id.)  Plaintiff continued:

> Officer Dempsey slapped me around, beat on me,
> screamed in my face, starved me, antagonized
> me, and had other officers come through there
> and join in the fun. I was sleep deprived. I
> didn't get nothing to eat. I couldn't use the
> bathroom.  I  was  already  injured  from
> previously being shot in the stomach. He was
> punching me in my stomach.  Beating on my legs.
> Slapping me in my face, like I was a child.
> Making me say things that I did not have
> nothing to do with whatsoever, and he knew it.

(Pl's 56.1 Add'l Facts ¶ 306.)

"After [P]laintiff signed the written statement, he was given the opportunity to be recorded on video, but [P]laintiff refused."  (Defs' 56.1 Stmt. ¶ 224.)  "Several photographs, including several Polaroid photographs, were taken of [P]laintiff after he signed the statement in the NCPD Homicide Squad."  (Id. ¶ 225; see also Photographs of Plaintiff, Ex. TT, ECF No. 390-20.) "Plaintiff did not ask for medical attention for the injuries he claims to have suffered during the interrogation and did not have to see a doctor."  (Id. ¶ 227.)  Plaintiff avers he "was threatened with harm if he disclosed the abuse."  (Pl's Counterstmt. ¶ 227.)

"On  December  19,  1994,  at  approximately  3:35 a.m., . . . Dempsey    and . . . Abbondandelo    transported [P]laintiff to the NCPD Records Bureau to be processed on the drug charge and the outstanding valid warrants."  (Defs' 56.1 Stmt. ¶ 242.)  Additionally, "at approximately 4:05 a.m., [P]laintiff

signed a Physical Condition Questionnaire Form while at the NCPD
Detention Desk." (Id. ¶ 243.)

"On Monday, December 19, 1994, [P]laintiff was arraigned
on [the] criminal sale of a controlled substance charges," but was
not charged with Victim's murder. (Id. ¶¶ 244-45.)  "On March 6,
1995, [P]laintiff made bail on the criminal sale of a controlled
substance charges and had a court appearance" scheduled for the
next day. (Id.)  "On March 7, 1995, [P]laintiff was arrested in
Freeport for the murder of [Victim]." (Id. ¶ 246.)

E. NCPD's Investigation, and Prosecution, of Plaintiff

Plaintiff was initially represented by criminal defense
attorney Eugene Cordaro (hereafter, "Cordaro"). (Id. ¶ 247.)  At
trial, Plaintiff was represented by attorney Scott Brettschneider.
(See id. ¶¶ 316-17.)

1. NCPD Credits Witherspoon's and Campbell's
   Accounts of the Murder at the Expense of Larrea's
   and Montes'

Per Abbondandelo, "Witherspoon was a witness to
[Victim's] shooting because she was with [Victim] right before he
was shot, saw the interaction where a gun was pointed at [Victim],
could identify the shooter, and heard gun shots immediately after
she turned to run back to the American Legion Hall." (Id. ¶ 248.)
Abbondandelo also credited the observations of Campbell over those
of Larrea and Montes because Campbell was present "at the scene at

37

the time [of the shooting]" when she saw the two men flee and enter a car that fled the scene with its lights out.  (Id. ¶ 249.)

"After reviewing Larrea's and Montes' statements and learning Larrea shouted 'that's the guy', . . . Abbondandelo believed that Larrea was referring to the person that he tried to stop, not [Victim's] shooter."  (Id. ¶ 250.)  The fact Larrea and Montes observed a person fleeing the scene did not prompt Abbondandelo to consider this male a "person of interest because numerous people were running from the scene in all different directions" after the shooting.  (Id. ¶ 251.)  Similarly, Severin "did not believe Larrea's or Montes' account was a logical, or credible lead in the investigation."  (Id. ¶ 253.)  Instead, Severin credited Witherspoon's and Campbell's accounts due to their "close proximity to the crime scene when the shooting occurred."  (Id.)  Severin discredited Larrea's and Montes' accounts because they "were in a moving vehicle and would not be able to get a clear description of what happened."  (Id.)

Although Larrea testified he called either the FPD directly or 911 from a payphone on Church Street after hearing gunshots, Abbondandelo "did not retrieve any records related to [that] phone call . . . because he did not believe Larrea's phone call would assist in the investigation other than the time the phone call was made."  (Id. ¶ 254.)

"In March of 1994, a 911 call from a payphone made within the Village of Freeport would have been received, initially, by the NCPD Communications Bureau." (Id. ¶ 255.)  Upon determining that the emergency was within the Village of Freeport, the 911 operator would have transferred the call to FPD. (Id.)  "In 1994, as well as currently, 911 calls received by the NCPD's Communications Bureau were automatically recorded." (Id.)  "In the case of a call transferred to a local police department, the NCPD's audio recording of the call would have ended after the call was transferred to the local department and the NCPD operator disconnected." (Id.)

"The NCPD and the FPD are two separate[,] independent police departments" each of which has its "own communications bureau[] with separate recording systems for emergency calls." (Id. ¶ 256.)  Had Larrea made a call from the payphone on Church Street to FPD directly, the call would have been received by the Village of Freeport; "the NCPD Communications Bureau would have never received th[e] call, would never have recorded this call . . . [,] and there would be no documentation or paperwork within the possession of the NCPD Communications Bureau that this phone call was ever made to the FPD." (Id. ¶ 256.)  Larrea testified "he believed the person that he was speaking to was with the FPD, and not the NCPD." (Id. ¶ 258.)

2. <u>Larrea's  and Montes' Written Statements</u>

Shortly after Victim's murder, Abbondandelo testified he spoke "with ADA Klein [(hereafter, "Klein"),] about the evidence identified thus far in the case, disclosed that Montes and Larrea gave written statements, and discussed the substance of th[eir] statement with [Klein]."  (<u>Id.</u> ¶ 260.)  When asked during his deposition whether he remembered this case, Klein stated he did not.  (Klein Dep. Tr., Ex. 5, ECF No. 389-8, 84:21-85:2.)  According to Abbondandelo, Abbondandelo shared with Klein that it was his opinion the individual Larrea and Montes pursued "obviously" was not the shooter.  (Defs' 56.1 Stmt. ¶ 262.)

Abbandandelo maintains that Larrea's and Montes' statements were kept in his case file.  (<u>Id.</u> ¶ 266.)  Additionally, according to Abbondandelo, he "brought the homicide case file to the NCDA's office, which contained Larrea['s] and Montes' statements," and left the file in ADA Michael Walsh's office "for a period of time."[11]  (<u>Id.</u>)  Notwithstanding Abbondandelo's claims, at his deposition, Walsh stated he had no "recollection of whether or not [he] ever saw th[e] statements."  (Walsh Dep. Tr., Ex. XX, ECF No. 390-24, 56:21-57:7; <u>see also</u> <u>id.</u> 57:8-23.)  Likewise, when ADA Anania searched the NCDA's file for Plaintiff's case, Larrea's and Montes' written statements were not part of the file.  (<u>See</u>

_____

[11] ADA Michael Walsh (hereafter, "Walsh") was assigned to Victim's homicide investigation by ADA Klein.  (Defs' 56.1 Stmt. ¶ 265.)

Anania Dep. Tr., Ex. KKK, ECF No. 386-11, 57:3-15; see also id. at 41:10-18.)

Abbondandelo maintains he discussed Larrea's and Montes' written statements with ADA Walsh.  (Defs' 56.1 Stmt. ¶ 268.) According to Walsh, he had "a very vague recollection of having a conversation with one or more of the homicide detectives involved" about Larrea and Montes.  (Walsh Dep. Tr., 137:4-19.)  Walsh was confident he would have had conversations about Larrea and Montes because they were listed in the Freeport Incident Report.  (Id.) Similarly, regarding Larrea's and Montes' written statements, Walsh stated he "would have had to have known" about them "because the fact that they had signed [written statements] was on th[e] Freeport Police Department incident report."  (Id. at 138:10-23.) Notwithstanding Walsh's above quoted testimony, "[w]hen Anania asked Walsh about the Montes and Larrea statements, Walsh said he did not remember seeing them."  (Pl's Stmt. Add'l Facts, ¶ 20.)

### 3. Witherspoon's Positive Identification of Plaintiff From a Line-Up

On April 10, 1995, a Nassau County Court Judge ordered Plaintiff to participate in a physical line-up, to be held the following day.  (Defs' 56.1 Stmt. ¶ 274.)  "Mullen called Witherspoon and told her that she needed to come to New York to look at a couple of people."  (Id. ¶ 275.)  Witherspoon was not

told "that the person who committed the crime would actually be in the line-up."  (Id.)

On April 11, 1995, Alger assisted Abbondandelo with the logistics of putting together the physical line-up.  (Id. ¶ 277.) "Alger went to Hempstead to get fillers for the line-up, with the fillers being male blacks with similar descriptions to the [P]laintiff."  (Id. ¶ 278.)  "Alger selected the fillers using a photograph of the [P]laintiff so that he had a 'clear and accurate likeness of [the [P]laintiff's] description.'"  (Id. ¶ 279.)  Alger agreed, since the line-up participants were seated, it was difficult for Witherspoon to discern the height of the participants.  (Pl's Counterstmt. ¶ 279.)  According to Alger, the reason for seating the participants was "because there was some disparity in height for the individuals" chosen to be fillers in the array.  (Defs' 56.1 Counterstmt. ¶ 486.)  Severin testified that, in his experience, it was "normal procedure" to conduct seated line-ups in this fashion.  (Id.)

As to the skin tones of the fillers, Alger speculated that the lighting set-up in the room had made certain fillers appear darker in the line-up photograph than they, in fact, actually appeared.  (Alger Dep. Tr., Ex. 48, ECF No. 391-22, 197:8-198:15; see also Defs' 56.1 Counterstmt. ¶ 494.)

When Alger "was organizing the line-up, he asked [P]laintiff's criminal defense attorney, [Cordaro], what position

42

he would like the [P]laintiff to sit in." (Defs' 56.1 Stmt. ¶ 282.) "[Cordaro] indicated that he wanted [Plaintiff] to sit in the middle of the line-up, and [P]laintiff was placed in position #4." (Id.) The fillers were then randomly placed in the line-up after Plaintiff was seated in his requested position. (Id.)

"On April 11, 1995, Witherspoon appeared at the NCPD Homicide Squad to view [the] physical line-up." (Id. ¶ 284.) When she arrived at NCPD Headquarters, Mullen brought Witherspoon to an office "on the opposite side of the hallway from the NCPD Homicide Squad." (Id. ¶ 287.) Mullen and Walsh were the only people in the room with Witherspoon prior to her review of the line-up. (Id. ¶ 288.) During the line-up, neither the Plaintiff nor the other fillers could see Witherspoon. (Id. ¶ 290.) Likewise, "Witherspoon could not see the room where the line-up was held from the office that she was initially placed in, and the door was closed at all times prior to viewing the line-up except when ADA Walsh came inside." (Id. ¶ 291.)

Prior to viewing the line-up, Witherspoon was told to "look into the glass and concentrate on the people that [she] would be looking at to see if [she] can recognize anyone.'" (Id. ¶ 294.) Both Walsh and Cordaro were present while Witherspoon observed the line-up. (Id. ¶ 295.) The line-up consisted of six black males, each wearing a cap and with a white garment covering their body. (Id. ¶ 298.) Witherspoon "recognized and positively identified

43

the man in position #4, [P]laintiff, as the person who pointed the gun at [Victim] on March 20, 1994." (Id. ¶ 300.) "Mullen then brought Witherspoon back to the office [she] was originally waiting in, prepared a written statement for Witherspoon, reviewed this written statement with her and had her sign it." (Id. ¶ 301.)

### 4. Presentation of Plaintiff's Case to the Grand Jury

Prior to presenting the case to the Grand Jury, "ADA Walsh spoke with Witherspoon and [Cousin] about their observations on the night [Victim] was murdered, and also spoke with" Abbondandelo, Mullen, and Dempsey "regarding their investigation into [Victim's] murder." (Id. ¶ 303.) The Grand Jury was not told about Larrea's and Montes' statements, the Valdez Notes, or Cousin's initial statements to police. (Pl's Counterstmt. ¶ 304.) After hearing the case as presented by Walsh, on April 19, 1995, the Nassau County Grand Jury indicted Plaintiff for, inter alia, Murder in the Second Degree, and Intimidating a Witness in the First Degree, related to Victim's murder. (Id. ¶ 304.)

### 5. The Pre-Trial Suppression Hearing

From November 1995 through February 1996, a pre-trial suppression hearing was held before the Nassau County Court (hereafter, the "Pretrial Hearing"). (Id. ¶ 305.) At the Pretrial Hearing, Plaintiff was represented by Cordaro, and the NCDA was represented by Walsh. (Id.) Exhibit 42 was one of several exhibits provided to Cordaro as Rosario material, and, at the

Pretrial Hearing, was marked for identification as evidence.  (Id. ¶¶ 306-07.)   "[Cordaro] acknowledged receipt of the Rosario material on the record in open court."  (Id. ¶ 306.)

During cross-examination, Abbondandelo testified that, during his investigation at the scene, there was one eyewitness to the incident, i.e., Witherspoon. (Pretrial Hr'g Tr., Ex. F, ECF No. 385-12, 170:11-171:5.)   The parties sharply dispute whether Abbondandelo misrepresented Witherspoon as being the sole eyewitness at the scene, since Larrea's and Montes' statements appear to suggest they too witnessed the shooting.  (Abbondandelo Dep. Tr. I, 27:21-34:11; 127:12-128:16.)

At the Pretrial Hearing, several NCPD officers testified, in addition to Plaintiff.  "Judge Boklan did not credit [P]laintiff's testimony at the [Pretrial H]earing."  (Id. ¶ 311.) Specifically, Judge Boklan found, "the credible evidence adduced at the hearing demonstrate[d] that the delay in arraigning the [Plaintiff] on the charges upon which he was taken into custody was neither 'unnecessary' nor solely purposed to obtain an uncounseled confession."  (Id. ¶ 312.)   Likewise, Judge Boklan found "[t]here was sufficient probable cause to arrest [Plaintiff] on narcotics charges . . . [and] the police had more than ample probable cause to arrest the [Plaintiff] for the murder of [Victim]."  (Id. ¶ 313.)   Regarding Plaintiff's then claims of coercion, Judge Boklan found "[t]here [was] no credible evidence

here to indicate that the [Plaintiff] was either subjected or succumbed to continuous interrogation, intimidation, coercion, threats, improper inducements or other unfair tactics by the police which might have resulted in a false confession." (Id. ¶ 314.) Instead, Judge Boklan found "the [Plaintiff's] statements to the police were freely and voluntarily given." (Id.) As to Plaintiff's objections to the photo-packets shown to Witherspoon, Judge Boklan found "[t]he two photo[-]packets shown to [Witherspoon], as well as the corporeal line[-]up which she viewed, were not unduly suggestive." (Id. ¶ 315.) Consequently, Judge Boklan permitted Witherspoon to testify at trial regarding her positive identification of Plaintiff at the line-up. (Id.)

> 6. <u>Scott Brettschneider is Retained to Defend Plaintiff in the Criminal Case</u>

"After the pre-trial suppression hearing, [P]laintiff fired [Cordaro] as his criminal defense attorney, and hired Scott Brettschneider" (hereafter, "Brettschneider".) (Id. ¶ 316.) "Brettschneider was retained before [Plaintiff's] criminal trial" and was given approximately one month to prepare. (Brettschneider Dep. Tr., Ex. 31, ECF No. 391-5, 11:15-12:5.)

"Brettschneider received a copy of [Cordaro's] file, which included the transcripts from [P]laintiff's pre-trial suppression hearing." (Defs' 56.1 Stmt. ¶ 318.) "The pre-trial hearing transcripts indicate that [Cordaro] was in possession of

Exhibit 42 as of at least November 6, 1995, approximately [one] year prior to [P]laintiff's criminal trial." (Id. ¶ 319.) Walsh provided Brettschneider with Rosario material which consisted of 102 items. (Id. ¶ 320.) Exhibit 42 was "[i]ncluded in the Rosario material . . . Walsh provided to Brettschneider." (Id.) At his deposition, however, Brettschneider claimed to have no recollection of seeing Exhibit 42, but speculated if it had been disclosed it was disclosed with the witness information redacted. (Brettschneider Dep. Tr., 36:13-37:7; see also id. at 74:12-75:15.) Additionally, "[i]ncluded in the Rosario material provided to Brettschneider were notes of . . . Mullen's conversation with Baldwin, which was marked for identification as trial exhibit 57." (Defs' 56.1 Stmt. ¶ 325.)

### 7. Plaintiff is Convicted of Victim's Murder

On November 4, 1996, Plaintiff's trial for Victim's murder began. (Id. ¶ 326.) "During the criminal trial, Witherspoon identified [P]laintiff as the person who she saw point a gun at [Victim]." (Id. ¶ 327.) Likewise, Cousin, who was subjected to extensive cross-examination by Brettschneider, "identified [P]laintiff as the person he saw outside Blimpies who shot [Victim]." (Id. ¶ 328.)

"On December 9, 1996, the jury rendered a verdict and found [P]laintiff guilty of all the criminal charges" with which he was indicted. (Id. ¶ 329.) Consequently, "[o]n March 7, 1997,

[P]laintiff was sentenced to 25 years to life imprisonment." (Id. ¶ 332.) Brettschneider appealed Plaintiff's conviction to the New York State Appellate Division Second Department. (Id. ¶ 333.) On March 11, 2002, the Second Department issued a decision and order denying Plaintiff's appeal. (Id.) A subsequent petition for habeus corpus relief was denied by District Court Judge Denis R. Hurley on July 29, 2004. (Id. ¶ 334.) "On March 18, 2005, the United States Court of Appeals for the Second Circuit issued a Mandate denying [P]laintiff's requests and dismissing [P]laintiff's appeal of District Court Judge . . . Hurley's Decision and Order denying [P]laintiff's Habeas Corpus petition. (Id. ¶ 340.)

> F. The NCDA Conviction Integrity Unit's Motion to Vacate Plaintiff's Conviction

Anthony Mayol (hereafter, "Mayol") was an attorney with whom Plaintiff was acquainted who, at some point, agreed to voluntarily assist Plaintiff with his case. (Id. ¶ 335; see also Pl's 56.1 Counterstmt. ¶ 335.) At some point, Brettschneider turned over Plaintiff's file to Mayol. (Id. ¶ 336.) On August 5, 2004, Mayol wrote a letter to Brettschneider, and included a copy of the Rosario list; Mayol stated he had reviewed Exhibit 42 and had "noticed that there were supporting depositions from Montes and Larrea that were missing from [Plaintiff's] file when the file was transferred." (Id. ¶ 337.)

"In 2005, Mayol sent [P]laintiff Exhibit 42 and told [P]laintiff that he needed to get Montes' and Larrea's statements referenced in [Exhibit 42]." (Id. ¶ 341.) "On June 25, 2007, Plaintiff prepared a FOIL request dated June 5, 2007 and sent it to the NCDA's Office which included a specific request for Montes' and Larrea's written statements." (Id. ¶ 342.) "Plaintiff believes he received the Montes and Larrea statements with the pack of 91 documents included in the November 5, 2007 FOIL response from the NCPD." (Id. ¶ 343.)

In June, 2017, Plaintiff wrote a letter to the NCDA Conviction Integrity Unit (hereafter, "CIU") requesting to have his conviction reviewed in light of Larrea's and Montes' statements. (See Pl's Stmt. Add'l Facts ¶ 6.) Anania proceeded to undertake "a reinvestigation of [P]laintiff's case." (Id.) In reviewing Larrea's and Montes' written statements, "it was not clear [to Anania] if [Larrea's and Montes'] statements were material" since "it was unclear . . . if Montes and Larrea were chasing the shooter." (Defs' 56.1 Stmt. ¶ 363.) Anania testified she "believes that there is evidence that corroborates the content of [P]laintiff's fifteen (15) page written confession and that the [P]laintiff told the detectives what was in [P]laintiff's written confession." (Id. ¶ 364.) As part of her reinvestigation, Anania spoke with Witherspoon "who denied that NCPD detectives pressured her to pick someone in the photo array and line-up, and was

49

confident that when she identified [P]laintiff in court, she identified [Victim's] murderer."  (Id. ¶ 365.)  "Anania did not believe that the NCDA, including ADA Walsh, withheld Brady material" because Anania believed "the district attorney was not in possession of the Montes and Larrea statements." (Anania Dep. Tr. 41:10-18.)

"On February 14, 2018, ADA Anania filed motion papers and a memorandum of law requesting to vacate [P]laintiff's conviction for the murder of [Victim] pursuant to NYS CPL § 440.10(1)(h)."  (Defs' 56.1 Stmt. ¶ 369.)  "Anania believed that moving to vacate [P]laintiff's conviction pursuant to [CPL] § 440.10(1)(h) was applicable and appropriate in this case because Montes' and Larrea's statements were not 'new evidence' and since [P]laintiff received Exhibit 42, he knew about the[] statements, could have asked for them, but he did not."[12]  (Id. ¶ 368.)  "On

---

[12]  For context, the Court elucidates.  Subsection (1)(h) of CPL § 440.10 permits one to move to vacate a judgment when the judgment was obtained in violation of the State or National constitution. Pursuant to subsection (1)(g), however, one may move to vacate a judgment when:

> New evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant; provided that a motion based upon such ground must be made with due

February 16, 2018, Hon. Teresa Corrigan vacated [P]laintiff's convictions under Indictment No. 91607/1995 pursuant to NYS CPL § 440.10(1)(h) . . . and dismissed the Indictment pursuant to NYS CPL § 210.20(1)(i)." (Id. ¶ 371.) Because the NCDA elected not to retry Plaintiff, the issue of Plaintiff's innocence was not litigated.

G. NCPD's Training Program for Detectives and the Complaints Procedure

"The NCPD Police Academy teaches police recruits, supervisors, and detectives within the NCPD." (Defs' 56.1 Stmt. ¶ 346.) An "NCPD police officer promoted to the rank of detective receives approximately 69 hours of additional instruction and training which includes the Criminal Investigator Course as outlined by the Division of Criminal Justice Services" (hereafter, the "DCJS"). (Id. ¶ 347.) Additionally, "NCPD detectives are trained in a course specifically devoted to the custodial interrogation of criminal suspects [entitled] 'Admissions, Confessions, and Miranda.'" (Id. ¶ 348.) "Since 1974, the 'Admissions, Confessions, and Miranda' course has generally retained the same format, with periodic updates and amendments based on changes and developments in law." (Id. ¶ 349.) "[I]f a

---

diligence after the discovery of such alleged new evidence.

NYS CPL § 440.10(1)(g).

new case is decided that alters the NCPD training curriculum, the NCPD Police Academy takes the case and amends the curriculum." (Id. ¶ 350.)  Likewise, "if a case comes down that would change something that a detective currently assigned to the detective division would do, an update would be created in the form of a legal bulletin and dispersed to the entire NCPD."  (Id.)

"Between 1974 and 1994, NCPD detectives who went through the basic training course also received in-service training on various topics every three to five years."  (Id. ¶ 351.)  During the same period, "members of the NCPD who were assigned to supervise detectives underwent a basic supervisor training course outlined by NYS DCJS, and these supervisors generally had experience in the detective division prior to supervising NCPD detectives." (Id. ¶ 352.)  "NCPD Police Academy training materials and training courses related to detectives and their supervisors were not changed or revised based solely upon allegations" made against the County "regarding improper interrogation tactics by homicide squad detectives, or based solely upon any complaints" received by the County "regarding the way interrogations were being conducted."  (Id. ¶ 353.)  Instead, "materials and courses were updated to account for changes in the law."  (Id.)

"All complaints made against NCPD officers are reviewed by the Office of Internal Affairs."  (Id. ¶ 354.)  "From 1974 to 1994, if a civilian ha[d] a complaint about the way that they were

treated in NCPD custody, the civilian would contact NCPD, complete a complaint tracking [form], then the NCPD supervisor would complete the complaint tracking form"; thereafter, Internal Affairs would vet the complaint, "and then the complaint would be investigated."  (Id. ¶ 355.)  "If a police officer [observed] a fellow police officer violating a civilian's rights, they would complete the same complaint tracking form that the civilian would complete, and police officers are obligated to report any violation of a civilian's rights."  (Id. ¶ 356.)  "The County, through multiple avenues, searched records, or had records searched, regarding complaints made between 1974 and 1994 to the NCPD alleging coercive interrogation tactics by homicide detectives, and located one complaint made regarding coercive interrogation tactics."  (Id. ¶ 357.)  In compliance with a revised Rule 30(b)(6) notice from Plaintiff, the County also "searched for records regarding 'the nature, extent, and findings of the County's investigations into the allegations of misconduct presented by' eleven (11) different complainants, and the County located records indicating that there was an investigation for one (1) of the eleven (11) listed complainants."  (Id. ¶ 358.)  "The County's investigation into this one complainant's allegations, which were made in 2002, was undetermined, meaning that there was no evidence to show if the allegations were founded or unfounded."  (Id. ¶ 359.)  "After the County conducted its search" it "did not locate

any records that the remaining ten (10) complainants listed in [P]laintiff's revised [Rule] 30(b)(6) notice made allegations to the County about the way that they were treated by homicide detectives." (Id. ¶ 360.)

## PROCEDURAL HISTORY

The Court incorporates herein by reference the procedural history section of its July 28, 2021 Memorandum & Order, granting in part and denying in part Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint (hereafter, the "July Order"). (See July Order, ECF No. 338,[13] at 12-14.) The Court adds the following.

1. In compliance with the Court's July Order, Plaintiff filed his TAC on August 12, 2021. Plaintiff's TAC presently alleges nine causes of action, to wit: (1) Malicious Prosecution against Abbondandelo, Dempsey, and Severin (hereafter, "Count One");

2. Fabrication of Evidence against Abbondandelo, Dempsey, Alger, Kosior, and Severin based upon:

   i.   the alleged manufacturing of Plaintiff's identification by Witherspoon,

   ii.  the alleged conspiring with Cousin to present false testimony and frame Plaintiff, and

---

[13]  Also found at Jackson v. Nassau County, 552 F. Supp. 3d 350 (E.D.N.Y. 2021).

iii.      fabrication of a confession which Plaintiff was coerced to adopt (hereafter, "Count Two");

3. Coercion against Abbondandelo, Dempsey, and Kosior (hereafter, "Count Three");

4. Monell liability for Failure to Supervise or Train against Nassau County;

5. State Law Malicious Prosecution against Nassau County (hereafter, "Count Five");

6. State Law False Imprisonment against Nassau County (hereafter, "Count Six");

7. Conspiracy against all individual defendants (hereafter, "Count Seven");

8. Evidence Suppression, Brady violations, Spoliation and Denial of Access to Courts against all individual defendants based upon alleged suppression of:

    i.      the Larrea and Montes Statements,

    ii.     Larrea's 911 call;

    iii.    the Valdez Notes,   and

    iv.     the Zimmer-Baldwin Interview (hereafter, "Count Eight"); and

9. Failure to Intervene, pled in the alternative, against all individual defendants (hereafter, "Count Nine").

(See TAC at ¶¶ 125-77.)

55

On March 20, 2023, Defendants moved for summary judgment on all counts of Plaintiff's TAC.  (See Support Memo, ECF No. 388; see also Reply, ECF No. 394-11.)  Plaintiff opposes Defendants' summary judgment motion.  (See Opp'n, ECF No. 389-3.)

ANALYSIS

I.   Legal Standard

A. Summary Judgment Standard

Pursuant to Rule 56(a), "[a] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "A fact is 'material' for these purposes when it might affect the outcome of the suit under the governing law."  Adamson v. Miller, 808 F. App'x 14, 16 (2d Cir. 2020).  Additionally, "'[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Id. (quoting Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005)).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."  Hetchkop v. Woodlawn at Grassmere, Inc., 116 F.3d 28, 33 (2d Cir. 1997).  Moreover, "the court is not to make assessments of the credibility of witnesses" on a motion for summary judgment, as "[c]redibility

56

assessments, choices between conflicting versions of events, and weighing of the evidence are matters for the jury." Id.

On a motion for summary judgment, a court considers "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011). Further, while a court "may consider other materials in the record," it "need consider only the cited materials" in ruling on a summary judgment motion. FED. R. CIV. P. 56(c)(3); see also Pennington v. D'Ippolito, 855 F. App'x 779, 782 (2d Cir. 2021) ("[I]n ruling on a summary judgment motion the court need consider only the cited materials in the parties' submissions." (internal citations and alterations omitted)).

In reviewing the record, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sheet Metal Workers' Nat'l Pension Fund v. Vardaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)). When drawing inferences from evidence in the record in favor of the non-moving party, however, a court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." Berk v. St. Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005)

(quoting <u>County of Suffolk v. Long Island Lighting Co.</u>, 907 F.2d 1295, 1318 (2d Cir. 1990)).

"Once the movant has 'demonstrat[ed] the absence of a genuine issue of material fact . . . the onus shifts to the party resisting summary judgment to present evidence sufficient to satisfy every element of the claim.'" <u>Pennington</u>, 855 F. App'x at 781 (alteration in original) (quoting <u>Holcomb v. Iona Coll.</u>, 521 F.3d 130, 137 (2d Cir. 2008)).  To do this, "[t]he non-moving party is required to 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'"  <u>Id.</u>

      B. <u>Section 1983 of Title 42</u>

In pertinent part, Section 1983 of Title 42 provides:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

42 U.S.C. § 1983.  To plausibly state a claim under Section 1983, a plaintiff must allege: "(1) that the defendants deprived him of a right 'secured by the Constitution or laws of the United States'; and (2) that they did so 'under color of state law.'"  <u>Giordano v. City of N.Y.</u>, 274 F.3d 740, 750 (2d Cir. 2001) (quoting <u>Am. Mfrs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 49-50 (1999)).

II.  <u>Discussion</u>[14]

 A. <u>The Court has Already Adjudicated, and Dismissed,</u>
  <u>Plaintiff's Conspiracy Claim</u>

   The Court first addresses that branch of Defendants'
motion which seeks dismissal of Count Seven.  Defendants highlight
the Court previously determined, at the dismissal stage, that
Plaintiff's Second Amended Complaint "failed to allege an
agreement between NCPD officers and FPD officers" to violate
Plaintiff's constitutional rights.  (Support Memo, at 33.)  Indeed,

---

[14] As an initial matter, the Court notes that throughout their
Support Memo, Defendants implore the Court to give preclusive
effect to preliminary determinations made by the State Court as
part of Plaintiff's criminal trial.  (<u>See, e.g.</u>, Support Memo at
10 (arguing "the County Court found that there was ample probable
cause to arrest and that the [photo] identification procedures
were properly conducted"); <u>id.</u> at 28-29 (arguing Plaintiff should
be precluded from re-litigating the validity of his confession
based upon the County Court Judge's determination that Plaintiff's
statements were freely and voluntarily given).)  The Court declines
to do so.  Indeed, "[n]either the verdict of a jury nor the findings
of a court in a prior action upon the precise point involved in a
subsequent action between the same parties constitutes a bar,
unless followed by a judgment based thereon, or into which the
verdict or findings entered."  <u>Ortiz v. Wagstaff</u>, 523 F. Supp. 3d
347, 366 (W.D.N.Y. 2021) (quoting <u>Peterson v. Forkey</u>, 50 A.D.2d
774, 774 (1st Dep't 1975)).  "The judgment is the bar, and not the
preliminary determination of the Court."  <u>Id.</u> (quoting <u>Rudd v.</u>
<u>Cornell</u>, 171 N.Y. 114, 128-29 (1902)).  "Thus, when no order or
final judgment has been entered on a verdict or decision, <u>or when</u>
<u>the judgment is subsequently vacated</u>, collateral estoppel is
inapplicable."  <u>Id.</u> (quoting <u>Church v. N.Y. State Thruway Auth.</u>,
16 A.D.3d 808, 810 (3rd Dep't 2005) (emphasis added)); <u>see also</u>
<u>Kogut v. County of Nassau</u>, No. 06-CV-6695, 2009 WL 5033937, at *10
(E.D.N.Y. Dec. 11, 2009) ("[A] vacated judgment, by definition,
cannot have any preclusive effect in subsequent litigation.")
(quoting <u>Bos. Firefighters Union v. Bos. Police Patrolmen's Ass'n</u>,
468 U.S. 1206, 1211 (1984)).

while the Court "directed [Plaintiff] to file a [TAC] that omit[ted] . . . stricken exhibits, and any reference to them in the body of the complaint", Plaintiff was explicitly "not permitted to amend his pleadings to remedy the deficiencies" identified by the Court in the July Order.  (See July Order, at 71-72.) Plaintiff's TAC continues to allege a conspiracy amongst NCPD and FPD officers, who have since been dismissed from this action, and, as emphasized by Defendants, "the TAC makes the exact same allegations" as those previously made and adjudicated.  (Support Memo, at 33.)  Plaintiff's Opposition omits any response to Defendants' arguments on this point.  (See Opp'n, in toto.)

Since the Court previously dismissed practically identical allegations of a conspiracy at the motion to dismiss stage, while explicitly precluding Plaintiff from further amending his complaint to remedy the identified deficiencies, Defendants' motion seeking summary judgment on Count Seven of the TAC is granted.[15]

---

[15] Regardless, given Plaintiff's lack of opposition to Defendants' arguments as to Count Seven, even if the Court had not previously adjudicated this issue, the Court would have found Plaintiff abandoned any conspiracy claim.  See Jackson v. Fed. Exp., 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition [to summary judgment] that relevant claims or defenses that are not defended have been abandoned")

B. Plaintiff's Due Process Fair Trial Claims

"The Due Process Clause guarantees a criminal defendant's 'right to a fair trial.'" Frost v. N.Y.C. Police Dep't, 980 F.3d 231, 244 (2d Cir. 2020) (quoting Ramchair v. Conway, 601 F.3d 66, 73 (2d Cir. 2010)). When this right is violated, "[s]uch violations are 'redressable in an action for damages under 42 U.S.C. § 1983.'" Id. A fair trial claim lies where a police officer "creates false information likely to influence a jury's decision and forwards that information to prosecutors." Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997)). "A fair trial claim may also arise where the police or prosecutors withhold material exculpatory or impeaching evidence from a defendant." Fappiano v. City of N.Y., 640 F. App'x 115, 118 (2d Cir. 2016).

1. Brady Violations/Evidence Suppression (Claim Eight: Against All Individual Defendants)

Where police officers "withhold exculpatory or impeaching evidence . . . they may be held liable under § 1983 for violating the disclosure requirements of Brady v. Maryland." Bellamy v. City of N.Y., 914 F.3d 727, 751 (2d Cir. 2019); see also Fappiano, 640 F. App'x at 118 (stating, where a fair trial claim arises in the context of police officers or prosecutors withholding "material exculpatory or impeaching evidence from a defendant" such a theory of liability "is essentially a civil claim

seeking damages for a Brady violation"). A typical Brady violation contains three elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." United States v. Rivas, 377 F.3d 195, 199 (2d Cir. 2004). "To establish prejudice, a plaintiff must show the evidence was material; i.e., whether the 'evidentiary suppression undermines confidence in the outcome of the trial.'" Fappiano, 640 F. App'x at 118 (quoting Leka v. Portuondo, 257 F.3d 89, 104 (2d Cir. 2001)).

"The Second Circuit has 'suggested, though without so concluding, that a civil Brady claim requires a showing that the non-disclosure was intentional.'" Fraser v. City of N.Y., No. 20-CV-4926, 2021 WL 1338795, at *5 (S.D.N.Y. Apr. 9, 2021) (quoting Bellamy, 914 F.3d at 751 n.23); see also Fappiano, 640 F. App'x at 118 ("We have never held that anything less than an intentional Brady violation establishes a § 1983 due process claim for damages, however, and we decline to do so here."). An intentional Brady violation can be found where an officer hides information, which is known only to the police, from the prosecutor. Valentin v. City of Rochester, No. 11-CV-6238, 2018 WL 5281799, at *13 (W.D.N.Y. Oct. 24, 2018).

Defendant first argues, as to Larrea's and Montes' statements, "the [I]ndividual [D]efendants discharged their duties under Brady by delivering the Montes and Larrea statements to the DA's office." (Support Memo, at 14.) Defendants highlight Abbondandelo's testimony in which he represented he spoke with ADA Klein and ADA Walsh about Larrea's and Montes' statements. (Id.) Likewise, Defendants rely upon Abbondandelo's testimony that Larrea's and Montes' statements became part of his case file and that the case file "was brought to ADA Walsh's office and left there for a period of time." (Id.) Since Walsh testified he knew about the existence of Larrea's and Montes' statements, the Individual Defendants argue they "cannot be held liable for any claims with respect to withholding exculpatory information." (Id.)

Next, Defendants contend "[P]laintiff's criminal defense team clearly knew of the existence of Montes and Larrea at the time of [Plaintiff's] pre-trial suppression hearing and criminal trial." (Id. at 16.) Defendants emphasize Exhibit 42 "was provided to the prosecutor and to plaintiff's criminal defense team at the suppression hearing", and that Exhibit 42 contained Larrea's and Montes' "names and contact information, along with a detailed narrative of their observations, and that they both gave written statements to detectives." (Id.) Consequently, Defendants aver Plaintiff's attorneys "knew or should have known,

63

of essential facts permitting [Plaintiff] to take advantage of [that] evidence." (Id. (citation omitted).)  Likewise, Defendants assert "[P]laintiff's criminal defense team knew of the existence of Baldwin and the substance of the Baldwin-Zimmer recording." (Id. at 16-17.)  Defendants maintain Mullen's notes, which detailed the substance of Mullen's interview with Baldwin and which contained substantially the same information as the Baldwin-Zimmer recording, were furnished to Plaintiff's attorneys.  (Id. at 17.) Moreover, Defendants emphasize Plaintiff's attorney was able to cross-examine Mullen at Plaintiff's trial about his interview with Baldwin.  (Id.)

Finally, as to the Valdez Notes and Larrea's and Montes' statements, Defendants attack the extent to which such evidence was exculpatory.  (Id. at 17-20.)  Specifically, Defendants argue Valdez simply "saw a male, who she could not identify, run on foot under the train platform towards the fire department with a gray or white car in pursuit"; therefore, according to Defendants, "[t]he fact that Valdez was not able to identify this male alone demonstrates that this evidence was not material and would not have affected the outcome of [P]laintiff's criminal trial."  (Id. at 18.)  As to Larrea's and Montes' statements, Defendants contend these statements are cumulative of Valdez' observations, and, regardless, they are neither exculpatory nor material because the person Larrea and Montes pursued could not have been the shooter.

(Id. at 18-19.)   Defendants direct the Court to Cousin's and Campbell's testimony which, collectively, "show[ed] that the shooter got into [a] getaway car which drove southbound away from the scene."  (Id. at 19.)

Plaintiff counters, arguing the record evidence demonstrates "that the Montes and Larrea statements were suppressed at the time of trial in the sense that they were functionally unknown to both the prosecution and the defense." (Opp'n, at 16.)   Plaintiff highlights: Larrea's and Montes' statements were missing from the District Attorney's file; ADA Klein testified he did not recall learning about Montes or Larrea from Severin; and Severin "made no mention of Montes and Larrea in the Morning Report."  (Id.)  Plaintiff further highlights Walsh's inconsistent statements made to Anania in which he claimed "he did not remember the statements."  (Id. at 17.)  As to Defendants' contentions Plaintiff was aware of the essential facts via production of Exhibit 42, which would have allowed him to take advantage of Larrea's and Montes' statements, Plaintiff highlights Abbondandelo testified at the pre-trial suppression hearing that Witherspoon was the sole eyewitness to the shooting, and that "Plaintiff was therefore 'reasonably unaware' of the Montes, Larrea [and] Valdez . . . information."  (Id. at 20.)   While Plaintiff agrees the prosecution was unaware of Larrea's and Montes' statements, Plaintiff avers Walsh's failure to correct

65

Abbondandelo's representation's regarding Witherspoon compounded the issue.  (See id. at 11.)

The Court finds Plaintiff has presented evidence sufficient to create a material dispute of fact over whether the Individual Defendants possessed, and failed to turn over, exculpatory material to prosecutors, to wit, Larrea's and Montes' statements.[16] As an initial matter, the Court agrees with Plaintiff

---

[16]    Plaintiff makes no argument in response to Defendants' contentions he should have been aware of Baldwin's identity because of production of Mullen's notes; consequently, the Court considers Plaintiff to have waived this argument.   (See Opp'n, in toto.) See, e.g., Butler v. County of Suffolk, No. 11-CV-2602, 2023 WL 5096218, at *29 n.34 (E.D.N.Y. Aug. 3, 2023) (finding, where non-movant did not meaningfully respond to an argument raised in support of summary judgment, court may deem claim abandoned) (collecting cases).   Regardless, the Court agrees with Defendant that Mullen's notes sufficed to apprise Plaintiff of Baldwin's identity and the type of testimony he could provide.

Additionally, for the reasons stated in Magistrate Judge Shields' September 19, 2022 Order denying sanctions for alleged spoliation of Larrea's 911 call by the Defendants (hereafter, the "Spoliation Ruling"), the Court finds summary judgment on Plaintiff's Spoliation claim is warranted. (See Spoliation Ruling, ECF No. 375, at 9-11.)   Specifically, the Court highlights, the record evidence establishes no bad faith on the part of the County since if Larrea made the 911 call to the Village of Freeport there would have been no recording of the call in the County's possession. (See Gaddist Decl. No. 2, Ex. GGG, ECF No. 386-7, in toto.) Similarly, even if the call was made to the County in the first instance, such call would have been re-routed immediately to the Village of Freeport.   (See Gaddist Decl. No. 1, Ex. FFF, ECF No. 386-6, in toto.)   Therefore, if the call existed, it would have contained no exculpatory value, consisting of nothing more than re-routing information.   (Id.)   Plaintiff's spoliation claim must fail for these reasons.   See United States v. Tyree, 279 F. App'x 31, 33 (2d Cir. 2008) ("Destruction of evidence by the government only rises to a constitutional violation when three requirements are met: (1) the government must have acted in bad faith in

that Larrea's and Montes' statements are favorable to the Plaintiff
in that they have both exculpatory and impeaching value.   For
example, Plaintiff makes much throughout his Opposition of the
height discrepancy between Plaintiff and the perpetrator of
Victim's murder; Montes' statement bolsters Plaintiff's argument
he was not the shooter since Montes described a shooter several
inches shorter than Plaintiff.   Likewise, Montes' recitation of
the shooting, namely that Victim was pursued by two assailants
through the Blimpies parking lot, is at odds with Witherspoon's
account; thus, had Plaintiff been able to utilize Montes' testimony
at trial, Plaintiff could have presented to the jury an alternative
theory of the crime.   The same is true if Plaintiff were able to
have Larrea testify at trial; as is evident from Larrea's
statement, his version of events contradicted Cousin's and
Campbell's testimony that Victim's shooter fled in a vehicle,
Southbound.   Rather, Larrea's statement was consistent with
Plaintiff's assertion that the man Larrea pursued was the shooter.
And, Montes' statement dovetails with Plaintiff's contentions in

---

destroying the evidence; (2) the evidence must possess an
exculpatory value that was apparent before it was destroyed; and
(3) the defendant must be unable to obtain comparable evidence by
other reasonably available means." (internal citations and
alterations omitted)).

As to the Valdez Notes, the Court finds no Brady violation since
Valdez's statement is not material in that it possesses neither
exculpatory, nor impeaching value.

this regard since Montes previously represented he was 100 percent certain the person Larrea and he pursued was the shooter.[17]  See United States v. Martinez, 388 F. Supp. 3d 225, 232 (E.D.N.Y. 2019) (stating, where "exculpatory character [of testimony] harmonize[s] with the theory of the defense case, a Brady violation has occurred" (quoting United States v. Triumph Cap. Grp., Inc., 544 F.3d 149, 164 (2d Cir. 2008))).

As to Defendants' claims Plaintiff was in possession of Exhibit 42, and so possessed Larrea's and Montes' contact details, including the fact they each provided signed, written statements, the Court finds there is a material dispute of fact as to whether Plaintiff received an unredacted or redacted copy of the exhibit. Additionally, the narrative provided in Exhibit 42 does not make it readily apparent that the "subject" Larrea and Montes pursued was distinct from the subject Cousin, Witherspoon, and Campbell described, i.e., that they thought they were in pursuit of a person, not Plaintiff, who they allegedly witnessed shoot Victim. The Court finds it cannot be said, under these circumstances, that from the narrative of the events, Plaintiff "either knew, or should

---

[17] Although Defendants argue Montes' statements in this regard are hearsay, such statements are arguably admissible as impeaching evidence.

have known, <u>of the essential facts</u> permitting him to take advantage of" Larrea's and Montes' statements.[18]

The Court also finds whether Abbondandelo brought the case file containing Larrea's and Montes' statements to the NCDA office, and left it there for Walsh, remains a material question of fact encompassing Abbondandelo's credibility, something which this Court cannot evaluate on a motion for summary judgment. <u>See</u> <u>Frost</u>, 980 F.3d at 245. Similarly, the Court cannot credit Abbondandelo's testimony he discussed Larrea's and Montes' statements with Walsh, notwithstanding Walsh testified he vaguely recalled a conversation about the statements, due to the inconsistent statements from Walsh about his knowledge of the statements, present in the record.[19]

---

[18] Further, while Exhibit 42 mentions Larrea and Montes provided so-called "32(b)" written statements, Brettschneider testified he was unaware of what a "32(b)" was. Specifically, Brettschneider testified he was unsure the information in the narrative would have prompted him to request the information from prosecutors. (Brettschneider Dep., Ex. III, ECF No. 386-9, 39:21-41:11.) To the extent Brettschneider's testimony is incredible giving his experience as a defense attorney, such a determination is one of credibility which Defendants may raise at trial. <u>See</u> <u>Frost</u>, 980 F.3d at 245 ("It is a bedrock rule of civil procedure that a district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented") (quotation marks and citation omitted).

[19] It is unclear to the Court whether Plaintiff intended to plead a denial-of-access-to-the-courts claim as part of Count Eight; regardless, the Court considers this claim abandoned since Plaintiff failed to address any of Defendants' arguments on this issue in his Opposition. <u>See</u> <u>Jackson</u>, 766 F.3d at 198.

2. <u>Fabrication of Evidence (Claim Two: Abbondandelo, Dempsey, Alger, Kosior and Severin)</u>

To plead a fair trial claim based upon fabricated evidence, a plaintiff must allege "an (1) investigating official (2) fabricate[d] information (3) that [wa]s likely to influence a jury's decision, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of liberty as a result." <u>Garnett v. Undercover Officer C0039</u>, 838 F.3d 265, 277 (2d Cir. 2016). "A fair trial claim based on fabricated evidence can be sustained even if the officer had probable cause to arrest in the first place." <u>Hincapie v. City of N.Y.</u>, 434 F. Supp. 3d 61, 75 (S.D.N.Y. 2020).

Fabrication of evidence "violates the right to a fair jury trial whether the officer fabricates tangible evidence or 'the officer's own account of his or her observations of alleged criminal activity.'" <u>Collins v. City of N.Y.</u>, 295 F. Supp. 3d 350, 371 (S.D.N.Y. 2018) (quoting <u>Garnett</u>, 838 F.3d at 274). "[T]he Second Circuit equates 'the fraudulent omission of factual information . . . with the affirmative perpetration of a falsehood,' and disclaims any 'plausible legal distinction between misstatements and omissions.'" <u>Galgano v. County of Putnam, N.Y.</u>, No. 16-CV-3572, 2024 WL 1623401, at *102 (S.D.N.Y. Apr. 15, 2024) (quoting <u>Morse v. Fusto</u>, 804 F.3d 538, 550 (2d Cir. 2015)).

Plaintiff alleges Abbondandelo, Dempsey, Alger, Kosior, and Severin fabricated evidence in three ways, to wit: (1) by manufacturing the identification of Plaintiff by Witherspoon; (2) by coercing and/or conniving with Cousin to provide false testimony which inculpated Plaintiff; and (3) by drafting a false confession which Plaintiff was forced to adopt.[20]   (See TAC, at ¶¶ 132-38.)   The Court addresses Plaintiff's arguments in turn.

> i.   There is no Evidence NCPD Detectives Conspired with Cousin to Suborn False Testimony and Frame Plaintiff

"[T]o survive summary judgment on a witness tampering claim, a plaintiff must offer some proof of witness tampering.  In many cases, this proof comes in the form of a recantation from a tampered-with-witness."  Fappiano v. City of N.Y, No. 01-CV-2476, 2015 WL 94190, at *21 (E.D.N.Y. Jan. 7, 2015).  Alternatively, a plaintiff can defeat summary judgment "by pointing to circumstantial evidence from which a reasonable jury could infer that a witness was tampered with by a defendant."  Id. (collecting cases).

Defendants argue Plaintiff's claims of witness tampering are unsupported by any evidence in the record.  (Support Memo, at

---

[20]  Defendants make no argument that Severin's omission of Larrea's and Montes' statements from the Morning Report, to the extent it altered the narrative of the investigation and compounded the suppression of the statements, does not qualify as fabrication by omission; therefore, the Court does not analyze this further.

21.)  Specifically, Defendants highlight that, in his deposition, Cousin testified "his trial testimony was accurate."  (Id. at 21-22.)[21]  Defendants also highlight Cousin's account of the murder was corroborated by statements from the Isaac brothers and, moreover, that both of Cousin's statements, in addition to a video recorded statement from Cousin, were turned over to Plaintiff's counsel.  (Id. at 22.)  Defendants emphasize, there is no evidence that the Isaac brothers' statements were manufactured and, Cousin was subject to extensive cross-examination during Plaintiff's criminal trial about his account.  (Id.)

Plaintiff summarily responds, "the jury can find that defendants threatened, cajoled and ultimately conspired with Cousin to present false testimony against plaintiff in exchange for inducements that were not adequately disclosed to [P]laintiff."  (Opp'n, at 21.)  As support for this conclusory assertion, Plaintiff cites a slew of paragraphs from his Rule 56.1 Statement of Additional Facts without further explanation or argument as to why these citations advance his position (see id.); this is unavailing.  See Krul v. DeJoy, 705 F. Supp. 3d 5 (N.D.N.Y. 2023) ("[I]t is not a court's duty to make a counseled plaintiff's case for them by figuring out which conclusory, generalized

---

[21] Defendants also note, Witherspoon, likewise, "denied that any of the defendants pressured her to pick someone in the photo array and line-up."  (Support Memo, at 21-22.)

assertion matches up with an event that might or might not be described in sufficient detail elsewhere."). Rather, the Court finds Plaintiff's conclusory assertions that the officers in question threatened, cajoled, or conspired with Cousin to present false testimony inculpating Plaintiff are without merit, and unsupported by any discernable evidence in the summary judgment record. Indeed, Plaintiff has chosen not to expound upon his arguments in his Opposition in a manner sufficient to assist the Court in assessing his theory. Yet, at the summary judgment stage, it is Plaintiff's burden to present evidence in the record of the alleged fabrication; Plaintiff may not stand on his own speculation.

Here, the record evidence demonstrates in both iterations of Cousin's account of Victim's murder, Cousin described witnessing Plaintiff shoot Victim. Cousin's second account of the shooting was credited by NCPD because Abbondandelo considered it to be more consistent with the facts, as he knew them, and because Cousin made statements against his own penal interests. It was reasonable for Abbondandelo to credit Cousin's testimony for this reason. See United States v. Agapito, 620 F.2d 324, 333 (2d Cir. 1980) ("A statement against penal interest, especially one that is consistent with all other known information, is more reliable than a statement which seeks to exculpate a person charged with [a] crime" and, consequently, can establish probable

73

cause for the arrests of those implicated.).  Moreover, Cousin's testimony was consistent with statements provided to NCPD from the Isaac brothers who inculpated Plaintiff, and corroborated Cousin's role in Victim's murder.  Cousin's testimony was further corroborated by Witherspoon, who identified Plaintiff as Victim's shooter.

Of further import: Cousin was confronted as to the truthfulness of his previous testimony during his deposition and declined to recant that testimony.  See McDonough v. Smith, No. 15-CV-1505, 2022 WL 3279348, at *24 (N.D.N.Y. Aug. 11, 2022) (granting summary judgment on fabrication claim where, inter alia, "[p]laintiff [did] not challenge, in anything but the most conclusory terms, the undisputed fact that none of the witnesses against him ever recanted their incriminating testimony and each stated under oath that [d]efendant did not improperly influence or coerce their testimony, or ask them to fabricate evidence"); see also Thorpe v. Duve, No. 20-3679-CV, 2022 WL 332804, at *3 (2d Cir. Feb. 4, 2022) (affirming trial court's grant of summary judgment on fabrication of evidence claim where witness, who plaintiff alleged police had coerced into providing false testimony, "never recanted or claimed that she lied in her interview, before the grand jury, or at trail").  Instead, Cousin reiterated he stood by the contents and accuracy of his prior

testimony.    Likewise, Cousin denied being pressured by NCPD officers to name Plaintiff as Victim's killer.[22]

ii.  Witherspoon's Identification of Plaintiff was Neither Manufactured nor Tainted by an Unduly Suggestive Procedure

A photo array is unduly suggestive "if the defendant 'meets the description of the perpetrator previously given by the witness and the other [array] participants obviously do not.'" United States v. Diaz, 986 F.3d 202, 207 (2d Cir. 2021) (quoting Raheem v, Kelly, 257 F.3d 122, 134 (2d Cir. 2001)); see also United States v. Eltayib, 88 F.3d 157, 166 (2d Cir. 1996) ("A photo array is improperly suggestive if 'the picture of an accused . . . so stood out from all of the other photographs as to suggest to an identifying witness that [that person] was more likely to be the culprit'" (quoting United States v. Thai, 29 F.3d 785, 808 (2d Cir. 1994))).  "When evaluating a photo array, fairness depends on 'the size of the array, the manner of presentation by the officers, and the array's contents.'"  United States v. Morgan, 690 F. Supp.

---

[22]  To the extent Cousin was promised inducements in exchange for truthful testimony, or was told he should help himself, such incentives, alone, do nothing to prove NCPD officers connived with Cousin to fabricate false testimony.  See United States v. Ruggles, 70 F.3d 262, 265 (2d Cir. 1995) (holding, "a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials" and, likewise, "statements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive" but are "merely common sense factual observations").

2d 274, 283 (S.D.N.Y. 2010) (quoting United States v. Concepcion, 983 F.2d 369, 377 (2d Cir. 1992)).

"Even where the photo array itself may not be suggestive, the actions or remarks of the officers and the manner in which they present the array may render an otherwise fair array impermissibly suggestive." Velazquez v. Poole, 614 F. Supp. 2d 284, 323 (E.D.N.Y. 2007). Consequently:

> In examining the procedures used by law enforcement officials, courts consider both the officer's comments in presenting the array and the manner of presentation, including whether the witness's initial identification was certain or tentative, whether there were repeated showings of a selected photograph in isolation, whether the officer reinforced an initially tentative identification by conducting a show-up or by pressuring the witness to take additional looks at the suspect, and whether the officer made suggestive comments prior to the identification.

Id. at 323-24 (internal citations omitted).

Defendant argues "[t]here is no evidence that the photo array and subsequent line-up where Witherspoon positively identified [P]laintiff was corrupt or manufactured." (Support Memo, at 22.) Defendants highlight that, today, Witherspoon maintains "NCPD detectives did not pressure her to make a selection from the photo array, and that she was confident that when she identified [P]laintiff in court, she identified Victim's murderer." (Id. at 7.)

76

Plaintiff retorts, the photo array was unduly suggestive for two reasons.  (Opp'n at 21.)  First, Plaintiff contends he was "the lightest-skinned subject" in this photo array.  (Id.)  Second, Plaintiff asserts, the seated line-up did not permit Witherspoon to take into consideration his height during her identification.[23]  (Id.)

In reply, Defendants emphasize Plaintiff's picture was included in a photo packet along with five other black, male individuals and, while the six males had "different skin complexions", this alone did not render the photo array unduly suggestive.  (Reply at 14.)  As to the seated line-up, Defendants highlight courts in this Circuit routinely find such line-ups to be legally permissible.  (Id. at 14-15.)

Having reviewed the photo-array in question, the Court finds no rational jury could conclude that: the photograph of Plaintiff was "so distinctive a component of the array as to suggest unnecessarily that [Plaintiff] must be the suspect"; and, therefore, Witherspoon's identification was impermissibly suggestive or "manufactured" by the Individual Defendants.

---

[23] Plaintiff also argues Witherspoon testified at trial that the perpetrator had prominent lips and that he has the most prominent lips out of all the individuals in the photo-array and line-up; however, Defendants correctly highlight that, at the time the photo-array was conducted, Witherspoon had described the perpetrator only as being "light-skinned" and had given his approximate height.  (See Reply at 14.)

Rather, the photo array comprises six head shots of black males who appear to be of similar age and who possess a similar build as Plaintiff.  (See Color Photo Array, Ex. V, ECF No. 385-30; see also Line-up Photos, Ex. BBB, ECF No. 386-1.)  Further, all the males have similar hairstyles, with small variations in length, and with facial hair stylized in generally the same fashion.  (Id.) While the black males are of varying skin tones, as Defendants highlight, this alone is not dispositive.  See, e.g., Robinson v. Artus, 664 F. Supp. 2d 247, 259 (W.D.N.Y. 2009) (stating "differences in complexion tones between subjects in an identification procedure, standing alon[e], does not create an unduly suggestive procedure"); see also Roldan v. Artuz, 78 F. Supp. 2d 260, 274 (S.D.N.Y. 2000) ("Differential in skin color between line[-]up participants does not violate due process.") (collecting cases).  The Court finds multiple individuals in the photo array can fairly be described as "light-skinned", such that several of the males fit the description given by Witherspoon to NCPD.[24]  See Tavarez v. LeFevre, 649 F. Supp. 526, 530 (S.D.N.Y. 1986) ("There is no requirement that a suspect in a line[-]up be surrounded by people identical in appearance."); see also Gossett

---

[24] Furthermore, the term "light-skinned" has no dictionary definition; the term, in and of itself, is subject to individual interpretation.  As such, the Court finds it was not unreasonable in this case for the NCPD Officers involved to include black males in the photo array that possessed varying degrees of lighter skin tones.

v. Henderson, 87-CV-5878, 1991 WL 135601, at *2 (S.D.N.Y. July 18, 1991) ("Police stations are not theatrical casting offices; a reasonable effort to harmonize the line-up is normally all that is required."); United States v. Porter, 430 F. Supp. 208, 211 (W.D.N.Y. 1977) ("[A]s Judge Friendly has recognized, there is no requirement that a defendant in a line[-]up must be surrounded by people nearly identical in appearance, however desirable that may be.").

Additionally, Plaintiff neither argues nor presents any evidence tending to suggest any Defendant made impermissible comments to Witherspoon or otherwise impermissibly encouraged her to identify Plaintiff.  On the contrary, when asked by Anania whether any NCPD detectives had pressurized her into picking someone from the photo-array or line-up, Witherspoon denied this was the case and stood by her trial testimony. (See Anania Dep. Tr., 134:21-135:14.)

As to the height discrepancy between Plaintiff and the fillers in the line-up, the Court agrees with Defendants that Plaintiff was not prejudiced by having all subjects be seated during the procedure.  Indeed, there is ample case law from this Circuit highlighting where, as allegedly occurred here, there are discrepancies in height between a suspect and the fillers in a line-up, a seated line-up is a permissible means of minimizing the discrepancy.  See, e.g., Stallings v. Heath, No. 11-CV-4894, 2012

WL 735399, at *11 (S.D.N.Y. Mar. 7, 2012) (collecting cases); see also Roldan, 78 F. Supp. 2d at 272-73 ("As the trial court correctly held, the fact that Roldan was taller than the other fillers was inconsequential because the line[-]up . . . was conducted in a seated position.") (collecting cases).

Since Plaintiff's fabrication claim against Alger is based solely upon the unsupported claim Alger corruptly manufactured Witherspoon's identification of Plaintiff as Victim's killer, through use of an unduly suggestive line-up procedure, the Court finds summary judgment is warranted as to him on this Count of the TAC.[25]

### iii. Plaintiff's Fabrication of Evidence Claim, as it Relates to his Allegedly Coerced Confession, Survives

"Coercion and fabrication are distinct." Thomas v. Mason, No. 17-CV-06266, 2023 WL 2709730, at *7 (N.D.N.Y. Mar. 30, 2023); see also McDonough, 2022 WL 3279348, at *24 ("There is clearly a difference between 'coercing witnesses to testify and fabricating witness testimony." (quoting Petty v. City of Chicago, 754 F.3d 416, 422 (7th Cir. 2014)). "Fabricated testimony is

---

[25] Alger was not present at the NCPD Homicide Squad when Plaintiff was being interrogated. (Defs' 56.1 Stmt. ¶ 236.) Logically, therefore, Alger could not have been complicit in the alleged fabrication of Plaintiff's confession.

testimony that is made up; it is invariably false." Thomas, 2023 WL 2709730, at *7.

The aforementioned law notwithstanding, Plaintiff's fabrication-of-evidence claim, as it relates to his confession, appears inextricably intertwined with his coercion claim in that Plaintiff essentially contends Dempsey wrote out Plaintiff's confession, which included false facts NCPD had learned from Cousin, which Dempsey and Abbondandelo coerced Plaintiff into adopting. Since the Court finds questions of fact preclude granting summary judgment on Plaintiff's coercion claim (see infra), so too, here, the Court finds Defendants' motion for summary judgment on Plaintiff's fabrication claim must be denied. To be sure, the evidence of fabrication is slight. However, viewing the evidence in the light most favorable to Plaintiff, as the Court must do at this stage, given Plaintiff's testimony he was beaten by Dempsey, and possibly Abbondandelo, during a 39-hour interrogation held in a frigid interrogation room, it would be imprudent for the Court to grant summary judgment on this claim. Likewise, if a jury credits the version of the shooting as set forth in Larrea's and Montes' and statements, those statements may support Plaintiff's contention the confession he was allegedly coerced into adopting was fabricated.

C. <u>Credibility Determinations Largely Preclude the Grant of
Summary Judgment on Plaintiff's Coercion Claim</u>[26]

1. <u>As to Dempsey and Abbondandelo</u>

"A plaintiff may bring a § 1983 coercion claim 'if
coercion was applied to obtain a waiver of the plaintiff's rights
against self-incrimination and/or to obtain inculpatory
statements, and the statements thereby obtained were used against
the plaintiff in a criminal proceeding.'" <u>Hincapie</u>, 434 F. Supp.
3d at 76 (quoting <u>Deshawn E. by Charlotte E. v. Safir</u>, 156 F.3d
340, 346 (2d Cir. 1998)).  "To establish a violation of the
accused's Fifth Amendment right against self-incrimination, '[a]
plaintiff must point to circumstances indicating that []he could
not make a knowing and voluntary decision.'" <u>Tankleff v. County
of Suffolk</u>, No. 09-CV-1207, 2017 WL 2729084, at *16 (E.D.N.Y. June
23, 2017) (quoting <u>Sedunova v. City of N.Y.</u>, 652 F. App'x 29, 31
(2d Cir. 2016)).  "The test for whether a statement was improperly
obtained by coercion is determined by the totality of the

_____

[26]  To the extent Plaintiff attempts to argue Severin and Herts
should be liable on his coercion claim, since this claim was
pleaded against Abbondandelo, Dempsey, and Kosior -- and not
Severin and Herts -- in the TAC, such arguments are disregarded.
<u>See</u> <u>Avillan v. Donahoe</u>, 483 F. App'x 637, 639 (2d Cir. 2012)
(holding, district court "did not err in disregarding allegations
[plaintiff] raised for the first time in response to [defendant's]
summary judgment motion"); <u>see also</u> <u>Wright v. Ernst & Young LLP</u>,
152 F.3d 169, 178 (2d Cir. 1998) (recognizing a party may not use
opposition to a dispositive motion as a means to amend the
complaint).

circumstances." Id. (quoting Higazy v. Templeton, 505 F.3d 161, 170 (2d Cir. 2007) (internal quotation marks and citation omitted); see also Safir, 156 F.3d at 347-48 (explaining, relevant factors to consider as part of coercion claim include, "whether Miranda warnings were properly administered or waived, whether counsel was present, whether the defendant knew the nature of the offense with which he was charged, . . . the time elapsing between arrest and the confession, . . . the characteristics of the accused[,] the conditions of interrogation and[,] the conduct of the law enforcement officials"); Thomas, 2023 WL 2709730, at *9 ("Whether a confession is a product of coercion may only be determined after a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." (quoting United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991))). "[T]he determination of whether a defendant's statement was voluntary is highly fact-specific, and no single criterion controls." United States v. Juvenile Male, 968 F. Supp. 2d 490, 505 (E.D.N.Y. 2013) (internal citations omitted) (emphasis added).

Defendants argue Plaintiff's "story surrounding his confession is unsupported by any evidence, other than his own testimony", and Plaintiff's testimony "is so preposterous that any related claims should not survive summary judgment." (Support

Memo, at 24.)  Defendants highlight the record evidence establishes Plaintiff signed a <u>Miranda</u> rights card; further, Plaintiff's claim "he did not know" what he was signing is "ludicrous given that he has signed [<u>Miranda</u> cards] in the past and has knowledge of the criminal justice system, as evidenced by his numerous prior arrests." (<u>Id.</u> at 25.)

As to Plaintiff's claims he was beaten, Defendants aver the record evidence establishes "[P]laintiff signed a form indicating he was in good health and did not suffer any injuries, and photos taken of [P]laintiff after his time in custody show <u>no signs</u> of physical injuries." (<u>Id.</u> (emphasis in original).) Defendants emphasize no medical records substantiate Plaintiff's claims of abuse, and Plaintiff made no complaints to any other officers regarding abuse. (<u>Id.</u>)  Of note, Defendants highlight numerous contradictions and inconsistent statements made by Plaintiff regarding the circumstances surrounding his confession. Defendants highlight the "plethora of evidence that supports and corroborates the [I]ndividual [D]efendants' accounts of what transpired while plaintiff was in custody when he confessed." (<u>Id.</u> at 27.)  For example, both Abbondandelo and Dempsey "detailed the chronology of [P]laintiff's time in custody at the pre-trial hearing" and Dempsey "wrote detailed notes of his conversations with the [P]laintiff." (<u>Id.</u>)  Additionally, "Mullen and Kosior testified at the pre-trial hearing detailing the chronology of

plaintiff's time in custody and Kosior testified about and detailed his interactions with plaintiff during the polygraph examination." (Id.)

In opposition, Plaintiff fails to counter any of the specific arguments laid out by Defendants; instead, he responds generally that, at the summary judgment stage, the Court must credit his testimony. (Opp'n at 24.) Indeed, "a § 1983 Plaintiff's testimony alone may be independently sufficient to raise a genuine issue of material fact." Bellamy, 914 F.3d at 746. "Corroboration, though helpful, is not essential." Adamson, 808 F. App'x at 16.

Here, although Defendants aptly highlight Plaintiff has made inconsistent and contradictory statements about the events surrounding his interrogation and ultimate confession over the years, certain key details of Plaintiff's account have remained consistent. For example, Plaintiff has maintained, inter alia, that: his confession was fabricated; he was coerced by Dempsey -- and, possibly, Abbondandelo -- into adopting the confession, with Dempsey having beaten him over the course of a 39-hour interrogation; and Plaintiff was interrogated in a frigid interrogation room without adequate clothing.[27]   Ironically, to

---

[27]   The Court has no doubt Defendants will seek to use, and will be entitled to use, these prior inconsistent statements to impeach Plaintiff's credibility at trial.   However, as is well-

discredit Plaintiff's account, Defendants rely upon their own testimonies and notes of the chronology of Plaintiff's interrogation, thus, in essence, Defendants ask the Court to make a credibility determination finding Defendants' account the more likely version of events.  Since this is improper, the Court declines to do so.  See Frost, 980 F.3d at 246 ("In the ordinary case where a district court is asked to consider the contradictory deposition testimony [or declaration] of a fact witness, . . . the general rule remains that a district court may not discredit a witness's deposition testimony [or declaration] on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury." (quoting In re Fosamax Prod. Liab. Litig., 707 F.3d 189, 194 n.4 (2d Cir. 2013)); see also Adamson, 808 F. App'x at 16 ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.")[28]

---

established, the issue of witness credibility is not for the Court to determine at summary judgment.

[28]  To the extent Defendants argue Jeffrey's permits the Court to assess Plaintiff's account, the Court declines to do so.  (See Support Memo at 24-28.)  Jeffrey's applies only "in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete." Jeffreys v. City of N.Y., 426 F.3d 549, 554 (2d Cir. 2005).  While contradictions have been identified, other key facets of Plaintiff's account have remained consistent throughout the years and a reasonable jury could forgive minor inconsistencies given the traumatic nature of the events, if they actually occurred, and the passage of time.  See Frost, 980 F.3d at 246

Consequently, the Court denies Dempsey's and Abbondandelo's request for summary judgment on this claim.

### 2. As to Kosior

The Court agrees with Defendants that Plaintiff has affirmatively waived his coercion claim against Kosior for failure to address any of the arguments put forward by Defendants as to why dismissal is appropriate as to Kosior. (See Opp'n, in toto.) Even if Plaintiff had not waived this claim, the Court would have been inclined to grant Kosior's motion on the basis the Court can discern no evidence in the record indicating Kosior participated in any alleged coercion of Plaintiff's confession. See Jackson, 766 F.3d at 198; see also Taylor v. City of N.Y., 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."); Butler, 2023 WL 5096218, at *29 n.34 (collecting cases); Patacca v. CSC Holdings, LLC., No. 16-CV-0679, 2019 WL 1676001, at *13 (E.D.N.Y. Apr. 17, 2019)) (collecting cases of courts deeming

---

("[W]here . . . 'there is a plausible explanation for discrepancies in a [witness's] testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete.'" (quoting Jeffreys, 426 F.3d at 555 n.2.)). Likewise, there has been no argument Plaintiff's account is incomplete in any way. Further, as previously identified, if certain of Plaintiff's evidence is credited, a reasonable jury could find that such evidence makes more plausible Plaintiff's claim that his confession was coerced.

an argument waived because it was not addressed in a party's opposition brief).

      D. <u>Malicious Prosecution & False Imprisonment (Claim One:</u>
<u>Abbondandelo/Dempsey/Severin; Claim Five: Nassau County</u>
<u>*Respondeat Superior*; Claim Six: Nassau County *Respondeat*</u>
<u>*Superior*</u>

To prevail on a § 1983 claim for malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law." <u>Manganiello v. City of N.Y.</u>, 612 F.3d 149, 160-61 (citations omitted). To establish the elements of malicious prosecution under New York law, plaintiff must prove: "(1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice, and (4) the matter terminated in plaintiff's favor." <u>Rentas v. Ruffin</u>, 816 F.3d 214, 220 (2d Cir. 2016) (cleaned up). "In addition to the required state law elements, to sustain a Section 1983 malicious prosecution claim, a plaintiff must show 'a seizure or other perversion of proper legal procedures implicating [his] personal liberty and privacy interests under the Fourth Amendment.'" <u>Schinella v. Salem</u>, No. 19-CV-8931, 2024 WL 643169, at *4 (S.D.N.Y. Feb. 15, 2024) (quoting <u>Lanning v. City of Glen Falls</u>, 908 F.3d 19, 24 (2d Cir. 2018) (<u>abrogated on other grounds by</u> <u>Thompson v.</u> <u>Clark</u>, 596 U.S. 36 (2022))).

To establish a claim for false imprisonment under New York law, a plaintiff must show: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." <u>Shaheed v. City of N.Y.</u>, 287 F. Supp. 3d 438, 448 (S.D.N.Y. 2018) (quoting <u>Singer v. Fulton County Sheriff</u>, 63 F.3d 110, 118 (2d Cir. 1995)).

> 1. <u>There was Sufficient Independent Evidence Linking Plaintiff to Victim's Murder Such that Defendants Had Probable Cause to Arrest and Prosecute Him</u>[29]

The existence of probable cause is a "'complete defense' to malicious prosecution.'" <u>Jeanty v. Cerminaro</u>, No. 21-CV-1974, 2023 WL 325012, at *5 (2d Cir. Jan. 20, 2023) (summary order) (quoting <u>Savino v. City of N.Y.</u>, 331 F.3d 63, 72 (2d Cir. 2003); <u>see also</u> <u>Buari v. City of N.Y.</u>, 530 F. Supp. 3d 356, 384 (S.D.N.Y. 2021) ("No claim for malicious prosecution can survive if there was probable cause for the prosecution."). This is true because "a malicious prosecution claim is rooted in the Fourth Amendment right to be free from a baseless criminal prosecution." <u>Hoyos v. City of N.Y.</u>, 999 F. Supp. 2d 375, 390 (E.D.N.Y. 2013) (citing <u>Morse v. Spitzer</u>, No. 07-CV-4793, 2012 WL 3202963, at *2-6 (E.D.N.Y. Aug. 3, 2012)). "Because a Fourth Amendment violation

---

[29] As the Court finds there was sufficient independent probable cause to arrest, and prosecute Plaintiff, it need not address other arguments made by Defendants in favor of summary judgment on Plaintiff's malicious prosecution claims.

only occurs when probable cause is lacking, the lack of probable cause to prosecute remains an essential element of a malicious prosecution claim." Morse, 2012 WL 3202963, at *4; accord McClellan v. Smith, 439 F.3d 137, 145 (2d Cir. 2006). Likewise, a confinement in the false imprisonment context is considered "privileged where the arresting officer has probable cause to arrest." Shaheed, 287 F. Supp. 3d at 448 (citing Jocks v. Tavernier, 316 F.3d 128, 135 (2d Cir. 2003)).

The relevant probable cause determination differs depending upon the stage of the criminal proceeding. For example, probable cause to arrest exists where "the historical facts, viewed from the standpoint of an objectively reasonable police officer provide knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been . . . committed by the person to be arrested." Rupp v. Buffalo, 91 F.4th 623, 638 (2d Cir. 2024) (internal citation omitted); see also Ashley v. City of N.Y., 992 F. 3d 128, 136 (2d Cir. 2021) ("Officers have probable cause when they 'have knowledge or reasonably trustworthy information or facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed . . . a crime." (quoting Jenkins v. City of N.Y., 478 F.3d 76, 84 (2d Cir. 2007))). In determining whether there was probable cause to effectuate an arrest "courts . . . are limited

to considering only the facts leading up to the arrest in determining whether probable cause exists." Caraballo v. City of N.Y., No. 21-CV-0285, 2024 WL 1332609, at *10 (Mar. 28, 2024) (citing Marcavage v. City of N.Y., 689 F.3d 98, 109 (2d Cir. 2012)).

"The probable cause standard relevant to a malicious prosecution claim is different from, but related to, the probable cause standard relevant to a false arrest claim." Id. Specifically, "[i]n a malicious prosecution action, probable cause means 'probable cause to believe that [the prosecution] could succeed.'" Id. (quoting Boyd v. City of N.Y., 336 F.3d 72, 76 (2d Cir. 2003)). Put another way, "[i]f the 'facts and circumstances . . . would lead a reasonably prudent person to believe the plaintiff guilty,' then sufficient probable cause exists." Id. (quoting Frost, 980 F.3d at 243); see also Hoyos, 999 F. Supp. 2d at 390 ("[T]he relevant probable cause determination is whether there was probable cause to believe the criminal proceeding could succeed and, hence, should be commenced.") "The existence of probable cause is measured 'as of the time the judicial proceeding is commenced (e.g., the time of the arraignment), not the time of the preceding warrantless arrest.'" Hoyos, 999 F. Supp. 2d at 390 (quoting Davis v. City of N.Y., 373 F. Supp. 2d 322, 333 (S.D.N.Y. 2005)).

At bottom, since the Court declines to grant summary judgment on Plaintiff's claims that Defendants fabricated and coerced his confession, the issue to address is whether the Defendants had probable cause to arrest, and prosecute, Plaintiff for Victim's murder _independent_ of his allegedly false, coerced confession. Discounting Plaintiff's confession, and subsequent grand jury indictment,[30] Defendants aver there, nevertheless, remained a "mountain of evidence providing ample probable cause" to arrest and prosecute Plaintiff. (Support Memo, at 9.) Specifically, Defendants highlight:

> i) eyewitness observations of Witherspoon and [Cousin]; ii) Witherspoon's statements and positive photo array identification; iii) Campbell's statement and interviews with detectives (which corroborates the direction that the suspect fled after the shooting); iv) [Cousin's] statements and videotaped interview (corroborated by Campbell's and the Isaac brother's statements); v) Roy Isaac's statement and Tyrone Isaac's statement; vii) [P]laintiff's relationship with [Friend]; [and] viii) Plaintiff's motive to murder [Victim].

---

[30] The Court agrees with Plaintiff that the Grand Jury proceedings relied upon the allegedly falsified coerced confession, and that Larrea's and Montes' statements were suppressed within the meaning of _Brady_; consequently, Defendants cannot use the Grand Jury indictment as _prima facie_ evidence of probable cause. _See_ _Savino_, 331 F.3d at 72 ("[I]ndictment by grand jury creates a presumption of probable cause that may . . . be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" (quoting _Colon v. City of N.Y._, 60 N.Y.2d 78, 83 (1983)).

(Id. (internal citations omitted).)

Plaintiff's arguments in opposition largely rely upon those previously raised and decided herein, i.e., Plaintiff's position that Defendants manufactured Witherspoon's identification of Plaintiff through use of unduly suggestive identification procedures, and that Defendants conspired with Cousin to frame Plaintiff. (See Opp'n at 33-34.)

Having already rejected Plaintiff's contentions regarding, inter alia, the photo-array, the line-up procedures, and Cousin's inculpatory statements, the Court finds the totality of the remaining evidence provided Defendants sufficient, independent, probable cause to arrest and prosecute Plaintiff. For example, Witherspoon's identifications alone arguably provided ample probable cause to arrest, especially given the sureness with which she identified Plaintiff as Victim's shooter. See, e.g., Norwood v. Mason, 524 F. App'x 762, 765 (2d Cir. 2013) ("[P]hoto identification of a person provides the police with probable cause to arrest that person, even where the identification may not be 100% reliable."); see also; Williams v. City of N.Y., No. 14-CV-7158, 2016 WL 3194369, at *4 (S.D.N.Y. June 7, 2016) ("Absent circumstances that cast doubt on the reliability of an identification, such as an unduly suggestive procedure, 'positive photo identification by an eyewitness is normally sufficient to establish probable cause to arrest.'" (quoting Celestin v. City of

N.Y., 581 F. Supp. 2d 420, 431 (E.D.N.Y. 2008)); Paige v. Moskalik,
No. 07-CV-7381, 2010 WL 6466052, at *5 (S.D.N.Y. Apr. 28, 2010)
(finding "positive photo identification by an eyewitness is
legally sufficient to establish probable cause to arrest"), report
& recommendation adopted, 2011 WL 1362120 (S.D.N.Y. Apr. 8, 2011).

Likewise, "[i]dentification of the suspect by a victim
or eyewitness can constitute, by itself, probable cause to
prosecute." Nnodimele v. Derienzo, No. 13-CV-3461, 2016 WL 337751,
at *8 (E.D.N.Y. Jan. 27, 2016) (collecting cases); see also
Williams, 2012 WL 511533, at *3 (finding probable cause to arrest
and prosecute based on at least one witness's identification of
plaintiff in line-up); Thompson v. City of N.Y., 603 F. Supp. 2d
650, 658 (S.D.N.Y. 2009) (finding probable cause to arrest and
prosecute based on single witness's identifications of plaintiff
in line-up and photo array); Rodriguez, 1996 WL 197749, at *2
(finding probable cause to arrest and prosecute based on
identification of plaintiff by two eyewitnesses).

Cousin's statements, elicited by Defendants,
corroborated Witherspoon's identifications; Cousin's statements
also provided independent probable cause to arrest and prosecute
Plaintiff. Indeed, "[i]t is well-established that a law
enforcement official has probable cause to arrest if he received
his information from some person, normally a putative victim or
eyewitness, unless the circumstances raise doubt as to the person's

94

veracity." Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (quoting Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000) (internal citations omitted)). Likewise, the sworn statement of an eyewitness "who testifie[s] that [he was an] accomplice[] to the crimes for which the plaintiff[] [was] arrested [can] . . . establish . . . probable cause to arrest the plaintiff[] for those crimes." Daniels v. D'Aurizo, 564 F. Supp.2d 194, 198 (W.D.N.Y. 2008); see also United States v. Agapito, 620 F.2d 324, 333 (2d Cir. 1980) (holding, "[a] statement against penal interest, especially one that is consistent with all other known information, is more reliable than a statement which seeks to exculpate a person charged with [a] crime" and, consequently, can establish probable cause for the arrests of those persons implicated).

Cousin's role in the murder was corroborated by Tyrone Isaac's statement, thereby bolstering the veracity of Cousin's testimony. Tyrone Isaac also corroborated Victim left the party with Witherspoon, thereby fortifying the veracity of her account of the murder. Additionally, Roy Isaac independently provided statements linking Plaintiff to Victim's shooting, including statements by Plaintiff to Roy Isaac that Plaintiff wanted to "get" Victim for snitching on Friend; and that Plaintiff had "handled" his beef with Victim. Such statements of motive provided further probable cause to arrest and prosecute Plaintiff. See Green v.

City of N.Y., No. 06-CV-3942, 2008 WL 4394679, at 1 (E.D.N.Y. Sept. 23, 2008) ("[E]yewitness identifications, combined with evidence of motive, provided probable cause for the arrest of plaintiff."); see also Moreno v. City of New Haven Dept. of Police Servs., 604 F. Supp. 2d 364, 375 (D. Conn. 2009) (finding, "photo identifications by . . . eyewitnesses" together with "motive witness" sufficient to establish probable cause to arrest and prosecute).

Hence, given the extensive nature of the remaining independent evidence in this case, which provided Defendants with ample, independent, probable cause to arrest and prosecute Plaintiff, the Court finds Plaintiff's malicious prosecution and false arrest claims fail as a matter of law.[31]

---

[31] Since summary judgment is granted on Plaintiff's malicious prosecution claim, the Court does not analyze Defendants' qualified immunity defense. To the extent Defendants argued qualified immunity should shield them from liability for Plaintiff's fair trial claims (fabrication of and coercion of his confession), the Court finds it does not. See Ricciuti, 124 F.3d at 130 (reversing trial court's grant of summary judgment on fabrication claim because "defendant police officers are not entitled to summary judgment on the ground of qualified immunity . . . where, as here, the action violates an accused's clearly established constitutional rights, and no reasonably competent police officer could believe otherwise"); Ying Li v. City of N.Y., 246 F. Supp. 3d 578, 642 (E.D.N.Y. 2017) (finding qualified immunity unavailable where plaintiff had "sufficiently demonstrated potential violations of her constitutional right to be free from prosecution based on fabricated or suppressed exculpatory evidence" and "[t]hose rights were clearly established at the time of her prosecution and pretrial detention, such that no reasonable officer could believe that fabricating evidence or suppressing exculpatory evidence is constitutional"); Blake v.

E. *Monell* Liability

    1. <u>Plaintiff's Failure-to-Train Claim Must Fail Because Plaintiff Proffers No Deficiencies in Any of the County's Training Programs for Officers</u>

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." <u>Connick v. Thompson</u>, 563 U.S. 51, 61 (2011) (citing <u>Okla. City v. Tuttle</u>, 471 U.S. 808, 822-23 (1985)). Nevertheless, the "inadequacy of police training may serve as the basis for § 1983 liability" if "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 388 (1989). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." <u>Connick</u>, 563 U.S. at 61 (citing <u>Bd. of County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 410 (1997)). The Second Circuit has identified three requirements to determine whether a "failure to train . . . constitutes deliberate indifference." <u>Jenkins v. City of N.Y.</u>, 478 F.3d 76, 94 (2d Cir. 2007) (citing <u>Walker v. City of N.Y.</u>, 974 F.2d 293, 297 (1992)). The plaintiff must show:

<u>Race</u>, 487 F. Supp. 2d 187, 214 (E.D.N.Y. 2007) ("The [Second Circuit] found qualified immunity unavailable because conspiring to fabricate and forward to prosecutors a known false confession 'violates an accused's clearly established constitutional right, and no reasonably competent police officer could believe otherwise.'" (quoting <u>Ricciuti</u>, 124 F. 3d at 130))).

> [f]irst . . . that [the] policymaker knows to a moral certainty that her employees will confront a given situation . . . [;] Second, . . . the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation.  Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

Id. (internal citations and quotation marks omitted). "Additionally, to prevail on a failure-to-train claim, a plaintiff must 'identify a specific deficiency in the city's training program and establish that that deficient is closely related to the ultimate injury, such that it caused the constitutional deprivation.'" Alwan v. City of N.Y., 311 F. Supp. 3d 570, 579 (E.D.N.Y. 2018) (quoting Wray v. City of N.Y., 490 F.3d 189, 196 (2d Cir. 2007)).

Although Plaintiff's TAC appears to allege Monell liability based upon, inter alia, an alleged failure of the County to properly train its officers to conduct constitutional investigations pursuant to probable cause, Plaintiff's Opposition contains no argument or discussion as to how the record evidence supports this theory.  It is undisputed NCPD detectives receive official training and instruction on conducting constitutionally permissible investigations.  For example, officers promoted to detective receive 69 hours of additional instruction and training

"which includes the Criminal Investigator Course as outlined by the Division of Criminal Justice Services." (Defs' 56.1 Stmt. ¶ 347.) Detectives also receive training specifically devoted to custodial interrogation, and this course is updated periodically to reflect changes in the law. (See supra, Part I.G.) Plaintiff identifies no deficiencies in any of these training programs (see, e.g., Opp'n, in toto); for that reason, to the extent his Monell claim is based upon a failure to train, it must fail. See Alwan, 311 F. Supp. 3d at 580 (granting summary judgment where plaintiff failed to produce "evidence of any deficient or absent training program" related to the complained-of constitutional violation, and stating plaintiff could not "show that the City acted with deliberate indifference in failing to train its police officers"); Green v. City of N.Y., 465 F.3d 65, 81 (2d Cir. 2006) (affirming grant of summary judgment on failure-to-train claim where plaintiff "ha[d] not identified a specific deficiency in the [city's] training program that account[ed] for his unlawful arrest", and observing, "[t]he mere fact that [plaintiff] was falsely arrested, without more, does not show that the City's training program is inadequate" because "[a] training program is not inadequate merely because a few of its graduates deviate from what they were taught"); Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 130 (2d Cir. 2004) (affirming grant of summary judgment on failure-to-train claim where plaintiffs "proffered no evidence

99

of the Town's training programs or advanced any theory as to how a training deficiency caused the police officers to use excessive force at the second demonstration").

> 2. Plaintiff Proffers No Evidence the County was Deliberately Indifferent to the Need to Properly Supervise and/or Discipline its Officers

Failure to supervise or discipline may "also serve as a basis for § 1983 liability where 'policymakers [are] knowingly and deliberately indifferent to the possibility that its police officers [are] wont to violate the constitutional rights of [individuals]." R.A. v. City of N.Y., 206 F. Supp. 3d 799, 803 (E.D.N.Y. 2016) (quoting Amnesty Am., 361 F.3d at 127 (emphasis and alterations in original)). "Under the failure to supervise or discipline theory, a plaintiff must show that 'the municipality failed to adequately supervise or discipline its employees (thereby implicitly encouraging or ratifying their unlawful conduct) . . . [and] that such a failure of supervision or discipline was tantamount to deliberate indifference.'" Buari v. City of N.Y., 530 F. Supp. 3d 356, 399 (S.D.N.Y. 2021) (quoting Alwan v. City of N.Y., 311 F. Supp. 3d 570, 578 (E.D.N.Y. 2008) (alteration in original)). To demonstrate deliberate indifference, a plaintiff "must show that the need for more or better supervision to protect against constitutional violations was obvious." Vann v. City of N.Y., 72 F.3d 1040, 1049 (2d Cir. 1995) (citing Canton, 489 U.S. at 390). Such obvious need may be

100

proven "through proof of repeated complaints of civil rights violations." Id. "[D]eliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." Alwan, 311 F. Supp. 3d at 580 (quoting Vann, 72 F.3d at 1049). "The municipality's failure to take action must constitute 'deliberate indifference, rather than mere negligence or bureaucratic inaction.'" Id. (quoting Amnesty Am., 361 F.3d at 128).

As an initial matter, Defendants argue Plaintiff's use of civil rights complaints which post-date Plaintiff's conviction "cannot be used to establish notice for Monell liability." (Support Memo, at 31.) Defendants next emphasize, "a search was conducted of the County's records regarding complaints made between 1974 and 1994 to the NCPD alleging coercive interrogation tactics by homicide detectives" and only a singular complaint was located. (Id. at 31-32.)

Plaintiff counters, "[i]n short, there is ample evidence for a jury to find that despite clear notice of ongoing constitutional violations, Nassau County buried its head, refusing to investigate or discipline its homicide detectives for blatantly unconstitutional conduct, . . . effective[ly] ratifying their misconduct." (Opp'n, at 37.) Plaintiff fails to support his conclusory assertion with evidence. However, the Court gleans

from Plaintiff's Rule 56.1 Statement of Additional Facts that his Monell claim is premised upon civilian complaints made against Dempsey in other cases, together with newspaper clippings detailing alleged complaints against Dempsey.  Yet, as it has been consistently throughout Plaintiff's Opposition, Plaintiff neither identifies the alleged Dempsey complaints in his Opposition, nor explains his theory as to why these complaints support his position.  (See Opp'n, in toto); see also Genova v. County of Nassau, No. 17-CV-4959, 2020 WL 813160, at *9 n.1 (E.D.N.Y. Feb. 19, 2020) ("[T]he requirements of Local Rule 56.1 were instituted, in part, to obviate burdening the courts with the onerous task of hunting through voluminous records for evidence supporting a nonmovant's opposition." (citing Patacca, 2019 WL 1676001, at *17) (ruling it is "not the role of the Court to search the summary judgment record for evidence supporting" a party's position (citations omitted)), aff'd, 851 F. App'x 241 (2d Cir. 2021).

In any event, upon the record presented, the Court finds summary judgment is warranted on Plaintiff's Monell claim based upon the theory of failure-to-supervise.  To the extent Plaintiff seeks to establish notice through the use of cases involving Dempsey which post-date Plaintiff's conviction, such cases do not establish the County was on notice of the "obvious" need "for more or better supervision to protect against constitutional violations."  Rodriguez v. City of N.Y., 607 F. Supp. 3d 285, 299

(E.D.N.Y. 2022) (denying reconsideration of dismissal of plaintiff's failure-to-supervise claim where "all but three of the decisions the plaintiff cite[d]" to support his theory "post-date[d] his May 1990 conviction"); see also Collins, 923 F. Supp. 2d at 479 (granting motion to dismiss where "the litany of other police-misconduct cases are insufficient to make a plausible case for Monell liability" because, inter alia, they "post-date[d] [plaintiff's] conviction"); Mosca v. City of New York, No. 17-CV-4327, 2018 WL 6835524, at * 15 (E.D.N.Y. Dec. 26, 2018), report & recommendation adopted in relevant part, 2019 WL 938936, at *8-10 (S.D.N.Y. Feb. 25, 2019) ("In order to plausibly allege a pattern of similar violations, a complaint must reference comparable incidents that occurred prior to the events in question and cannot rely on events that post-date the subject act of alleged misconduct"); cf. Alwan, 311 F. Supp. 3d at 584 ("[D]eliberate indifference may be inferred if [prior complaints of misconduct] are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents" (quoting Vann, 72 F.3d at 1049 (emphasis in original).

Likewise, while the newspaper articles Plaintiff relies upon to establish Dempsey's misconduct may be admissible to show notice to the County of allegations of misconduct, they fail to establish deliberate indifference on the part of the County. See R.A. v. City of N.Y., 206 F. Supp. 3d 799, 804 (E.D.N.Y. 2016)

103

("[N]ewspaper articles establish only that other individuals have experienced similar violations of their constitutional rights as Plaintiffs allege here, not that the violations underlying those actions actually occurred." (citing <u>Simms v. City of N.Y.</u>, 480 F. App'x 627, 630 (2d Cir. 2012))); <u>see also</u> <u>Ladner v. City of N.Y.</u>, 20 F. Supp. 2d 509, 519 (E.D.N.Y. 1998) (finding "newspaper article[s] [are] inadmissible hearsay and unusable to defeat summary judgment"); <u>Carter v. District of Columbia,</u> 795 F.2d 116, 123 (D.C. Cir. 1986) (Ginsburg, C.J. & Bork, C.J.) ("Plaintiffs urge us to include and consider, . . . <u>inter alia</u>, bare complaints, pleadings, and press clippings, unsubstantiated by testimony, concerning alleged incidents of the use of excessive force by police officers. As the district court recognized, these hearsay items could show no more than notice to the city that allegations had been made. The items were admitted for that limited purpose, and 'not for the purpose of establishing the truth of those [allegations.]' . . . We therefore cull out such items as failing to show actual, as distinguished from merely alleged, occurrences.").

In view of the foregoing, the Court grants summary judgment to the County on Plaintiff's <u>Monell</u> claims.

F. <u>Failure to Intervene (Claim Nine: All Individual Defendants)</u>

All law enforcement officers "have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." <u>Anderson v. Branen</u>, 17 F.3d 552, 557 (2d Cir. 1994). To succeed on a failure-to-intervene claim, a plaintiff must demonstrate: "[i] the officer had a realistic opportunity to intervene and prevent the harm; [ii] a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and [iii] the officer d[id] not take reasonable steps to intervene." <u>Guerrero v. City of N.Y.</u>, No. 16-CV-0516, 2017 WL 2271467, at *3 (S.D.N.Y. May 23, 2017). "Obviously, a person who is held liable under a theory of direct participation in the constitutional violation cannot also be held liable for a failure to intervene." <u>Rizk v. City of N.Y.</u>, 462 F. Supp. 3d 203, 226 (E.D.N.Y. 2020).

1. <u>Plaintiff May Plead Failure to Intervene in the Alternative as to Dempsey, Abbondandelo, Kosior and Severin</u>

Defendants first argue: "Since plaintiff alleges that . . . Dempsey, Abbondandelo, Kosior, Alger, and Severin[] are liable under a direct theory of participation for fabricating evidence . . . [and] coercing plaintiff", Plaintiff should be barred "from making any claims against those individual defendants

105

for failing to intervene." (Support Memo, at 34.) The Court declines to grant summary judgment on Plaintiff's failure-to-intervene claim against these Defendants on this basis. See Rizk, 462 F. Supp. 3d at 226 (recognizing legal principle that "individual law enforcement officers may not be held liable for failure to intervene where they are liable under a direct theory of participation," but nevertheless denying summary judgment since "plaintiffs are permitted to plead in the alternative" (internal citations omitted)).

### 2. Plaintiff's Failure to Respond to Defendants' Arguments as to Holland, Herts, and Swenson, Constitutes Waiver of Those Claims

Defendants argue, "[w]ith respect to plaintiff's claims of fabrication of evidence and coercion for plaintiff's confession, there is no evidence that Holland, Herts or Swenson violated [Plaintiff's] rights." (Support Memo, at 35.) Defendants highlight, Swenson testified he did not recall whether he was present while Plaintiff was in custody at NCPD Homicide. (Id.) Likewise, Defendants maintain "Holland was not present at the NCPD Homicide Squad while [P]laintiff was in custody." (Id.) Regarding Herts, Defendants assert he "was in and out of the NCPD Homicide Squad and did not see [P]laintiff's constitutional rights being violated." (Id.) Regarding the suppression of Larrea's and Montes' statements, Defendants assert "Holland and Herts gave Abbondandelo the Montes[] and Larrea[] statements" for inclusion

in the case file, and that Abbondandelo, as per his testimony, left the case file with NCDA.

Considering Defendants' evidence in support of their Summary Judgment Motion as to Holland, Herts, and Swenson on this claim, and Plaintiff's affirmative choice not to present any theory or evidence in opposition (see Opp'n, in toto), which is deemed to be an abandonment of this claim, the Court grants summary judgment in favor of Holland, Herts, and Swenson on Claim Nine of the TAC. See Jackson, 766 F.3d at 198; see also Taylor, 269 F. Supp. 2d at 75.

> 3. Summary Judgment is Appropriate as to Alger Since Witherspoon's Identification of Plaintiff was Not the Product of an Unduly Suggestive Line-Up

The Court finds summary judgment should be granted in Alger's favor on Claim Nine, as well. "[A] failure to intervene claim is contingent upon the disposition of the [underlying] primary claims." Levy v. City of N.Y., 935 F. Supp. 2d 575, 594 (E.D.N.Y. 2013). As Defendants argue, Alger was not present at NCPD Homicide Squad at the time Plaintiff was interrogated regarding, and confessed to, Victim's murder. (See Support Memo, at 36.) Plaintiff's claims against Alger were premised on the now-dismissed claim of evidence fabrication in relation to the Witherspoon line-up. Since the Court has found neither the photo-array nor the line-up were unduly suggestive, and because Plaintiff's failure to intervene claim against Alger was

contingent on his fabrication claim, Plaintiff's failure-to-intervene claim against Alger must fail. Moreover, Plaintiff failed to address any of Defendants' arguments in favor of granting summary judgment to Alger on this claim; such failure is deemed Plaintiff's abandonment of this claim as to Alger, warranting judgment entering in Alger's favor upon said claim. See, e.g., Butler, 2023 WL 5096218, at *29 n.34; Patacca, 2019 WL 1676001, at *13.

[Remainder of page intentionally left blank]

CONCLUSION[32]

For the stated reasons, **IT IS HEREBY ORDERED that** Defendants' Summary Judgment Motion (ECF No. 385) is GRANTED IN PART AND DENIED IN PART.[33]  Specifically:

1. Defendants' Motion for Summary Judgment on Plaintiff's § 1983 Malicious Prosecution Claim (Count One) is GRANTED;

2. Defendants' Motion for Summary Judgment on Plaintiff's Fabrication of Evidence Claim (Count Two) is GRANTED as to Alger, but otherwise DENIED;

3. Defendants' Motion for Summary Judgment on Plaintiff's § 1983 Coercion Claim (Count Three) is GRANTED as to Kosior but otherwise DENIED;

4. Defendants' Motion for Summary Judgment on Plaintiff's Monell Failure to Supervise or Train Claim (Count Four) is GRANTED;

---

[32] To the extent either party made an argument that was not explicitly addressed herein, such argument was deemed to have been rendered moot, and/or was considered by the Court but found to be without merit.

[33] Finally, the Court sua sponte dismisses all Plaintiff's claims against the John and Jane Doe Defendants.  "Courts typically refrain from dismissing suits against John Doe defendants until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials."  Cruz v. Fischer, 175 F. Supp. 3d 33, 37 (W.D.N.Y. 2016) (internal quotation marks and citation omitted).  Here, despite having had ample opportunity to learn the identities of the John and Jane Doe defendants, Plaintiff has not proposed substituting any of the John and Jane Doe defendants with a named defendant.  Accordingly, the John and Jane Doe defendants are dismissed.

5. Defendants' Motion for Summary Judgment on Plaintiff's State Law Malicious Prosecution Claim (Count Five) is GRANTED;

6. Defendants' Motion for Summary Judgment on Plaintiff's State Law False Imprisonment Claim (Count Six) is GRANTED;

7. Defendants' Motion for Summary Judgment on Plaintiff's § 1983 Conspiracy Claim (Count Seven) is GRANTED;

8. Defendants' Motion for Summary Judgment on Plaintiff's Evidence Suppression/Brady Violations/Spoliation & Denial of Access to Courts Claim (Count Eight) is GRANTED in PART to the extent the Motion is GRANTED as to the Spoliation and Denial of Access to Court's Claims and DENIED as to the Brady Claim related to alleged suppression of Larrea's and Montes' statements; and

9. Defendants' Motion for Summary Judgment on Plaintiff's Failure to Intervene Claim is GRANTED in part as to Holland, Herts, Swenson, and Alger but otherwise DENIED.

**IT IS FURTHER ORDERED** that the parties are directed to file their joint proposed pre-trial order, on or before November 20, 2024.

**IT IS FURTHER ORDERED** that the parties are directed to file a letter, on or before September 27, 2024, advising the Court as to whether a settlement conference before the Magistrate Judge would be productive.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: September 20, 2024
      Central Islip, New York

111